**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Jeffrey D. Prol, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtors and*
*Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| Duro Dyne National Corp., *et al.*[1] | Case No. 18 –     (     ) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF RANDALL S. HINDEN
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

 Randall S. Hinden, pursuant to 28 U.S.C. § 1746, declares as follows:

 1. I am the Chief Executive Officer of Duro Dyne National Corporation ("Duro

Dyne") and of each of the affiliated debtors and debtors–in–possession (together, the "Debtors"

or the "Company").

 2. I have been an officer of the Debtors for more than 25 years, and as such, I am

familiar with the Company's business and financial affairs. I am responsible, together with the

other members of the Company's senior management team for, among other things, devising and

implementing strategies for the Company, including, *inter alia*, (i) understanding and shaping the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax
identification number, are: Duro Dyne National Corp. (4664); Duro Dyne Machinery Corp. (9699); Duro
Dyne Corporation (3616); Duro Dyne West Corp. (5943); and Duro Dyne Midwest Corp. (4662).

business and financial affairs of the Company; (ii) developing a cash flow analysis and assessing

the current liquidity position of the Company; (iii) exploring and implementing various

restructuring strategies for the Company; and (iv) serving as a contact with the Company's

creditors and vendors. I am also familiar with the Company's books and records, and I have

extensive knowledge of the Company and its day-to-day operations and business affairs,

including its assets, liabilities, historical operations, and future plans.

3.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary

petition (collectively, the "Chapter 11 Cases") for relief under chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of

New Jersey. In accordance with the relevant resolutions and/or authorizations filed

simultaneously with the Chapter 11 Cases, I have been authorized to submit this Declaration in

support of the applications and motions (each a "First Day Pleading" and collectively, the "First

Day Pleadings") filed as of the Petition Date.[2]

4.     I have reviewed the First Day Pleadings or have otherwise had their contents

explained to me and, to the best of my knowledge and insofar as I have been able to ascertain

after reasonable inquiry, I believe that approval of the relief requested therein is necessary to

minimize disruption to the Company's business operations, permit an effective transition into

chapter 11, and preserve and maximize the value of the Debtors' estates.

5.     Except as otherwise indicated, all facts set forth in this Declaration are based upon

my personal knowledge of the Company's business operations, my review of relevant

documents, information provided to me or verified by other managers, employees or the

Company's professional advisors, including Lowenstein Sandler LLP ("Lowenstein Sandler")

---

[2]     Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them
in the Debtors' Prenegotiated Plan of Reorganization filed simultaneously herewith (the "Plan").

and Getzler Henrich & Associates, LLC ("Getzler"), and/or my opinion based upon my experience, and/or knowledge and information concerning the Company's financial records and the industry as a whole. Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change. If I were called upon to testify, I would testify competently to the facts set forth herein.

6.      The Company intends to operate its business and manage its properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As set forth in detail below, the primary purpose of these Chapter 11 Cases is to address the Company's asbestos liability issues which arise out of products sold by the Company in the 1950's to 1970's.

## I.      COMPANY BACKGROUND

### A.      The Company's Business and Corporate Structure

7.      The Company was founded in 1952 by my father Milton Hinden, and originally conducted business under the name Duro-Dyne Corporation. Over the span of 60 years, the Company has evolved into the leading manufacturer of sheet metal accessories and equipment for the heating, ventilating, and air conditioning (HVAC) industry.

8.      Duro Dyne is a holding company whose primary asset is all of the issued and outstanding capital stock of the other Debtors. Duro Dyne is owned by members of the Hinden family and various trusts for the benefit of Hinden family members. The Company's operations are conducted through Duro Dyne Machinery Corp ("Duro Dyne Machinery"), Duro Dyne Corp. ("Duro Dyne Corp."), Duro Dyne Midwest Corp. ("Duro Dyne Midwest") and Duro Dyne West Corp. ("Duro Dyne West").

9.      The Company has sales offices and over 200,000 square feet of manufacturing and warehousing facilities in Trenton, New Jersey, Bay Shore, New York, Fairfield, Ohio and Fontana, California (Los Angeles area). The Company leases its Bay Shore, New York and

Fairfield, Ohio facilities from non-debtor affiliates.    In addition to the US operations, the

Company has a Canadian affiliate located in Quebec[3] and a licensee that manufactures under the

Duro Dyne label in the United Arab Emirates.

**B.     The Debtors' Business Operations**

10.    Duro Dyne Machinery manufactures machines for the sheet metal industry which

are sold to third party customers by the affiliated Debtors. Duro Dyne Corp. manufactures and

sells sheet metal parts and tools on the east coast of the United States. Duro Dyne Midwest

manufactures and sells sheet metal parts in the midwestern part of the United States, and Duro

Dyne West sells sheet metal parts and tools on the west coast of the United States.  The Debtors

operate as a consolidated and integrated entity.

11.    In addition to manufacturing, the Company also engages in the research and

development of HVAC products.  The Company's extensive research and development program

has introduced more new products and processes than any other company in this industry, and its

ingenuity and technical advances are unmatched in the industry.  The Company's innovations

continue to lead to the development of an increasing number of diverse items in their product

line.   The Flexible Duct Connector, the Vane Rail, FGMH Auto Shift Multi-Head Pinspotter

System, and Blade Kits for multi-blade dampers were originally developed by the Company.

Other products that have now become standard in the sheet metal fabrication field such as self-

drilling sheet metal screws were likewise developed by the Company.  The Company's products

also include, among other things, manual and mechanical air dampers, multi-zone control

---

[3] Duro Dyne Corp. owns all the stock of Duro Dyne Canada Inc., a Canadian corporation, which
manufactures and distributes the most complete line of sheet metal accessories and equipment for the
heating, ventilating and air conditioning industry in Canada.  Duro Dyne Canada is not a Debtor in these
proceedings.

systems, ductwork suspension kits, insulation fasteners, ductwork connecting systems, sealants, and the machinery and tools needed for installation of these products.

