SHIPMAN & GOODWIN LLP
Stephen M. Forte, Esq.
400 Park Avenue, Fifth Floor
New York, NY 10022-4406
Tel:  (212) 376-3015
Fax:  (212) 376-3024
Email: sforte@goodwin.com

James P. Ruggeri (admitted *pro hac vice*)
Joshua D. Weinberg (admitted *pro hac vice*)
Abigail W. Williams (admitted *pro hac vice*)
SHIPMAN & GOODWIN LLP
1875 K Street, NW, Suite 600
Washington, DC 20006-1251
Tel:   (202) 469-7750
Fax:   (202) 469-7751
Email: jruggeri@goodwin.com
         jweinberg@goodwin.com
         awilliams@goodwin.com

*Attorneys for Hartford Accident and Indemnity Company*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re: | Chapter 11 |
| DURO DYNE NATIONAL CORP., *et al.*,[1] | Case No. 18-27963 MBK |
| Debtors. | (Jointly Administered) |
| | Hearing Date:  October 15, 2018, 2:00 p.m. |

**CERTAIN INSURERS' SUPPLEMENTAL BRIEF IN SUPPORT OF OBJECTIONS
TO DEBTORS' MOTION FOR AN ORDER APPOINTING A LEGAL
REPRESENTATIVE FOR FUTURE ASBESTOS BODILY INJURY CLAIMS,
<u>EFFECTIVE AS OF THE PETITION DATE</u>**

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Duro Dyne National Corp. (4664); Duro Dyne Machinery Corp. (9699); Duro Dyne Corporation (3616); Duro Dyne West Corp. (5943); and Duro Dyne Midwest Corp. (4662).

1

Hartford Accident and Indemnity Company, The North River Insurance Company and Federal Insurance Company (collectively, "Certain Insurers") respectfully submit this supplemental brief in support of their objections to Debtors' motion for an order appointing Lawrence Fitzpatrick as the legal representative for future asbestos claimants, effective as of the petition date.

Even the limited discovery that Certain Insurers have taken over the past two weeks has confirmed that Mr. Fitzpatrick is not a disinterested or effective future claimants' representative ("FCR") for this case.  He was hand-selected by the present claimants and was given financial incentives to accede to their wishes.  The results were not surprising.  Mr. Fitzpatrick spent hardly any time working for his constituency and instead agreed to critical documents (*e.g.*, Trust Distribution Procedures ("TDPs")) that are detrimental to the group he seeks to serve.  Mr. Fitzpatrick conceded at his deposition that, if confirmed as FCR here, he would do nothing different.  The Court should give future claimants the benefit of a fresh look.  The Court should deny Debtors' motion and exercise its discretion to appoint an independent representative of its own choosing.

## PRELIMINARY STATEMENT

The United States Trustee and Certain Insurers objected to Debtors' motion to appoint Mr. Fitzpatrick as the statutory representative for future claimants because his longstanding connections to the plaintiffs' bar and incentives to reach deals favorable to present claimants (at the expense of future claimants) create material adverse interests that cannot be reconciled with the obligations of an honest fiduciary.  At the October 1, 2018 hearing on Debtors' motion, the Court announced that "disinterestedness" was the legal standard for whether Mr. Fitzpatrick (or anyone else) could be qualified to serve as the statutory representative for future claimants, and

permitted the United States Trustee and Certain Insurers limited discovery regarding Debtors' motion.  *See* Oct. 1, 2018 Hearing Tr.

That limited discovery confirms that Certain Insurers' concerns were correct.  Mr. Fitzpatrick has conflicts of interest that place his interests materially at odds with the group that he would be charged to represent.  He cannot be "disinterested" under § 101(14) of the Bankruptcy Code.  Even the limited (and frequently redacted) documents that were produced confirm that Mr. Fitzpatrick was not selected following a broad-based search, but rather was chosen by the *ad hoc* committee, composed of plaintiffs' firms with whom he has lengthy (and ongoing) business relationships.  His retention agreement and his own testimony confirm he understood that he was being promised, not just the pre-petition job, but that, should he be able to reach agreement on a Plan, he would be nominated as the FCR in this case and as the trust FCR post-confirmation as well, entitling him to additional compensation.  Not surprisingly, all evidence indicates that Mr. Fitzpatrick took pains to avoid "rocking the boat" during the pre-petition "negotiations."  He could not identify a single revision of his that made it into the parties' term sheet or many of the Plan documents.  The result of Mr. Fitzpatrick's ability to "get along" with the parties to which he should have been adverse should not be future employment; he is not a "disinterested person," much less the *right* person for the futures' representative job.

To the extent there is any doubt, Mr. Fitzpatrick's own description of his job duties is disqualifying.  At his deposition, Mr. Fitzpatrick acknowledged that fraud in the trust system is harmful to future claimants because it prematurely dilutes assets.[2]  He also acknowledged that he was aware of recent developments, including the *Garlock* decision, shedding light on numerous

---

[2]    *See* Declaration of Stephen M. Forte, dated October 12, 2018 ("Forte Decl."), Ex. 1 (Lawrence Fitzpatrick Dep. Tr., dated Oct. 10, 2018 ("Fitzpatrick Tr.") at 47:12-17("To the extent current claims [that] are not meritorious are paid, that reduces the amount available for meritorious future claims."); *see also id*. at 39:1-21.

examples of fraud and abuse.  *In re Garlock Sealing Technologies, LLC*, 504 B.R. 71, 86

(W.D.N.C. 2014).  Yet, he refused to seek TDPs in this case that would reduce the kind of fraud

that *Garlock* uncovered.  Nor would Mr. Fitzpatrick fight for such provisions if appointed here.

