UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
ACTING UNITED STATES TRUSTEE, REGION 3
Mitchell B. Hausman, Esq.
Jeffrey M. Sponder, Esq.
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Email: mitchell.b.hausman@usdoj.gov
        jeffrey.m.sponder@usdoj.gov

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>DURO DYNE NATIONAL CORP., *et al.*,[1]<br><br>             Debtors. | ) Chapter 11<br>)<br>) Case No. 18-27963 (MBK)<br>)<br>) Jointly Administered<br>)<br>) Hearing Date: October 15, 2018,<br>)             at 2:00 p.m. |

## SUPPLEMENTAL OBJECTION OF THE UNITED STATES TRUSTEE TO MOTION FOR AN ORDER APPOINTING LAWRENCE FITZPATRICK AS REPRESENTATIVE FOR FUTURE ASBESTOS CLAIMANTS

Andrew R. Vara, the Acting United States Trustee for Region 3 ("United

States Trustee"), by and through his undersigned counsel, hereby files this

supplemental objection ("Supplemental Objection") to the Debtors' motion for an

order appointing Lawrence Fitzpatrick as the legal representative of future asbestos

---

[1] The Debtors in these chapter 11 cases are: Duro Dyne National Corp., No. 18-27963-MBK; Duro Dyne Corporation, No. 18-27968-MB;, Duro Dyne Machinery Corp., No. 18-27969-MBK; Duro Dyne MidWest Corp., No. 18-27970-MBK; and Duro Dyne West Corp., No. 18-27971-MBK (collectively, the "Debtors").

1

claimants (the "FCR") in the above-captioned cases under 11 U.S.C.

§ 524(g)(4)(B)(i) (the "Motion"), in further support of the United States Trustee's

pending objection to the Motion filed on September 27, 2018 (Dkt. 103) (the

"Objection").[2]

## PROCEDURAL HISTORY

1.     The United States Trustee submits this Supplemental Objection at the

direction of the Court as stated on the record of the October 1, 2018, hearing on the

Motion.  At the conclusion of that hearing, the Court deferred its ruling on the

Motion and authorized the parties to conduct certain limited discovery on issues

relating to Mr. Fitzpatrick's pre-petition employment by the Debtors.  *See*

Transcript Regarding Hearing held October 1, 2018, at 78:10–80:9 (Dkt. 132).  In

accordance with the Court's instructions, the United States Trustee served

document discovery on the Debtors, Mr. Fitzpatrick, and members of the pre-

petition Ad Hoc Committee of present asbestos claimants on October 3, 2018.  On

October 10, 2018, the United States Trustee participated in depositions of Mr.

Fitzpatrick and of Randall S. Hinden, the Debtors' Chief Executive Officer.

Transcripts of the depositions of Mr. Fitzpatrick and Mr. Hinden are attached to

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Objection.

2

this Supplemental Objection as Exhibits A ("Fitzpatrick Tr.") and B ("Hinden

Tr.").

2.      In their responses to the United States Trustee's document requests

and in the Fitzpatrick deposition, the Debtors, Mr. Fitzpatrick and the Ad Hoc

Committee refused to produce certain documents, heavily redacted those

documents that were produced, and refused to give testimony on a broad range of

topics relating to Mr. Fitzpatrick's pre-petition activities on the basis of an alleged

"joint defense privilege," "negotiation privilege," or the "common interest

doctrine." *See* Debtors' Responses and Objections to the United States Trustee's

First Request for Production of Documents at 4 (attached as Exhibit C); The Legal

Representative's Responses and Objections to the United States Trustee's First

Requests for Production of Documents at 4 (attached as Exhibit D); Letter from

James B. Wehner to Mitchell B. Hausman and Mark D. Plevin, dated October 8,

2018 at 2 (attached as Exhibit E); Fitzpatrick Tr. at 79:8-22.   Due to this expansive

claim of privilege, critical facts about Mr. Fitzpatrick's pre-petition activities—the

principal topic on which the Court directed the parties to conduct discovery—

remain unknown.  Furthermore, because none of these parties attached a privilege

log to their discovery responses, it has not been possible for the United States

Trustee to ascertain which documents have been withheld or the precise scope of

the privilege that is being asserted.[3]

3.    The United States Trustee submits this Supplemental Objection to

advise the Court of certain additional facts that have been ascertained through

discovery that are relevant to arguments raised in the United States Trustee's

earlier Objection.  Because the discovery authorized by the Court was limited, not

every argument raised in the Objection relates to matters on which discovery was

taken.  The United States Trustee does not reiterate those arguments here but relies

on his earlier Objection.

