UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re: | : | Case No. 18-27963 (MBK) |
| | : | |
| DURO DYNE NATIONAL CORP., *et al.*, | : | Chapter 11 |
| | : | |
| Debtors.[1] | : | Jointly Administered |
| | : | |

## SECOND AMENDED DISCLOSURE STATEMENT FOR SECOND AMENDED PRENEGOTIATED PLAN OF REORGANIZATION FOR DURODYNE NATIONAL CORP., ET AL.

LOWENSTEIN SANDLER LLP
Kenneth D. Rosen, Esq.
Jeffrey D. Prol, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
Facsimile:  (973) 597-2400
krosen@lowenstein.com
jprol@lowenstein.com

*Counsel to the Debtors and
Debtors in Possession*

---

[1]    The Debtors subject to this Disclosure Statement and the Prenegotiated Plan of Reorganization referred to herein are Duro Dyne National Corp., Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp.

## DISCLAIMER

THIS SECOND AMENDED DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONBANKRUPTCY LAW. THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE HOLDERS OF CLAIMS AGAINST THE DEBTORS WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THEY CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.    THIS DISCLOSURE STATEMENT AND ALL EXHIBITS HERETO, INCLUDING THE PLAN, SHOULD BE READ.    PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE DISCLOSURE STATEMENT AND THE PLAN.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN.    THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF.    NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN WILL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.    CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE THE PLAN, UNLESS ANOTHER TIME IS SPECIFIED.    THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE OF THE PLAN.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT OR THE PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.    THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

## TABLE OF CONTENTS

**PAGES**

ARTICLE I.         INTRODUCTION ....................................................................................1

ARTICLE II.        PURPOSE OF THIS DISCLOSURE STATEMENT..................................1

ARTICLE III.       PLAN VOTING PROCEDURES AND CONFIRMATION OF
                   PLAN ....................................................................................................2

    A.    Requirements for Confirmation ..................................................................2

    B.    Persons Potentially Eligible to Vote on the Plan ......................................3

    C.    Solicitation and Confirmation Hearing Notice .........................................3

    D.    Deadline for Voting to Accept or Reject the Plan ....................................4

    E.    Acceptance of the Plan..............................................................................5

    F.    Time and Place of the Confirmation Hearing ...........................................6

    G.    Procedure for Objections to Confirmation of the Plan .............................6

ARTICLE IV.        BACKGROUND AND SUMMARY OF CHAPTER 11 CASES .............7

    A.    The Debtors' Business and Corporate Structure........................................7

        1.    Overview and Nature of the Debtors' Business..............................7

        2.    The Debtors' Current Business, Officers and Directors .............................9

        3.    The Debtors' Equity Structure .................................................9

        4.    Prepetition Secured Debt. ........................................................10

        5.    Leases........................................................................................11

        6.    Trade Debt .................................................................................11

    B.    Duro Dyne Pension Plan Obligations .....................................................11

        1.    Duro Dyne Pension Plan............................................................11

        2.    Decertification of Local 210, Warehouse & Production Employees
                   Union, AFL-CIO and Assertion of Withdrawal Liability Claims by
                   the Local 210 Unity Pension Fund ...........................................12

        3.    Collective Bargaining Agreements with SMART Local Union No.
                   24 of Sheet Metal Workers' International Union and SMART
                   Local Union No. 170 of the Sheet Metal Workers' International
                   Union and Participation in Sheet Metal Workers' National Pension
                   Fund ...........................................................................................13

    C.    Asbestos Litigation .................................................................................13

    D.    Insurance Coverage..................................................................................14

|   |   | 1. | The Insurance Coverage Litigation | 15 |
|   |   | 2. | Factors That May Reduce Available Insurance Coverage | 15 |
|   |   | 3. | Treatment of Alleged Claims of Asbestos Insurers | 16 |
|   | E. | PREPETITION SETTLEMENT NEGOTIATIONS | | 17 |
|   | F. | The Company's Prepetition Discussions with Representatives of Current Holders of Asbestos Personal Injury Claims and with the Legal Representative | | 18 |
|   |   | 1. | The Asbestos Claimants Committee Representing Current Asbestos Personal Injury Claimants. | 18 |
|   |   | 2. | The Pre-Petition Future Claimants' Representative | 18 |
|   |   | 3. | Due Diligence and Plan Negotiations | 19 |
|   | G. | Other Litigation | | 20 |
|   | H. | The Chapter 11 Cases | | 20 |
|   |   | 1. | First Day Motions | 20 |
|   | I. | Retention of Professionals | | 22 |
|   | J. | Appointment of Official Committee and Legal Representative | | 22 |

ARTICLE V.    SUMMARY OF THE PLAN ... 22

|   | A. | General | 22 |
|   | B. | Trust Funding | 23 |
|   | C. | Classification of Claims and Interests | 24 |
|   |   | 1. | Unclassified Claims. | 24 |
|   |   | 2. | Unimpaired Classes of Claims | 24 |
|   |   | 3. | Impaired Classes of Claims. | 25 |
|   |   | 4. | Insider Classes of Claims and Equity Interests. | 25 |

ARTICLE VI.    TREATMENT OF UNCLASSIFIED CLAIMS ... 25

|   | A. | Administrative Claims | 25 |
|   | B. | Treatment of Priority Tax Claims | 26 |
|   | C. | Statutory Fees | 26 |

ARTICLE VII.    TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ... 27

|   | A. | Classification of Claims and Interests | 27 |
|   | B. | Summary of Classification. | 27 |
|   | C. | Treatment of Claims and Interests | 28 |

ARTICLE VIII.    THE ASBESTOS TRUST ... 33

A.  Creation and Purposes of the Asbestos Trust .........................................................33

B.  The Asbestos Trust Distribution Procedures ...........................................................33

C.  Appointment of Asbestos Trustee ............................................................................37

D.  Appointment of Delaware Trustee ...........................................................................38

E.  Trust Advisory Committee .......................................................................................38

F.  Legal Representative for Demand Holders ...............................................................38

G.  Assumption of Certain Liabilities by the Asbestos Trust ........................................39

I.  Funding of the Asbestos Trust ..................................................................................39

J.  Securing Payment and Performance Under the Trust Note ......................................40

K.  Vesting of Asbestos Trust Assets ............................................................................40

L.  Earn Out Payments ...................................................................................................41

M.  Financial Reporting and Disclosures ......................................................................42

N.  Actions Against the Reorganized Debtor to Obtain the Benefits of
Asbestos Insurance Coverage ...................................................................................42

O.  Actions Against Non-Settling Asbestos Insurers to Obtain the Benefits of
Asbestos Insurance Coverage ...................................................................................43

P.  Limitations on Recoveries of Insurance Coverage from Non-Settling
Asbestos Insurers .....................................................................................................44

Q.  Determination of Credit, Reduction, or Offset ........................................................44

R.  Subordination of Related-Party Payments and Related-Party Claims ....................45

S.  Preservation of Asbestos-Related Defenses.............................................................45

T.  Books and Records ...................................................................................................45

ARTICLE IX.     IMPLEMENTATION OF THE PLAN ...................................................45

A.  Substantive Consolidation .......................................................................................45

B.  Corporate Governance ..............................................................................................47

C.  Supersedeas Bonds and Payment Assurances..........................................................48

ARTICLE X.     VOTING AND  DISTRIBUTIONS UNDER THE PLAN
GENERALLY..............................................................................................49

A.  Classes Eligible to Vote ...........................................................................................49

B.  Class 6 and 7 Acceptance Requirements ..................................................................49

C.  Voting on Basis of Substantive Consolidation .........................................................49

D.  Issuance of Asbestos Permanent Channeling Injunction Pursuant to
Section 524(g) of the Bankruptcy Code....................................................................50

E.      Nonconsensual Confirmation.................................................................50

F.      Distributions Under the Plan.................................................................50

G.      Time Bar to Distributions by Check ......................................................51

H.      Distributions After the Effective Date ..................................................51

I.      Setoffs ...................................................................................................51

J.      Cancellation of Existing Securities and Agreements.............................52

K.      Allocation of Plan Distributions Between Principal and Interest ..........52

L.      Tax Obligations and Reporting Requirements.......................................52

ARTICLE XI.      TREATMENT OF DISPUTED, CONTINGENT, OR
                 UNLIQUIDATEDNON-ASBESTOS CLAIMS UNDER THE
                 PLAN ....................................................................................................52

A.      Objections to Claims; Prosecution of Disputed Claims.........................52

B.      Estimation of Individual Claims ...........................................................53

C.      Cumulative Remedies ...........................................................................53

D.      No Distributions Pending Allowance or Motion ...................................53

E.      Distributions After Allowance ..............................................................53

ARTICLE XII.      TREATMENT OF EXECUTORY CONTRACTS AND
                  UNEXPIRED LEASES ..........................................................................54

A.      General Treatment ................................................................................54

B.      Assumption of Insurance Policies.........................................................54

C.      Letters of Credit, Surety Bonds, and Guaranties ..................................54

D.      Cure of Defaults and Survival of Contingent Claims ............................55

E.      Deadline for Filing Rejection Damages Claims ....................................55

F.      Contracts and Leases with Related Parties ...........................................55

G.      Effect of Confirmation .........................................................................56

ARTICLE XIII.      DISCHARGE, RELEASES, AND INJUNCTIONS ................................56

ARTICLE XIV.      CONDITIONS PRECEDENT TO CONFIRMATION OF THE
                  PLAN ....................................................................................................62

ARTICLE XV.      RETENTION OF JURISDICTION .........................................................66

ARTICLE XVI.      RISK FACTORS ...................................................................................69

A.      Bankruptcy Considerations...................................................................69

        1.      Failure to Receive Requisite Accepting Votes ...........................69

2.      Risk of Non-Confirmation of the Plan......................................................69

3.      The Debtors may object to the amount or classification of a Claim..........70

4.      Risk of Additional or Larger Claims. .......................................................70

B.      Business Considerations ........................................................................71

C.      Risks Related to Financial Information ..................................................71

D.      No Duty to Update Disclosures ..............................................................72

E.      Alternatives to Confirmation and Consummation of the Plan..............................72

1.      Alternate Plan............................................................................72

2.      Chapter 7 Liquidation ................................................................72

3.      Dismissal of the Chapter 11 Cases.............................................73

ARTICLE XVII.          FEASIBILITY OF THE PLAN ....................................................73

ARTICLE XVIII.         BEST INTERESTS TEST ...........................................................74

A.      The Liquidation Analysis......................................................................74

B.      Application of the Best Interests Test....................................................76

ARTICLE XIX.           NON-CONSENSUAL CONFIRMATION .............................76

A.      Unfair Discrimination ..........................................................................76

B.      Fair and Equitable Test ........................................................................77

ARTICLE XX.            TAX CONSEQUENCES..........................................................78

A.      Compliance with Tax Requirements......................................................78

B.      Tax Consequences to the Debtors..........................................................78

C.      Tax Consequences to Holders of Claims or Equity Interests ................78

ARTICLE XXI.           MISCELLANEOUS PROVISIONS........................................79

ARTICLE XXII.          RECOMMENDATION .............................................................84

## ARTICLE I.
## INTRODUCTION

Duro Dyne National Corp. ("Duro Dyne"), Duro Dyne Machinery Corp. ("Duro Dyne Machinery"), Duro Dyne Corporation ("Duro Dyne Corp."); Duro Dyne West Corp. ("Duro Dyne West"); and Duro Dyne Midwest Corp. ("Duro Dyne Midwest"), as debtors and debtors-in-possession (collectively, the "Company", "Debtors" or "Debtors-in-Possession"), pursuant to the provisions of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended) (the "Bankruptcy Code"), submit this Second Amended Disclosure Statement (the "Disclosure Statement") for their second Amended Prenegotiated Plan of Reorganization (the "Plan")[2] for the resolution of their outstanding Claims and Equity Interests (as those terms are defined herein).

On September 7, 2018, each of the Debtors commenced a bankruptcy case (collectively, the "Chapter 11 Cases") by filing a voluntary chapter 11 petition with the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").  Chapter 11 of the Bankruptcy Code allows a debtor to propose a plan of reorganization or liquidation.  On the same date, the Debtors filed their Plan, as may be amended or modified from time to time, with the Bankruptcy Court.  A copy of the Plan is attached hereto as **Exhibit A**.  This document is the Disclosure Statement for the Plan.

The Plan constitutes a chapter 11 plan of reorganization.  Except as set forth in the Plan or otherwise provided by order of the Bankruptcy Court, Distributions will occur on the Effective Date or as soon thereafter as is practicable and at various intervals thereafter.

In the Debtors' opinion, the treatment of Claims under the Plan provides a greater recovery for Creditors than that which is likely to be achieved under other alternatives. **Accordingly, the Debtors believe that Confirmation of the Plan is in the best interests of all creditors and, therefore, urge all creditors to vote to accept the Plan.**

## ARTICLE II.
## PURPOSE OF THIS DISCLOSURE STATEMENT

This Disclosure Statement summarizes what is in the Plan and describes certain information relating to the Plan and the process the Bankruptcy Court will follow in determining whether or not to confirm the Plan.  This Disclosure Statement contains the following exhibits:

- The Plan (Exhibit A)

- Financial Projections and Liquidation Analysis (Exhibit B)

Please read this Disclosure Statement and the Exhibits carefully as they discuss, among other things:

    a.   Who can vote to accept or reject the Plan;

---

[2]  All capitalized terms not defined in this Disclosure Statement shall have the same meanings set forth in the Plan.

b.   The proposed treatment of claims (i.e., what creditors will receive on account of their claims if the Plan if confirmed), and how this treatment compares to what creditors would receive if the Chapter 11 Cases were converted to Chapter 7 bankruptcy cases;

c.   What the Bankruptcy Court will consider when deciding whether to confirm the Plan; and

d.   The effect of confirmation of the Plan.

This Disclosure Statement cannot tell creditors everything about their rights.  A creditor should consider consulting his or her own lawyer to obtain more specific advice on how the Plan will affect the creditor and what is the best course of action for the creditor.

Creditors should be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.   Bankruptcy Code § 1125 requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The term "adequate information" is defined in Bankruptcy Code § 1125(a) as "information of a kind, and in sufficient detail," about a debtor "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of a debtor to make an informed judgment about accepting or rejecting the Plan.

This Disclosure Statement has been approved by Order of the Bankruptcy Court dated November __, 2018.  Approval of this Disclosure Statement by the Bankruptcy Court does not constitute an endorsement of the Plan by the Bankruptcy Court.

## ARTICLE III.
## PLAN VOTING PROCEDURES AND CONFIRMATION OF PLAN

**THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.  IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTORS AND ON ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS IN THE CHAPTER 11 CASES.**

If the Plan is confirmed, the Distributions provided for in the Plan will be in exchange for, and in complete satisfaction, discharge and release of, all Claims against the Debtors or any of their assets or properties, including all Asbestos Claims and Demands and any Claim accruing after the Petition Date and before the Confirmation Date to the fullest extent permitted by law. As of the Effective Date of the Plan, all holders of Claims and Equity Interests will be precluded from asserting any Claim against the Debtors or their assets or other interests in the Debtors based on any transaction or other activity of any kind that occurred before the Confirmation Date except as otherwise provided in the Plan.

## A.    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all of the applicable requirements of section 1129 of the Bankruptcy Code.  Among the requirements for confirmation in these Chapter 11 Cases are that the Plan (a) is accepted by Class 6 or Class 7, which are the

only Impaired Classes with the right to vote; and (b) the Plan is feasible.  The Bankruptcy Court must also find that:

1.      the Plan has classified Claims and Equity Interests in a permissible manner;

2.      the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

3.      the Plan has been proposed in good faith.  *See* 11 U.S.C. §§ 1123, 1129.

## B.      Persons Potentially Eligible to Vote on the Plan

Pursuant to section 1126 of the Bankruptcy Code, only the holders of Claims in Classes impaired by the Plan and receiving a payment or Distribution under the Plan may vote on the Plan.  Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be "impaired" if the Plan alters the legal, equitable or contractual rights of the holders of such Claims or Equity Interests in such Class.

Classes 1, 2, 3, 4, 5 and 8 are Unimpaired under the Plan, and, pursuant to Section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan.

Classes 9, 10, 11 and 12 are claims of Insiders and/or Affiliates and are not entitled vote on the Plan.

The following are the Unclassified Claims: General Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims and Statutory Fees.  Each holder of an Unclassified Claim is conclusively presumed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan.

Classes 6 and 7 are Impaired under the Plan and are entitled to vote on the Plan.  The Plan can be confirmed by the Bankruptcy Court and thereby made binding on creditors if it is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the holders of Class 6 Claims actually voting on the Plan, and by at least two-thirds (2/3) in dollar amount and more than seventy-five percent (75%) in number of the holders of Class 7 Claims that have voted on the Plan. Acceptance of the Plan by Class 7 shall also be determined in accordance with section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code and Section 6.04 of the Plan.  In the event that Class 7 votes to accept the Plan and Class 6 votes to reject the Plan, the Plan Proponents reserve the right to  seek confirmation of the Plan under § 1129(b) of the Bankruptcy Code.

## C.      Solicitation and Confirmation Hearing Notice

All holders of Claims in Classes 6 and 7 (as well as the other Notice Parties) will receive a package (the "Solicitation Package") consisting of a USB flash drive containing:

1.      the Disclosure Statement (with the Plan attached as an exhibit);

2.      the Solicitation Order (with the Voting Procedures attached as an exhibit); and

3.	any other materials ordered by the Court to be disseminated.

The Solicitation Package shall also include:

1.	a cover letter describing the contents of the Solicitation Package, and instructions for obtaining (free of charge) a printed copy of the Solicitation Package;

2.	the Confirmation Hearing Notice;

3.	solely for the holders of claims entitled to vote on the Plan, appropriate ballots and voting instructions for the same; and

4.	solely for the holders of claims entitled to vote on the Plan, pre-addressed, return envelopes for completed ballots.

All other creditors and parties in interest not entitled to vote on the Plan will receive a copy of the Confirmation Hearing Notice and a Notice of Non-Voting Status.

Creditors may also obtain copies of the Solicitation Package on the website of BMC Group, the Debtors' Claims and Noticing Agent (the "Claims and Noticing Agent"), at www.bmcgroup.com/DuroDyne.  Copies of the Plan and the Disclosure Statement also may be examined by interested parties between the hours of 9:00 a.m. and 4:30 p.m. (prevailing Eastern Time) at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the District of New Jersey, Clarkson S. Fisher US Courthouse, 402 East State Street, Trenton, NJ 08608. To the extent any portion of this notice conflicts with the Plan or the Disclosure Statement, the terms of those documents shall control over this notice.

The Ballots received by holders of Claims in Classes 6 and 7 do not constitute a proof of claim.  If a creditor is uncertain whether its claim has been correctly scheduled, the creditor should check the Debtors' Schedules, which are on file at the Office of the Clerk of the Bankruptcy Court located at: United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Trenton, New Jersey, 08608.  The Clerk of the Bankruptcy Court will not provide this information by telephone.

**D.	Deadline for Voting to Accept or Reject the Plan**

In order for a Ballot to count, the creditor or its representative must (1) complete, date and properly execute the Ballot and (2) properly deliver the Ballot to the Claims and Noticing Agent by either mail or overnight courier to the Claims and Noticing Agent at the following address:

| **If by regular mail:** | **If by messenger or overnight delivery:** |
|---|---|
| BMC Group, Inc. | BMC Group, Inc. |
| Attn: **Duro Dyne** Ballot Processing | Attn: **Duro Dyne** Ballot Processing |
| PO Box 90100 | 3732 West 120th Street |
| Los Angeles, CA 90009 | Hawthorne, CA 90250 |

The Claims and Noticing Agent must RECEIVE Ballots **on or before 4:00 p.m. (prevailing Eastern Time), on January 24, 2019 (the "Voting Deadline")**. Holders of Claims in Class 7 may vote by master ballot as provided for in the Order of the Bankruptcy Court dated November __, 2018. Except as otherwise ordered by the Bankruptcy Court, a creditor may not change its vote once a Ballot is submitted to the Claims and Noticing Agent. **BALLOTS SENT BY FACSIMILE TRANSMISSION OR E-MAIL ARE NOT ALLOWED AND WILL NOT BE COUNTED.**

Any ballot that is timely received, that contains sufficient information to permit the identification of the claimant and that is cast as an acceptance or rejection of the Plan will be counted and will be deemed to be cast as an acceptance or rejection, as the case may be, of the Plan.

The following ballots will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

1.      any Ballot or Master Ballot received after the Voting Deadline, unless the Plan Proponents, with approval of the Court, grant a written extension of the Voting Deadline (whether prior to or following such date) with respect to such ballot;

2.      any Ballot or Master Ballot that is illegible or contains insufficient information to permit the identification of the claimant(s);

3.      any Ballot or Master Ballot cast by a person or entity that does not hold a claim in a class that is entitled to vote to accept or reject the Plan;

4.      any Ballot cast for a Claim identified  as unliquidated, contingent or disputed for which no proof of claim was timely filed or deemed timely filed or was designated as zero or unknown in amount and for which no Rule 3018(a) motion has been filed by the Rule 3018(a) motion deadline;

5.      any unsigned Ballot or Master Ballot; or

6.      any Ballot or Master Ballot transmitted to the Debtors only by facsimile or electronic mail.

**Voting Questions.** If there are any questions regarding the provisions or requirements for voting to accept the Plan or require assistance in completing a Ballot, creditors may contact counsel to the Debtors at durodyne@lowenstein.com.

## E.      Acceptance of the Plan

The acceptance of the Plan by creditors in one of Class 6 or 7 is important.  In order for the Plan to be accepted by Class 6, it must be accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the holders of Class 6 Claims actually voting on the Plan. Class 7 shall be deemed to have accepted the Plan if at least two thirds (2/3) in dollar amount and more than seventy-five percent (75%) in number of the holders of Class 7 Claims that vote on the Plan, accept the Plan. In the event that Class 6 does not vote to accept the

Plan, the Plan Proponents reserve the right to seek to confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code. Acceptance of the Plan by Class 7 shall also be determined in accordance with section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code and Section 6.04 of the Plan.  The Debtors urge that creditors vote to accept the Plan.  **CREDITORS ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY RETURN THE BALLOT.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF THE CREDITOR'S CLAIM AND THE NAME OF THE CREDITOR.**

**F.      Time and Place of the Confirmation Hearing**

The hearing at which the Court will determine whether to confirm the Plan (the "Confirmation Hearing") will take place on **March 6, 7,and 8, 2019 at 10:00 a.m.** in Courtroom No. 8, United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Trenton, New Jersey, 08608.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the hearing.

**G.      Procedure for Objections to Confirmation of the Plan**

Any objection to confirmation of the Plan must (a) be in writing; (b) state the name and address of the objecting party and the amount of the claim of such party; and (c) state with particularity the grounds for the objection.  Any objection must be filed with the Court and served so as to be actually received on or before **February 8, 2019 at 4:00 p.m.** (the "Objection Deadline") on:

| | |
|---|---|
| *To the Debtors and Reorganized Debtors*: | Lowenstein Sandler LLP<br>One Lowenstein Drive<br>Roseland, NJ 07068<br>Attention: Kenneth A. Rosen, Esq.<br>Jeffrey Prol, Esq.<br>krosen@lowenstein.com<br>jprol@lowenstein.com |
| *To the Asbestos Claimants' Committee*: | Caplin & Drysdale, Chtd.<br>One Thomas Circle, N.W.<br>Ste. 1100<br>Washington, DC  20005<br>Attention: James Wehner, Esq.<br>Jeffrey Liesemer, Esq.<br>jwehner@capdale.com<br>jliesemer@capdale.com |

| *To the Legal Representative* | Young Conaway Stargatt & Taylor |
| | Rodney Square |
| | 1000 North King Street |
| | Wilmington, DE  19801 |
| | Attention: Edwin Harron, Esq. |
| | eharron@ycst.com |
| | |
| *To the Office of the United States Trustee*: | Office of the United States Trustee |
| | for the District of New Jersey |
| | One Newark Center |
| | 1085 Raymond Boulevard, Suite 2100, |
| | Newark, NJ 07102 |
| | Attention: Mitchell Hausman, Esq. |
| | Jeffrey Sponder, Esq |
| | mitchell.b.hausman@usdoj.gov |
| | jeffrey.m.sponder@usdoj.gov |

If an objection is not timely filed and served, it may not be considered by the Bankruptcy Court.

## ARTICLE IV.
## BACKGROUND AND SUMMARY OF CHAPTER 11 CASES

**A.      The Debtors' Business and Corporate Structure**

**1.      Overview and Nature of the Debtors' Business**

In 1952 Milton Hinden founded the Company which did business under the name Duro-Dyne Corporation.   Over the span of 60 years, the Company has evolved into the leading manufacturer of sheet metal accessories and equipment for the heating, ventilating, and air conditioning (HVAC) industry.   The Company' operations are conducted though Duro Dyne, Duro Dyne Machinery, Duro Dyne Corp., Duro Dyne Midwest and Duro Dyne West.

Duro Dyne is a holding company whose primary asset is all of the issued and outstanding capital stock of the other Debtors.  Duro Dyne is owned by members of the Hinden family and various trusts for the benefit of Hinden family members.

The Company has sales offices and over 200,000 square feet of manufacturing and warehousing facilities in facilities in Trenton, New Jersey, Bay Shore, New York, Fairfield, OH and Fontana, CA (Los Angeles area).   In addition to the U.S. operations, the Company has a Canadian affiliate located in Quebec[3] and a licensee that manufactures under the Duro Dyne label located in the United Arab Emirates.

