**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Jeffrey D. Prol, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Counsel to the Debtors and
Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| Duro Dyne National Corp., *et al.*[1] | Case No. 18-27963 (MBK) |
| Debtors. | (Jointly Administered) |

**AFFIDAVIT OF PUBLICATION**

Pursuant to the Amended Order (i) Approving Second Amended Disclosure Statement as Providing Adequate Information Within the Meaning of Section 1125(a) of the Bankruptcy Code; (ii) Establishing Procedures for Solicitation and Tabulation of Votes on Amended Plan of Reorganization; (iii) Approving the Form of Ballots; (iv) Scheduling a Hearing on Confirmation of the Plan; (v) Approving the Form, Manner and Scope of Mailed and Published Notices of the Time Fixed to (a) Vote on the Amended Plan, and (b) File Objections to Confirmation of the Amended Plan; and (vi) Granting Related Relief [Dkt.289], the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") caused the attached Notices of Hearing on Confirmation of Plan of Reorganization to be published on November 23, 2018 in the following

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Duro Dyne National Corp. (4664); Duro Dyne Machinery Corp. (9699); Duro Dyne Corporation (3616); Duro Dyne West Corp. (5943); and Duro Dyne Midwest Corp. (4662).

newspapers: USA Today, National Edition and New York Times, National Edition.

Dated:  December 14, 2018                               Respectfully submitted,

**LOWENSTEIN SANDLER LLP**

/s/ *Jeffrey D. Prol*
Kenneth A. Rosen, Esq.
Jeffrey D. Prol, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
krosen@lowenstein.com
jprol@lowenstein.com

*Counsel to the Debtors and Debtors-in-Possession*



## VERIFICATION OF PUBLICATION

**COMMONWEALTH OF VIRGINIA**
**COUNTY OF FAIRFAX**

Being duly sworn, Toussaint Hutchinson says that he is the principal clerk of USA TODAY, and is duly authorized by USA TODAY to make this affidavit, and is fully acquainted with the facts stated herein: on **Friday, November 23, 2018** the following legal advertisement – **Duro Dyne National Corp.** – was published in the national edition of **USA TODAY.**

*[signature]*
Principal Clerk of USA TODAY
November 28, 2018

This 28th day of November month 2018 year.

*[signature]* Robin Sue Purcell
Notary Public
Commission expires
31 Oct 2019

[Notary Seal: ROBIN SUE PURCELL, NOTARY PUBLIC, MY COMMISSION NUMBER 7630258, COMMONWEALTH OF VIRGINIA]

# Groups demand fixes at VA nursing homes

## AmVets head urges 'swift and transparent action'

**Donovan Slack**
USA TODAY
**and Andrea Estes**
The Boston Globe

WASHINGTON – Six veterans' groups are calling on the Department of Veterans Affairs to improve the quality of care at its nursing homes following a story by USA TODAY and The Boston Globe detailing "blatant disregard for veteran safety" at a VA nursing home in Massachusetts.

"Anybody who respects veterans should be angered by this," American Legion National Commander Brett Reistad said. "America's veterans deserve better."

The groups, who together represent nearly 5 million members, said veterans who risked their lives for our country shouldn't have to risk their lives in VA nursing homes.

In Brockton, Massachusetts, investigators found two nurses asleep during their shifts, even though the facility knew it was under scrutiny and inspectors were coming to visit, looking for potential signs of patient neglect. A whistleblower had reported that nurses and aides did not empty the bedside urinals of frail veterans, they failed to provide clean water at night and didn't check on the veterans regularly. The VA said the napping nurses no longer work at the facility.

The story was the latest in an investigation by USA TODAY and the Globe that revealed care at many VA nursing facilities was worse than at private nursing homes in the agency's own internal ratings, kept secret from veterans for years.

The stories detailed disturbing examples of substandard care – a veteran



Nick Bonanno talks with his father, Rosario "Russ" Bonanno, inside the VA nursing home in Bedford, Mass.
KELSEY CRONIN/FOR THE BOSTON GLOBE

with undiagnosed scabies for months, another struggling to eat in Bedford, Massachussetts; and a third sitting for hours in soiled sheets and another writhing in pain without medication in West Palm Beach, Florida.

A Navy veteran was declared dead after he walked out of a supposedly secure VA nursing home and was never found in Tuskegee, Alabama. An Army vet landed in intensive care suffering from malnutrition, septic shock and bed sores after a stay at a VA nursing home in Livermore, California.

"The stories being reported about the treatment of some individual veterans at these facilities are nothing short of horrifying," said Rege Riley, national commander of American Veterans, known as AmVets. He called on VA Secretary Robert Wilkie to "take swift and transparent action to fix this."

Veterans of Foreign Wars, Disabled American Veterans, Paralyzed Veterans of America and Vietnam Veterans of America joined AmVets and the Legion in calling for action.

"The VA must address and correct these issues," said Garry Augustine, executive director of Disabled American Veterans.

---

## IN BRIEF

### Mattis says he has extra authority to use military on border

Defense Secretary Jim Mattis says the White House has given him authority to use military troops to protect Customs and Border Protection personnel at the southwest border.

This could mean directing troops to temporarily detain migrants in the event of disorder or violence against border patrol agents.

Mattis said Wednesday such detention would be measured in "minutes, not even hours," and does not mean troops would be performing law enforcement duties. He said the troops also could use lethal force, if necessary, to protect the Border Patrol.

### DeVos revives for-profit college watchdog cut under Obama

Education Secretary Betsy DeVos on Wednesday restored federal recognition to an accrediting group that oversees dozens of for-profit colleges but was shut down by the Obama administration over allegations of lax supervision.

Her decision says the Accrediting Council for Independent Colleges and Schools was found to be "substantially in compliance" in 19 of 21 areas reviewed by the Education Department. DeVos said the group must fix problems within a year.

