Margaret F. Catalano
Christina R. Salem
570 Lexington Avenue – 8th Floor
New York, New York 10022
(212) 252-0004
meg.catalano@kennedyscmk.com
christina.salem@kennedyscmk.com

IFRAH PLLC
George R. Calhoun, V (*pro hac vice*)
1717 Pennsylvania Ave., NW
Washington, D.C. 20006
(202) 525-4147
george@ifrahlaw.com

*Attorneys for The North River Insurance Company*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re: | Chapter 11 |
| DURO DYNE NATIONAL CORP., *et al.*,[1] | Case No. 18-27963 MBK |
| Debtors. | (Jointly Administered) |

JOINT OBJECTION OF CERTAIN INSURERS TO DEBTORS' SECOND AMENDED PLAN
OF REORGANIZATION FOR DURO DYNE NATIONAL CORP., ET AL., UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Duro Dyne National Corp. (4664); Duro Dyne Machinery Corp. (9699); Duro Dyne Corporation (3616); Duro Dyne West Corp. (5943); and Duro Dyne Midwest Corp. (4662).

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..............................................................................................1

ARGUMENT .....................................................................................................................2

I.   The Plan's Classification and Treatment of Insurers' Reimbursement Claims Is Unlawful,
     Precluding Confirmation ...........................................................................................2

     A.    The Plan Cannot Be Confirmed to The Extent It Classifies Insurers' Claims for
           Recovery of Post-Petition Defense Costs and Pre- and Post-Petition Indemnity Costs as
           Class 7 Channeled Asbestos Claims and Not as Class 5 General Unsecured Claims .........3

     B.    Even If Insurers' Claims Are Properly Classified in Class 7, The Plan Cannot Be
           Confirmed Because It Does Not Provide Insurers' Claims with The Same Treatment
           Provided to Other Class 7 Claims ............................................................................7

II.  The Plan Is Not Fair and Equitable ...........................................................................11

III. The Plan's § 524(g) Provisions Violate the Law and Invite Invalid Claims.......................16

     A.    Lack of Adequate Protection............................................................................. 16

     B.    The Plan Fails to Satisfy § 524(g)(2)(B)(i)(III) ..................................................... 19

IV.  The Plan Improperly Purports to Alter Insurers' Rights ...............................................21

V.   The Plan Cannot Be Confirmed Because It Does Not Satisfy The "Best Interests Of
     Creditors" Requirement Of § 1129(A)(7) ..................................................................23

VI.  The Plan Is Not Filed In Good Faith .........................................................................28

     A.    The Plan Violates § 1129(a)(3) .......................................................................... 29

     B.    The Plan Seeks to Evade Review by Redefining Substantial Consummation ..........34

## TABLE OF AUTHORITIES

**Cases**

*Begier v. IRS*, 496 U.S. 53 (1990) ................................................................................................ 7

*Blankenship v. Chamberlain*, 695 F. Supp. 2d 966 (E.D. Mo. 2010) ........................................... 24

*Covanta Onondaga Ltd. v. Onondaga Cnty. Res.*, 318 F.3d 392 (2d Cir. 2003) .......................... 24

*Furness v. Lilienfield*, 35 B.R. 1006 (D. Md. 1983) .................................................................... 33

*In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605 (3d Cir. 2009) ........................................ 31

*In re ACandS, Inc.*, 311 B.R. 36 (Bankr. D. Del. 2004) ............................................................... 31

*In re AOV Indus., Inc.*, 792 F.2d 1140 (D.C. Cir. 1986) ................................................................. 3

*In re Argus Group 1700, Inc.*, 206 B.R. 757 (E.D. Pa. 1997) ...................................................... 33

*In re Armstrong World Indus.*, 432 F.3d 507 (3d Cir. 2005) ........................................................ 12

*In re ASARCO LLC*, 420 B.R. 314 (S.D. Tex. 2009) .................................................................... 27

*In re Capital Center Equities, 144 B.R. 262 (Bankr. E.D. Pa. 1992)* ........................................... 14

*In re Chateauguay Corp.*, 89 F.3d 942 (2d Cir. 1996) ................................................................... 6

*In re Cipparone*, 175 B.R. 643 (Bankr. E.D. Mich. 1994) .......................................................... 15

*In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004) ................................................. passim

*In re Congoleum Corp.*, 362 B.R. 198 (Bankr. D.N.J. 2007) ............................................... passim

*In re Cont'l Airlines*, 91 F.3d 553 (3d Cir. 1996) ........................................................................ 37

*In re Conxus Commc'ns, Inc.*, 262 B.R. 893 (D. Del. 2001) ........................................................ 24

*In re Downtown Investment Club*, 89 B.R. 59 (B.A.P. 9th Cir. 1988) ......................................... 29

*In re Global Indus. Techs., Inc.*, 645 F.3d 201 (3d Cir. 2011) ..................................................... 24

*In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213 (Bankr. D.N.J. 2000) ............................... 31

*In re H & L Developers, Inc.*, 178 B.R. 77 (Bankr. E.D. Pa. 1994) ............................................. 37

*In re H.H. Distributions, L.P.*, 2009 WL 136821 (Bankr. E.D. Pa. Jan. 16, 2009) ...................... 15

# TABLE OF AUTHORITIES

*In re Haskell Dawes, Inc.*, 199 B.R. 867 (Bankr. E.D. Pa. 1996)................................................. 16

*In re HBA East, Inc.*, 87 B.R. 248 (Bankr. E.D.N.Y. 1988) ......................................................... 33

*In re Jersey City Med. Ctr.*, 817 F.3d 1055 (3d Cir. 1987)............................................................. 3

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd sub nom. In re Johns-
    Manville Corp.*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988) ....................................................................................................... 25

*In re Johns-Manville Corp.*, 837 F.2d 89 (2d Cir. 1988)........................................................ 18, 19

*In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721 (2d Cir. 1992) ........................................... 9

*In re Madison Hotel Assocs.*, 749 F.2d 410 (7th Cir. 1984) ........................................................ 31

*In re Martin*, 51 B.R. 490 (Bankr. M.D. Fla. 1985) ...................................................................... 33

*In re New Valley Corp.*, 168 B.R. 73(Bankr. D.N.J. 1994) ........................................................ 31

*In re Oak Park Calabasas Condominium Ass'n*, 302 B.R. 665 (Bankr. C.D. Cal. 2003) ............ 29

*In re One2One Commc'ns, LLC*, 805 F.3d 428 (3d Cir. 2015) .................................................... 37

*In re Plant Insulation Co.*, 734 F.3d 900 (9th Cir. 2013) ...................................................... 21, 22

*In re Pullman Constr. Indus., Inc.*, 107 B.R. 909 (Bankr. N.D. Ill. 1989) .................................. 17

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000)........................................................ 12, 30

*In re Quigley Co.*, 377 B.R. 110 (Bankr. S.D.N.Y. 2007)........................................................ 3, 6

*In re Quigley Co.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010).............................................. 25, 27, 28

*In re Resorts Int'l, Inc.*, 145 B.R. 412 (Bankr. D.N.J. 1990)....................................................... 16

*In re S.A.B.T.C. Townhouse Ass'n, Inc.*, 152 B.R. 1005 (Bankr. M.D. Fla. 1993)...................... 15

*In re Sea Garden Motel and Apts.*, 195 B.R. 294 (Bankr. D.N.J. 1993) ........................ 14, 16, 17

*In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999) ........................................................ 32, 33

*In re Sierra-Cal*, 210 B.R. 168 (Bankr. E.D. Cal. 1997) ............................................................ 25

## TABLE OF AUTHORITIES

*In re Silberkraus*, 253 B.R. 890 (Bankr. C.D. Cal. 2000), *aff'd*, 336 F.3d 864 (9th Cir. 2003)... 31

*In re SportStuff, Inc.*, 430 B.R. 170 (B.A.P. 8th Cir. 2010) .......................................... 20

*In re Sunflower Racing*, 226 B.R. 673 (D. Kan. 1998) ................................................. 24

*In re Torgro Atlantic City, LLC, No. 08-13458, 2009 WL 1288367 (Bankr. D.N.J. May 7, 2009)*

................................................................................................................. 14, 16

*In re Tribune Co.*, 476 B.R. 843 (Bankr. D. Del. 2012) ................................................. 3

*In re Tribune Co.*, 506 B.R. 613 (Bankr. D. Del. 2013) ................................................ 25

*In re Tribune Media Co.*, 799 F.3d 272 (3d Cir. 2015) ................................................. 36

*In re Union Meeting Partners*, 165 B.R. 553 (Bankr. E.D. Pa. 1994) ........................... 29

*In re W.R. Grace & Co.*, 729 F.3d 311 (3d Cir. 2013) .......................................... passim

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154 (3d Cir. 1993)..... 3

*Keyspan Gas East Corp. v Munich Reins. Am., Inc.*, 96 N.E.3d 209 (N.Y. 2018) ...................... 10

*Major's Furniture Mart, Inc. v Castle Credit Corp., Inc.*, 602 F.2d 538 (3d Cir. 1979) ............ 21

*Mercury Capital Corp. v. Milford Connecticut Assocs.*, 354 B.R. 1 (D. Conn. 2006) ................. 28

*Midway Motor Lodge v. Innkeepers' Telemanagement & Equip. Co.*,

54 F.3d 406 (7th Cir. 1995) ........................................................................... 24

*Motor Vehicle Cas. Co. v Thorpe Insulation Co.*,  671 F.3d 980 (9th Cir. 2012) ................. 24, 27

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988) ............................................ 12

*State Farm Fire & Cas. Co. v. Imeri,* 582 N.Y.S.2d 463 (N.Y. App. Div. 1992) ..................... 23

*State-Wide Ins. Co. v. Luna*, 889 N.Y.S.2d 488, 488 (N.Y. App. Div. 2009) ......................... 23

*Thrasher v. United States Liab. Ins. Co.,* 225 N.E.2d 503 (N.Y. 1967) .............................. 23

# TABLE OF AUTHORITIES

**Statutes**

11 U.S.C. § 363 ................................................................................................ 18

11 U.S.C. § 506 ................................................................................................ 17

11 U.S.C. § 524 ........................................................................................... *passim*

11 U.S.C. § 553 ................................................................................................ 17

11 U.S.C. § 1101 ................................................................................. 35, 36, 37

11 U.S.C. § 1112 ................................................................................................ 31

11 U.S.C. § 1122 ........................................................................... 1, 3, 7, 10

11 U.S.C. § 1123 ..................................................................................... 1, 7, 8

11 U.S.C. § 1129 ........................................................................................ *passim*

**Treatises**

4 *Collier on Bankruptcy* ¶ 524.07 (16th ed. 2013) ........................................ 20

7 *Collier on Bankruptcy* ¶ 1129.03[7] (15th ed. rev. 1997) ................... 25, 26

The North River Insurance Company, Federal Insurance Company, and MidStates Reinsurance Corporation, f/k/a Mead Reinsurance Corporation (collectively, the "Insurers") respectfully submit the following objections to explain to the Court why it should decline to confirm the Debtors' Second Amended Plan of Reorganization for Duro Dyne National Corp., *et al.*, Under Chapter 11 of the Bankruptcy Code, Dkt. 278, (the "Plan").

