**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Jeffrey D. Prol, Esq.
David Leit, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Counsel to the Debtors and*
*Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| Duro Dyne National Corp., *et al.*[1] | Case No. 18-27963 (MBK) |
| Debtors. | (Jointly Administered) |

**DEBTORS' VERIFIED OBJECTION TO**
**PROOF OF CLAIM FILED BY INTERNATIONAL ASSOCIATION OF**
**SHEET METAL AIR RAIL AND TRANSIT WORKERS**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors" or the "Debtors"), by and through their undersigned counsel, file this objection (the "Objection"), pursuant to sections 105(a), 502(b) and 502(c) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et. seq.* (the "Bankruptcy Code"), and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking entry of an order, substantially in the form submitted herewith, reducing and/or disallowing the claims filed by International Association of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Duro Dyne National Corp. (4664); Duro Dyne Machinery Corp. (9699); Duro Dyne Corporation (3616); Duro Dyne West Corp. (5943); and Duro Dyne Midwest Corp. (4662).

Sheet Metal Air Rail and Transit Workers ("SMART"). In support of this Objection, the Debtors respectfully state as follows:

## JURISDICTION, VENUE AND STATUTORY PREDICATES

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered on July 23, 1984 and amended on September 18, 2012. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. The statutory predicates for the relief sought herein are sections 105(a), 502(b) and 502(c) of the Bankruptcy Code and Bankruptcy Rule 3007.

## BACKGROUND

### A. General Background

3. On September 7, 2018 (the "Petition Date")[2], each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of New Jersey.

4. The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the bankruptcy code.

5. On September 26, 2018, the Office of the United States Trustee appointed an Official Committee of Asbestos Claimants (the "Committee").

6. A detailed description of the Debtors' business and the facts surrounding the commencement of the chapter 11 cases is set forth in the *Declaration of Randall S. Hinden in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 3], which is incorporated herein by reference.

---

[2] All capitalized terms not defined herein have the meaning ascribed to them in the Plan.

7. The Debtors filed a Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al., under Chapter 11 of the Bankruptcy Code, on November 16, 2018 (Docket No. 279) )"Plan"(. The Confirmation Hearing is scheduled to begin on March 6, 2019.

8. The Debtors are engaged in the business of, among other things, manufacturing products for the HVAC industry. Duro Dyne Corporation ("Duro Dyne Corp.") operates a non-union manufacturing and distribution center in Bay Shore, New York. Duro Dyne Midwest Corporation ("Duro Dyne Midwest") operates a manufacturing and distribution center in Ohio. The manufacturing employees that work in the facility operated by Duro Dyne Midwest are represented by the SMART union.

9. Duro Dyne Midwest is party to two collective bargaining agreements (and related amendments) with SMART Local Union No. 24 of Sheet Metal Workers' International Union (collectively, the "Ohio CBAs"), which govern Duro Dyne Midwest's employment of its employees at its facility in Ohio.

10. Under the Ohio CBAs, SMART authorized Duro Dyne Midwest to apply SMART's "Yellow Label," (U.S. Federal Trademark Registration Reg. No. 5,012,125) on goods manufactured at the Ohio Facility. The Ohio CBA authorizes the use of the Yellow Label, but does not set any limits or conditions on its use

**B. The Proof of Claim filed by SMART**

11. On November 14, 2018, SMART filed a proof of claim in the amount of $7,600,000.00 (the "Claim") against Duro Dyne National Corp., Duro Dyne Corp., and Duro Dyne Machinery Corp. (the "Claim Defendants"). Duro Dyne Midwest is not a named defendant in the Claim. SMART alleges that the Claim arises from violations of the Lanham Act (15 U.S.C. § 1501, et seq.), such as trademark infringement and counterfeiting.

12. SMART alleges, in paragraph 23 of its Claim that, "starting in or about June, 2017, Defendants' fabrication facility in Bay Shore, New York started fabricating and shipping various types of access doors to which the [Yellow Label] was affixed." According to SMART, the Yellow Label may only be affixed to products made by SMART union members. SMART alleges that the Claim Defendants were not permitted to use the Yellow Label. SMART seeks statutory damages of $200,000 per type of good, for the thirty-eight types of goods allegedly sold, pursuant to 15 U.S.C. § 1117(c). In fact, statutory damages under this provision may range anywhere from $1,000 to $200,000 for each type of good sold.