12.     The Company sells its products to national, regional and independent HVAC distributors as well as HVAC equipment manufacturers. The distributors stock and sell Duro Dyne's products to HVAC contractors and other end users.

13.     The Company employs approximately 170 people with sales and distribution channels throughout the United States, Canada and internationally.  The Company will, from time to time, supplement its production, shipping and accounting workforces with temporary employees.

14.     Within the Debtors' workforce are employees who are or were members of several different unions. Approximately 27 employees of Duro Dyne Midwest are currently members of the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART"), Local Union No. 24 of the Sheet Metal Workers' International Union.  However, in November 2017, the New York members of the Warehouse & Production Employees Union, AFL-CIO, Local Union 210 ("Local 210") voted to decertify Local Union 210.  Prior to June 2018, Duro Dyne West operated a warehouse in Fontana, California which employed six members of SMART Local Union No. 170 of the Sheet Metal Workers' International Union. Those operations were closed and the employees were terminated on June 15, 2018.

C.     **The Debtors' Sales**

15.     Prior to the first quarter of 2018, the Company's sales and profits rose steadily as steel prices fell to historic lows and construction activity improved significantly.  Most recently, in 2017, the Company's sales were approximately $69 million, and earnings before interest, taxes, depreciation and amortization ("EBITDA") was approximately $5.2 million after adjustments for legal and other fees related to the Company's asbestos and insurance issues,

which are discussed further below. Steel prices rose throughout 2017 due to the strongest increase in worldwide steel demand since 2013, which directly impacted the Company's gross margins.  In 2018, steel prices increased dramatically due to uncertainty regarding potential U.S. tariffs on imported steel, with some of the Company's steel vendors raising prices by as much as 25%.  To offset this increase in steel costs, the Company announced a price increase effective May 1, 2018. The Company remains profitable and estimates that sales and EBITDA (after adjusting for costs related to this bankruptcy proceeding) for 2018 will be approximately $73.6 million and $5.2 million, respectively.

**D.      The Debtors' Prepetition Financing**

16.      Duro Dyne is party to a Revolving Credit Note dated February 3, 2013 (as amended) and a security agreement with a non-debtor affiliate, 4 Site, LLC (the "Prepetition Lender") pursuant to which the Prepetition Lender extended a revolving credit facility to Duro Dyne in the maximum principal amount up to $5 million (the "Prepetition Loan").    The Prepetition Loan is secured by a security interest in all of Duro Dyne's personal property.  The Prepetition Loan is also guaranteed and secured by a lien on all assets of Duro Dyne, Duro Dyne Machinery, Duro Dyne Midwest and Duro Dyne West, including accounts receivable, inventory, equipment, and general intangibles.  As of the Petition Date, the total outstanding balance due on the Prepetition Loan is approximately $1,290,000.

17.      As discussed more fully in the Debtors' cash collateral motion, the Prepetition Lender has consented to the Debtors' use of cash collateral, subject to certain agreed upon terms and conditions. The Prepetition Lender has also agreed to a carve-out to fund the administrative costs of these Chapter 11 Cases.

18.     The Debtors lease certain real estate, machinery and equipment from non-debtor affiliates.   Rent payments and other obligations due under these leases are paid in the ordinary course of business.  The Debtors' liabilities to non-debtor related parties include:

| Lessor | Property | Agreement Date | Monthly Payment | Maturity Date |
|--------|----------|----------------|-----------------|---------------|
| PRO4MA | Equipment | 8/1/2005 | $12,328.37 | 12/31/2019 |
| PRO4MA II | Equipment | 6/27/2006 | $3,618.28 | 5/31/2018 |
| ISWR Ohio | Real Property | 1/8/2011 | $16,258.73 | 7/31/2021 |
| Spence | Real Property | 6/1/2015 | $82,546.42 | 5/312020 |

19.     As of the Petition Date, the Debtors owed approximately $7.6 million on an unsecured basis to trade creditors, including approximately $2.6 million in 503(b)(9) claims.

**E.     History of the Debtors' Asbestos Litigation**

20.     The primary reason for the filing of the Debtors' Chapter 11 Cases is the need to address the Company's asbestos liability. As of the Petition Date, the Company has been named as a defendant in approximately 956 pending personal injury cases stemming from alleged asbestos exposure.   Prior to the Petition Date, the Company settled more than 650 asbestos claims that had been filed against them and obtained dismissals of more than 8,100 asbestos claims.   These claims have been asserted in various jurisdictions, including California, New York, Michigan, Illinois, Massachusetts, Missouri, and West Virginia.

21.     The alleged asbestos liability arose as a result of the Company having sold products that allegedly contained asbestos beginning in approximately 1952 until about 1978. Among the asbestos based products that the Company is alleged to have sold are a flexible duct connector and a sealant manufactured by Bordon Chemical. In addition, the Company is alleged

to have sold fibers or asbestos containing products purchased from Ray Bestos Manhattan, US Rubber, Uniroyal, and HK Porter, among other companies.

22.     Since the first asbestos claims were filed against the Company in 1988, the Company has worked with its insurance carriers to seek dismissal of a large portion of the claims and to settle the remaining claims in advance of trial.

23.     At the rate the asbestos claims were being filed and settled by the Company and its insurance carriers, it originally appeared that the Company would be able to address all of the claims through proceeds of insurance and cash flow from operations.  However, in recent years, the Company has been forced to bear an increasing share of settlements and defense costs due to the insolvency of one of the Company's insurance carriers, the exhaustion of the Company's primary insurance coverage, and disputes with insurance carriers providing excess level coverage.