He testified that he accepts the Plan and plan documents as is; consequently, his role in this case

would be largely one of "monitoring" the bankruptcy case to protect future claimants' rights.  Of

course, merely "monitoring" the bankruptcy case, rather than pushing back against the current

claimants, makes it much more likely that Mr. Fitzpatrick will receive future employment, either

as a future claimants' representative for the Duro Dyne trust, or in other cases involving the same

plaintiffs' firms.  But his refusal even to seek such protections is incompatible with the

Congressional mandate of a futures' representative that would zealously argue for the rights of

future claimants, including seeking to implement TDPs that reduce fraud and mismanagement.

Mr. Fitzpatrick admits he will seek to do none of this if appointed in these bankruptcy cases.

Indeed, it appears his main task will be to seek unlimited future employment as the futures'

representative for the Duro Dyne trust.

At bottom, the Debtors -- joined by the official committee of asbestos claimants ("ACC")

-- essentially have argued that this Court should approve their selection of Mr. Fitzpatrick to

serve as the statutory future claimants' representative, not because he is truly independent, but

because he has extensive asbestos-related experience and, in the past, other courts have accepted

the debtor's recommendation of an experienced representative without further inquiry.  The

Court need not reach the issue of whether those cases were correctly decided because this case is

different.  Far more information about the operation of asbestos trusts is known now than when

many of the early cases were decided, including the potential for abuse when future claimants are

not vigorously represented, as § 524(g)(4)(B)(i) requires.  The structural problems with asbestos

bankruptcies have been highlighted in recent years, as evidence has been developed suggesting

that asbestos trusts have been paying claims that may be invalid under applicable non-

bankruptcy law – either because the statute of limitations has expired, or because the claimant

lacked sufficient evidence of exposure to the debtor's products, or because – in some cases – of

fraudulent conduct by claimants.  Because funds siphoned off to pay invalid claims today reduce

the funds that will be available to satisfy the claims of those who are injured tomorrow, one

would have thought that future claimants' representatives would be at the vanguard of guarding

against such activity.

But the record established in this case shows that Mr. Fitzpatrick has chosen to

conceptualize his role in a way that, Certain Insurers submit, departs from the Congressional

vision.  When asked about the risk that a trust might pay invalid present claims, Mr. Fitzpatrick

responded that so long as present and future claimants are measured by the same yardstick, the

diversion of trust resources to the holders of invalid claims – even in the face of evidence of

fraud – is not a matter within his purview.  Certain Insurers submit that this answer reflects a

misapprehension of the role of FCR envisioned by Congress, and provides ample reason for this

Court to appoint an independent representative.  The interests that Congress was concerned about

were the interests of the holders of *valid* future claims – not those who in the future might elect

to engage in fraudulent claiming activity.

Certain Insurers do not dispute that Mr. Fitzpatrick has experience in the world of

asbestos bankruptcies, but there are other candidates that have similar experience without the

same disqualifying ties to the plaintiffs' bar or refusals to pursue changes to TDPs that would

help reduce fraud that unfairly disadvantages both individuals that may have a legitimate future

claim and the insurers that are asked to pay those claims.  The Debtors concede they would

suffer no prejudice if Mr. Fitzpatrick is not appointed; instead, they would continue on with their

bankruptcy plans with a new, independent FCR. Under these circumstances, there is no reason

for the Court *not* to appoint someone who will take a fresh look and see whether the Plan

documents, including the TDPs, can be improved. The Court should deny the Debtors' motion

to appoint Mr. Fitzpatrick.

## **ARGUMENT**

## I.  **THE DEBTORS CANNOT SHOW THAT MR. FITZPATRICK MEETS THE HIGH STANDARDS OF DISINTERESTEDNESS UNDER 11 U.S.C. § 101(14)**

The specific issue before the Court is whether to approve appointment of Mr. Fitzpatrick

as the official representative of future claimants. This Court ruled during the October 1 hearing

that to be permitted to serve in that role, the proposed future claimants' representative must be

"disinterested" within the meaning of the Bankruptcy Code. *See* Oct. 1, 2018 Hearing Tr. [Dkt.

No. 131]. A person is "disinterested" if, among other things, he "does not have an interest

materially adverse to the interest of the estate or of any class of creditors or equity security

holders, by reason of any direct or indirect relationship to, connection with, or interest in, the

debtor, *or for any other reason*." 11 U.S.C. § 101(14)(B), (C) (emphasis added).

Applying that standard, the Third Circuit held in *In re Marvel Entertainment Group, Inc.*,

140 F.3d 463 (3d Cir. 1998), that a court must not allow the appointment of a person with an

actual conflict of interest, and "should generally disapprove the employment of a professional

with a potential conflict, with certain possible exceptions," namely where "every competent

professional in a particular field" has a conflict and "where the possibility that the potential

conflict will become actual is remote, and the reasons for employing the professional in question

are particularly compelling." *Id.* at 476-77 (quoting *In re BH & P, Inc.*, 949 F.2d 1300, 1316–17

(3d Cir.1991)). It is the Debtors' burden here to show that Mr. Fitzpatrick meets this standard.