4.    The Debtors and the FCR have the burden to establish that the

proposed FCR has been and can be a disinterested, independent, and rigorous

advocate for future asbestos victims.  Given that Mr. Fitzpatrick was paid for his

work on the pre-negotiated Plan over a period of sixteen months before these cases

filed, everything he said and did during these Plan negotiations are relevant to his

qualifications as the proposed FCR.  Yet, during limited discovery on these precise

issues, the FCR and the Debtors invoked various privileges to withhold

information about what he did and said while advocating for future asbestos

---

[3] During the course of the October 10, 2018, depositions, the Court ordered the parties to serve a privilege log by Friday, October 12, 2018.  Because that is the same date as the deadline for this Supplemental Objection, this Supplemental Objection does not reflect any additional information that may have been contained in the parties' privilege logs.  As discussed below, it is not necessary for the Court to decide whether these documents have been properly withheld because they relate to issues on which the Debtors bear the burden of proof and because there are already ample grounds to deny the Motion even without disclosure of the allegedly privileged documents.

claimants.  The Debtors simply want the Court to evaluate his fitness for a job without disclosing how he has actually performed that job to date.  The Debtors and the FCR were required to either provide the necessary evidence to evaluate his job performance over the last sixteen months, or else live with their choice of having made questionable claims of privilege and force the Court to deny Mr. Fitzpatrick the appointment for failure to meet their burden of proof.

5.    What is perhaps more telling is the nature of the privileges asserted—common interest and joint defense.  Although the Debtors, the FCR, and the pre-petition Ad Hoc Committee may have had common interests with regard to the debtors' insurers, they surely do not have common interests with regard to each other.  The Debtors want to conclude the case as inexpensively as possible, while the Ad Hoc Committee and the FCR want the largest possible "pie."  But the present claimants represented by the Ad Hoc Committee and the future claimants represented by the FCR each seek to maximize their recovery at the other's expense.  The assertion of the common interest privilege with one's adversaries is particularly telling and essentially *res ipsa loquitur* regarding the FCR's disinterestedness.  If he sees his constituents' interests as perfectly and fully aligned with the current claimants or the Debtors, that itself is an admission that Mr. Fitzpatrick is not and cannot be a disinterested, independent fiduciary for future claimants.

5

6.     Nevertheless, despite the invocations of privilege and failure to meet
their burden, the facts disclosed support the conclusion that Mr. Fitzpatrick is not
disinterested.  But even if the Court found otherwise, his appointment still should
be denied given the Court's discretion to appoint the FCR.  Among other facts, Mr.
Fitzpatrick's duties were constrained by his terms of employment, and he was
presented with a plan negotiated over a two-year period before he was retained.
He did not question or resist plan provisions with negative consequences for future
asbestos claimants, nor does he have the ability to do so now, given his
commitment to support this plan.  The Debtors did not consider him an adversary,
and Mr. Fitzpatrick has accepted a personal financial benefit under the plan by
agreeing to serve as the FCR for the post-confirmation trust.  For all these reasons
and those originally briefed, the application must be denied.

## STATEMENT OF ADDITIONAL FACTS

7.     The following additional material facts have either been admitted by
the Debtors or Mr. Fitzpatrick or can be inferred by the Court based on the
deposition testimony and discovery conducted in this case:

6

**a. When selecting Mr. Fitzpatrick, the Debtors did not conduct a comprehensive search, did not consider the interests of future claimants, and did not take adequate steps to ensure that he would be free from conflicts.**

8.      In his deposition, Mr. Hinden stated that he left the selection of candidates to serve as FCR "up to counsel." *See* Hinden Tr. at 21:4-7.  Although Mr. Hinden stated a "few" other candidates were considered other than Mr. Fitzpatrick, he could not remember their full names or any other information about them.  *Id.* at 21:12-24.  The Debtors did not conduct a public search or solicit applications for the FCR position, and Mr. Fitzpatrick was the only candidate interviewed.  *Id.* at 23:19–24:9.  When questioned about the criteria he used in selecting an FCR, Mr. Hinden named just two factors: "to have somebody with experience doing what we wanted him to be doing for us or for the trust," and "[l]ocality for the case, being in New Jersey."  *Id.* at 21:25–22:9.  Mr. Hinden could not identify any other factors that were considered, and in particular he testified that he did not consider or review the results of Mr. Fitzpatrick's work on behalf of future claimants in his prior cases.  *Id.* at 54:20-24.