---

[3] Duro Dyne Corp. owns all the stock of Duro Dyne Canada Inc., a Canadian Corporation, which manufactures and distributes the most complete line of sheet metal accessories and equipment for the heating, ventilating and air conditioning industry in Canada.  Duro Dyne Canada is not a Debtor in these proceedings.

-7-

Duro Dyne Machinery manufactures machines for the sheet metal industry which are sold to third party customers. Duro Dyne Corp. manufactures and sells sheet metal parts and tools on the east coast of the United States. Duro Dyne Midwest manufactures and sells sheet metal parts in the Midwestern part of the United States, and Duro Dyne West sells sheet metal parts and tools on the west coast of the United States. The Debtors operate as a consolidated and integrated entity.

In addition to manufacturing, the Company also engages in the research and development of HVAC products. The Company's extensive research and development program has introduced more new products and processes than any other company in this industry, and their ingenuity and technical advances are unmatched in the industry. The Company's innovations continue to lead to the development of an increasing number of diverse items in their product line. The Flexible Duct Connector, the Vane Rail, FGMH Auto Shift Multi-Head Pinspotter System and Blade Kits for multi-blade dampers were originally developed by the Company. Other products that have now become standard in the sheet metal fabrication field such as self-drilling sheet metal screws were likewise developed by the Company. The Company's products also include, among other things, manual and mechanical air dampers, multi-zone control systems, ductwork suspension kits, insulation fasteners, ductwork connecting systems, sealants, and the machinery and tools needed to install it all.

The Company sells its products to national, regional and independent HVAC distributors as well as HVAC equipment manufacturers. The distributors stock and sell Company's products to HVAC contractors and other end users.

Prior to the first quarter of 2018, Debtors sales and profits rose steadily as steel prices fell to historic lows and construction activity improved significantly. Most recently, in 2017, the Company's sales were approximately $69 million, and earnings before interest, taxes, depreciation and amortization ("EBITDA") was approximately $5.2 million after adjustments for legal and other fees related to the Company's asbestos and insurance issues, which are discussed further below. Steel prices rose throughout 2017 due to the strongest increase in worldwide steel demand since 2013, which directly impacted the Company's gross margins. In 2018, steel prices have increased dramatically due to uncertainty regarding potential US tariffs on imported steel, with some of the Company's steel vendors raising prices by as much as 25%. To offset this increase in steel costs, the Company announced a price increase effective May 1, 2018. The Company remains profitable and estimates that sales and EBITDA (after adjusting for costs related to this bankruptcy proceeding) for 2018 will be approximately $73.6 million and $5.2 million, respectively. As set forth in detail below, the primary reason for the Company's bankruptcy filings is to address the Company's liability for asbestos related claims.

The Company employs approximately 170 people with sales and distribution channels throughout the United States, Canada and internationally. The Company will from time to time supplement its production, shipping and accounting workforces with temporary employees.

Within the Company's workforce are employees who are or were members of several different unions. Approximately 27 employees of Duro Dyne Midwest are currently members of the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART"), Local Union No. 24 of the Sheet Metal Workers' International Union. In November 2017, the

New York members of the Warehouse & Production Employees Union, AFL-CIO, Local Union 210 ("Local 210") voted to decertify Local Union 210.  Prior to June 2018, Duro Dyne West operated a warehouse in Fontana, California which employed six members of SMART Local Union No. 170 of the Sheet Metal Workers' International Union.  Those operations were closed and the employees were terminated on June 15, 2018.

### 2.      The Debtors' Current Business, Officers and Directors

The Officers of Duro Dyne are:

| TITLE | NAME |
| --- | --- |
| Chief Executive Officer | Randall Hinden |
| President | Patrick Rossetto |
| Vice President-Sales & New Product Development | David Krupnick |
| Vice President-Controller | Leo White |
| Secretary and Treasurer | Patrick Rossetto |

The members of the Board of Directors for Duro Dyne National are Randall Hinden, Wendy Hinden, Irene Hinden, Patrick Rossetto and David Krupnick.

Pursuant to the terms of the Plan, each officer of Duro Dyne will continue to hold office following the Effective Date, and likewise the Board of Directors will remain unchanged following the Effective Date.

### 3.      The Debtors' Equity Structure

Duro Dyne is authorized to issue 5,000 shares of Class B Voting Stock, par value $100.00 per share. Currently, there are 3 shares of Class B voting stock issued. Randall Hinden, Wendy Hinden and Irene Hinden each own one share of the Class B Stock.

Duro Dyne is also authorized to issue 40,000 shares of Class A Non-Voting Stock, par value $1.00 per share. There are 20,903 shares of Class A non-voting stock issued, which are held by the Hinden Family Members and by trusts for the benefit of other members of the Hinden family.

Duro Dyne holds all of the outstanding shares of all of the other Debtors.

Pursuant to the Plan, upon the Effective Date Duro Dyne Machinery, Duro Dyne Corp., Duro Dyne West and Duro Dyne Midwest shall be merged into Duro Dyne, and the shareholders of Duro Dyne shall retain their interests in Duro Dyne.  There is no public market for the equity securities of the Debtors.

On the Effective Date, Duro Dyne shall amend its Certificate of Incorporation to:

     i.     remove from the authorized shares of the corporation a total of 21,097 unissued shares, consisting of (1) 19,097 unissued Class A Non-Voting Common Shares, par value $1.00 per share and (2) 2,000 unissued Class B Voting Common Shares, par value $1.00 per share;

    ii.    change 3 authorized Class B Voting Common Shares into 3,000 issued Class B Voting Common Shares; and

    iii.    add a provision prohibiting the further issuance of non-voting equity securities to the extent prohibited by Section 1123(a)(6) of Title 11 of the United States Code as in effect on the date of the filing of this restated certificate of incorporation by the Department of State.

**4.**    **Prepetition Secured Debt.**

Duro Dyne is party to a revolving credit note dated February 3, 2003 (as amended) with a non-debtor affiliate, 4 Site, LLC (the "<u>Prepetition Lender</u>") pursuant to which the Prepetition Lender extended a revolving credit facility to Duro Dyne in the principal sum of five million dollars ($5,000,000.00) (the "<u>Prepetition Loan</u>").  As of the Petition Date, the total outstanding balance due on the Prepetition Loan is approximately $1,290,000.00.

The Prepetition Loan was advanced to the Company in several tranches between 2003 and 2015.  As of the Petition Date, the tranches distributed in 2009, 2011, 2012, 2014 and 2015 remain outstanding.  Each tranche has a 10-year maturity date ranging from 2019 until 2025.

Payments on the Prepetition Loan are due on a quarterly basis each March 31, June 30, September 30 and December 31, and each quarter Duro Dyne pays the Prepetition Lender a total of $82,100.00 on the six outstanding tranches.  The Debtors are current on the Prepetition Loan.

As an inducement for the Prepetition Lender to make the Prepetition Loan, Duro Dyne also executed a security agreement dated February 3, 2003 (the "Security Agreement"), pursuant to which the Prepetition Lender was granted a continuing security interest in "all personal property and fixtures in which the debtor has an interest, now or hereafter existing or acquired, and wherever located, tangible or intangible, including but not limited to, all present and hereafter existing or acquired accounts, contract rights, leases, general intangibles, equipment, goods, inventory (raw materials, components, work-in process, finished merchandise, and packing and shipping materials), personal property made available to the debtor by the secured party (or its agent or bailee) pursuant to a trust receipt or other security agreement the effect of which is to continue the secured party's security interest herein, money, instruments, books, records, documents, chattel paper, securities, deposits, credits, claims and demands, together with all  proceeds, products, returns, additions, accessions and substitutions of and to any of the foregoing."

As further inducement for the Prepetition Lender to make the Prepetition Loan, the Prepetition Loan is guaranteed and secured by liens on the assets of Debtors Duro Dyne Corp., Duro Dyne Machinery, Duro Dyne Midwest and Duro Dyne West.

The Prepetition Lender has consented to the Debtors' use of cash collateral, subject to certain agreed upon terms and conditions contained in the cash collateral order. The Prepetition Lender has also agreed to a carve-out to fund the administrative costs of these chapter 11 cases.

5.      Leases

The Debtors lease certain real estate, machinery and equipment from non-debtor affiliates.  Rent payments and other obligations due under these leases are paid in the ordinary course of business.  The Debtors' liabilities to non-debtor related parties include:

| Lessor | Property | Agreement Date | Monthly Payment | Maturity Date |
|--------|----------|----------------|-----------------|---------------|
| PROFORMA | Equipment | 8/01/2005 | $12,328.37 | 12/31/2019 |
| PROFORMA II | Equipment | 6/27/2006 | $3,618.28 | 5/31/2018 |
| ISWR Ohio | Real Property | 1/08/2011 | $16,258.73 | 7/31/2021 |
| Spence | Real Property | 6/01/2015 | $82,546.42 | 5/312020 |

6.      Trade Debt

Exclusive of Asbestos Claim liability, as of the Petition Date, the Debtors also owe approximately $7.6 million on an unsecured basis to trade creditors, including nearly $2.6 million in 11 U.S.C. §503(b)(9) claims. The Debtors also have unliquidated pension and withdrawal liabilities as explained in detail below.

B.      Duro Dyne Pension Plan Obligations

1.      Duro Dyne Pension Plan

Duro Dyne sponsors and maintains the Duro Dyne Pension Plan (the "Duro Dyne Pension Plan"), a frozen defined benefit single-employer pension plan for non-union employees. The Duro Dyne Pension Plan is governed by the provisions of Title IV of the Employee Retirement Income Security Act of 1974, as amended 29 U.S.C. section 1301 et seq. ("ERISA"), and the Internal Revenue Code. The Pension Benefit Guaranty Corporation ("PBGC"), a United States Government corporation, guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA.

Upon confirmation of the Plan, the Reorganized Debtor will continue to maintain the Duro Dyne Pension Plan, and will contribute to the Duro Dyne Pension Plan the amount necessary to satisfy the minimum funding standards under sections 302 and 303 of ERISA, 29 U.S.C. §§ 1082 and 1083, and sections 412 and 430 of the Internal Revenue Code, 26 U.S.C. §§ 412 and 430.

Nothing in the Plan will be construed as discharging, releasing or relieving the Reorganized Debtor from any liability imposed under any law or legally valid regulatory provision with respect to the Duro Dyne Pension Plan. Neither the PBGC nor the Duro Dyne Pension Plan will be enjoined or precluded from enforcing such liability as a result of any

provision of the Plan or the Confirmation Order.  Any Claims or liabilities owed on account of or to the Duro Dyne Pension Plan will be deemed Employee Benefit Claims, which Claims are classified in Class 3 of the Plan and shall be unimpaired and reinstated on the Effective Date. Because the Debtors through the Effective Date and Reorganized Debtor from and after the Effective Date will continue to maintain the Duro Dyne Pension Plan and satisfy any unpaid minimum funding contributions and other obligations that may be owed to the Duro Dyne Pension Plan, the Debtors believe that no PBGC Claims shall arise in connection with the Duro Dyne Pension Plan and thus any claims asserted by the PBGC on account of the Duro Dyne Pension Plan shall not be entitled to any distribution under the Plan.

2.      **Decertification of Local 210, Warehouse & Production Employees Union, AFL-CIO and Assertion of Withdrawal Liability Claims by the Local 210 Unity Pension Fund**

Until November 2017, pursuant to a collective bargaining agreement with Warehouse & Production Employees Union, AFL-CIO, Local 210 ("Local 210"), Debtors Duro Dyne Corp. and Duro Dyne Machinery were obligated to contribute to the Local 210 Unity Pension Fund on behalf of eligible bargaining unit members. However, an election was conducted pursuant to the National Labor Relations Board's Rules and Regulations and the employees of Duro Dyne Corp. and Duro Dyne Machinery located at 81 Spence Street, Bay Shore, New York (the "Bay Shore Employees") voted not to select a collective-bargaining representative (the "Decertification Vote"). Accordingly, on or about November 28, 2017, the National Labor Relation Board decertified Local 210 as the exclusive collective-bargaining representative of the Bay Shore Employees.

Following the Decertification Vote, by letter dated December 1, 2017, the board of trustees of the Local 210 Unity Pension Fund sent a notice and demand letter to Duro Dyne Corp. and Duro Dyne Machinery asserting that as a result of the Decertification Vote, Duro Dyne Corp. and Duro Dyne Machinery "effected a complete withdrawal from the Local 210 Unity Pension Fund within the meaning of Section 4203(a) of ERISA and are subject to the payment of Withdrawal Liability Claims (as defined in the Plan) in the estimated amount of $1,466,510" and further asserting that "Payment shall be made in seventy-eight (78) quarterly installment payments of $31,573 and a final payment in the amount of $11,899." Prior to the Petition Date, the Debtors disputed the asserted amount of the Withdrawal Liability Claims related to the Local 210 Unity Pension Fund by: (a) by letter dated February 22, 2018, timely filing a request for review pursuant to Section 4219(b)(2)(A) of ERISA; and (b) by letter dated May 1, 2018, timely demanding arbitration pursuant to Section 4221 of ERISA. The amount of the Withdrawal Liability Claim asserted by the Local 210 Unity Pension Fund remains subject to a pending arbitration proceeding (which proceeding has been stayed by the filing of these Chapter 11 Cases).  By email dated May 1, 2018, the Local 210 Unity Pension Fund issued a revised demand for withdrawal liability in the amount of $1,337,594, payable in sixty-six (66) quarterly installment payments of $31,573 and a final payment in the amount of $2,097. Subject to the determination by the arbitrator (and by a court of competent jurisdiction, as applicable) of the Allowed amount (if any) of the asserted Withdrawal Liability Claim related to the Local 210 Unity Pension Fund, any Withdrawal Liability Claims related to the Local 210 Unity Pension Fund shall be deemed an Employee Benefit Claim which Claims are unimpaired under the Plan. Any such Allowed Withdrawal Liability Claims related to the Local 210 Unity Pension

Fund will be paid in quarterly installment payments pursuant to the demand letters issued by the Local 210 Unity Pension Fund, the terms of the Local 210 Unity Pension Fund's governing plan and trust documents and applicable law.

**3.    Collective Bargaining Agreements with SMART Local Union No. 24 of Sheet Metal Workers' International Union and SMART Local Union No. 170 of the Sheet Metal Workers' International Union and Participation in Sheet Metal Workers' National Pension Fund**

The Debtors are party to two collective bargaining agreements (and related amendments) with SMART Local Union No. 24 of Sheet Metal Workers' International Union (collectively, the "Ohio CBAs"), which govern the Debtors' employment of their employees at their facilities located in Ohio.  Until June 2018, Duro Dyne West was party to a separate collective bargaining agreement (the "California CBA") with SMART Local Union No. 170 of the Sheet Metal Workers' International which governed the Debtors' employment of employees at the facility located in California.  On June 15, 2018, the Debtors' terminated all remaining Local 170 union employees thereby terminating the Debtors' obligations under the California CBA, including any obligations to make contributions on behalf of the Debtors' California employees to the Sheet Metal Workers' National Pension Fund (as defined in the Plan), a multiemployer pension plan. Pursuant to the Ohio CBAs and the California CBA (prior to termination), the Debtors were obligated to contribute to the Sheet Metal Workers' National Pension Fund.  The Debtors and Reorganized Debtor will continue to make all required contributions owed pursuant to the Ohio CBAs to the Sheet Metal Workers' National Pension Fund, and any Claims or liabilities owed on account of or to the Sheet Metal Workers' National Pension Fund to the extent related to the Ohio CBAs or Withdrawal Liability Claims related to the Sheet Metal Workers' National Pension Fund (if and solely to the extent Allowed) will be deemed Employee Benefit Claims, which Claims are classified in Class 3 of the Plan and shall be unimpaired and reinstated on the Effective Date.  Any such Allowed Withdrawal Liability Claims related to the Sheet Metal Workers' National Pension Fund will be paid in quarterly installment payments as for provided pursuant to Title IV of ERISA.

**C.    Asbestos Litigation**

The primary reason for the filing of the Debtors' Chapter 11 Case is the need to address the Debtor's asbestos liability. As of the Petition Date, the Debtors are named as defendants in approximately 956 pending personal injury cases stemming from alleged asbestos exposure (the "Asbestos Personal Injury Claims").  Prior to the Petition date, the Debtors settled more than 650 asbestos claims that had been filed against them. There were also over 8,100 asbestos claims dismissed.   These claims have been asserted in various jurisdictions, including Michigan, Illinois, Massachusetts, Missouri and West Virginia.

The alleged asbestos liability arose as a result of the Debtors having sold products that allegedly contained asbestos beginning in approximately 1952 until about 1978.  Among the asbestos based products that the Debtors are alleged to have sold are a flexible duct connector and a sealant manufactured by Bordon Chemical. In addition, the Debtors are alleged to have sold fibers or asbestos containing products purchased from Ray Bestos Manhattan, US Rubber, Uniroyal, and HK Porter, among other companies.

Since the first asbestos claims were filed against the Debtors in 1988, the Debtors have worked with their insurance carriers to seek dismissal of a large portion of the Asbestos Personal Injury Claims and to settle the remaining Asbestos Personal Injury Claims in advance of trial.

At the rate the Asbestos Personal Injury Claims were being filed and settled by the Debtors and their insurance carriers, it originally appeared that the Debtors would be able to address all of the claims through proceeds of insurance and cash flow from operations. However in recent years, the Debtors have been forced to bear an increasing share of settlements and defense costs due to the insolvency of one of the Debtors' insurance carriers, the exhaustion of the Debtors' primary insurance coverage, and disputes with insurance carriers providing excess level coverage.

## D.    Insurance Coverage

Beginning at least as early as 1968, the Company maintained comprehensive general liability insurance coverage applicable to asbestos personal injury claims.  The Company purchased primary general liability policies from North River Insurance Company ("North River"), Hartford Accident & Indemnity Company ("Hartford"), Federal Insurance Company ("Federal"), Aetna Insurance Company of Connecticut ("Aetna"), and Insurance Company of North America ("INA") covering the policy periods from August 1, 1968 through June 23, 1991. Additionally, Duro Dyne purchased umbrella or excess insurance policies from Hartford, North River, Federal, MidStates Reinsurance Corporation ("MidStates"), Munich Reinsurance America, Inc., ("Munich") and Great Atlantic Insurance Company of Delaware ("GAIC") covering the policy periods from May 15, 1972 through June 23, 1989.

The comprehensive general liability insurance policies described above are "occurrence-based" policies which, subject to other policy terms, generally insure against liability arising from bodily injury or property damage during the policy period, even if the injury or damage does not manifest itself until after the policy period. The Company's pre-1991 "occurrence" policies provide insurance coverage for asbestos and other "long tail" claims, which are commonly asserted years or decades after the underling injuries are alleged to have occurred. After 1991, the policies purchased by the Company contain various exclusions for asbestos and asbestos-related claims.

In total, from 1968 through 1991, the Company purchased comprehensive general liability policies with combined limits of liability of approximately $82.5 million.  All of the policies impose a duty on the insurer to indemnify the Company for settlements or judgments. The primary and umbrella policies also require the insurer to pay to defend the Company in potentially covered claims.  Although there are limits of liability that apply to indemnity payments in all of the policies, some of the Company's primary and umbrella policies provide for the payment of an unlimited amount of defense costs in the event a potentially covered claim is asserted against the Company.  As a general matter, primary policies respond to claims first, followed by umbrella and excess policies.

Beginning in the mid to late 1980s, the Company was sued on account of Asbestos Personal Injury Claims in various jurisdictions alleging liability for bodily injury allegedly sustained as a result of exposure to products containing asbestos allegedly manufactured and/or

distributed by the Company from the 1950s through the 1970s. The Company made a claim under its insurance policies for insurance coverage in connection with the Asbestos Personal Injury Claims. Pursuant to an agreement under which the parties reserved certain rights, and a later court order, the Company's insurers have for decades been paying 100% of the Company's defense costs in connection with the Asbestos Personal Injury Claims, and the insurers and the Company each pay a share of indemnity costs for settlements and judgments.  As a result of these payments, some of the primary comprehensive general liability insurance policies purchased by the Company have been exhausted, and the limits of liability of other policies may be significantly impaired.  Moreover, approximately $13 million in coverage was underwritten  by MidStates which now is in runoff, and approximately $2 million in coverage was underwritten by GAIC which is also  insolvent.

Thus, taking into account probable exhaustion and the coverage sold by insolvent GAIC, it appears that nearly $57 million of solvent primary, umbrella, and excess coverage is available to respond to asbestos bodily injury claims, depending on how the policies are interpreted.

### 1.      The Insurance Coverage Litigation

On September 19, 2013, North River commenced an action against the Company and the Company's other primary and umbrella/excess insurance companies in New York state court seeking to limit its coverage obligations to the Company in connection with the Asbestos Personal Injury Claims.  That action remains pending.  To date, the parties have not undertaken any discovery but have filed motions for summary judgment on a variety of presently known legal issues.  Critical issues in the coverage case include the insurance companies' argument, contested by the Company, that the Company is obligated to reimburse insurers for a share of its defense and indemnity costs in the Asbestos Personal Injury Claims (and should reimburse the insurers for more than $1 million in past defense costs), and an argument by North River that one of its policies contains an absolute exclusion for asbestos liability.

### 2.      Factors That May Reduce Available Insurance Coverage

There are several factors that may reduce the amount of insurance coverage potentially available to the Company on account of the Asbestos Personal Injury Claims.

### a.      The Existence of Pending Litigation

Although the Company believes that the insurers' arguments in the coverage litigation have no merit, the outcome of any litigation is uncertain.  Depending on how the court interprets the insurance policies at issue, the value of the coverage could be compromised.

### b.      The *Keyspan*[4] Decision

A recent decision by the highest New York state court may reduce the value of the Company's coverage if it is interpreted in the manner suggested by the insurers, which would allocate a *pro rata* share of all defense and indemnity costs to the Company for all "uninsured"

---

[4] *Keyspan Gas E. Corp. v. Munich Reinsurance Am., Inc.*, 31 N.Y. 3d 51, 96 N.E. 3d 209, 73 N.Y.S. 3d 113 (2018).

years, including years where asbestos coverage was not available. This share of costs could be substantial. For instance, under the insurers' argument, if asbestos bodily injury is alleged to have occurred between the period 1981 and 2011, a 30-year period, insurers would be responsible for one-third of defense and indemnity costs, with the Company responsible for the remaining two-thirds. The Company contends that the *Keyspan* decision is not applicable because it involved different insurance policy language, among other reasons, and it does not apply in any event to defense costs.

### c.    Insolvent and Financially Troubled Insurers

Another factor that may reduce available insurance coverage is the insolvency of any insurer. As noted above, MidStates is in run-off and GAIC is insolvent, and it is impossible to predict the financial strength of any other insurer in the future. Recovery under policies issued by now-insolvent insurers in liquidation or rehabilitation is subject to uncertainties that result from the insolvent insurer's liquidation or rehabilitation plan. Therefore, it is not possible at this time to predict amounts, if any, that ultimately may be recovered from insolvent or financially troubled insurers.

### d.    Asbestos Exclusions

As noted above, North River contends that one of its policies contains an absolute asbestos exclusion. This creates uncertainty as to the total limits available to satisfy asbestos bodily injury claims.

### e.    Other Disputed Issues

In addition to the issues identified above, the insurers have raised a host of other arguments that they contend limit or eliminate their coverage obligations. Those arguments include, but are not limited to, assertions that certain insurers' obligations to pay defense costs are limited or non-existent, that the Company has not properly exhausted the primary policies, and that insurers who issued policies in multiple years are obligated only to provide coverage up to the limits of a single year's policy. The Company disputes these arguments and believes that they lack merit.

### 3.    Treatment of Alleged Claims of Asbestos Insurers

As noted above, the Asbestos Insurers argue that the Company is obligated to reimburse them for a share of the defense and indemnity costs attributable to asbestos personal injury claims asserted against the Company, including more than $1 million in past defense costs. The Company disagrees with the Asbestos Insurers as to the validity and amount of their asserted claims for reimbursement or contribution of indemnity and defense costs and believes that such claims lack merit. Nevertheless, in an effort to deal comprehensively with any and all claims asserted against the Company, including those claims that the Company disputes, the Plan Proponents have classified the Asbestos Insurers' alleged claims for reimbursement or contribution of past defense costs as Prepetition Defense-Cost Reimbursement Claims and placed them in Class 6 under the Plan. Please see Article VII(C)(1)(f) hereof for the treatment and voting of Class 6 Prepetition Defense-Cost Reimbursement Claims. As for any other claims

of the Asbestos Insurers for reimbursement or contribution of asbestos-related indemnity payments and postpetition defense costs, those claims will be included in and treated as Class 7 Channeled Asbestos Claims; accordingly, any such claims of the Asbestos Insurers will be channeled by the Asbestos Permanent Channeling Injunction to the Asbestos Trust, but such claims will not be compensable, and Asbestos Insurers will not receive any payment or distribution from the Asbestos Trust on account of such claims, under the Trust Distribution Procedures. The Plan Proponents believe that existing decisional law and legal precedents support this proposed treatment of the Asbestos Insurers' Class 7 claims but acknowledge that the Asbestos Insurers will likely disagree and object to that treatment. Finally, the Asbestos Insurance Policies and any related coverage-in-place agreements are not executory contracts under section 365 of the Bankruptcy Code and will not be treated as such under the Plan.

## E.    PREPETITION SETTLEMENT NEGOTIATIONS

As detailed above, the cost of defending and resolving Asbestos Personal Injury Claims asserted against the Company has been and continues to be substantial. In addition, the amount of insurance coverage remaining to the Company has continued to decline.