### Border Patrol agent acquitted in Mexican teen's 2012 death

A jury in Arizona has acquitted a U.S. Border Patrol agent of manslaughter in the cross-border shooting death of a Mexican teen six years ago.

Jurors found Lonnie Swartz not guilty of involuntary manslaughter Wednesday. It was his second trial after another jury acquitted him of second-degree murder and deadlocked on the manslaughter charge earlier this year.

### US and South Korea to reduce scope of major military exercise

Defense Secretary Jim Mattis says the United States and South Korea will scale back a major military exercise next spring to avoid setting back diplomacy over North Korea's nuclear weapons.

Mattis told reporters at the Pentagon on Wednesday that the exercise, which is called Foal Eagle and is conducted each spring in South Korea, will be "reduced in scope." The decision had not previously been announced.

### Moderate quake jolts Alaska's Cook Inlet; no damage reported

A moderate earthquake in Alaska's Cook Inlet has jolted a large section of the state.

The Alaska Earthquake Center said the magnitude-5.7 quake Wednesday was widely felt in Anchorage and Kenai Peninsula. There were no immediate reports of damage or injuries.

The earthquake occurred at 9:21 a.m. and was centered 70 miles northwest of Homer.

### Board of automaker Nissan fires Carlos Ghosn as chairman

Nissan Motor Co. confirmed Thursday that its board of directors voted unanimously to dismiss Carlos Ghosn as its chairman after he was arrested on suspicion of falsifying financial reports and other misconduct.

*From staff and wire reports*

---

**Corrections & Clarifications**



USA TODAY is committed to accuracy. To reach us, contact Standards Editor Manny Garcia at 800-872-7073 or e-mail accuracy@usatoday.com. Please indicate whether you're responding to content online, on social media or in the newspaper.

**USA TODAY**

7950 Jones Branch Dr., McLean, Va. 22108, 703-854-3400
Published by Gannett, Volume 37, No. 49
(ISSN 0734-7456)

**SUBSCRIPTIONS 1-800-USA-0001**
Monday – Friday, 8 a.m. – 7 p.m. ET

Regular U.S. subscription rates: $29 per month; $348 per year. For customer service-related inquiries, please contact Barb Smith, VP/Customer Service, PO BOX 650301, DALLAS TX 75265-0301, or fax 1-800-732-3631.

Advertising: All advertising published in USA TODAY is subject to the current rate card; copies available from the advertising department. USA TODAY may in its sole discretion edit, classify, reject or cancel at any time any advertising submitted.

Classified: 1-800-397-0070
National, Regional: 703-854-3400

Reprint permission, copies of articles, glossy reprints: www.GannettReprints.com or call 212-221-9595

USA TODAY is a member of The Associated Press and subscribes to other news services. Published daily except Saturdays, Sundays and widely observed holidays. Periodicals postage paid at McLean, Va., and at additional mailing offices. USA TODAY, its logo and associated graphics are registered trademarks. All rights reserved.

POSTMASTER: Send address changes to USA TODAY, 8700-K Red Oak Blvd., Charlotte, NC 28217.

---

# Black Friday

Continued from Page 1A

cation where a customer can find the doll or sweater they're looking for. The map will be colored coded for Black Friday to make the search even simpler.

During the holidays, "we have every register open," says Tony Amirikhass, store manager for a Walmart near Los Angeles in Southgate. "Our baskets are very large. We're a high volume store, and it takes three to five minutes per transaction. So yeah, there's a big time saving."

Such shortcuts are critical. A survey by consultancy Deloitte found that 27 percent of those polled would tap into alternate checkout options – such as using a smartphone to scan and pay for purchase as they shop, or buying online, then picking the gift up at a store – to skip long check out lines.

And while shoppers should check because store hours may vary, those willing to brave the cold started grabbing doorbusters before the sun comes up Friday.

There's a lot of money on the line. Nearly 20 percent of retail sales last year occurred during the holiday season, and it's expected that shoppers will spend roughly $717 billion to $721 billion this year, an uptick of 4.3 percent to 4.8 percent over 2017, according to the National Retail Federation.

Black Friday has waned in recent years, its power dulled as such retailers as Walmart, Amazon and J.C. Penney launch holiday sales days or weeks earlier, with many stores opening their doors on Thanksgiving Day.

A number of retailers flung open their doors before the dishes were cleared from the holiday feast. "Shopping on Thanksgiving is fine as long as you get to do it with your family," Marlina Kozdra said.

The 34-year-old stay-at-home mom of West Orange, N.J., went to New York City to watch the Macy's Thanksgiving Day Parade with her family, but then went hunting for deals.

At the peak, Shopify merchants worldwide generated more than $250,000 in sales per minute on Thanksgiving, according to the e-commerce company's data as of 5 p.m. EST. The average shopping cart order was $80.78 and clothes and shoes were the most popular items. In the U.S., the states that spent the most were California, Texas and New York.

A Target store in Virginia Beach, Virginia, was moderately populated with Thanksgiving Day shoppers about an hour after opening. Parking wasn't so bad, said Elizabeth Schreiber-Byers, a professor from Fairfax, Virginia, but that didn't make check out any less painful.

"It's like the worst Disneyland ride ever."

*Contributing: Dalvin Brown, Ben Tobin, Michelle Maltais and Jefferson Graham*



Nearly 20 percent of retail sales last year occurred during the holiday season, and the National Retail Federation estimates shoppers will spend roughly $717 billion to $721 billion this year, almost 5 percent more than last year. GETTY IMAGES/ISTOCKPHOTO

---

**MARKETPLACE TODAY**
For advertising information: 1.800.397.0070    www.russelljohns.com/usat

**NOTICES**

**LEGAL NOTICE**

**UNITED STATES BANKRUPTCY COURT, DISTRICT OF NEW JERSEY**

In re:                                                  Chapter 11
Duro Dyne National Corp., Duro Dye Corp., Duro Dyne Machinery    Case No. 18-27963 (MBK)
Corp., Duro Dyne Midwest Corp., and Duro Dyne West Corp.,        (Jointly Administered)
Debtors.