## PRELIMINARY STATEMENT

The Plan presents multiple, serious violations of bankruptcy and non-bankruptcy law that preclude its confirmation by this Court.  Under controlling legal precedent in this Circuit, as well as this Court's own prior rulings, the Plan cannot be confirmed.  The Plan Proponents admittedly filed this Plan to gain "leverage" over insurers.  The structure of the Plan bears out this admission: The Plan proposes to strip insurers of their state law rights and to extinguish insurers' claims without payment.  In contrast, similarly situated unsecured creditors are paid in full, asbestos creditors are treated favorably, and equity holders retain their interests even though senior creditors are not paid in full.  In short, the Plan presents the exact type of effort to use the Bankruptcy Code to gain an unfair litigation advantage that the Third Circuit has disapproved previously.

In addition to failing the good faith standard of § 1129(a), the Plan violates numerous other provisions of the Bankruptcy Code and cannot be confirmed.  To achieve its purpose of prejudicing insurers, the Plan improperly classifies the insurers' claims against the Debtors' estates in violation of § 1122(a).  Similarly, the Plan impermissibly discriminates against insurers' claims in violation of § 1122(a) and 1123(a)(4).  It is not just Insurers' claims that receive improper treatment under the Plan; the Plan impermissibly alters – or otherwise fails to protect – the Insurers' state law rights.  As a result of this improper treatment of the Insurers and their claims, the Plan fails the best interest of creditors test.  Without doubt, Insurers would fare better in a liquidation.

In contrast, the Plan proposes that equity holders retain their interests despite senior creditors not being paid in full. That favorable treatment violates the absolute priority rule. Similarly, the Plan violates § 524(g) because Debtors are not required to make any meaningful contribution of their equity to the proposed Trust. Such favorable treatment for the Debtors and their owners supports the obvious conclusion that the Plan was designed to enable the owners of profitable businesses to use bankruptcy to shed asbestos liabilities and defense costs at the expense of insurers who would not bear that cost in the tort system. The Plan was not proposed in good faith. Based on that lack of good faith and the many violations of the Bankruptcy Code that evidence its improper purpose, the Court should refuse to confirm the Plan.

## **ARGUMENT**

### I.      The Plan's Classification and Treatment of Insurers' Reimbursement Claims Is Unlawful, Precluding Confirmation

The Plan cannot be confirmed because it improperly classifies and treats Insurers' reimbursement claims. First, the Plan improperly classifies Insurers' reimbursement claims in Class 7 along with asbestos personal injury claims, rather than with other general unsecured claims in Class 5. Second, the Plan improperly treats Insurers' reimbursement claims differently than other claims classified in Class 7; while asbestos personal injury claims are eligible for payment by the Trust and also have the right to recover in court, Insurers' reimbursement claims are simply extinguished, with no opportunity for payment.

**A.    The Plan Cannot Be Confirmed to The Extent It Classifies Insurers' Claims for Recovery of Post-Petition Defense Costs and Pre- and Post-Petition Indemnity Costs as Class 7 Channeled Asbestos Claims and Not as Class 5 General Unsecured Claims**

The Plan cannot be confirmed because it classifies Insurers' reimbursement claims in Class 7 along with asbestos personal injury claims, rather than with other general unsecured claims in Class 5.

Under § 1122(a) of the Bankruptcy Code, "a plan may place a claim or an interest in a particular class *only if* such claim or interest is *substantially similar* to the other claims or interests of such class." 11 U.S.C. § 1122(a) (emphasis added).  The Third Circuit stated in *W.R. Grace* that "[t]o determine whether claims are 'substantially similar,' the proper focus is on 'the legal character of the claims as it relates to the assets of the debtor.'" *In re W.R. Grace & Co.*, 729 F.3d 311, 326 (3d Cir. 2013) (quoting *In re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C. Cir. 1986)). *See also In re Congoleum Corp.*, 362 B.R. 198, 203 (Bankr. D.N.J. 2007) ("the foremost consideration in bankruptcy classification 'is the legal character of the claim as it relates to the assets of the debtor'" (quoting *AOV Indus*, 792 F.2d at 1150)).  "[T]he phrase 'substantially similar' reflects 'the legal attributes of the claims, not who holds them.'" *W.R. Grace*, 729 F.3d at 326 (quoting *In re Tribune Co.*, 476 B.R. 843, 855 (Bankr. D. Del. 2012)).  "Claims are similar if they have substantially similar rights to the debtor's assets." *Id.* (quoting *In re Quigley Co.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007)).  The Third Circuit has also stated that a plan's classification scheme will not be upheld if it is unreasonable or arbitrarily designates classes in a manner that "would not serve any legitimate purpose." *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993). *See also In re Jersey City Med. Ctr.*, 817 F.3d 1055, 1061 (3d Cir. 1987) ("the classification of the claims or interests must be reasonable").

Under these standards, Insurers' direct reimbursement claims against the Debtors – particularly their claims for reimbursement of defense costs – cannot properly be classified in Class 7 along with the claims of asbestos claimants.  Instead, Insurers' claims should be in Class 5, along with other general unsecured claims.  *See* Plan § 3.03(e) ("Class 5 shall consist of all General Unsecured Claims") and § 1.01(75) (defining "General Unsecured Claim" as "any Claim . . . to the extent that such Claim is neither secured nor entitled to a priority under applicable law").

Class 7 is comprised of "all Channeled Asbestos Claims," which include, in pertinent part, "any (a) Asbestos Personal Injury Claim, [or] (b) Indirect Trust Claim."  Plan § 1.01(7).  Indirect Trust Claims include

> any Claim, now existing or hereafter arising, that is (a) held by a Non-Settling Asbestos Insurer . . . to the extent based on, arising out of, or attributable to an Asbestos Personal Injury Claim, *and* (b) on account of alleged liability of a Debtor for reimbursement, indemnification, subrogation, or contribution of any portion of any *damages* such Entity has paid or may pay . . . on account of . . . personal injury . . . caused or allegedly caused . . . by asbestos or asbestos-containing products manufactured, supplied, distributed, handled, fabricated, stored, sold, installed, or removed by a Debtor.

Plan § 1.01(79) (emphasis added).

The Plan's classification of Insurers' claims for reimbursement of post-petition defense expenses and pre- and post-petition indemnity expenses in Class 7 is improper for several reasons. First, Insurers' reimbursement claims, which arise from their contractual relationship with Debtors, are not substantially similar to asbestos personal injury claims, which are tort claims. Insurers' claims against the Debtors have been addressed in the pending coverage litigation between Debtors and Insurers.  Both the New York Supreme Court and the Appellate Division have held that Debtors must contribute to both defense costs and indemnity payments on a pro rata basis for injuries occurring during uninsured or self-insured periods and that the Insurers are only liable to pay such expenses due to injury or loss occurring during their policy periods.  Thus,

Insurers' reimbursement claims, consistent with applicable New York law, seek merely to enforce obligations between sophisticated commercial entities within a contractual relationship governed by the parties' insurance policies.  As such, these claims bear little resemblance to the tort claims of asbestos personal injury claimants.  Accordingly, Insurers' claims should not be classified in Class 7 along with asbestos tort claims but should instead be classified as general unsecured claims in Class 5.  *See Congoleum Corp.*, 362 B.R. at 203 ("absent compelling justification, insurer claims should not be separately classified from other unsecured claims").

Second, Insurers' claims for reimbursement of post-petition defense costs do not meet the definitional requirements to be considered Indirect Trust Claims in Class 7.  To be an "Indirect Trust Claim," a claim must seek recovery "on account of alleged liability of a Debtor for reimbursement, indemnification, subrogation, or contribution of any portion of any *damages* such Entity has paid or may pay . . . on account of . . . personal injury . . . caused or allegedly caused . . . by asbestos."  *See* Plan at § 1.01(79) (emphasis added).  Insurers' reimbursement claims for recovery of Debtors' share of post-petition defense expenses do not encompass any payments that would be owed to asbestos personal injury claimants as "damages"; rather, the amounts sought to be reimbursed were paid by Insurers to defense counsel representing Debtors against the asbestos claimants.  Because the Plan's definition of "Indirect Trust Claim" refers only to reimbursement of "damages," and does not include defense expenses, Insurers' claims for reimbursement of defense costs do not fall within Class 7.