13. Duro Dyne Midwest manufactures duct access door doorframes, utilizing union labor, at its plant in Ohio. Duro Dyne Midwest is party to the Ohio CBAs, under which it is authorized to attach Yellow Labels to such duct access doorframes manufactured at its plant in Ohio. Yellow Labels were affixed to duct access doorframes manufactured by union representatives working at Duro Dyne Midwest.

14. The conditions under which Yellow Labels are applied are strictly controlled. SMART supplies the Yellow Labels to a trusted union representative, a union steward and journeyman, who is an employee of Duro Dyne Midwest. The Yellow Labels are kept in the secure custody of that union representative, who holds the only key to the secure location in which they are stored. Neither Duro Dyne Midwest nor any of the Claim Defendants have access to the Yellow Labels. Each Yellow Label bears a barcode, which can be scanned to reveal information about the source of the item to which the label is affixed. Only union representatives actually apply the Yellow Labels on products.

15. The Yellow Labels applied at Duro Dyne Midwest are genuine labels (as may be verified by the barcodes on such labels), supplied and controlled by SMART, and applied by a union representative to the duct access doorframes produced by workers pursuant to the terms of the Ohio CBAs at Duro Dyne Midwest's facility in Ohio.

16. During the time period in question, no Yellow Labeled duct access doorframes were manufactured at Duro Dyne Corp.'s facility in Bay Shore, NY. Duro Dyne Corp.'s facility

in Bay Shore, NY did not possess the machinery necessary to manufacture the duct access doorframes.

17. Some of the duct access doorframes manufactured by Duro Dyne Midwest in Ohio bearing the genuine Yellow Labels were sold by Duro Dyne Midwest to Duro Dyne Corp. and shipped to its facility in Bay Shore, NY. Duro Dyne Corp. is not party to a collective bargaining agreement with SMART.

18. At the facility in Bay Shore, NY, duct access door panels were added to the duct access doorframes bearing the genuine Yellow Labels, to produce duct access doors ready for shipment and sale to customers.

19. The Proof of Claim incorrectly states that 38 distinct model numbers of duct access doors were sold by the Claim Defendants, in various permutations of sizes, "self-stick" or non-"self-stick" designs, hinged designs, or "cam-only" designs. In fact, of the 38 distinct model numbers identified in the Proof of Claim, only 19 were actually sold by Duro Dyne Corp. Specifically, Duro Dyne Corp. only sold "self-stick" types of duct access doors, eliminating the first 18 model numbers listed in paragraph 23 of the Proof of Claim. In addition, Duro Dyne Corp. did not sell any units of model number 7315.[3]

20. SMART previously raised concerns regarding the use of the Yellow Label at the facility in Bay Shore, NY, to Duro Dyne Corp. in July, 2017. Duro Dyne Corp. responded to SMART, also in July 2017, explaining that Yellow Labels had never been applied to products at the Bay Shore facility. Duro Dyne Corp. invited SMART to inspect the facility at any time, without notice, to verify compliance.

21. In reply, Rob Durham, who, at the time, was the Business Agent of SMART Local 24, and is currently an International Organizer of the SMART union, spoke to Josh

---

[3] Duro Dyne Corp. did sell, as a distributor, products that correspond to the other 19 listed model numbers. However, these units were purchased by Duro Dyne Corp. from third party manufacturers that had applied the Yellow Label pursuant to their own manufacturing standards and practices.

Diamand, Duro Dyne Corporation's Director of Human Resources, confirming that the situation had been resolved to SMART's satisfaction.

22. At the union's request, Duro Dyne Corp. ceased ordering Yellow Label doorframes from Duro Dyne Midwest and adding duct access door panels at its facility in Bay Shore, NY to produce duct access doors, but otherwise continued its business operations openly and without further complaint by SMART. Despite Duro Dyne Corp.'s invitation, SMART did not visit the Bay Shore, NY facility and did nothing to pursue any claim against the Claim Defendants until November 2018. SMART then filed its Claim the day before workers at the facility in Bay Shore, NY, voted against SMART's efforts to unionize the workers at the Bay Shore facility. Upon information and belief, SMART has asserted this Claim at this belated time as a means of trying to obtain leverage in its unsuccessful campaign for unionization of the Bay Shore facility.