**F.     Prepetition Settlement Negotiations**

      **i.     The Ad Hoc Committee Representing Current Asbestos Personal Injury Claim Holders**

24.     In the spring of 2015, counsel for the Company began discussions with plaintiffs' counsel who represent numerous current holders of Asbestos Personal Injury Claims against the Company in order to explore the feasibility of and the potential for a prenegotiated Chapter 11 plan of reorganization that would include an Asbestos Trust and a channeling injunction pursuant to section 524(g) of the Bankruptcy Code.  Plaintiffs' counsel, without the involvement of the Company, formed an ad hoc committee (the "Ad Hoc Committee") for the purpose of negotiating the terms of a possible plan of reorganization.

25.     The members of the Ad Hoc Committee were:  Brayton Purcell LLP; Cooney and Conway; Early, Lucarelli, Sweeney & Meisenkothen; Ferraro & Associates, P.A.; Gori Julian & Associates, P.C.; Simmons Hanley Conroy; and Weitz & Luxenberg, P.C.

26.     The Ad Hoc Committee selected the law firm of Caplin & Drysdale, Chartered as its bankruptcy counsel, the law firm of Gilbert, LLP as its insurance counsel, and Charter Oak Financial Consultants, LLC as its financial advisors.

### ii.    The Pre-Petition Future Claimants' Representative

27.     The Company and the Ad Hoc Committee determined that it was necessary and appropriate to engage an independent third-party representative (the "Pre-Petition Future Claimants' Representative") for the purpose of protecting the rights of persons that might subsequently assert asbestos-related personal injury or wrongful death claims against the Company.

28.     In conducting its search for possible candidates to serve as Pre-Petition Future Claimants' Representative, the Company and the Ad Hoc Committee focused on persons with reputations of high integrity and with recognized experience and expertise in dealing with mass torts, particularly asbestos, and who would not have any actual or perceived conflict of interest. Lawrence Fitzpatrick was ultimately selected to serve as the Pre-Petition Future Claimants' Representative and, if appointed by the Court, to continue to serve as the postpetition legal representative for all holders of Demands pursuant to section 524(g) of the Bankruptcy Code (the "Legal Representative").  This selection was based on Mr. Fitzpatrick's reputation for integrity, renown in the field of complex mass tort proceedings, and extensive experience with asbestos-related personal injury litigation.  Mr. Fitzpatrick has served as Vice President, Law for the Asbestos Claims Facility and the President and Chief Executive Officer of the Center for Claims

Resolution, Inc., which handled asbestos related claims on behalf of their member companies and their insurers from 1986 to 1998.  Mr. Fitzpatrick has also served as the future claims' representative in numerous large and complex asbestos bankruptcy cases. Mr. Fitzpatrick's extensive expertise in this field is detailed in the Debtors' Motion for an Order Appointing a Legal Representative for Future Asbestos Personal Injury Claimants Effective as of the Petition Date, filed herewith.

29.     Prior to assuming the role of Pre-Petition Future Claimants' Representative, Mr. Fitzpatrick had no association or relationship with, or other connection to, the Company or any of its affiliates and had never represented any plaintiff, defendant, or insurer in any asbestos-related litigation involving the Company.

30.     Mr. Fitzpatrick selected Young, Conaway, Stargatt & Taylor LLP as his counsel.

**iii.     Due Diligence and Plan Negotiations**

31.     The Ad Hoc Committee and the Pre-Petition Future Claimants' Representative, personally and/or through their various representatives, have conducted extensive due diligence concerning the background, nature, and scope of the Company's liability for Asbestos Claims. This investigation has included, among other things, careful review of the facts concerning the Company's historical involvement with asbestos; the nature and extent of past and pending asbestos litigation against the Company, including the types of claims asserted and the legal issues raised; the projected value of present and future Asbestos Claims and Demands; and the extent to which insurance and other assets may be available to satisfy these liabilities in whole or in part.  The Ad Hoc Committee and the Pre-Petition Future Claimants' Representative have also examined the potential for recovery by claimants asserting asbestos-related claims against affiliates of the Company based upon a variety of legal theories, including derivative liability theories such as alter ego, successor liability, and/or fraudulent conveyance.

32.     Following extensive due diligence, representatives of the Company, the Ad Hoc Committee and the Pre-Petition Future Claimants' Representative spent considerable time negotiating the terms of a possible plan of reorganization.  These negotiations addressed all of the material provisions of a plan, including without limitation the funding for a trust to be established by the plan, the contributions to be made by the Company, the terms of a channeling injunction, issues relating to insurance coverage, and indemnification provisions.  Ultimately, the Company, the Ad Hoc Committee, and the Pre-Petition Future Claimants' Representative reached an agreement on the terms for a proposed plan of reorganization for the Company  which were incorporated into a term sheet dated January 6, 2018.

**G.     The Plan**

33.     The Plan contemplates the establishment of a trust under section 524(g) of the Bankruptcy Code and an Asbestos Permanent Channeling Injunction that will channel all current Asbestos Claims and future asbestos-related Demands to the Asbestos Trust.  The Asbestos Permanent Channeling Injunction will cover all Asbestos Claims and Demands based in whole or in part on the alleged conduct or products of the Company.   The Asbestos Permanent Channeling Injunction will also channel all current Asbestos Claims and Demands based in whole or in part upon asbestos-related personal injury and wrongful death Claims and Demands against certain parties related to the Company, including, but not limited to, past and present affiliates of the Company, past and present officers and directors of the Company, predecessors in interest to the Company, and any entity that owned a financial interest in the Company or its affiliates or predecessors.

34.     Specifically, the Asbestos Permanent Channeling Injunction will cover Asbestos Claims and Demands against the Company and the Reorganized Debtor, as well as Asbestos

Claims and Demands against certain of the Company's affiliates and related parties based on any purported liability arising from their ownership of or relation to the Company.

35.     I have been advised that the effect of "channeling" Asbestos Claims and Demands to the Asbestos Trust is that they may only be pursued through, and paid from the Asbestos Trust. I have also been advised that Asbestos Claims and Demands may not be asserted against the Company or any Protected Parties following the confirmation of the Plan.