*In re Champagne Services, LLC*, 560 B.R. 196, 201 (E.D. VA. 2016) ("[t]he burden is on the proponent of the application to show that proposed counsel satisfies all requirements, including that he is disinterested").

This test applies with particular force in cases involving the pre-petition conduct of parties. The Third Circuit has made clear that a bankruptcy court must carefully scrutinize pre-packaged bankruptcy plans and the events that led up to them:

> We do not approve of a bankruptcy court applying less than careful scrutiny to pre-petition procedures in pre-packaged plans.
>
> * * *
>
> Pre-packaged plans offer a means of expediting the bankruptcy process by doing most of the work in advance of filing. That efficiency, however, must not be obtained at the price of diminishing the integrity of the process. In this case, it was not a proper exercise of the bankruptcy court's discretion to fail to consider and appraise the conduct of the parties and counsel pre-petition.

*In re Congoleum Corp.*, 426 F.3d 675, 692-93 (3d Cir. 2005).

Here, not only have Debtors failed to meet their burden, but the pre-petition conduct of the parties indicates, and additional testimony from Mr. Fitzpatrick confirms, that Mr. Fitzpatrick is *not* disinterested; in fact, he is the opposite. Mr. Fitzpatrick has a significant interest in "playing ball" with the present claimants, rather than playing "hardball" and pushing hard for concessions favoring the future claimants. From the start of his pre-petition engagement, which the *ad hoc* committee engineered, Mr. Fitzpatrick has been given significant financial incentives to make sure that the parties reach a deal, irrespective of whether it is the right deal for future claimants. And, in fact, Mr. Fitzpatrick has not sought to press the *ad hoc* committee for changes to Plan documents, particularly the TDPs, that would benefit his constituency by reducing illegitimate claims paid by the trust. By his own admission, he will continue not to

seek such protections for future claimants if appointed in this case, which is consistent with the

desire to obtain an appointment as future claimants' representative for the trust, post-

confirmation.  Because these relationships and incentives are "materially adverse" to his own

constituents' interests, he is not "disinterested" within the meaning of the Bankruptcy Code.

### A.    Mr. Fitzpatrick Was Not "Disinterested" When He Was Hired to Serve as the Pre-Petition Future Claimants' Representative

From the beginning of the hiring process, it was clear that Mr. Fitzpatrick was anything

but "disinterested."  Debtors' selection of Mr. Fitzpatrick was not the product of a broad search

(as Debtors' previously represented); rather, he was all but selected by the *ad hoc* committee,

whose interests are *adverse* to future claimants' interests.  In fact, counsel for the *ad hoc*

committee contacted Mr. Fitzpatrick's counsel days before the Debtor spoke to Mr. Fitzpatrick,

and apparently asked Mr. Fitzpatrick and his counsel to conduct a conflict check.  *See* Forte Decl.

Ex. 2 (May 22, 2017 e-mail from J. Wehner to E. Harron); Forte Decl. Ex. 3 (May 22, 2017 e-

mail from E. Harron to J. Wehner).

By the time Debtors had a telephone call to "meet" Mr. Fitzpatrick, the decision was all

but made.  Debtors conceded that Randall Hinden who, as CEO, was the final decision maker,

reviewed only one resume and interviewed (by telephone) only one candidate -- Mr. Fitzpatrick.

*See, e.g.,* Forte Decl. Ex. 4 (Randall S. Hinden Dep. Tr., dated Oct. 10, 2018 ("Hinden Tr.)) at

46:6-9, 47:9-18.  Nor did Mr. Hinden ask for due diligence that would allow him to even

consider any other candidates.  *See id.* 47:19-23.  Rather, he followed the recommendation of

counsel, which was to select the name that had been forwarded to counsel by the *ad hoc*

committee.  Prior to this case, Debtors' counsel had never met with or spoken to Mr. Fitzpatrick.

*See* Forte Decl. Ex 1 (Fitzpatrick Tr.) at 21:19-24.  Yet, Debtors' counsel recommended Mr.

Fitzpatrick after reviewing a resume, holding a brief call with Mr. Fitzpatrick's counsel, and

conducting a brief telephone interview -- and apparently without much investigation, if any, of other candidates.

Counsel representing the *ad hoc* committee, on the other hand, were very familiar with Mr. Fitzpatrick, at his deposition, he acknowledged having a prior relationship with every single plaintiffs' firm on the *ad hoc* committee. *See* Forte Decl. Ex. 1 (Fitzpatrick Tr.) 23:2-21. He originally seemed to suggest that these relationships were confined to the past, dating back to his defense work and his time at the CCR. *See* Forte Decl. Ex. 1 (Fitzpatrick Tr.) 59:21-60:22. Further questioning, though, revealed that Mr. Fitzpatrick has ongoing relationships with these firms through the trusts on which he currently serves as the post-confirmation representative of future claimants.[3] *See id.* 102:21-103:5. In other words, Mr. Fitzpatrick owed his appointment as FCR to his amicable relationship with his clients' *adversaries*; he is a citizen in good standing of "the insular world of asbestos bankruptcies," where "[t]he opportunity for back-scratching" is ever-present. *See In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D.N.J. May 11, 2007).