9.      There is no evidence that the Debtors ever performed a rigorous review of Mr. Fitzpatrick's conflicts—a subject that was not mentioned by Mr. Hinden as part of the selection process.   Although Mr. Fitzpatrick testified that he performed a personal conflicts check based on a list provided to him by his counsel, the only entities for whom he could recall performing a check were "[a]ll

7

the U.S. trustee employees; all the judges, bankruptcy judges in New Jersey."

Fitzpatrick Tr. at 24:11-24.   Based on testimony of Mr. Fitzpatrick and Mr.

Hinden, it is unclear if any broader conflicts search was ever requested or

performed.

### b. Mr. Fitzpatrick was hired at a late stage of the Plan negotiations, after the principal terms of the Plan were already in place.

10.    Mr. Hinden testified that he first began negotiating a chapter 11 plan

with the Ad Hoc Committee in 2015.  *See* Hinden Tr. at 18:10-19.  As of 2015, Mr.

Hinden was also represented by experienced bankruptcy counsel with experience

in section 524(g) cases.  *Id.* at 19:14-22.  Despite this, the Debtors did not begin

their search for a pre-petition FCR until 2017—after negotiations with present

claimants had already been underway for approximately two years.  *Id.* at 20:12-

19.  For his part, Mr. Fitzpatrick testified that he was first approached concerning

the Debtors' potential cases on May 23, 2017.  *See* Fitzpatrick Tr. at 19:23–20:4.

By that point, according to Mr. Fitzpatrick, the decision to file the chapter 11 cases

had already been made.  *Id.* at 28:8-9.  In addition, the Debtors and the Ad Hoc

Committee had already prepared a term sheet for the Plan, a copy of which was

provided to Mr. Fitzpatrick on June 1, 2017.  *Id.* at 72:11-13.

### c. The Debtors did not regard Mr. Fitzpatrick as an adversary.

11.    When asked if he viewed Mr. Fitzpatrick as an adversary during the

pre-petition period, Mr. Hinden testified, "[N]ot as an adversary."  Hinden Tr. at

30:10-12.  This remark is consistent with the characterization of Mr. Fitzpatrick's

role asserted in the discovery responses of Mr. Fitzpatrick, the Debtors, and the Ad

Hoc Committee.  Although the exact scope of the privilege claimed is not clear, it

is notable that all three parties have asserted the existence of a "common interest"

during the entire period of Mr. Fitzpatrick's pre-petition engagement—

notwithstanding the fact that, according to Mr. Fitzpatrick's own testimony, he did

not definitively agree to support the plan until the very eve of the bankruptcy.  *See*

Fitzpatrick Tr. at 39:1-14.

### d. Mr. Fitzpatrick's duties were severely constrained, and he was subject to the control of the Debtors during the pre-petition period.

12.    During  his pre-petition engagement, Mr. Fitzpatrick was constrained

in his ability to advocate for future claimants because the basic outcome of the

case—a chapter 11 plan including a section 524(g) injunction—had already been

predetermined by the time he became involved.  Among other things, this

prevented Mr. Fitzpatrick from advocating or even considering whether the

interests of future claimants would have been better served by an alternative

structure to chapter 11.  *See* Fitzpatrick Tr. at 28:7-9 ("I did not consider any

alternatives to a Chapter 11. The decision to file for a Chapter 11 I believe had

been made before I was retained."). As noted, he was hired after a term sheet had

already been prepared that would define the basic structure of the Plan; there is no

evidence that he would have or even could have challenged this agreement if

necessary to improve the outcomes for future claimants.

13. The evidence also supports an inference that Mr. Fitzpatrick was

constrained because of the implicit threat that he could be terminated if his efforts

did not proceed in a manner favorable to the Debtors or the Ad Hoc Committee.