In light of these circumstances, the Company determined that it may be necessary to commence a case under Chapter 11 of the Bankruptcy Code to preserve its remaining assets and to confirm a plan of reorganization that would allow the Company to satisfy its Asbestos Personal Injury Claims in accordance with the requirements of section 524(g) of the Bankruptcy Code. Section 524(g) provides for the creation of a trust to "assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products ...." 11 U.S.C. § 524(g)(2)(B)(i)(I). Section 524(g) further provides for a "channeling" injunction that directs all present and future asbestos-related "demands" to the trust for liquidation and satisfaction of allowed amounts. 11 U.S.C. 524(g)(1). This channeling injunction, however, is only valid and enforceable against future asbestos claimants if, "as part of the proceedings leading to issuance of such injunction, the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert [asbestos-related personal injury or wrongful death claims against the debtor] .... " 11 U.S.C. § 524(g)(4)(B)(i).

The Company believes that it is necessary for any such channeling injunction to cover all asbestos-related personal injury or wrongful death Claims and future Demands based on the conduct or products of the Company, against the Company and parties related to the Company including, but not limited to, past and present affiliates of the Company, past and present officers and directors of the Company, predecessors in interest to the Company, and any entity that owned a financial interest in the Company or its affiliates or predecessors.

Accordingly, the Company commenced negotiations with the holders of asbestos- related personal injury and wrongful death Claims arising out of the conduct or products of the Company in order to establish a consensus on the framework for a Chapter 11 plan of reorganization that would satisfy the requirements of section 524(g) of the Bankruptcy Code and treat all present and future claimants fairly and equitably.

F.    **The Company's Prepetition Discussions with Representatives of Current Holders of Asbestos Personal Injury Claims and with the Legal Representative**

    1.    **The Asbestos Claimants Committee Representing Current Asbestos Personal Injury Claimants.**

In July 2015, the Company began discussions with counsel for the holders of Asbestos Personal Injury Claims against the Company in order to explore the feasibility of and the potential for a prenegotiated Chapter 11 plan of reorganization that would include a trust for present and future asbestos personal injury claimants and a channeling injunction pursuant to section 524(g) of the Bankruptcy Code. Counsel for holders of Asbestos Personal Injury Claims formed an ad hoc committee of asbestos plaintiffs to represent present asbestos claimants (the "Ad Hoc Committee"). The Ad Hoc Committee consisted of the following law firms: Brayton Purcell, LLP; Cooney & Conway; Early Lucarelli Sweeney & Meisenkothen; The Ferraro Law Firm; Gori Julian & Associates, PC; Simmons Hanly Conroy LLC; and Weitz & Luxenberg PC.

The Ad Hoc Committee selected the law firm of Caplin & Drysdale, Chartered as its bankruptcy counsel, the law firm of Gilbert, LLP as its insurance counsel, and Charter Oak Financial Consultants, LLC as its financial advisors.

    2.    **The Pre-Petition Future Claimants' Representative**

In addition, to satisfy the requirements of section 524(g) of the Bankruptcy Code with regard to obtaining a channeling injunction, the Company determined that it was necessary and appropriate to engage an independent third-party representative for the purpose of protecting the rights of persons that might subsequently assert asbestos-related personal injury or wrongful death Claims against the Company (the "Pre-Petition Future Claimants' Representative").

The Company commenced a search for an individual to serve as the Pre-Petition Future Claimants' Representative for the holders of future Asbestos Demands against the Company. In conducting its search for possible candidates to serve as the Pre-Petition Future Claimants' Representative, the Company focused on persons with reputations of high integrity and with recognized experience and expertise in dealing with mass torts, particularly asbestos, and who would not have any actual or perceived conflict of interest.

Following the search, the Company asked Lawrence Fitzpatrick whether he would be willing to serve as the Pre-Petition Future Claimants' Representative and, if appointed by the Court, continue to serve as the post-petition Legal Representative for future Asbestos Demands. The Company chose Mr. Fitzpatrick based on his reputation for integrity, renown in the field of complex mass tort proceedings, and extensive experience with asbestos-related personal injury litigation. Mr. Fitzpatrick has over 38 years of experience handling asbestos bankruptcy matters. Mr. Fitzpatrick has served as vice president, law for the asbestos claims facility and the president and chief executive officer of the Center for Claims Resolution, Inc., which handled asbestos related claims on behalf of their member companies and their insurers from 1986 to 1998. Mr. Fitzpatrick has also served as the future claimants' representative numerous large and complex asbestos bankruptcy cases pursuant to Section 524(g) of the Bankruptcy Code, including *In re Kaiser Gypsum Co.*, Case No. 16-31602 (JCW) (Bankr. W.D.N.C. 2016); *In re Sepco Corp.*,

Case No. 16-50058 (Bankr. N.D. Ohio); *In re Rapid-American Corp.*, Case No. 13-10687 (SMB) (Bankr. S.D.N.Y.); *In re Metex Mfg. Corp.*, Case No. 12-14554 (BRL) (Bankr. S.D.N.Y.); *In re Durabla Mfg. Co.*, Case No. 09-14415 (MFW) (Bankr. D. Del.); *In re Global Indus. Technologies, Inc.*, Case No. 02-21626 (JKF) (Bankr. W.D. Pa.); *In re ACandS, Inc.*, Case No. 02-12687 (KG) (Bankr. D. Del.); *In re North Am. Refractories Co.*, Case No. 02-20198 (JKF) (Bankr. W.D. Pa.); and *In re Pittsburgh Corning Corp.*, Case No. 00-22876 (JKF) (Bankr. W.D. Pa.). Mr. Fitzpatrick currently serves as the legal representative for future claimants in the pending bankruptcy cases of Rapid American Corporation, Kaiser Gypsum Co., and Sepco Corp. Additionally, Mr. Fitzpatrick serves as legal representative in connection with the asbestos claims settlement trusts established in the bankruptcy cases of ACandS, Durabla Manufacturing Company, Global Industrial Technologies, Metex Manufacturing Corporation, North American Refractories Company, and Pittsburgh Corning Corporation

Prior to assuming the role of Pre-Petition Future Claimants' Representative, Mr. Fitzpatrick had no association or relationship with, or other connection to, the Company or any affiliate of the Company, and had never represented any plaintiff, defendant, or insurer in any asbestos-related litigation against the Company.

Mr. Fitzpatrick selected Young, Conaway, Stargatt & Taylor LLP as his counsel.

### 3.    Due Diligence and Plan Negotiations

The Ad Hoc Committee and the Pre-Petition Future Claimants' Representative, personally and/or through their various representatives, conducted extensive due diligence concerning the background, nature, and scope of the Company's liability for Asbestos Personal Injury Claims and Demands. This investigation has included, among other things, careful review of the facts concerning the Company's historical involvement with asbestos; the nature and extent of past and pending asbestos litigation against the Company, including the types of claims asserted and the legal issues raised; the projected value of present Asbestos Personal Injury Claims and Demands, and the extent to which insurance and other Company assets might be available to satisfy these liabilities in whole or in part. The Ad Hoc Committee and the Pre-Petition Future Claimants' Representative have also examined the potential for recovery by claimants asserting Asbestos Claims against the Company, and their affiliates, based upon a variety of legal theories, including derivative liability theories such as alter ego, successor liability, and/or fraudulent conveyance.

That due diligence process included the review of numerous documents and electronic files relating to the Company. The Company also provided detailed presentations to Ad Hoc Committee and the Pre-Petition Future Claimants' Representative on relevant factual and legal issues.

Following the extensive due diligence process described above, representatives of the Company, the Ad Hoc Committee and the Pre-Petition Future Claimants' Representative spent considerable time negotiating over the terms of a possible Plan of Reorganization for the Company. These negotiations addressed all of the material provisions of the Plan, including without limitation the funding for the Trust to be established by the Plan, the contributions to be made by the Company, the terms of the Channeling Injunction, the issues relating to insurance

coverage, and the indemnification provisions.  Ultimately, the Company, the Ad Hoc  Committee and the Pre-Petition Future Claimants'  Representative reached an agreement on the terms for a proposed Plan of Reorganization  for the Company. For a detailed description of those terms, please see the summary of the Plan provided at the beginning of this Disclosure Statement.

### G.    Other Litigation

The Debtors are not party to any substantial litigation other than the Asbestos Insurance Litigation.

### H.    The Chapter 11 Cases

The following is a brief description of certain material events that have occurred during the Chapter 11 Cases:

### 1.    First Day Motions

On the Petition Date, each of the Debtors filed a petition to commence their Chapter 11 Cases. Also on the Petition Date, the Debtors filed several customary motions designed to facilitate the smooth operation of their business during the Chapter 11 Cases (the "First Day Motions"). The Court granted the following First Day Motions:

- **Joint Administration.**  Pursuant an Order entered on September 11, 2018, the Court granted the Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases.

- **Cash Management System**. Pursuant to an Order entered on September 11, 2018, the Cort granted the Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363(c) and 1107 (i) Authorizing the Debtors to Continue and Maintain Their Existing Cash Management System, Bank Accounts and Business Forms, (ii) Modifying the Investment Guidelines Set Forth in 11 U.S.C. § 345, and (iii) Granting Related Relief.

- **Utility Order.**  Pursuant to an interim Order entered on September 11, 2018, and a final order entered on October 1, 2018, the Court granted Debtors' Motion for Entry of an Interim Order and a Final Order (i) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service on Account of Prepetition Invoices, (ii) Deeming Utility Companies to Have Adequate Assurance of Future Payment, and (iii) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(a) and 366.

- **Wage Order.**  Pursuant to an interim Order entered on September 11, 2018, and a final order entered on October 1, 2018, the Court granted the Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 507(a) (i) Authorizing the Debtors to Pay Prepetition Wages and Salaries and Related Obligations and Taxes, and (ii) Directing All Banks to Honor Checks and Transfers for Payment of Prepetition Employee Obligations.

- **Tax Order.** Pursuant to an Order entered on September 11, 2018, the Court granted Debtors' Motion for an Order Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition Sales, Use, Income, Property and Other Miscellaneous Taxes and Fees, and Granting Related Relief.

- **Insurance Order.** Pursuant to an Order entered on September 11, 2018, the Court granted the Debtors' Motion for an Order Authorizing the Debtors to (i) Pay Prepetition Insurance Premiums, (ii) Continue Prepetition Insurance Programs, and (iii) Pay All Prepetition Obligations in Respect Thereof.

- **Customer Program Order**. Pursuant to an interim Order entered on September 11, 2018, and a final order entered on October 1, 2018, the Court granted the Debtors' Motion Pursuant to 11 U.S.C. §§ 105(A) and 363 for an Order Authorizing, But Not Requiring, the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Prepetition Customer Programs and Practices in the Ordinary Course of Business.

- **Pay Prepetition Claims in the Ordinary Course.** Pursuant an interim Order entered on September 12, 2018, and a final order entered on October 1, 2018, the Court granted the Debtors' Motion for Entry of an Order Pursuant To 11 U.S.C. §§ 105(A), 363(B) And 503(B)(9) and Fed. R. Bankr. P. 6003 Authorizing the Debtor to Pay Prepetition Claims of General Unsecured Creditors in the Ordinary Course of Business. Most of the Debtors' trade vendors extended payment terms of 30 to 90 days. As of November 1, 2018, the Debtors had made payments post-Petition Date payments totaling approximately $5,559,000 on account of General Unsecured Claims, and the balance due on account of liquidated General Unsecured Claims was approximately $1,256,000. Per the Final Order, these remaining General Unsecured Claims will be paid within the next approximately 40 days. Per the Final Order, the Debtors reserve the right to object to and resolve any disputes regarding these remaining claims in the ordinary course of their business.

- **Cash Collateral Order.** Pursuant to an interim Order entered on September 11, 2018, and a final Order entered on October 9, 2018, the Court granted the Debtors' Motion for Interim and Final Orders (i) Authorizing Use of Cash Collateral Pursuant To 11 U.S.C. § 363; (ii) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 361 and 363; and (iii) Scheduling a Final Hearing Pursuant To Bankruptcy Rule 4001.

- **Service on Asbestos Claimants.** Pursuant to an Order entered on September 11, 2018, the Court granted the Debtors' Motion for an Order Authorizing the Debtors to Serve Asbestos Claimants through their Representative Attorney.

- **Retention of Claims and Noticing Agent**. Pursuant to an Order entered on September 11, 2018, the Court approved the Debtors' Application for Entry of an Order Authorizing the Retention of BMC Group as Claims and Noticing Agent Effective as of the Petition Date.

I.      **Retention of Professionals**

On October 19, 2018 the Court entered Orders approving the retention of Lowenstein Sandler, LLP as counsel for the Debtors and Getzler Henrich as financial advisors to the Debtors. On November 1, 2018, the Court entered an Order approving the Debtors' retention of various other professionals in the ordinary course of business.

J.      **Appointment of Official Committee and Legal Representative**

On September 26, 2018, the United States Trustee formed an official committee of asbestos personal injury claimants (the "Asbestos Claimants Committee"), in accordance with § 1102(a)(1) of the Bankruptcy Code.  On November 9, 2018, the Court entered Orders approving the retention of Caplin & Drysdale, Chartered as counsel and The Law Office of John A. Fialcowitz, LLC as local counsel to the Asbestos Claimants Committee.

On October 17, 2018, the Court entered an Order Appointing Lawrence Fitzpatrick as the legal representative to represent the interests of future personal injury claimants (the "Legal Representative").  On November 14, 2018, the Court entered an Order approving the retention of Young Conaway Stargatt & Taylor, LLP as counsel to the Legal Representative.

## ARTICLE V.
## SUMMARY OF THE PLAN

The following is a summary of the significant elements of the Plan.  This Disclosure Statement is qualified in its entirety by reference to the Plan.  This summary does not describe every element of the Plan and is not a substitute for a complete review of the Plan.  All parties are encouraged to review the Plan in its entirety for a full understanding of its provisions and impact on creditors and interest holders.  If there are any inconsistencies between the provisions of this Disclosure Statement and the provisions of the Plan, the provisions of the Plan will control.

A.      **General**

In general, a chapter 11 plan divides claims and equity interests into separate classes, specifies the treatment of such classes under the plan and contains other provisions necessary to the reorganization, or in some cases case, liquidation, of the debtor.  The Debtors are proposing a plan of reorganization and not a plan of liquidation.  Under the Bankruptcy Code, creditors (including equity interest holders) may hold claims or interests in more than one class.

The Plan segregates the various Claims and Equity Interests into different classes taking into account the different nature and priority of such respective Claims and Equity Interests.

A chapter 11 plan may specify that certain classes of claims or interests are either to be paid in full upon the effectiveness of the plan or that the plan does not alter the legal, equitable and contractual rights of such classes.  Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to have accepted the plan.  Accordingly, the Bankruptcy Code conclusively presumes the acceptance of a plan by unimpaired classes and it is not necessary to solicit votes from the holders of claims or interests in unimpaired classes.

The Plan is predicated upon the principal terms and conditions of a comprehensive compromise and settlement between: (a) the Debtors; (b) Randall Hinden, Wendy Hinden, Irene Hinden, David Brett Krupnick, Lindsay Jill Trant, Tobey Hinden Parker Geller, Joshua Blumenthal, Jessie Geller Cawley, Abby Beth Wein, Hayley Rebekah Geller, and Max Hinden (together, the "Hinden Family Members"); (c) Duro Dyne Canada, Inc., 4 Site LLC, Rize LLC, Rize Enterprises Canada Inc., Pro4ma LLC, Pro4ma II LLC, Foma LLC, ISWR Ohio LLC, Duro Dyne Spence LLC, The Irene Lee Hinden Trust, The Wendy Lynn Geller Trust, The Randall Scott Hinden Trust, The Hinden Grandchildren Trust, the estate of Sheryl Blumenthal, and the trusts created under the will of Sheryl Blumenthal (collectively, the "Hinden Family Entities"); (d) the law firms that were members of the Ad Hoc Committee, which represent clients holding present claims against one or more of the Debtors for asbestos-related personal injury or wrongful death; and (e) Pre-Petition Future Claimants' Representative.

Pursuant to the Plan, a trust will be established that satisfies Section 524(g) and other applicable provisions of the Bankruptcy Code (the "Asbestos Trust"). The Plan shall provide for the issuance, on the Effective Date and on condition of the delivery of the Trust Funding set out below, of a permanent injunction channeling all Asbestos Claims and Demands to the Trust in accordance with § 524(g) of the Bankruptcy Code ("Asbestos Permanent Channeling Injunction"). The Asbestos Trust will assume sole responsibility to process, resolve, and pay all Asbestos Claims and Demands, in accordance with the Plan and the Plan-related documents.

**B.    Trust Funding**

Pursuant to the Plan, the Asbestos Trust shall be funded by:

1.    a cash contribution by the Debtors in the amount of $7,500,000, to be made on the Effective Date, and made available through an asset-based lending facility to be provided by Bank of America, N.A. which will be secured by a first lien on substantially all assets of the  Reorganized Debtor;

2.    a cash contribution by or on behalf of the Hinden Family Members and the Hinden Family Entities in the total amount of $3,000,000, to be made on the Effective Date;

3.    the Trust Note in the original principal sum of $13.5 million to be delivered on the Effective Date, together with all liens, security interests, and collateral securing payment of and performance under the  Trust Note;

4.    the Earn Out Amount in the amount of $2 million to be paid in accordance with Article VII L hereof; and,

5.    an assignment and contribution by the Debtors of all rights to insurance coverage responsive or potentially responsive to asbestos personal injury claims, and any and all proceeds of or from such rights, regardless of whether such rights and proceeds arise or result from insurance policies, settlement agreements, or other insurance-related agreements.

### C.      Classification of Claims and Interests

Pursuant to section 1122 of the Bankruptcy Code, set forth below is the designation of Classes of Claims and Equity Interests under the Plan.  A Claim or Equity Interest is placed in a particular Class for the purpose of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest has not been paid, released, withdrawn, or disallowed before the Effective Date.

As set forth in Articles II and III of the Plan, the Plan classifies the various Claims against, and Equity Interests in, the Debtors and specifies their treatment pursuant to sections 1122 and 1123(a) of the Bankruptcy Code.  A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest falls within the description of such other Classes.  A Claim or Equity Interest is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim has not been Disputed, paid, discharged, released or otherwise settled prior to the Effective Date.

Under the Plan, all Claims and all Equity Interests, the Professional Fee Claims, the General Administrative Expense Claims, the Statutory Fees, and the Priority Tax Claims are placed into the Classes set forth below.  The Plan provides for the division of holders of Claims and Equity Interests as follows:

### 1.      Unclassified Claims.

Pursuant to Bankruptcy Code section 1123(a)(1), the Professional Fee Claims, the General Administrative Expense Claims, the Statutory Fees, and the Priority Tax Claims are not classified in the Plan (the "Unclassified Claims").  Except for Priority Tax Claims, which are impaired only to the extent permitted by the Bankruptcy Code, unclassified Claims are not impaired by the Plan.  Each holder of an Unclassified Claim is conclusively presumed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan. The Professional Fee Claims, the General Administrative Expense Claims, the Statutory Fees, and the Priority Tax Claims are the only types of Claims that are unclassified in the Plan.

### 2.      Unimpaired Classes of Claims

Each holder of an Allowed Claim in the following classes is unimpaired and deemed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan:

- Class 1: Priority Non-Tax Claims

- Class 2: Secured Claims

- Class 3: Employee Benefit Claims

- Class 4: Worker Compensation Claims

- Class 5: General Unsecured Claims

- Class 8: Bonded Claims

**3.** **Impaired Classes of Claims.**

Each holder of an Allowed Claim in the following classes is impaired and entitled to vote to accept or reject the Plan:

- Class 6: Prepetition Defense-Cost Contribution Claims

- Class 7: Channeled Asbestos Claims

**4.** **Insider Classes of Claims and Equity Interests.**

Holders of Allowed Claims or Equity Interests in the following Classes are Insiders or Affiliates of the Debtors and, as a result, are not entitled vote to accept or reject the Plan:

- Class 9: Intercompany Claims

- Class 10: Related Party Claims

- Class 11: Equity Interests in Duro Dyne National Corp.

- Class 12: Equity Interests in Duro Dyne Corporation, Duro Dyne Midwest Corp., Duro Dyne West Corp., and Duro Dyne Machinery Corp.

**ARTICLE VI.**
**TREATMENT OF UNCLASSIFIED CLAIMS**

**A.** **Administrative Claims**

*1.* *Administrative Claims Other Than for Professional Compensation and Reimbursement*. Except to the extent that any Entity entitled to payment of any Allowed Administrative Claim agrees to less favorable treatment with the Reorganized Debtor, each holder of an Allowed Administrative Claim (other than a Professional Claim) shall receive Cash in an amount equal to such Allowed Administrative Claim on the later of the Effective Date and the date on which such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as reasonably practicable; *provided, however*, that Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by the applicable Debtor shall be paid in full and performed by the applicable Reorganized Debtor in accordance with the terms and subject to any conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

*2.* *Bar Date for Administrative Claims Other Than Professional Claims* All parties seeking payment of an Administrative Claim (other than a Professional Claim) must file with the Bankruptcy Court and serve upon the Reorganized Debtos a request for payment of such Administrative Claim prior to the applicable deadline set forth below; *provided, however*, that parties seeking payment of postpetition ordinary course trade obligations, postpetition payroll obligations incurred in the ordinary course of the Reorganized Debtor's postpetition business,

and amounts arising under agreements approved by the Bankruptcy Court or the Plan need not file such a request.  All holders of Administrative Claims (other than Professional Claims) must file with the Bankruptcy Court and serve on the Debtors or the Reorganized Debtor, as applicable, a request for payment of such Claims so as to be received on or before 4:00 p.m. (Eastern Time) on the first Business Day after the date that is sixty (60) days after the Effective Date, unless otherwise agreed to by the appropriate Debtor or Reorganized Debtor, without further approval by the Bankruptcy Court. ***Failure to comply with these deadlines shall forever bar the holder of an Administrative Claim (other than a Professional Claim) from seeking payment tthe Plan.***  Any holder of an Administrative Claim (other than a Professional Claim) that does not assert such Claim in accordance with Section 2.01 of the Plan shall have its Claim deemed disallowed under the Plan and be forever barred from asserting such Claim against any of the Reorganized Debtor, the Debtors, their Estates, or their assets. Any such Claim and the holder tthe Plan shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup, or recover such Claim.

    *3.*        *Professional Claims.*  Holders of Professional Claims shall (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by the first Business Day after the date that is sixty (60) days after the Effective Date or by such other date as may be fixed by the Bankruptcy Court, and (ii) be paid in full in such amounts as are Allowed by the Bankruptcy Court (A) on the date on which such Professional Claim becomes an Allowed Administrative Claim, or as soon thereafter as reasonably practicable, or (B) upon such other terms as may be mutually agreed upon between the holder of such Allowed Professional Claim and the Reorganized Debtor.

**B.**      **Treatment of Priority Tax Claims.**

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the later of the Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as reasonably practicable, one of the following treatments, at the option of the Reorganized Debtor:  (a) Cash in the amount of such Allowed Priority Tax Claim; (b) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installments over a period of time not to exceed five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other treatment as may be agreed upon by such holder and the Reorganized Debtor or otherwise determined by order of the Bankruptcy Court.

**C.**      **Statutory Fees**.

The Debtors shall pay in full, in Cash, any fees due and owing to the United States Trustee, including quarterly fees payable under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 (if any), on all disbursements, including disbursements in and outside the ordinary course of the Debtors' businesses at the time of Confirmation.  On and after the Effective Date, the Reorganized Debtor shall pay the applicable fees to the United States Trustee for the Reorganized Debtor when due in the ordinary course in accordance with applicable law.

# ARTICLE VII.
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**A.      Classification of Claims and Interests.**

Pursuant to section 1122 of the Bankruptcy Code, set forth below is the designation of Classes of Claims and Equity Interests under the Plan.  A Claim or Equity Interest is placed in a particular Class for the purpose of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest has not been paid, released, withdrawn, or disallowed before the Effective Date.

**B.      Summary of Classification.**

The Plan constitutes a chapter 11 plan of reorganization for each of the Debtors.  The Plan's classifications of Claims and Equity Interests are set forth below and described in more detail below.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote |
| 3 | Employee Benefit Claims | Unimpaired | Not Entitled to Vote |
| 4 | Worker Compensation Claims | Unimpaired | Not Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote |
| 6 | Prepetition Defense-Cost Contribution Claims | Impaired | Entitled to Vote |
| 7 | Channeled Asbestos Claims | Impaired | Entitled to Vote |
| 8 | Bonded Claims | Unimpaired | Not Entitled to Vote |
| 9 | Intercompany Claims | Impaired | Not Entitled to Vote |
| 10 | Related-Party Claims | Impaired | Not Entitled to Vote |
| 11 | Equity Interests in Duro Dyne National Corp. | Impaired | Not Entitled to Vote |
| 12 | Equity Interests in Duro Dyne Corporation, Duro Dyne Midwest Corp., Duro Dyne West Corp., and Duro Dyne Machinery Corp. | Impaired | Not Entitled to Vote |

**C.      Treatment of Claims and Interests**

To the extent a Class contains Claims or Equity Interests with respect to one or more of the Debtors, the classification of Claims and Equity Interests and their respective treatment hereunder are specified below.

1.      *Classification and Treatment of Claims and Interests*.  To the extent a Class contains Claims or Equity Interests with respect to one or more of the Debtors, the classification of Claims and Equity Interests and their respective treatment hereunder are specified below.

### a.      Class 1 – Priority Non-Tax Claims

Classification:  Class 1 shall consist of all Priority Non-Tax Claims.

Treatment: Except to the extent that a holder of an Allowed Priority Non-Tax Claim and the Debtors shall have agreed in writing to a different treatment, each holder of an Allowed Priority Non-Tax Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash, without interest, in the Allowed Amount of such Allowed Priority Non-Tax Claim as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date when such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim.