**NOTICE OF HEARING ON CONFIRMATION OF PLAN OF REORGANIZATION**

1. **Bankruptcy Case.** On September 7, 2018, Duro Dyne National Corp., *et al* ("Debtors") petitioned for reorganization under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey ("Bankruptcy Court"). The purpose of the Debtors' chapter 11 reorganization is to resolve all existing and future asbestos-related personal injury and wrongful death claims.

2. **Approval of Disclosure Statement.** On November 20, 2018, the Bankruptcy Court entered an order approving the Second Amended Disclosure Statement ("Disclosure Statement") with respect to the Debtors' Second Amended Plan of Reorganization ("Plan").

3. **Solicitation Materials Distributed to Voting Classes.** The Disclosure Statement, together with copies of the Plan, Ballots and other voting materials, called a "Solicitation Package," has been mailed to known holders of Class 6 (Prepetition Defense-Cost Contributions) and Class 7 (Channeled Asbestos Claims) or their lawyers. You should read all of the documents included in the Solicitation Package for details about how the Plan may affect your rights.

4. **Notices to Non-Voting Classes.** This Notice and a Notice of Non-Voting Status has been mailed to known holders of Class 1, 2, 3, 4, 5, 8, 9, 10, 11 and 12 Claims. If you are a member of a Non-Voting Class, you should read the Solicitation Package for details about how the Plan may affect your rights.

5. **Key Parts of the Plan.** The Plan provides for the establishment of an Asbestos Trust that will resolve and, as appropriate, pay all eligible Channeled Asbestos Claims. The Plan provides for the issuance of an Asbestos Permanent Channeling Injunction that will channel all current and future Asbestos Claims and Demands against the Debtors to the Asbestos Trust, which will assume liability for all Channeled Asbestos Claims and use its assets to resolve and compensate eligible Channeled Asbestos Claims. The Plan also proposes certain releases and exculpations, whereby certain parties would be shielded from liability or exculpated for a variety of claims.

6. **How to Vote on the Plan.** The Bankruptcy Court has issued an order describing who can vote on the Plan and how to vote. The Disclosure Statement contains information that will help you decide how to vote on the Plan if you are entitled to do so. *Your legal rights may be affected if the Plan is confirmed (approved).* Lawyers for holders of Channeled Asbestos Claims may vote on the Plan on behalf of their clients if the lawyers are authorized to do so. If you are unsure whether your lawyer is authorized to vote on your behalf, please contact your lawyer. To be counted, a ballot voting on the Plan must be *actually received* by the Balloting Agent at one of the addresses below by **January 24, 2019 at 4:00 p.m. (E.T.)**. Ballots that are *not actually received* by that date and time—even if they are postmarked on that date—will not be counted. Ballots will *not* be accepted by facsimile or other electronic means, including email.
IF BY REGULAR MAIL: BMC Group, Inc., Attn: Duro Dyne Ballot Processing, PO Box 90100, Los Angeles, CA 90009; IF BY MESSENGER OR OVERNIGHT DELIVERY: BMC Group, Inc., Attn: Duro Dyne Ballot Processing, 3732 West 120th Street, Hawthorne, CA 90250.

7. **Objections to Confirmation of the Plan.** A party in interest seeking to object to confirmation of the Plan must (i) be in writing, (ii) set forth in detail the name and address of any party filing the objection, the grounds for the objection, any relevant and admissible evidence in support of the objection, and the amount of the objector's claims or such other grounds that give the objector standing to assert the objection, (iii) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, (iv) be filed with the Bankruptcy Court, and (v) served in accordance with the Local Rules upon the following parties so as to be actually received on or before **February 8, 2019 at 4:00 p.m. (E.T.)**: (i) counsel to the Debtors at Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, New Jersey 07068, Attn: Jeffrey D. Prol, Esq.; (ii) counsel to the Asbestos Claimants Committee at Caplin & Drysdale, Chtd., One Thomas Circle, N.W., Suite 1100, Washington, D.C. 20005, Attn: James P. Wehner, Esq.; (iii) the Future Claimants' Representative at Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801 Attn: Edwin J. Harron, Esq.; and (iv) the Office of the United States Trustee for the District of New Jersey, One Newark Center, 1085 Raymond Boulevard, Suite 2100, Newark, NJ 07102, Attn: Mitchell Hausman, Esq.. Registered users of the Bankruptcy Court's case filing system must electronically file their objections and responses. All other parties in interest must file their objections and responses in writing with the Clerk of the Bankruptcy Court, Clarkson S. Fisher US Courthouse, 402 East State Street, Trenton, NJ 08608. *If you or your attorney does not file an objection to the Plan, the Bankruptcy Court may conclude that you do not object to confirmation of the Plan, and may enter an order confirming the Plan by which you will be bound.*

8. **Hearing on Confirmation of the Plan.** A hearing ("Confirmation Hearing") to consider whether the Bankruptcy Court should confirm the Plan will be held at the United States Bankruptcy Court for the District of New Jersey, Courtroom 8, Clarkson S. Fisher US Courthouse, 402 East State Street, Trenton, NJ 08608, on **March 6, 7 and 8, 2019, at 10:00 a.m. (E.T.)**.