Third, apart from the definitional issue, Insurers' claims for reimbursement of amounts they paid to defense counsel cannot be considered claims that are similar in character to asbestos claimants' personal injury claims against Debtors.  Insurers' claims seek recovery of amounts Insurers paid that were in excess of such Insurers' proper ratable shares and are thus rightfully

owed by Debtors to the Insurers.  This is an ordinary commercial debt of the same character as the general unsecured claims in Class 5.

Judge Ferguson of this Court held in *Congoleum*, an asbestos bankruptcy case, that insurer claims like those at issue here should be classified along with general unsecured claims.  There, an insurer-sponsored plan sought to classify insurer claims in a stand-alone class, separate from general unsecured claims.  The insurer claims at issue were not fully defined but were alleged to include, *inter alia*, claims resulting from the insurers' "overpayment of indemnity and defense costs."  *Congoleum Corp.*, 362 B.R. at 203.  The court rejected the proposed stand-alone classification of the insurers' claims, stating: "The legal character of insurer claims *vis a vis* the debtor is that they would be unsecured claims.  As such, absent compelling justification, insurer claims should not be separately classified from other unsecured claims."  *Id.*  The same is true here:  Insurers' claims are substantially similar to, and therefore should be classified as, general unsecured claims, in Class 5.  They are not similar to the asbestos claimants' claims in Class 7 and therefore may not be classified along with them.  *See, e.g.*, *Quigley*, 377 B.R. at 116 ("Dissimilar claims may not be classified together.") (quoting *In re Chateauguay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996)).

The Third Circuit's *W.R. Grace* decision does not permit Insurers' defense reimbursement claims to be classified in Class 7.  There, the court held that because the indemnification and contribution claims asserted by Montana and the Crown were subject to the plan's § 524(g) channeling injunction, those claims could be classified along with asbestos tort claims.  The claims asserted by Montana and the Crown in that case did not include claims for reimbursement of defense costs owed by the debtor, like the Insurers' claims here do.  This is significant because, as noted elsewhere in this brief, the costs of defending against asbestos personal injury claims –

whether incurred by Insurers or the Reorganized Debtor – are not being paid, directly or indirectly, by the Trust. Thus, the portion of Insurers' claims that seek reimbursement of post-petition defense costs cannot lawfully be enjoined under § 524(g)(1)(B) – and, therefore, *W.R. Grace* provides no authority for classifying such claims along with asbestos personal injury claims.

Accordingly, because the Plan improperly classifies Insurers' reimbursement claims in Class 7, instead of in Class 5 (General Unsecured Claims), the Plan cannot be confirmed. Once properly classified in Class 5, Insurers are entitled to payment equal to the full Allowed Amounts of their claims or such other treatment that renders Insurers unimpaired.[2] *See, e.g.*, Plan § 3.03(e)(2). If Plan Proponents no longer want to treat Class 5 as unimpaired once Insurers' claims are reclassified there, they can amend their plan and conduct a resolicitation allowing all Class 5 claimants to cast votes in favor of or against the Plan.

> **B.    Even If Insurers' Claims Are Properly Classified in Class 7, The Plan Cannot Be Confirmed Because It Does Not Provide Insurers' Claims with The Same Treatment Provided to Other Class 7 Claims**

The Third Circuit observed in both *W.R. Grace* and *Combustion Engineering* that "[e]quality of distribution among creditors is a central policy of the Bankruptcy Code." *W.R. Grace*, 729 F.3d at 327 (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239 (3d Cir. 2004) (quoting *Begier v. IRS*, 496 U.S. 53, 58 (1990))). The Bankruptcy Code furthers the policy of "equality of distribution among creditors" by requiring that a plan of reorganization provide similar treatment to similarly situated claims. Several sections of the Code are designed to ensure equal treatment of similarly situated claims. For example:

---

[2] Because Insurers' Claims must be reclassified into Class 5, Debtors must either pay the claims in full or, if they are objected to, must establish a reserve to provide for the payment of such claims in full.

- Section 1122(a) requires that plans of reorganization classify only "substantially similar" claims together;

- Section 1123(a)(4) requires that a plan of reorganization "provide the same treatment for each claim or interest of a particular class;" and

- Section 524(g)(2)(B)(ii)(V) requires that present claims and future demands that are channeled to an asbestos trust be paid "in substantially the same manner."

As the Third Circuit explained in *W.R. Grace*, the "same treatment" requirement in § 1123(a)(4) means "that all claimants in a class must have 'the same opportunity' for recovery." *Id.* "What matters, then, is not that claimants recover the same amount but that they have equal opportunity to recover on their claims." *Id.*

The Plan fails to meet these requirements. The Plan not only fails to give Insurers "equal opportunity to recover on their claims," it actually provides Insurers *no opportunity* to recover on their claims even though other claims classified in Class 7 do have the chance to recover on their claims. Specifically, while the Plan provides that Class 7 asbestos personal injury claims can obtain payments from the Trust and also obtain recoveries in court, Debtors acknowledge that "Asbestos Insurers will not receive any payment or distribution from the Asbestos Trust on account of such claims…" Disclosure Statement at 17. The Plan also enjoins Insurers from seeking to recover on their reimbursement claims in court. Because the Plan bars any recovery by Insurers on their reimbursement claims in Class 7, the actual effect of the Plan is to extinguish Insurers' valid claims – even as other Class 7 claims have the opportunity to seek payment from the Trust or in court. This treatment is a textbook example of prohibited disparate treatment.

Plan Proponents cannot justify their extinguishment of Insurers' Class 7 claims on the basis that the Plan provides that certain asbestos personal injury claimants who fail to satisfy the necessary medical or exposure criteria in the TDP will not be paid. In the case of asbestos

claimants, this requirement simply means that claimants who fail to prove that they have a valid underlying claim will not be paid by the Trust. But all asbestos claimants have the same right to prove their entitlement to a recovery. *See, e.g.*, *W.R. Grace*, 729 F.3d at 327 (citing, with approval, *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 749 (2d Cir. 1992), where the court held that "'[a]sbestos health claimants would receive the 'same treatment' if they all were permitted to present their claims to a jury and were all paid whatever amounts the jury awarded, until funds were no longer available'"). That treatment is completely unlike the treatment given the Insurers' claims, which are treated as *per se* invalid simply because Plan Proponents do not want to pay Insurers' claims. Moreover, the TDPs grant the Trustee broad discretion to pay asbestos personal injury claims that do not meet the stated criteria. Under the TDPs, the Trustee has discretion to change or eliminate the Medical/Exposure Criteria, to pay asbestos claims that do not meet those criteria,[3] or to pay asbestos claims lacking medical evidence.[4] Thus, even asbestos personal injury claimants with the weakest of claims will have an opportunity to receive a distribution from the Trust, while Insurers are guaranteed to be paid nothing on their valid claims.

In addition to pursuing a trust recovery, asbestos claimants can also pursue their claims against the Reorganized Debtor in the tort system in order to seek a recovery from the Debtors' non-settled insurers. Plan §§ 4.13, 4.14. Insurers do not have the same opportunity with respect to their claims.

---

[3] TDPs § 5.3(a)(3) ("with the consent of the TAC and FCR, the Trustee may . . . change, or eliminate Disease Levels, Scheduled Values or Medical/Exposure Criteria . . . or determine that a novel or exceptional asbestos personal injury claim is compensable even though it does not meet the Medical/Exposure Criteria for any of the then-current Disease Levels").

[4] TDPs § 5.6(a)(4) ("The Trustee, with the consent of the TAC and FCR, may exempt claimants from the obligation to submit medical evidence or certain types of medical evidence").

There is, of course, no legal requirement that invalid claims be paid.  Thus, in *W.R. Grace*, the Third Circuit upheld a plan that provided that *invalid* indirect asbestos claims would not be paid.  "But," the court noted, "the only indirect claims that will not be paid based on that provision are those for which Grace has no underlying liability."  *W.R. Grace*, 729 F.3d at 328.  Here, Insurers' reimbursement claims have not been disallowed and thus the Plan must provide for them to be paid, like other claims classified in Class 7.  The Plan cannot simply refuse to pay Insurers' valid Class 7 claims while providing that other claims in the same class can be paid.

Because the Plan denies Insurers any opportunity to recover on their claims, Insurers' claims cannot be enjoined under § 524(g).  Section 524(g)(1)(B) allows a court to enter an injunction channeling asbestos claims that are to be "paid in whole or in part by [the] trust."  But the Plan is clear that Insurers' Class 7 claims will in fact not be paid by the Trust, in whole or in part.  Insurers' claims cannot simply be enjoined without payment; because the Plan purports to do just that, it cannot be confirmed.

As discussed elsewhere in these objections, the failure to pay Insurers' claims means that the Plan also violates the best interest test of § 1129(a)(7) and the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B) because while Insurers' valid reimbursement claims would be wiped out without compensation, equity holders are retaining their existing interests in the Debtors (*see* Plan §§ 3.03(k) and 3.03(l), specifying the treatment of such equity interests).  Finally, the failure to make any distribution to Insurers' on account of their reimbursement claims also violates the law of the case as decided by the coverage court in the New York State Action and applicable New York law as reflected in *Keyspan Gas East Corp. v Munich Reins. Am., Inc.*, 96 N.E.3d 209 (N.Y. 2018), because it has the effect of negating Debtors' undoubted legal obligation to pay their pro rata share of defense and indemnity expenses.

In sum, because the Plan improperly classifies Insurers' reimbursement claims in Class 7 instead of Class 5, §§ 1129(a)(1) and 1122(a) preclude confirmation of the Plan.   Further, because the Plan purports to extinguish Insurers' valid reimbursement claims while allowing equity holders to retain their interests, the Plan violates, *inter alia*, §§ 524(g)(1)(B), 1129(a)(1), and 1129(a)(7), and cannot be confirmed.