## RELIEF REQUESTED

23. For the reasons set forth herein, the Debtors request entry of an order reducing and/or disallowing the Claim in full.

## ARGUMENT

24. Section 502(a) of the Bankruptcy Code provides that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest … objects." 11 U.S.C. § 502(a). Once an objection to a claim is filed, the Court, after notice and a hearing, shall determine the allowed amount of the claim. *See* 11 U.S.C. § 502(b).

25. As set forth in Bankruptcy Rule 3001(f), a properly executed and filed proof of claim constitutes *prima facie* evidence of the validity and the amount of the claim under section 502(a) of the Bankruptcy Code. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). To receive the benefit of the *prima facie* validity, however, "the proof of claim must 'set forth facts necessary to support the claim.'" *In re Chain*, 255 B.R. 278, 280 (Bankr. D. Conn. 2000) (quoting *In re Marino*, 90 B.R. 25, 28 (Bankr. D. Conn. 1988)). The failure to allege sufficient facts in support of a claim deprives the claim of *prima facie* validity. *In re Jorczak*, 314 B.R.

474, 481 (Bankr. D. Conn. 2004) (discussing the evidentiary requirements and burden of proof with respect to the allowance of claims).

26. In addition, a claimant's proof of claim is entitled to the presumption of *prima facie* validity under Bankruptcy Rule 3001(f) only until an objecting party refutes at least one of the allegations that is essential to the claim's legal sufficiency. *See In re Allegheny Int'l*, 954 F.2d at 173-74. Once such an allegation is refuted, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. *See id.* at 174; *In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009). In other words, once the *prima facie* validity of a claim is rebutted, "it is for the claimant to prove his claim, not for the objector to disprove it." *In re Kahn*, 114 B.R. 40, 44 (Bankr. S.D.N.Y. 1990) (citations omitted). The burden of persuasion with respect to the validity of a claim is always on the claimant. *In re Allegheny Int'l*, 954 F.2d at 174.

27. SMART's Claim fails, both as to liability and the extent of the claimed damages.

28. To establish federal trademark infringement under 15 U.S.C. § 1114, a plaintiff must show: (1) it owns a valid trademark; (2) defendant used the trademark "in commerce" without plaintiff's authorization; (3) defendant used plaintiff's trademarks, or an imitation thereof, "in connection with the sale, offering for sale, distribution, or advertising" of goods and services; and (4) defendant's use of plaintiff's trademarks is likely to cause consumer confusion.

29. For the reasons set forth above, Duro Dyne Midwest was authorized to use the Yellow Labels under the terms of the CBAs. The Yellow Labels were properly applied to the duct access doorframes and then sold to Duro Dyne Corp.

30. Once Duro Dyne Midwest made this sale of duct access doorframes bearing the Yellow Labels, as a matter of trademark law, it exhausted its rights in the mark. Under the "exhaustion doctrine," once a trademarked good is first sold in commerce, the trademark

holder's rights are exhausted, and the trademark holder does not have rights against downstream resellers.

31. Moreover, to recover on a federal trademark counterfeiting claim, a plaintiff must additionally show: (1) the defendant infringed a registered trademark in violation of 15 U.S.C. § 1114, as above; and (2) the defendant intentionally used the mark knowing it was a counterfeit as the term is defined in the Lanham Act. The Lanham Act generally defines a counterfeit mark as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127; *see also* 15 U.S.C. § 1116(d)(1)(B). Counterfeiting, thus, involves copying of a mark. *See, e.g., Pennzoil-Quaker State Co. v. Smith*, No. 05-1505, 2008 WL 4107159, at *21 (W.D.Pa. Sept. 2, 2008) ("[T]he plain language of the statute indicates that the term 'counterfeit' refers to the mark itself, not the nature of the goods and services associated with the mark").