36.     The Asbestos Trust will be funded with (i) Cash contributions from the Company, the Hinden Family Entities and Hinden Family Members on behalf of themselves and certain other parties; (ii) a Trust Note executed by the Company and secured by a pledge of 50.1% of the voting shares of the Reorganized Debtor and non-debtor affiliate Duro Dyne Canada, and by mortgages on two parcels of real estate owned by non-debtor affiliates and the improvements thereon; (iii) the Earn Out Payments (as defined in the Plan); and (iv) an assignment of the Asbestos Insurance Rights and Asbestos Insurance Actions.  The assets of the Asbestos Trust will be used to pay current and future asbestos-related person injury and wrongful death claimants in accordance with the terms of the asbestos Trust Distribution Procedures established under the Plan.

37.     The Asbestos Trust's assets, which are limited, must be managed by the Asbestos Trustee to ensure that funds are available to pay all current claimants we well as all expected future claimants.  Nevertheless, for all the reasons detailed in the Disclosure Statement, the Company believes that there will be substantially more assets available to pay claimants under the Plan than would be the case if there were no Plan and the Company was forced to pay Claims solely from its own assets.

38.     I believe that substantially more assets will be available under the Plan because, among other reasons, the Hinden Family Entities and Hinden Family Members are contributing substantial assets to the Asbestos Trust as part of the Plan on behalf of themselves and other protected parties, in exchange for the protections provided to these parties under the Plan, which would not be contributed otherwise.    Moreover, without the settlements and distribution procedures contained in the Plan and the Trust Distribution Procedures, there likely would be years of costly and time-consuming litigation.

## II. <u>FIRST DAY PLEADINGS</u>[4]

39.     Based on my first-hand experience, and through my review of various materials and information, discussions with other members of the Debtors' management, and discussions with the Debtors' outside advisors, I have formed opinions as to (i) the necessity of obtaining the relief sought by the Debtors in the First Day Pleadings, (ii) the need for the Debtors to continue to operate effectively, (iii) the deleterious effects upon the Debtors of not obtaining such relief, and (iv) the immediate and irreparable harm to which the Debtors and their estates will be exposed immediately following the Petition Date unless the relief requested in the First Day Pleadings is granted without delay.

40.     The relief sought in the First Day Pleadings will minimize the adverse effects that these Chapter 11 Cases will have on the Debtors' and their estates.    I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate effectively in chapter 11 as debtors-in-possession.

41.     As described more fully below, the relief requested in the First Day Pleadings was carefully tailored by the Debtors, in consultation with their professionals, to ensure that the

---

[4] Terms not otherwise defined in Section II shall have the meanings ascribed to them in the underlining First Day Pleadings described below.

Debtors' immediate operational needs are met and that the Debtors suffer no immediate and irreparable harm.  I personally participated in the analysis that lead to the creation of each of the First Day Pleadings and assisted in the drafting and development of the relief requested therein. At all times, the Debtors' management and professionals remained cognizant of the limitations imposed on debtors-in-possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these cases to those issues that require urgent relief to sustain the Debtors' operability, pending confirmation of a plan of reorganization pursuant to chapter 11 of the Bankruptcy Code.

**A.**    ***Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion")***

42.    The Debtors seek entry of an order directing: (a) the joint administration of these Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1; (b) that an official caption be used by all parties in all pleadings in the jointly administered cases; and (c) that a docket entry be entered on the docket of each case to reflect the joint administration.

43.    The joint administration of the Chapter 11 Cases will permit the Clerk of the Court to use a single general docket for the Chapter 11 Cases and to combine notices to creditors and other parties in interest of the Debtors' respective estates. The Debtors anticipate that numerous notices, applications, motions, and other pleadings, hearings and orders in these Chapter 11 Cases will affect all of the Debtors.

44.    Joint administration will save time and money and avoid duplicative and potentially confusing filings by permitting parties in interest to: (a) use a single caption on all documents that will be served and filed in the Debtors' Chapter 11 Cases; and (b) file pleadings in one case rather than in multiple cases. Joint administration will also protect parties in interest

by ensuring that parties in each of the Debtors' respective Chapter 11 Cases will be apprised of the various matters before the Court in these cases. Joint administration of these Chapter 11 Cases will ease the administrative burden for the Court and all parties in interest.

45.    The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases because the relief sought in this Motion is purely procedural and is in no way intended to affect substantive rights. Each creditor and other party in interest will maintain whatever rights it has against the particular estate in which it allegedly has a claim or interest.

**B.**    ***Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363(c) and 1107 (i) Authorizing the Debtor to Continue and Maintain Its Existing Cash Management System, Bank Accounts and Business Forms, (ii) Modifying the Investment Guidelines Set Forth in 11 U.S.C. § 345, and (iii) Granting Related Relief (the "Cash Management Motion")***

46.    By the Cash Management Motion, the Debtors seek the entry of an Order, substantially in the form submitted with the Cash Management Motion, pursuant to 105(a), 345(b), 363(c) and 1107 of the Bankruptcy Code:

(a)    authorizing the Debtors to continue to use their cash management system without interruption in the ordinary course of business;

(b)    directing the Debtors' banks to transfer, in accordance with prepetition practices, or at the request and direction of the Debtors, any funds in the Debtors' bank accounts ("Bank Accounts") to the extent set forth in the Cash Management Motion;

(c)    authorizing the Debtors to maintain and continue to use their Bank Accounts with the same account numbers, and directing that the Bank Accounts be treated for all purposes as debtor-in-possession accounts;

(d)    authorizing and directing the Debtors' banks to service and administer the Bank Accounts without interruption and in the usual and ordinary course, and to receive, process, honor and pay any and all checks and drafts drawn on the Bank Accounts, whether presented, drawn or issued before or after the Petition Date for payment by the holders or makers thereof, for any obligations of the Debtors for which payment is authorized by Court Order, provided that sufficient funds exist, whether deposited prior or

subsequent to the commencement of the Debtors' Chapter 11 Cases, to cover such checks upon presentment;

(e)     authorizing the Debtors to use, in their present form, existing checks and other documents, including their existing business forms (collectively, the "Business Forms"), relating to the Bank Accounts, provided, however, that in the event that the Debtors must purchase new checks or business forms during the pendency of these Chapter 11 Cases, such forms will include a legend referring to the Debtors' status as debtors-in-possession; and

(f)     granting a waiver of the investment guidelines of section 345 of the Bankruptcy Code, subject to a 60-day objection period for the United States Trustee.