Once selected, Mr. Fitzpatrick was given concrete financial incentives to make a deal with both Debtors and the *ad hoc* committee. Mr. Fitzpatrick's engagement letter, which provided that he could be terminated only "for cause," also provided that, if the parties reached agreement on the terms of a consensual bankruptcy plan, Duro Dyne and the claimants would seek to have Mr. Fitzpatrick assume the role of post-petition future claimants' representative that the Bankruptcy Code requires (at his and his counsel's standard rates). *See* Forte Decl. Ex. 5 (June 12, 2017 letter from E. Harron to J. Prol) at ¶ 7. Indeed, Mr. Fitzpatrick believed that, when hired, he was being brought on to be *both* the pre- and post-petition future claimants;

---

[3]      The law firm Weitz & Luxenberg, for example, is a TAC member on at least four of the trusts where Mr. Fitzpatrick serves -- ACandS, Metex, NARCO and Pittsburgh Corning.

representative.  As a result, he would be compensated for both roles so long as the parties

reached a deal that led to bankruptcy:

> Q.   And you assumed that if you were selected to be pre-
> petition FCR that you would be nominated to be the post-
> petition FCR as well?
> A.   I did.
> Q.   And you understood that that would entitle you to receive
> compensation as a post-petition FCR?
> A.   That's correct.

Forte Decl. Ex 1 (Fitzpatrick Tr.) at 66:7-14.  Of course, if the parties did not reach a deal, Mr.

Fitzpatrick would have been terminated from his pre-petition role as the future claimants'

representative, and thus would not have received any additional compensation.  *See* Forte Decl.

Ex. 4 (Hinden Tr.) at 56:4-12.

Those financial incentives continue now that Debtors' petitions have been filed.  If the

Court confirms the Plan in this case, there will be a trust to which asbestos claims will be

channeled, and the current Trust Agreement calls for oversight of the trustee from a Trust

Advisory Committee and a Future Claims Representative.  Mr. Fitzpatrick clearly expects to be

named as the FCR for the trust following plan confirmation, as he repeatedly expressed that he

would be able properly to safeguard the operation of the trust:

> Q.   And you understand, do you not, that if a current asbestos
> claimant opts out and brings a suit, that they would recover
> and take for themselves any insurance coverage that they
> received, correct?
> A.   Correct.
> Q.   And so none of that insurance would then be available for
> future demand holders?
> A.   Well, in order to get there, they first have to go through me
> and get my permission.  And if I see large numbers of
> current claimants siphoning off the insurance asset so that
> it's not available to my clients, the future claimants, I'm
> going to start putting conditions on granting a cent, because
> I've been allowing them to do that, either setting up a
> reserve or doing something else, but I'm not going to allow

the current claimants to drain the entire insurance asset
through litigation.

Forte Decl. Ex. 1 (Fitzpatrick Tr.) at 108:21-109:14.  *See also id.* at 57:18-58:4 ("Before I would

allow [a medical waiver] to happen, they would have to go through a reputable facility before I

would allow it.").  From the start, in other words, Mr. Fitzpatrick has believed that he would be

the futures' representative for as long as Duro Dyne proceeds through bankruptcy and towards

establishing a trust, and understood that he would receive compensation for as long as it does so.

### B.  Mr. Fitzpatrick Did Not Act in a Disinterested Manner During the Pre-Petition Process.

Mr. Fitzpatrick's actions during his pre-petition engagement were fully consistent with

the financial incentives that were put in place when he was hired (*i.e.*, continued employment

pursuant to a consensual plan).  Shortly after agreeing to serve as pre-petition futures'

representative, Mr. Fitzpatrick received a draft term sheet that the *ad hoc* committee and Debtors

had been negotiating.  *See* Forte Decl. Ex. 6 (June 1, 2017 e-mail from E. Harron to L.

Fitzpatrick); Forte Decl. Ex. 1 (Fitzpatrick Tr.) at 72:2-13.  The term sheet outlined a framework

for a consensual plan.  Forte Decl. Ex. 1 (Fitzpatrick Tr.) at 78:12-15.  Although Mr. Fitzpatrick

testified that he made changes to the term sheet after reviewing it, he refused to identify what

those changes were.  *See id.* at 78:22-79:16.  Mr. Fitzpatrick, through his counsel, refused to

discuss communications with the other parties on the grounds that they all had a "common

interest."  And both Mr. Fitzpatrick and the *ad hoc* committee (through counsel) asserted that

any substantive communications or changes regarding the terms sheet were protected by a

"common interest" privilege even though there was no agreement between them at the time.  *See*

Forte Decl. Ex. 7 (Duro Dyne Legal Representative's Categorical Privilege Log (10.12.18) at 4

("The redacted information is protected from disclosure pursuant to the common interest

privilege, the settlement privilege and/or otherwise is not discoverable."); Forte Decl. Ex. 8 (Ad

11

Hoc Committee categorical privilege log).  The suggestion that the Debtor, current claimants and

the future claimants are aligned runs contrary to controlling law, which holds that they have

*adverse* interests.  *See, e.g., In re Amatex Corp.*, 755 F.2d 1034, 1042-43 (3d Cir. 1985) ("None

of the parties currently involved in the reorganization proceedings have interests similar to those

of future claimants."); *In re Federal-Mogul Global, Inc.*, 684 F.3d 355, 362 (3d Cir. 2012)

(recognizing "competing interests of present and future claimants"); *In re Quigley Co.*, No, 09-

13739 (SNB), 2009 WL 9034027, at *5 (Bankr. S.D.N.Y. 2009) ("a natural antagonism" exists

between present and future claimants).[4]  More to the point, it reveals a fundamental

misunderstanding of the role of the FCR in plan negotiations -- the FCR *should be* adverse to the

debtors and *ad hoc* committee in such negotiations.