Although Mr. Fitzpatrick believed that he could only be terminated for

"malfeasance," he admitted that he had never discussed this question with the

Debtors. *Id.* at 36:18–37:5. Mr. Fitzpatrick's testimony was also contradicted by

Mr. Hinden, who testified that Mr. Fitzpatrick could be terminated on the same

basis as the Debtors' other professionals:

> Q:   And from the company's point of view, did it have the ability to end
>      Mr. Fitzpatrick's engagement?
>
> A:   I don't see why not. I could end Mr. Prol's as well.

Hinden Tr. at 33:16-20.

14. Mr. Hinden later elaborated by identifying several specific scenarios,

not related to malfeasance by Mr. Fitzpatrick, that would lead to Mr. Fitzpatrick's

termination. These included a decision not to proceed with a chapter 11 strategy,

an impasse in plan negotiations, or a lack of progress towards a consensual plan.

10

*Id.* at 56:4-12.  Notably, any of these outcomes apparently would have led to Mr.

Fitzpatrick's termination without regard to whether they may have been in the best

interests of future claimants.

### e.  There is no evidence that Mr. Fitzpatrick substantially participated in the formulation of the Plan.

15.      Although the Disclosure Statement recites that Mr. Fitzpatrick "spent

considerable time negotiating over the terms of a possible Plan," *see* Dkt. 20 at 19,

the decision by Mr. Fitzpatrick and the Debtors to assert a blanket privilege over

the entire plan formulation process means that there is nothing in the record to

substantiate such a statement.  But the time records produced by Mr. Fitzpatrick

speak for themselves, and they reflect at best a minimal involvement by Mr.

Fitzpatrick in the actual negotiation and drafting of the Plan.

16.      Specifically, the first reference to a term sheet in Mr. Fitzpatrick's

billing records occurs in June 2017, shortly after his retention, when he spent 0.6

hours reviewing a term sheet and a further 0.1 hours communicating with his

counsel about the term sheet.  *See* Fitzpatrick Time Records (attached hereto as

Exhibit F) at 000002-000003.  This is presumably the same term sheet referenced

in Mr. Fitzpatrick's deposition testimony, which was prepared by the Debtors and

the Ad Hoc Committee prior to his retention.

17.     The first reference to a plan in Mr. Fitzpatrick's billing records does not occur until May 17, 2018, when he billed 1.1 hours for "Review revised Prenegotiated Plan of Reorganization." *Id.* at 000007.  There are no references to a plan in any of Mr. Fitzpatrick's billing records for the intervening 11 months, suggesting that this plan was also formulated without his participation.  And although there are scattered references to reviewing various plan documents in the months leading to the bankruptcy (generally totaling no more than a few hours per month), there are no time additional records that refer explicitly to Mr. Fitzpatrick drafting, revising, or otherwise advancing the Plan.  *Id.*

### f.  As pre-petition FCR, Mr. Fitzpatrick did not challenge questionable Plan provisions on behalf of future claimants.

18.     As discussed in the United States Trustee's pending objection to the Disclosure Statement, the current Plan in this case is not confirmable because, among other reasons, it contains numerous provisions that appear to facilitate fraud and other forms of abuse.  *See* Objection of the United States Trustee to the Disclosure Statement for the Prenegotiated Plan of Reorganization for Duro Dyne National Corp., *et al.* at 8-16 (Dkt. 140).

19.     Although Mr. Fitzpatrick conceded that it is in the best interests of future claimants to prevent fraudulent and abusive claims that may deplete the Trust, *see* Fitzpatrick Tr. at 96:9-13, Mr. Fitzpatrick did not object to numerous

12

questionable provisions of the proposed Plan and Trust Distribution Procedures

(TDPs).  In particular, Mr. Fitzpatrick did not object to, or affirmatively supported,

TDPs provisions that: (i) recite that all evidence is for the sole benefit of the Trust;

(ii) treat trust claims as confidential settlement discussions; (iii)  exempt certain

claimants from submitting medical evidence; (iv) treat entire occupational

categories as presumptively exposed; (v) allow claimants to recover who have

previously denied liability; and (vi) allow claimants to withdraw and refile claims

without giving rise to a statute of limitations defense.  *See Id.* at 50:2–53:18.