Impairment and Voting:  Class 1 is Unimpaired.  Holders of Allowed Class 1 Priority Non-Tax Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 1 Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and their votes will not be counted.

### b.      Class 2 – Secured Claims

Classification:  Class 2 shall consist of all Secured Claims.

Treatment:  Each holder of an Allowed Secured Claim shall be paid the Allowed Amount of such Claim either, at the option of the Reorganized Debtor, (A) in full, in Cash, on the later of (1) the Effective Date, or as soon as reasonably practicable thereafter, or (2) the date such Secured Claim becomes an Allowed Secured Claim, or as soon as reasonably practicable thereafter; (B) upon such other terms as may be agreed upon between the Reorganized Debtor and the holder of an Allowed Secured Claim and approved by the Bankruptcy Court; (C) by the surrender to the holder or holders of any Allowed Secured Claim of the property securing such Secured Claim; or (D) notwithstanding any contractual provision or applicable law that entitles a holder of a Secured Claim to demand or receive payment the Plan prior to the stated maturity upon and after the

occurrence of a default, by reinstatement in accordance with section 1124(2)(B) of the Bankruptcy Code.

Impairment and Voting: Class 2 Secured Claims are Unimpaired, and holders of Class 2 Secured Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 2 Secured Claims are not entitled to vote to accept or reject the Plan, and their votes will not be solicited.

### c.       Class 3 – Employee Benefit Claims

Classification: Class 3 shall consist of all Employee Benefit Claims.

Treatment: The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Allowed Employee Benefit Claim entitles the holder of such Claim, including, for the avoidance of doubt, quarterly installment payments on account of any Allowed Withdrawal Liability Claims as provided for pursuant to Title IV of ERISA.

Impairment and Voting:   Class 3 Employee Benefit Claims are Unimpaired and holders of Class 3 Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 3 Employee Benefit Claims are not entitled to vote to accept or reject the Plan, and their votes will not be solicited.

### d.       Class 4 – Worker Compensation Claims

Classification: Class 4 shall consist of all Worker Compensation Claims.

Treatment: The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Allowed Worker Compensation Claim entitles the holder of such Claim.

Impairment and Voting:   Class 4 Worker Compensation Claims are Unimpaired and holders of Class 4 Worker Compensation Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 4 Worker Compensation Claims are not entitled to vote to accept or reject the Plan, and their votes will not be solicited.

### e.       Class 5 – General Unsecured Claims

Classification: Class 5 shall consist of all General Unsecured Claims.

Treatment:   Except to the extent previously paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for,

each such Claim, (i) payment equal to the Allowed amount of such Claim, in Cash, as an when such Claim becomes due and payable in the ordinary course of the applicable Debtors' business or in accordance with applicable court order or applicable law, or (ii) such other treatment that renders such holder Unimpaired.

Impairment and Voting: Class 5 General Unsecured Claims are Unimpaired. Therefore, holders of Asbestos Claims in Class 5 are not entitled to vote to accept or reject the Plan, and their votes will not be solicited.

### f.        Class 6 – Prepetition Defense-Cost Reimbursement Claims

Classification:   Class 6 shall consist of all Prepetition Defense-Cost Reimbursement Claims.

Treatment:   Except to the extent that a holder of a Prepetition Defense-Cost Reimbursement Claim agrees to different treatment, each holder of an Allowed Insurance Reimbursement Obligation Claim shall receive, in full and complete satisfaction, settlement and release of and in exchange for such Claim, payment shall be paid in full of the Allowed Amount of such Insurance Reimbursement Obligation Claim payable as follows: (a) annual payments of principal based on a twenty (20) year amortization schedule plus interest at the federal judgement rate in effect as of the Petition Date to be made on the first (1st) through seventh (7th) year anniversaries of the Effective Date; and (b) a balloon payment of all outstanding principal and interest on the eighth (8th) anniversary of the Effective Date.

Impairment and Voting:  Class 6 Insurance Reimbursement Claims are Impaired.  Therefore, holders of Asbestos Claims in Class 6 are entitled to vote on the Plan, and their votes will be solicited.

### g.        Class 7 – Channeled Asbestos Claims

Classification:  Class 7 shall consist of all Channeled Asbestos Claims.

Treatment:   Class 7 Channeled Asbestos Claims shall be resolved in accordance with the terms, provisions, and procedures of the Asbestos Trust Agreement and the TDP.  All Class 7 Channeled Asbestos Claims that are eligible for payment shall be paid by the Asbestos Trust out of the Asbestos Trust Assets, as and to the extent provided in the Asbestos Trust Agreement and the TDP.

Impairment and Voting:   Class 7 Channeled Asbestos Claims are Impaired.  Therefore, holders of Asbestos Claims in Class 7 are entitled to vote on the Plan, and their votes will be solicited.

For purposes of voting only, and not for purposes of processing claims or receiving any payment or distribution under the Trust Distribution Procedures, Asbestos Insurers holding asserted claims in Class 7 will be permitted to vote on the Plan as holders of Indirect Trust Claims.  As holders of Indirect Trust Claims for voting purposes only, each of the Asbestos Insurers will have a voting amount of $1.00.  Asbestos Insurers wishing to receive a temporarily allowed voting amount greater than $1.00 must file and serve a motion requesting such relief under Bankruptcy Rule 3018 in accordance with procedures approved by the Bankruptcy Court.

### h.     Class 8– Bonded Claims

Classification:  Class 8 shall consist of all Bonded Claims.

Treatment:  On the later of (A) the Effective Date or (B) the date on which a Bonded Claim becomes an Allowed Bonded Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Bonded Claim shall receive in full and final satisfaction of such Allowed Bonded Claim, Cash in the Allowed Amount of the Allowed Bonded Claim; provided, however, that (1) in no event shall such Cash distribution exceed the amount of the bond or other payment assurance securing such Allowed Bonded Claim and (2) each such holder of an Allowed Bonded Claim shall look solely to the bond or other payment assurance securing its Claim for such Cash distribution with respect to such Allowed Bonded Claim, and shall receive no property or Distribution from the applicable Debtor, the Reorganized Debtor, or the Asbestos Trust on account of such Allowed Bonded Claim.  If (x) the holder of a Bonded Asbestos Personal Injury Claim and the Plan Proponents or (y) the holder of a Bonded Non-Asbestos Claim and the applicable Debtor or Reorganized Debtor, do not agree on the Allowed Amount of such Bonded Claim, the Bankruptcy Court or other court of competent jurisdiction shall determine the Allowed Amount of such Claim.

Impairment and Voting:  Class 8 Bonded Claims are Unimpaired, and holders of Class 8 Bonded Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 8 Bonded Claims are not entitled to vote to accept or reject the Plan, and their votes will not be solicited.

### i.     Class 9 – Intercompany Claims

Classification:  Class 9 shall consist of all Intercompany Claims.

Treatment:  Intercompany Claims shall be expunged and no Distributions shall be made on account of any Allowed Intercompany Claim

Impairment and Voting:  Class 9 is Impaired by the Plan.  Because the holders of Allowed Class 9 Intercompany Claims are Insiders of the Debtors, Class 9 is not entitled to vote to accept or reject the Plan.

### j.        Class 10 – Related-Party Claims

Classification:  Class 10 shall consist of all Related-Party Claims.

Treatment:  Related-Party Claims shall be paid in the ordinary course according to any terms or agreements governing such Claims, except that all Related-Party Claims shall be subordinated to the Trust Note in accordance with Section 4.16 the Plan and shall be subject to any other applicable terms or provisions set forth in the Plan Documents.  Any personal property or equipment securing any Related-Party Claim as of the Effective Date shall revert to, or be held by, the Reorganized Debtor free and clear of any Lien, interest, or other encumbrance, upon the maturity or satisfaction of such Related-Party Claim.

Impairment and Voting:  Class 10 is Impaired by the Plan.  Because holders of Class 10 Related-Party Claims are Insiders of the Debtors, Class 10 is not entitled to vote to accept or reject the Plan.

### k.        Class 11 – Equity Interests in Duro Dyne National Corp.

Classification:  Class 11 shall consist of all Equity Interests in Duro Dyne National Corp.

Treatment:  Subject to the provisions of Section 5.02(c) of the Plan, holders of Equity Interests in Debtor Duro Dyne National Corp. shall receive and retain their Equity Interests in Reorganized Duro Dyne National Corp. to the same extent held in the Debtor Duro Dyne National Corp. on the Petition Date.

Impairment and Voting:  Class 11 Equity Interests are Impaired by the Plan. Because the holders of Class 11 Equity Interests are Insiders, holders of Class 11 Equity Interests are not entitled to vote to accept or reject the Plan.

### l.        Class 12 – Equity Interests in Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp.

Classification:  Class 12 shall consist of all Equity Interests in Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp.

Treatment:  All Equity Interests in Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp.

shall be cancelled and extinguished on the Effective Date and holders of Equity Interests in Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp. shall receive no distributions on account of such Equity Interests.

Impairment and Voting:  Class 12 Equity Interests are Impaired by the Plan.  Because each holder of Class 12 Equity Interests is an Insider, holders of Class 12 Equity Interests are not entitled to vote to accept or reject the Plan.

The Debtors reserve the right to modify the treatment of any Allowed Claim or Interest in any manner adverse only to the holder of such Claim or Interest at any time after the Effective Date upon the consent of the holder of the Claim or Interest whose Allowed Claim or Interest, as the case be, is being adversely affected, or as allowed by Court Order, through the Effective Date.

## ARTICLE VIII.
## THE ASBESTOS TRUST

### A.    Creation and Purposes of the Asbestos Trust.

Effective upon Consummation, the Asbestos Trust shall be created and established without further notice, action, or deed, except as provided in the Plan Documents.  The Asbestos Trust shall be a "qualified settlement fund" within the meaning of 26 U.S.C. § 468B.  The purposes of the Asbestos Trust shall be, *inter alia*, (a) to assume and succeed to all liabilities and responsibility for Channeled Asbestos Claims; (b) to direct the processing, resolution, liquidation, and payment of all Channeled Asbestos Claims in accordance with section 524(g) of the Bankruptcy Code, the Plan, the Asbestos Trust Agreement, the Asbestos Trust Distribution Procedures ("TDP"), and the Confirmation Order; (c) to preserve, hold, manage, and maximize the Asbestos Trust Assets for use in paying or satisfying Channeled Asbestos Claims; and (d) to comply in all respects with the requirements of a trust set forth in section 524(g)(2)(B) of the Bankruptcy Code, all in accordance with the Plan and the Asbestos Trust Agreement. *On the Effective Date, except as provided in Sections 4.13 and 4.14 of the Plan, all Channeled Asbestos Claims shall be channeled to the Asbestos Trust pursuant to the Asbestos Permanent Channeling Injunction, and shall be resolved, liquidated, and (if entitled to payment) paid in accordance with the Asbestos Trust Agreement and the TDP.*

### B.    The Asbestos Trust Distribution Procedures.

The goal of the Asbestos Trust is to treat all present and future holders of Asbestos Claims in substantially the same manner and in accordance with the requirements of section 524(g) of the Bankruptcy Code.  To further that goal, the Asbestos Trust will resolve Channeled Asbestos Claims in accordance with the TDP, the form of which is attached to the Plan as Exhibit B and is incorporated herein by reference.  The Asbestos Trust Agreement provides that the Asbestos Trust will make payments to holders of eligible Asbestos Claims pursuant to the TDP while maintaining sufficient resources to pay eligible future Asbestos Claims in substantially the same manner.

Historically, the Debtors resolved only a few dozen asbestos cases annually on a national basis. The vast majority of those cases were based on claims by sheet metal workers who worked directly with the Debtors' asbestos-containing specialty products and who were installing such products personally. Because of the specialized nature of those products and the very limited resources of the Asbestos Trust, the TDP provides for the payment by the Asbestos Trust of eligible Asbestos Claims based only on certain diseases, and it is anticipated that the Debtors' historical experience will be reflected in the claims approval process of the Asbestos Trust. The Asbestos Trustee will supervise the review of filed Asbestos Claims with the goal of limiting the approval of Asbestos Claims to those claims that provide evidence of the type of exposure patterns that were required by the Debtors for payment of claims in the tort system. To that end, the Asbestos Trust may make reasonable inquiries of claimants or co-workers as to the nature and extent of their exposure to the Debtors' asbestos-containing products.

The TDP establishes a schedule of five (5) asbestos-related diseases ("Disease Levels"): Mesothelioma, Lung Cancer 1, Lung Cancer 2, Other Cancer, and Severe Asbestosis.

To qualify for payment, claimants must submit specific medical and exposure evidence as provided in the TDP. The Trustee may review the governing documents of another asbestos trust or claims facility and, with the consent of the TAC and the FCR, determine to accept the disease level classifications as found by such other asbestos trust or claims facility in lieu of the medical evidence claimants are required to submit under this TDP.

The TDP provides that the Claimants who do not meet those criteria will not receive a settlement offer from the Asbestos Trust. Non-malignant asbestos-related diseases that do not qualify as Severe Asbestosis under the criteria set forth in the TDP will *not* be compensable by the Asbestos Trust. However, claimants with non-malignant asbestos-related diseases who are subsequently diagnosed with Severe Asbestosis or a malignant disease will be able to seek compensation from the Asbestos Trust.

In addition to meeting the other medical and exposure requirements of the TDP, in order for a claim to be approved by the Asbestos Trust, the claimant must either (a) establish that the injured party worked in one of the occupations identified below ("Presumptive Occupations") and demonstrate to the Asbestos Trust's satisfaction that such injured party worked directly with Duro Dyne asbestos-containing flexible duct connectors or (b) if the injured party did not work in one of the Presumptive Occupations, demonstrate the injured party's requisite direct exposure to Duro Dyne asbestos-containing flexible duct connectors. The Presumptive Occupations are sheet metal mechanic, sheet metal worker, sheet metal apprentice, HVAC repairman, HVAC installer, HVAC technician, duct installer, and furnace installer.

The Asbestos Claim values for each Disease Level are set forth below.[5]

| Level | Disease Category | Scheduled Value |
|-------|------------------|-----------------|
| V | Mesothelioma | $140,000 |

---

[5] The figures presented here represent claim values for settlement purposes only. The parties reserve all rights with respect to actual claim values in the event the Plan is not confirmed.

| IV | Lung Cancer 1 | $50,000 |
|----|---------------|---------|
| III | Lung Cancer 2 | $25,000 |
| II | Other Cancer | $20,000 |
| I | Severe Asbestosis | $34,000 |

The TDP provides that claims generally will be processed in "First In, First Out" ("FIFO") order so that the oldest claims will be processed first.

The TDP further provides that applicable statutes of limitations shall be tolled as of the earliest of (a) the actual filing of the claim against a Debtor prior to the Petition Date, whether in the tort system or by submission of the claim to a Debtor pursuant to an administrative settlement agreement; (b) the tolling of the claim against a Debtor prior to the Petition Date by an agreement or otherwise, provided such tolling is still in effect on the Petition Date; or (c) the Petition Date.  If an Asbestos Claim meets any of the applicable tolling provisions and the Asbestos Claim was not barred by the applicable federal or state statute of limitation at the time of the tolling event, it shall be treated as timely filed if it is actually filed with the Asbestos Trust within three (3) years after the initial claims filing date, or within three (3) years after the date of the diagnosis of the disease for which the Asbestos Claim is filed, whichever occurs later.  In addition, any Asbestos Claims that were first diagnosed after the Petition Date, irrespective of the application of any relevant federal or state statute of limitation or repose, may be filed with the Asbestos Trust within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims Filing Date, whichever occurs later.

Asbestos Claims will be processed through the TDP's Expedited Review Process, which is designed to provide an expeditious, efficient, and inexpensive method for resolving and liquidating Asbestos Claims based on the assigned, disease-specific "Scheduled Value" applicable to the Asbestos Claim, as set forth in the schedules contained in the TDP and in the table above.

Claimants will be required to submit a filing fee of $50 to have an Asbestos Claim processed by the Asbestos Trust.  This fee will be refunded in full to claimants who receive and accept payment of a settlement offer from the Asbestos Trust.

After they have completed the Expedited Review Process, claimants will have the option of engaging in binding or nonbinding arbitration to resolve disputes concerning whether the Asbestos Trust's outright rejection or denial of a claim was proper, or whether the claimant's medical condition or exposure history meets the requirements of the TDP for purposes of categorizing a claim involving Disease Levels I-V.

All arbitration will be conducted in accordance with Alternative Dispute Resolution Procedures that the Asbestos Trust is expected to adopt after the Effective Date.  The arbitrator may return awards only in accordance with the values set forth in the TDP.  Only if a claimant elects nonbinding arbitration and rejects the arbitration award may the claimant then litigate in court against the Asbestos Trust to establish its claim.  Awards in litigation will be paid as specifically provided in the TDP.

As a condition to making payment to a claimant with respect to an Asbestos Claim, the Asbestos Trust will obtain, for the benefit of the Asbestos Trust and the Protected Parties, a release of liability with respect to the claimant's Asbestos Claim.

Potential claimants should be aware that any funds they recover against the Asbestos Trust, or against any "primary plan" as defined in the Medicare Secondary Payer Statute, 42 U.S.C. § 1395y(b) (the "MSPS"), could be subject to repayment obligations owing or potentially owing under the MSPS or related rules, regulations, or guidelines.

Potential claimants should also be aware that, as a condition of receiving payment from the Asbestos Trust or any "primary plan" as defined by the MSPS, the claimants may be asked to certify that they will comply with any obligations owing or potentially owing under the MSPS or related rules, regulations, or guidelines.

All Asbestos Claims paid by the Asbestos Trust will be subject to a payment percentage. The payment percentage is the percentage of the full liquidated value of a claim that claimants will receive from the Asbestos Trust. Eligible claimants will each receive a payment equal to the liquidated value of their claim multiplied by the payment percentage.

The Debtors are unable to provide a payment percentage at this time for several reasons. First, in order for a payment percentage to be calculated now, the Asbestos Claimants Committee and the Legal Representative would need to retain experts to estimate future claims, perform necessary computations and negotiate what would merely be a *hypothetical* payment percentage. This would result in substantial additional and unnecessary expense to the Debtors' estates and delay the Debtors' exit from chapter 11 while the *hypothetical* payment percentage was being estimated. Moreover, this merely theoretical payment percentage would have to be recalculated post-confirmation by the Asbestos Trustee as the fiduciary for the Asbestos Trust charged with determining the *actual* payment percentage in consultation with the TAC and Legal Representative. In addition, any payment percentage calculated now will be inaccurate and misleading because it will be based solely on the cash being contributed to the Asbestos Trust by the Debtors and their affiliates. If settlements with the Asbestos Insurers are entered into prior to the Confirmation Hearing, there will be additional assets to be distributed and the payment percentage will change.

There can be no certainty as to the precise amounts that will be distributed by the Asbestos Trust in any particular time period or when eligible Asbestos Claims will be paid by the Asbestos Trust. Payments that will be made on eligible Asbestos Claims will be determined under the TDP and will be based, on the one hand, on estimates of the number, types, and amount of current Asbestos Claims and expected future Demands, and on the other hand, on the value of the assets of the Asbestos Trust, the liquidity of the Asbestos Trust, the Asbestos Trust's expected future income and expenses, and other matters that are likely to affect the sufficiency of funds to pay all holders of Asbestos Claims.

The initial payment percentage will be determined after the Effective Date by comparing the anticipated assets of the Asbestos Trust against its projected liability for Asbestos Claims and Asbestos Trust Expenses. The Asbestos Trust's projected assets and liabilities will be based on a number of assumptions. Should any assumption from which a payment percentage is developed

prove to be materially inaccurate based on the Asbestos Trust's actual experience, the Asbestos Trust may have to adjust the payment percentage upwards or downwards from time to time, pursuant to the Asbestos Trust Agreement and the TDP, to reflect current estimates of the Asbestos Trust's assets and liabilities.

Aggregate distributions to claimants in each year will not exceed a "Maximum Annual Payment" amount determined for that year. After determining the payment percentage, the Asbestos Trust will determine the Maximum Annual Payment for each year by modeling the cash flow, principal, and income year-by-year to be paid over the Asbestos Trust's entire life in a manner designed to ensure that all present and future holders of Asbestos Claims are compensated in an amount equal to the liquidated value of their respective Asbestos Claims multiplied by the payment percentage.

Based upon the Debtors' claims settlement history and an analysis of present and future claims, a Claims Payment Ratio has been determined which will be set, as of the Effective Date, at 90% for Asbestos Claims involving mesothelioma (Disease Level V) ("Category A") and at 10% for Asbestos Claims involving all other diseases (Disease Levels I-IV) ("Category B"). In each year, after the determination of the Maximum Annual Payment, 90% of that amount shall be available to pay Category A Asbestos Claims, and 10% shall be available to pay Category B Asbestos Claims that have been liquidated since the Petition Date. Asbestos Claims for which there are insufficient funds allocated to the relevant Category shall be carried over for priority payment in the next year.

## C.    Appointment of Asbestos Trustee.

Alan B. Rich, Esquire, has been proposed as the initial Asbestos Trustee pursuant to the terms of the Asbestos Trust Agreement.

Mr. Rich practices civil appellate law, complex civil litigation, and toxic-tort-related bankruptcy law. He is the Managing Trustee of the G-I Holdings, Inc. Asbestos Personal Injury Settlement Trust, and the Trustee of the APG Asbestos Trust, the Christy Refractories Company, LLC Asbestos Personal Injury Trust, the Geo. V. Hamilton, Inc. Asbestos Trust, and the United Gilsonite Laboratories Asbestos Personal Injury Trust. In addition, he serves as counsel to (a) the Trust Advisory Committees of both the Fuller-Austin Asbestos Settlement Trust and the Swan Asbestos and Silica Trust, and (b) the Asbestos PD Future Claimants' Representative of the WRG Asbestos Property Damages Trust. For several months in 2007, he served on the TAC of the ARTRA Asbestos Trust. None of these representations or engagements presents a disqualifying conflict of interest.

Mr. Rich has received nine Pro Bono Legal Service Awards from the Dallas Bar Association and Legal Services of North Texas, including the Meritorious and the Distinguished Pro Bono Service Awards. He has been practicing law for more than thirty years.

Mr. Rich's appointment shall be effective as of the Effective Date. Upon termination of the Asbestos Trust, or as otherwise provided in the Asbestos Trust Agreement, the Asbestos Trustee's employment shall be deemed terminated, and the Asbestos Trustee shall be released

and discharged of and from all further authority, duties, responsibilities, and obligations with respect to or in connection with the Asbestos Trust and the Chapter 11 Cases.

**D.      Appointment of Delaware Trustee.**

Wilmington Trust, N.A. will serve as the initial Delaware Trustee for the Asbestos Trust and will be identified in the Asbestos Trust Agreement and appointed pursuant to the Confirmation Order. As set forth in the Asbestos Trust Agreement, the Delaware Trustee's role is limited to (i) accepting legal process served on the Asbestos Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Delaware law (acting solely at the written direction of the Trustee). Accordingly, there is unlikely to be any disqualifying conflict of interest that prevents Wilmington Trust from performing the Delaware Trustee's duties under the Asbestos Trust Agreement.

**E.      Trust Advisory Committee.**

On the Effective Date, the Trust Advisory Committee ("TAC") shall be established pursuant to the terms of the Asbestos Trust Agreement.  The TAC shall have five (5) members and shall have the functions, duties, and rights provided in the Asbestos Trust Agreement.  The initial members of the TAC that have been selected by the Asbestos Claimants Committee are James Ferraro, Esq of Kelley & Ferraro, LLP, Al Brayton, Esq. of Brayton Purcell, LLP, Kathy Byrne, Esq. of Cooney & Conway,  Joseph Belluck of Belluck & Fox LLP, and Perry Browder of Simmons Hanly Conroy LLC.  Each of the foregoing law firms represents a member of the Asbestos Claimants Committee.  Each of the members of the TAC and/or other members of their law firms have served as counsel to members of asbestos claimants committees in other asbestos chapter 11 cases and trust advisory committees of trusts formed at the conclusion of such cases.  None of these representations or engagements presents a disqualifying conflict of interest that would prevent these individuals from serving on the TAC.  Upon termination of the Asbestos Trust, or as otherwise provided in the Asbestos Trust Agreement, the TAC shall be deemed dissolved and discharged of and from all further authority, duties, responsibilities, and obligations with respect to or in connection with the Asbestos Trust and the Chapter 11 Cases.

**F.      Legal Representative for Demand Holders.**

Effective on the Effective Date, the Legal Representative shall serve in such capacity under the terms of the Asbestos Trust Agreement, and shall have the functions, duties, and rights provided in the Asbestos Trust Agreement.  The Bankruptcy Court found that the Legal Representative was disinterested as that term is defined in section 101(14) of the Bankruptcy Code in connection with his appointment as the Legal Representative.  The Legal Representative's appointment to serve as the legal representative under the Asbestos Trust Agreement does not present any disqualifying conflict of interest that would prohibit him from servicing in that capacity.  Upon termination of the Asbestos Trust, or as otherwise provided in the Asbestos Trust Agreement, the Legal Representative shall be discharged of and from all further authorities, duties, responsibilities, and obligations with respect to or in connection with the Asbestos Trust and the Chapter 11 Cases.