9. **Additional Information.** Copies of the Plan, the Disclosure Statement and other materials contained in the Solicitation Package, including a ballot to vote on the Plan, may be obtained by contacting the Debtors' Balloting Agent at either of the addresses listed above; by email at DuroDyne@bmcgroup.com or by visiting www.bmcgroup.com/durodyne.
Copies of the Plan and the Disclosure Statement also may be examined between the hours of 9:00 a.m. and 4:30 p.m. E.T. at the Bankruptcy Court Clerk's office at the Clarkson S. Fisher US Courthouse, 402 East State Street, Trenton, NJ 08608. To the extent any portion of this notice conflicts with the Plan or the Disclosure Statement, the terms of those documents shall control over this notice.
Dated: November 23, 2018                                    LOWENSTEIN SANDLER LLP
                                                            By: s/Jeffrey D. Prol, Esq.



**CLASSIFIEDS**

**ONE CALL
DOES IT ALL!**
Call Today! (800) 397-0070
Your Ad in Print, Online Classifieds,
& Internet Banners Too!



**The New York Times**
620 8TH AVENUE · NEW YORK, NY 10018

# PROOF OF PUBLICATION

Nov 26 , 2018

I, Alice Weber, in my capacity as a Principal Clerk of the Publisher of **The New York Times**, a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of

**The New York Times** on the following date or dates, to wit on

NOV 2 3 2018    B7  NATIONAL

_Alice Weber_

Sworn before me the
26th day of Nov, 2018

_Michelle M. Scibilia_

Notary Public

MICHELLE M. SCIBILIA
Notary Public, State of New York
Registration #01SC6281145
Qualified In Nassau County
Commission Expires May 13, 2021

---

**UNITED STATES BANKRUPTCY COURT, DISTRICT OF NEW JERSEY**
In re: Duro Dyne National Corp., Duro Dye Corp., Duro Dyne Machinery Corp., Duro Dyne Midwest Corp., and Duro Dyne West Corp., Debtors.
Chapter 11
Case No. 18-27963 (MBK)
(Jointly Administered)

**NOTICE OF HEARING ON CONFIRMATION OF PLAN OF REORGANIZATION**

1. **Bankruptcy Case.** On September 7, 2018, Duro Dyne National Corp., et al ("Debtors") petitioned for reorganization under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey ("Bankruptcy Court"). The purpose of the Debtors' chapter 11 reorganization is to resolve all existing and future asbestos-related personal injury and wrongful death claims.

2. **Approval of Disclosure Statement.** On November 20, 2018, the Bankruptcy Court entered an order approving the Second Amended Disclosure Statement ("Disclosure Statement") with respect to the Debtors' Second Amended Plan of Reorganization ("Plan").

3. **Solicitation Materials Distributed to Voting Classes.** The Disclosure Statement, together with copies of the Plan, Ballots and other voting materials, called a "Solicitation Package," has been mailed to known holders of Class 6 (Prepetition Defense-Cost Contributions) and Class 7 (Channeled Asbestos Claims) or their lawyers. You should read all of the documents included in the Solicitation Package for details about how the Plan may affect your rights.

4. **Notices to Non-Voting Classes.** This Notice and a Notice of Non-Voting Status has been mailed to known holders of Class 1,2,3,4,5,8,9,10, 11 and 12 Claims. If you are a member of a Non-Voting Class, you should read the Solicitation Package for details about how the Plan may affect your rights.

5. **Key Parts of the Plan.** The Plan provides for the establishment of an Asbestos Trust that will resolve and, as appropriate, pay all eligible Channeled Asbestos Claims. The Plan provides for the issuance of an Asbestos Permanent Channeling Injunction that will channel all current and future Asbestos Claims and Demands against the Debtors to the Asbestos Trust, which will assume liability for all Channeled Asbestos Claims and use its assets to resolve and compensate eligible Channeled Asbestos Claims. The Plan also proposes certain releases and exculpations, whereby certain parties would be shielded from liability or exculpated for a variety of claims.

6. **How to Vote on the Plan.** The Bankruptcy Court has issued an order describing who can vote on the Plan and how to vote. The Disclosure Statement contains information that will help you decide how to vote on the Plan if you are entitled to do so. Your legal rights may be affected if the Plan is confirmed (approved). Lawyers for holders of Channeled Asbestos Claims may vote on the Plan on behalf of their clients if the lawyers are authorized to do so. If you are unsure whether your lawyer is authorized to vote on your behalf, please contact your lawyer. To be counted, a ballot voting on the Plan must be actually received by the Balloting Agent at one of the addresses below by **January 24, 2019 at 4:00 p.m. (E.T.)**. Ballots that are not actually received by that date and time—even if they are postmarked on that date—will not be counted.

Ballots will not be accepted by facsimile or other electronic means, including email.
**IF BY REGULAR MAIL:** BMC Group, Inc., Attn: Duro Dyne Ballot Processing, PO Box 90100, Los Angeles, CA 90009; **IF BY MESSENGER OR OVERNIGHT DELIVERY:** BMC Group, Inc., Attn: Duro Dyne Ballot Processing, 3732 West 120th Street, Hawthorne, CA 90250.

7. **Objections to Confirmation of the Plan.** Objections and responses to confirmation of the Plan must (i) be in writing, (ii) set forth in detail the name and address of any party filing the objection, the grounds for the objection, any relevant and admissible evidence in support of the objection, and the amount of the objector's claims or such other grounds that give the objector standing to assert the objection, (iii) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, (iv) be filed with the Bankruptcy Court, and (v) served in accordance with the Local Rules upon the following parties so as to be actually received on or before **February 8, 2019 at 4:00 p.m. (E.T.)**: (i) counsel to the Debtors at Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, New Jersey 07068, Attn: Jeffrey D. Prol, Esq.; (ii) counsel to the Asbestos Claimants Committee at Caplin & Drysdale, Chtd., One Thomas Circle, N.W., Suite 1100, Washington, D.C. 20005, Attn: James P. Wehner, Esq.; (iii) the Future Claimants' Representative at Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801 Attn: Edwin J. Harron, Esq.; and (iv) the Office of the United States Trustee for the District of New Jersey One Newark Center 1085 Raymond Boulevard, Suite 2100, Newark, NJ 07102, Attn: Mitchell Hausman, Esq.. Registered users of the Bankruptcy Court's case filing system must electronically file their objections and responses. All other parties in interest must file their objections and responses in writing with the Clerk of the Bankruptcy Court, Clarkson S. Fisher US Courthouse, 402 East State Street, Trenton, NJ 08608. If you or your attorney does not file an objection to the Plan, the Bankruptcy Court may conclude that you do not object to confirmation of the Plan, and may enter an order confirming the Plan by which you will be bound.