## II.       The Plan Is Not Fair and Equitable

Pursuant to 11 U.S.C. § 1129(b), the Plan may only be confirmed over the vote of a dissenting class if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." *Id.* The Plan is not fair and equitable because it violates the absolute priority rule and because it fails to preserve insurers' setoff rights.   Codified at § 1129(b)(2) of the Bankruptcy Code, the absolute priority rule requires that creditors be paid in full before holders of equity receive any distribution.   The Code provides, in pertinent part:

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
> * * *
> (B) With respect to a class of unsecured claims—
> * * *
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

*See* 11 U.S.C. § 1129(b)(2).   In other words, a plan is not fair and equitable if a junior class receives a distribution over the objection of an impaired rejecting senior class. *See In re Armstrong World Indus.*, 432 F.3d 507, 513 (3d Cir. 2005); *In re PWS Holding Corp.*, 228 F.3d 224, 237 (3d Cir. 2000).   The Plan violates § 1129(b)(2) and cannot be confirmed.

Hartford and North River are both creditors in Class 6, which is impaired and which voted 100% to reject the proposed Plan.[5]  *See* January 30, 2019 Balloting Report.  Yet, the Plan provides that the equity holders in Duro Dyne National Corp. will retain their interests "to the same extent" as their interests on the petition date.  *See* Plan § 3.03(k)(ii) (defining Class 11 equity interests). Because equity holders are retaining their interests over the dissent of an impaired class, the Plan is not fair and equitable, and this Court cannot confirm it.[6]

Because the Plan violates the absolute priority rule, Certain Insurers anticipate that the Plan Proponents will attempt to rely on the so-called "new value" exception to the absolute priority rule. The Court should decline that invitation.

The plain text of the Bankruptcy Code never mentions such an exception, and neither the Supreme Court nor the Third Circuit has ever held that such an exception exists.  In the absence of such a ruling, this Court should decline to assume that an appellate court would create such an exception, particularly when the Plan Proponents can easily correct this deficiency in the Plan, for example, by paying Class 6 claims in full.

But even if the "new value" exception were potentially available in an appropriate case, its application would not be warranted here.  The courts recognizing such an exception have held that the exception is warranted because, in some circumstances, an injection of new money is essential

---

[5] Moreover, if claims were properly valued for voting purposes as requested in North River's Motion for Temporary Allowance of its Claims for Voting Purposes, Dkt. 368, Insurers also would have caused Class 7 to vote against the Plan.  Alternatively, if Insurers' claims were placed in Class 5 or in their own class, they also would have caused those classes to reject the Plan assuming the Debtors no longer proposed to pay Class 5 in full.  In any case, at least one impaired class has rejected the Plan.  But for the Debtors' gerrymandering, no impaired class would have accepted the Plan.

[6] Also, if Insurers' Class 7 claims were reclassified to Class 5, as discussed above, that class would also reject the Plan (unless Debtors chose to maintain Class 5 as a class of unimpaired class whose claims are paid in full).

to the success of the reorganized business, which otherwise might fail. *See, e.g.*, *In re Sea Garden Motel and Apts.*, 195 B.R. 294, 301 (Bankr. D.N.J. 1993). That is not the case here. On the contrary, Debtors' Disclosure Statement, Plan, and financial statements make clear that Debtors are operating a profitable business which, but for its desire to escape its share of defense and indemnity costs, would never have filed these bankruptcy cases. If Debtors' Plan is confirmed, the Reorganized Debtor intends to continue these profitable business operations. *See, e.g.*, Plan § 5.02. There is no need for an additional infusion of capital as was necessary in the limited circumstances where other courts found that applying the "new value" exception was warranted.

Nor are there any other considerations that support applying a "new value" exception. Even in cases where new money is essential, courts have recognized that "new value" may not be used as a means to bypass the absolute priority rule. Consequently, those courts have applied strict requirements, including that the new value contribution must be (1) necessary to the reorganization; (2) in the form of money or money's worth; and (3) reasonably equivalent to the interest retained; (4) substantial; and (5) proffered by the debtor at the outset, *i.e.*, "'up front.'" *See Sea Garden*, 195 B.R. at 301 (quoting *In re Capital Center Equities*, 144 B.R. 262, 268 (Bankr. E.D. Pa. 1992)); *see also In re Torgro Atlantic City, LLC*, 2009 WL 1288367, at *14 (Bankr. D.N.J. May 7, 2009).

Here, the equity holders – the Hinden family and their related interests – are proposing to contribute $3,000,000 as "new value" (the "Hinden Contribution"), which will go to the Trust, not the Reorganized Debtor, in any event. *See* Plan § 1.01(76).[7] That contribution does not meet the *Sea Garden* criteria in several respects.

---

[7] The Debtors' separate contributions under the Plan are irrelevant to the new value analysis, as are any potential post-consummation payments from the Reorganized Debtor. It is well-established that any new value exception to the absolute priority rule will only apply "where the

First, the Hinden Contribution is not "essential to the reorganization" of the debtors. Cash infusions from equity holders have been found to be necessary to the reorganization when the contributions: (1) "will fund repairs or improvements to the debtor's property necessary to the reorganization" or (2) "are necessary to enable the debtor to make payments due under the plan and continue operating." *See, e.g.*, *In re H.H. Distributions, L.P.,* 2009 WL 136821, at *5 (Bankr. E.D. Pa. Jan. 16, 2009).

Neither circumstance is present here. As noted above, there is no dispute that debtors have a business that can be reorganized with no additional infusion of capital. Nor is the Hinden Contribution being used to help Debtors reorganize their business or fund improvements to it; it is being paid entirely to the Trust that will be used to pay asbestos claims. *See* Plan § 1.01(22). It is, by definition, not "essential" to any reorganization or to the successful operation of the Reorganized Debtor.

Second, the proposed Hinden Contribution is not reasonably equivalent to the equity interests that the Hinden family would retain under the Plan. Courts generally require the proponent of the "new value" exception to show that a contribution is equivalent by offering a qualified valuation of the business, typically in the form of an earnings projection, discounted to net present value to show the value of equity. *See, e.g.*, *In re Torgro Atlantic City, LLC*, No. 08-13458, 2009 WL 1288367, at *16 (Bankr. D.N.J. May 5, 2009); *In re Haskell Dawes, Inc.*, 199 B.R. 867, 877–79 (Bankr. E.D. Pa. 1996) ("The generally accepted method for establishing enterprise value is the capitalization of future earnings," which "entails an earnings projection

---

infusion of capital comes from an 'outside' source." *See, e.g.*, *In re Cipparone*, 175 B.R. 643, 645 (Bankr. E.D. Mich. 1994); *see also In re S.A.B.T.C. Townhouse Ass'n, Inc*., 152 B.R. 1005, 1010 (Bankr. M.D. Fla. 1993) ("the existing equity holders must contribute something to the Debtor that does not already belong to the Debtor or to which the Debtor is not already entitled").

discounted to present value on the basis of a capitalization rate that reflects the expected annual rate of return that investors would require on an investment of comparable risk."). Plan Proponents have failed to demonstrate that the Hinden Contribution is commensurate with the retained equity (100%) in the Reorganized Debtor.

Indeed, it is difficult to see how such a showing could be made. Debtors' own financial projections forecast profits in excess of $4 million each year for at least the next four years beginning in 2019. *See* Second Am. Disclosure Statement of Duro Dyne Corporation, Dkt. 278, at 99 (Oct. 29, 2018) ("Duro Dyne Corp. and Subsidiaries, Consolidated Financial Projections, 2018–2022. A $3 million contribution is not an equivalent exchange for a 100% equity interest in that projected stream of profits.

Third, the Hinden Contribution is not "substantial," as Courts have interpreted that term in the context of new value. In the new value context, courts have looked to equity holders' contribution relative to the amount of pre-petition debt that is discharged under the plan. *See, e.g.*, *Sea Garden*, 195 B.R. at 302; *In re Resorts Int'l, Inc.*, 145 B.R. 412, 483 (Bankr. D.N.J. 1990) ("a court must compare the contribution to the total prepetition claims and the amount of the debt to be discharged under the Plan.").

Here, that comparison shows that the Hinden Contribution fails. The balloting report shows that more than $83 million in estimated asbestos claims have voted in favor of the plan. *See* Jan. 30, 2019 Ballot Report. Plan Proponents maintain that all of these claimants may have legitimate claims and should be counted. In contrast, the Hinden Contribution proposes to pay $3 million – less than 5% of the estimated asbestos liability alone – while Class 11 retains 100% of their equity in the Reorganized Debtor. No court has found that such a proportion constitutes "new value" sufficient to overcome the absolute priority rule.

Finally, courts applying the new value exception have looked to the proposed plan to determine whether the impaired creditors will benefit from the proposed infusion of capital, or whether the equity is intended to benefit only the proposed shareholders. *See e.g.*, *In re Sea Garden*, 195 B.R. at 302; *In re Pullman Constr. Indus., Inc.*, 107 B.R. 909, 950 (Bankr. N.D. Ill. 1989)). Here, of course, the impaired Class 6 creditors – Hartford and North River – will see no benefit at all from the proposed "infusion" of capital, as it will be contributed to the Trust, exclusively for the purpose of paying Class 7 claim holders (excluding Hartford, Federal, and North River). None of the relevant considerations, in other words, support applying a "new value" exception here, and the Court should apply the absolute priority rule according to its terms.

The Plan also violates § 1129(b) and is not fair and equitable with respect to Insurers' claims because it purports to strip Insurers of their setoff rights. Setoff rights are treated as secured claims under the Bankruptcy Code. *See* 11 U.S.C. §§ 553, 506. Section 1129(b) provides that a plan is fair and equitable with respect to such claims if it provides the class with the "indubitable equivalent" of its claims. The Plan expressly seeks to eliminate these setoff rights.[8] *See* Plan § 9.05(a)(iv). Because the Plan does not preserve those rights, the Plan cannot be confirmed.