32. Here, no counterfeiting of the Union Mark occurred. All of the Yellow Labels affixed to products were genuine, as can be verified by the bar codes. They were affixed by SMART's union representative, as authorized by SMART. The Yellow Labels, as affixed, correctly and truthfully reflect exactly what SMART claims they are supposed to reflect: that the product bearing the Yellow Label was manufactured using union labor.

33. 15 U.S.C. § 1116(d)(1)(B) explicitly excludes situations where "the manufacturer or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation." *See U.S. v. Hanafy*, 124 F. Supp. 2d 1016, 1023-24 (N.D. Tex. 2000) (not counterfeiting when "goods to which the mark is attached were

manufactured by, or with the permission or, the owner of the mark—that is, the goods themselves are genuine."), *aff'd*, 302 F.3d 485, 64 U.S.P.Q.2d 1050 (5th Cir. 2002).

34. SMART's Claim for statutory damages depends entirely on the Court accepting that the claim is a counterfeiting claim, since statutory damages are not available for ordinary trademark claims. Counterfeiting, under 15 U.S.C. § 1114, is a subset, and extreme case, of trademark infringement. *See Gucci America, Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 242 (S.D.N.Y. 2012) ("[C]ounterfeiting is the 'hard core' or 'first degree' of trademark infringement") (citation omitted). The essence of counterfeiting is that the use of the infringing mark "seeks to trick the consumer into believing he or she is getting the genuine article, rather than a 'colorable imitation.'" *Id.*

35. Claim Defendants have made no attempt to deceive consumers, as evidenced by the fact that the Yellow Labels were only applied to products manufactured by union labor at Duro Dyne Midwest's facility in Ohio, and by the fact that Duro Dyne Corporation repeatedly invited SMART to inspect the manufacturing operations at any time to verify compliance.

36. Even if the Claim were found to be subject to statutory damages, such damages would only apply to the 19 types of duct access doors manufactured by Duro Dyne Corp. using Yellow Labeled doorframes manufactured by Duro Dyne Midwest, not the 38 product types listed in the Claim, which include products manufactured by wholly unrelated third parties, and merely purchased and then re-sold and distributed by Duro Dyne Corp. Furthermore, since statutory damages range from $1,000 to $200,000 per product, the damages range would be from $19,000 to $3,800,000. Given all the factors discussed above, Claim Defendants submit that any statutory damages would be on the low end of the permitted statutory range, rather than the maximal damage SMART seeks here.

37. Furthermore, statutory damages should bear a correlation to the actual economic harm suffered by the plaintiff. Here, since SMART first complained of this issue over a year ago and decided to take no action, and since the products bearing the Yellow Label were actually produced using union labor, there simply are no actual economic harms suffered by SMART. Moreover, SMART does not collect any licensing fee for permitted uses of the Yellow Label, so SMART has not lost any revenue from any products sold with allegedly improperly applied Yellow Labels.

38. To the extent the Claim is not estopped or waived by the over 18 month delay in asserting it, the economic damages ought to be measured by the net operating margin on sales of duct access doors sold by Duro Dyne Corp. which incorporate Yellow Label duct access doorframes Duro Dyne Corp. had purchased from Duro Dyne Midwest.

39. During the period at issue in the Claim, Duro Dyne Midwest sold a total of 14,226 duct access doorframes bearing the Yellow Label to Duro Dyne Corp. in Bay Shore. Of these frames, 1,953 were eventually returned to Duro Dyne Midwest and 5,668 remained in inventory at the Bay Shore facility as of March 31, 2018, when SMART verbally approved the use of those duct access doorframes by Duro Dyne Corp. The remaining 6,605 frames bearing Yellow Labels may have been produced prior to that date, and so are the only ones potentially "at issue" in this Claim.

40. During the period at issue in the Claim, Duro Dyne Corp. produced a total of 12,752 duct access doors at its Bay Shore facility. These duct access doors fell into 19 distinct product types. The total sales of these duct access doors amount to $187,033. Duro Dyne Corp.'s gross margin on these doors is 36%, so the total dollar value of Duro Dyne Corp.'s gross margin from the sale of these products is $67,332. The net operating margin from these sales is 4.5%, or

a total of $8,700. Since this figure includes nearly twice as many duct access doors as the number of duct access door frames "at issue," this figure is likely overstated by about double.