47.     As described in detail in the Cash Management Motion, the Debtors maintain a cash management and disbursement system in the ordinary course of their operations (the "Cash Management System").   To lessen the disruption caused by the bankruptcy filings and to maximize the value of the estates in these Chapter 11 Cases, it is vital that the Debtors maintain the Cash Management System, the Bank Accounts, and the Business Forms.

48.     The Debtors will work closely with their banks to ensure that appropriate procedures are in place so that checks issued prior to the Petition Date, but presented after the Petition Date, will not be honored absent approval from the Court.   The Debtors will also maintain records of all transfers within the Cash Management System, so that all transfers and transactions will be documented in their books and records to the same extent such information was maintained by the Debtors prior to the Petition Date.

49.     Permitting the Debtors to use their existing Cash Management System and Bank Accounts is in the best interests of the Debtors' estates, their creditors and other interested parties.   It is critical that the Debtors be able to coordinate transfers of funds to efficiently and effectively operate their business.   Through the Cash Management System and Bank Accounts,

the Debtors are able to effectively and efficiently collect, transfer, and disburse funds as needed, as well as to efficiently monitor and control the movement of cash.

50.     To require the Debtors to use new accounts would be disruptive to their business and would impair their efforts to maximize the value of their estates for the benefit of their creditors and parties-in-interest.

51.     Conversely, maintenance of the Debtors' Cash Management System and Bank Accounts will avoid delays in the payment of necessary expenses, and will ensure a smooth transition into chapter 11 without the inconvenience, cost, confusion and delay associated with transferring cash management operations to new accounts.  By allowing the continued use of the Debtors' existing Cash Management System and Bank Accounts, the Debtors will have the unimpeded cash flow necessary for the interim maintenance of their operations.  Accordingly, the Debtors request authorization to maintain their existing Cash Management System and Bank Accounts in the ordinary course of business, provided that no prepetition checks, drafts, wire transfers, or other forms of tender that have not yet cleared as of the Petition Date will be honored unless authorized by separate order of this Court.

52.     The Debtors also request authority to preserve various reporting and accounting mechanisms, such as signatory authorizations and accounting systems central to the maintenance of the Bank Accounts.  The interruption or termination of such reporting and accounting mechanisms would undermine the utility of the Bank Accounts.  In accordance with existing practices, the Debtors will maintain strict records of all receipts and disbursements from the Bank Accounts during the pendency of these Chapter 11 Cases and will ensure that their records properly distinguish between pre- and post-petition transactions.

53.    Additionally, requiring the Debtors to change their Business Forms would be expensive, unnecessary and burdensome to the Debtors' estates and disruptive to the Debtors' business operations and would not confer any benefit upon the Debtors, their estates, their creditors or those dealing with the Debtors.   The Debtors propose that in the event that they must purchase new Business Forms during the pendency of these Chapter 11 Cases, such forms will include a reference to the Debtors' status as debtors-in-possession.

54.    Waiver of the investment guidelines in the Bankruptcy Code is appropriate in these Chapter 11 Cases as the Bank Accounts are maintained with financially sound banking institutions.  The funds are not encumbered by any creditors' liens and/or security interests other than those held by 4Site LLC, the Debtors' prepetition lender. Consequently, a waiver of the deposit guidelines would not pose a risk to the Debtors' estates or their creditors.  Furthermore, requiring the Debtors to issue bonds in favor of the United States, as the statute requires, would cause substantial, unnecessary expense to the Debtors' estates.

55.    Accordingly, granting a waiver of the requirements of section 345 of the Bankruptcy Code will facilitate a smooth and orderly transition of the Debtors' business into chapter 11 and minimize the disruption of this transition.

56.    In light of the foregoing, the Debtors submit, and I believe, that the relief requested in the Cash Management Motion is in the best interest of the Debtors, their estates and creditors, and therefore should be granted.

**C.**    ***Debtors' Motion for Entry of an Interim Order and a Final Order (i) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service on Account of Prepetition Invoices, (ii) Deeming Utility Companies to Have Adequate Assurance of Future Payment, and (iii) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(a) and 366 (the "Utilities Motion")***

57.    By the Utilities Motion, the Debtors seek entry of an Interim Order and a Final Order, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (i) prohibiting all utility

companies (the "Utility Companies") from discontinuing, altering or refusing service to the Debtors on account of prepetition invoices, (ii) deeming the Utility Companies to have adequate assurance of future performance on the basis of payment of an Adequate Assurance Deposit (defined below) and (iii) establishing procedures for resolving requests for additional assurance of payment.

58.    The Debtors incur utility expenses in the ordinary course of business for, among other things, electricity, gas, local telephone service, long-distance telephone service, internet service and wireless telephone service, at an average monthly cost of approximately $40,077.99. A non-exhaustive list of the Utility Companies is attached as Exhibit 1 to the Interim Order and Final Order.

59.    The Debtors propose to provide each Utility Company with a deposit equivalent to the estimated average value of utility consumption for a two-week period (the "Adequate Assurance Deposit") as estimated in Exhibit 1.

60.    The Adequate Assurance Deposit will be placed into a single, segregated, newly-created, interest-bearing account (the "Adequate Assurance Deposit Account").  The Adequate Assurance Deposit shall be held in the Adequate Assurance Deposit Account for the benefit of the Utility Companies during the pendency of these Chapter 11 Cases.