      Moreover, Mr. Fitzpatrick spent fewer than five hours over seven months working on the

many drafts of the term sheet that were exchanged between June 2017 and January 2018, even

though this was an important document setting forth the framework for the proposed bankruptcy

plan.  *See* Forte Decl. Ex. 9 (Fitzpatrick time sheets from June, 2017 to September, 2018).[5]  In

other words, despite protestations to the contrary, the evidence that Mr. Fitzpatrick was willing

to provide suggests that he had very little personal involvement in protecting his clients' interests.

      Following the execution of a term sheet in January 2018, the parties began to circulate

drafts of the proposed Plan documents during the spring and summer of 2018.  Once again, there

is no evidence that Mr. Fitzpatrick pushed for his clients' interests, or against the adverse

---

[4]    The Debtors and counsel that represented the *ad hoc* committee pre-petition asserted
generally the same privilege, confirming that they saw themselves as allies, not adversaries.

[5]    *See id.* at F00000019-21, F00000237-239, Legal_Rep_000446-448, Legal_Rep_000526-
527, Legal_Rep_000537-539, Legal_Rep_000550-553, Legal_Rep_000733-734,
Legal_Rep_000742-743, Legal_Rep_000757-758, Legal_Rep_000854-855, Legal_Rep_000873-
874, Legal_Rep_000880-881, Legal_Rep_000892-893, and Legal_Rep_000911-915.

interests of other parties.  On the contrary, Mr. Fitzpatrick testified that he could not recall

whether he made any changes to the proposed Plan, and that, if shown a copy of the proposed

Plan as filed, he would not be able to identify whether he had made any changes or whether any

revisions were his.  Indeed, Mr. Fitzpatrick could not even recall whether he waited to read the

plan before agreeing to support it:

> Q.    Do you have any recollection as to whether you made
>        changes that are incorporated into the final plan?
> A.    I don't recall.
> Q.    So if I showed you a copy of the plan, would you be able to
>        identify provisions of it that you changed?
> A.    No.
> Q.    When did you agree to become a plan proponent, Mr.
>        Fitzpatrick?
> A.    I really don't recall.
> Q.    Was it prior to receiving a draft plan?
> A.    I don't recall.

Forte Decl. Ex 1 (Fitzpatrick Tr.) at 85:5-18.  Similarly, although Mr. Fitzpatrick asserted that he

had proposed changes to the TDPs, he could not recall a single one of those changes that he

proposed.  *See id.* at 91:7-12.  And Mr. Fitzpatrick affirmatively testified that he did not suggest

any revisions to the proposed trust agreement, even though the trust is critically important to

future claims.  *See id.* at 88:25-89:14.

Equally revealing are specific areas where Mr. Fitzpatrick did not push back despite his

own recognition that it would be in his own constituents' interests to do so.  Mr. Fitzpatrick

testified that the future claimants' representative has an obligation to try to reduce fraud to

prevent premature diminution of trust assets.  *See id.* at 96:9-13.  Yet, Mr. Fitzpatrick

acknowledged that he has not taken -- and will not take -- steps to try to reduce some of the most

well-known sources of fraud and abuse in asbestos trusts.  For example, Mr. Fitzpatrick testified

that he was aware of the *Garlock* decision, but that it has not affected his views on trust claim

handling at all:

> Q.    Are you aware of whether claimants have taken
>       inconsistent positions to other trusts or to multiple trusts in
>       other cases?
> A.    Not to my personal knowledge.
> Q.    Are you aware of any examples where that has been
>       presented as a problem for asbestos trusts?
> A.    I've seen the Garlock case referenced.
> Q.    Have you read any of the decisions from the Garlock case?
> A.    I have, yes.
> Q.    And has the Garlock decision affected your views as to
>       how TDPs should handle asbestos claims?
> A.    No.

*Id.* at 97:17-98:6.  Remarkably, in spite of *Garlock*, Mr. Fitzpatrick remains firmly committed to

"business as usual."  Although denying that *Garlock* affected his views, Mr. Fitzpatrick

acknowledged that prior statements of exposure or occupational history may be relevant to

evaluating a trust claim, particularly when evidence is taken under oath:

> Q.    Do you think -- is it irrelevant if a claimant has previously
>       denied under oath that they were exposed to Duro Dyne
>       products?
> A.    No, I don't think that's irrelevant.  If -- well, go ahead.
> Q.    So you would agree that that type of evidence would be
>       relevant to the trust's determination?
> A.    It's certainly something that should be considered or could
>       be considered.