> **g.  Mr. Fitzpatrick will not seek to negotiate further the plan post-petition.**

20.    Although he could not specifically recall signing any term sheets, Mr.

Fitzpatrick testified that he had made an agreement to support the confirmation of

the Plan.  *Id.* at 40:1-6 and 41:1-5.   Apparently on account of that agreement, Mr.

Fitzpatrick further testified that his duties going forward would be limited to a few

discrete matters that have not yet been finalized as well as to any "last-minute

changes."  *Id.*at 41:6-20.  Mr. Fitzpatrick does not anticipate performing any

additional due diligence or seeking to renegotiate the Plan, and he could not think

of any facts that would cause him to reconsider his support for the Plan.  *Id.* at

42:18–43:8.

13

**h. Mr. Fitzpatrick will accept a personal financial benefit under the Plan.**

21.     In his testimony, Mr. Fitzpatrick confirmed that he will be named as Future Claims Representative for the Trust on a post-confirmation basis in the event the Plan is confirmed. *Id.* at 61:7-10.

**i. Mr. Fitzpatrick's appointment is not a condition to the Debtors' support of the Plan.**

22.     Mr. Hinden testified that the Debtors' support of the Plan is not conditioned on whether Mr. Fitzpatrick or another person is appointed to serve as FCR and that replacement of Mr. Fitzpatrick would not cause the Debtors to withdraw their request for approval of the Plan. *See* Hinden Tr. at 57:24–58:1-8.

## ARGUMENT

23.     As the Court observed at the October 1, 2018, hearing, what is at issue here is not Mr. Fitzpatrick's experience or qualifications (*see* October 1, 2018, Tr. at 75:13-14), but rather "the concerns that have been raised" by the United States Trustee (*id.* at 75:21-22) and "what's being proposed" in the Plan and "how it got to the point with respect to the pre-petition activities" (*id.* at 78:11-12). With respect to Mr. Fitzpatrick's appointment, the Court must now conduct a two-part analysis. First, the Court must determine whether the Debtors have demonstrated that Mr. Fitzpatrick is disinterested. *Id.* at 79:15–80:2. If the Court determines

that Mr. Fitzpatrick is not disinterested—as the United States Trustee believes it should—his appointment should be denied.

24.    But it does not follow that the Court should automatically approve Mr. Fitzpatrick's appointment in the event he is found to be disinterested.  Section 524(g) commits the power to appoint an FCR to the Court alone.  Mr. Fitzpatrick does not have a right to be appointed, and the Debtors do not have a right to have an FCR of their choice appointed.  Even if the Court concludes that Mr. Fitzpatrick is disinterested, it should conduct an independent analysis of whether, based on the facts of this case, he would provide more effective service to future claimants than would a different FCR nominee.

25.    Mr. Fitzpatrick's appointment should be denied under either prong of this analysis.   The Debtors have not demonstrated that Mr. Fitzpatrick is disinterested under the well-established standards applicable to section 1104 trustees.  Even if he were disinterested, however, his appointment should alternatively be denied because he cannot effectively represent future claimants due to his prior role in the pre-petition negotiations, and he cannot provide the fresh, unbiased analysis of the Plan—or of future iterations of the Plan—which this case requires.

15

## I.    Mr. Fitzpatrick is Not Disinterested

### a. The Debtors Bear the Burden of Demonstrating that Mr. Fitzpatrick is Disinterested

26.    As the party moving for Mr. Fitzpatrick's retention, the Debtors bear the burden of demonstrating that he is disinterested.  *See In re Interwest Bus. Equip., Inc*., 23 F.3d 311, 318 (10th Cir. 1994) ("An applicant … has the burden of establishing by application and accompanying affidavit that its chosen professional is qualified"); *In re Triple Star Welding, Inc*., 324 B.R. 778, 793 (B.A.P. 9th Cir. 2005), *abrogated on other grounds by In re AFI Holding, Inc.,* 530 F.3d 832 (9th Cir. 2008) (holding that "The initial burden is on [the professional] to establish that he was eligible for employment and should receive compensation notwithstanding his possible conflicts of interest"); *In re Champagne Servs., LLC*, 560 B.R. 196, 201 (Bankr. E.D. Va. 2016) ("The burden is on the proponent of the application to show that proposed counsel satisfies all requirements, including that he is disinterested. It is not the United States trustee's burden to show that he is not disinterested.").