**G.      Assumption of Certain Liabilities by the Asbestos Trust.**

On the Effective Date, subject to the terms of the Plan Documents and in accordance with sections 524(g) and 1141 of the Bankruptcy Code, the Asbestos Trust shall assume and succeed to all liability and responsibility for all Channeled Asbestos Claims.  Notwithstanding the Asbestos Trust's assumption of liability and responsibility for all Channeled Asbestos Claims, such assumption shall not itself operate or be construed as a release, accord, or novation of each Debtor's obligations on account of such Claims for purposes of any Asbestos Insurance Rights solely to the extent of suits against the Reorganized Debtor directly in accordance with Section 4.13 the Plan (subject, however, to the discharge of any "personal liability" of the Debtors as that term is used in section 524(a) of the Bankruptcy Code and as provided in Section 9.03 the Plan).

**H.      Transfer of Asbestos Insurance Rights.**

On the Effective Date, by virtue of Confirmation, without further notice, action, or deed, the Asbestos Insurance Rights shall be automatically transferred to, and indefeasibly vested in, the Asbestos Trust, and the Asbestos Trust shall thereby become the estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, with the exclusive right to enforce any and all of the Asbestos Insurance Rights against any Entity, and the Proceeds of the recoveries of any such Asbestos Insurance Rights shall be the property of, and shall be deposited in, the Asbestos Trust.  The Asbestos Insurance Rights shall be vested in the Asbestos Trust free and clear of all Liens, encumbrances, interests, claims, and causes of action of any Entity.

If a court of competent jurisdiction determines the transfer of the Asbestos Insurance Rights pursuant to Section 4.07(a) of the Plan to be invalid, non-binding, or unenforceable, in whole or in part, then the Reorganized Debtor shall (1) upon request by the Asbestos Trust and at the reasonable expense of the Asbestos Trust, take all reasonable actions to pursue any of the Asbestos Insurance Rights for the benefit of, and to the extent required by, the Asbestos Trust; and (2) immediately transfer any Proceeds or property recovered under or on account of any Asbestos Insurance Rights to the Asbestos Trust; *provided, however*, that while any such Proceeds or property are held by or under the control of the Reorganized Debtor, such amounts shall be held in trust solely for the benefit of the Asbestos Trust.  The Reorganized Debtor shall have no obligation to defend or otherwise appear or incur any costs or expenses in connection with any action brought under Section 4.13 of the Plan, and any liability of the Reorganized Debtor to any Entity, including any Channeled Asbestos Claimant or Asbestos Insurer, that is based on, arises from, or is attributable to any action commenced under Section 4.13 of the Plan shall be enforceable only against the Asbestos Insurance Coverage provided by Non-Settling Asbestos Insurers as set forth in Section 4.14 of the Plan.

**I.      Funding of the Asbestos Trust.**

1.      On the Effective Date, the Debtors shall pay in full and in Cash the Debtors' Contribution to the Asbestos Trust.

2.      On the Effective Date, the Hinden Contribution shall be paid in full and in Cash to the Asbestos Trust by or on behalf of the Hinden Family Entities and the Hinden Family Members.

3.      On the Effective Date, any Proceeds held by the Debtors on account of Asbestos Insurance Rights shall be paid in full and in Cash to the Asbestos Trust.

4.      On the Effective Date, the Reorganized Debtor shall issue and deliver the Trust Note to the Asbestos Trust.

5.      Effective on the Effective Date, by virtue of Confirmation, any and all other Asbestos Trust Assets shall be transferred to and be vested in the Asbestos Trust, without further notice, deed, or order.

**J.      Securing Payment and Performance Under the Trust Note.**

1.      Effective on the Effective Date, the Trust Note shall be secured by the RDD Pledge, the DDC Pledge, the Bay Shore Mortgage, and the Fairfield Mortgage.

2.      The Bay Shore Mortgage shall be a recorded and first-priority Lien on the Bay Shore Property.  The Fairfield Mortgage shall be a recorded and first-priority Lien on the Fairfield Property.

3.      The DDC Pledge shall be a first-priority Lien and perfected in a manner such that it will not be subordinate to, or *pari passu* with, any other Lien, security interest, pledge, hypothecation, or other encumbrance or interest prior to the release of the DDC Pledge pursuant to the terms of the Pledge and Security Agreement.  On the Effective Date, Duro Dyne Canada shall deliver certificates representing 50.1% of the Duro Dyne Canada Stock, together with stock power executed in blank, to the Asbestos Trust to be held by the Asbestos Trustee in accordance with the Pledge and Security Agreement.

4.      The RDD Pledge shall be a first-priority Lien and perfected in a manner such that it will not be subordinate to, or *parri passu* with, any other Lien, security interest, pledge, hypothecation, or other encumbrance or interest prior to the release of the RDD Pledge pursuant to the terms of the Pledge and Security Agreement.  On the Effective Date, the Reorganized Debtor shall deliver certificates representing 50.1% of the Reorganized Duro Dyne Stock, together with stock power executed in blank, to the Asbestos Trust to be held by the Asbestos Trustee in accordance with the Pledge and Security Agreement.

**K.      Vesting of Asbestos Trust Assets.**

Upon the transfer of the Asbestos Trust Assets to the Asbestos Trust, all right, title, and interest in and to the Asbestos Trust Assets, and any proceeds thereof under the Plan, shall be indefeasibly and irrevocably vested in the Asbestos Trust free and clear of all Claims, Demands, Liens, Equity Interests, other interests, and causes of action of any Entity, without any further action of the Bankruptcy Court or any Entity, subject to the Asbestos Permanent Channeling Injunction and other provisions of the Plan; *provided, however*, that to the extent that certain Asbestos Trust Assets, because of their nature or because they will accrue subsequent to the Effective Date, cannot be transferred to and vested in the Asbestos Trust on the Effective Date, such Asbestos Trust Assets shall be transferred to and irrevocably and indefeasibly vested in the Asbestos Trust, free and clear of Claims, Demands, Liens, Equity Interests, other interests, and causes of action of any Entity, as soon as practicable after the Effective Date.

L.      **Earn Out Payments.**

The Reorganized Debtor shall annually pay to the Asbestos Trust, by no later than March 31 of each year, a sum of Cash equal to thirty percent (30%) of the amount of LTM Adjusted EBITDA (as measured at December 31 that is in excess of the Earn Out Threshold (as defined in the Plan), subject to and in accordance with the terms of Section 4.11 of the Plan.

1.      For purposes of this Section, the term "*Total Scheduled Rent*" means the total amount of rent scheduled under the Bay Shore Lease and the Fairfield Lease and paid on account of the Bay Shore Lease and the Fairfield Lease during the twelve (12) calendar months immediately preceding January 1 of each year; and the term "*Earn Out Threshold*" means an amount equal to $3,000,000 *plus* Total Scheduled Rent.

2.      For purposes of calculating the Earn Out Payments under this section, LTM Adjusted EBITDA and Total Scheduled Rent shall be measured at December 31 of the same calendar year.

3.      By way of illustration and not limitation, if LTM Adjusted EBITDA, as measured at December 31 of a given year, is $7,000,000, and if Total Scheduled Rent, as measured at December 31 of the same year, is $1,100,000, then the Reorganized Debtor shall pay to the Asbestos Trust the sum of $870,000 (*i.e.*, 30% ($7,000,000 *less* ($3,000,000 *plus* $1,100,000)) by March 31 of the same year.

4.      If the amount of LTM Adjusted EBITDA, as measured at December 31 of a given year, is equal to or less than the Earn Out Threshold, as calculated at December 31 of the same year, there shall be no Earn Out Payment in that same year.

5.      If a Catch-Up Payment and an Earn Out Payment are due and payable on the same Semiannual Payment Date, then the Reorganized Debtor shall pay the holder of the Trust Note the greater of the Catch-Up Amount and the amount of the Earn Out Payment, and such payment shall be applied first to any accrued and unpaid interest and outstanding Deferral Amounts in accordance with section 3(b)(5) of the Note Issuance Agreement and then, after such interest and Deferral Amounts have been paid in full in accordance with such section, to the amount of the Earn Out Payment that is outstanding.  To the extent all or part of the Earn Out Payment would have been paid to the Asbestos Trust but for the application of the Catch-Up Payment to the unpaid accrued interest and Deferral Amount in accordance with this subsection (e), such unpaid Earn Out Payment shall be deemed a "*Deferred Earn Out Amount*," and no Related-Party Payments shall be made unless and until the Deferred Earn Out Amount is indefeasibly paid in Cash and in full to the Asbestos Trust.

6.      Notwithstanding any provision in this Section, the Reorganized Debtor shall have no duty or obligation to pay an Earn Out Payment March 31, 2019 based on LTM Adjusted EBITDA measured at December 31, 2018.

7.      Once the cumulative total of Earn Out Payments irrevocably and indefeasibly paid to the Asbestos Trust equals $2,000,000, the Reorganized Debtor shall have no duty or obligation to pay further Earn Out Payments to the Asbestos Trust.

8.      Unless and until the cumulative total of Earn Out Payments irrevocably and indefeasibly paid to the Asbestos Trust equals $2,000,000, the Reorganized Debtor shall not (1) transfer any assets to a Related Party (other than payments authorized under any of the Plan Documents or payments in the ordinary course of the Reorganized Debtor's business to Duro Dyne Canada in exchange for reasonably equivalent value) or to any Entity, the majority of whose Equity Interests are owned directly or indirectly by the Reorganized Debtor or one or more of the Related Parties; (2) acquire a business, division, or substantially all the assets of any Entity; or (3) acquire fifty percent (50%) or more of the Equity Interests in any Entity, unless, before any asset transfer or acquisition is effectuated, such Related Party or Entity (i) expressly assumes joint and several liability for the Earn Out Payments, (ii) agrees in writing that its books, records, and financial statements, including the calculation of LTM Adjusted EBITDA under this Section, shall be kept and done on a consolidated basis with the Reorganized Debtor and Duro Dyne Canada, (iii) executes and delivers to the Asbestos Trust an assumption agreement that is satisfactory in form and substance to the Asbestos Trust, and (iv) takes all other actions as the Asbestos Trust deems appropriate to ensure payment of the Earn Out Payments hereunder.

9.      In accordance with the projections annexed hereto as Exhibit B, the Debtors anticipate that the full $2 million Earn Out Payment will be paid within three years of the Effective Date.  Had the Debtors confirmed their Plan prior to the end of 2015, Earn Out Payments in 2016 and 2017 would have been $1,050,808, and $949,142, respectively.

**M.      Financial Reporting and Disclosures.**

On and after the Effective Date, and up to and through the maturity date of the Trust Note, the Reorganized Debtor shall furnish the Asbestos Trust with all financial reporting in the same form and at the same time as required by the lender under the Secured Lending Facility or any secured credit agreement in replacement thereof, and any additional information reasonably required to monitor Adjusted EBITDA for purposes of payments under the Trust Note and the Earn Out Payments.  All such financial reporting and additional information shall conform to generally accepted accounting principles, consistently applied in each period in which a calculation is performed, if such conformity is not required by the lender under the Secured Lender Facility or any secured credit agreement in replacement the Plan.  If the Secured Lending Facility is terminated or not renewed or replaced, the Reorganized Debtor shall furnish the Asbestos Trust with such financial reporting at the same time and with the same level of detail and disclosure previously required under the Secured Lending Facility.

**N.      Actions Against the Reorganized Debtor to Obtain the Benefits of Asbestos Insurance Coverage.**

In addition to the potential for recoveries from the Asbestos Trust under the TDP, and not as an alternative thereto, Channeled Asbestos Claimants shall have the right to commence an action against the Reorganized Debtor and pursue their claims in the tort system to obtain the benefit of Asbestos Insurance Coverage, subject to the applicable provisions of section 5.10 of the TDP.  If a holder of a Channeled Asbestos Claim commences such an action on account of such Claim, any complaint commencing such an action shall name the Reorganized Debtor as a defendant, in lieu of the Debtors, *provided, however*, that, consistent with the Injunctions, no party may identify the Reorganized Debtor using the term "Duro Dyne" or any variation in the

caption of any pleading or other filing in connection with the action commenced by such complaint and shall only identify the Reorganized Debtor in such caption as "RDD Company" or such other name for the Reorganized Debtor as may be specified in the Confirmation Order. Such action may be filed in any court where any Debtor was subject to *in personam* jurisdiction as of the Petition Date and shall be deemed by operation of law to be an action against the Debtors, except that any judgment that may be obtained in such action may not be enforced against the assets of the Reorganized Debtor or the Asbestos Trust, other than the Asbestos Insurance Policies. Any such action may be served on the Asbestos Trust, who shall tender such actions to Non-Settling Asbestos Insurers. The Asbestos Trust shall continue to process the Channeled Asbestos Claim of any Channeled Asbestos Claimant who brings an action under Section 4.13 of the Plan, including by making payment thereon to such Channeled Asbestos Claimant as and when provided under the TDP. Subject to the Injunctions, nothing in Section 4.13 of the Plan is intended to bar any cause of action, or right to bring a cause of action, held by any Channeled Asbestos Claimant directly against any Asbestos Insurer if a Channeled Asbestos Claimant obtains a judgment in any action permitted under Section 4.13 of the Plan, with such actions governed by the procedures set forth in Section 4.14 of the Plan. The Reorganized Debtor shall have no obligation to defend or otherwise appear or incur any costs or expenses in connection with any action brought under Section 4.13 of the Plan, and any liability of the Reorganized Debtor to any Entity, including any Channeled Asbestos Claimant or Asbestos Insurer, that is based on, arises from, or is attributable to any action commenced pursuant to Section 4.13 of the Plan shall be enforceable only against the Asbestos Insurance Coverage provided by Non-Settling Asbestos Insurers, as set forth in Section 4.14 of the Plan.

**O.    Actions Against Non-Settling Asbestos Insurers to Obtain the Benefits of Asbestos Insurance Coverage.**

Any Channeled Asbestos Claimant that has obtained a judgment against the Reorganized Debtor pursuant to Section 4.13 of the Plan, or that would otherwise have the right under applicable nonbankruptcy law to join or substitute an Asbestos Insurer in an action filed on account of his Channeled Asbestos Claim, may, in order to obtain the benefits of Asbestos Insurance Coverage, make a request to the Asbestos Trust that the Asbestos Insurer Injunction be lifted so as to permit such Claimant to commence a judgment-enforcement action or direct action against a Non-Settled Asbestos Insurer (an "Enforcement Request"). Such an Enforcement Request shall be made in the form of a written request directed to the Asbestos Trust, containing such information as the Asbestos Trust may, in its sole discretion, require as part of any such request. The Asbestos Trust may require or impose appropriate terms and conditions on Channeled Asbestos Claimants in exchange for the Asbestos Trust's agreement to lift the Asbestos Insurer Injunction with respect to their claims; *provided, however*, that to the extent a Channeled Asbestos Claimant makes an Enforcement Request, the Asbestos Trust shall not lift the Asbestos Insurer Injunction unless the Channeled Asbestos Claimant agrees in writing to stipulate and agree to the following conditions:

1.    Judgment Reduction

If any Non-Settling Asbestos Insurer against whom a judgment-enforcement action or direct action is brought asserts as a defense that it would have an Asbestos Insurance Policy Claim as a result of contribution rights against one or more Settling Asbestos Insurers with

respect to the Channeled Asbestos Claimant's claim that it could have asserted but for the Injunctions (hereinafter, "Contribution Claims"), the liability, if any, of the Non-Settling Asbestos Insurer to the Channeled Asbestos Claimant shall be reduced dollar-for-dollar by the amount, if any, of any judgment establishing the Contribution Claims in accordance with Section 4.14(b) of the Plan; and

2.    Assertion of Settling Asbestos Insurers' Rights

In determining the amount of any Contribution Claim that operates to reduce the amount of liability of a Non-Settling Asbestos Insurer in a judgment-enforcement action or direct action, the Channeled Asbestos Claimant may assert the legal or equitable rights, if any, of the Settling Asbestos Insurers with respect to such Contribution Claims, provided that the Channeled Asbestos Claimant shall not be permitted to argue that any Contribution Claims are not properly asserted against the Channeled Asbestos Claimant, or that the Injunctions bar or affect in any way such Contribution Claims in connection with the Channeled Asbestos Claimant's claim against a Non-Settling Asbestos Insurer.

**P.    Limitations on Recoveries of Insurance Coverage from Non-Settling Asbestos Insurers.**

1.    *No Coverage for Trust Payments or Claims Resolutions*.  No Non-Settling Asbestos Insurer that has paid a Channeled Asbestos Claim pursuant to the provisions of Section 4.13 or Section 4.14 of the Plan shall be required or requested by the Asbestos Trust, the Debtors, the Reorganized Debtor, or any other Entity to make any payment whatsoever, based on or for (i) amounts paid by the Asbestos Trust to that Channeled Asbestos Claimant in accordance with the TDP or otherwise; (ii) the liquidated value of that Channeled Asbestos Claim resolved by the Asbestos Trust, whether or not paid in whole or in part by the Asbestos Trust; (iii) any amounts that the Asbestos Trust promises or proposes to pay to that Channeled Asbestos Claimant under the TDP or otherwise; or (iv) the amounts set forth in the scheduled values matrix of the TDP that would otherwise be applicable to the paid Channeled Asbestos Claim. For the avoidance of doubt, this Section does not preclude actions, or recoveries or payments from actions authorized by Section 4.13 or Section 4.14 of the Plan, and all Asbestos Insurance Litigation and Asbestos Insurance Policy Claims (including all claims for contribution, reimbursement, indemnity, or subrogation against Non-Settling Asbestos Insurers) are subject to the preceding two sentences of this subsection and to Section 4.14(b) of the Plan.  No Non-Settling Asbestos Insurer may argue or contend, in any action authorized by Section 4.13 or Section 4.14 the Plan, that a Channeled Asbestos Claimant is barred by this Section from obtaining the benefits of Asbestos Insurance Coverage simply because such Claimant either could or did have his Channeled Asbestos Claim resolved, valued, or paid by the Asbestos Trust.

**Q.    Determination of Credit, Reduction, or Offset.**

1.    The amount of any payments actually received by a Channeled Asbestos Claimant from the Asbestos Trust on account of his Channeled Asbestos Claim shall be credited dollar-for-dollar against the liability of the Reorganized Debtor in any action brought by such Channeled Asbestos Claimant under Section 4.13 of the Plan, and following the full satisfaction of a judgment obtained in such an action or in an action brought under Section 4.14 of the Plan,

the Entities that pay such a judgment shall be deemed to have been assigned the right to payment of any further amounts due from the Asbestos Trust to such Channeled Asbestos Claimant.

2.    Notwithstanding anything in the Plan to the contrary, if a Non-Settling Asbestos Insurer asserts a claim that it is entitled to a credit, offset, or reduction of damages based on any payment made by the Asbestos Trust or any Debtor, then nothing in the Plan or the TDP shall restrict any right of such Non-Settling Asbestos Insurer to introduce in any action otherwise admissible evidence in support of such claim.  All parties' rights to make arguments as to the admissibility of such evidence under the applicable rules of evidence are reserved.

**R.    Subordination of Related-Party Payments and Related-Party Claims.**

Upon the occurrence and continuance of a default under the Trust Note or an "Event of Default" as defined in the Note Issuance Agreement or in the Pledge and Security Agreement, (a) all obligations under the Trust Note, including principal and accrued interest, shall be paid in Cash and in full before any Related-Party Payment or any payment, whether in cash, property, or securities, on account of a Related-Party Claim is made; and (b) any Related Party receiving a Related-Party Payment or any payment, whether in cash, property, or securities, made on account of a Related-Party Claim shall be paid or delivered directly to the holder of the Trust Note for application in payment of the same unless and until all obligations under the Trust Note, including principal and accrued interest, are paid in Cash and in full.

**S.    Preservation of Asbestos-Related Defenses.**

In any action commenced against the Reorganized Debtor under Section 4.13 of the Plan or against a Non-Settling Asbestos Insurer under Section 4.14, (a) subject to Section 4.15(b) of the Plan, any payments made by the Asbestos Trust to the Channeled Asbestos Claimant commencing such action shall be taken into account in such action in accordance with rule of law or evidence related to any credit, offset, or reduction of damages allowed by applicable nonbankruptcy law; and (b) nothing pertaining to the Plan, the confirmation of the Plan, the entry of the Confirmation Order, the creation of the Asbestos Trust, and the implementation of the TDP shall be construed as a waiver or admission with respect to any Asbestos-Related Defenses, and all parties (including the Asbestos Insurers) shall be free to make any contention permitted by applicable nonbankruptcy law with respect to such defenses.

**T.    Books and Records.**

On the Effective Date, the Cooperation Agreement shall become effective, and the Asbestos Records (as defined in the Cooperation Agreement) shall be treated in accordance therewith.

# ARTICLE IX.
## IMPLEMENTATION OF THE PLAN

**A.    Substantive Consolidation**

1.    Prior to the Petition Date, the Debtors operated their business such that customers and vendors believed the Debtors were a single company. Creditors dealt with the

Debtors as a single economic and legal unit, and relied on the financial strength of the Debtors as a whole in extending credit. Likewise, the Debtors transferred assets and cash between the various entities as needed. Although books and records were maintained to reflect intercompany transfers, regular efforts were not made to reconcile intercompany accounts. The Debtors filed consolidated tax returns and maintained their books and records on a consolidated basis. Substantive consolidation of the Debtors is sought in these cases in order to simplify the Debtors' operations post-confirmation. Because all general unsecured creditors are receiving payment in full of their Claims under the Plan, substantive consolidation of the Debtors will neither harm nor benefit general unsecured creditors of any of the respective Debtors. Similarly, substantive consolidation will not impact the distribution to any impaired classes of Claims. For these reasons, the Debtors believe that substantive consolidation is appropriate in these cases.

2.     Confirmation shall constitute approval, pursuant to sections 105(a) and 1123(a)(5) of the Bankruptcy Code, effective upon Consummation, of the substantive consolidation and merger of each of the Debtors and their respective Estates with and into Debtor Duro Dyne National Corp. such that the Reorganized Debtor shall be the surviving Entity on the Effective Date. As a result of such substantive consolidation and merger,

(i)     the assets and liabilities of the Debtors will be deemed to be the assets and liabilities of the Reorganized Debtor;

(ii)     each and every Claim listed on the Schedules or filed in the Chapter 11 Cases against any Debtor shall be considered filed against the Reorganized Debtor and shall be considered one Claim against and obligation of the Reorganized Debtor on and after the Effective Date;

(iii)     all joint obligations of two or more Debtors, and all multiple Claims against such Entities on account of such joint obligations, shall be considered a single Claim against the Reorganized Debtor;

(iv)     all guaranties by any of the Debtors of the obligations of any Debtor arising prior to the Effective Date shall be deemed cancelled and eliminated under the Plan so that any Claim against any Debtor and any guaranty executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the Reorganized Debtor; and

(v)     all Equity Interests in Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp. shall be cancelled and extinguished on the Effective Date in accordance with Section 3.03(k)(ii); and

(vi)     all Intercompany Claims shall be cancelled and extinguished on the Effective Date.

3.     Notwithstanding the terms and provisions of Section 5.01(a), such substantive consolidation and merger shall not (other than for purposes related to funding Distributions under the Plan) affect (i) executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed, assumed and assigned, or rejected; (ii) any agreements entered into by the Reorganized Debtor on or after the Effective

Date; and (iii) the Debtors' or the Reorganized Debtor's ability to subordinate or otherwise challenge Claims on an entity-by-entity basis.

**B.      Corporate Governance.**

1.      *Amendment of Certificate of Incorporation of the Reorganized Debtor.* The certificate of incorporation of each Reorganized Debtor that is a corporation on the Effective Date shall, as of the Effective Date, be amended in its entirety to read substantially in the form that will be included as Schedule 5.02(a) of the Plan Supplement.  Consistent with, but only to the extent required by, section 1123(a)(6) of the Bankruptcy Code, the amended certificates of incorporation of such Reorganized Debtor shall, *inter alia*, prohibit the issuance of non-voting equity securities.

2.      *Amendment of Bylaws of the Reorganized Debtor.*  The bylaws of the Reorganized Debtor shall be amended as of the Effective Date to read substantially in the form that will be included as Schedule 5.02(b) of the Plan Supplement and, *inter alia*, to effectuate the provisions of the Plan.

3.      *Exchange of Equity Interests in Duro Dyne National Corp.*  Prior to the Effective Date, each of the three outstanding shares of voting stock in Debtor Duro Dyne National Corp. shall be exchanged for 1,000 shares of voting stock in Debtor Duro Dyne National Corp., so as to result in a total of 3,000 outstanding shares of voting stock in Debtor Duro Dyne National Corp., and the three holders of voting shares in Duro Dyne National Corp. shall each receive certificates evidencing a total of 1,000 shares of such voting stock.

4.      *Management of the Reorganized Debtor.*  On and after the Effective Date, the business affairs of the Reorganized Debtor will be managed by the same board of Directors and management team that was in place as of and prior to the Petition Date.  *See* Article IV A 2 hereof.

5.      *Effectuating Documents and Further Transactions*.  Each of the officers of the Reorganized Debtor is authorized, in accordance with his or her authority under the resolutions of the applicable governing body of such Reorganized Debtor, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and to take such action as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the other Plan Documents.

6.      *Corporate Action*.  All matters provided for under the Plan involving the corporate structure of the Debtors or Reorganized Debtor, or any corporate or limited liability company action to be taken by, or required of the Debtors or Reorganized Debtor, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by or notice to the holders of Equity Interests in, or the directors or managers of, any of the Debtors or the Reorganized Debtor.

### C.    Supersedeas Bonds and Payment Assurances

1.    *Preserved Actions*.    All Supersedeas Bond Actions and the rights and Claims asserted or to be asserted therein shall be preserved and shall be prosecuted or defended, as the case may be, by the Reorganized Debtor on and after the Effective Date.