8. **Hearing on Confirmation of the Plan.** A hearing ("Confirmation Hearing") to consider whether the Bankruptcy Court should confirm the Plan will be held at the United States Bankruptcy Court for the District of New Jersey, Courtroom 8, Clarkson S. Fisher US Courthouse, 402 East State Street, Trenton, NJ 08608, on **March 6, 7 and 8, 2019, at 10:00 a.m. (E.T.)**.

9. **Additional Information.** Copies of the Plan, the Disclosure Statement and other materials contained in the Solicitation Package, including a ballot to vote on the Plan, may be obtained by contacting the Debtors' Balloting Agent at either of the addresses listed above; by email at DuroDyne@bmcgroup.com or by visiting www.bmcgroup.com/durodyne.

Copies of the Plan and the Disclosure Statement also may be examined between the hours of 9:00 a.m. and 4:30 p.m. E.T. at the Bankruptcy Court Clerk's office at the Clarkson S. Fisher US Courthouse, 402 East State Street, Trenton, NJ 08608. To the extent any portion of this notice conflicts with the Plan or the Disclosure Statement, the terms of those documents shall control over this notice.

Dated: November 23, 2018

**LOWENSTEIN SANDLER LLP**
By: s/Jeffrey D. Prol, Esq.

AUTOMOBILES | FINANCE

# Smart Headlights Close In on American Roads

A continuously adjusting beam provides better night vision. Europe has used the technology for years.

### Wheels

By ERIC A. TAUB

If you want to see farther at night while driving, there's a simple solution: Never cut your high beams.

Of course, that's a terrible idea. While your lights might brightly illuminate the road ahead, you'll also be blinding every oncoming driver.

Unfortunately, standard American-spec low beams — no matter how bright — typically do not throw light far enough to allow drivers to stop in a hurry.

But there's another solution. A.D.B., or adaptive driving beam headlights, use sensors and cameras to continuously shape a vehicle's high beam so that it illuminates only areas without oncoming traffic, while throwing light elsewhere far down the road. Audi, BMW, Mercedes and Toyota, among others, already offer this type of lighting.

But not in the United States, where A.D.B. lamps are illegal. However, change is on the horizon, although maybe not quite within range of even the high beams. The government is considering a rule to allow these smarter headlights, but it may take as long as two years for it to be approved.

As it stands, the National Highway Traffic Safety Administration mandates that vehicles have distinct high and low beams, disallowing lights that can dynamically adjust.

"Low beams are fundamentally inadequate for the task," said Daniel Stern, the editor in chief of Driving Vision News, a lighting industry website. "Most only help you stop in time if you're going no faster than 35 miles per hour."

Drivers can use their high beams when conditions permit, but few do. According to a study by the Insurance Institute for Highway Safety, only 18 percent of drivers at best used them on a rural road with no oncoming traffic.

To improve their use, some manufacturers offer automatic high beam switching, technology that uses a vehicle's built-in camera to turn on the brights when there's no nearby oncoming traffic. But that still limits the light available when there is.

Automobile companies and car aficionados have been critical of the government's position on adaptive beam headlights for years, urging the National Highway Traffic Safety Administration to move away from what they see as an archaic approach to vehicle lighting.

Last month, supporters of this technology got good news when the agency issued a notice of proposed rule-making that, if approved, would finally allow these headlamps in the United States.

"General Motors is very interested in A.D.B. headlamps," said Michael Larsen, the automaker's exterior lighting technical fellow and chairman of the adaptive driving beam task force for the Society of Automotive Engineers. "Once you try them, you will be immediately converted. A.D.B. lights let you drive with your high beams on all the time."

Adaptive headlamps will be a huge improvement over today's lighting, said Mike Hernandez, the technical manager for safety standards at BMW of North America.

More illumination gives drivers more time to react to dangers on the road, and studies by Rensselaer Polytechnic Institute's Lighting Research Center predicted better safety when adaptive beam headlamps are used.

"We're optimistic," said Stephan Berlitz, Audi's head of lighting innovations. "More light is more sight is more safety."

Two systems are used to produce A.D.B. headlamps. Matrix headlights, such as those from Audi, use multiple LEDs that can be turned on and off in different groups to alter the beam pattern. Other systems use a combination of projector lamps and shades that can cover parts of the beam.

In development are pixel systems that can trim the light point by point, and a laser system that uses micromirrors.

Whichever technology is used, the goal is to shape the light, throwing it a maximum distance while keeping it out of the eyes of oncoming drivers, whether they're in a tractor-trailer or on a motorcycle. Doing so requires sophisticated software, sensors and cameras capable of quickly and accurately detecting oncoming traffic. Much of that gear is already in modern vehicles.

The initial specifications proposed by the National Highway Traffic Safety Administration differ from those that have been in use for years in Europe and elsewhere. In other markets, A.D.B. high-beam lights can put out twice the light intensity currently allowed for high beams in the United States. And the agency wants A.D.B. headlights to also put out a minimum amount of light everywhere, even in the shadow areas where an oncoming driver's eyes might be.