## III.    The Plan's § 524(g) Provisions Violate the Law and Invite Invalid Claims

### A.    Lack of Adequate Protection

A plan of reorganization can only be confirmed if it complies with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). Under the Bankruptcy Code, property of the estate may not be used or sold without providing adequate protection to entities with an interest in the property. *See* 11 U.S.C. § 363(e). The adequate protection requirement is generally satisfied

---

[8] The Plan's efforts to strip insurers' setoff rights further demonstrates the improper classification and disparate treatment of Insurers' Class 7 Claims. No other creditors in Class 7 have such setoff rights. Rather than preserve them, the Plan Proponents expressly seek to abrogate those rights.

if an entity's interest in estate property attaches to the proceeds from the sale or use of the property.

*See In re Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition.").

The same is true when property of the estate is transferred to an asbestos trust pursuant to § 524(g): claims or interests against property of the estate can only be enjoined if they have recourse against the trust.  This conclusion is clear from the plain language of the statute:

> An injunction may be issued under subparagraph (A) to enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, *is to be paid in whole or in part by a trust . . . .*

11 U.S.C. § 524(g)(1)(B) (emphasis added).  The Second Circuit's *Johns-Manville* decision, which was effectively codified by § 524(g), made this conclusion express:

> Even if we assume that MacArthur could show that it has a valid claim against the insurers, MacArthur is not left without a remedy: It may proceed in the Bankruptcy Court against the $770 million settlement fund. It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition.

*Johns-Manville Corp.*, 837 F.2d at 94; *see also In re W.R. Grace & Co.*, 729 F.3d 311, 330–32 (3d Cir. 2013) (injunction of indemnity and contribution claims proper where claims were to be paid from trust).

The Plan asserts that Insurers have interests in each other's policies in the form of contribution rights.  *See* Plan § 1.01(12) (defining "Asbestos Insurance Policy Claim" to include claims for "contribution, reimbursement, indemnity or subrogation").  The Plan provides injunctive protections under § 524(g) to any insurer that settles with the Trust, thereby extinguishing claims of non-settling insurers against a settling insurer.  *See id.* § 9.05 (enjoining

any entity from "asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind against any obligation due any Protected Party"). Thus, under the Plan, insurers may not pursue the Debtor, settling insurers, or the Trust, for any of their claims arising under state law.

The Plan does contain a so-called "judgment-reduction" mechanism. It provides that to the extent a non-settling insurer has a contribution claim against a settling asbestos insurer that it could have asserted but for the Plan's channeling injunction, "the liability, if any, of the Non-Settling Asbestos Insurer to the Channeled Asbestos Claimant shall be reduced dollar-for-dollar by the amount, if any, of the judgment establishing the Contribution Claims in accordance with Section 4.14(b)." *Id.* § 4.14(a). But even if that judgment-reduction mechanism provided adequate protection with respect to the Insurers' rights to reimbursement with respect to indemnity obligations, it provides no adequate protection with respect to the Insurers' right to reimbursement for defense obligations, which typically exceed indemnity obligations. The Insurers' rights can be adequately protected only if non-settling insurers have the right to reimbursement from the Trust for that Insurer's incurrence of defense obligations that would otherwise have been borne by a third party. *Cf. In re SportStuff, Inc.*, 430 B.R. 170, 179 (B.A.P. 8th Cir. 2010) (holding that bankruptcy court erred in extinguishing contribution claims of non-settling insurers in connection with settlement under Rule 9019 but suggesting that such relief would be permissible under § 363 *if the non-settling insurers have the right to seek full contribution from the sale proceeds*). Because the Plan does not so provide, it cannot be confirmed.

18

## B.    The Plan Fails to Satisfy § 524(g)(2)(B)(i)(III) Because The Trust Will Not Obtain A Controlling Interest In The Reorganized Debtors

A plan providing for a § 524(g) trust and channeling injunction must provide for the trust to "own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares" of "each such debtor," "the parent corporation of each such debtor," or "a subsidiary of each such debtor that is also a debtor." 11 U.S.C. § 524(g)(2)(B)(i)(III). "This provision is to ensure that, if there are not sufficient funds in the trust otherwise, the trust may obtain control of the debtor company." 4 *Collier on Bankruptcy* ¶ 524.07 (16th ed. 2013).

Here, the Plan does not grant the Trust, upon the effective date, ownership of any equity in the Reorganized Debtors or any related entity (let alone a majority of the voting shares). The Plan's compliance with the control requirement therefore is completely dependent on the occurrence of a "specified contingency." To satisfy the "specified contingency" the Plan requires that the Debtors provide the Trust with the "Trust Note." *See* Plan § 1.01(123). Under the Plan, the Trust theoretically could own 50.1% of the Reorganized Debtors' voting shares in the event of a payment default on the Trust Note. But that possibility is illusory and cannot satisfy the statutory standard. In the unlikely event that a payment default on the Trust Note does occur – meaning that the Reorganized Debtors cannot pay it – the shares the Trust would be entitled to receive will be worthless. The Trust Note is a debt obligation of the Reorganized Debtors senior to their equity. If the Reorganized Debtors cannot pay the Trust Note – and thus do not have the financial wherewithal to pay their debt obligations – they will be insolvent. The Reorganized Debtors' equity would therefore be inconsequential.[9]

---

[9] In the unlikely event that the Reorganized Debtors were to default on the Trust Note while having any meaningful equity value, the Trust still would not become entitled to own *a majority* of the

For these reasons, courts have found similar note-default provisions insufficient to satisfy § 524(g)(2)(B)(i)(III).  *See Congoleum Corp.*, 362 B.R. at 179 (plan providing that trust would not be granted immediate majority ownership but would instead receive promissory note from debtors that, upon the debtors' continuing default, could be converted to 51% of the debtors' shares did not satisfy § 524(g)(2)(B)(i)(III) because there was no plausible scenario in which a trust would be able to convert shares when they were still valuable, so trust would obtain control of the debtors only when control was not meaningful); *see also In re Plant Insulation Co.*, 734 F.3d 900, 916 (9th Cir. 2013).  The *Congoleum* court explained that if the reorganized debtor were to "default on such insignificant payments, it is essentially insolvent, making the value of the shares negligible . . . . This cannot be the kind of contingency Congress envisioned when it drafted § 524(g)(2)(B)(i)(III)."

The Ninth Circuit in *Plant* similarly explained:

> The history of § 524(g) also suggests that this subsection is not to be lightly discarded.  In the model Johns-Manville bankruptcy, the trust came out of the bankruptcy with 80% of Johns-Manville's common stock.  *In re Johns-Manville Corp.*, 68 B.R. 618, 621 (Bankr. S.D.N.Y. 1986).  Indeed, taking less than 100% of the common stock was viewed as a "significant concession" by the Asbestos Health Committee at the time.  *In re Johns-Manville Corp.*, 66 B.R. 517, 529–30 (Bankr.

---

voting shares.  The Trust would be able to obtain only so much stock as was necessary to satisfy the outstanding obligations under the Note. This is black-letter law under the Uniform Commercial Code ("UCC"): a foreclosing creditor is entitled only to satisfaction of its debt and is liable to the debtor for any surplus.  *See* UCC § 9-608(a) ("If a security interest ... secures payment or performance of an obligation, the following rules apply: . . . (4) A secured party shall account to and pay a debtor for any surplus, and the obligor is liable for any deficiency . . . .").  The UCC also makes clear that an oversecured creditor can keep all of the collateral only if the debtor consents after the default occurs.  A debtor's consent given prior to a default is invalid.  *See* UCC § 9-620(c)(2) ("a debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default . . . ").  These provisions of the UCC are non-waivable.  *See* UCC § 9-602; *Major's Furniture Mart, Inc. v Castle Credit Corp., Inc.*, 602 F.2d 538, 542 (3d Cir. 1979) (secured creditor "was obligated to account for and pay over the surplus proceeds to [the debtor] . . . as a debtor's right to surplus . . . cannot be waived even by an express agreement").

> S.D.N.Y. 1986).  It strains credulity to believe that, against this backdrop, Congress
> would have drafted such a toothless provision.

734 F.3d at 916.  The reasoning of those courts applies with equal force here.  The possibility of

the Trust ever acquiring a majority of the voting shares of the Reorganized Debtors is illusory; the

Plan therefore does not satisfy § 524(g)(2)(B)(i)(III) and cannot be confirmed.

## IV.   The Plan Improperly Purports to Alter Insurers' Rights

Section 4.07 of the proposed Plan violates 11 U.S.C. § 1129(a)(3).  This section of the Plan

provides that, after assignment of insurance policies to the Trust, the Trust shall have "the

exclusive right to enforce any and all of the Asbestos Insurance Rights against any Entity, and the

Proceeds of the recoveries of any such Asbestos Insurance Rights shall be the property of, and

shall be deposited in, the Asbestos Trust.  The Asbestos Insurance Rights shall be vested in the

Asbestos Trust free and clear of all Liens, encumbrances, interests, claims and causes of action of

any Entity."  Plan § 4.07.  Under applicable state law, and the insurers' policies, coverage exists

only to indemnify against judgments and reasonable settlements with the insurers' consent, and

only after a final judgment finding that such coverage exists.  By attempting to transfer the policy

rights without the Insurers' consent, Debtors are attempting to change the entity that the Insurers

are required to indemnify to one that has, as its beneficial owner, the very Asbestos Claimants that

are adverse to Debtors, and thus to the Insurers.  To the extent that this provision purports to

deprive the Insurers of any interest, claims, and/or causes of action under the policies, it improperly

expands the rights to coverage under such insurance policies pursuant to the assignment.