41. Thus, the maximum economic damages suffered by SMART, even in the unlikely event that it proves the Claim Defendants' liability for trademark infringement, and measured by Duro Dyne Corp.'s profits, since SMART would have received any revenue from such sales, is about $5,000 or less. Given the actual economic value of this claim, the Claim Defendants submit that no escrow is necessary, since such a figure could be paid out of operating income.

42. In sum, the Debtors' objections to SMART'S Claim are summarized set forth below:

| Claim Type | Basis of Objection |
|---|---|
| Counterfeiting | SMART's Claim should be reduced or disallowed because the Yellow Labels used were and are genuine (as may be verified by the barcodes on such labels), were supplied by SMART, and were applied by a union representative to the duct access doorframes produced by union workers operating under the Ohio CBAs at Duro Dyne Midwest's facility. The use of the Yellow Label by Claim Defendants therefore does not meet the definition of "counterfeit" under the Lanham Act. |
| Counterfeiting | SMART's Claim should be reduced or disallowed because Duro Dyne Midwest, at the time of manufacture, was authorized by SMART to use the Yellow Label for the duct access doorframes. The use of the Yellow Label by Claim Defendants therefore does not meet the definition of "counterfeit" under the Lanham Act. |
| Counterfeiting | SMART's Claim should be reduced or disallowed because statutory damages are permitted under 15 U.S.C. § 1117(c) only for cases involving use of counterfeit marks. As discussed above, the use of the Yellow Label by Claim Defendants does not meet |

| | |
|---|---|
| | the definition of "counterfeit" under the Lanham Act. |
| Counterfeiting | SMART's Claim should be reduced or disallowed, because statutory damages, under 15 U.S.C. § 1117(c)(1), are only available in cases involving use of counterfeit marks, and may be awarded in the range of not less than $1,000 or more than $200,000 per counterfeit mark per type of good "as the court considers just." SMART has alleged no facts to justify damages of the maximum statutory limit. |
| Infringement | SMART's Claim should be reduced or disallowed because SMART licensed Duro Dyne Midwest to manufacture and sell products bearing labels with the Yellow Label orally, through a course of dealing, and/or through the Ohio CBAs |
| Infringement | SMART's Claim should be reduced or disallowed because any damages, if infringement were ultimately determined, should be determined by 15 U.S.C. § 1117(a) which permits a plaintiff to recover defendant's profits, any damages sustained by the plaintiff (which do not exist here), and the costs of the action. |
| Infringement | SMART's Claim should be reduced or disallowed because Duro Dyne Midwest's sale of the duct access doorframes bearing Yellow Labels to Duro Dyne Corp. exhausted SMART's ongoing ability to control the use of the Yellow Label, and, as a result, the Claim is barred by the trademark exhaustion doctrine. |
| Infringement | SMART's Claim should be reduced or disallowed because it is barred, in whole or in part, on the grounds of waiver and estoppel. Duro Dyne continued its activities openly and without further complaint by SMART after responding to SMART's concerns in July 2017. |
| Damages | No escrow is necessary for SMART's Claim, because its actual economic harm, even assuming it can establish liability, is de minimis. |

WHEREFORE, for all the reasons set forth herein, the Debtors request that the Court disallow all Claims set forth by SMART in their entirety.

Dated: February 26, 2019

**LOWENSTEIN SANDLER LLP**

/s/ *Jeffrey D. Prol*
Kenneth D. Rosen
Jeffrey D. Prol
David Leit
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400
E-mail: jprol@lowenstein.com

*Counsel to the Debtors and Debtors-in-Possession*

## VERIFICATION

I, Patrick Rossetto, of full age, certify as follows:

1. I am the President of Duro Dyne National, one of the Debtors and Claim Defendants in the Proof of Claim.

2. I verify the factual statements in the Debtors' Verified Objection to Proof of Claim Filed by the International Association of Sheet Metal Air Rail and Transit Workers based on my personal knowledge. I know the matters factual statements in the Verified Objection to be true.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Patrick Rossetto

Dated: February 26, 2019