61.    Additionally, the Debtors seek to establish reasonable procedures by which Utility Companies may request additional adequate assurance of future payment in the event that a Utility Company believes that the Adequate Assurance Deposit does not provide them with satisfactory adequate assurances, which procedures are more fully described in the Utilities Motion.

62.     Uninterrupted utility services are essential to the continuation of the Debtors' ongoing operations and to the success of the Debtors' Chapter 11 Cases. The Debtors' operations will be severely impacted should one or more of the Utility Companies refuse or discontinue utility services for even a brief period of time. Interruption of utility services, to the extent that such interruption limits the Debtors' operations, will damage the Debtors' sales revenue and profits. In addition, interruption of utility services may damage the Debtors' relationships with their customers and will be detrimental to the Debtors' estates, to the Debtors' creditors and to the Debtors' employees. Any disruption to the Debtors' operations as a result of termination of utility services will frustrate the Debtors' reorganization efforts. Thus, it is critical that the Debtors' utility services continue uninterrupted.

63.     In light of the foregoing, the Debtors submit, and I believe, that the relief requested in the Utilities Motion is in the best interest of the Debtors, their estates and creditors, and therefore should be granted.

**D.      *Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 507(a) (i) Authorizing the Debtors to Pay Prepetition Wages and Salaries and Related Obligations and Taxes, and (ii) Directing All Banks to Honor Checks and Transfers for Payment of Prepetition Employee Obligations (the "Wage Motion")***

64.     By this motion, the Debtors seek an order authorizing, but not directing, the Debtors to (i) pay all prepetition Employee claims for wages, salaries, contractual compensation, sick pay, personal pay, holiday pay and other accrued compensation; (ii) make all payments for which Employee payroll deductions were made prepetition; (iii) reimburse all prepetition Employee business expenses; (iv) make prepetition contributions and pay benefits under certain Employee benefit plans; (v) honor workers' compensation programs; (vi) pay other miscellaneous Employee-related costs including but not limited to processing costs and fees; and (vii) continue Employee programs with respect to vacation, sick, personal and holiday leave and

continue certain health, welfare, savings and other benefit programs (collectively, the "Employee Obligations"), as more fully described in the Wage Motion.

65.     In the ordinary course of its business, the Debtors employ approximately 170 people with sales and distribution channels throughout the United States, Canada and internationally.  The Company will from time to time supplement its production, shipping and accounting workforces with temporary employees.

66.     The Debtors use ADP Workforce Now to process the Employees' paychecks, process direct deposits and pay all related taxes.  The Debtors' Employees are paid on a weekly basis, and employees receive their wages on the Wednesday after the prior pay week. The Debtors' average weekly payroll, including overtime, bonuses, business expenses, health insurance allowances and other employee withholdings (e.g., garnishments), is approximately $125,000-$150,000.

67.     The Debtors' weekly payroll for the pay period ending August 31, 2018 was paid on September 5, 2018 and therefore funded prior to the Petition Date. The Debtors' next weekly payroll for the pay period ending September 7, 2018 is due on September 12, 2018.

68.     In addition, the Debtors' sales force is paid commissions on a monthly basis, a month in arrears. Commissions due for August 2018 were paid prepetition on September 5, 2018.  The average monthly commissions range between $175,000 and $225,000, depending on monthly sales volume.

69.     The Debtors recognize that any delay in paying outstanding wages, salaries and other compensation to the Employees could severely disrupt the Debtors' relationship with their Employees, impair morale and disrupt the Debtors' business operations.

70.    No individual Employee or Temporary Employee will receive payment in excess of the $12,850 priority claim amount established pursuant to section 507(a)(4) and 507(a)(5) of the Bankruptcy Code on account of outstanding pre-petition compensation, including wages, salaries, contractual compensation, sick pay, personal pay, holiday pay and other accrued compensation.  The Debtors believe that the payment of the Employee Obligations is critical, especially in light of the need to maintain the morale of the Debtors' Employees during the pendency of these Chapter 11 Cases.

71.    In light of the foregoing, the Debtors submit, and I believe, that the relief requested in the Wage Motion is in the best interest of the Debtors, their estates, and creditors, and therefore should be granted.

**E.    _Debtors' Motion for an Order Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition Sales, Use, Income, Property and Other Miscellaneous Taxes and Fees, and Granting Related Relief (the "Tax Motion")_**

72.    By the Tax Motion, the Debtors request entry of an order authorizing them to pay taxes and governmental fees (including sales, use, income, margin, business activity, personal property, franchise, and other miscellaneous taxes and business license, permit, annual report, and other miscellaneous fees) that accrued or arose in the ordinary course of business before the Petition Date (collectively, the "Taxes and Fees").  The Debtors estimate that the following taxes and fees totaling approximately $80,843.20 in the aggregate, have accrued and remain owing as of the Petition Date:

| Category | Approximate Amount |
|---|---|
| Use Taxes | $1,762.00 |
| Real Estate Taxes | $22,721.20 |
| Privilege Taxes | $33,000.00 |
| New Jersey State Income Tax | $23,360.00 |

73.     The Debtors' successful chapter 11 process will require good standing within the states in which they do business (the "Taxing Authorities") and a complete devotion of effort by their officers and directors.  If any of the Taxing Authorities attempt to exercise certain remedies against the Debtors with respect to unpaid Taxes and Fees, it could have the devastating effect of distracting the attention of the Debtors' management and professionals away from the Debtors' successful chapter 11 process.  Any regulatory dispute or delinquency that could impact the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole, which, in turn, could significantly reduce the value of the Debtors' assets.  The Debtors' failure to pay the Taxes and Fees could adversely impact the Debtors' business operations because, among other things: (i) the Taxing Authorities could initiate audits of the Debtors or prevent the Debtors from continuing their business, which would unnecessarily divert the Debtors' attention from the restructuring process; (ii) the Taxing Authorities could attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that would harm the estate; and (iii) certain directors and officers might be subject to personal liability – even if a failure to pay such Taxes and Fees was not a result of malfeasance on their part – which would undoubtedly distract those key employees from their duties related to the Debtors' restructuring.