*Id.* at 98:25-99:9.  Yet, Mr. Fitzpatrick testified that he did not make any attempt to incorporate

into the TDPs any requirement that this type of evidence be submitted to the trust:

> Q.    Does the claim form require a claimant to submit evidence
>       that he or she has previously denied exposure to Duro Dyne
>       products?
> A.    No, it doesn't.  Not to my knowledge.
> Q.    So the trust has no way -- the TDPs have no way of
>       requiring that information to be submitted, correct?
> A.    I believe that's correct.

> Q.      Do you -- did you seek to implement that requirement into
>         the TDPs?
> A.      Not that I recall.

*Id.* at 99:15-25.  Why did Mr. Fitzpatrick fail to insist on this requirement?  Here is his entire

explanation:  "I thought that the TDP in this case offered sufficient protections."  *Id.* at 100:23-

24.

Mr. Fitzpatrick similarly decided not to seek evidence relating to a claimant's smoking

history when presenting a claim for lung cancer, even though it is well known that smoking is a

substantial cause of lung cancer and smokers' lung cancer claims are far weaker than those of

claimants who did not smoke (particularly in the absence of severe asbestosis).  *See id.* at 101:1-

102:5.  And Mr. Fitzpatrick acknowledged that the TDPs allow claims filed out of time under

some statutes of limitation, but concluded that those provisions were acceptable because they

applied to future claimants as well as present.  *See id.* at 53:19-54:6.  That, of course, misses the

whole point of the FCR's role:  if the debtor's funds are depleted by weak claims now, there will

be less available in the future to pay either strong claims or weak ones.  And it assumes that

Congress intended the FCR to serve as the guardian as any person who might in the future assert

a claim against as asbestos trust, as opposed to the far more logical inference that the role of the

FCR is to safeguard the interest of those who will, in the future, assert *valid* claims that have

been channeled to the trust.

In sum, there is no evidence that pre-petition Mr. Fitzpatrick worked aggressively to

protect future claimants, or that he made any meaningful changes to trust documents in any way

that was beneficial to future claimants or adverse to the other interested parties.  His actions were

fully consistent with placing a premium on reaching a consensual plan rather than negotiating for

additional terms that might have benefitted his constituency.

### C. There is No Evidence that Mr. Fitzpatrick Would be any More "Disinterested" in This Bankruptcy Case

Mr. Fitzpatrick also confirmed that, if appointed as future claimants' representative in this case, he does not intend to pursue any additional protections or remedies for the future claimants. On the contrary, he stated that he sees the role of the future claimants' representative as one of primarily "monitoring" the bankruptcy case to ensure that nothing unexpected happens:

> Q. So what are the obligations of the court-appointed FCR in your view?
> A. Wait a minute. We have to back up. Post-confirmation?
> Q. No.
> A. I'm getting confused by your uses of "post" and "pre."
> Q. Let me clarify for you the words so we're clear on this.
> A. Yes.
> Q. I'm talking about post-petition --
> A. Post-petition.
> Q. -- but prior to plan confirmation, what are the obligations of the FCR in this case in your view?
> A. Post-petition but prior to confirmation. It would be a monitoring role at that point in my view.
> Q. And when you say "monitoring," monitoring what?
> A. Anything that might affect the future claimants.

Forte Decl. Ex. 1 (Fitzpatrick Tr.) at 87:22-88:18. So, Mr. Fitzpatrick plans to watch closely, but failed to identify any areas where he believes that he needs to make a push to represent the interests of future asbestos claimants. Not on insurance issues, not on the trust documents, not on responses to the issues where the U.S. Trustee has expressed concerns. None.

There is at least one obvious reason that Mr. Fitzpatrick has decided not to rock the boat. As noted above, Mr. Fitzpatrick expects full well that, if a plan is confirmed, he will be named as the future claimants' representative for the trust that is to be formed. The Trust Agreement provides that (unlike members of the Trust Advisory Committee ("TAC")), the futures' representative serves for life unless he resigns or is removed for cause. *See* Asbestos Trust Agreement § 6.2 [Doc. No. 19-1] (Sept. 7, 2018). And the Trust Agreement likewise provides

16

that the futures' representative will be compensated at standard rates.  *See id.* § 6.5.  As a result,

the trust creates a potential for substantial income for Mr. Fitzpatrick over its life.  Mr.

Fitzpatrick received in excess of $100,000 last year from the four trusts where he serves as FCR

and which publicly identify those fees.[6]  Mr. Fitzpatrick has a palpable financial incentive to

keep this case on track, rather than proposing changes that may make it more difficult to achieve

a quick resolution.

## II.    The Court Should Deny the Motion and Appoint An Independent FCR

Because Mr. Fitzpatrick has financial incentives to "get along" with the Debtors and,

even more so, with the ACC, he is not "disinterested," and the Court should not appoint him as

the official representative of future claimants.  But even if he were technically "disinterested"

with the meaning of the Bankruptcy Code, the Court should decline to appoint him in this case.