### b. The Debtors' claim of privilege does not relieve them from their evidentiary burden.

27.    As the Court recognized in its comments at the October 1, 2018, hearing, the conduct of the pre-petition negotiations in which Mr. Fitzpatrick allegedly participated is the single most critical factual issue that the Court must

16

explore before deciding the request to appoint Mr. Fitzpatrick. *See* Oct. 1, 2018

Tr. at 80:22–81:1 ("[T]here was pre-petition negotiations here, there's the plan

process which this Court has to review[.]").  But it is precisely on those issues that

the Debtors, Mr. Fitzpatrick, and the Ad Hoc Committee have asserted privilege,

and it is precisely those documents that relate directly to the pre-petition plan

process that they have refused to produce.

28.    It is not necessary for the Court to rule on the Debtors' (and Mr.

Fitzpatrick's) assertions of privilege in the context of this Motion because the

burden of proof is theirs.  It is the responsibility of the Debtors and Mr. Fitzpatrick

to provide this Court with a sufficient factual record to support the Motion, and if

the common interest privilege is an obstacle to making that disclosure, it is within

their power to waive it.   But they cannot use that alleged privilege as an excuse for

not meeting their evidentiary burden.  As one court has noted in similar

circumstances, "allowing a plaintiff to hide ... behind a claim of privilege" on an

issue that the plaintiff has placed directly at issue "would simply be contrary to the

most basic sense of fairness and justice." *Jackson v. Chubb Corp.*, 193 F.R.D.

216, 221 (D.N.J. 2000) (internal quotations omitted).  The Debtors may or may not

be within their rights to withhold documents that would explain the course of their

negotiations, but they cannot withhold those documents while simultaneously

requesting that the Court make a factual finding based on the very facts and

documents they have refused to disclose.

### c. Alternatively, the deposition testimony and documents produced establish that Mr. Fitzpatrick is not disinterested.

29.      In any event, the evidence <u>not</u> withheld by the Debtors and Mr.

Fitzpatrick is more than sufficient for the Court to conclude that Mr. Fitzpatrick is

not disinterested.  In its October 1, 2018, bench ruling, the Court held that an FCR

would be held to the same standard of disinterestedness as a section 1104

fiduciary.  *See* Oct. 1, 2018 Tr. at 79:18–80:2.  As applied to trustees and

examiners, the requirement of disinterestedness has been held to prohibit, among

other things: an examiner's entry into an agreement that would provide a financial

reward based on the particular outcome of a case, *see In re Big Rivers Elec. Corp.*,

355 F.3d 415, 434 (6th Cir. 2004); a trustee's outside employment with a firm that

held an adverse interest to the estate, *see In re Bennett Funding Grp., Inc.*, 226

B.R. 331, 336 (Bankr. N.D.N.Y. 1998); or any other "personal interest(s) which

might be reflected in their decisions concerning matters of the debtor's estate or

which might impair the high degree of impartiality and detached judgment

expected of them during the course of administration."  *In re Vebeliunas*, 231 B.R.

181, 191 (Bankr. S.D.N.Y. 1999) (internal citations omitted).

30.     Although many of the facts concerning Mr. Fitzpatrick's employment have not been disclosed, the existing record is sufficient to demonstrate that Mr. Fitzpatrick is not disinterested within the meaning of the Bankruptcy Code.  It is undisputed that Mr. Fitzpatrick will benefit personally from the confirmation of the proposed Plan, through its requirement that he be named post-confirmation FCR. The testimony of Mr. Hinden, as well as the practical control that the Debtors exercised over Mr. Fitzpatrick, support the conclusion that Mr. Fitzpatrick's role was far more in the nature of an employee than of an independent adversary. Finally, as Mr. Fitzpatrick himself testified, he cannot act as an impartial FCR with respect to the Plan because he considers himself obligated to support it due to his pre-petition agreement with the Debtors.