2.    *Assumption by the Asbestos Trust*.    As of the Effective Date, the Asbestos Trust shall assume, and shall have exclusive liability for, any deficiency portion of a Bonded Asbestos Personal Injury Claim remaining after crediting the proceeds of any supersedeas bond or other payment assurances to which the holder of such Claim is determined by Final Order or agreement of the parties to be entitled.    To the extent the Reorganized Debtor successfully prosecutes or defends against a Supersedeas Bond Action resulting in the discharge or release of the relevant supersedeas bond or other payment assurance provided in connection therewith, any such recoveries shall inure to the benefit of such Reorganized Debtor.

3.    *Reservation of Rights of Issuers and Insurers of Payment Assurances*. Notwithstanding anything to the contrary contained herein, nothing in the Plan shall be deemed to impair, prejudice, compromise, or otherwise affect any defense or counterclaim asserted by an issuer or insurer of any supersedeas bond or other payment assurance issued on behalf of any of the Debtors, including any defense based on an asserted right of setoff or recoupment, or other defense under applicable nonbankruptcy law.    Any right of setoff or recoupment shall be satisfied out of the assets in the possession of the sureties or insurers providing such supersedeas bond or payment assurance.

4.    *Compromise and Settlement*.    The Reorganized Debtor shall be entitled to compromise or settle any of the Supersedeas Bond Actions; *provided, however*, that any such compromise or settlement shall require the consent of the Asbestos Trust to the extent the compromise or settlement results in a deficiency portion of a Bonded Asbestos Personal Injury Claim after applying the proceeds of any supersedeas bond or equivalent form of payment assurance.

5.    *Withholding of Taxes*.    The Reorganized Debtor or the Asbestos Trust, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property that must be withheld for foreign, federal, state, or local taxes payable with respect thereto or payable by the Entity entitled to such assets or property to the extent required by applicable law.

6.    *Transfer Taxes*.    The issuance, transfer, or exchange of any of the securities issued under, or the transfer of any other assets or property pursuant to or in connection with the Plan, or the making or delivery of an instrument of transfer under or in connection with the Plan shall not, pursuant to section 1146 of the Bankruptcy Code, be taxed under any law imposing a stamp tax, transfer tax, or other similar tax.

7.    *Recordable Order*.    Upon Confirmation, the Confirmation Order shall be deemed to be in recordable form, and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications, or other supporting documents.

8.     *Authority of the Debtors*.  Effective on the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable them to implement their respective obligations under the Plan and the other Plan Documents.

## ARTICLE X.
## VOTING AND  DISTRIBUTIONS UNDER THE PLAN GENERALLY

**A.     Classes Eligible to Vote.**

1.     *Deemed Acceptance of Plan by Unimpaired Classes*.  Class 1 Priority Non-Tax Claims, Class 2 Secured Claims, Class 3 Employee Benefit Claims, Class 4 Worker Compensation Claims, Class 5 General Unsecured Claims and Class 8 Bonded Claims are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, solicitation of votes of holders of Claims in Classes 1, 2, 3, 4, 5 and 8 is not required.

2.     *Insider Claims Not Entitled to Vote*.  Class 9 Intercompany Claims, Class 10 Related Party Claims, Class 11 Equity Interests in Duro Dyne National Corp., and Class 12 Equity Interests in Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp. are Claims of Insiders and are not entitled to vote on the Plan. Therefore, solicitation of votes of holders of Claims in Classes 9, 10 and 11 is not required.

3.     *Only Class 6 Prepetition Defense-Cost Contribution Claims and Class 7 Channeled Asbestos Claims Are Eligible to Vote*. Class 6 Prepetition Defense-Cost Contribution Claims and Class 7 Channeled Asbestos Claims are Impaired under the Plan.  Only holders of Class 6 and Class 7 Claims are entitled to vote to accept or reject the Plan.  Accordingly, the solicitation of votes of holders of Prepetition Defense-Cost Contribution Claims in Class 6 and Asbestos Claims in Class 7 is required.

**B.     *Class 6 and 7 Acceptance Requirements*.**

Class 6 shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the holders of Class 6 Claims actually voting on the Plan. Class 7 shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than seventy-five percent (75%) in number of the holders of Class 7 Claims that have actually voted on the Plan. Acceptance of the Plan by Class 7 shall also be determined in accordance with section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code and Section 6.04 of the Plan.

**C.     Voting on Basis of Substantive Consolidation.**

Voting on the Plan shall be conducted on a substantively consolidated basis with respect to the Debtors, consistent with Section 5.01 the Plan.  If the Bankruptcy Court authorizes the Debtors to substantively consolidate less than all of the Debtors' Estates, (a) the Plan shall be treated as a separate plan of reorganization for each Debtor not substantively consolidated, and (b) the Debtors shall not be required to resolicit votes with respect to the Plan.  Notwithstanding

the foregoing, the Debtors reserve the right to seek confirmation of the Plan on an Entity-by-Entity basis.

**D.    Issuance of Asbestos Permanent Channeling Injunction Pursuant to Section 524(g) of the Bankruptcy Code.**

The Bankruptcy Court or the District Court, as applicable, shall be asked to issue the Asbestos Permanent Channeling Injunction if at least seventy-five present (75%) in number of the holders of Class 7 Claims that have voted on the Plan have voted in favor of the Plan in accordance with section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code and Section 6.02 of the Plan.

**E.    Nonconsensual Confirmation.**

If any Impaired Class of Claims or Equity Interests, other than Class 7, fails to accept this Plan in accordance with sections 1126 and 1129 of the Bankruptcy Code, the Plan Proponents will request, to the extent consistent with applicable law, that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class of Claims or Equity Interests (other than Class 7), and the Plan constitutes a motion for such relief.

**F.    Distributions Under the Plan.**

Whenever any Distribution to be made under the Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.  The Distributions shall be made to the holders of Allowed Claims as of the Record Date and the Debtors and the Reorganized Debtor shall have no obligation to recognize any transfer of a Claim occurring after the Record Date.

1.    *Distribution Deadlines*.  Any Distribution to be made by the Disbursing Agent pursuant to the Plan shall be deemed to have been timely made if made within twenty-one (21) calendar days after the time therefor specified in the Plan or such other agreements.  No interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date.

2.    *Distributions with Respect to Allowed Claims*.  Subject to Bankruptcy Rule 9010, all Distributions under the Plan to holders of Allowed Claims shall be made by the Disbursing Agent to the holder of each Allowed Claim in such Classes at the address of such holder as noted on the Schedules as of the Record Date, unless the Debtors or, on and after the Effective Date, the Reorganized Debtor have been notified in writing of a change of address, including by the timely filing of a proof of claim by such holder that provides an address for such holder different from the address noted on the Schedules.  If any Distribution to any such holder is returned as undeliverable, then no further Distributions to such holder shall be made unless and until the Reorganized Debtor is notified of such holder's then current address, at which time all missed Distributions shall be made to such holder without interest.  At the expiration of six (6) calendar months after the date on which an undeliverable Distribution was originally sent, mailed, or otherwise transmitted, such undeliverable Distribution will be deemed unclaimed

property under section 347(b) of the Bankruptcy Code and will revest in the Reorganized Debtor, and any entitlement of a holder of any Claim to the re-vested Distribution shall be extinguished, discharged, and forever barred.   Nothing contained in the Plan shall require the Reorganized Debtor or the Disbursing Agent to attempt to locate any holder of an Allowed Claim.

3.      *Responsibility for Transfers and Distributions.*   The Reorganized Debtor and the Disbursing Agent shall be responsible for Distributions required by the Plan, other than distributions to holders of Class 7 Channeled Asbestos Claims. The Asbestos Trust and only the Asbestos Trust shall be responsible for resolving, liquidating, and paying Class 7 Channeled Asbestos Claims in accordance with the Asbestos Trust Agreement and the TDP, except as provided in Sections 4.13 and 4.14 the Plan.

4.      *Manner and Method of Payment Under the Plan.*   Unless the Entity entitled to receive a Distribution agrees otherwise, any payment of such Distribution in Cash shall be made by a check drawn from a domestic bank or wire transfer from a domestic bank; *provided, however*, that no Cash payment of less than one hundred dollars ($100) shall be made to a holder of an Allowed Claim unless a request therefor is made in writing to the Disbursing Agent.

## G.      Time Bar to Distributions by Check.

Checks issued by the Reorganized Debtor in respect of Distributions on account of Allowed Claims shall be null and void if not presented for payment within ninety (90) calendar days after the date of issuance the Plan.   Requests for reissuance of any check shall be made in writing to the Disbursing Agent by the holder of the Allowed Claim to whom such check originally was issued on or before thirty (30) calendar days after the expiration of the ninety (90) day period following the date of issuance of such check.   After the expiration of the thirty (30) day period, all funds held on account of such void check shall be used to satisfy the costs of administering and fully consummating the Plan or become the property of the Reorganized Debtor, and the Claim of any holder to such Distributions shall be extinguished, discharged, and forever barred.

## H.      Distributions After the Effective Date.

Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of the Plan.

## I.      Setoffs.

Pursuant to applicable nonbankruptcy law, and before any Distribution is made on account of any Allowed Claim, the Reorganized Debtor may, but shall not be required to, setoff the claims, rights, and causes of action of any nature that the Reorganized Debtor holds against the holder of such Allowed Claim, other than a Channeled Asbestos Claim, against any Allowed Claims and the Distributions to be made pursuant to the Plan on account the Plan; *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any such claims, rights, and

causes of action that the Reorganized Debtor may possess on and after the Effective Date against such holder.

**J.      Cancellation of Existing Securities and Agreements.**

On the Effective Date, any document, agreement, or instrument evidencing any Claim, other than an Asbestos Claim or any Claim that is Unimpaired, shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors under such documents, agreements, or instruments evidencing such Claims and Equity Interests, as the case may be, shall be discharged.

**K.      Allocation of Plan Distributions Between Principal and Interest.**

To the extent that an Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

**L.      Tax Obligations and Reporting Requirements.**

Notwithstanding any provision herein, each holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution. Any Entity issuing any instrument or making any Distribution under the Plan has the right, but not the obligation, to refrain from making a Distribution, until such holder has made arrangements satisfactory to such Entity for payment of any such tax obligations.

## ARTICLE XI.
## TREATMENT OF DISPUTED, CONTINGENT, OR UNLIQUIDATEDNON-ASBESTOS CLAIMS UNDER THE PLAN

**A.      Objections to Claims; Prosecution of Disputed Claims.**

The Reorganized Debtor shall object to the allowance of Claims (other than Channeled Asbestos Claims) filed with the Bankruptcy Court or with a duly appointed claims agent, as applicable, with respect to which the Reorganized Debtor, disputes, in whole or in part, liability or the amount of the Claim. All objections filed by the Reorganized Debtor as provided herein shall be litigated to Final Order by the Reorganized Debtor, as applicable; *provided, however*, that the Reorganized Debtor may compromise, settle, or resolve by any other method any objections to Claims, subject to approval of the Bankruptcy Court. Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections to Claims shall be served and filed on or before the later of (a) one hundred and eighty (180) calendar days after the Effective Date, or (b) such date as may be fixed by the Bankruptcy Court, after notice and hearing, whether fixed before or after the date specified in clause (a) above.

**B.** **Estimation of Individual Claims.**

Unless otherwise limited by an order of the Bankruptcy Court, the Reorganized Debtor may at any time request that the Bankruptcy Court estimate for final Distribution purposes any contingent, unliquidated, or disputed Claim (other than Channeled Asbestos Claims) pursuant to section 502(c) of the Bankruptcy Code or other applicable law, regardless of whether any of the Debtors or the Reorganized Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on such objection, and the Bankruptcy Court will retain jurisdiction to consider any such request at any time, including during the pendency of any appeal relating to an objection to any Claim.  Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated, or disputed Claim (other than Channeled Asbestos Claims), the estimated amount shall constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; *provided, however*, that, if the estimate constitutes the maximum limitation on such Claim, the Reorganized Debtor may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and *provided further* that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code.

**C.** **Cumulative Remedies.**

All of the aforementioned Claims objection, motion, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.

**D.** **No Distributions Pending Allowance or Motion.**

Notwithstanding any provision the Plan, if any portion of a Claim is disputed, contingent, or unliquidated, no Distribution provided for hereunder shall be made on account of any portion of such Claim unless and until such disputed, contingent, or unliquidated Claim becomes an Allowed Claim.  No interest shall be paid on account of disputed, contingent, or unliquidated Claims that later become Allowed except to the extent that payment of interest is required under section 506(b) of the Bankruptcy Code.

**E.** **Distributions After Allowance.**

To the extent a disputed, contingent, or unliquidated Claim ultimately becomes an Allowed Claim, a Distribution shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court or other applicable court of competent jurisdiction (including any appeal therefrom) allowing any previously disputed, contingent, or unliquidated Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Allowed Claim the Distribution to which such holder is entitled hereunder on account of or in exchange for such Allowed Claim.

## ARTICLE XII.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.     General Treatment.**

The Debtors shall assume, as of the Effective Date, all executory contracts to which they are a party, respectively, except for (a) the executory contracts specifically listed on Schedule 8.01 of the Plan Supplement; or (b) the executory contracts or unexpired leases specifically addressed herein or pursuant to a Final Order of the Bankruptcy Court entered on or before the Effective Date.  The Debtors may, at any time on or before the Effective Date, amend Schedule 8.01 to delete therefrom, or add thereto, any executory contract or unexpired lease.  The Debtors shall provide notice of any such amendments to the parties to the executory contract or unexpired lease affected thereby and to parties on any master service list established by the Bankruptcy Court in the Chapter 11 Cases.  The fact that any contract or lease is listed in Schedule 8.01 shall not constitute or be construed to constitute an admission that such contract or lease is an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code or that any of the Debtors or any successors in interest to the Debtors (including the Reorganized Debtor) has any liability thereunder.  The Plan shall constitute a motion to assume the executory contracts and unexpired leases not listed in Schedule 8.01 and to reject those executory contracts and unexpired leases that are listed on Schedule 8.01.  Any and all claims held by a Related Party against the Reorganized Debtor that are based on, arise from, or are attributable to a contract or lease assumed under this Section shall be subject to Section 4.16 and Section 8.06 of the Plan.

**B.     Assumption of Insurance Policies.**

Notwithstanding anything contained in the Plan to the contrary, to the extent any Debtor's insurance policies and any agreements, documents, or instruments relating thereto, including Asbestos Insurance Policies or prepetition Asbestos Insurance Settlements, are executory contracts, such policies, agreements, documents, or instruments shall be treated as executory contracts under the Plan and shall be assumed pursuant to the Plan, effective as of the Effective Date, regardless of whether any such policy, agreement, document, or instrument is listed on Schedule 8.01 of the Plan Supplement.  The Plan shall constitute a motion to assume such policies, agreements, documents, and instruments.  Nothing contained in Section 8.02 of the Plan shall constitute or be deemed a waiver of any cause of action that the Debtors, the Reorganized Debtor, or the Asbestos Trust may hold against any Entity, including the insurer, under any Asbestos Insurance Policy or prepetition Asbestos Insurance Settlements, or any of the Debtors' policies of insurance or insurance-related agreements.

**C.     Letters of Credit, Surety Bonds, and Guaranties.**

1.     *Assumption Under Section 365(a).*  Unless otherwise designated by the Plan Proponents in Schedule 8.03 of the Plan Supplement, agreed to in writing by the affected parties, or modified by order of the Bankruptcy Court, the Debtors' obligations under letters of credit, surety bonds, guaranties (which, for purposes of this Section include contingent liabilities arising in connection with assigned executory contracts and unexpired leases), or written indemnity agreements with respect to letters of credit, surety bonds, or guaranties existing as of the Effective Date shall be deemed to be, and shall be treated as though they are, executory

contracts that are assumed under this Plan, effective as of the Effective Date.  In addition, the Debtors' obligations under such letters of credit, surety bonds, guaranties, and written indemnity agreements shall be deemed assumed pursuant to section 365(a) of the Bankruptcy Code, effective as of the Effective Date.  The Plan shall constitute a motion to assume such letters of credit, surety bonds, guaranties, and written indemnity agreements.

> 2. *Reservation of Rights*.  The Plan Proponents reserve the right, at any time prior to the Effective Date, to amend or modify the list included in <u>Schedule 8.03</u> of the Plan Supplement to add or remove letters of credit, surety bonds, guaranties, and indemnity agreements with respect to letters of credit, surety bonds, or guaranties existing as of the Effective Date, *provided* that the Plan Proponents shall file a notice with the Bankruptcy Court and serve each affected party with such notice.

**D.     Cure of Defaults and Survival of Contingent Claims.**

Except as may otherwise be agreed to by the applicable parties, on or before the thirtieth (30th) calendar day after the Effective Date, provided the non-Debtor party to any executory contract or unexpired lease that is assumed pursuant to Article VIII of the Plan has filed a proof of claim with respect to a cure amount, the Reorganized Debtor shall cure any and all undisputed defaults under each executory contract or unexpired lease assumed pursuant to this Plan, in accordance with section 365(b) of the Bankruptcy Code.  All disputed defaults required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of a Reorganized Debtor's liability with respect thereto, or as may otherwise be agreed to by the applicable parties.  Unless a proof of claim was timely filed with respect thereto, all cure amounts and all contingent reimbursement or indemnity claims for prepetition amounts expended by the non-Debtor parties to assumed executory contracts and unexpired leases shall be discharged upon Consummation.

**E.     Deadline for Filing Rejection Damages Claims.**

If the rejection of a contract or lease pursuant to Section 8.01 or Section 8.03 of the Plan results in damages to the non-Debtor party to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of claim, shall forever be barred and shall not be enforceable against the Debtors, or their respective properties, agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court or with a duly appointed claims agent, as applicable, and served upon the Debtors or the Reorganized Debtor on or before thirty (30) calendar days after the later to occur of (a) the Confirmation Date, or (b) the date of entry of an order by the Bankruptcy Court authorizing rejection of such contract or lease.

**F.     Contracts and Leases with Related Parties.**

> 1.     The Reorganized Debtor shall not make any Related Party Payments if there is any arrearage, breach, or default with respect to any debt or obligation of the Reorganized Debtor.

> 2.     Any contract or personal-property lease with a Related Party, including the contracts and leases assumed under <u>Section 8.01</u> or listed on <u>Schedule 8.06</u> of the Plan Supplement, shall terminate in accordance with their respective terms, including on the dates

noted on <u>Schedule 8.06</u> of the Plan Supplement, and shall not be renewed.  Any personal property or equipment that is the subject of such contracts or personal-property leases shall, upon the aforesaid termination, be transferred or delivered to the Reorganized Debtor, which shall thereupon assume or acquire ownership of such personal property or equipment, free and clear of any Lien, interest, or other encumbrance.

3.     The Reorganized Debtor shall not enter into any contract or personal-property  lease (whether an operating lease or a capital lease) with a Related Party that pertains to personal property or equipment, unless such contract or personal-property lease provides that the Reorganized Debtor shall own such personal property or equipment free and clear of any Lien, interest, or other encumbrance after such Related Party has recouped its investment in such personal property or equipment, plus an eight-percent (8%) return.

**G.     Effect of Confirmation.**

Entry of the Confirmation Order shall constitute approval of the (a) rejections, (b) assumptions, or (c) assumptions and assignments, as the case may be, that are provided for in Article VIII of the Plan, in accordance with sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, and a finding by the Bankruptcy Court that each such rejection, assumption, or assumption and assignment is in the best interests of the Debtors, their Estates, and all parties in interest in the Chapter 11 Cases.

**ARTICLE XIII.**
**DISCHARGE, RELEASES, AND INJUNCTIONS**

1.     *Binding Effect*.  The Plan shall be binding upon, and enforceable against, the Debtors and all holders of Claims, Demands, Equity Interests, or other interests (regardless of whether such holders agree to the Plan or whether such Claims, Demands, Equity Interests or other interests are impaired by the Plan), and their respective successors and assigns, including the Reorganized Debtor.

2.     *Title to Assets*.  Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Estates shall vest in the Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests created prior to the Effective Date, except as provided in the Plan and the other Plan Documents.  On and after the Effective Date, the Reorganized Debtor may operate its businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided in the Plan.

3.     ***Discharge of Claims.  In accordance with and not in limitation of sections 524(a) and 1141(d) of the Bankruptcy Code, and except as provided in the Plan, upon the occurrence of the Effective Date, all Claims, including, to the fullest extent permitted by law, Channeled Asbestos Claims, shall be, and shall be deemed to be, discharged in full, and all holders of Claims shall be, to the fullest extent permitted by law, precluded and enjoined from asserting against the Protected Parties, or any of their assets or properties, any other or further Claim based upon any act or omission, transaction, or other activity of any kind or***

*nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of claim.*

*4.       Discharge Injunction.  Except as specifically provided in the Plan or any of the Plan Documents, the discharge set forth in Section 9.03 of the Plan shall also operate, upon the occurrence of the Effective Date, as an injunction pursuant to sections 105(a), 524(a), and 1141(d) of the Bankruptcy Code, prohibiting and enjoining the commencement or continuation of any action, the employment of process, or any act to collect, recover from, or offset (a) any Claim, including, to the fullest extent permitted by law, any Channeled Asbestos Claim, against or interest in any of the Protected Parties by any Entity, and (b) any cause of action, whether known or unknown, against the Protected Parties arising out of, attributable to, or based on any Claim, including, to the fullest extent permitted by law, any Channeled Asbestos Claim, or interest described in clause (a) of Section 9.04 of the Plan.*

*5.       Asbestos Permanent Channeling Injunction.   Pursuant to sections 105(a) and 524(g) of the Bankruptcy Code, the Confirmation Order shall provide for the issuance of the following injunction to take effect upon the occurrence of the Effective Date:*

*a.       Scope of Injunction:  All Entities that have held or asserted, or hold or assert, or may in the future hold or assert any Channeled Asbestos Claim against one or more of the Protected Parties shall be permanently stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery on account of any Channeled Asbestos Claim, including*

*(i)       commencing or continuing in any manner any action or other proceeding of any kind on account of any Channeled Asbestos Claim against any of the Protected Parties, or against the property of any Protected Party on account of any such Channeled Asbestos Claim;*

*(ii)       enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree, or order against any of the Protected Parties or against the property of any Protected Party on account of any Channeled Asbestos Claim;*

*(iii)       creating, perfecting, or enforcing any Lien of any kind against any Protected Party or the property of any Protected Party on account of any Channeled Asbestos Claim;*

*(iv)       except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind against any obligation due any Protected Party or against the property of any Protected Party on account of any Channeled Asbestos Claim; and*

*(v)       taking any act, in any manner, in any place whatsoever, against any of the Protected Parties or their property, that does not conform to,*

*or comply with, the provisions of the Plan Documents applicable to a Channeled Asbestos Claim.*

      *b.     Reservations:  Notwithstanding anything to the contrary above, this Asbestos Permanent Channeling Injunction shall not enjoin:*

           *(i)     the rights of Entities to the treatment accorded them under Articles II and III of the Plan, as applicable, including the rights of holders of Channeled Asbestos Claims to have such Channeled Asbestos Claims resolved in accordance with the TDP;*

           *(ii)     the rights of Entities to assert any Channeled Asbestos Claim against the Asbestos Trust in accordance with the TDP, or any debt, obligation, or liability for payment of Asbestos Trust Expenses against the Asbestos Trust;*

           *(iii)     the rights of the Asbestos Trust or, if applicable, the Reorganized Debtor to prosecute any claim or cause of action based on or arising from any of the Asbestos Trust Assets against any Entity that is not a Protected Party;*

           *(iv)     any action under Section 4.13 of the Plan against the Reorganized Debtor that strictly conforms to the pleading requirements of Section 4.13; or*

           *(v)     any action against any Asbestos Insurer that is neither a Settling Asbestos Insurer nor an Asbestos Insurer protected, at the time such action is brought, by the Asbestos Insurer Injunction.*

      *6.     Settling Asbestos Insurer Injunction.  In accordance with sections 105(a) and 524(g) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any Asbestos Insurance Policy Claim shall be, and hereby are, permanently stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery on account of any such Asbestos Insurance Policy Claim from or against any Settling Asbestos Insurer, only to the extent that such Settling Asbestos Insurer has been released from any claim under one or more Asbestos Insurance Policies in accordance with one or more Asbestos Insurance Settlements, including:*

      *a.     commencing, conducting, or continuing in any manner any action or other proceeding of any kind (including an arbitration or other form of alternative dispute resolution) against any Settling Asbestos Insurer, or against the property of any Settling Asbestos Insurer, on account of any Asbestos Insurance Policy Claim;*

      *b.     enforcing, attaching, levying, collecting, or recovering, by any manner or means, any judgment, award, decree, or other order against any*

*Settling Asbestos Insurer, or against the property of any Settling Asbestos Insurer, on account of any Asbestos Insurance Policy Claim;*

*c.      creating, perfecting, or enforcing in any manner any Lien of any kind against any Settling Asbestos Insurer, or against the property of any Settling Asbestos Insurer, on account of any Asbestos Insurance Policy Claim;*

*d.      asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation due any Settling Asbestos Insurer, or against the property of any Settling Asbestos Insurer, on account of any Asbestos Insurance Policy Claim; and*

*e.      taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Asbestos Insurance Policy Claim.*

7.      *Asbestos Insurer Injunction.*

*a.      Scope of Injunction.  In accordance with section 105(a) of the Bankruptcy Code, in order to carry out the provisions of section 524(g) of the Bankruptcy Code, upon the occurrence of the Effective Date, except as expressly allowed in subsection (b) below, all Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any Asbestos Insurance Policy Claim or Channeled Asbestos Claim shall be, and hereby are, permanently stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery on account of any such Asbestos Insurance Policy Claim or Channeled Asbestos Claim from or against any Asbestos Insurer, including:*