Neither idea is a good one, Mr. Stern said. He pointed out that as long as the light didn't dazzle an oncoming driver, brightness could be safely increased to European standards. And projecting a minimum amount of light in every area could still blind a driver at certain angles.

"It does not make sense to have a high-beam limit with A.D.B. lamps, as there won't be any glare," said Matthew Brumbelow, senior research engineer at the Insurance Institute for Highway Safety. He said his organization would ask the federal highway agency to allow A.D.B. high beams to be brighter.

In anticipation that these headlamps will be approved, Audi already sells vehicles in the United States with "matrix-design" LED lamps that need only a software upgrade to turn on the adaptive beam, Mr. Berlitz said. If the American standards differ from Europe's, new software will have to be written, he said.

While Canada typically follows United States vehicle safety standards, it decided this year to allow A.D.B. headlamps that conform to the European system.

"We're working on activation for Canada cars," Mr. Berlitz said. "When we do it is a marketing decision."

Those interested in commenting on the proposed rule-making can do so until Dec. 11. Most of the comments so far are of the "What took you so long?" variety.

Allowing time to incorporate industry comments and standards modifications, many of the interested parties expect that A.D.B. headlamps won't be legal for 18 to 24 months. Once they are, they should be quickly available.

"Within weeks after they're allowed, they'll be in the market," Mr. Larsen of G.M. said.





The Lexus Adaptive Front Lighting System headlight, above, and a diagram from Audi showing how such headlights can avoid blinding the driver of an oncoming vehicle.

AUDI AG

---

# Goldman Chairman Met Privately With Fugitive Accused in Malaysian Fraud

FROM FIRST BUSINESS PAGE

Abu Dhabi's state energy investment company sued Goldman in New York State Court on Wednesday, accusing bank employees of bribing Abu Dhabi officials.

The 2012 meeting at Goldman headquarters, which took place in mid-December, was one of at least two occasions on which Mr. Blankfein was in a room with Mr. Low, but it was the only time that the Malaysian financier had a personal audience with the Goldman chief executive. Two people familiar with the 2012 meeting said it was a one-on-one sit-down.

A Goldman spokesman, Jake Siewert, said that Mr. Blankfein had a meeting with Mr. Low on Dec. 14, 2012, but that it was also attended by Mohamed Ahmed Badawy Al-Husseiny, who ran an Abu Dhabi investment fund, Aabar. "Mr. Blankfein had an introductory, high-level meeting in December 2012 with the C.E.O. of Aabar, which was an existing client of the firm," Mr. Siewert said. "At Aabar's request, Mr. Low accompanied the C.E.O. to that meeting."

After this article was published online, Mr. Siewert added: "Mr. Blankfein does not recall any one-on-one meeting with Mr. Low, nor have we seen any record to suggest such a meeting occurred."

In the lawsuit filed Wednesday, Mr. Husseiny's former employer accused him of accepting bribes related to 1MDB deals; he was also named in a 2016 civil proceeding that federal prosecutors filed to try to recover some of the money looted in those deals.

Mr. Blankfein's tenure as chief executive ended on Oct. 1, but he remains chairman of the bank's board of directors. He is scheduled to cede that job and to assume an honorary boardroom role effective Jan. 1.

In the three years before the 2012 meeting, the bank's compliance staff had repeatedly rejected Mr. Low as a Goldman client because it was unclear how he had amassed his wealth.

But when Mr. Blankfein's aides sought information about Mr. Low in preparation for the meeting, a senior investment banker in Asia praised Mr. Low and did not mention the compliance concerns, according to a person who has reviewed internal Goldman emails about the meeting.

Nor did the compliance red flags stop the bank from doing extensive business with 1MDB, which Malaysia's prime minister had set up in 2008 ostensibly to invest in infrastructure and other projects to improve Malaysians' daily lives. Goldman ultimately helped 1MDB sell more than $6 billion in bonds to investors, earning about $600 million in fees.

Prosecutors in Malaysia and the United States have accused Mr. Low of looting hundreds of millions of dollars from 1MDB for himself and the friends and family of former Prime Minister Najib Razak. Voters ousted Mr. Najib this year, and Malaysian authorities charged him and his wife with embezzlement. The couple have denied wrongdoing, and through his lawyers, Mr. Low has maintained that he is innocent.

The 1MDB bond deals were arranged in part by a senior Goldman banker in Asia named Tim Leissner. He also facilitated the meeting between Mr. Low and Mr. Blankfein, according to the three people familiar with the meeting.

Mr. Leissner pleaded guilty in August to bribery and money-laundering charges in connection with the 1MDB bond deals.

From the start, Goldman's relationship with 1MDB unsettled some bank employees, according to interviews with current and former Goldman officials and a person involved in government investigations into the bank. They spoke on the condition of anonymity because of the criminal investigation.

Goldman's internal compliance team, known as the business intelligence group, had repeatedly blocked Mr. Low from opening an account with the bank's elite private client group, citing concerns about the source of his money, according to court documents filed by federal prosecutors.

The compliance team also identified Mr. Low as someone Goldman should avoid working with on any 1MDB transactions, according to the court documents.

In March 2012, Goldman agreed to help 1MDB sell $1.75 billion in bonds. The bank stood to collect fees representing about 10 percent of the deal's value. It was a huge win for Goldman as it sought to make inroads in Asia.

"This fund was dodgy from the beginning," said John Pang, who once worked for Mr. Najib's government and was an adviser on a deal that Mr. Leissner and Goldman worked on. "There is no excuse for not knowing this fund had to do with Najib's political patronage and his election plans. This was an open secret."