Section 4.13 of the Plan purports to abrogate the Debtors' obligation to cooperate in the

defense of asbestos claims.  It provides, in part:

> The Reorganized Debtor shall have no obligation to defend or otherwise appear or
> incur any costs or expenses in connection with any action brought under this
> Section 4.13, and any liability of the Reorganized Debtor to any Entity, including
> any Channeled Asbestos Claimant or Asbestos Insurer, that is based on, arises from,

or is attributable to any action commenced pursuant to this Section 4.13 shall be enforceable only against the Asbestos Insurance Coverage provided by Non-Settling Asbestos Insurers . . . .

Pursuant to this language, Insurers' claims arising out of the Debtors' share of defense or indemnity costs would be borne by the Insurers themselves. Nothing in the Bankruptcy Code authorizes this Court to rewrite the Debtors' insurance contracts to eliminate the Debtors' cooperation obligations. If the Debtors choose not to participate in the defense of claims, the consequence under binding state law would be abrogation of coverage for any such claim. *See, e.g.*, *Thrasher v. United States Liab. Ins. Co.*, 225 N.E.2d 503, 508 (N.Y. 1967) (holding that when an insured deliberately fails to cooperate with its insurer in the investigation of a covered incident as required by the policy, the insurer may disclaim coverage under the cooperation condition of an insurance policy); *State-Wide Ins. Co. v. Luna*, 889 N.Y.S.2d 488, 488 (N.Y. App. Div. 2009) (same); *State Farm Fire & Cas. Co. v. Imeri*, 582 N.Y.S.2d 463, 464–65 (N.Y. App. Div. 1992) (same).

Moreover, these provisions are tantamount to seeking a declaration concerning the rights and obligations of the parties with respect to insurance policies in the context of a confirmation hearing. Bankruptcy courts have consistently recognized that state court coverage actions, or minimally an adversary proceeding, is the appropriate forum for resolution of declaratory claims. *See, e.g.*, *In re Congoleum*, No. 03-51524-KCF, Dkt. 497 (Bankr. D.N.J. 2004); *In re Conxus Commc'ns, Inc.*, 262 B.R. 893, 900 (D. Del. 2001) (bankruptcy court lacks authority to enjoin contract counterparty from exercising rights after post-confirmation breach); *In re Sunflower Racing*, 226 B.R. 673, 694 (D. Kan. 1998) (bankruptcy courts lack equitable power to determine contract rights in context of confirmation hearing). Nor can the bankruptcy court dictate the prospective and preclusive effect that its findings will have to bind future courts in ruling on

coverage issues. *See, e.g.*, *Covanta Onondaga Ltd. v. Onondaga Cnty. Res.*, 318 F.3d 392, 397–98 (2d Cir. 2003) ("the first court does not get to dictate to other courts the preclusion consequences of its own judgment"); *Blankenship v. Chamberlain*, 695 F. Supp. 2d 966, 974 (E.D. Mo. 2010); *Midway Motor Lodge v. Innkeepers' Telemanagement & Equip. Co.*, 54 F.3d 406, 409 (7th Cir. 1995). These principles apply in full to bankruptcy court rulings.[10] The Court, therefore, should refuse to confirm a plan that purports to dictate the effect of confirmation on the rights of insurers to assert claims and/or defenses under their respective policies.

## V.    The Plan Cannot Be Confirmed Because It Does Not Satisfy The "Best Interests Of Creditors" Requirement Of § 1129(A)(7)

Section 1129(a)(7) requires Plan Proponents to show that those Insurers who are creditors of the estate will fare at least as well under the Plan as they would if this case were converted to a case under Chapter 7. This requirement, known as the "best interest of creditors test," is a cornerstone of the theoretical underpinnings of Chapter 11. *See, e.g.*, *In re Tribune Co.*, 506 B.R. 613, 617 (Bankr. D. Del. 2013); 7 *Collier on Bankruptcy* ¶ 1129.03[7] (15th ed. rev. 1997) (The "best interest" test stands as an "individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation."). Specifically, § 1129(a)(7) requires:

> With respect to each impaired class of claims or interests – each holder of a claim or interest of such class – has (i) has accepted the plan or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

---

[10] The Third Circuit has rebuffed efforts by plan proponents to escape insurer objections where that plan purports to have some impact on insurers' contracts (*e.g.*, that the plan was not "insurance neutral"). *See In re Global Indus. Techs., Inc.*, 645 F.3d 201, 212–15 (3d Cir. 2011) (*en banc*); *see also Motor Vehicle Cas. Co. v Thorpe Insulation Co*., 671 F.3d 980 (9th Cir. 2012).

As the bankruptcy court held in *Johns-Manville*, where acceptance of the plan by an impaired class is not unanimous, the plan "must provide each holder of a claim or interest with an amount equal to or greater than the amount he or she would receive under chapter 7, in order to comply with [§ 1129(a)(7)]." *In re Johns-Manville Corp.*, 68 B.R. 618, 633 (Bankr. S.D.N.Y. 1986), *aff'd In re Johns-Manville Corp.*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *see also* 7 *Collier on Bankruptcy* ¶ 1129.03[7], at 1129-45 (15th ed. rev. 2004) (explaining that the test "is an individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation"). Section 1129(a)(7) is designed to protect individual dissenting members of an impaired class, establishing the minimum that they must receive or retain under the plan. *See, e.g.*, *In re Quigley Co., Inc.*, 437 B.R. 102, 144 (Bankr. S.D.N.Y. 2010). The "best interests" test applies even to contingent and disputed claims not allowed to vote on the plan, and gives creditors who did not vote to accept the plan a "pocket veto" to prevent confirmation. *In re Sierra-Cal*, 210 B.R. 168, 172, 176 (Bankr. E.D. Cal. 1997) ("[i]f a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization."). The best interests test reflects one of the foundational precepts of Chapter 11: the debtor's various constituencies are free to negotiate and formulate a plan of reorganization via the structures of Chapter 11, but the final product of this process may not deprive any objecting creditor of the amount it would receive upon liquidation of the debtor without the objecting creditor's consent. 7 *Collier on Bankruptcy* ¶ 1129.03[7][b], at 1129-45–1129-46 (15th ed. Rev. 2004).

24

The Plan does not satisfy the "best interests" test as to those Insurers who voted against the Plan as Class 7 creditors.[11]  The Plan proposes to pay those Insurers nothing on their claims, regardless of the amount of such claims, offset rights, or the Insurers' entitlement to payment.  If Debtors were to liquidate under a Chapter 7, the Insurers' claims would be entitled to at least some pro rata payment based on the liquidated assets of the Debtors.[12]  Axiomatically, a plan that makes Insurers' claims ineligible even to be considered for payment violates the best interests test.

In addition, if this case were converted to Chapter 7, the Court would be unable to issue a § 524(g) channeling injunction, because such an injunction may only be issued in connection with a confirmed Chapter 11 plan of reorganization.  *See, e.g.*, *Combustion Eng'g*, 391 F.3d at 234 n.46.  In the absence of a § 524(g) channeling injunction, Insurers would be free to pursue contribution claims against Settling Asbestos Insurers to the full extent allowed by law.

As discussed below, the Plan does make certain accommodations for Insurers' contribution rights, including allowing judgment reduction in certain limited circumstances.  The Plan's treatment of Insurers' contribution rights is, however, woefully inadequate.  Specifically, where judgment reduction is not adequate to compensate Insurers for their enjoined contribution rights, the Plan does not recognize Insurers' right – recognized in two other § 524(g) cases, *Thorpe Insulation* and *Asarco* – to bring suit against the Trust to obtain whatever contribution they are entitled to but cannot obtain via the judgment reduction mechanism.  The plan in *Thorpe Insulation* and the confirmation order in *Asarco* were explicit that the insurers had the right to be paid by the Trust in 100-cent dollars.  *See, e.g.*, *In re ASARCO LLC*, 420 B.R. 314, 376–78 (S.D. Tex. 2009).

---

[11] Those creditors are North River, Federal, and Hartford.
[12]  In reality, because Duro Dyne's business is profitable, any chapter 7 likely would result in dismissal rather than liquidation.  Insurers' claims could then be paid in the ordinary course of business.

Such treatment was a recognition of the requirements imposed by § 1129(a)(7): the Plan could not enjoin the non-settling Insurers' contribution claims without providing compensation, and channeling theose claims to the § 524(g) trust for payment in less than 100-cent dollars provided the insurers with worse treatment than they would be entitled to in a Chapter 7 case.

If this case were converted to Chapter 7, claimants would be permitted to sue Debtors; Debtors would tender the claims to Insurers; if Insurers chose to (as they presumably would), they would defend and resolve claims, subject to reservations of rights; and if any Settling Asbestos Insurer or any other insurer failed to pay their fair share, Insurers who had paid more than their fair share would have the right, to the fullest extent permitted by law, to sue for, and recover, contribution in 100-cent dollars from solvent, non-debtor entities.  The Plan takes away that right, enjoining the assertion of all contribution claims, granting an imperfect judgment reduction remedy that may partially compensate Insurers only under certain limited circumstances, and leaving Insurers without any remedy at all in other circumstances.

This type of interference with the right to pursue non-debtor third parties for full payment led the court in *Quigley* to refuse to confirm a § 524(g) plan because it failed the best interests test. *Quigley*, 437 B.R. at 146.  In *Quigley*, the plan sought to establish a § 524(g) channeling injunction that would have enjoined asbestos claimants from pursuing claims against Pfizer, debtor's solvent non-debtor parent company.  The court explained that, because "[i]n a Chapter 7 liquidation proceeding, creditors retain their rights to pursue non-debtors for full payment," "giving at least liquidation value to each creditor [in a Chapter 11 case] requires protection of the Chapter 7 right to pursue non-debtor actions."  *Id.* at 145.  The court dismissed as a "lopsided view of creditor equality" any plan "which sanctions confiscation of these non-debtor rights," noting that only plans that respect "creditors' Chapter 7 right to seek full satisfaction from non-debtors" will satisfy the

"best interests test." *Id.* (emphasis added). *See also Combustion Eng'g*, 391 F.3d at 234, 243 n.59.