74.     In light of the foregoing, the Debtors submit, and I believe, that the relief requested in the Tax Motion is in the best interest of the Debtors, their estates, and creditors, and therefore should be granted.

**F.      *Debtors' Motion for an Order Authorizing the Debtors to (i) Pay Prepetition Insurance Premiums, (ii) Continue Prepetition Insurance Programs, and (iii) Pay All Prepetition Obligations in Respect Thereof (the "Insurance Motion")***

75.     In connection with the day-to-day operations of their business, the Debtors maintain various insurance programs (the "Insurance Programs") and related insurance policies

as set forth on a non-exhaustive list attached to the Insurance Motion as Exhibit A (the "Insurance Policies"), through several different insurance providers (the "Insurance Providers"). The Debtors have numerous insurance policies covering a variety of matters such as commercial property, crime, commercial automobile, commercial umbrella, workers' compensation, foreign package, and management and company liability.

76.     The Debtors seek authority to pay premiums due for the Insurance Policies based on the fixed premium and billed by each Insurance Provider.   Depending on the particular Insurance Policy, premiums are either (i) paid in installments to the Insurance Provider over the term of the policy; or (ii) pre-paid at a policy's inception or renewal.  As of the Petition Date, the Debtors are current on all of their payments to Insurance Providers.   The Debtors pay approximately $2,257,084 in annual insurance premiums to the Insurance Providers.

77.     The Debtors have compelling business reasons for seeking to maintain their Insurance Policies and to pay all necessary premiums thereunder.  Insurance coverage provided under the Debtors' Insurance Policies is essential for preserving the value of the Debtors' business, properties, and assets, and, in many cases, such coverage may be required by various regulations, laws, and contracts that govern the Debtors' business.   Such coverage is also required by the U.S. Trustee guidelines.   If the Debtors do not continue to perform their obligations under the Insurance Policies, their coverage under the Insurance Policies could be impaired.  Disruption of their insurance coverage would expose the Debtors to serious risks, including (i) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable by the Insurance Providers under the Insurance Policies; (ii) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Providers under the Insurance Policies; (iii) the possible inability to obtain

similar types of insurance coverage; and (iv) the possible incurrence of higher costs for re-establishing lapsed policies or obtaining new insurance coverage.  Any or all of these consequences would cause serious and irreparable harm to the Debtors' business and restructuring efforts, as they would expose the Debtors to higher costs and increased risks of loss, at a minimum.  To avoid those consequences, the relief requested in the Insurance Motion should be granted.

78.    In light of the foregoing, the Debtors submit, and I believe, that the relief requested in the Insurance Motion is in the best interest of the Debtors, their estates, and creditors, and therefore should be granted.

**G.    *Debtors' Motion Pursuant to 11 U.S.C. §§ 105(A) and 363 for an Order Authorizing, But Not Requiring, the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Prepetition Customer Programs and Practices in the Ordinary Course of Business (the "Customer Program Motion")***

79.    Prior to the Petition Date and in the ordinary course of their businesses, the Debtors offered and engaged in certain customer and other programs and practices to develop and sustain a positive reputation in the marketplace for their online products and services and to engender customer loyalty (the "Customer Programs"), certain of which are described in greater detail below.

80.    By this Motion, the Debtors request that they be authorized but not directed, in their business judgment to (a) perform and honor such of their pre-petition obligations related to the Customer Programs as they deem appropriate and (b) continue, renew, replace, implement new and/or terminate Customer Programs as they deem appropriate, in the ordinary course of business, without further application to the Court.

81.    The Debtors need to continue those Customer Programs that are beneficial to their businesses during the postpetition period. Such relief is necessary to preserve the Debtors'

critical business relationships and customer goodwill for the benefit of their estates. It is essential and in the best interests of the Debtors, their estates and their creditors that the Debtors be permitted to honor their prepetition obligations in connection with the Customer Programs and to continue the Customer Programs in the ordinary course of their businesses.

82.    The Debtors' offer customers a rebate program based on sales targets specific to each customer.  Criteria for rebates include total sales, increases in sales from year to year, sales of specific products or other similar metrics.  In all but one case, rebates are calculated on a calendar year basis typically issued to each customer in March or April of the following year. One customer, however, receives quarterly installment payments throughout the year, which are then netted against its final calculated rebate amount. Rebates range from $300 to $375,000 depending on the customer. Rebates are issued to customers in one or a combination of two forms: (i) rebate checks issued to the customer; or, (ii) product credits issued to the customer that apply against new or outstanding invoices.

83.    To preserve and maximize the value of their business, the Debtors must promptly assure their customers that the goods and services that they have come to expect from the Debtors will continue uninterrupted and the chapter 11 filings will not interfere with the Debtors' ability to fully meet customer needs and expectations. Continuance of the Customer Programs in the ordinary course of business and the authority to satisfy these obligations is therefore essential to the Debtors' seamless transition into chapter 11, the maintenance of customer confidence and trust, and the facilitation of the Debtors' successful chapter 11 reorganization process.

H.     ***Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(A), 363(B) And 503(B)(9) And Fed. R. Bankr. P. 6003 Authorizing The Debtor To Pay Prepetition Claims Of General Unsecured Creditors In The Ordinary Course Of Business (the "Payment of Creditors in the Ordinary Course Motion")***

84.     In the ordinary course of the Debtors' business, the Debtors incur obligations to trade creditors, vendors and other unsecured creditors (the "General Unsecured Creditors") that provide, among other things, raw materials, equipment, supplies, and various other goods and services that are necessary for the continued operation of the Debtors' business.  The aggregate amount owed to the General Unsecured Creditors as of the Petition Date is approximately $7.6 million in the aggregate (the "General Unsecured Claims"), nearly $2.6 million of which constitute claims under 11 U.S.C. § 503(b)(9).