While disinterestedness is a pre-requisite for appointment, it is not the end of the inquiry.  In the

two major pre-§ 524(g) bankruptcies (*Manville* and *UNR*), the Court, not the debtors selected the

futures' representative, and the Third Circuit has repeatedly recognized that likewise, under

§ 524(g)(4), this Court has the final say.  *See First State Ins. Co. v. Congoleum Corp. (In re*

*Congoleum Corp.)*, No. 04-1517 (D.N.J. Aug. 9, 2004) (affirming order appointing future

claimants' representative); *see also In re Combustion Engineering*, 391 F.3d at 240 (debtor-

selected FCR did not adequately represent future claimants' interests).  This case illustrates the

---

[6]      Mr. Fitzpatrick received $14,035 from the Metex Trust, $65,798 from Pittsburgh Corning,
$6,878 from Global Industrial Tech., Inc. (GIT), and $19,515 from ACandS in 2017.  *See* Forte
Decl. Ex. 10 (Excerpts from Metex Trust Annual filings); Forte Decl. Ex. 11 (Excerpts from
Pittsburgh Corning Annual filings); Forte Decl. Ex. 12 (Excerpts from GIT Annual filings);
Forte Decl. Ex. 13 (Excerpts from ACandS Annual filings).  And Mr. Fitzpatrick's counsel
received a total of $889,851 in 2017 from Metex, Pittsburgh Corning and ACandS.  *See id.*  In
addition, it appears that Mr. Fitzpatrick received compensation from two other trusts where he
serves as a future claimants' representative -- Durabla and NARCO -- but those amounts are not
publicly disclosed.

systemic problems that can arise when a pre-petition futures' representative is guaranteed future

positions through the life of the bankruptcy and beyond.  Rather than perpetuating these

problems, the Court should appoint a truly independent representative to take a fresh look at this

case on behalf of future claimants.

> **A.    The Proposed Plan Lacks Sufficient Safeguards To Ensure That Trust Assets Are Preserved For Future Asbestos Claimants**

The Court is well-aware of heightened concerns regarding the lack of transparency in the

operation of asbestos trusts that control billions of dollars used for the settlement of asbestos

claims.  The *Garlock* decision, the Rand Report, and the recent Rule 2019 disclosure litigation in

Delaware (discussed below) are just a few of the recent developments highlighting the growing

concerns that this lack of transparency leads to abuse and fraud.  Yet Mr. Fitzpatrick appears

unable or unwilling to respond to these developments.  In *Garlock*, the court permitted limited

discovery of underlying claims and based on that limited inquiry concluded that there was

widespread abuse, including multiple cases where claimants were permitted to file claims against

asbestos trusts even after representing elsewhere that they had never been exposed to the product

for which the trust is liable.  *See Garlock*, 504 B.R. at 86.  Curiously, Mr. Fitzpatrick testified at

his deposition that while he was familiar with the *Garlock* court's decision, it did not change his

views regarding how TDPs should handle asbestos claims.

> Q.    And has the Garlock decision affected your views as to
> how    TDPs should handle asbestos claims?
> A.    No.

Forte Decl. Ex. 1 (Fitzpatrick Tr.) at 98:3-6.  In addition, in a recent asbestos bankruptcy case in

Delaware, Mr. Fitzpatrick opposed efforts to unseal certain plaintiffs' firms 2019 statements for

the purpose of uncovering fraud; when the Court granted the request to unseal, Mr. Fitzpatrick,

in his capacity as future's representative for certain trusts, *appealed* from that ruling.  *See In re*

*Motions Seeking Access to Rule 2019 Statements*, 585 B.R. 733, 738 (D. Del. 2018).  Mr.

Fitzpatrick apparently continues to be unwilling to take measures to promote disclosure that

might diminish or reduce fraud in the trust system in this case.  Instead, he endorsed a provision

in the TDPs here that would treat all trust claims as confidential settlement discussions not

subject to disclosure.  *See* Forte Decl. Ex. 1 (Fitzpatrick Tr.) at 50:7-12.

   In this case, Mr. Fitzpatrick has accepted the Plan and plan documents as they currently

stand even though, as he admits, some of the provisions of the TDPs permit the filing of

fraudulent, or at least inconsistent, claims.  Absent appointment of a new representative for

future claimants, therefore, the claims process under the Plan will lack integrity. For example,

the plan would pay time-barred claims.  Under the TDPs, persons who are first diagnosed with

an asbestos-related disease after the trust becomes effective have three years from the date of

diagnosis to file a claim against the trust, even if their claims would otherwise be barred by the

relevant state statutes of limitations or repose.  *See* TDPs § 5.1(a)(2) [Dkt. No. 19-6] (Sept. 7,

2018).  This means that there will be claimants who will receive compensation from the trust

even through their claims would be time-barred under relevant state law.  Mr. Fitzpatrick's

explanation, that this provision is acceptable because it applies to both present and future claims,

does not alleviate any concerns.  A provision that pays invalid claims does not become more

acceptable simply because it pays *all* untimely-asserted claims.  In any event, that explanation

misses the point, which is that accepting time-barred claims now unfairly diminishes the pot for

those (primarily future claimants) with timely claims later.

   Likewise, under the proposed TDP, the trust could disregard medical evidence

requirements.  The TDPs allow the trust (with the permission of the TAC and the future

claimants' representative) to accept disease level classifications from other trusts on a case-by-

case basis, or even to ignore medical evidence requirements entirely. *See* TDPs § 5.6(a)(3-4) ("The Trustee, with the consent of the TAC and the FCR, may exempt claimants from the obligation to submit medical evidence or certain types of medical evidence").