## II.     In the alternative, the Court should exercise its discretion to appoint an FCR other than Mr. Fitzpatrick

### a.  The interests of future claimants would be better served by a truly independent FCR.

31.     Even were the Court to conclude that Mr. Fitzpatrick is disinterested, it should exercise its discretion to appoint a different candidate.  In enacting section 524(g), Congress expected that future claimants would receive vigorous, independent representation, and it is clear that Mr. Fitzpatrick is not presently capable of fulfilling that function.  Mr. Fitzpatrick has stated that he has no intention of reconsidering or renegotiating the current Plan and that he considers

himself bound by the results of the pre-petition negotiations.  In addition, it appears

that during those negotiations, Mr. Fitzpatrick was either unwilling or unable to

advocate effectively on behalf of future claimants with respect to the abusive Plan

provisions identified by the United States Trustee, the risks of which will be

primarily borne by future claimants.

### b. Mr. Fitzpatrick's pre-petition activities are not a substitute for the protections of a fully independent FCR.

32.    Even if the Court concludes that Mr. Fitzpatrick acted diligently and

with good intentions, his pre-petition services are not a substitute for the

protections provided by an independent FCR because Mr. Fitzpatrick's services

were provided under conditions and constraints that would not exist for a truly

independent, post-petition FCR.  As an initial matter, there is no evidence that Mr.

Fitzpatrick was subject to the same rigorous, transparent selection process that

would normally be expected of a chapter 11 fiduciary.  Instead, he was selected

through an abbreviated process that was not based on the needs or interests of

future claimants and that may not necessarily have involved a full review of Mr.

Fitzpatrick's possible conflicts and connections.  Furthermore, the scope of Mr.

Fitzpatrick's work was limited in comparison to what a post-petition FCR would

presumably be expected to perform.  Rather than being allowed to consider all

options, including the possibility that future claimants would be better served by a

20

plan that did not include a section 524(g) channeling injunction, Mr. Fitzpatrick's role was limited to considering only a narrow range of restructuring options based on an eventual section 524(g) plan.  Rather than being permitted to negotiate a plan in its entirety, Mr. Fitzpatrick was presented from the beginning with a term sheet already negotiated by other parties.  And rather than being free to take a strongly adversarial position against the Debtors, Mr. Fitzpatrick was subject to an implicit threat of termination in the event that his work did not progress in a manner satisfactory to the Debtors.

33.     By appointing a different FCR, the Court would ensure that future claimants will receive strong representation not subject to any of the same limitations to which Mr. Fitzpatrick is subject.  Unlike Mr. Fitzpatrick, a new FCR would be free to renegotiate or refuse to support the plan, even at the risk of antagonizing the Debtors.  That FCR would also have the ability to consider and advocate for restructuring outcomes other than those preferred by the Debtors and the Committee.  And in the event that a new plan is proposed, that FCR would have the ability to participate fully in plan negotiations as an equal partner of the Debtors and the Committee—something that does not appear to have happened during Mr. Fitzpatrick's pre-petition engagement.

### c. **Appointment of an independent FCR would not unduly disrupt or delay this case.**

34.     Finally, the appointment of an alternative FCR in lieu of Mr. Fitzpatrick would not unduly delay progress of this case.  As discussed in the United States Trustee's objection to the Debtors' Disclosure Statement, the United States Trustee does not believe that the Plan is confirmable in its present form, and resolution of these cases is therefore not imminent.  Considerable revisions and discussions will be necessary before any plan can be confirmed, and that time interval would provide a replacement FCR with an ample opportunity both to familiarize himself with these cases and to participate in any subsequent Plan negotiations.  Furthermore, as Mr. Hinden testified, the Debtors do not regard Mr. Fitzpatrick's participation as an indispensable requirement of any plan.  Indeed, given the questions that have been raised about Mr. Fitzpatrick's independence, a new FCR may eliminate some of the potential challenges that may be brought to the eventual plan—ultimately providing both a more certain and a less costly resolution to these cases for all parties.

WHEREFORE the United States Trustee respectfully requests that the Court

deny the Motion for the appointment of Mr. Fitzpatrick.

Respectfully submitted,

ANDREW R. VARA
ACTING UNITED STATES TRUSTEE
REGION 3

By:     */s/ Jeffrey M. Sponder*
Jeffrey M. Sponder
Trial Attorney
Mitchell B. Hausman
Trial Attorney

DATED: October 12, 2018