*(i)      commencing, conducting, or continuing in any manner any action or proceeding of any kind (including an arbitration or other form of alternative dispute resolution) against any Asbestos Insurer, or against the property of any Asbestos Insurer, on account of any Asbestos Insurance Policy Claim or Channeled Asbestos Claim;*

*(ii)      enforcing, attaching, levying, collecting, or recovering, by any manner or means, any judgment, award, decree, or other order against any Asbestos Insurer, or against the property of any Asbestos Insurer, on account of any Asbestos Insurance Policy Claim or Channeled Asbestos Claim;*

*(iii)      creating, perfecting, or enforcing in any manner any Lien of any kind against any Asbestos Insurer, or against the property of any Asbestos Insurer, on account of any Asbestos Insurance Policy Claim or Channeled Asbestos Claim;*

*(iv)      asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or*

*indirectly against any obligation due any Asbestos Insurer, or against the property of any Asbestos Insurer, on account of any Asbestos Insurance Policy Claim or Channeled Asbestos Claim; and*

(v)    *taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Asbestos Insurance Policy Claim or Channeled Asbestos Claim.*

*b.    Reservations.  The provisions of this Asbestos Insurer Injunction shall not preclude the Reorganized Debtor or the Asbestos Trust, to the extent either has the right to do so, from pursuing any claim for Asbestos Insurance Coverage or any claim that may exist under any Asbestos Insurance Policy against any Asbestos Insurer.    The provisions of this Asbestos Insurer Injunction shall not bar, impair, or affect (i) any Asbestos Insurance Litigation brought by the Asbestos Trust or any Debtor against any Asbestos Insurer, by the Asbestos Trust on behalf of the Reorganized Debtor, or by the Reorganized Debtor on behalf of the Asbestos Trust; (ii) any Asbestos Insurance Rights held or acquired by the Asbestos Trust or the Reorganized Debtor; or (iii) the rights of the Asbestos Trust to tender any Channeled Asbestos Claim or any action commenced under Section 4.13 of the Plan to a Non-Settled Asbestos Insurer for coverage, indemnity, or defense, or otherwise to invoke Asbestos Insurance Coverage with respect to a Non-Settled Asbestos Insurer.    Except for the penultimate sentence of section 9.07(b) of the Plan, the provisions of this Asbestos Insurer Injunction are not issued for the benefit of any Asbestos Insurer and no such insurer is a third-party beneficiary of this Asbestos Insurer Injunction.    The Asbestos Trust shall have the sole and exclusive authority at any time, upon written notice to any affected Asbestos Insurer, to terminate, or reduce or limit the scope of this Asbestos Insurer Injunction with respect to any Asbestos Insurer, including for the purpose of allowing any Channeled Asbestos Claimant to bring any Asbestos Insurance Policy Claim or Channeled Asbestos Claim against such Asbestos Insurer; provided, however, that the Asbestos Trust may not permit the assertion of any Asbestos Insurance Policy Claim or Channeled Asbestos Claim by a Channeled Asbestos Claimant against a Non-Settling Asbestos Insurer unless and until such Channeled Asbestos Claimant agrees in writing to stipulate to and be bound by the provisions of Section 4.14 of the Plan pertaining to the right of Non-Settling Asbestos Insurers to obtain a dollar-for-dollar reduction of any liability to such Channeled Asbestos Claimant based on the Non-Settling Asbestos Insurer's Asbestos Insurance Policy Claims against any and all Settling Asbestos Insurers that could have been asserted against such Settling Asbestos Insurers but for the Injunctions.    For the avoidance of doubt, the provisions of this Asbestos Insurance Injunction shall not impair or affect any claims between or among Non-Settling Asbestos Insurers.    Notwithstanding any provision of the Plan to the contrary, including this Asbestos Insurer Injunction, no new equitable contribution rights are created in favor of the Non-Settling Asbestos Insurers.*

8.     **Term of Existing Injunctions or Stays.**  Unless otherwise provided in the Plan, all injunctions or stays issued or rendered in the Chapter 11 Cases, or in any adversary proceeding relating thereto, pursuant to section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

9.     **Injunction Against Interference with Plan of Reorganization.** Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, on and after the Confirmation Date, all holders of Claims and Equity Interests, Affiliates, and other parties in interest, along with their respective present or former Agents shall be enjoined from taking any action to interfere with the implementation and Consummation of the Plan, except for actions necessary to attain judicial review.

10.     **Exculpation.**  None of the Plan Proponents, the members of the Asbestos Claimants Committee, or any of their respective employees, advisors, attorneys, financial advisors, accountants, agents, or other professionals retained with Bankruptcy Court approval, in their capacities as such, shall have or incur any liability to any Entity for any act or omission in connection with or arising out of the Chapter 11 Cases, including the negotiation of the Plan, pursuit of confirmation of the Plan, the Consummation of the Plan, the administration of the Plan, or the property to be distributed under the Plan, except for gross negligence or willful misconduct, and in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Plan.

11.     **Settlement and Release of Certain Avoidance Actions and Estate Causes of Action.**  Effective upon Consummation, each Debtor and the Reorganized Debtor hereby settle and fully, finally, and forever release, relinquish, and discharge (a) each and every Avoidance Action against a Protected Party; (b) each and every Avoidance Action against any holder of a Channeled Asbestos Claim (satisfied or pending) or any such holder's Agents; and (c) each and every Avoidance action against holders of Class 5 claims; and (d) any and all Estate Causes of Action against any Protected Party, holder of a Channeled Asbestos Claim (satisfied or pending), or any Agent of such holder.  Such released Claims and Avoidance Actions shall in no event be asserted against or paid by the Asbestos Trust.  The Plan constitutes a motion to approve the settlement of the foregoing Claims and Avoidance Actions pursuant to Bankruptcy Rule 9019(a).

12.     **Reservation of Rights.**  Except as otherwise specifically provided in the Plan, nothing herein shall constitute or be deemed a waiver of any claim, right, or cause of action that the Debtors, the Reorganized Debtor, or the Asbestos Trust may have against any Entity other than a Protected Party in connection with or arising out of a Channeled Asbestos Claim, and the Injunctions shall not apply to the assertion of any such claim, right, or cause of action by the Debtors, the Reorganized Debtor, or the Asbestos Trust.

## ARTICLE XIV.
## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN

1.    ***Conditions to Confirmation***    The Confirmation Date shall not occur unless and until each of the following conditions  have been satisfied or duly waived in accordance with Section 10.03 the Plan:

**a.    at least two-thirds (2/3) in amount and more than seventy-five percent (75%) in number of the holders of Class 7 Channeled Asbestos Claims actually voting on the Plan have voted to accept the Plan;**

**b.    at least two-thirds (2/3) in amount and more than fifty percent (50%) in number of the holders of Prepetition Defense-Cost Contribution actually voting on the Plan have voted in favor of the Plan or the Bankruptcy Court has determined that the requirements of section 1129(b)(1) of the Bankruptcy Code have been satisfied with respect to Class 6 (Prepetition Defense-Cost Contribution Claims);**

**c.    the Confirmation Order shall be in form and substance acceptable to each of the Plan Proponents and shall have been entered by (i) the District Court or (ii) the Bankruptcy Court and affirmed by the District Court; and**

**d.    the Confirmation Order shall contain the following findings of fact and conclusions of law, and shall approve the following relief, among others:**

(i)    the Asbestos Permanent Channeling Injunction is issued in accordance with the Plan and section 524(g) of the Bankruptcy Code;

(ii)    the Plan Documents comply with section 524(g) of the Bankruptcy Code for the issuance of an irrevocable injunction against Claims and Demands subject to the exclusive subject-matter jurisdiction of the District Court;

(iii)    as of the Petition Date, the Debtors have been named as a defendant in personal injury and wrongful death actions seeking recovery for damages allegedly caused by exposure to asbestos or asbestos-containing products;

(iv)    the Asbestos Trust, as of the Effective Date, will assume all the liabilities of the Debtors and the Reorganized Debtor for all Channeled Asbestos Claims, except as provided in Sections 4.13 and 4.14 of the Plan;

(v)    the Asbestos Trust is to hold, for purposes of section 524(g) of the Bankruptcy Code, a pledge of 50.1% of the voting stock of the Reorganized Debtor and 50.1% of the voting stock of Duro Dyne Canada, Inc.;

(vi)    the Debtors (and the Reorganized Debtor in the absence of the Asbestos Permanent Channeling Injunction) are likely to be subject to

substantial future Demands for payment arising out of the same or similar conduct
or events that gave rise to the Asbestos Claims that are addressed by the Asbestos
Permanent Channeling Injunction;

(vii)    the actual amounts, numbers, and timing of the future
Demands referenced in *Section 10.01(d)(vi)* above cannot be determined;

(viii)    pursuit of the Demands referenced in *Section 10.01(d)(vi)*
above outside the procedures described by the Plan is likely to threaten the Plan's
purpose to deal equitably with Asbestos Claims and Demands;

(ix)    the terms of the Asbestos Permanent Channeling
Injunction, including any provisions barring actions against third parties pursuant
to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan and the
Disclosure Statement;

(x)    the Plan establishes in Class 7 (Channeled Asbestos
Claims) a separate class of claimants whose Claims are to be addressed by the
Asbestos Trust;

(xi)    the Legal Representative was appointed as part of the
proceedings leading to the issuance of the Asbestos Permanent Channeling
Injunction for the purpose of protecting the rights of persons that might
subsequently assert unknown Asbestos Claims and Demands that are addressed in
the Asbestos Permanent Channeling Injunction and channeled to the Asbestos
Trust;

(xii)    applying the Asbestos Permanent Channeling Injunction to
each Protected Party is fair and equitable with respect to persons that might
subsequently assert Demands against each such Protected Party, in light of the
benefits provided, or to be provided, to the Asbestos Trust by or on behalf of any
such Protected Party;

(xiii)    Class 7 (Channeled Asbestos Claims) has voted, by at least
seventy-five percent (75%) of those voting on the Plan, in favor of the Plan

(xiv)    pursuant to court orders or otherwise, the Asbestos Trust
will operate through mechanisms such as structured, periodic, or supplemental
payments, pro rata distributions, matrices, or periodic review of estimates of the
numbers and values of Asbestos Claims and Demands, or other comparable
mechanisms, that provide reasonable assurance that the Asbestos Trust will
liquidate, and be in a financial position to pay, Asbestos Claims and Demands that
involve similar Claims in substantially the same manner;

(xv)    the Settling Asbestos Insurer Injunction is issued in
accordance with the Plan and sections 105(a) and 524(g) of the Bankruptcy Code;

(xvi)    to carry out the provisions of section 524(g) of the Bankruptcy Code, the Asbestos Insurer Injunction is issued in accordance with section 105(a) of the Bankruptcy Code; and

(xvii)    each of the Plan Documents shall be a valid and binding instrument, in full force and effect, and enforceable in accordance with its terms, as of the Effective Date; and

**b.     the agreement governing the Senior Lending Facility and all documents related thereto shall be in form and substance acceptable to the Asbestos Claimants Committee and the Legal Representative, and the Asbestos Claimants Committee and the Legal Representative shall have registered such acceptance in writing.**

2.     ***Conditions Precedent to Effective Date of the Plan.***  The Effective Date shall not occur and the Plan shall not be consummated unless and until each of the following conditions has been satisfied or duly waived in accordance with Section 10.03 of the Plan:

a.     the Confirmation Order shall have been entered and shall have become a Final Order;

b.     the Bankruptcy Court or the District Court, as required, shall have entered or affirmed the Asbestos Permanent Channeling Injunction (which may be included in the Confirmation Order), which shall contain terms satisfactory to the Plan Proponents;

c.     the Asbestos Trust Agreement shall have been fully executed, and the Asbestos Trust shall have been established;

d.     the Asbestos Trust shall have received full payment of the Debtors' Contribution in accordance with Section  4.08(a).

e.     the Asbestos Trust shall have received full payment of the Hinden Contribution in accordance with Section 4.08(b).

f.     the Asbestos Trust shall have received full payment of the Asbestos Insurance Settlement Proceeds in accordance with Section 4.08(c).

g.     the Cooperation Agreement shall have been fully executed and be held in escrow, to be released therefrom and delivered to each of the parties thereto upon Consummation;

h.     the Note Issuance Agreement shall have been fully executed and be held in escrow, to be released therefrom and promptly delivered to each of the parties thereto upon Consummation;

i.      the Trust Note shall have been duly executed and be held in escrow, to be released therefrom and promptly delivered to the Asbestos Trust upon Consummation;

j.      the Pledge and Security Agreement shall have been fully executed and be held in escrow, to be released therefrom and promptly delivered to each of the parties thereto upon Consummation;

k.      the three outstanding shares of voting stock in Duro Dyne National Corp. shall have been exchanged for 3,000 outstanding shares of voting stock in Duro Dyne National Corp. and delivered to the holders of such voting stock in accordance with Section 5.02(c).

l.      certificates representing 50.1% of the Duro Dyne Canada Stock, together with stock power executed in blank, shall have been issued and be held in escrow, to be released therefrom and promptly delivered to the Asbestos Trust upon Consummation;

m.      certificates representing 50.1% of the Reorganized Duro Dyne Stock, together with stock power executed in blank, shall have been issued and be held in escrow, to be released therefrom and promptly delivered to the Asbestos Trust upon Consummation;

n.      the Bay Shore Mortgage shall have been duly executed and be held in escrow, to be released therefrom and promptly delivered to the Asbestos Trust upon Consummation;

o.      the Fairfield Mortgage shall have been duly executed and be held in escrow, to be released therefrom and promptly delivered to the Asbestos Trust upon Consummation;

p.      the agreement governing the Senior Lending Facility shall have been duly executed and delivered, and the financing contemplated under the Senior Lending Facility shall be available to the Reorganized Debtor in an amount that will provide the Reorganized Debtor with sufficient Cash, when combined with other available sources, to make all payments due under the Plan as of the Effective Date and to provide sufficient working capital to fund the operation of the Reorganized Debtor;

q.      the Debtors shall have delivered to the Plan Proponents a copy of any loan commitment and any pre-closing approvals received from the Senior Lender within two business days of receipt of same;

r.      the Debtors shall have delivered a copy of any pre-closing Borrowing Base Report (as defined in the Loan and Security Agreement between the Reorganized Debtor and Senior Lender) and other pre-closing documents required by Senior Lender to the Plan Proponents at the same time such documents are delivered to the Senior Lender;

s.      all other agreements and instruments that are exhibits to the Plan or included in the Plan Supplement that require execution shall have been fully executed and held in escrow, to be released therefrom and promptly delivered to the applicable parties upon Consummation;

t.      such other actions and documents as the Plan Proponents deem necessary to implement the Plan shall have been effected or executed; and

u.      all conditions to closing set forth in any of the Plan Documents shall have been fulfilled to the reasonable satisfaction of the Plan Proponents.

3.      ***Completed Delivery of the Asbestos Trust Assets***.  For the avoidance of doubt, notwithstanding any term or provision to the contrary in the Plan or the other Plan Documents, the Effective Date shall not occur, and the discharge, injunctions, exculpations, and releases set forth in Article IX of the Plan or the Confirmation Order, shall not become effective or enforceable unless and until the Asbestos Trust Assets are transferred or delivered, and the Debtors' Contribution and the Hinden Contribution are paid in full to the Asbestos Trust, as provided in Section 4.08, and all other conditions precedent to the Effective Date set forth in Section 10.02 are satisfied or waived.

4.      ***Waiver of Conditions Precedent.***  To the extent practicable and legally permissible, each of the conditions precedent in Section 10.01 or Section 10.02 may be waived, in whole or in part, by the Plan Proponents, acting jointly.  Any such waiver of a condition precedent may be effected at any time in a writing executed by, or on behalf of, each of the Plan Proponents.  If any Plan Proponent desires to waive a condition precedent to facilitate Confirmation or Consummation of the Plan, the other Plan Proponents shall confer promptly with it as to whether or not the suggested waiver should be given, in recognition that time is of the essence.

## ARTICLE XV.
## RETENTION OF JURISDICTION

1.      **Retention of Jurisdiction**.  The Bankruptcy Court shall retain the jurisdiction it has over any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Cases or the Plan, including the following:

a.      to interpret, enforce, and administer the terms of the Plan, the other Plan Documents (including all annexes, schedules, and exhibits thereto), and the Confirmation Order;

b.      to resolve any matters related to the assumption, assignment, or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable; to hear, determine, and, if necessary, liquidate, any Claims arising therefrom;

c.      to enter such orders as may be necessary or appropriate to implement or consummate the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan; *provided,*

*however,* that nothing in the Plan Documents shall detract from or contravene any jurisdictional or other provisions therein, including Sections 4.13 and 4.14 of the Plan, that permit or require legal actions or proceedings to be brought in another court;

d.  to determine any and all motions, adversary proceedings, applications, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Reorganized Debtor, the Asbestos Claimants Committee, the Legal Representative, or the Asbestos Trust, after the Effective Date, including any claims to recover assets for the benefit of the Estates or the holders of Channeled Asbestos Claims, except for matters waived or released under the Plan;

e.  to ensure that Distributions to holders of Allowed Claims (other than Channeled Asbestos Claims) are accomplished as provided herein;

f.  to hear and determine any timely objections to Administrative Claims or to proofs of Claim (other than Channeled Asbestos Claims), both before and after the Confirmation Date, including any objections to the classification of any Claim (other than Channeled Asbestos Claims), and to allow, disallow, determine, designate, liquidate, classify, estimate, or establish the priority of or the secured or unsecured status of, any Claim (other than Channeled Asbestos Claims), in whole or in part;

g.  to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

h.  to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

i.  o consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

j.  to hear and determine all applications for allowance and payment of compensation and reimbursement of expenses of professionals under sections 330 and 331 of the Bankruptcy Code, and any other fees and expenses authorized to be paid or reimbursed under the Plan, except as provided in <u>Section 13.03</u> the Plan;

k.  to hear and determine disputes arising in connection with or relating to the Plan or the interpretation, implementation, or enforcement of the Plan or the extent of any Entity's obligations incurred in connection with or released under the Plan;

l.  to issue or enforce injunctions, enter or implement other orders, or take such other actions as may be necessary or appropriate to restrain interference

by any Entity with Consummation or enforcement of the Plan or Confirmation Order;

m.      to recover all assets of the Debtors and property of the Estates, wherever located;

n.      to resolve any disputed Claims;

o.      to determine the scope of any discharge of any Debtor under the Plan or the Bankruptcy Code;

p.      to determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, agreement, or document created in connection with the Plan or the Disclosure Statement, including any of the Plan Documents;

q.      to the extent that the Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim (excluding any Channeled Asbestos Claim) or cause of action by or against any of the Estates;

r.      to hear and determine any other matters that may be set forth in the Plan, the Confirmation Order, or any of the Injunctions, or that may arise in connection with the Plan, the Confirmation Order, or any of the Injunctions;

s.      to hear and determine any proceeding that involves the validity, application, construction, or enforceability of any of the Injunctions, or that may arise in connection with the Plan, the Confirmation Order, or any of the Injunctions;

t.      to hear and determine matters concerning federal, state, and local taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code, including the expedited determination of tax under section 505(b) of the Bankruptcy Code;

u.      to enter a final decree closing the Chapter 11 Cases; and

v.      to hear and determine all objections to the termination of the Asbestos Trust.

2.      ***Non-Core Proceedings.***  To the extent any of the foregoing matters described in Section 11.01 of the Plan does not qualify as a core proceeding under 28 U.S.C. § 157(b), or to the extent the Bankruptcy Court is otherwise not permitted to render dispositive orders or judgments in any such matters, the reference to the "Bankruptcy Court" in Section 11.01 the Plan shall be deemed to be replaced by the "District Court."

3.      ***Other Proceedings.***  Except as provided in Section 4.13 and Section 4.14 of the Plan, (a) the resolution and payment of Channeled Asbestos Claims, and the forum in which such resolution and payment will be determined, will be governed exclusively by and in

accordance with the Asbestos Trust Agreement or the TDP; and (b) the Bankruptcy Court and the District Court shall have concurrent rather than exclusive jurisdiction with respect to disputes relating to the Debtors' rights to insurance with respect to Worker Compensation Claims.

# ARTICLE XVI.
## RISK FACTORS

Holders of Claims and Equity Interests should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to or incorporated by reference herein, before voting to accept or reject the Plan. Although these risk factors are many, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and their implementation.

## A.    Bankruptcy Considerations.

### 1.    Failure to Receive Requisite Accepting Votes

In order for the Plan to be accepted, it must be accepted at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the holders of Class 6 Claims actually voting on the Plan, and by at least two-thirds (2/3) in dollar amount and seventy-five percent (75%) in number of the holders of Class 7 Claims that have voted on the Plan. If the requisite votes are not received from holders of Class 6 to accept the Plan, the Debtors may seek to confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code. If sufficient votes are not received from holders of Class 6 Claims or Class 7 Claims, the Debtors may also seek to liquidate Debtors' bankruptcy estates in accordance with chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of a liquidation under chapter 7 of the Bankruptcy Code would be similar to or as favorable to holders of Claims and Equity Interests as those proposed in the Plan. The Debtors believe that the financial results would not be as favorable to such holders in a proceeding under chapter 7 of the Bankruptcy Code. Significantly, the projected dividend payable to the holders of Allowed Claims under the Plan would be substantially diminished by virtue of weight of administrative expense claims against the estates. In addition, the effectiveness of the Plan is conditioned on closing an exit financing facility with Bank of America in order to fund the Debtors' payment to the Asbestos Trust and for working capital which would not be available in a chapter 7. Effectiveness of the Plan is also conditioned on the Hinden Family Members and Hinden Family Entities making a cash contribution to the Asbestos Trust, the Reorganized Debtor executing and delivering the Trust Note to the Asbestos Trust and affiliates of the Debtors executing and delivering mortgages on certain real estate to secure the Trust Note. None of these accommodations would be available in a chapter 7 liquidation.

### 2.    Risk of Non-Confirmation of the Plan.

Although the Debtors believe that the Plan satisfies all legal requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed. There can also be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate a solicitation of votes to accept or reject the Plan. If the Plan is not confirmed and consummated, there can be no

assurance that the Chapter 11 Cases will continue rather than be converted to a chapter 7 liquidation. The Bankruptcy Court, which sits as a court of equity, may exercise substantial discretion with respect to the affairs of the Debtors during the Chapter 11 Cases. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan and requires, among other things, that the value of distributions to dissenting creditors and shareholders not be less than the value of distributions such creditors and shareholders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Furthermore, although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing. In addition, the Debtors could experience material adverse changes in their liquidity as a result of such delay. Moreover, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent specified herein, and there can be no assurance that such conditions will be satisfied or waived. In the event such conditions precedent have not been satisfied or waived (to the extent possible hereunder), then the Confirmation Order may be vacated, no Distributions will be made pursuant to the Plan, and the Debtors and all holders of Claims and Equity Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

### 3. The Debtors may object to the amount or classification of a Claim.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan (except Channeled Asbestos Claims, which will be channeled and resolved by the Asbestos Trust.). The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive their expected share of the estimated distributions described in this Disclosure Statement.

### 4. Risk of Additional or Larger Claims.

The Disclosure Statement and its attached exhibits necessarily include estimates, including forecasts of future events. These estimates include, but are not limited to, estimates of future income and expenses, estimates as to the total amount of Claims that will be asserted against the Debtors and the outcome of Disputed Claims. The Debtors believe that the estimates presented are reasonable and appropriate under the circumstances. Nevertheless, there is a risk that unforeseen future events may cause one or more of these estimates to be materially inaccurate. Among the potential risks is additional Administrative Expense Claims may be asserted, that Disputed Claims may be resolved at higher amounts than expected or that the resolution of such Claims may require the expenditure of unanticipated professional fees. If one or more of these estimates proves to be inaccurate, the amount of funds available for Distribution pursuant to the Plan may be reduced.

## B.    Business Considerations

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtor from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

## C.    Risks Related to Financial Information

The financial information is based on the Debtors' books and records and, unless otherwise stated, no audit was performed.    This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtor; operations that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates.    Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtor may turn out to be different from the financial projections.    Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of Reorganized Debtor, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of Confirmation and Consummation of the Plan in accordance with their terms; (b) Reorganized Debtor's ability to maintain or increase revenues and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; and (e) the Debtors' ability to maintain the loyalty of their customers.

The distribution projections and other information contained herein and attached hereto are estimates only.    Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.    In addition, unanticipated events and circumstances occurring after the date the Plan may materially affect the actual financial results of the Reorganized Debtor's operations.    These variations may be material and may adversely affect the ability of the Reorganized Debtor to make payments with respect to its indebtedness.    Because the actual results achieved may vary from projected results, perhaps significantly, the projections should not be relied upon as a guaranty or other assurance of the actual results that will occur.

The contents of this Disclosure Statement should not be construed as legal, business or tax advice to any person.    Each holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest.    This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or whether to object to Confirmation of the Plan.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, any Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, holders of Allowed Claims, Equity Interests or any other parties in interest.

**No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this**

**Disclosure Statement. The Debtors or the Reorganized Debtor may seek to investigate, File and prosecute Claims and Interests and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims or objections to Claims.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure a creditor's acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by the creditor in arriving at his or her decision. Creditors should promptly report unauthorized representations or inducements to counsel to the Debtors and the Office of the United States Trustee for the District of New Jersey.

**D.      No Duty to Update Disclosures**

The Debtors have no duty to update the information contained in the Plan as of the date the Plan, unless otherwise specified herein, or unless the Debtors are required to do so pursuant to an Order of the Bankruptcy Court. Delivery of the Plan after the date of the Plan does not imply that the information contained herein has remained unchanged.