Mr. Low's name did not appear on the 1MDB bond deal, but Mr. Leissner said in his plea deal that the financier was a key intermediary in negotiating the transaction with Goldman. Mr. Leissner said that he ignored warnings from the bank's compliance team about Mr. Low and that he lied to Goldman officials who asked him whether Mr. Low was involved.

Mr. Leissner and Mr. Low frequently attended events and parties together, including a blowout Las Vegas event in November 2012 where they mingled with supermodels and actors such as Leonardo DiCaprio.

Inside Goldman, some executives were worried about the bank's work on the 1MDB deal. David C. Ryan, who was Mr. Leissner's superior in Asia, voiced concerns that Goldman had landed the lucrative assignment without having to compete against other banks, according to four people familiar with his thinking. The unusual no-bid contract struck Mr. Ryan and other Goldman executives as possibly too good to be true, the people said.

After the first 2012 bond deal was completed, Mr. Ryan argued to colleagues that Goldman should reassess, and potentially end, its relationship with 1MDB, the people said.

But Mr. Leissner was soon pitching his superiors on a second 1MDB bond issuance, which the Malaysian fund again was offering to Goldman exclusively.

The assignment had to be vetted by a pair of internal Goldman committees whose mandates were to ensure that the bank did not get involved in deals that could hurt clients or put the bank and its reputation at risk, according to court documents.

The committees — made up of senior Goldman executives, including Stephen M. Scherr, who is now the bank's chief financial officer — approved the 1MDB transaction. Goldman executives hoped the 1MDB bond deals would pave the way for other business with Malaysia, according to the current and former Goldman employees.

The second bond sale took place in October 2012. Before long, a third was being planned.

Around that time, Mr. Blankfein's staff received a request for a private meeting with Mr. Low. Three years earlier, Mr. Blankfein had attended a meeting with Mr. Low and the prime minister, Mr. Najib, but it was mainly billed as a chance for Mr. Blankfein to meet the government leader and his associates, according to people familiar with the matter. Goldman officials have said it was possible Mr. Blankfein did not interact with Mr. Low at that gathering.

When Mr. Blankfein's aides weighed the request for the 2012 meeting, they went to Mr. Leissner to see if Mr. Low merited an audience with the chief executive, according to the person who reviewed the Goldman emails.

Mr. Leissner vouched for Mr. Low. Days later, Mr. Blankfein and Mr. Low sat down and discussed investment opportunities in Southeast Asia, according to two people familiar with the meeting. The 1MDB fund was not on the agenda, and there is no indication that the men talked about the planned third bond sale.

In March 2013, Goldman was prepared to start work on a third 1MDB deal, this one to raise $3 billion by selling bonds. Mr. Ryan urged his colleagues to postpone it until after an election, in which Mr. Najib was vying for another term as prime minister, according to the people familiar with Mr. Ryan's thinking.

The bond sale went ahead despite Mr. Ryan's objections. It brought Goldman's fees from 1MDB to some $600 million. Mr. Najib was re-elected weeks later.

Mr. Ryan left Goldman in 2014, partly because he was frustrated that his concerns about the 1MDB deals were not heeded, the people said. Mr. Ryan did not respond to requests for comment.

Prosecutors have described Goldman bankers as playing a crucial role in enabling Mr. Low's activities. The Justice Department charged Mr. Leissner and his deputy, Roger Ng, with violating bribery and money-laundering laws. The charging documents, unsealed in federal court on Nov. 1, referred to an unidentified Goldman executive as an unindicted co-conspirator who approved of the alleged bribery. People familiar with the matter said that executive was Andrea Vella, who was Goldman's co-head of Asian investment banking. The bank suspended him the same day that prosecutors unsealed the criminal complaints.

In addition to the Justice Department's investigation, the Federal Reserve is preparing an action against Mr. Leissner, Mr. Ng and Mr. Vella, according to a person familiar with the plans. The New York Department of Financial Services is also investigating, according to a person familiar with the agency's work.

David M. Solomon, who recently succeeded Mr. Blankfein as Goldman's chief executive, sent a voice mail message to all bank employees last week, telling them, "I am personally outraged that any employee of the firm would undertake the actions spelled out in the government's pleadings."

> A financier believed to have masterminded a giant racket.

---



**COMMERCIAL REAL ESTATE BUSINESS OPPORTUNITIES**

**OFFICE SPACE** (100)

Offices—Manhattan 105

5th+Lex Offices, Showrooms, Retail
B/t GRAND CENTRAL & PENN STA.
185 Mad., 353 Lex., 385 5th,
390 5th, 5 W 37th

620 SF to 8,620 SF
Owner Management
212-843-5400 Floor Plans on Website
www.HilsonManagement.com

Office Space-chelsea
W 28th street 6 & 7 ave
5,000 square feet
Natural Sunlight on 3 sides
New windows and floor, freshly painted
Listed by owner 917-217-9761

**COMMERCIAL & INDUSTRIAL PROPERTIES** (300)

Other Areas 385

INVESTMENT PROPERTIES
PORTFOLIO FOR SALE IN MIAMI!
MUST SEE! 41 RESIDENTIAL UNITS
CLOSE TO DOWNTOWN MIAMI & 11
COMMERCIAL RETAIL UNITS IN
HIALEAH FOR SALE.
ARIEL LOPEZ 305-300-0880

---

UNITED STATES BANKRUPTCY COURT, DISTRICT OF NEW JERSEY
In re:
Duro Dyne National Corp., Duro Dye Corp., Chapter 11
Duro Dyne Machinery Corp., Duro Dyne Case No.
Midwest Corp., and Duro Dyne West Corp., 18-27963 (MBK)
Debtors. (Jointly Administered)

**NOTICE OF HEARING ON CONFIRMATION OF PLAN OF REORGANIZATION**

1. **Bankruptcy Case.** On September 7, 2018, Duro Dyne National Corp., et al ("Debtors") petitioned for reorganization under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey ("Bankruptcy Court"). The purpose of the Debtors' chapter 11 reorganization is to resolve all existing and future asbestos-related personal injury and wrongful death claims.