The *Quigley* court thus held that the plan could not be confirmed because the dissenting claimants

would not receive the full value of their third-party claims against non-debtor Pfizer. *Quigley*, 437

B.R. at 143–46. Precisely the same is true here: Insurers, who voted against the Plan, in addition

to receiving nothing on their claims against the Debtors, would be enjoined under the Plan from

receiving the full value of their third-party claims against non-debtors.

Other courts have, like *Quigley*, held that plans do not satisfy the "best interests" test when

they provide recoveries from non-debtors that are less than what would be available under a

Chapter 7 plan. For example, in *Mercury Capital Corp. v. Milford Connecticut Assocs.*, 354 B.R.

1 (D. Conn. 2006), the district court remanded a confirmation order to the bankruptcy court for

further consideration of a creditor's objection that the plan failed to satisfy the "best interests" test

because it released certain non-debtor guarantors and, therefore, appeared to extinguish pre-

petition guarantees benefitting the creditor. The court held that the creditor "may be significantly

less secured under the debtor's plan than under a Chapter 7 liquidation," and thus the record was

insufficient to support a finding that the plan satisfied the "best interests" test. *Id.* at 9.

Similarly, in *In re Union Meeting Partners*, 165 B.R. 553 (Bankr. E.D. Pa. 1994), the court

denied confirmation of a plan because it failed to satisfy the "best interests" test. The plan

proposed to pay certain unsecured creditors 30% of their allowed claims. In a Chapter 7 case,

however, the unsecured creditors would have been entitled to receive their pro rata share of the

estate, plus their share of any recovery from the debtor's non-debtor general partners in a

deficiency claim asserted by the trustee. The court concluded that the plan's preservation of the

individual creditors' rights to sue the general partners was less valuable than the right to share in

a deficiency recovery, because the litigation costs to an individual creditor to pursue such a claim

might be prohibitive. *Id.* at 576.  Because the rights that creditors retained under the competing

plan were less valuable than those creditors would receive under a Chapter 7 liquidation – *i.e.*,

their pro rata shares from the estate plus recovery from non-debtor general partners – the court

held that the plan failed the "best interest" test.  *Id.*

In sum, (1) Insurers, part of at least two impaired classes, have not accepted the Plan; (2)

the Plan does not pay full value for Insurers' Class 7 Claims or its contribution claims against any

Settling Asbestos Insurer; and (3) in a Chapter 7 case, Insurers would be entitled to at least a pro

rata distribution of the Debtors' assets and would be entitled to, and would not be enjoined from

seeking, full value for their contribution claims against non-debtor third parties.  Accordingly, the

Plan fails the "best interests" test set forth in § 1129(a)(7) and therefore cannot be confirmed.  *See,

e.g.*, *In re Downtown Investment Club*, 89 B.R. 59, 65 (B.A.P. 9th Cir. 1988) (Chapter 11 plan

failed best interests test where it did not provide non-accepting creditors at least as much as they

would receive under Chapter 7); *In re Oak Park Calabasas Condominium Ass'n*, 302 B.R. 665,

666–75 (Bankr. C.D. Cal. 2003) (plan could not be confirmed where debtor had not shown creditor

would fare as well under plan as under Chapter 7).

## VI.    The Plan Is Not Filed In Good Faith

The many violations of the Bankruptcy Code discussed above are all designed to impair

Insurers' rights.  The Court need not speculate as to the Plan Proponents' intent in crafting such a

plan. The Plan Proponents admit that they submitted the Plan to gain "leverage" over insurers or

to "maximize the recovery" from insurers.  Neither is a valid bankruptcy purpose and Plan

Proponents' admissions underscore the bad faith inherent in the Plan's structure.

In their efforts to further these improper purposes, the Plan Proponents forced Insurers'

claims into Class 7 in an effort to gerrymander the vote (*i.e.*, to secure the vote of an impaired class

and to devalue Insurers' claims so that Class 7 could not reject) and simultaneously seek to effectively disallow all insurer claims by providing that insurer claims will be ineligible for payment.  The net effect of the Plan Proponents' improper objectives and Plan provisions is that insurers' claims effectively will be extinguished without payment, the Debtors will be discharged, the equity holders will retain their interests even though a senior class of claims is unpaid, and asbestos creditors will be able to establish claims more easily than they could in the tort system at higher values.  The Court should not approve the Plan.

A.      **The Plan Violates § 1129(a)(3)**

Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  "[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 246–47 (3d Cir. 2004)  (quoting *In re PWS Holding Corp.*, 228 F.3d 224, 241 (3d Cir. 2000)).  Furthermore, a plan must be fundamentally fair, which requires that "the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code."  *In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del. 2004) (citation omitted); *see also In re New Valley Corp.*, 168 B.R. 73, 80–81(Bankr. D.N.J. 1994) ("A further refinement of the test for whether a plan is proposed in good faith is found in the notion that the plan must provide for fundamental fairness in dealing with creditors.") (citation omitted).[13]

---

[13] Similarly, Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith and the burden is on the bankruptcy petitioner to establish good faith.  *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009) (citations, modifications, internal quotation marks and footnotes omitted).  "Whether the good faith requirement has been satisfied is a fact intensive inquiry in which the court must examine the totality of facts and

The Plan Proponents bear the burden of establishing good faith and fundamental fairness.
*See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 221 (Bankr. D.N.J. 2000) ("The
proponent bears the burden of establishing the plan's compliance with each of [the] requirements
[of § 1129(a)]."); *In re Silberkraus*, 253 B.R. 890, 902 (Bankr. C.D. Cal. 2000) (debtor bears the
burden of establishing "good faith" and fundamental fairness), *aff'd*, 336 F.3d 864 (9th Cir. 2003).
In determining whether the Plan Proponents have satisfied this burden, the Court must examine
"the totality of the circumstances surrounding the confection of the plan." *In re Madison Hotel
Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984); *see also Combustion Eng'g*, 391 F.3d at 242 n.55
("Only after analyzing the totality of circumstances surrounding a reorganization plan can the court
exercise the informed, independent judgment which is an essential prerequisite for the
confirmation of a plan.") (citation omitted).

Chapter 11 is intended for valid reorganization of "financially troubled businesses," not to
permit financially solvent companies to "rapidly conclude litigation to enable a continuation of
their business." *In re SGL Carbon Corp.*, 200 F.3d 154, 169 (3d Cir. 1999). This case presents a
prime example of a bankruptcy case filed to gain a litigation advantage, not to reorganize a
business. The Debtors are solvent, operating companies.[14] Historically, the Debtors have obtained
dismissals of more than 90% of the asbestos claims filed against them. *See* Report of Marc
Scarcella, attached to North River's Motion for Estimation of Its Claims for Voting Purposes, Dkt.

---

circumstances and determine where a petition falls along the spectrum ranging from the clearly
acceptable to the patently abusive. We focus on two inquiries that are particularly relevant to the
question of good faith: (1) whether the petition serves a valid bankruptcy purpose and (2) whether
the petition is filed merely to obtain a tactical litigation advantage." *Id.*

[14] *See* Disclosure Statement, Dkt. 278, at 8 (2017 EBITDA was "was approximately $5.2 million
*after* adjustments for legal and other fees related to the Company's asbestos and insurance issues.
. . .") (emphasis added). Debtors further stated, with respect to 2018: "The Company remains
profitable and estimates that sales and EBITDA (after adjusting for costs related to this bankruptcy
proceeding) for 2018 will be approximately $73.6 million and $5.2 million, respectively." *Id.*

368, attachment 5.  Because pro rata allocation applies to the asbestos claims as a matter of governing New York insurance law, however, the Debtors are responsible for a significant portion of any settlement or defense costs associated with those claims.  As the Debtors' CEO, Randall S. Hinden, acknowledged, "the Company has been forced to bear an increasing share of settlements and defense costs due to the insolvency of one of the Company's insurance carriers, the exhaustion of the Company's primary insurance coverage, and disputes with insurance carriers providing excess level coverage . . . ."  Decl. of R. Hinden, Dkt. 3, at 8.  The Debtors have offered no evidence that they could not continue to pay their share of such costs indefinitely.  The Debtors are seeking to avoid that potential liability, not because they must do so to preserve their business, but because they would prefer not to pay.

Accordingly, when the Debtors negotiated the Plan with representatives of asbestos claimants, they structured the Plan to gain an advantage over insurers.  As one of the Plan Proponents - Mr. Fitzpatrick - admitted: "Well, the purpose is to put some leverage on the insurance companies through torts – suits in the tort system.  I'm not sure if that's the bankruptcy purpose.  That was the purpose."  L. Fitzpatrick Dep. Tr. 112:6-10, Oct. 10, 2018.  In argument on January 31, 2019, counsel for the ACC admitted that the design of the Plan is to "maximize" the recovery from insurers.  In their efforts to do so, the Plan Proponents have violated numerous provisions and purposes of the Bankruptcy Code.  While those violations individually provide grounds to deny confirmation – taken together they collectively show that the Plan is not proposed in good faith.