85.     The Debtors are not seeking to pay all General Unsecured Claims immediately; rather the Debtors intend to pay such amounts as they become due and payable in the ordinary course of the Debtors' business or as otherwise agreed by the General Unsecured Creditors.  The use of cash collateral and cash flow from the Debtors' operations will provide sufficient liquidity for the payment of General Unsecured Claims in the ordinary course of business.

86.     The Debtors believe that an extended delay in payment of General Unsecured Claims would adversely impact their business through the immediate loss of trade credit and the loss of favorable existing payment terms when negotiating upcoming materials purchases with important vendors.  The Debtors believe that the payment of General Unsecured Claims will allow them to continue their operations with minimal disruption and preserve their enterprise value for the benefit of their estates, creditors, and all parties-in-interest.

87.     Accordingly, by this Motion, the Debtors seek entry of an Interim Order pursuant to sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, authorizing, but not directing, the Debtors to pay General Unsecured Claims in the ordinary course of business in an amount

not to exceed $4.3 million[5], and a Final Order authorizing, but not directing, the Debtors to pay

all General Unsecured Claims in full in the ordinary course of business.  The Debtors reserve the

right to require the reinstatement or continuance of terms from the holders of General Unsecured

Claims that do not have contracts with the Debtors or otherwise are free to change their terms or

have changed their terms.

I.      ***Debtors' Motion for Interim and Final Orders (i) Authorizing use of Cash Collateral Pursuant to 11 U.S.C. § 363; (ii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363; and (iii) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "Cash Collateral Motion")***

88.     Prior to the Petition Date on February 3, 2003, Duro Dyne and a non-debtor

affiliate, 4 Site, LLC ("4 Site" or the "Prepetition Lender") entered into a Revolving Credit Note

(as amended) pursuant to which 4 Site agreed to make credit advances to Duro Dyne up to

$5,000,000, and Duro Dyne agreed to repay those advances together with interest per annum at a

rate determined by Bank of America to be its "prime rate" (the "Prepetition Loan").

89.     As inducement for 4 Site to make the Prepetition Loan, Duro Dyne also executed

a Security Agreement dated February 3, 2003 (the "Security Agreement"), pursuant to which 4

Site was granted a continuing security interest in "all personal property and fixtures in which the

Debtor has an interest, now or hereafter existing or acquired, and wherever located, tangible or

intangible, including but not limited to, all present and hereafter existing or acquired accounts,

contract rights, leases, general intangibles, equipment, goods, inventory (raw materials,

components, work-in process, finished merchandise, and packing and shipping materials),

personal property made available to the Debtor by the Secured Party (or its agent or bailee)

pursuant to a trust receipt or other security agreement the effect of which is to continue the

---

[5] The Debtors reserves the right to seek authorization to pay additional amounts relative to General Unsecured Claims

Secured Party's security interest herein, money, instruments, books, records, documents, chattel paper, securities, deposits, credits, claims and demands, together with all proceeds, products, returns, additions, accessions and substitutions of and to any of the foregoing" (the "Collateral")

90.     As further inducement for 4 Site to make the Prepetition Loan, the Prepetition Loan is guaranteed by Duro Dyne Corp., Duro Dyne Machinery, Duro Dyne Midwest and Duro Dyne West (the "Guarantors") and secured by a security interest in substantially all of the assets of the Guarantors.

91.     The Prepetition Loan was distributed in various tranches between 2003 and 2015. As of the Petition Date, tranches distributed in 2009, 2011, 2012, 2014 and 2015 remain outstanding. Each tranche has a 10-year maturity date ranging from 2019 until 2025. The total outstanding balance due on the Prepetition Loan is approximately $1,290,000.00.  Payments on the Prepetition Loan are due on a quarterly basis on March 31, June 30, September 30 and December 31, and each quarter Duro Dyne pays 4 Site a total of $82,100.00 on the six outstanding tranches.  The Debtors are current on payments toward the Prepetition Loan.

92.     The Prepetition Lender has consented to the Debtors' use of cash collateral in accordance with the terms of the budget annexed to the Cash Collateral Motion, subject to certain agreed upon terms and conditions set forth in the proposed cash collateral order. The Prepetition Lender has is also willing to agree to a carve-out in an amount to be determined to fund the administrative costs of these Chapter 11 Cases.

93.     I believe that the Debtors' continued access to the cash collateral of 4 Site is necessary to effectuate its consensual, prepackaged restructuring through these Chapter 11 Cases. Absent the Debtors' ability to use Cash Collateral and to implement the adequate protection arrangements proposed in the Cash Collateral Motion, the Debtors would lack

sufficient available sources of capital and would be unable to pay its restructuring expenses, to the severe detriment of the estate and creditors.

J.     ***Debtors' Application for Entry of an Order Authorizing the Retention of BMC Group as Claims and Noticing Agent Effective as of the Petition Date (the "BMC Retention Application")***

95.     Pursuant to the BMC Retention Application, the Debtors seek to retain BMC Group ("BMC Group") as claims and noticing agent in these Chapter 11 Cases.

96.     The Debtors' estates, and particularly their creditors, will benefit from BMC Group's services. BMC Group specializes in noticing, claims processing, and other administrative tasks necessary to operate the Chapter 11 Cases efficiently and effectively. BMC Group is fully equipped to manage claims and balloting issues and to provide notice to creditors and other interested parties in the Chapter 11 Cases.

## <u>CONCLUSION</u>

97.    For the reasons stated herein and in each of the First Day Pleadings filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Pleadings be granted in their entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 7th day of September, 2018

/s/Randall S. Hinden
Randall S. Hinden
Chief Executive Officer, Duro Dyne
National Corporation