And, the trust is not just permitted, but required, to ignore evidence that would show that a claimant may not have substantial Duro Dyne exposure at all. Mr. Fitzpatrick conceded at his deposition that the TDPs do not require claimants to submit prior claims, including claims (or sworn testimony) that may be inconsistent with a claim against the Duro Dyne trust. Mr. Fitzpatrick could not explain why a representative charged with preserving assets for future claim holders would not seek to have a transparency requirement of this sort included in the TDPs.

**B.      The Issues In The Proposed Plan Will Not Be Addressed If Mr. Fitzpatrick Is Appointed FCR**

Mr. Fitzpatrick's testimony, moreover, leaves little doubt that these legitimate issues will not be addressed if the Court grants debtors' motion. Mr. Fitzpatrick confirmed that he will support the Plan as drafted if he is appointed FCR:

> Q.      So is it your understanding that you made an agreement to
> support the confirmation of this plan?
> A.      Yes, that is my understanding.

Forte Decl. Ex. 1 (Fitzpatrick Tr.) at 41:1-4. Mr. Fitzpatrick further confirmed that he does not view his role as one of trying to effect change to benefit his clients, but rather as a "monitor" in case there are any unexpected developments. *See* Forte Decl. Ex. 1 (Fitzpatrick Tr.) at 88:9-14.

This circumstance, where someone selected by the Debtor and present claimants as a purported pre-petition future claimants' representative has reached agreement on a consensual plan, is not unique to this case. Whenever a purported pre-petition future claims representative seeks appointment as the statutory future claims representative in the bankruptcy case, there are

20

necessarily concerns regarding that person's independence and ability to energetically represent

the interests of future claimants.  The Court need not decide whether there are other

circumstances in which an individual who purports to represent future claimants pre-petition can

meet their burden to show that he can adequately serve as the statutory future claims

representative.  The facts here, including his own admissions that he does not intend to seek

important changes to the TDPs, show unequivocally that Mr. Fitzpatrick is not prepared to do so

in this case.  An independent representative that has not been beholden to Debtors or members of

the ACC -- and who is not seeking lifetime employment with the trust -- is far more likely to take

on these important issues.

      **C.**      **Appointment of an Independent Future Claimants' Representative Will Not Prejudice Debtors**

Finally, while not a critical consideration, it is worth noting that appointment of an

independent representative will not prejudice Debtors.  Debtors testified that they will continue

to pursue confirmation of the same plan irrespective of the identity of the future claimants'

representative:

> Q.    Would Duro Dyne continue to seek approval of the same
> plan if a future claims representative other than Mr.
> Fitzpatrick was appointed?
> A.    Yes.
> Q.    Would Duro Dyne continue to seek approval of the same
> plan if a person other than Mr. Fitzpatrick was appointed as
> post-confirmation future claims representative?
> A.    Yes.

Forte Decl. Ex. 4 (Hinden Tr.) at 57:24-58:8.  In other words, appointment of an independent

future claimants' representative will not impair Debtors' willingness to pursue the current Plan.

Nor will it cause any undue delay.  In fact, it is *Debtors* who recently requested a

continuance of the hearing on Debtors' disclosure statement.  Whomever the Court selects will

have additional time, in other words, to get up to speed on this case.

21

## **<u>CONCLUSION</u>**

For the foregoing reasons, Certain Insurers respectfully requests that the Court deny

Debtors' motion to appoint Lawrence Fitzpatrick as the statutory legal representative for future

claimants, and instead appoint an independent representative of the Court's choosing.

Dated: October 12, 2018                    Respectfully submitted,


/s/ *Stephen M. Forte*
Stephen M. Forte, Esq.
SHIPMAN & GOODWIN LLP
400 Park Avenue, Fifth Floor
New York, NY 10022-4406
Tel:    (212) 376-3015
Fax:    (212) 376-3024
Email: sforte@goodwin.com

-and-

James P. Ruggeri (admitted *pro hac vice*)
Joshua D. Weinberg (admitted *pro hac vice*)
Abigail W. Williams (admitted *pro hac vice*)
SHIPMAN & GOODWIN LLP
1875 K Street, NW, Suite 600
Washington, DC 20006-1251
Tel:    (202) 469-7750
Fax:    (202) 469-7751
Email: jruggeri@goodwin.com
           jweinberg@goodwin.com
           awilliams@goodwin.com

*Attorneys for Hartford Accident and Indemnity
Company*

KENNEDYS CMK LLP

/s/ *Margaret F. Catalano*
Margaret F. Catalano
Christina R. Salem
570 Lexington Avenue, 8th Floor
New York, N.Y. 10022
(212) 252-0004

Emails:  meg.catalano@ kennedyscmk.com
            christina.salem@kennedyscmk.com

-and-

IFRAH PLLC
George R. Calhoun, V (*pro hac vice*)
Ifrah PLLC
1717 Pennsylvania Ave., NW
Washington, D.C. 20006
202.525.4147
Email: george@ifrahlaw.com

*Attorneys for The North River Insurance Company*

*/s/ Mark S. Lichtenstein*
Mark S. Lichtenstein
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, New York 10022
Telephone:      (212) 223-4000
Facsimile:      (212) 223-4001
Email:          mlichtenstein@crowell.com

Mark D. Plevin (admitted *pro hac vice*)
Tacie H. Yoon (admitted *pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Telephone:      (202) 624-2500
Facsimile:      (202) 628-5116
Email:          mplevin@crowell.com
                tyoon@crowell.com

*Attorneys for Federal Insurance Company*