**E.      Alternatives to Confirmation and Consummation of the Plan**

**1.      Alternate Plan**

If the Plan is not confirmed, the Debtors or any other party in interest (if, pursuant to section 1121 of the Bankruptcy Code, the Debtors have not filed a plan within the time period prescribed under the Bankruptcy Code) could attempt to formulate and propose a different plan. Such a plan likely would result in additional costs, including, among other things, additional professional fees or potential asserted substantial contribution claims, all of which would likely constitute Administrative Expense Claims (subject to allowance). The additional costs may be so significant that one or more parties in interest could request that the Chapter 11 Cases be converted to chapter 7 of the Bankruptcy Code or dismissed. As discussed below, the Debtors believe holders of Claims will receive more under the Plan than they would under chapter 7 or if the Chapter 11 Cases were dismissed. Accordingly, the Debtors believe that the Plan enables creditors to realize the best return under the circumstances.

**2.      Chapter 7 Liquidation**

If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Chapter 11 Cases may be converted to liquidation cases under Chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed, pursuant to applicable provisions of Chapter 7 of the Bankruptcy Code, to liquidate the assets of the Debtors for

distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under Chapter 7 of the Bankruptcy Code of the Debtors' assets would result in substantial diminution in the value to be realized by holders of Claims as compared to distributions contemplated under the Plan.  This is so because the Asbestos Claims against the Debtors could exceed the value of the Debtors' assets.  Under the terms of the Plan, however, there will be substantially more assets available to pay claimants than there would be if there was no Plan and the Company was forced to pay Claims solely from its own assets.  This is because the Hinden Family Entities and Hinden Family Members are contributing substantial assets to the Asbestos Trust as part of the Plan on behalf of themselves and other Protected Parties, in exchange for the protections provided to these parties under the Plan, which would not be contributed otherwise.  Moreover, without the settlements and distribution procedures contained in the Plan and the Trust Distribution Procedures, there likely would be years of costly and time-consuming litigation which would further drain and any available assets.

**3.      Dismissal of the Chapter 11 Cases**

Alternatively**,** if a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Chapter 11 Cases could be dismissed.  In such case, the Debtors would continue to operate their business in the ordinary course of business and would continue to defend cases in the state court tort system.  The Debtors would also continue to defend the Insurers claims and prosecute their counter-claims in the Asbestos Insurance Litigation.  The Debtors would likely be unable to attract new investment to continue to grow their business due to their pending asbestos liabilities.  Debtors would continue to pay their share of asbestos related settlements and judgments, if any, and the Debtors' share of each payment will increase as insurance coverage is exhausted.  The Debtors could be forced into an orderly liquidation as insurance is exhausted over time or a forced liquidation in the event of a large judgment which exceeds cash reserves.  In such case, holders of future Asbestos Claims would receive no recovery on their Claims and would not be treated equally with holders of Present Claims.

**ARTICLE XVII.**
**FEASIBILITY OF THE PLAN**

As a condition to Confirmation, section 1129(a)(11) of the Bankruptcy Code requires that the Debtors show that confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation or reorganization is a component of the Plan.  Based on the financial projections annexed hereto as **Exhibit B**, the Debtors believe that the Plan is feasible because, among other things, (i) the Debtors will be able to satisfy all of their obligations under the Plan, (ii) the Debtors' revenue from continuing operations will be sufficient to satisfy all ordinary course business expenses as such expenses come due, and (iii) Reorganized Debtor will be profitable and well capitalized as a result of the Senior Lending Facility and  channeling of Asbestos Claims and Demands to the Asbestos Trust.

ALTHOUGH EVERY EFFORT WAS MADE TO BE ACCURATE, THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTS OR IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPALS IN THE UNITED STATES, THE FINANCIAL ACCOUNTING

STANDARDS BOARD, OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING PROJECTIONS.  FURTHERMORE, NEITHER THE DEBTORS' ACCOUNTANTS, NOR ANY OTHER ACCOUNTANTS, HAVE COMPILED, EXAMINED, OR PERFORMED ANY PROCEDURES WITH RESPECT TO THE PROJECTIONS CONTAINED HEREIN, NOR HAVE THEY EXPRESSED ANY OPINION OR ANY OTHER FORM OF ASSURANCE ON SUCH INFORMATION OR ITS ACHIEVABILITY, AND ASSUME NO RESPONSIBILITY FOR, AND DISCLAIM ANY ASSOCIATION WITH, THE PROSPECTIVE FINANCIAL INFORMATION.   WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED ON A VARIETY OF ASSUMPTIONS, WHICH MAY NOT BE REALIZED, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY ANY OF THE DEBTORS, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED.  ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.  HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATION AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN REACHING THEIR DETERMINATIONS OF WHETHER TO ACCEPT OR REJECT THE PLAN.   THE DEBTORS' FINANCIAL ADVISORS HAVE NOT EXPRESSED AN OPINION ON OR MADE A REPRESENTATION REGARDING THE ACHIEVABILITY OF THE FINANCIAL PROJECTIONS.

## ARTICLE XVIII.
## BEST INTERESTS TEST

Often called the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code requires that a Bankruptcy Court find, as a condition to confirmation of a chapter 11 plan, that the plan provides, with respect to each impaired class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 on the Effective Date.  To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the Chapter 11 Case was converted to a chapter 7 case on the Effective Date and the assets of the Debtors' Estates were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a Claim or an Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare the holder's liquidation distribution to the distribution under the Plan that the holder would receive if the Plan were confirmed and consummated.

A.     **The Liquidation Analysis**

Amounts that holders of Claims in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtors prepared by the Debtors' management with the assistance of their advisors (the "Liquidation Analysis"), which is attached hereto as **Exhibit B**.

As described in the Liquidation Analysis, the Debtors developed the Liquidation Analysis for the Debtors based on the unaudited book values as of August 31, 2018, unless otherwise noted in the Liquidation Analysis. The recoveries may change based on further refinements of Allowed Claims, as the Debtors' claim objection and reconciliation process continues.

As described in the Liquidation Analysis, underlying the analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management and advisors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected in the Liquidation Analysis might not be realized if the Debtors were, in fact, to undergo a liquidation.

This Liquidation Analysis is solely for the purposes of (i) providing "adequate information" under section 1125 of the Bankruptcy Code to enable the holders of Claims and Interests entitled to vote under the Plan to make an informed judgment about the Plan and (ii) providing the Bankruptcy Court with appropriate support for the satisfaction of the "Best Interests Test" pursuant to section 1129(a)(7) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors or any of their Affiliates.

Events and circumstances occurring subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtors and the Combined Company do not intend to and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events. Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of the actual results that will occur.

In deciding whether to vote to accept or reject the Plan, holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

In this case, the Debtors' liquidation value would consist primarily of existing Non-Trust sources, i.e., the unencumbered and unrestricted Cash held by the Debtors at the time of the conversion to a chapter 7 liquidation and the proceeds resulting from the sale of the Debtors' remaining unencumbered assets and properties by a chapter 7 trustee. The gross Cash available for distribution would be reduced by the costs and expenses of the chapter 7 liquidation and any additional Administrative Claims that might arise as a result of the chapter 7 cases. Costs and expenses incurred as a result of the chapter 7 liquidation would further include, among other things, the fees payable to a trustee in bankruptcy and the fees payable to attorneys and other professionals engaged by such trustee. Additional Administrative Claims could arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases. Such Administrative Claims and Other Administrative Claims that might arise in a liquidation case or result from the

pending Chapter 11 Cases, such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition claims.

To determine if the Plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the estimated amounts attributable to the costs, expenses and Administrative Claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired Classes under the Plan. If the hypothetical liquidation distribution to holders of Claims or Interests in any Impaired Class is greater than the distributions to be received by such parties under the Plan, then the Plan is not in the best interests of the holders of Claims or Interests in such Impaired Class.

**B.     Application of the Best Interests Test**

The Debtors believe that the funding of the Asbestos Trust to be established by the Plan, the contributions to be made by the Company, the terms of the Channeling Injunction, the issues relating to insurance coverage, the indemnification  provisions and the ,continued operation of the Debtors as a going concern satisfies the Best Interests Test for the Impaired Classes. Notwithstanding the difficulties in quantifying recoveries to holders of Claims and Interests with precision, the Debtors believe that, based on the Liquidation Analysis, the Plan meets the Best Interests Test. As the Plan and the Liquidation Analysis indicate, confirmation of the Plan will provide each holder of an Allowed Claim in an Impaired Class with a greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code.

Although the Debtors believe that the Plan meets the "best interests test" of section 1129(a)(7) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will determine that the Plan meets this test.

## ARTICLE XIX.
## NON-CONSENSUAL CONFIRMATION

Although § 1129(a)(8) of the Bankruptcy Code requires that a plan be accepted by each class that is impaired by such plan, Section 1129(b) of the Bankruptcy Code provides that the Bankruptcy Court may still confirm the Plan at the request of the Debtors if all requirements of § 1129(a) (except § 1129(a)(8)) are met and if, with respect to each Class of Claims that is impaired under the Plan and has not voted to accept the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A plan confirmed on the basis of this provision is commonly referred to as a "cramdown" plan. In the event an impaired Class of Claims does not accept the Plan, the Debtors may seek cramdown confirmation of the Plan with respect to any such non-accepting Class.

**A.     Unfair Discrimination**

A plan of reorganization does not discriminate unfairly if no class receives more than it is legally entitled to receive for its claims or equity interests. The Debtors believe that the Plan meets this requirement.

B.    **Fair and Equitable Test**

"Fair and equitable" has different meanings for Secured Claims, Unsecured Claims and Equity Interests.

With respect to an Unsecured Claim such as Class 4 and Class 5 Claims, "fair and equitable" means either (A) the Plan provides that each holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date, equal to the Allowed Amount of such Claim; or (B) the holder of any Claim or Interest that is junior to the Claims of such Class will not receive or retain any property under the Plan on account of such junior Claim or Interest.

With respect to a Secured Claim, "fair and equitable" means that the Plan provides either (A) that the holder of a Secured Claim in an impaired Class retains the Liens securing such Claim, whether the property subject to such Liens is retained by the Reorganized Debtor or transferred to another Entity, to the extent of the amount of such Allowed Claim; and that the holder of such Claim receives on account of such Claim deferred cash payments totaling at least the amount of such Allowed Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in the Estate's interest in such property, (B) for the sale, subject to § 363(k) of the Bankruptcy Code, of any property that is subject to the Liens securing such Claim, free and clear of such Liens, with such Liens to attach to the proceeds of such sale, and the treatment of such Liens on proceeds under subsection (A) or (C) hereof, or (C) the realization by such holder of the "indubitable equivalent" of such Claim.

With respect to an Equity Interest, "fair and equitable" means either (A) each holder of an Interest in an impaired Class receives or retains property of a value, as of the Effective Date, equal to the greatest of the Allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such Interest; or (B) the holder of any Interest that is junior to the Interests of such Class will not receive or retain any property under the Plan on account of such junior Interest.  An exception exists that would permit Equity Interests to retain their Interests under a Plan even where all senior classes are not paid in full provided that the holders of Equity Interests contribute "new value".

The Debtors believe that the "fair and equitable" test is satisfied herein for at least two reasons.  First, if Class 7 (Channeled Asbestos Claims) votes to accept the Plan and Class 6 (Defense-Cost Reimbursement Claims) votes to reject the Plan, Class 6 will still receive payment in full of their claims with interest, so it is permissible for holders of Equity Interests to retain their interests.  Second, holders of Equity Interests may retain their interests because the holders of Equity Interests are contributing "new value" in the sum of $3 million and their equity interests are being diluted by secured debt being placed on the Reorganized Debtor in order to exit the chapter 11, including exit financing from Bank of

America in the sum of $9.5 million and the Trust Note in the sum of $13.5 million.

## ARTICLE XX.
## TAX CONSEQUENCES

**CIRCULAR 230 DISCLAIMER**

**To ensure compliance with requirements imposed by the Internal Revenue Service (the "IRS"), the Debtors inform all creditors that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter(s) addressed herein**

Confirmation may have federal income tax consequences for the Debtors and holders of Claims or Equity Interests.  The Debtors have not obtained and do not intend to request a ruling from the Internal Revenue Service, nor have the Debtors obtained an opinion of counsel with respect to any tax matters.  Any federal income tax matters raised by Confirmation of the Plan are governed by the Internal Revenue Code and the regulations promulgated thereunder.  The following is intended to be a summary only and not a substitute for careful tax planning with a tax professional.  The federal, state and local tax consequences of the Plan may be complex in some circumstances and, in some cases, uncertain.  Accordingly, each holder of a Claim or Interest is strongly urged to consult with his or her own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.

A.      **Compliance with Tax Requirements.**

In connection with the Plan, the Debtors will comply with all withholding and reporting requirements imposed by Federal, State, local or foreign taxing authorities.  Under section 1146(a) of the Bankruptcy Code and applicable New Jersey State law, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under the Plan will not be taxed under any law imposing a stamp tax or similar tax.  Upon request, Claim holders must provide the Reorganized Debtors with a tax identification number or similar information.

B.      **Tax Consequences to the Debtors.**

The Debtors may not recognize income as a result of the discharge of debt pursuant to the Plan because section 108 of the Internal Revenue Code provides that taxpayers in bankruptcy proceedings do not recognize income from the discharge of debt.  However, a taxpayer is required to reduce its "tax attributes" by the amount of the debt discharged.  Tax attributes are reduced in the following order: (i) net operating losses; (ii) general business credits; (iii) capital loss carryovers; (iv) basis in assets; and (v) foreign tax credits.

C.      **Tax Consequences to Holders of Claims or Equity Interests.**

The confirmation and consummation of the Plan may have tax consequences to holders of Claims and Equity Interests.  The Debtors do not offer an opinion as to any federal, state, local or other tax consequences to holders of Claims and Equity Interests as a result of the

confirmation of the Plan.  All holders of Claims and Equity Interests are urged to consult with their own tax advisors to ascertain the federal, state, local and foreign tax consequences of the Plan.  The Plan is not intended, and should not be construed, as legal or tax advice to any Creditor,  Interest holder, or any other party in interest.

**DISCLAIMER**
**Holders of Claims or Interests should not rely on this Disclosure Statement with respect to the tax consequences of the Plan.  Creditors should consult with their own tax counsel or advisor.  The discussion of tax consequences in this Disclosure Statement is not intended as a complete discussion or analysis of all tax consequences of the Plan.**

### ARTICLE XXI.
### MISCELLANEOUS PROVISIONS

1.      *Expedited Tax Determination*.  The Reorganized Debtor may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

2.      *Exemption from Registration*.  Pursuant to sections 1145(a),(c) and (d) of the Bankruptcy Code, the issuance of any securities pursuant to the Plan shall be exempt from registration pursuant to section 5 of the Securities Act of 1933, as amended, and all other applicable nonbankruptcy laws and regulations.

3.      *Statutory Committee and Legal Representative*. Except as provided below, the Asbestos Claimants Committee and the Legal Representative shall continue in existence until the Effective Date.

   a.      Except as provided below, on and after the Effective Date, the rights, duties, and responsibilities of the Legal Representative shall be as set forth in the Asbestos Trust Agreement.

   b.      On and after the Effective Date, the Asbestos Claimants Committee and the Legal Representative shall continue in existence and shall have post-Effective Date standing and capacity (i) to complete matters, if any, including litigation, appeals, or negotiations pending as of the Effective Date that are not released pursuant to the Plan; (ii) to grant or withhold, in their sole discretion, any consent contemplated or required under the Plan; (iii) to object to or defend any Professional Claims; (iv) to oppose any appeals of the Confirmation Order; and (v) to prepare and prosecute applications for the payment of fees and reimbursement of expenses of their respective professionals.

   c.      In all events, the Asbestos Claimants Committee's professionals, and the Legal Representative and his professionals, shall have the right to seek, and shall be entitled to, reasonable fees and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code for

services rendered, including those services arising from or connected with any matter authorized or described in paragraph 3(b) above.  The Debtors shall pay such reasonable fees and expenses incurred through the Effective Date, in accordance with the fee and expense procedures set forth in the Bankruptcy Code and Bankruptcy Rules or otherwise promulgated during the Chapter 11 Cases.  The Reorganized Debtor shall pay such reasonable fees and expenses relating to any post-Effective Date activities authorized or described in paragraph 3(b) above without the necessity of approval by the Bankruptcy Court.

d.      Upon (i) the completion of all matters authorized and described in paragraph 3(b) above and (ii) the irrevocable and indefeasible payment in full by the Reorganized Debtor of all Allowed Professional Claims, the Asbestos Claimants Committee shall be dissolved, and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, liabilities, and obligations related to, or arising from, the Chapter 11 Cases.  Upon dissolution of the Asbestos Claimants Committee, the Trust Advisory Committee shall succeed to, and exclusively hold, the attorney-client privilege and any other privilege held by the Asbestos Claimants Committee and shall enjoy the work product protections that were applicable or available to the Asbestos Claimants Committee before its dissolution.

4.      ***Effective Date Actions Simultaneous.***    Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  Actions required to be taken after the Effective Date or as soon thereafter as is reasonably practicable shall be deemed to have been taken on the Effective Date.

5.      ***Substantial Consummation.***   On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

6.      ***Sections 1125 and 1126 of the Bankruptcy Code.***   As of and subject to the occurrence of the Confirmation Date: (a) the Plan Proponents shall be deemed to have solicited acceptance of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including sections 1125(a) and (e) of the Bankruptcy Code, and any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with solicitation; and (b) the Reorganized Debtor and the Plan Proponents and each of their respective members, attorneys, advisors, and agents shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

7.    ***Deemed Acts.***  Whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

8.    ***Binding Effect.***  The Plan shall be binding upon and inure to the benefit of the Plan Proponents, the Debtors, the holders of Claims, Demands (to the fullest extent permitted by law), and interests, and their respective successors and assigns, including the Reorganized Debtor.

9.    ***Exhibits/Schedules.***  All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are part of the Plan as if set forth in full herein.

10.    ***Entire Agreement.***  On the Effective Date, the Plan, the other Plan Documents, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

11.    ***Reservation of Rights.***  If the Plan is not confirmed by a Final Order, or if the Plan is confirmed and does not become effective, the rights of all parties in interest in the Chapter 11 Cases are and shall be reserved in full.  Any concessions or settlements reflected herein, if any, are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Chapter 11 Cases shall be bound or deemed prejudiced by any such concession or settlement.  Moreover, if the Plan does not become effective, no party in interest in the Chapter 11 Cases shall be bound or prejudiced by any representation, written or oral, made by any party in connection with the Plan or the negotiation or prosecution of the Plan, including the representations made in the Plan, the Disclosure Statement, the other Plan Documents, or the Confirmation Order.

12.    ***Further Assurances.***  The Debtors, the Reorganized Debtor, the Protected Parties, the Asbestos Trust, all Entities receiving Distributions under the Plan, and all other parties in interest shall, and shall be authorized to, from time to time, prepare, execute, and deliver any agreements or documents and take any other action consistent with the terms of the Plan as may be necessary to effectuate the provisions and intent of the Plan, with each such Entity to bear its own costs incurred after the Effective Date in connection therewith.

13.    ***Further Authorizations.***  Prior to the Effective Date, the Plan Proponents may seek such orders, judgments, injunctions, and rulings that they, by unanimous agreement, deem necessary to carry out further the intentions and purposes of, and to give full effect to the provisions of, the Plan or any of the other Plan Documents, and any costs incurred in connection therewith shall be borne by the Debtors' Estates.  On and after the Effective Date, the Reorganized Debtor and the Asbestos Trust may seek such orders, judgments, injunctions, and rulings that any of them deem necessary to carry out further the intentions and purposes of, and to give full effect to the provisions of, the Plan or any of the other Plan Documents, with each such Entity to bear its own costs in connection therewith.

14.    ***Notices and Deliveries.***  Any notice, request, or other communication required or permitted to be given under the Plan shall be in writing and deemed to have been

properly given (a) when delivered in person or when sent by electronic mail  and electronic confirmation of error-free receipt is received, or (b) three (3) days after being sent by certified or registered United States mail, return receipt requested, postage prepaid, and addressed to the Entity at the address listed in Schedule 13.14 of the Plan Supplement.  Any Entity may change its address for notices by giving notice of such change to the other Entities in the manner set forth in Section 13.14 of the Plan.

15. ***Asbestos Trust Annual Report.***  Notwithstanding the closing of the Chapter 11 Cases under section 350 of the Bankruptcy Code, the Clerk of the Bankruptcy Court shall accept for filing the Asbestos Trust's annual report without the requirement that any party in interest file a request to reopen the case.

16. ***Notices.***  All notices, requests or demands for payments provided for in the Plan will be in writing and will be deemed to have been given when personally delivered by hand or deposited in any general or branch post office of the United States Postal Service. Notices, requests and demands for payments will be addressed and sent postage pre-paid or delivered to the following:

*To the Debtors and Reorganized Debtors*:         Lowenstein Sandler LLP
                                                  One Lowenstein Drive
                                                  Roseland, NJ 07068
                                                  Attention: Kenneth A. Rosen, Esq.
                                                  Jeffrey Prol, Esq. and
                                                  krosen@lowenstein.com
                                                  jprol@lowenstein.com

*To the Asbestos Claimants' Committee*:           Caplin & Drysdale, Chtd.
                                                  One Thomas Circle, N.W.
                                                  Ste. 1100
                                                  Washington, DC  20005
                                                  Attention: James Wehner, Esq.
                                                  Jeffrey Liesemer, Esq.
                                                  jwehner@capdale.com
                                                  jliesemer@capdale.com

*To the Legal Representative*                      Young Conaway Stargatt & Taylor
                                                  Rodney  Square
                                                  1000 North King Street
                                                  Wilmington, DE  19801
                                                  Attention: Edwin Harron, Esq.
                                                  eharron@ycst.com

*To the Office of the United States Trustee*:     Office of the United States Trustee
                                                  for the District of New Jersey
                                                  One Newark Center

1085 Raymond Boulevard, Suite 2100,
Newark, NJ 07102
Attention: Mitchell Hausman, Esq.
Jeffrey Sponder, Esq
mitchell.b.hausman@usdoj.gov
jeffrey.m.sponder@usdoj.gov

17.    ***Plan Controls Disclosure Statement.***  Notwithstanding anything to the contrary contained herein or in the Disclosure Statement, in the event and to the extent that any provision of the Plan is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan will control and take precedence.

18.    ***Rules of Interpretation; Computation of Time.***  For purposes of the Plan, (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document as being in a particular form or containing particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions, (b) any reference in the Plan to an existing document, schedule or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented, (c) unless otherwise specified, all references in the Plan to Sections, Articles, Schedules and Exhibits, if any, are references to Sections, Articles, Schedules and Exhibits of or to the Plan, (d) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan, (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, and (f) the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules will apply.  In computing any period of time prescribed or allowed by the Plan, unless otherwise specifically designated herein, the provisions of Bankruptcy Rule 9006(a) will apply.

19.    ***Filing of Additional Documents.***  Prior to the Effective Date, the Debtors may File with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan that are not inconsistent with the terms of the Plan.  On or after the Effective Date, the Debtors and/or the Reorganized Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate the terms and conditions of the Plan.

20.    ***Direction to a Party.***  From and after the Effective Date, the Debtors may apply to the Bankruptcy Court for the entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including the satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

21.    ***Successors and Assigns.***  The rights, duties and obligations of any Person named or referred to in the Plan, including all Creditors, will be binding on, and will inure to the benefit of, the successors and assigns of such Person.

22.    ***Waiver of Subordination.***   Notwithstanding any provision of the Plan to the contrary, all holders of Claims will be deemed to have waived any and all contractual subordination rights which they may have with respect to the distributions made pursuant to the Plan, and the Confirmation Order will permanently enjoin, effective as of the Effective Date, all holders of Claims from enforcing or attempting to enforce any such rights against any Person receiving distributions under the Plan.

23.    ***Post-Effective Date Professional Fees.***   The reasonable fees and actual and necessary expenses incurred after the Effective Date by professionals for the Debtors will be paid by the Debtors or Reorganized Debtors upon the submission of an invoice to the Debtors or Reorganized Debtors without the need for further notice to any Person or approval by the Bankruptcy Court.

24.    ***Governing Law***.   Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control).

25.    ***No Admissions***.   Notwithstanding anything herein to the contrary, nothing contained in the *Plan* will be deemed as an admission by any Entity with respect to any matter set forth herein.

## ARTICLE XXII.
## <u>RECOMMENDATION</u>

THE DEBTORS RECOMMEND THAT CREDITORS VOTE TO "ACCEPT" THE PLAN. THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES DESCRIBED ABOVE AND THAT THE PLAN IS DESIGNED TO PROVIDE GREATER RECOVERIES THAN THOSE AVAILABLE IN ANY OTHER FORM OF LIQUIDATION. ANY OTHER ALTERNATIVE WOULD CAUSE SIGNIFICANT DELAY AND UNCERTAINTY, AS WELL AS ADDITIONAL ADMINISTRATIVE COSTS.

Dated: November 15, 2018              Respectfully submitted,

**LOWENSTEIN SANDLER LLP**
<u>/s/ *Jeffrey D. Prol*                          </u>
Kenneth A. Rosen, Esq.
Jeffrey Prol, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
krosen@lowenstein.com
jprol@lowenstein.com

*Counsel to the Debtors and Debtors-in-Possession*

**EXHIBIT A**

**SEE SEPARATELY FILED AMENDED PRENEGOTIATED PLAN OF
REORGANIZATION FOR DURO DYNE NATIONAL CORP., ET AL.,
UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**