2. **Approval of Disclosure Statement.** On November 20, 2018, the Bankruptcy Court entered an order approving the Second Amended Disclosure Statement ("Disclosure Statement") with respect to the Debtors' Second Amended Plan of Reorganization ("Plan").

3. **Solicitation Materials Distributed to Voting Classes.** The Disclosure Statement, together with copies of the Plan, Ballots and other voting materials, called a "Solicitation Package", has been mailed to known holders of Class 6 (Prepetition Defense-Cost Contributions) and Class 7 (Channeled Asbestos Claims) or their lawyers. You should read all of the documents included in the Solicitation Package for details about how the Plan may affect your rights.

4. **Notices to Non-Voting Classes.** This Notice and a Notice of Non-Voting Status has been mailed to known holders of Class 1, 2, 3, 4, 5, 8, 9, 10, 11 and 12 Claims. If you are a member of a Non-Voting Class, you should read the Solicitation Package for details about how the Plan may affect your rights.

5. **Key Parts of the Plan.** The Plan provides for the establishment of an Asbestos Trust that will resolve and, as appropriate, pay all eligible Channeled Asbestos Claims. The Plan provides for the issuance of an Asbestos Permanent Channeling Injunction that will channel all current and future Asbestos Claims and Demands against the Debtors to the Asbestos Trust, which will assume liability for all Channeled Asbestos Claims and use its assets to resolve and compensate eligible Channeled Asbestos Claims. The Plan also proposes certain releases and exculpations, whereby certain parties would be shielded from liability or exculpated for a variety of claims.

6. **How to Vote on the Plan.** The Bankruptcy Court has issued an order describing who can vote on the Plan and how to vote. The Disclosure Statement contains information that will help you decide how to vote on the Plan if you are entitled to do so. **Your legal rights may be affected if the Plan is confirmed (approved).** Lawyers for holders of Channeled Asbestos Claims may vote on the Plan on behalf of their clients if the lawyers are authorized to do so. If you are unsure whether your lawyer is authorized to vote on your behalf, please contact your lawyer. To be counted, a ballot voting on the Plan must be **actually received** by the Balloting Agent at one of the addresses below by **January 24, 2019 at 4:00 p.m. (E.T.)**. Ballots that are not actually received by that date and time—even if they are postmarked on that date—will not be counted.

Ballots will not be accepted by facsimile or other electronic means, including email.

IF BY REGULAR MAIL: BMC Group, Inc., Attn: Duro Dyne Ballot Processing, PO Box 90100, Los Angeles, CA 90009; IF BY MESSENGER OR OVERNIGHT DELIVERY: BMC Group, Inc., Attn: Duro Dyne Ballot Processing, 3732 West 120th Street, Hawthorne, CA 90250.

7. **Objections to Confirmation of the Plan.** Objections and responses to confirmation of the Plan must (i) be in writing, (ii) set forth in detail the name and address of any party filing the objection, the grounds for the objection, any relevant and specific evidence in support of the objection, and the amount of the objector's claims or such other grounds that give the objector standing to assert the objection, (iii) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, (iv) be filed with the Bankruptcy Court, and (v) served in accordance with the Local Rules upon the following parties so as to be actually received on or before **February 8, 2019 at 4:00 p.m. (E.T.)**: (i) counsel to the Debtors at Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, New Jersey 07068, Attn: Jeffrey D. Prol, Esq.; (ii) counsel to the Asbestos Claimants Committee at Caplin & Drysdale, Chtd., One Thomas Circle, N.W., Suite 1100, Washington, D.C. 20005, Attn: James P. Wehner, Esq.; (iii) the Future Claimants' Representative at Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801 Attn: Edwin J. Harron, Esq., and (iv) the Office of the United States Trustee for the District of New Jersey, One Newark Center, 1085 Raymond Boulevard, Suite 2100, Newark, NJ 07102, Attn: Mitchell Hausman, Esq.. Registered users of the Bankruptcy Court's case filing system must electronically file their objections and responses. All other parties in interest must file their objections and responses in writing with the Clerk of the Bankruptcy Court, Clarkson S. Fisher US Courthouse, 402 East State Street, Trenton, NJ 08608. **If you or your attorney does not file an objection to the Plan, the Bankruptcy Court may consider that you do not object to confirmation of the Plan, and may enter an order confirming the Plan by which you will be bound.**

8. **Hearing on Confirmation of the Plan.** A hearing ("Confirmation Hearing") to consider whether the Bankruptcy Court should confirm the Plan will be held at the United States Bankruptcy Court for the District of New Jersey, Courtroom 8, Clarkson S. Fisher US Courthouse, 402 East State Street, Trenton, NJ 08608, on **March 6, 7 and 8, 2019, at 10:00 a.m. (E.T.)**.

9. **Additional Information.** Copies of the Plan, the Disclosure Statement and other materials contained in the Solicitation Package, including a Ballot to vote on the Plan, may be obtained by contacting the Balloting Agent at either of the addresses listed above; by email at DuroDyne@bmcgroup.com or by visiting www.bmcgroup.com/durodyne. Copies of the Plan and the Disclosure Statement also may be examined between the hours of 9:00 a.m. and 4:30 p.m. E.T. at the Bankruptcy Court Clerk's office at the Clarkson S. Fisher US Courthouse, 402 East State Street, Trenton, NJ 08608. To the extent any portion of this notice conflicts with the Plan or the Disclosure Statement, the terms of those documents shall control over this notice.

Dated: November 23, 2018
LOWENSTEIN SANDLER LLP
Counsel to the Debtors
By: s/ Jeffrey D. Prol, Esq.