In this regard, this case is strikingly similar to *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999) in which the Third Circuit ordered the dismissal of a bankruptcy case that had been filed to gain an unfair advantage over the debtor's litigation adversaries.  In *SGL Carbon*, the debtor

similarly admitted that it filed the plan to gain an advantage over its litigation opponents.  *Id.* at

158 (Debtor's vice president "testified that he believed filing for Chapter 11 would 'change the

negotiating platform' with plaintiffs and 'increase the pressure on . . . plaintiffs to settle.'").  As

the Third Circuit held, "filing a Chapter 11 petition merely to obtain tactical litigation advantages

is not within "the legitimate scope of the bankruptcy laws."  *Id.* at 165 (citing *In re Argus Group*

*1700, Inc.*, 206 B.R. 757, 765–66 (E.D. Pa. 1997)); *see also Furness v. Lilienfield*, 35 B.R. 1006,

1013 (D. Md. 1983) ("The Bankruptcy provisions are intended to benefit those in genuine financial

distress. They are not intended to be used as a mechanism to orchestrate pending litigation."); *In*

*re HBA East, Inc.*, 87 B.R. 248, 259–60 (Bankr. E.D.N.Y. 1988) ("As a general rule where, as

here, the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the

primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as

not being filed in good faith."); *In re Martin*, 51 B.R. 490, 495 (Bankr. M.D. Fla. 1985).

        In addition to their admissions that the Plan is intended to put pressure on insurers, Debtors'

other conduct shows that the Plan lacks a valid reorganizational purpose.  Debtors' website does

not mention their bankruptcy.  The last two quarterly issues of its internal newsletter "Good

Times," do not mention the bankruptcy.  After accounting for asbestos issues, the Debtors had

earnings before interest, taxes, and dividends in excess of $5 million each of the last two years,

which is considerably more than the total amount of indemnity paid to asbestos claimants in any

given year.  *See* Scarcella Report, Dkt. 368, at Fig. 4.  In short, like *SGL Carbon*, Debtors operate

a profitable business that has – with the assistance of its insurers – largely successfully defended

themselves in the tort system.  And like the debtor in *SGL Carbon*, Debtors filed for bankruptcy

to gain a litigation advantage.  Under the Plan, Debtors propose to pay all non-asbestos and non-

insurer creditors in full.  With respect to asbestos creditors, Debtors have committed $23 million

to the Trust, more – on a present dollar basis - than they would be expected to pay to asbestos creditors in the tort system. *See* Scarcella Report at Fig. 1. Moreover, the proposed TDPs assign higher values to asbestos claims than they were historically paid in the tort system and have less stringent standards of proof than the tort system.

The only creditors who fare worse under the Plan are insurers – whose Class 6 claims are impaired and whose Class 7 claims are ineligible for *any* payment whatsoever. The Plan Proponents went to great lengths to gerrymander a vote on this doomed structure. To prevent Insurers' from causing Class 5 (or any other class) from rejecting the Plan, Debtors artificially split Insurers' claims and placed the bulk of those claims in Class 7 with Asbestos Claims. Then, so that Class 7 would not reject the Plan, the Plan Proponents proposed to temporarily allow Insurers' claims at $1.00, but agreed to allow all speculative asbestos claims to vote at TDP values regardless of the merit or historical dismissal rates of such claims. *See supra.* The result of these machinations is that the only parties in this case who are faring worse under the proposed bankruptcy plan are the Insurers, who – by design – had no say in the formulation of the Plan and were precluded from voting in proportion to the value and proper treatment of their claims. As in *SGL Carbon*, the Debtors' efforts to manipulate the votes and to gain a litigation advantage show that the Plan was not proposed in good faith. To the contrary, the Plan relies upon multiple violations of the Bankruptcy Code and its underlying principles of equitable treatment. Because the Plan thus violates § 1129(a)(3), it cannot be confirmed.

**B.**      **The Plan Seeks to Evade Review by Redefining Substantial Consummation**

Consistent with their efforts to gain a litigation advantage over insurers, the Debtors seek to evade review of their improper Plan by unilaterally altering the definition of "substantial consummation" set forth in 11 U.S.C. § 1101(2). *See* Plan § 13.05. Substantial consummation is defined in 11 U.S.C. § 1101(2). It occurs only when there is:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
> (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
> (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2). Plan Proponents seek to avoid full compliance with these three conditions by deeming substantial confirmation to occur on the Effective Date of the Plan.[15] Because nothing in the Plan indicates that distributions will commence on the Effective Date, the Plan cannot be deemed substantially consummated at that time.

Section 3.03 of the Plan states if, how, and when distributions will be made for Claims in Classes 1-10, and none of those provisions contemplate distributions commencing as early as the Effective Date. No distributions under the Plan will be made for Claims in Classes 3 and 4, which are unaltered, or for Claims in Class 9, which are expunged.[16] Claims in Classes 1, 2, 5, and 8 will be paid only on "the later of" the Effective Date or the date when the Claim is allowed.[17] Allowed Claims in Class 6 will be paid on the first through eighth anniversaries of the Effective Date.[18]

---

[15]      *See* Plan, § 13.05 ("On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code").

[16]      *Id.,* §§ 3.03(c), (d), and (i).

[17]      *Id.*, §§ 3.03(a), (b), (e), (h).

[18]      *Id.*, § 3.03(f).

Claims in Class 10 will be paid in the ordinary course, but will be subordinated to the Trust Note.[19]

Finally, Asbestos Claims in Class 7 will only be paid after the procedures set out in the TPDs have

been established (including *inter alia* preparation of claim forms and establishment of the Payment

Percentage),[20] which is extremely unlikely to occur before the Effective Date.  Thus, the Plan

improperly accelerates substantial confirmation by eliminating at least one of the definitional

requirements under § 1101(2) of the Bankruptcy Code.

The reason for this is evident.  The Plan Proponents seek to insulate the Plan's confirmation

from appeals.  Under the doctrine of equitable mootness, an appellate court may refuse to grant

meritorious relief if it "will undermine the finality and reliability of consummated plans of

reorganization."  *In re Tribune Media Co.*, 799 F.3d 272, 277 (3d Cir. 2015).  Courts look to five

factors to determine if an appeal has become equitably moot:

> (1) whether the reorganization plan has been substantially consummated, (2)
> whether a stay has been obtained, (3) whether the relief requested would affect the
> rights of parties not before the court, (4) whether the relief requested would affect
> the success of the plan, and (5) the public policy of affording finality to bankruptcy
> judgments.

*In re Cont'l Airlines*, 91 F.3d 553, 560 (3d Cir. 1996).  Of these five factors, "the foremost

consideration has been whether the reorganization plan has been substantially consummated."  *Id.*

"[T]he importance of substantial consummation in rendering a claim equitably moot raises

concerns that a debtor can 'stack the deck' in its favor to expedite implementation of its plan and

foreclose review of questionable plan components."  *In re One2One Commc'ns, LLC*, 805 F.3d

428, 448 n.1 (3d Cir. 2015) (citation omitted).

---

[19]      *Id.*, § 3.03(j).

[20]      *Id.*, § 3.30(g).

For this reason, substantial consummation must be based on the facts, not an arbitrary definition at odds with the Bankruptcy Code's own definition of the term. *In re H & L Developers, Inc.*, 178 B.R. 77, 80 (Bankr. E.D. Pa. 1994) ("Whether a plan has been substantially consummated is a question of fact to be determined upon the circumstances of each case and the evidence provided by the parties."). By re-defining substantial consummation, the Plan guts this protection.

Section 1129(a)(1) requires a plan to comply with all applicable provisions of the Bankruptcy Code. By re-defining substantial consummation, the Plan violates § 1101(2) and eliminates a statutory protection for plan opponents. As discussed above, this change appears intended to insulate the Plan – and its inherent lack of good faith and other Code violations – from appeal. The redefinition of substantial consummation is thus part and parcel of the Plan's overall lack of good faith. The Plan cannot be confirmed.

## **CONCLUSION**

The Court should refuse to confirm the Plan because it has not been filed in good faith and violates numerous provisions of the Bankruptcy Code. Rather than an effort to reorganize the Debtors, the Plan represents an admitted effort to create litigation pressure on insurers and to induce them to settle. To advance that improper purpose, the Plan Proponents have included numerous provisions that violate the Code and improperly seek to alter Insurers' rights. Accordingly, the Court should deny confirmation.

Dated: February 8, 2019                    Respectfully submitted,


                                           KENNEDYS CMK LLP

                                           */s/ Christina R. Salem*
                                           Margaret F. Catalano
                                           Christina R. Salem

570 Lexington Avenue, 8th Floor
New York, N.Y. 10022
(212) 252-0004
Emails:  meg.catalano@ kennedyscmk.com
          christina.salem@kennedyscmk.com

-and-

IFRAH PLLC
George R. Calhoun, V (*pro hac vice*)
Ifrah PLLC
1717 Pennsylvania Ave., NW
Washington, D.C. 20006
202.525.4147
Email: george@ifrahlaw.com

*Attorneys for The North River Insurance Company*


*/s/ Mark S. Lichtenstein*
Mark S. Lichtenstein
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, New York 10022
Telephone:    (212) 223-4000
Facsimile:    (212) 223-4001
Email:      mlichtenstein@crowell.com

Mark D. Plevin (admitted *pro hac vice*)
Tacie H. Yoon (admitted *pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Telephone:    (202) 624-2500
Facsimile:    (202) 628-5116
Email:      mplevin@crowell.com
                tyoon@crowell.com

*Attorneys for Federal Insurance Company*


      /s/ Sommer L. Ross

Sommer L. Ross (NJ Bar No. 004112005)
DUANE MORRIS LLP
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659

Telephone: (302) 657-4900
Facsimile:  (302) 657-4901
E-mail:  slross@duanemorris.com

Jeff D. Kahane, Esq.
865 South Figueroa Street, Suite 3100
Los Angeles, CA 90017-5450
Telephone:  (213) 689-7431
Facsimile: (213) 403-6372
E-mail:  jkahane@duanemorris.com

-and-

James T.H. Deaver, Esq.
LONDON FISCHER LLP
59 Maiden Lane
New York, NY 10038
Telephone: (212) 331-9580
Facsimile:  (212) 972-1030
E-mail:  jdeaver@LondonFischer.com

*Co-Counsel for MidStates Reinsurance
Corporation, f/k/a Mead Reinsurance Corporation*

38