## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| DURO DYNE NATIONAL CORP., *et al.*[1] | Case No. 18-27963 MBK |
| Debtors. | (Jointly Administered) |

### PLAN PROPONENTS' MEMORANDUM OF LAW
### IN SUPPORT OF ENTRY OF AN ORDER CONFIRMING THE
### SECOND AMENDED PRENEGOTIATED PLAN OF
### <u>REORGANIZATION AND RESPONSE TO PLAN OBJECTIONS</u>

LOWENSTEIN SANDLER LLP
Kenneth A. Rosen, Esq.
Jeffrey D. Prol, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400
krosen@lowenstein.com
jprol@lowenstein.com

*Counsel to the Debtors and Debtors in Possession*

CAPLIN & DRYSDALE, CHARTERED
James P. Wehner, Esq.
(admitted *pro hac vice*)
Jeffrey A. Liesemer, Esq.
(admitted *pro hac vice*)
One Thomas Circle, N.W.
Washington, DC 20005
Telephone:  (202) 862-5000
Facsimile: (202) 429-3301
jwehner@capdale.com
jliesemer@capdale.com

*Counsel to the Asbestos Claimants Committee*

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Edwin J. Harron, Esq.
Sara Beth A.R. Kohut, Esq.
(admitted *pro hac vice*)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6703
Facsimile:  (302) 576-3298
eharron@ycst.com
skohut@ycst.com

*Counsel to the Legal Representative*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Duro Dyne National Corp. (4664); Duro Dyne Machinery Corp. (9699); Duro Dyne Corporation (3616); Duro Dyne West Corp. (5943); and Duro Dyne Midwest Corp. (4662).

# TABLE OF CONTENTS

I.  Preliminary Statement ................................................................................................. 2

II.  Background ................................................................................................................... 3

    A.  Filing of the Case .................................................................................................3

    B.  Solicitation and Voting Results ...........................................................................4

    C.  The Plan Supplement ...........................................................................................5

    D.  Confirmation Objections ......................................................................................6

III.  The Plan Satisfies Each of the Bankruptcy Code's Requirements for Confirmation .......... 6

    A.  The Plan Complies with the Applicable Provisions of the Bankruptcy Code
        (§ 1129(a)(1)).......................................................................................................6

    B.  The Plan Satisfies the Classification Requirements of 11 U.S.C. § 1122 ........................7

    C.  The Plan Satisfies the Mandatory Requirements of 11 U.S.C. § 1123(a) ........................8

    D.  The Plan Proponents Have Complied with the Applicable Provisions of the
        Bankruptcy Code (§ 1129(a)(2)).......................................................................10

    E.  The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden
        by Law (§ 1129(a)(3))........................................................................................11

    F.  The Plan Provides for Court Approval of Certain Administrative Payments
        (§ 1129(a)(4))....................................................................................................12

    G.  Post-Emergence Directors and Officers Have Been Disclosed and Their
        Appointment Is Consistent with Public Policy; Insider Post-Emergence
        Employment Arrangements for Insiders Have Been Disclosed (§ 1129(a)(5))..............12

    H.  The Plan Does Not Require Governmental Approval of Rate Changes
        (§ 1129(a)(6))....................................................................................................13

    I.  The Plan Is in the Best Interests of Creditors (§ 1129(a)(7)).........................................13

    J.  The Plan Can Be Confirmed Notwithstanding the Requirements of § 1129(a)(8).........14

    K.  The Plan Complies with Statutorily Mandated Treatment of Administrative
        Expense and Priority Tax Claims (§ 1129(a)(9)).................................................14

    L.  At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the
        Acceptance of Insiders (§ 1129(a)(10)) ............................................................15

    M.  The Plan is Feasible (§ 1129(a)(11)) .................................................................15

    N.  The Plan Provides for Payment of All Fees Under 28 U.S.C. § 1930
        (§ 1129(a)(12))..................................................................................................15

    O.  The Plan Provides for Payment of Retiree Benefits (§ 1129(a)(13))............................15

P.    Sections 1129(a)(14)-(16) Are Inapplicable ..................................................16

IV.    The Discretionary Contents of the Plan Are Appropriate and Should Be Approved (§ 1123(b)) ........................................................................................... 16

V.    The Plan Satisfies the Requirements for Entry of the Asbestos Permanent Channeling Injunction Under § 524(g) of the Bankruptcy Code ...................................... 16

    A.    The Trust Satisfies the Requirements of 11 U.S.C. § 524(g)(2)(B)(i) ...........................17

    B.    The Debtors' History, the Nature of Asbestos-Related Litigation, and the Facts of These Chapter 11 Cases Support the Findings Required for Issuance of the Asbestos Permanent Channeling Injunction ..................................................19

    C.    The Asbestos Permanent Channeling Injunction Protects Identifiable Third Parties.......................................................................................................................22

    D.    Entry of the Asbestos Permanent Channeling Injunction Is Fair and Equitable With Respect to Future Asbestos Claimants .................................................23

VI.    All Other Provisions for Confirmation Have Been Met ........................................ 24

VII.    The Duro Dyne TDP Achieves the Goals of § 524(g) Through Proven Mechanisms ...... 24

    A.    The Confidentiality Provision in Section 6.5 of the TDP Is Necessary, Appropriate, and in Line with Best Practices .................................................29

    B.    The Trust Will Pay Only People Who Are Sick, or the Survivors of Those Who Have Died from Asbestos-Related Illness ........................................................34

    C.    Section 5.6(b)(3) of the TDP Does Not Prevent the Trust from Asserting an "Affirmative Defense" ........................................................................................35

    D.    The Withdrawal and Deferral Provisions of Section 6.3 Are Appropriate ...................37

    E.    The Trust Has Appropriate Audit Procedures .................................................38

    F.    The Duro Dyne Trust Does Not Have an "Extraordinary Claim" Category, so the UST's Suggestion to Include Section 6.8(c) of the Garlock CRP Is Misguided ...............................................................................................................39

    G.    Attorneys' Fees Should Be Left to State Regulation ....................................................40

    H.    The TDP and Trust Have Appropriate Mechanisms to Pay Present and Future Claims in the same Manner........................................................................................41

VIII.    Substantive Consolidation Is Appropriate Under Controlling Law................................... 43

IX.    The Debtors Have Established Feasibility As Required By 11 U.S.C. § 1129(a)(11) ...... 47

X.    The UST's Miscellaneous Objections Should Be Overruled ........................................... 50

    A.    The Plan Will Go Effective............................................................................................50

B.  The Reorganized Debtor Will Assume Responsibility for Payment of Statutory Fees Post-Confirmation ............................................................50

C.  Administrative Expense Claims Will Be Paid in the Ordinary Course or Following the Date on Which They Become Allowed Claims......................................50

D.  Section 13.03(e) Regarding Dissolution of the Committee Is Appropriate...................51

E.  Information About the Fees and Expenses Required for Post-Petition Financing and Proof of the Debtors' Ability to Pay Them Is Provided...........................................51

F.  The Cooperation Agreement Is Being Provided ...........................................................51

XI.  The Plan's Treatment of the Insurers' Asserted Claims Is Proper......................................52

A.  The Plan Grants the Insurers Two Valuable Protections in the Form of Trust-Payment Credits and Judgment-Reduction Credits ........................................................52

B.  The Insurers Are Not Entitled to Full Compensation for Their Claims ........................59

C.  Although Directly Applicable to Judgments, the Trust-Payment and Judgment-Reduction Credits Will Influence and Shape Settlements ..............................................61

D.  The Trust-Payment and Judgment-Reduction Credits Would Benefit Insurers by Discouraging the Prosecution of Claims in the Tort System ..........................................63

XII.  The Insurers' Other Objections Are Unavailing and Should Be Overruled .....................64

A.  The Insurers' Claims Are Properly Classified as Class 7 Channeled Asbestos Claims ...........................................................................................................................64

B.  Under the Plan, the Insurers' Class 7 Claims Will Receive Treatment That Is the Same as, if Not Better Than, the Treatment Afforded to Other Indirect Asbestos Claims ...........................................................................................................................68

C.  Section 524(g) Mandates the Injunction and Channeling of the Insurers' Claims Even if the Insurers Receive No Payment From the Trust ............................................70

D.  The Plan Is Fair and Equitable ....................................................................................72

E.  The Insurers Are Not Entitled to "Cramdown" Protection Under § 1129(b) with Respect to Their Class 7 Claims ..................................................................................74

F.  As Unsecured Creditors, the Insurers Are Not Entitled to "Adequate Protection" ........75

G.  The Pledge of 50.1% of the Reorganized Debtor's Voting Stock to Secure Payment of the Trust Note Satisfies § 524(g) .............................................................77

H.  It Is a Basic Tenet of Bankruptcy That a Plan May Alter a Creditor's State-Law Rights; a Plan Need Not Be "Insurance Neutral" ........................................................79

I.  The Plan Provides for an Asbestos Channeling Injunction Within the Proper Scope of § 524(g) ........................................................................................................85

J.  The Plan Satisfies the "Best Interest of Creditors" Test ................................................86

K.    The Plan Is Proposed in Good Faith ................................................................92

L.    The Insurers' Arguments Regarding "Substantial Consummation" Lack Merit ............96

XIII.  SMART's Objection Should Be Overruled ........................................................ 98

A.    SMART Bears the Burden of Establishing Its Claim ........................................98

B.    SMART's Miscellaneous Objections Should Be Overruled. ...................................100

XIV.  Cause Exists to Waive a Stay of the Confirmation Order ............................................. 100

XV.   Conclusion .................................................................................................. 102

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re 354 E. 66th St. Realty Corp.*,
　177 B.R. 776 (Bankr. E.D.N.Y. 1995)........................................................................76

*In re ACandS, Inc.*,
　311 B.R. 36 (Bankr. D. Del. 2004) ...........................................................................81

*Admiral Ins. Co. v. Grace Indus., Inc.*,
　409 B.R. 275 (E.D.N.Y. 2009) ...........................................................................82, 84

*In re Allegheny Int'l, Inc.*,
　954 F.2d 167 (3d Cir. 1992)....................................................................................99

*In re American Capital Equip. LLC*,
　688 F.3d 145 (3d Cir. 2012)....................................................................................29

*In re Arden Props., Inc.*,
　248 B.R. 164 (Bankr. D. Ariz. 2000) .......................................................................73

*In re Armstrong World Indus., Inc.*,
　348 B.R. 111 (D. Del. 2006) ................................................................................6, 67

*In re Armstrong World Indus., Inc.*,
　348 B.R. 136 (D. Del. 2006) ..............................................................................66, 67

*In re ASARCO LLC*,
　420 B.R. 314 (S.D. Tex. 2009) ...........................................................................60, 61

*In re Bally Total Fitness of Greater N.Y., Inc.*,
　No. 0712395 (BRL), 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007)............................6

*Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
　526 U.S. 434 (1999).............................................................................................14

*In re Beeney*,
　142 B.R. 360 (B.A.P. 9th Cir. 1992).......................................................................54

*Bruce Energy Ctr. Ltd. v. Orfa Corp. of Am. (In re Orfa Corp.)*,
　129 B.R. 404 (Bankr. E.D. Pa. 1991) ......................................................................43

*In re Burns & Roe Enters., Inc.*,
　District Court Case No. 08-4191, 2009 WL 438694 (D.N.J. Feb. 23, 2009) ...................54, 79

*In re Catholic Bishop of N. Alaska*,
    2009 WL 8412175 (Bankr. D. Alaska Sept. 11, 2009) ............................................................89

*CertainTeed Corp. v. Dexter*,
    330 S.W.3d 64 (Ky. 2010) ...................................................................................................36

*In re Chain*,
    255 B.R. 278 (Bankr. D. Conn. 2000) ...................................................................................99

*In re Chapel Gate Apartments, Ltd.*,
    64 B.R. 569 (Bankr. N.D. Tex. 1986) ...................................................................................12

*In re Charter Commc'ns*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ..................................................................................47

*Cisneros v. Alpine Ridge Grp.*,
    508 U.S. 10 (1993) ...............................................................................................................81

*Citizens Bank of Maryland v. Strumpf*,
    516 U.S. 16 (1995) ...............................................................................................................75

*CNH Am., LLC v. Am. Cas. Co.*,
    C.A. No. N12C-07-108 JTV, 2014 WL 626030 (Del. Super. Ct. Jan. 6, 2014) ....................81

*In re Combustion Eng'g, Inc.*,
    391 F.3d (3d Cir. 2004) ........................................................................................................28

*In re Congoleum Corp.*,
    362 B.R. 167 (Bankr. D.N.J. 2007) ......................................................................................78

*In re Congoleum Corp.*,
    362 B.R. 198 (Bankr. D.N.J. 2007) ......................................................................................67

*In re Congoleum Corp.*,
    426 F.3d 675 (3d Cir. 2005) ..............................................................................36, 67, 78, 79

*In re Corp. Res. Servs., Inc.*,
    564 B.R. 196 (Bankr. S.D.N.Y. 2017) ..................................................................................75

*Correspondent Servs. Corp. v. J.V.W. Inv. Ltd.*,
    524 F. Supp. 2d 412 (S.D.N.Y. 2007) ..................................................................................75

*Cytec Indus., Inc. v. Allnex (Luxembourg) & Cy S.C.A.*,
    2015 WL 3762592 (S.D.N.Y. May 15, 2015) .......................................................................75

*In re Dow Corning Corp.*,
    237 B.R. 380 (Bankr. E.D. Mich. 1999) ..........................................................................89, 91

*Eastgroup Props. v. S. Motel Assoc.*,
  935 F.2d 245 (11th Cir. 1991) .................................................................................43

*In re Eddington Thread Mfg. Co., Inc.*,
  181 B.R. 826 (Bankr. E.D. Pa. 1995), *appeal dismissed as moot*, 189 B.R. 898
  (Bankr. E.D. Pa. 1995) ...........................................................................................47

*In re Edgeworth*,
  993 F.2d 51 (5th Cir. 1993) ....................................................................................54

*Everett v. Nort*,
  547 F. App'x 117 (3d Cir. 2013) ............................................................................30

*In re Federal-Mogul Glob., Inc.*,
  402 B.R. 625 (D. Del. 2009) ...................................................................................80

*In re Federal-Mogul Glob., Inc.*,
  684 F.3d 355 (3d Cir. 2012) ........................................................................... *passim*

*In re Finova Capital Corp.*,
  356 B.R. 609 (Bankr. D. Del. 2006) .................................................................79, 80

*In re Fraser's Boiler Serv., Inc.*,
  No. 18-41245-BDL, 2018 Bankr. LEXIS 2122 (Bankr. W.D. Wash. July 18,
  2018) .................................................................................................................58, 59

*In re Future Energy Corp.*,
  83 B.R. 470 (Bankr. S.D. Ohio 1988) ....................................................................12

*In re G-I Holdings, Inc.*,
  No. 01-30135, ECF No. 9648 (Bankr. D.N.J. Oct. 6, 2009) ..................................31

*In re Gaston & Snow*,
  1996 WL 694421 (S.D.N.Y. Dec. 4, 1996) .......................................................89, 90

*Green v. Welsh*,
  956 F.2d 30 (2d Cir. 1992) .....................................................................................94

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. Ltd.* (*In re Briscoe Enters.
  Ltd.*),
  994 F.2d 1160 (5th Cir. 1993) ................................................................................47

*In re Jersey City Med. Ctr.*,
  817 F.2d 1055 (3d Cir. 1987) ...................................................................................7

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
  987 F.2d 154 (3d Cir. 1993) .....................................................................................7

*In re Johns-Manville Corp.*,
  837 F.2d 89 (2d Cir. 1988) ........................................................................... 76

*In re Johnston*,
  21 F.3d 323 (9th Cir. 1994) ......................................................................... 73

*In re Jorczak*,
  314 B.R. 474 (Bankr. D. Conn. 2004) .......................................................... 99

*In re Kahn*,
  114 B.R. 40 (Bankr. S.D.N.Y. 1990) ............................................................ 99

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d. Cir. 1988) .............................................................. 47, 49, 76

*Lang v. Hanover Ins. Co.*,
  3 N.Y.3d 350 (2004) ..................................................................................... 94

*In re Lapworth*,
  No. 97-34529 (DWS), 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998) ............... 10

*In re Leslie Fay Cos.*,
  207 B.R. 764 (Bankr. S.D.N.Y. 1997) ..................................................... 43, 93

*In re LightSquared Inc.*,
  513 B.R. 56 (Bankr. S.D.N.Y. 2014) .............................................................. 7

*Lisanti Foods v. Lubetkin (In re Lisanti Foods, Inc.)*,
  No. 04-3868 (JCL), 2006 U.S. Dist. LEXIS 76844 (D.N.J. Oct. 11, 2006) ............ 46

*In re LMR, LLC*,
  496 B.R. 410 (Bankr. W.D. Tex. 2013) ......................................................... 73

*In re Los Angeles Asbestos Litig. – General Order*,
  No. C700000 .............................................................................................. 32

*In re Madison Hotel Assocs.*,
  749 F.2d 410 (7th Cir. 1984) ....................................................................... 11

*In re Marvel Entertainment Grp., Inc.*,
  140 F.3d 463 (3d Cir. 1998) ........................................................................ 94

*In re Mayer Pollack Steel Corp.*,
  174 B.R. 414 (Bankr. E.D. Pa. 1994) ........................................................... 47

*Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*,
  354 B.R. 1 (D. Conn. 2006) ............................................................... 73, 74, 92

*In re Minoco Grp.*,
799 F.2d 517 (9th Cir. 1986) ...............................................................................93

*In re Motions Seeking Access to 2019 Statements*,
585 B.R. 733 (D. Del. 2018) ...............................................................................30

*In re Mushroom Transp. Co., Inc.*,
382 F.3d 325 (3d Cir. 2004) ...............................................................................94

*Nat'l Corp.*, Case No. 18-27963 (MBK) (Bankr. D.N.J. Oct. 15, 2018) .....................................26

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Stauffer Chem. Co.*,
No. C.A. 87C-SE-11, 1991 WL 138431 (Del. Super. Ct. July 15, 1991) .........................81, 92

*In re New York City Asbestos Litig.*,
74 N.Y.S.3d 180 (App. Div. Mar. 22, 2018) .........................................................32

*In re NII Holdings, Inc.*,
288 B.R. 356 (Bankr. D. Del. 2002) .....................................................................11

*Official Comm. of Unsecured Creditors of Cybergenics Corp., v. Chinery*,
330 F.3d 548 (3d Cir. 2003) ...............................................................................94

*OneBeacon Am. Ins. Co. v. A.P.I., Inc.*,
No. 06-167, 2006 WL 1473004 (D. Minn. 2006) ...................................................81

*In re Oneida Ltd.*,
400 B.R. 384 (Bankr. S.D.N.Y. 2009) ..................................................................99

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999) ...........................................................................................93

*Owaski v. Jet Florida Sys., Inc.*
883 F.2d 970 (11th Cir. 1989) .............................................................................94

*In re Owens Corning*,
419 F.3d 195 (3d Cir. 2005) ....................................................................43, 44, 45

*In re Penn Cent. Transp. Co.*,
458 F. Supp. 1234 (E.D. Pa. 1978) ......................................................................73

*In re Pittsburgh Corning Corp.*,
No. 00-22876 (JKF), 2013 WL 2299620 (Bankr. W.D. Pa. May 24, 2013),
*clarified on denial of reconsideration*, No. 00-22876-TPA, 2013 WL 5994979
(Bankr. W.D. Pa. Nov. 12, 2013), *aff'd and adopted sub nom. Mt. McKinley
Ins. Co. v. Pittsburgh Corning Corp.*, 518 B.R. 307 (W.D. Pa. 2014) ......................26, 31, 38

*In re Plant Insulation Co.*,
469 B.R. 843 (Bankr. N.D. Cal.), *aff'd*, 485 B.R. 203 (N.D. Cal. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013), *and aff'd*, 544 F. App'x 669 (9th Cir. 2013) ............................................................................................. *passim*

*In re Plant Insulation Co.*,
734 F.2d 900 (9th Cir. 2013) ......................................................................... 54

*Platinum Capital, Inc. v. Sylmar Plaza, L.P.* (*In re Sylmar Plaza, L.P.*),
314 F.3d 1070 (9th Cir. 2002) ................................................................ 11, 93

*In re Quigley Co.*,
377 B.R. 110 (Bankr. S.D.N.Y. 2007) ................................... 65, 66, 90, 91

*In re Quigley Co.*,
437 B.R. 102 (Bankr. S.D.N.Y. 2010) .......................................................... 90

*In re Renegade Holdings, Inc.*,
429 B.R. 502 (Bankr. M.D.N.C. 2010) ......................................................... 73

*In re Rivers End Apartments, Ltd.*,
167 B.R. 470 (Bankr. S.D. Ohio 1994) ......................................................... 49

*In re S&W Enter.*,
37 B.R. 153 (Bankr. N.D. Ill. 1984) ............................................................... 6

*In re SGL Carbon Corp.*,
200 F.3d 154 (3d Cir. 1999) .................................................................. 95, 96

*Sparks v. Owens-Illinois, Inc.*,
38 Cal. Rptr. 2d 739 (Ct. App. 1995) .......................................................... 37

*In re SportStuff, Inc.*,
430 B.R. 170 (B.A.P. 8th Cir. 2010) ............................................................. 77

*In re STC, Inc.*,
No. 14-41014, 2016 Bankr. LEXIS 1110 (Bankr. S.D. Ill. Apr. 7, 2016) ............... 73

*In re Stone & Webster, Inc.*,
286 B.R. 532 (Bankr. D. Del. 2002) ............................................................. 43

*In re SunEdison, Inc.*,
562 B.R. 243 (Bankr. S.D.N.Y. 2017) .......................................................... 76

*In re Toy & Sports Warehouse, Inc.*,
37 B.R. 141 (Bankr. S.D.N.Y. 1984) ............................................................ 48

*In re Union Meeting Partners*,
165 B.R. 553 (Bankr. E.D. Pa. 1994) ...................................................................92

*Viking Pump, Inc. v. Century Indem. Co.*,
2 A.3d 76 (Del. Ch. 2009) ...................................................................................81

*Viola v. Fireman's Fund Ins. Co.*,
965 F. Supp. 654 (E.D. Pa. 1997) .......................................................................80

*In re Vitek, Inc.*,
51 F.3d 530 (5th Cir. 1995) .................................................................................93

*In re W. Asbestos Co.*,
313 B.R. 859 (N.D. Cal. 2004) ...........................................................................93

*In re W.R. Grace*,
446 B.R. 96 (Bankr. D. Del. 2011), *amended on reconsideration in part*, No.
BK 01-1139 JKF, 2011 WL 832940 (Bankr. D. Del. Mar. 4, 2011), *and aff'd*,
468 B.R. 81 (D. Del. 2012), *withdrawn from bound volume, opinion amended
and superseded*, 475 B.R. 34 (D. Del. 2012), *aff'd sub nom. In re WR Grace
& Co.*, 729 F.3d 332 (3d Cir. 2013), *and aff'd*, 532 F. App'x 264 (3d Cir.
2013) ....................................................................................................................42

*In re W.R. Grace*,
475 B.R. 34 (D. Del. 2012), *aff'd*, 729 F.3d 311 (3d Cir. 2013), *and aff'd*, 729
F.3d 332 (3d Cir. 2013), *and aff'd*, 532 F. App'x 264 (3d Cir. 2013) ...........42, 88

*In re W.R. Grace*,
729 F.3d 311 (3d Cir. 2013)............................................................................42, 66

*Willett v. Lincolnshire Mgmt.*,
756 N.Y.S.2d 9 (A.D. 1st Dep't 2003) ................................................................75

*In re WorldCom, Inc.*,
No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ..................10, 47

**Statutes**

11 U.S.C. § 101(31) ..................................................................................................13

11 U.S.C. § 101(49)(A)(i) .........................................................................................17

11 U.S.C. § 107(c) ....................................................................................................30

11 U.S.C. § 363(e) ....................................................................................................76

11 U.S.C. § 502(a) ...............................................................................................98, 99

11 U.S.C. § 502(b) ..............................................................................................61, 99

11 U.S.C. § 506 ...........................................................................................................74

11 U.S.C. § 524(g) ................................................................................................... *passim*

11 U.S.C. § 524(g)(1)(A) ...........................................................................................17

11 U.S.C. § 524(g)(1)(B) ......................................................................................70, 71

11 U.S.C. § 524(g)(2)(B)(i) ....................................................................................17, 18

11 U.S.C. § 524(g)(2)(B)(i)(I) ...................................................................................17

11 U.S.C. § 524(g)(2)(B)(i)(II) .................................................................................17

11 U.S.C. § 524(g)(2)(B)(i)(III)(aa) ....................................................................77, 79

11 U.S.C. § 524(g)(2)(B)(ii) .....................................................................................19

11 U.S.C. § 524(g)(2)(B)(ii)(I) .................................................................................19

11 U.S.C. § 524(g)(2)(B)(ii)(II) ................................................................................20

11 U.S.C. § 524(g)(2)(B)(ii)(III) ..............................................................................20

11 U.S.C. § 524(g)(2)(B)(ii)(IV) ..............................................................................21

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa) ........................................................................21

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) ........................................................................68

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) ........................................................................21

11 U.S.C. § 524(g)(2)(B)(ii)(V) ....................................................................21, 22, 42

11 U.S.C. § 524(g)(3)(A)(i) .......................................................................................97

11 U.S.C. § 524(g)(4)(A)(ii) .........................................................................22, 85, 86

11 U.S.C. § 524(g)(4)(B) ...........................................................................................71

11 U.S.C. § 524(g)(4)(B)(ii) ....................................................................................... *passim*

11 U.S.C. § 524(g)(B)(i)(III) .....................................................................................18

11 U.S.C. § 524(g)(B)(i)(IV) .....................................................................................18

11 U.S.C. § 553 .....................................................................................................74, 75

11 U.S.C. § 1114 ..................................................................................................15, 16

11 U.S.C. § 1122 ................................................................................................6, 7, 8

11 U.S.C. § 1122(a) .....................................................................................7, 64, 65, 66

11 U.S.C. § 1123(a) ...............................................................................................8, 81

11 U.S.C. § 1123(a)(1) ............................................................................................8, 9

11 U.S.C. § 1123(a)(2) ................................................................................................8

11 U.S.C. § 1123(a)(4) ............................................................................................8, 9

11 U.S.C. § 1123(a)(5) ...........................................................................................9, 10

11 U.S.C. § 1123(a)(5)(B) .................................................................................46, 80, 81

11 U.S.C. § 1123(a)(6) ..............................................................................................10

11 U.S.C. § 1123(a)(7) ..............................................................................................10

11 U.S.C. § 1123(a)(8) ..............................................................................................10

11 U.S.C. § 1123(b) ..................................................................................................16

11 U.S.C. § 1123(b)(6) .........................................................................................83, 84

11 U.S.C. § 1125 ......................................................................................................10

11 U.S.C. § 1126 ..................................................................................................10, 11

11 U.S.C. § 1126(f) ...................................................................................................11

11 U.S.C. § 1129 .....................................................................................................3, 6

11 U.S.C. § 1129(a)(1) ..........................................................................................6, 83

11 U.S.C. § 1129(a)(2) ........................................................................................10, 11

11 U.S.C. § 1129(a)(3)................................................................................... *passim*

11 U.S.C. § 1129(a)(4) ..............................................................................................12

11 U.S.C. § 1129(a)(5) ..............................................................................................12

11 U.S.C. § 1129(a)(5)(A)(i) ......................................................................................12

11 U.S.C. § 1129(a)(5)(A)(ii) .....................................................................................13

11 U.S.C. § 1129(a)(5)(B) ..........................................................................................13

11 U.S.C. § 1129(a)(6) .................................................................................................13

11 U.S.C. § 1129(a)(7) ............................................................................................ *passim*

11 U.S.C. § 1129(a)(8) .................................................................................................14

11 U.S.C. § 1129(a)(9) ...........................................................................................14, 15

11 U.S.C. § 1129(a)(10) ...............................................................................................15

11 U.S.C. § 1129(A)(11) ..............................................................................15, 47, 49

11 U.S.C. § 1129(a)(12) ...............................................................................................15

11 U.S.C. § 1129(a)(13) .........................................................................................15, 16

11 U.S.C. § 1129(b) ...........................................................................................72, 73, 74

11 U.S.C. § 1129(b)(1) .................................................................................................74

11 U.S.C. § 1129(b)(2)(B)(i) ................................................................................72, 73

11 U.S.C. § 1129(c) ......................................................................................................24

11 U.S.C. § 1129(d) .....................................................................................................24

11 U.S.C. § 1146(a) .....................................................................................................10

28 U.S.C. § 1930 ..........................................................................................................15

Cal. Bus. & Prof. Code § 6146 (West 2019) ..............................................................40

N.J. Stat. Ann. § 30:4-24.2 (2018) .............................................................................30

N.J. Stat. Ann. § 56:8-164 (2018) ..............................................................................30

N.Y. Bus. Corp. Law § 901 (McKinney 2012) ..........................................................46

N.Y. Jud. Law § 474-a (McKinney 2019) .................................................................40

UCC § 9-610(c) ............................................................................................................79

Wis. Stat. Ann. § 802.025(6) (2018) ..........................................................................32

**Other Authorities**

Black's Law Dictionary (10th ed. 2014) .....................................................................56

Fed. R. Bankr. P. 3001(f) ............................................................................................99

Fed. R. Bankr. P. 3020(e) ................................................................................100, 101

Geoffrey C. Hazard, Jr., W. William Hodes & Peter R. Jarvis, LAW OF
    LAWYERING (4th Edition, 2018-1 Supp. 2014)........................................................40

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C. C.A.N. 5963 (1977) ....................................6, 10

Lloyd Dixon, Geoffrey McGovern and Amy Coombe, *Asbestos Bankruptcy
    Trusts: An Overview of Trust Structure and Activity With Detailed Reports on
    the Largest Trusts*, RAND Institute for Civil Justice (2010)...................................................27

N.Y. Rules App. Div. 1st Dept. § 603.25 ..................................................................40

S. Rep. No. 95-989, *reprinted in* 1978 U.S.C.C.A.N. 5787 (1978)...........................................6, 10

1 Steven Plitt & Jordan Ross Plitt, PRACTICAL TOOLS FOR HANDLING INSURANCE
    CASES § 8:2 (2018) .........................................................................................91

U.S. Gov't Accountability Off., GAO 11-819, ASBESTOS INJURY COMPENSATION,
    THE ROLE AND ADMINISTRATION OF ASBESTOS TRUSTS (2011) .......................................26, 31

U.S. Office of Mgmt. and Budget, STATEMENT OF ADMINISTRATION POLICY ON
    H.R. 982 - FURTHERING ASBESTOS CLAIM TRANSPARENCY (FACT) ACT OF
    2013 (Nov. 12, 2013),
    https://obamawhitehouse.archives.gov/sites/default/files/omb/legislative/sap/1
    13/saphr982h_20131112.pdf ...........................................................................27, 30

The above-captioned Debtors and debtors-in-possession, the Official Committee of Asbestos Claimants, and Lawrence Fitzpatrick in his official capacity as Legal Representative (collectively, "**Plan Proponents**"), by and through their undersigned counsel, hereby submit this memorandum in support of confirmation of the Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., *et al.* Under Chapter 11 of the Bankruptcy Code (such as may be modified or supplemented, the "**Plan**") and in response to the Objection of the Acting United States Trustee ("**UST**") to Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., *et al.* Under Chapter 11 of the Bankruptcy Code, filed Feb. 8, 2019 (ECF No. 447) ("**UST Obj.**"), the Joint Objection of Certain Insurers ("**Insurers**") to Debtors' Second Amended Plan of Reorganization for Duro Dyne National Corp., *et al.* Under Chapter 11 of the Bankruptcy Code, filed Feb. 8, 2019 (ECF No. 445) ("**Jt. Obj.**"),[2] MidStates Reinsurance Corporation's (I) Joinder in Support of the Joint Objection of Certain Insurers to Debtors' Second Amended Plan of Reorganization for Duro Dyne National Corp., *et al.* Under Chapter 11 of the Bankruptcy Code and (II) Supplemental Plan Objections, filed Feb. 8, 2019 (ECF No. 445) ("**MidStates Obj.**"), and Objection to Confirmation of Debtors' Second Modified Plan of Reorganization and to Substantive Consolidation, filed Feb. 6, 2019 on behalf of the International

---

[2]   North River Insurance Company and Midstates Reinsurance Corporation have filed joinders in the UST Obj.:  the Limited Joinder of the North River Insurance Company in the Objection of the Acting United States Trustee to Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al., Under Chapter 11 of the Bankruptcy Code, filed Feb. 12, 2019 (ECF No. 452) ("**NRI Joinder**"); and Midstates Reinsurance Corporation's Joinder in Support of the Objection of the Acting United States Trustee to Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., *et al.*, Under Chapter 11 of the Bankruptcy Code, filed Feb. 12, 2019 (ECF No. 453) ("**MidStates Joinder**"). We will not separately address the NRI Joinder and the MidStates Joinder but respectfully submit that they should be overruled for the same reasons set forth herein that UST Obj. should be overruled.

Association of Sheet Metal, Air, Rail, and Transit Workers ("**SMART**") (ECF No. 438) ("**SMART Obj.**").[3]

## I.    PRELIMINARY STATEMENT

The Debtors filed for reorganization under chapter 11 to address existing and future asbestos-related claims against them under § 524(g) of the Bankruptcy Code—a remedy specifically enacted by Congress for doing so.  The Plan proposed by the Plan Proponents provides the means for implementing the relief granted by 11 U.S.C. § 524(g).  In accordance with that statute, the Plan provides for the formation of the Asbestos Trust ("**Duro Dyne Trust**" or "**Trust**") and the issuance of the Asbestos Permanent Channeling Injunction that will enjoin and channel existing Asbestos Claims and future Demands to the Trust for resolution and payment in accordance with the Trust Distribution Procedures ("**Duro Dyne TDP**" or "**TDP**").

The Plan is the product of more than three years of good-faith, arm's-length negotiations between the Debtors on the one hand and representatives of present and future asbestos claimants on the other.  The Plan necessarily addresses four competing interests:  (1) existing and future asbestos claimants; (2) insurers who chose to settle with the Debtors in exchange for complete protection from further litigation afforded under § 524(g); (3) the objecting Insurers who have chosen not to settle, opting to defend cases in the tort system, while awaiting the outcome of coverage litigation; and (4) the Reorganized Debtor's business requirements.

The gist of the Plan shaped by these competing interests is simple:  The Debtors, their affiliates, members of the Hinden family, and Settling Asbestos Insurers pay money to the Trust. In return, they receive complete peace.  The policy obligations of the Settling Asbestos Insurers

---

[3]    Unless otherwise defined herein, all capitalized terms have the meanings ascribed to them in the Plan.

will be terminated.  The Settling Asbestos Insurers and the Debtors will be protected from all claims, including contribution claims that might otherwise be asserted by the Insurers.  The Trust will pay out its funds (generated by contributions by the Debtors and the Hinden family and insurance settlements) under a distribution formula and procedure designed to ensure that present and future asbestos claimants are treated the same and fairly.  The Debtors will reorganize and merge into a single entity (the Reorganized Debtor), freed of asbestos liabilities, and obligated to make specified contributions to the Trust.  The Reorganized Debtor, or the Trust in its stead, will continue to have obligations (cooperation, notice, and the like) to the Non-Settling Asbestos Insurers.  Those insurers will continue to have obligations to defend and indemnify, which remain unaffected by the Plan.  Asbestos victims may sue the Reorganized Debtor but may collect only from available insurance—with appropriate state law and Plan credits for partial payments that victims received from the Trust.

Asbestos victims voted unanimously to accept this Plan.  The only rejecting votes were cast by Asbestos Insurers who are coverage litigation adversaries of the Debtors.  The Insurers also filed objections to confirmation of the Plan.  Additionally, confirmation objections have been filed by the UST and SMART.  For the reasons explained below, all of the objections lack merit, and the Plan satisfies the requirements for confirmation under 11 U.S.C. § 1129 and for relief under § 524(g).  Accordingly, this Court should overrule the objections, and the Plan should be confirmed.

## II.      BACKGROUND

### A.      Filing of the Case

On September 7, 2018 ("**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-titled chapter 11 cases (collectively, "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of New

Jersey.  The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  A detailed description of the Debtors' business and the facts surrounding the commencement of the chapter 11 cases is set forth in the *Declaration of Randall S. Hinden in Support of Chapter 11 Petitions and First Day Pleadings* (ECF No. 3), which is incorporated herein by reference.  The *Certification of Mark Podgainy in Support of Confirmation* ("**Podgainy Certification**") is likewise incorporated herein by reference.

On September 26, 2018, the Office of the United States Trustee appointed an Official Committee of Asbestos Claimants ("**Committee**") (ECF No. 107).  On October 17, 2018, the Court entered an Order Appointing Lawrence Fitzpatrick as the legal representative to represent the interests of future personal injury claimants ("**Legal Representative**") (ECF No. 191).

The Confirmation Hearing for the Plan is scheduled to begin on March 6, 2019.

### B.    Solicitation and Voting Results

Pursuant to the Amended Order (i) Approving Second Amended Disclosure Statement as Providing Adequate Information Within the Meaning of Section 1125(a) of the Bankruptcy Code; (ii) Establishing Procedures for Solicitation and Tabulation of Votes on Amended Plan of Reorganization; (iii) Approving the Form of Ballots; (iv) Scheduling a Hearing on Confirmation of the Plan; (v) Approving the Form, Manner and Scope of Mailed and Published Notices of the Time Fixed to (a) Vote on the Amended Plan, and (b) File Objections to Confirmation of the Amended Plan; and (vi) Granting Related Relief ("**Disclosure Statement Order**"), the Court established a deadline of January 24, 2019 ("**Voting Deadline**") for creditors entitled to vote on the Plan (creditors in Classes 6 and 7) to submit their ballots.

4

On November 22, 2018, the Debtors served the Confirmation Hearing Notice, Solicitation

Packages, and Notice of Non-Voting Status (each as defined in the Disclosure Statement Order)

on the appropriate parties in accordance with the terms of the Disclosure Statement Order.[4]

On January 30, 2019, the Debtors filed the *Declaration of Balloting Agent Regarding the*

*Solicitation and Tabulation of Votes in Connection with the Second Amended Prenegotiated Plan*

*of Reorganization for Duro Dyne National Corp., et al.* (ECF No. 427), which includes a report

summarizing the votes received on the Plan ("**Tabulation Report**").  As reflected in the

Tabulation Report and as modified by the *Order Granting North River's Motion Pursuant to*

*Bankruptcy Rule 3018 for Temporary Allowance of Its Proofs of Claim for Voting Purposes*, filed

Feb. 8, 2019 (ECF No. 448) ("**3018 Order**"), on or before the Voting Deadline, two holders of

Class 6 Prepetition Defense-Cost Contribution Claims timely submitted two ballots.  Both ballots,

representing $8,881,493.39, voted to reject the plan.

As also reflected in the Tabulation Report and as modified by the 3018 Order, on or before

the Voting Deadline, 1,473 holders of Class 7 Channeled Asbestos Claims timely submitted

ballots.  Of these ballots, 1,470 (99.8%), representing $83,729,900.00 (77.1%), voted to accept the

Plan, and three (0.2%), representing $24,992,118.79 (22.9%), voted to reject the Plan.

C.    **The Plan Supplement**

On October 29, 2018, the Plan Proponents filed a Plan Supplement which contained certain

material documents necessary for implementation of the Plan (ECF No. 222).  The Plan Proponents

have filed an Amended Plan Supplement with the filing of this memorandum.

---

[4]    *See* Certifications of Service (ECF Nos. 291, 292, 293 and 294).

### D.  Confirmation Objections

As noted above, objections to Confirmation have been filed by the UST, the Insurers, and

SMART.  For the reasons set forth herein, the Plan Proponents submit that the Objections should

be overruled by the Court in all respects and that the Plan should be confirmed.

## III.  THE PLAN SATISFIES EACH OF THE BANKRUPTCY CODE'S REQUIREMENTS FOR CONFIRMATION

To confirm the Plan, the Court must find that the Plan satisfies the applicable provisions

of § 1129 by a preponderance of the evidence.[5]  The Plan does so.

### A.  The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1))

Under § 1129(a)(1), a plan must "compl[y] with the applicable provisions of [the

Bankruptcy Code]."  The legislative history of § 1129(a)(1) explains that this provision

encompasses the requirements of §§ 1122 (classification) and 1123 (contents of a plan of

reorganization).[6]  The Plan complies with the Bankruptcy Code generally and, as set forth below,

with §§ 1122, 1123, and 1129 specifically.

---

[5]  *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 119-20 (D. Del. 2006) (stating that a court must determine whether a plan meets the requirements of § 1129 in order to confirm such plan); *In re Bally Total Fitness of Greater N.Y., Inc.*, No. 0712395 (BRL), 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The Debtors, as proponents of the Plan, have the burden of proving the satisfaction of the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.").

[6]  S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of . . . [§ 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were Sections 1122 and 1123.").

## B.    The Plan Satisfies the Classification Requirements of 11 U.S.C. § 1122

Pursuant to § 1122(a), claims or interests placed in a particular class must be substantially similar to each other.  Although § 1122 does not specify if or when similar claims may be separately classified – except with respect to unsecured claims that are separately classified for administrative convenience – courts uniformly have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a reasonable or rational basis for doing so.[7]

Article III of the Plan designates classes of Claims against and Interests in the Debtors, except for Administrative Expense Claims and Priority Tax Claims, which are not required to be classified.  The Plan designates the following classes of Claims and Interests:

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote |
| 3 | Employee Benefit Claims | Unimpaired | Not Entitled to Vote |
| 4 | Worker Compensation Claims | Unimpaired | Not Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote |
| 6 | Prepetition Defense-Cost Contribution Claims | Impaired | Entitled to Vote |
| 7 | Channeled Asbestos Claims | Impaired | Entitled to Vote |

---

[7]    *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158-59 (3d Cir. 1993) (noting that, as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also In re LightSquared Inc.*, 513 B.R. 56, 83 (Bankr. S.D.N.Y. 2014) ("[S]eparate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a 'reasonable' (or 'rational') justification for separate classification.").

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 8 | Bonded Claims | Unimpaired | Not Entitled to Vote |
| 9 | Intercompany Claims | Impaired | Not Entitled to Vote |
| 10 | Related-Party Claims | Impaired | Not Entitled to Vote |
| 11 | Equity Interests in Duro Dyne National Corp. | Impaired | Not Entitled to Vote |
| 12 | Equity Interests in Duro Dyne Corporation, Duro Dyne Midwest Corp., Duro Dyne West Corp., and Duro Dyne Machinery Corp. | Impaired | Not Entitled to Vote |

The Plan's classification of Claims and Interests satisfies the requirements of § 1122 because the Claims and Interests in each class (a) are substantially similar to each other, and (b) differ from the Claims and Interests in each other class in a legal or factual way that is a reasonable and legitimate basis for separate classification.[8]

### C.    The Plan Satisfies the Mandatory Requirements of 11 U.S.C. § 1123(a)

Section 1123(a) sets forth seven mandatory requirements that a chapter 11 plan of a corporate debtor must satisfy.  The Plan complies with all applicable provisions of the Bankruptcy Code as required by § 1123(a).

Article III of the Plan satisfies the first four requirements of § 1123(a) by (a) properly designating classes (§ 1123(a)(1)); (b) specifying the classes that are Unimpaired under the Plan (§ 1123(a)(2)); (c) specifying the treatment of each Class that is Impaired (§ 1123(a)(3)); and (d) providing for the same treatment of each Claim or Interest within a class, unless the holder of a Claim or Interest consents to less favorable treatment on account of its Claim or Interest (§ 1123(a)(4)).

Specifically, Article III of the Plan designates twelve classes of Claims and Interests.  This classification system is based upon the legal nature and relative rights of each class of Claims and

---

[8]    *See infra* part XII.A.

Interests, and is not proposed for any improper purpose. Each class contains only Claims or Interests that are substantially similar to other Claims and Interests therein. The Plan thus complies with § 1123(a)(1).

Article III of the Plan also specifies whether each class of Claims and Interests is unimpaired under the Plan, and sets forth the treatment of such classes of Claims and Interests. As such, the plan complies with § 1123(a)(2) and (3).

Pursuant to the Plan, in accordance with § 1123(a)(4), the treatment of each Claim or Interest in each particular class is the same as the treatment of each other claim or interest in such class, unless the holder of a particular claim or interest has agreed to a less favorable treatment of such particular claim or interest. As such, the Plan complies with § 1123(a)(4).

Articles IV and V and various other provisions of the Plan, provide adequate means for the Plan's implementation as required by § 1123(a)(5), including, among other things, provisions governing:

- the continued corporate existence of the Reorganized Debtor;

- the vesting of all assets and property of the Debtors and their Estates in the Reorganized Debtor;

- obtaining the Senior Lender Facility to fund the Debtors' Contribution to the Asbestos Trust  and working capital needs;

- the funding of the Asbestos Trust;

- the granting of the Bay Shore Mortgage and the Fairfield Mortgage to secure payment and performance under the Trust Note;

- the continued service of the Debtors' current officers, directors, and managers in such capacities for the Reorganized Debtor;

- the preservation of Causes of Action not expressly waived, relinquished, or released pursuant to the Plan;

- authorization for the Debtors or the Reorganized Debtor, as applicable, to take corporate actions as may be necessary or appropriate to effectuate or further evidence the provisions of the Plan;

- the exemption from certain transfer taxes pursuant to § 1146(a); and

- the making of distributions to creditors under the Plan.

Each of the above and the other means for implementation of the Plan are necessary and appropriate and will help to streamline the Debtors' emergence from chapter 11. Accordingly, the proposed means for implementation of the Plan satisfy § 1123(a)(5) and should be approved.

Section 5.02(a) of the Plan provides that the certificate of incorporation and bylaws of the Reorganized Debtor shall be amended consistent with § 1123(a)(6), and these proposed amendments are annexed as Schedule 5.02(a) to the Plan Supplement. Accordingly, the Plan complies with § 1123(a)(6).

In accordance with section 5.02 of the Plan, the current officers and directors of the Debtors will continue to serve in those capacities for the Reorganized Debtor and their continued service is consistent with the interests of holders of Claims and Interests and with public policy, which satisfies § 1123(a)(7). The Debtors are not individuals. Accordingly, § 1123(a)(8) is inapplicable.

**D.    The Plan Proponents Have Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2))**

Section 1129(a)(2) requires compliance with the disclosure and solicitation requirements set forth in 11 U.S.C. § 1125 and the plan acceptance requirements set forth in 11 U.S.C. § 1126.[9]

---

[9]    *See In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that § 1129(a)(2) requires compliance with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code"); S. Rep. No. 989, at 126 (1978); H.R. Rep. No. 595, at 412 (1977).

As described above, the Plan Proponents have complied with these provisions, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan in accordance with the Disclosure Statement Order.

Section 1126 provides that holders of claims and equity interests allowed under § 502 in impaired classes that will receive or retain property under a plan may vote to accept or reject a plan. Accordingly, the Plan Proponents solicited votes from holders of Claims in Classes 6 and 7 because each of these Classes is impaired under the Plan. In accordance with § 1126(f), the Debtors did not solicit votes from the unimpaired classes because they are statutorily presumed to have accepted the Plan. Based on the foregoing, the Plan Proponents have satisfied the requirements of § 1129(a)(2).

**E.      The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (§ 1129(a)(3))**

Section 1129(a)(3) requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law." Where the plan proponent proposes the plan with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the plan proponent satisfies the good faith requirement of § 1129(a)(3).[10] Under this section, "good faith" should be evaluated in light of the totality of the circumstances in the development of the plan.[11]

The Plan Proponents submit that they negotiated, developed, and proposed the Plan in good faith. The Plan is the result of an extended negotiation process with intense arm's length

---

[10]    *See In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002) (concluding 1129(a)(3) is satisfied when "the Plan has been proposed with the legitimate purpose of reorganizing the business affairs of each of the debtors and maximizing the returns available to creditors of the Debtors.").

[11]    *See Platinum Capital, Inc. v. Sylmar Plaza, L.P.* (*In re Sylmar Plaza, L.P.*), 314 F.3d 1070, 1074 (9th Cir. 2002); *see also In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984) (court examines a plan for purposes of 1129(a)(3) "in light of the totality of the circumstances" surrounding confirmation).

negotiations and settlement discussions among the Debtors and their largest group of unsecured

creditors.  The Plan has been proposed in good faith and for the legitimate and honest purposes of

reorganizing the Debtors, while providing greater recovery to the Debtors' creditors than would

be otherwise available to them.  Accordingly, the Plan and the Plan Proponents' conduct satisfy

§ 1129(a)(3).

## F.    The Plan Provides for Court Approval of Certain Administrative Payments (§ 1129(a)(4))

Section 1129(a)(4) requires that certain professional fees and expenses paid by the plan

proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, be

subject to approval of the Court as reasonable.[12]

Here, all payments made or to be made by the Debtors for services or for costs or expenses

incurred in connection with these Chapter 11 Cases prior to the Effective Date, including all

Professional Claims, have been approved by, or are subject to approval of, the Court as reasonable.

Section 2.01(c) of the Plan provides that all final requests for payment of Professional Claims shall

be filed no later than thirty (30) days after the Effective Date for determination by the Court in

accordance with the procedures established by the Bankruptcy Code and prior Court orders.

Accordingly, the Plan fully complies with the requirements of § 1129(a)(4).

## G.    Post-Emergence Directors and Officers Have Been Disclosed and Their Appointment Is Consistent with Public Policy; Insider Post-Emergence Employment Arrangements for Insiders Have Been Disclosed (§ 1129(a)(5))

Section 1129(a)(5)(A)(i) requires the plan proponent to disclose the affiliation of any

individual proposed to serve as a director or officer of the debtor or a successor to the debtor under

---

[12]   *See In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

the plan. Section 1129(a)(5)(A)(ii) further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy. The Plan satisfies § 1129(a)(5)(A)(i) and (ii) because the Debtors have disclosed the identities and affiliations of all persons proposed by the Reorganized Debtor to serve as directors and officers, and those appointments are not inconsistent with the interests of creditors and equity security holders or public policy.

In addition, § 1129(a)(5)(B) requires disclosure of the identity of any "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider. Here, the Plan satisfies § 1129(a)(5)(B) because the identity of any "insider" to be employed or retained by the Reorganized Debtor and the nature of any compensation to be paid to such insiders have been disclosed in the Plan Supplement.

### H.    The Plan Does Not Require Governmental Approval of Rate Changes (§ 1129(a)(6))

Section 1129(a)(6) permits confirmation only if a regulatory commission that will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the plan. The Plan does not provide for any rate changes. Therefore, § 1129(a)(6) is inapplicable here.

### I.    The Plan Is in the Best Interests of Creditors (§ 1129(a)(7))

Section 1129(a)(7)—the "best interests of creditors" test—requires that, with respect to each impaired class of claims or interests, each holder of a claim or interest of such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain

if the debtor liquidated under chapter 7.[13]  As discussed at length in part XII.J below, the Plan

satisfies the requirements of § 1129(a)(7).

> ### J.    The Plan Can Be Confirmed Notwithstanding the Requirements of § 1129(a)(8)

Section 1129(a)(8) requires that each class of claims or interests either accept a plan or be

unimpaired under the plan.  As discussed in part XII.D below, the Plan can be confirmed over the

objection of Class 6 because the Plan provides that holders of Claims in Class 6 will be receive

payment in full of their Claims with interest.

> ### K.    The Plan Complies with Statutorily Mandated Treatment of Administrative Expense and Priority Tax Claims (§ 1129(a)(9))

Section 1129(a)(9) requires that certain priority claims be paid in full on the effective date

of a plan and that the holders of certain other priority claims receive deferred cash payments.  In

particular, pursuant to § 1129(a)(9)(A), holders of claims of a kind specified in § 507(a)(2), in this

case administrative expenses allowed under § 503(b), must receive on the effective date cash equal

to the allowed amount of those claims.

In accordance therewith, section 2.01 of the Plan provides that each holder of an Allowed

Administrative Expense Claim or Allowed Professional Claim will receive, in full and final

satisfaction of its Allowed Administrative Expense Claim or Allowed Professional Fee Claim,

Cash equal to the amount of the unpaid portion of such Allowed Administrative Expense Claim or

Allowed Professional Fee Claim.  In addition, section 2.02 of the Plan provides that holders of

Allowed Priority Tax Claims will receive one of the following treatments at the option of the

Reorganized Debtor:  (a) Cash in the amount of the Allowed Priority Tax Claim; (b) cash in the

---

[13]   11 U.S.C. § 1129(a)(7); s*ee also Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.").

14

aggregate amount of the Allowed Priority Tax Claim payable in installments over a period of time not to exceed five (5) years; or (c) such other treatment as may be agreed upon by the holder and the Reorganized Debtor or otherwise determined by order of the Bankruptcy Court.  Furthermore, amounts due to be paid to the Office of the United States Trustee will be paid as provided for in section 13.18 of the Plan.  Accordingly, the Plan complies with the requirements of § 1129(a)(9).

**L.      At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptance of Insiders (§ 1129(a)(10))**

Section 1129(a)(10) provides that if a class of claims is impaired under a plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider.  Here, Class 7 has accepted the Plan.  Accordingly, the Plan satisfies the requirements of § 1129(a)(10).

**M.      The Plan is Feasible (§ 1129(a)(11))**

Section 1129(a)(11) requires the Court find that the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is provided for in the Plan.  As discussed in part IX below, the Plan satisfies feasibility requirements.

**N.      The Plan Provides for Payment of All Fees Under 28 U.S.C. § 1930 (§ 1129(a)(12))**

Section 1129(a)(12) requires the payment of all fees payable under 28 U.S.C. § 1930. Section 2.03 of the Plan provides that all such fees incurred prior to and after the Effective Date will be paid by the Debtors or Reorganized Debtor, as applicable, when due and payable. Accordingly, the Plan complies with § 1129(a)(12).

**O.      The Plan Provides for Payment of Retiree Benefits (§ 1129(a)(13))**

Section 1129(a)(13) requires chapter 11 plans to continue all retiree benefits (as defined in 11 U.S.C. § 1114).  Section 3.03(c) of the Plan provides for the Reorganized Debtor to continue

15

making payments to retiree benefit plans, funds or programs, including Allowed Withdrawal Liability Claims, as defined in § 1114.  Accordingly, the Plan complies with § 1129(a)(13).

### P.    Sections 1129(a)(14)-(16) Are Inapplicable

Sections 1129(a)(14) and (15) apply only to debtors that are individuals and therefore do not apply here.  Section 1129(a)(16) applies only to debtors that are nonprofit entities or trusts and therefore does not apply here.

## IV.    THE DISCRETIONARY CONTENTS OF THE PLAN ARE APPROPRIATE AND SHOULD BE APPROVED (§ 1123(b))

Section 1123(b) identifies various additional provisions that may be incorporated into a chapter 11 plan.  Among other things, § 1123(b) provides that a plan may (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate; and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[14]  As set forth below and in the Podgainy Certification, the Plan includes certain of these discretionary provisions that are appropriate and should be approved by the Court.

## V.    THE PLAN SATISFIES THE REQUIREMENTS FOR ENTRY OF THE ASBESTOS PERMANENT CHANNELING INJUNCTION UNDER § 524(g) OF THE BANKRUPTCY CODE

The Plan comports with the Bankruptcy Code's requirements for issuance of an injunction to enjoin entities from taking legal action to recover, directly or indirectly, payment in respect of asbestos-related claims or Demands against the Reorganized Debtor or its property.  The Plan Proponents hereby request the issuance of the Asbestos Permanent Channeling Injunction in

---

[14]    11 U.S.C. § 1123(b)(1)-(3), (6).

accordance with § 524(g).  Addressed below are those requirements of § 524(g) that are not subject to a pending objection.

### A.    The Trust Satisfies the Requirements of 11 U.S.C. § 524(g)(2)(B)(i)

Section 524(g)(1)(A) authorizes a court to enter, in connection with confirmation of a plan of reorganization, an injunction to enjoin entities from taking legal action to recover, directly or indirectly, payment in respect of asbestos-related claims or demands if the plan of reorganization establishes a trust to resolve and pay such claims.[15]  To be entitled to such an injunction, the trust must meet the structure and funding requirements of § 524(g)(2)(B)(i).  For the reasons explained below, the proposed Trust satisfies those requirements.

Section 524(g)(2)(B)(i)(I) requires that an asbestos settlement trust assume the liabilities of a debtor that, as of the petition date, has been named as a defendant in actions to recover damages for asbestos-related claims.[16]  The Trust meets this requirement because, on the Effective Date, the Trust will assume liability and responsibility for Channeled Asbestos Claims.[17]

Section 524(g)(2)(B)(i)(II) requires that an asbestos settlement trust "be funded in whole or in part by the securities of one or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends.[18]  The Bankruptcy Code defines the term "security" to include a "note."[19]  The Plan satisfies this requirement by providing that, on the Effective Date, the Reorganized Debtor will issue and deliver the Trust Note to the

---

[15]  11 U.S.C. § 524(g)(1)(A).

[16]  *Id.* § 524(g)(2)(B)(i)(I).

[17]  *See* Plan § 4.01, -.06.

[18]  § 524(g)(2)(B)(i)(II).

[19]  11 U.S.C. § 101(49)(A)(i).

Trust.[20]  The Trust Note will be a promissory note in the original principal amount of $13.5 million, payable in installments over roughly 20 years at an interest rate of 7.15% per annum.[21]

Section 524(g)(B)(i)(III) requires that an asbestos settlement trust have the ability to own, if specified contingencies occur, "a majority of the voting shares of—(aa) each such debtor; (bb) the parent corporation of each such debtor; or (cc) a subsidiary of each such debtor that is also a debtor."  In accordance with this requirement, the Trust will receive a pledge of, and possessory security interest in, 50.1% of the Reorganized Debtor's voting stock and 50.1% of the voting stock of Duro Dyne Canada.[22]

Section 524(g)(B)(i)(IV) requires an asbestos settlement trust "to use its assets or income to pay claims and demands."[23]  The Plan satisfies this requirement because, on the Effective Date, the Trust will assume liability and responsibility for Channeled Asbestos Claims and will use its assets to resolve and, if eligible, pay those Channeled Asbestos Claims in accordance with the Plan, the Confirmation Order, the Asbestos Trust Agreement, and the TDP.[24]

Accordingly, based on the foregoing provisions of the Plan and other applicable documents, the Trust satisfies the structure and funding requirements for an asbestos-claims trust under § 524(g)(2)(B)(i).

---

[20]  Plan § 4.08(d).

[21]  *Id*. § 1.01(123).

[22]  Plan §§ 1.01(50), (103), 4.09.

[23]  11 U.S.C. § 524(g)(B)(i)(IV).

[24]  Plan § 4.01.

**B.    The Debtors' History, the Nature of Asbestos-Related Litigation, and the Facts of These Chapter 11 Cases Support the Findings Required for Issuance of the Asbestos Permanent Channeling Injunction**

Section 524(g)(2)(B)(ii) requires a court to make certain factual findings to support the issuance of a § 524(g) injunction.  As set forth below, the Debtors' history as defendants in the tort system, the nature of asbestos litigation, and the facts of these Chapter 11 Cases support the findings required for the issuance of the Asbestos Permanent Channeling Injunction under § 524(g).

To support entry of a § 524(g) injunction, a court must find that "the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction."[25]  The Debtors' history and the nature of asbestos litigation support this finding in connection with confirmation of the Plan.  As of the Petition Date, one or more of the Debtors had been named as a defendant in approximately 956 pending personal injury cases stemming from alleged asbestos exposure.  Prior to the Petition Date, the Debtors settled more than 650 asbestos claims that had been filed against them and obtained dismissals of more than 8,100 asbestos claims.  These claims were asserted in various jurisdictions, including California, New York, Michigan, Illinois, Massachusetts, Missouri, and West Virginia.[26]  Based on this history, the Debtors have every reason to believe that, without the protection of § 524(g), they will be subject to substantial asbestos-related demands in the future.

---

[25]   11 U.S.C. § 524(g)(2)(B)(ii)(I).

[26]   *See* Declaration of Randall S. Hinden in Support of Chapter 11 Petitions and First Day Pleadings ¶¶ 20, 22-23 (ECF No. 3).

Section 524(g)(2)(B)(ii)(II) requires a court to find that "the actual amounts, numbers, and timing of such future demands cannot be determined."[27]  Due to the long latency period for asbestos-induced diseases and the substantial number of asbestos personal-injury lawsuits that had been asserted in the past and remained unresolved on the Petition Date, the actual number and amounts of future Demands, and the timing of assertion of such Demands, cannot be determined by the Debtors or their advisors with precise specificity at this time.  Accordingly, there is support for the finding required by § 524(g)(2)(B)(ii)(II).

Section 524(g)(2)(B)(ii)(III) requires a finding that "pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands."[28]  Here, if holders of asbestos-related Demands were to pursue their Demands outside of the TDP, those Demands would need to be litigated in the tort system on an individual basis.  Given the uncertainty and delay attendant with litigation, the value that Demand holders would receive would be less than the amounts they would receive under the Plan, and the relief available would be inconsistent.  Furthermore, the majority of asbestos-related Demands, and any estimate of the predicted liability for such Demands, would encompass a wide range of values.  There is a risk that, absent implementation of the TDP, Demands would not be treated equitably.[29]  Accordingly, the pursuit of asbestos-related Demands outside of the TDP would likely threaten the equitable treatment of Channeled Asbestos Claims by resulting in protracted litigation and consumption of the Debtors' assets by those claimants who first file suit, potentially leaving less for future Demand holders.

---

[27]    § 524(g)(2)(B)(ii)(II).

[28]    *Id.* § 524(g)(2)(B)(ii)(III).

[29]    TDP §§ 2.1, 4.1.

Section 524(g)(2)(B)(ii)(IV) requires a court to find that, as part of the confirmation process, the terms of the channeling injunction proposed, including "any provisions barring actions against third parties," are set forth in the plan of reorganization and the related disclosure statement.[30]  In addition, a court must find that "a separate class or classes of the claimants whose claims are to be addressed by a trust described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan."[31]  As part of the confirmation process here, the Plan Proponents included the terms of the Asbestos Permanent Channeling Injunction, including provisions barring actions against third parties (including Protected Parties) in conspicuous language in both the Plan and the Disclosure Statement.[32]  The Plan Proponents designated in Class 7 a separate class of Channeled Asbestos Claims that are to be addressed by the Trust and subject to the Asbestos Permanent Channeling Injunction.[33]  More than 75% of the Class 7 creditors who voted on the Plan voted in favor of the Plan.[34]

Finally, § 524(g)(2)(B)(ii)(V) requires a court to find that

the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.[35]

---

[30]   § 524(g)(2)(B)(ii)(IV)(aa).

[31]   *Id.* § 524(g)(2)(B)(ii)(IV)(bb).

[32]   Plan §§ 9.05-9.07; Disclosure Statement at 57-60.

[33]   Plan § 3.03(g).

[34]   *See supra* part II.B.

[35]   § 524(g)(2)(B)(ii)(V).

Here, as set forth in Article IV of the Plan, the Asbestos Trust Agreement, and the TDP, all Channeled Asbestos Claims will be determined and, if eligible, paid under the Asbestos Trust Agreement and TDP.  Moreover, the TDP contain mechanisms that provide reasonable assurance that the Asbestos Trust will value and be in a financial position to pay existing Asbestos Claims and future Demands in substantially the same manner.[36]  Accordingly, the TDP, which includes mechanisms such as pro rata distributions, matrices, maximum annual payments, and periodic review of estimates of the numbers and values of Asbestos Claims and Demands, provide reasonable assurance that the Trust will value, and be in a financial position to pay, existing Asbestos Claims and future Demands in substantially the same manner.[37]  As a result, the Plan and TDP support the findings required in § 524(g)(2)(B)(ii)(V).

### C.    The Asbestos Permanent Channeling Injunction Protects Identifiable Third Parties

Section 524(g)(4)(A)(ii) provides that a channeling injunction entered in accordance with

§ 524(g)

> may bar any action directed against *a third party who is identifiable from the terms of such injunction* (by name or as *part of an identifiable group*) and is alleged to be *directly or indirectly liable* for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of—
>
> (I)     the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
>
> (II)    the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;
>
> (III)   the third party's provision of insurance to the debtor or a related party; or

---

[36]   *See* Plan § 4.01; TDP § 2.1.

[37]   *See* TDP §§ 2, 4.

(IV)    the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party . . . .[38]

Consistent with that section, the Plan contemplates that, in addition to protecting the Debtors and the Reorganized Debtor, the Asbestos Permanent Channeling Injunction will be extended to protect each Protected Party, as defined in the Plan.  Each Protected Party is identifiable from the terms of the Plan by name or as part of an identifiable group.[39]    Accordingly, the Court should authorize and approve the application of the Asbestos Permanent Channeling Injunction to protect all Protected Parties from liability for any Channeled Asbestos Claims, including future Demands, in accordance with the terms and conditions of the Plan.

### D.    Entry of the Asbestos Permanent Channeling Injunction Is Fair and Equitable With Respect to Future Asbestos Claimants

Section 524(g)(4)(B)(ii) requires a court to determine that entry of the channeling injunction, and the protection from liability of the third parties named therein, "is fair and equitable with respect to the persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to [the] trust on behalf of such debtor or debtors or such third party."[40] In accordance with that section, the Asbestos Permanent Channeling Injunction will extend to and protect the Protected Parties in exchange for the following items being contributed to the Trust on the Effective Date:  (1) the Debtors' Contribution (cash sum of $7.5 million); (2) the Hinden Contribution (cash sum of $3 million); (3) the Trust Note (in the original principal amount of $13.5 million); (4) the right to receive Earn Out Payments in the aggregate amount of $2 million; and (5)

---

[38]    § 524(g)(4)(A)(ii)(I)—(IV) (emphasis added).

[39]    *See* Plan § 1.01(102) (defining "Protected Parties").

[40]    § 524(g)(4)(B)(ii).

the Asbestos Insurance Rights, including the proceeds of any Asbestos Insurance Settlement.[41]

Each Settling Asbestos Insurer is designated as a Protected Party in exchange for cash derived

from and payments made in accordance with an Asbestos Insurance Settlement.  In light of the

substantial contributions to be made to the Trust on behalf of all Protected Parties, entry of the

Asbestos Permanent Channeling Injunction, and the naming of the Protected Parties therein, is fair

and equitable with respect to persons that might subsequently assert future asbestos-related

Demands.

## VI.    ALL OTHER PROVISIONS FOR CONFIRMATION HAVE BEEN MET

No other chapter 11 plan has been proposed for confirmation, and therefore § 1129(c) is

inapplicable.  Section 1129(d) is satisfied because the primary purpose of the Plan is not the

avoidance of taxes or the requirements of section 5 of the Securities Act of 1933.  As required by

Bankruptcy Rule 3016(a), the Plan is dated and identifies the plan proponents as the Debtors, the

Committee, and the Legal Representative.

## VII.    THE DURO DYNE TDP ACHIEVES THE GOALS OF § 524(G) THROUGH PROVEN MECHANISMS

The proper operation of asbestos settlement trusts is an important concern.  It is one that

present and future asbestos claimants share.  For that reason, the TDP are based on models that

satisfy the requirements of 11 U.S.C. § 524(g), that have been approved by dozens of courts for a

quarter-century, and that have already paid more than a million claims in a fair and cost-effective

manner.

The § 524(g) asbestos trust has been one of the few successful mechanisms by which our

nation's legal system has dealt with the asbestos crisis.  As the Third Circuit has observed:

---

[41]    *See* Plan § 4.07, 4.08, 4.10.

24

[T]he trusts appear to have fulfilled Congress's expectation that they would serve the interests of both current and future asbestos claimants and corporations saddled with asbestos liability.  In particular, observers have noted the trusts' effectiveness in remedying some of the intractable pathologies of asbestos litigation, especially given the continued lack of a viable alternative providing a just and comprehensive resolution.  Empirical research suggests the trusts considerably reduce transaction costs and attorneys' fees over comparable rates in the tort system.[42]

As this Court noted in an exchange with the Legal Representative, the criticisms raised by the UST here have been raised by insurers in other cases and addressed and rejected by the courts that considered them:

THE COURT: I have just a limited follow-up on what Mr. Hausman was inquiring. He read through, and it appears in the supplemental objections filed by the U.S. Trustee, concerns with the claimed deficiencies in the TDP, such as that claims will be treated as confidential settlement discussions, that certain claimants are exempt from submitting medical evidence, that there are certain categories of occupations are presumptively treated -- presumed to be exposed, that there are -- that claimants may withdraw then refile claims notwithstanding certain statute of limitation defenses, and that there might -- claimants may be allowed recovery even if previously that claimant had denied the liability of Duro Dyne, for instance. That these are objections that have been raised in the supplemental -- objections to the disclosure statement of the plan as well as to your retention as -- in your alleged failure to address these concerns.  My question for you, in your experience as an FCR, both during a Chapter 11 and post-confirmation, are you aware of any such challenges along these lines being made in the past in cases that you've been involved in?

THE WITNESS: Yes, some of them have been made in the past.

THE COURT: Were any sustained by the courts in plans that have been confirmed?

THE WITNESS: No, Your Honor.

THE COURT: Were you aware, or are you aware of any of these objections raised by the Office of the U.S. Trustee previously, or Department of Justice?

THE WITNESS: No.

THE COURT: Were these objections raised by counsel for insurers?

---

[42]  *In re Federal-Mogul Glob., Inc.*, 684 F.3d 355, 362 (3d Cir. 2012).

THE WITNESS: Yes.[43]

Nonetheless, the Plan Proponents have heeded the Court's admonition to consider "that there can

be value and valid reasons . . . to challenge and reconsider the status quo" and to consider "concrete

suggestions for a protocol, or for a mechanism going forward, not just in this case but in future

cases to address the concerns that have been raised."[44]   The proposed terms of the Duro Dyne TDP

reflect certain improvements tailored to the circumstances of these Chapter 11 Cases, including a

claims payment ratio that directs 90% of payments to mesothelioma claimants, implementation of

a filing fee, and a single type of review for claims processing.

In the 25 years since § 524(g) was enacted, asbestos settlement trusts have been the subject

of much study, but there is no evidence of widespread fraud or mismanagement.   The United States

Government Accountability Office observed in its comprehensive review of asbestos trusts in 2011

that the trusts were "committed to ensuring that no fraudulent claims are paid by the trust[s], which

aligns with their goals of preserving assets for future claimants." [45]   Likewise, the U.S. Office of

---

[43]   Hr'g Tr. 59:24–61:6, *In re Duro Dyne Nat'l Corp.*, Case No. 18-27963 (MBK) (Bankr. D.N.J. Oct. 15, 2018); *see also* Hr'g Tr. 22:17–23, Oct. 16, 2018 ("[A]s to the issues relative to Mr. Fitzpatrick's failure to previously raise certain objections or on -- as to issues in the current plan and trust documents, I note the obvious, no court previously has mandated the changes proffered in the objections raised to date, and it is unsurprising that professionals have continued to use approaches which they regard as successful and appropriate."); *see also In re Pittsburgh Corning Corp.*, No. 00-22876 (JKF), 2013 WL 2299620 (Bankr. W.D. Pa. May 24, 2013) (overruling objections to TDP raised by Garlock and an insurer), *clarified on denial of reconsideration*, No. 00-22876-TPA, 2013 WL 5994979 (Bankr. W.D. Pa. Nov. 12, 2013), *aff'd and adopted sub nom. Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp.*, 518 B.R. 307 (W.D. Pa. 2014).

[44]   Hr'g Tr. 23:3-5, Oct. 16, 2018; Hr'g Tr. 76:7-9, Oct. 1, 2018.

[45]   U.S. Gov't Accountability Off., GAO 11-819, ASBESTOS INJURY COMPENSATION, THE ROLE AND ADMINISTRATION OF ASBESTOS TRUSTS, at 23 (2011) ("**GAO Report**").

Management and Budget ("**OMB**") gave no credence to "the false assertion that there is endemic fraud in the asbestos trust system."[46]

Despite history and ample precedent supporting the TDP, the UST's objection makes several hyperbolic allegations, arguing, for example, that the TDP are designed to "facilitate the filing of fraudulent or unmeritorious claims."[47]  Importantly, the UST's claims about "fraud" are speculative and, in an unusually partisan fashion, assume that asbestos victims and their attorneys are little better than scam artists.  The UST, for example, alleges "the potential for fraud," and discusses provisions that "shelter[s] claimants from . . . their misconduct," "could be exploited by a dishonest attorney," or "facilitate the filing of unmeritorious claims" by "dishonest claimants."[48] While claiming there is a "growing body of evidence" of malfeasance, the only case the UST offers that even arguably involves any misstatement to an asbestos trust is a single 2007 case from Ohio.[49] The Court should look with skepticism at the UST's portrayal of asbestos victims and their counsel as villains, a tactic long employed by the corporate asbestos defense bar but, until quite recently, uncharacteristic of the UST.

---

[46]  U.S. Office of Mgmt. and Budget, STATEMENT OF ADMINISTRATION POLICY ON H.R. 982 - FURTHERING ASBESTOS CLAIM TRANSPARENCY (FACT) ACT OF 2013 (Nov. 12, 2013), https://obamawhitehouse.archives.gov/sites/default/files/omb/legislative/sap/113/saphr982h_201 31112.pdf (last visited Feb. 26, 2019) ("**FACT Act Statement**").

[47]  UST Obj. at 18.

[48]  *Id.* at 8, 12, 15, 18, 21.

[49]  The Garlock estimation decision criticizes litigation in the tort system.  It is not about fraud in the asbestos trust system and does not even mention the word "fraud".  UST Obj. at 9-10.  The UST Obj. (at 7-8) also cites a defense-funded Rand study that criticizes the lack of transparency and publicly available data about asbestos trusts.  *See* Lloyd Dixon, Geoffrey McGovern and Amy Coombe, *Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity With Detailed Reports on the Largest Trusts*, at iii, RAND Institute for Civil Justice (2010) ("The research was supported by a coalition of asbestos defendants and insurers and by the RAND Institute for Civil Justice.").

The patent, practical effect of the changes espoused by the UST run counter to the purpose

of the Trust and § 524(g).  The only persons who would benefit from the Trust collecting evidence

of other exposures are defendants in the tort system (and the insurers of such defendants).

Likewise, eliminating confidentiality protections for claimants does not benefit claimants, who are

the direct intended beneficiaries of the Trust to whom the Trust owes fiduciary duties.

The Trust will provide modest compensation to persons who were sickened by asbestos

exposure for which the Debtors are responsible.  The TDP has been tailored to reflect the medical

and exposure criteria that the Debtors used to resolve claims and to pay only the Debtors' several

share of asbestos liability.[50]  The Trust has no need for evidence of exposure to other defendants'

products, and it would waste the Trust's very limited resources to collect and analyze irrelevant

information.  The Trust's resources are better used to pay eligible claims.

In service of its argument that the TDP "is intended to facilitate improper conduct," the

UST cites only two cases that address asbestos trusts.  But those cases establish only that deviations

from the traditional § 524(g) trust structure should be scrutinized closely.  In *In re Combustion*

*Engineering, Inc.*,[51] for example, the Third Circuit found that a plan that proposed an unusual two-

---

[50]  *See, e.g.*, TDP §§ 2.1, 5.6(b)(3)(A) ("Because of the nature of the Debtors' business, the
Asbestos Trust shall consider that there is a limited universe of occupations in which claimants are
likely to have been directly exposed to asbestos, asbestos-containing products, or conduct for
which the Asbestos Trust has responsibility.  Those occupations are sheet metal mechanic, sheet
metal worker, sheet metal apprentice, HVAC repairman, HVAC installer, HVAC technician, duct
installer, and furnace installer (the 'Presumptive Occupation')."); § 5.6(b)(3)(B) ("In order for a
claim to be approved by the Asbestos Trust, the injured party must have worked in a Presumptive
Occupation and must demonstrate to the Asbestos Trust's satisfaction that he or she worked
directly with Duro Dyne asbestos-containing flexible duct connectors.  When evaluating whether
an injured party has demonstrated that he or she worked directly with Duro Dyne asbestos-
containing flexible duct connections, the Asbestos Trust shall base its determination upon whether
the circumstances of the injured party's exposure to the product are the same as those of claimants
with respect to which the Debtors historically paid claims.").

[51]  391 F.3d, 190, 242 (3d Cir. 2004).

trust structure composed of a prepetition trust and a postpetition 524(g) trust was not confirmable

on the record before it.  And in *In re American Capital Equipment LLC*,[52] the Third Circuit

disapproved a non-524(g) asbestos trust which deviated from the structure required by § 524(g).

Far from undercutting the proposed TDP, which creates an ordinary 524(g) trust, these authorities

support it.

As to the specific concerns the UST raises, the TDP, like its many predecessors, achieves

the goals of § 524(g) at reasonable cost.[53]

### A.    The Confidentiality Provision in Section 6.5 of the TDP Is Necessary, Appropriate, and in Line with Best Practices

The UST states in its objection that "there is little question that personal identifiable

information  and  medical  information  may  be  appropriately  protected."[54]    The  UST  also

acknowledged in its earlier Disclosure Statement objection that there is "unquestionably a

legitimate privacy interest" in protecting claimants' medical and financial information.[55]  On this

point, the Plan Proponents readily agree.

Protecting vulnerable asbestos claimants is the primary purpose of section 6.5 of the TDP.

Claimants to asbestos trusts are typically sick and dying individuals, or their survivors.  They are

---

[52]    688 F.3d 145, 159-160 (3d Cir. 2012).

[53]    The UST attaches to its objection a 2009 Pittsburgh Corning TDP and the Garlock CRP (as the Garlock TDP are called), and suggests that the Garlock CRP was somehow a "gamechanger." UST Obj. at 11.  The Garlock CRP, however, has not yet proven itself to be workable.  Although the Garlock settlement facility was created in July 2017, it has not yet paid a single asbestos claim. Meanwhile, variations of the standard TDP have been confirmed and used consistently since the 2009 Pittsburgh Corning TDP, in for example, *In re W.R. Grace & Co.*, No. 01-1139 (Bankr. D. Del.) confirmed in 2012 and thereafter upheld on appeal by the Third Circuit, *In re Yarway Corp.*, No. 13-11035 (Bankr. D. Del.) confirmed in 2015, and *In re Geo. V. Hamilton, Inc.*, No. 18-00056 (Bankr. W.D. Pa.), confirmed in 2018.

[54]    UST Obj. at 17.

[55]    UST Disclosure Obj. at 8.

often elderly.  As the UST concedes, a claimant must submit to a settlement trust non-public

personal information of the kind that is protected from disclosure under federal and state law,

including the Bankruptcy Code.[56]  Confidentiality provisions like section 6.5 are designed to

protect those individuals' privacy interests, and the common sense principle that publishing a list

of sick, elderly, and vulnerable individuals who just received payments from an asbestos trust is

an invitation to identity thieves and swindlers.  The OMB acknowledged these very hazards in

criticizing proposed legislation that would have effectuated the type of disclosure the UST seeks

here.[57]

---

[56]  11 U.S.C. § 107(c) ("The bankruptcy court, for cause, may protect an individual, with respect
to the following types of information to the extent the court finds that disclosure of such
information would create undue risk of identity theft or other unlawful injury to the individual or
the individual's property: (A) Any means of identification (as defined in section 1028(d) of title
18[56]) contained in a paper filed, or to be filed, in a case under this title [and] (B) Other information
contained in a paper described in subparagraph (A)."); *Everett v. Nort*, 547 F. App'x 117, 122 n.9
(3d Cir. 2013) ("We have recognized the important privacy interest in one's medical records.  The
right to privacy is a consideration in the balancing process that courts conduct in deciding whether
to file a document under seal."  (internal citation omitted)); *In re Motions Seeking Access to 2019
Statements*, 585 B.R. 733, 752 (D. Del. 2018) ("Where materials contain personal identifiers,
paired with confidential medical information, the potential risk to privacy interests in disclosure is
self-evident.  As the Third Circuit has held, '[t]here can be no question that . . . medical records,
which may contain intimate facts of a personal nature, are well within the ambit of materials
entitled to privacy protection.  Information about one's body and state of health is matter which
the individual is ordinarily entitled to retain with the private enclave where he may lead a private
life.'"  (alteration in original) (quoting *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570,
577 (3d Cir. 1980))); *see also, e.g.*, N.J. Stat. Ann. §§ 30:4-24.2 (2018) (medical information to be
kept confidential subject to limited exceptions, including court determination that disclosure
necessary to conduct proceedings before it); 56:8-163 (requiring entities to notify New Jersey
consumers if a computer breach leads to the unauthorized access of personal information); *id.*
§ 56:8-164 (prohibiting public displays of Social Security Numbers).

[57]  FACT Act Statement ("The bill's mandatory reporting and disclosure requirements would
threaten asbestos victims' privacy when they seek payment for injuries from an asbestos
bankruptcy trust.  Claimants' sensitive personal information – including their names and exposure
histories – would be irretrievably released into the public domain and thus available to parties
unrelated to the claims (including insurance companies, prospective employers, lenders, and data
collectors).  These parties could then use this personal information for purposes entirely unrelated
to compensation for asbestos exposure, potentially to the detriment of asbestos victims.  The

Moreover, settlements in the tort system are likewise not public.[58]  The confidentiality

provision of the TDP affords the Trust the same rights to confidentiality in settlement discussions

that are enjoyed by defendants in the tort system.  The Duro Dyne Trust is not being established

to create a clearinghouse of data for defendants.  Congress evinced no intent to have claims filed

with an asbestos settlement trust treated as if they were filed in the tort system; to do so would

eviscerate all the efficiency savings § 524(g) was meant to impose.

As the GAO observed in its 2011 review of asbestos trusts, "[a]sbestos trusts typically

protect the confidentiality of claimants' submissions to the trust in accordance with the trust's

TDP, unless specifically given permission by the clamant or subpoenaed by a court of

jurisdiction."[59]  Such trust confidentiality provisions appeared, for example, in the G-I Holdings

TDP confirmed by this Court a decade ago.[60]

Despite the UST's concession of a legitimate privacy interest, the UST asserts there is no

"legitimate basis" for the confidentiality provision found in section 6.5 of the TDP.[61]  The object

of the UST's concern is unclear, but references to *Garlock*,[62] suggest that the UST is focused on

the interests of corporate asbestos defendants that remain outside the bankruptcy process and in

---

information on this public registry could be used to deny employment, credit, and insurance. Victims would be more vulnerable to identity thieves and other types of predators.").

[58]  *Pittsburgh Corning Corp.*, 2013 WL 2299620, at *36 ("We credit the testimony that in the tort system, defendants generally try to keep the terms of their settlements confidential, and settlement agreements generally contain confidentiality provisions.").

[59]  GAO Report at 28.

[60]  Asbestos PI Settlement Trust for Eighth Amended Plan, *In re G-I Holdings, Inc.*, No. 01-30135, ECF No. 9648 (Bankr. D.N.J. Oct. 6, 2009).

[61]  UST Obj. at 17.

[62]  *E.g.*, UST Obj. at 18.

the tort system.[63]  Setting aside the question of why the UST has taken up the interests of the

defendants in tort litigation over which it has no oversight role, the UST's concern is misplaced.

Asbestos trust claim information is ***already*** routinely available to asbestos defendants in

tort litigation in state and federal courts, through ordinary discovery from claimants themselves

and trusts, and pursuant to state court case management orders.  For example, in New York

asbestos litigation, the applicable case management order specifically addresses the timing of

asbestos bankruptcy trust claims and the standard, court-mandated discovery package includes a

document request for filed trust claims.[64]  The order was upheld on appeal, with the appellate court

observing that the order "will enable the [court] to monitor any behavior that could indicate that

plaintiffs are seeking to hide such trust claims."[65]  Many other state courts similarly require the

production of asbestos bankruptcy claims.[66]  Asbestos settlement trust claims have long been

known of and accounted for under state law, as each state legislature and court system sees fit.

---

[63]   The UST stated in its Disclosure Statement Objection that the "only possible purpose of such far reaching secrecy provisions would appear to be to allow litigants to conceal the existence of claims against other defendants," characterizing this as "misconduct."  UST Disclosure Statement Obj. at 9.

[64]   *See, e.g.*, Case Management Order, *In re New York City Asbestos Litigation (NYCAL)*, No. 782000/2017 (New York City July 20, 2017) (controlling timing of trust claims); Defendants' Fourth Amended Standard Set of Interrogatories and Request for Production of Documents, *In re New York City Asbestos Litigation (NYCAL)*, No. 40000/88 (New York City) (requiring production of bankruptcy trust claims).

[65]   *In re New York City Asbestos Litig.*, 74 N.Y.S.3d 180, 182 (App. Div. Mar. 22, 2018) (alteration in original).

[66]   *E.g.*, Third Amended General Order No. 29, *In re Los Angeles Asbestos Litig. – General Order*, No. C700000 (Cal. Super. Ct. Los Angeles Cty. May 27, 2009.  State legislatures are likewise fully aware of asbestos bankruptcy claims, and some have passed statutes which specifically address them in the context of asbestos personal injury lawsuits.  For example, the Wisconsin Code of Civil Procedure requires a plaintiff to assign to a defendant all future rights or claims he or she has or may have for a personal injury claim against an asbestos trust before the plaintiff can collect on a judgment.  Wis. Stat. Ann. § 802.025(6) (2018).

Section 6.5 of the proposed TDP complies with this structure.  The provision is virtually identical to the confidentiality provision in dozens of other asbestos trusts.  It expressly subjects the Trust to ordinary discovery rules and obligates the Trust to respond to properly issued subpoenas.  Section 6.5, like the parallel provisions in those other trusts, poses no obstacles to asbestos defendants obtaining trust claims in asbestos personal-injury litigation in the tort system pursuant to valid discovery or standing court orders.[67]  Even the Garlock trust's distribution procedures, which the UST suggests are a model, require the trust to protect claim submissions as confidential.[68]

Corporate asbestos defendants have for more than a decade lobbied for federal legislation that would create publicly accessible databases of asbestos settlement trust claims that would benefit no one but themselves.[69]  Congress has decided not to enact such measures.  This Court

---

[67]   The UST somewhat mysteriously points out that the provision is "longer" than the one in the 2009 Pittsburgh Corning TDP, perhaps implying that the additional length is somehow sinister. UST Obj. at 19.  In fact, the difference is due to the fact that the Duro Dyne TDP is specifically addressing the potential need to provide claimant information to insurance companies, a circumstance that may arise given the Asbestos Insurance Rights being received by the Trust.

[68]   *See* Garlock Settlement Facility, Amended and Restated Claims Resolution Procedures § 12.3, June 19, 2018 ("All submissions to the Trust by Claimants, including any materials that the Trust receives as a result of the utilization of the release of information form attached hereto in Appendix V, shall be treated as confidential by the Trust.  The Trust will take appropriate steps to preserve the confidentiality of such submissions.").  Inexplicably, the UST cites to and attaches an outdated copy of the Garlock trust's claims resolution procedures.  The current version of those procedures is available on the trust's website at http://garlocksettlementfacility.com/wp-content/uploads/2018/07/Settlement-Facility-Amended-and-Restated-Claims-Resolution-Procedures-as.._.pdf.

[69]   *E.g.*, Furthering Asbestos Claim Transparency (FACT) Act of 2015, S. Rep. No. 357; Furthering Asbestos Claim Transparency (FACT) Act of 2017, H.R. Rep. No. 906; Fairness in Class Action Litigation and Furthering Asbestos Claim Transparency (FACT) Act of 2017, H.R. Rep. No. 985.

should decline the UST's request to override Congress' decisions with respect to such legislative and policy issues.

### B.     The Trust Will Pay Only People Who Are Sick, or the Survivors of Those Who Have Died from Asbestos-Related Illness

The Duro Dyne Trust will be of modest size, making efficiency and economy important considerations in its TDP.  The Duro Dyne TDP is tailored to addresses those considerations while directing the Trust's funds toward payment of the sickest claimants whose disease is undeniably caused by asbestos exposure.  The Trust will provide only for "expedited review" of claims: the TDP sets forth a schedule of five asbestos-related disease levels that each have prescribed medical and exposure criteria and specified liquidated values.  These criteria and values were selected and derived in light of the best available information and considering the settlement history of the Debtors and the rights claimants would have in the tort system absent these Chapter 11 Cases.[70] Four of the five compensable disease levels of the TDP are malignant, cancerous diseases.[71]  The Trust's Claims Payment Ratio directs that 90% of its claimants each year must be paid to claims based on mesothelioma, a disease that has no known cause other than asbestos exposure.[72]

As an additional means of efficiency, section 5.6(a)(4) of the TDP gives the Trustee, with the consent of the TAC and Legal Representative, the ability to exempt claimants from submitting medical evidence or certain types of medical evidence.  The UST criticizes this provision as permitting the payment of "non-meritorious claims" by "waiving medical evidence."  UST Obj. at 20.  This is incorrect.  The provision must be read in conjunction with the immediately preceding one, section 5.6(a)(3), which permits the Trustee to decide to accept the determination of another

---

[70]   *See* TDP § 2.1.

[71]   *See id.* § 5.3(a)(3).

[72]   *See id.* § 2.5

trust that the claimant has the requisite illness.  Section 5.6(a)(3) is intended to facilitate cost savings by avoiding unnecessary review of medical evidence.  Section 5.6(a)(4) simply implements section 5.6(a)(3) by giving the Trustee the ability to make corresponding changes to the claim submission requirements.  Nevertheless, to avoid confusion, the proposed TDP will be modified to remove section 5.6(a)(4) with the understanding that the Trust may, as it sees fit, implement section 5.6(a)(3).

### C.    Section 5.6(b)(3) of the TDP Does Not Prevent the Trust from Asserting an "Affirmative Defense"

The UST argues that section 5.6(b)(3) of the TDP "appears to prevent the Trust from asserting an affirmative defense based on estoppel against a claimant who has engaged in dishonest or deceptive conduct in other proceedings."[73]  The UST points specifically to the last sentence of that section, which states that "failure to identify a Debtor's products in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the Asbestos Trust, provided the claimant otherwise satisfies the medical and exposure requirements of this TDP."[74]

The UST's argument must fail as it is based on several misunderstandings.  Asbestos settlement trusts are established as an alternative to litigating claims in the tort system.  They do not assert affirmative defenses any more than they conduct discovery, depose witnesses, or try cases.  Asbestos settlement trusts are set up to avoid litigating claims, because otherwise they would spend all their limited funds on lawyers rather than paying victims.[75]  Rather, asbestos

---

[73]   UST Obj. at 20-21.

[74]   TDP § 5.6(b)(3).

[75]   *See Federal-Mogul*, 684 F.3d at 362 ("Empirical research suggests the trusts considerably reduce transaction costs and attorneys' fees over comparable rates in the tort system.").

settlement trusts pay claims that meet the criteria set out in the TDP.  The only exception is the

post-ADR litigation option set out in section 5.9 of the TDP.  Historically, few if any claimants

have ever litigated against asbestos settlement trusts under similar provisions in other TDPs.

However, if claimants should do so here, section 7.6 of the TDP preserves any defenses that the

Debtors had in the tort system for use by the Trust, including any "estoppel" defense of the type

the UST posits.

Further, a claimant's failure to identify Duro Dyne exposure in a parallel lawsuit in the tort

system does not involve "dishonest or deceptive conduct."  When a person sick with asbestos

disease consults a lawyer, he or she does not walk in with all the evidence of exposure to asbestos

products pinned to his or her shirt.  Instead, the lawyer must use various investigative techniques

find out to which asbestos products that sick person might have been exposed decades earlier.  This

sick person may know of some products, but be entirely unaware of other exposures.[76]  If the

exposed person has died, his or her survivors may know even less.  Developing a case against any

particular manufacturer of asbestos products, therefore, takes considerable time and effort.  At the

same time, plaintiffs are not required to seek out evidence of all possible exposures.  An attorney

may reasonably (and ethically) focus development of the lawsuit against those manufacturers of

asbestos products the attorney believes will provide the best chance of a meaningful, cost-effective

recovery.  If an asbestos defendant wants to make the case that someone else is responsible for a

person's injury or death, it is that defendant's burden to do so.[77]

---

[76]  It is not unusual for certain types of workers to have been exposed to the asbestos-containing
products of multiple companies.  The worker may not have known certain products contained
asbestos, or the name and manufacturer of that product.  *In re Congoleum Corp.*, 426 F.3d 675,
679 (3d Cir. 2005) ("[B]ecause over time they may have been exposed to asbestos in various
environments, some of the injured persons may have claims against a number of defendants.")

[77]  *See, e.g.*, *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 73–74 (Ky. 2010) (holding that when

Section 5.6(b)(3) of the TDP merely stands for the proposition that if the information about a claimants' exposure to a Duro Dyne product has not been developed in the tort case, that does not automatically preclude recovery from the Trust.  Given the realities of tort law and practice, this is entirely appropriate.  The provision is not an unusual one, and appears in the distribution procedures for numerous operating asbestos settlement trusts.  For example the asbestos personal injury trust created in the *W.R. Grace* bankruptcy, confirmed in 2012 and upheld on appeal by the Third Circuit in 2013, contains almost identical language.[78]   Moreover, the provision is not inconsistent with the information defendants require to settle claims in the tort system.[79]

### D.    The Withdrawal and Deferral Provisions of Section 6.3 Are Appropriate

The UST claims that section 6.3 of the TDP, which permits withdrawal or deferral of a claim without affecting the status of the claim for statute of limitations purposes, "does not have "any valid purpose" and speculates that it may be exploited to harm corporate asbestos defendants outside of bankruptcy in the tort system.[80]

---

a defendant seeks to prove the fault of another entity, "[t]he burden of proof in such a case is effectively shifted, since it is the participating defendant, not the plaintiff, who seeks to show that the empty-chair defendant is responsible," and "a participating defendant must . . . prove liability on the part of the tortfeasor onto whom it seeks to shift some of the blame"); *Sparks v. Owens-Illinois, Inc.*, 38 Cal. Rptr. 2d 739, 749–50 (Ct. App. 1995) (the named defendant bears the burden of persuading the finder of fact that another entity is responsible, in whole or part, for the alleged injury).

[78]   *See* WRG Asbestos PI Trust Distribution Procedures § 5.7(b)(3) ("Similarly, failure to identify Grace products in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the PI Trust, provided the claimant otherwise satisfies the medical and exposure requirements of this TDP."    Available at http://wrgraceasbestostrust.com/wp-content/uploads/2014/02/WRG-TDP.pdf.

[79]   *See* Hr'g Tr. 11:20-12:4, Oct. 15, 2018 (Legal Representative testifying that defendants would require only limited exposure evidence to settle claims).

[80]   UST Obj. at 21.

In fact, section 6.3 provides practical claims-processing benefits for the Trust.  Experience

with asbestos trusts has shown that claimants facing a statute of limitations deadline will,

understandably, file an incomplete claim to preserve a potential recovery.  Without withdrawal

and deferral provisions like section 6.3, however, the incomplete claim will remain as a "filed

claim" with the Trust, even though in many cases the necessary exposure evidence will never be

obtained.  The withdrawal and deferral provisions lighten the administrative burden of carrying

such claims as filed claims with the Trust.  The Trust does not, for example, have to process the

claim and issue a deficiency notice; instead, the Trust has the equivalent of an "inactive docket"

or tolling provision for claims that are not ripe.[81]  Additionally, postponing the payment of those

claims that do refile is financially advantageous to the Trust, as paying claims with dollars later

rather than dollars now permits the Trust to earn a return on retained funds.  Filing a claim with

the Duro Dyne Trust will require the payment of a $50 filing fee, which will help defray the

administrative costs of handling the claims that are submitted to the Trust.[82]

### E.       The Trust Has Appropriate Audit Procedures

The UST protests that the TDP does not require a mandatory, independent audit of the

Trust and Trust fiduciaries, but provides instead for a discretionary one.[83]  The Trust Agreement

and TDP provide for an appropriate level of auditing, particularly given the limited resources of

the Trust.  First, audited financial information and claim processing information is required to be

filed annually with the Bankruptcy Court under section 2.2(c) of the Trust Agreement.  Second,

---

[81]   *Pittsburgh Corning*, 2013 WL 2299620, at *38 (describing similar TDP withdrawal provision
as a tolling provision).

[82]   As further protection for the Trust's corpus, the TDP requires that a claimant pay the filing fee
when submitting a claim.  TDP § 6.4.  The fee is refundable if the claim is ultimately approved for
payment.  *Id.*

[83]   UST Obj. at 22.

the Trustee is empowered to develop a claims audit program encompassing ***both*** medical and exposure evidence under section 5.7 of the TDP.  That the scope of the audit procedures are left to the discretion of the Trustee is appropriate given the extremely limited resources of the Trust.  Auditing by an independent firm can cost hundreds of thousands of dollars.  For a trust as small as the proposed trust, that can result in severe depletion of funds.  The Trustee must balance the need for auditing with the costs of such a project, a reality called out expressly in section 7.2 of the proposed TDP.  Additionally, the Trust will be administered by the Trustee, the TAC, and the Legal Representative, all of whom are bound by fiduciary duties as set forth in the Trust Agreement, the TDP, and the state law governing the Trust.

**F.      The Duro Dyne Trust Does Not Have an "Extraordinary Claim" Category, so the UST's Suggestion to Include Section 6.8(c) of the Garlock CRP Is Misguided**

The UST protests that the TDP do not contain a provision like section 6.8(c) in the Garlock CRP.[84]  It is correct that the TDP do not have an equivalent provision.  That provision is found in an "extraordinary claims" category that, because of its small size, the Duro Dyne Trust does not have.

"Extraordinary claim" provisions are found in some asbestos trusts' TDPs to provide the possibility of an enhanced recovery to claims where the injured party was exposed exclusively, or almost exclusively, to a single asbestos product.  For an ordinary claim, an asbestos trust does not have any need to consider other asbestos exposure beyond exposure to the product for which the trust is responsible.  This is because, among other things, the asbestos trust assumes that there was such other exposures.  Indeed, that assumption is built into the ordinary settlement values paid by the trust.  To obtain the enhanced settlement value for an "extraordinary claim," however, a

---

[84]   UST Obj. at 22.

claimant must represent to the trust that his or her exposure was restricted to a limited number of sources.    Hence, it makes sense for the trust to require information substantiating that representation.    Because the Garlock trust has such an extraordinary claims category, information about other trust claims sought in section 6.8(c) is relevant to the processing of such claims.

The Duro Dyne Trust will be, to a rough approximation, a tenth of the size of the Garlock trust.  Given the extremely limited resources of the Duro Dyne Trust, the TDP have been simplified to reduce processing complexity and costs.  One of those simplifications was the decision to not have an "extraordinary claims" provision.  With no extraordinary claims provision, there is simply no need for the Trust to obtain information of the type sought in section 6.8 of the Garlock CRP.

### G.    Attorneys' Fees Should Be Left to State Regulation

The UST complains that the Trust does not limit contingent fees.  It does not explain, however, why this Court should attempt to regulate attorneys' fees when § 524(g) requires no such thing.  Regulation of the relationship between a client and an attorney is carried out at the state level.[85]    The states use different mechanisms to regulate attorney-client fee arrangements, including state statutes, court rules, and, of course, the rules of professional conduct.[86]  There is

---

[85]    Geoffrey C. Hazard, Jr., W. William Hodes & Peter R. Jarvis, Law of Lawyering § 1.17 (4th Edition, 2018-1 Supp. 2014).

[86]    *See, e.g.*, Cal. Bus. & Prof. Code § 6146 (West 2019) (limiting contingency fees in medical malpractice actions based on the amount recovered (i.e., forty percent of the first fifty thousand dollars recovered)); *see also* N.Y. Jud. Law § 474-a (McKinney 2019) (setting statewide limits on contingent fees for medical, dental and podiatric malpractice cases); N.Y. Rules App. Div. 1st Dept. § 603.25 (limiting fees for personal injury and wrongful death actions in the counties in the First Appellate Department (Manhattan and the Bronx) either to a maximum based on the level of recovery, or a total not exceeding 33% of the amount recovered); Rules Regulating the Florida Bar § 4-15(f) (regulating contingency fees in personal injury suits by setting maximum percentages based on the amount of recovery and/or the stage when the litigation terminates).

no reason for this Court to impose arbitrary fee limitations when states already legislate on these matters.

The UST's passing suggestion that attorney fees should be capped for what it calls an "uncontested claim,"[87] reveals a misapprehension about the services an asbestos personal-injury attorney provides his or her clients.  While filing a trust claim is not a lawsuit and is not in that sense "contested," the work in assembling a trust claim is considerable, involving at a minimum meeting and interviewing a claimant (and/or his or her survivors and co-workers), researching possible exposures, drafting affidavits and obtaining documentary evidence, filing the claim, resolving claim deficiencies identified by the trust, and performing the administrative and accounting tasks associated with the processing of the claim.  All of this work must be compensated by a portion of what is, after the application of a payment percentage, already a modest amount.

Nothing in the TDP requires a claimant to retain an attorney to submit a claim.  That a claimant may find it necessary to retain an attorney suggests that the attorney should be compensated for the diligence and effort required to prepare and prosecute the claim.

### H.    The TDP and Trust Have Appropriate Mechanisms to Pay Present and Future Claims in the same Manner

The UST concedes that the TDP contain procedures in most respect identical to those adopted in decades of previous § 524(g) cases.[88]  However, the UST argues the TDP do not provide "reasonable assurance that the trust . . . will be able to pay present and future claims that involve similar claims in substantially the same manner" as required by § 524(g).

Section 524(g) requires that the trust:

---

[87]    UST Obj. at 23.

[88]    UST Obj. at 11.

> operate through mechanisms such as structured, periodic, or supplemental
> payments, pro rata distributions, matrices, or periodic review of estimates of the
> numbers and values of present claims and future demands, or other comparable
> mechanisms, that provide reasonable assurance that the trust will value, and be in a
> financial position to pay, present claims and future demands that involve similar
> claims in substantially the same manner.[89]

The Duro Dyne Trust, like the dozens of other trusts upon which it is modeled, employs such

mechanisms, including an adjustable payment percentage and periodic estimates of future claims.[90]

Decades of bankruptcy courts, district courts, and courts of appeals have approved these

mechanisms as satisfying § 524(g)'s standards.  As one of many examples, in *W.R. Grace*, the

bankruptcy court concluded at confirmation that the treatment of future claimants "will be

substantially similar to that afforded to current claimants in their class."[91]  This was seconded by

the district court, which found "that § 524(g) is satisfied under these circumstances because the

trust utilizes mechanisms that will value and pay present and future claims in substantially the

same manner."[92]  Confirmation was then affirmed by the Third Circuit.[93]  The UST provides no

basis to overturn the Third Circuit's decision or the many other similar ones.

The UST offers few clues about what, substantively, it finds objectionable with respect to

the mechanisms the Duro Dyne Trust will use to protect future claims beyond casually suggesting

---

[89]   11 U.S.C. § 524(g)(2)(B)(ii)(V).

[90]   *E.g.*, TDP § 4.

[91]   *In re W.R. Grace*, 446 B.R. 96, 130 n.58 (Bankr. D. Del. 2011), *amended on reconsideration in part*, No. BK 01-1139 JKF, 2011 WL 832940 (Bankr. D. Del. Mar. 4, 2011), *and aff'd*, 468 B.R. 81 (D. Del. 2012), *withdrawn from bound volume, opinion amended and superseded*, 475 B.R. 34 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), *and aff'd*, 532 F. App'x 264 (3d Cir. 2013).

[92]   *In re W.R. Grace*, 475 B.R. 34, 141 (D. Del. 2012), *aff'd*, 729 F.3d 311 (3d Cir. 2013), *and aff'd*, 729 F.3d 332 (3d Cir. 2013), *and aff'd*, 532 F. App'x 264 (3d Cir. 2013).

[93]   *In re W.R. Grace*, 729 F.3d 311 (3d Cir. 2013).

that some kind of "clawback" of claims payments might be considered.[94]  It offers no example where a "clawback" scheme was ever deployed by an existing asbestos settlement trust, nor does it explain how a "clawback" scheme could or would work for a trust making payments to actual sick and dying people (or their survivors) over many decades.  In short, the Court should overrule this objection.

## VIII.  SUBSTANTIVE CONSOLIDATION IS APPROPRIATE UNDER CONTROLLING LAW

The Plan is predicated upon the substantive consolidation and merger of all of the Debtors' Estates.  Such substantive consolidation is fair, appropriate, and necessary, and should be approved.

Although the power to substantively consolidate bankruptcy estates is not explicitly authorized by any provision of the Bankruptcy Code, it is well established that bankruptcy courts may use their equitable powers under § 105 to consolidate cases involving related debtors.[95]

The UST objects to substantive consolidation of the Debtors' Estates, citing the Third Circuit's decision in *In re Owens Corning*.[96]  But the Third Circuit itself noted in *Owens Corning*, the test it articulated for substantive consolidation applies only "absent consent."[97]  Here, creditors

---

[94]  UST Obj. at 23.

[95]  *See, e.g.*, *Eastgroup Props. v. S. Motel Assoc.*, 935 F.2d 245, 248 (11th Cir. 1991); *In re Stone & Webster, Inc.*, 286 B.R. 532, 539 (Bankr. D. Del. 2002); *In re Leslie Fay Cos.*, 207 B.R. 764, 779 (Bankr. S.D.N.Y. 1997); *Bruce Energy Ctr. Ltd. v. Orfa Corp. of Am.* (*In re Orfa Corp.*), 129 B.R. 404, 413-14 (Bankr. E.D. Pa. 1991) ("[T]he court's power to substantively consolidate cases is derived from its general equitable powers under 11 U.S.C. § 105[.]").

[96]  419 F.3d 195 (3d Cir. 2005).

[97]  *Id.* at 211 ("The upshot is this.  In our Court what must be proven (*absent consent*) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."  (emphasis added) (footnote omitted)).

43

voted overwhelmingly in favor of confirmation of the Plan and substantive consolidation of the

Debtors' Estates.  No creditor with an impaired claim has objected to substantive consolidation.

SMART, the only party with an economic stake in these Chapter 11 Cases to object to substantive

consolidation, holds a disputed Class 5 claim that will be paid in full and in cash if and when its

claim is Allowed.  It is not surprising that impaired creditors have not objected to the substantive

consolidation provisions of the Plan because they have no impact on the distributions being paid

to creditors of the Debtors' Estates.  Indeed, all classes of claims are being paid in full under the

Plan, except Class 7 Channeled Asbestos Claims, which voted in favor of the Plan, and related-

party claims in Classes 9 and 10.  Because substantive consolidation does not negatively impact

any class of creditors and no party-in-interest with an impaired claim in these cases has objected,

substantive consolidation should be approved.

Substantive consolidation should also be approved even if the Court applies the test

articulated by the Third Circuit in *Owens Corning*.  There, the Third Circuit held that the criteria

to permit substantive consolidation includes either (i) prepetition the entities to be consolidated

disregarded separateness so significantly their creditors relied on the breakdown of entity borders

and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled

that separating them is prohibitive and hurts all creditors.[98]

The Court explained that a *prima facie* case under the first prong typically exists when,

"based on the parties' prepetition dealings, a proponent proves corporate disregard creating

---

[98]    *See id.* at 205 ("Substantive consolidation … emanates from equity [and] 'treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities.'"  (quoting *In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 423 (3d Cir. 2005))).

contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity."[99]

Here, the applicable facts demonstrate a substantial identity and an extensive interrelationship and entanglement between and among the Debtors.  Importantly, the Debtors have historically operated on a consolidated basis.  As more fully detailed in the Debtors' motion for entry of an order authorizing the Debtors to continue and maintain their existing cash management system ("**Cash Management Motion**"), the Debtors' finances are completely intertwined:

> In the ordinary course of the Debtors' operations, accounts receivable due from customers are deposited into a lock box at BOFA.  Payments are received by BOFA in the form of wire transfers, checks and ACHs.  To the extent that BOFA is able to identify which of the Debtors the receipts are attributable to, the receipts are then deposited into the respective Debtor's receipts account at BOFA.  If any receipts are not readily identifiable as being attributable to a particular Debtor, BOFA deposits those receipts in the Duro Dyne Corp. receipts account at BOFA.  The Debtors reconcile receipts to each respective Debtor's receipts account.  Funds are then transferred to each respective Debtor's disbursement account which is used to pay that Debtor's obligations.  No external invoicing is done by Duro Dyne or Duro Dyne Machinery, and those Debtor's disbursement accounts are funded, as necessary, from the receipts accounts of the other Debtors.  Funds may also be transferred between receipts and disbursement accounts of the other Debtors when necessary to meet operating expenses.  Journal entries are made to reflect all inter-company transfers.[100]

In addition, customers and vendors identified the Debtors generally as "Duro Dyne" as opposed to any individual corporate identity.  The Debtors' trade creditors and customers view the Debtors as a single entity when extending credit.  The Debtors as a whole capitalized upon the

---

[99]  *Id*. at 212.

[100]  Cash Management Motion ¶ 11.

scale and operations of the entirety of the Debtors' business operations to negotiate agreements and maximize value.[101]

As in *Lisanti*, all of the Debtors have the same officers, directors, and shareholders. They conduct "virtually identical" business operations under similar names, and use the same general methods of operation.[102]   The Debtors' management works out of, and most administrative and accounting functions are all performed from, one centralized location.

Section 1123(a)(5)(B) expressly contemplates plans that provide for a merger or consolidation of the debtor with one or more persons as a means for the implementation of Chapter 11 plan.  Here, substantive consolidation is important to implementation of the Plan because it simplifies the Debtors' corporate structure post-Effective Date.  It also ensures that each class of creditors, other than Channeled Asbestos Claims which have voted in favor of the Plan, will be paid in full, and presents the most efficient and reasonable means of making distributions to all creditors.

Accordingly, the contemplated substantive consolidation should be approved as it is in the best interests of the Debtors, their Estates, and their creditors.[103]

---

[101]  *See Lisanti Foods v. Lubetkin* (*In re Lisanti Foods, Inc.*), No. 04-3868 (JCL), 2006 U.S. Dist. LEXIS 76844, at *26-27 (D.N.J. Oct. 11, 2006) (upholding substantive consolidation where substantial record evidenced creditors dealt with debtors where the financial risk was predicated on the debtors as a combined entity and credit was not rendered to each individual debtor).

[102]  *Id.*

[103]  Pursuant to the procedures set forth under New York law, N.Y. Bus. Corp. Law §§ 901-913 (McKinney 2012), two entities may merge pursuant to a plan of merger, approved by the board of directors and the shareholders of the corporations.  The documents authorizing the merger of the Debtors into the Reorganized Debtor are contained in the Plan Supplement.

## IX.  THE DEBTORS HAVE ESTABLISHED FEASIBILITY AS REQUIRED BY 11 U.S.C. § 1129(a)(11)

As a condition to approving a plan of reorganization, § 1129(a)(11) requires that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor or any successor to the debtor under the plan."  In interpreting § 1129(a)(11), courts have found the language of the statute to be "sufficiently broad so as to have provided a great deal of latitude to Courts interpreting its provisions."[104]  Courts have also universally interpreted the statute to mean that a debtor need only demonstrate a reasonable assurance of commercial viability.[105]

While the debtor bears the burden of proving plan feasibility, the applicable standard is by a preponderance of the evidence-proof that a given fact is "more likely than not."[106]  Further, a number of courts have held that this constitutes "a relatively low threshold of proof."[107]

---

[104] *In re Eddington Thread Mfg. Co., Inc.*, 181 B.R. 826, 832-33 (Bankr. E.D. Pa. 1995), *appeal dismissed as moot*, 189 B.R. 898 (Bankr. E.D. Pa. 1995).

[105] *See, e.g., Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d. Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed.").

[106] *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. Ltd.* (*In re Briscoe Enters. Ltd.*), 994 F.2d 1160, 1165 (5th Cir. 1993) (stating that "preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown"); *In re Charter Commc'ns*, 419 B.R. 221, 243 (Bankr. S.D.N.Y. 2009) (same).

[107] *Eddington*, 181 B.R. at 833; *In re Mayer Pollack Steel Corp.*, 174 B.R. 414, 423 (Bankr. E.D. Pa. 1994) (stating that the debtors "have established that they meet the requisite low threshold of support for the Plan as a viable undertaking . . ."); *Briscoe*, 994 F.2d at 1166 (5th Cir. 1993) (upholding the bankruptcy court's ruling that a reorganization that had only "a marginal prospect of success" was feasible because "only a reasonable assurance of commercial viability . . .[was] required" (citation and internal quotation marks omitted)).  Courts have also made clear that "speculative prospects of failure cannot defeat feasibility.  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds."  *WorldCom, Inc.*, 2003 WL 23861928, at *58.

Courts consider a series of factors in determining whether a debtor's plan is feasible. These factors, while varying from case to case, traditionally include: "(1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan."[108] In these Chapter 11 Cases, the Debtors have satisfied each of the factors.

First, the Debtors' board and current management have demonstrated their effectiveness through the successful operation of the Debtors for many years. These key members of the board and the management team intend to stay on post-confirmation.

The liquidity provided by the Debtors' cash on hand, on-going operations and the Senior Lending Facility will provide the Reorganized Debtor with sufficient cash to permit them to fund the Asbestos Trust, make distributions contemplated by the Plan, and will enable the Debtors to pay all Allowed Administrative Claims, and other claims, costs and expenses contemplated by the Plan. In addition to making required Plan distributions, the Reorganized Debtor will also have sufficient working capital to support its business operations.

The Debtors' financial advisor, Getzler Henrich, has prepared revised long-term and short-term cash flow projections of the Debtors' expected financial performance for fiscal years 2019 through 2024 (together, "**Projections**").[109] The Projections indicate that the Reorganized Debtor will generate sufficient cash flow to service and pay its debt obligations and fund its operations. The Debtors estimate that as of the Plan's Effective Date, the approximate amount of cash on hand

---

[108] *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 151 (Bankr. S.D.N.Y. 1984).

[109] *See* Exhibits A and C to the Podgainy Certification.

will be $2.48 million.  Additionally, the Debtors estimate that the initial borrowings from the Senior Lending Facility will be approximately $6 million, providing additional liquidity, if needed, of approximately $3.95 million.  By the end of 2020, it is projected that the Reorganized Debtor will have fully repaid the Senior Lending Facility, providing a minimum liquidity position throughout the Projection period in excess of $9.95 million.  In addition, the cash flows in the Projections include necessary capital expenditures for the continued operation and growth of the Reorganized Debtor's businesses.

Based on the Projections, the Reorganized Debtor expects to meet all financial covenants in the Senior Lending Facility.  Moreover, all conditions precedent to confirmation contained in section 10.01 of the Plan have been or will be satisfied.  Similarly, all conditions precedent to the Effective Date contained in section 10.02 either have been or will be satisfied.[110]

In addition to the foregoing, the Hinden Family Members and the Hinden Family Entities will fund the $3 million payment to the Trust prior to commencement of the hearing on confirmation of the Plan.  The funds will be held by the Debtors in a segregated bank account.

Section 1129(a)(11) does not require a guarantee of a plan's success; rather the proper standard is whether the plan offers a "reasonable assurance" of success.[111]  Based on the Projections and financial assurances presented by the Debtors, as well as the other articulated factors, the Plan meets the requirements of § 1129(a)(11).

---

[110] The Plan also provides that to the extent practicable and legally permissible, each of the conditions precedent in section 10.01 or section 10.02 may be waived, in whole or in part, by the Plan Proponents, acting jointly.  *See* Plan § 10.04.

[111] *Johns-Manville Corp.*, 843 F.2d at 649; *In re Rivers End Apartments, Ltd.*, 167 B.R. 470, 476 (Bankr. S.D. Ohio 1994) (noting that, to establish feasibility, "a [plan] proponent must demonstrate that its plan offers a 'reasonable prospect of success' and is workable").

49

## X.    THE UST'S MISCELLANEOUS OBJECTIONS SHOULD BE OVERRULED

In addition to the substantive Objections set forth above, the UST raises several miscellaneous objections ("**Miscellaneous Objections**"), which are addressed below.

### A.    The Plan Will Go Effective

The Plan Proponents have agreed to amend the definition of "Effective Date" so that it provides as follows:

> "Effective Date" means the date specified by the Plan Proponents in a notice filed with the Bankruptcy Court as the date on which this Plan shall take effect, which date shall be not more than ten (10) Business Days after the date on which the all conditions precedent specified in <u>Section 10.02</u> have been satisfied (or waived in accordance with <u>Section 10.04</u>).

Accordingly, this Objection is resolved.

### B.    The Reorganized Debtor Will Assume Responsibility for Payment of Statutory Fees Post-Confirmation

The Plan provides that the Reorganized Debtor will timely pay applicable fees due to the UST in the ordinary course, and the same is indicated in the Projections.  If the Plan's provisions regarding substantive consolidation are not approved, the Reorganized Debtor will pay all applicable fees due to the UST for any Debtor that is reorganized.  The fees shall be paid from cash on hand and cash flow from operations.

### C.    Administrative Expense Claims Will Be Paid in the Ordinary Course or Following the Date on Which They Become Allowed Claims

The Debtors are unaware of any outstanding Administrative Claims other than postpetition trade vendor claims, Allowed Professional Claims, and statutory fees due to the UST.  Under Article II of the Plan, Administrative Claims shall be paid on the Effective Date or thereafter following Allowance of such claims.

As of February 15, 2019, accrued but unpaid Professional Claims totaled $450,000.  The Debtors estimate that additional Professional Claims of $790,000 will be accrued through the

Effective Date.  Allowed Professional Claims will be paid from cash on hand as the claims are granted by order of the Court.  As of February 15, 2019, outstanding postpetition trade vendor claims totaled $4.5 million.  Ordinary course trade vendor claims will be paid in the ordinary course of business.  The Projections reflect that the Reorganized Debtor will have sufficient funds on hand to pay all of the foregoing Administrative Claims.

### D.      Section 13.03(e) Regarding Dissolution of the Committee Is Appropriate

The UST objects to section 13.03(e) of the Plan, which dissolves the Asbestos Claimants Committee, arguing that it represents an additional release to the exculpation in section 9.10 of the Plan.  Section 13.03(e), however, makes clear by the word "further" in the fourth line of the provision that the subject of section 13.03(e) is the cutting off of any further obligations that could arise after dissolution of the Committee.  Nevertheless the Plan Proponents agree to remove the words "released and" in the fourth line of section 13.03(e) to resolve this objection.

### E.      Information About the Fees and Expenses Required for Post-Petition Financing and Proof of the Debtors' Ability to Pay Them Is Provided

As set forth in the Podgainy Certification, the fees and expenses that will be incurred in connection with the Senior Lending Facility total $146,071.  These fees and expenses are reasonable and appropriate and will be paid from the proceeds of the Senior Lending Facility.

### F.      The Cooperation Agreement Is Being Provided

The Cooperation Agreement is attached as Exhibit D to the Podgainy Certification.  Accordingly, for the all of the above-stated reasons, the UST's Miscellaneous Objections should be overruled.

## XI.    THE PLAN'S TREATMENT OF THE INSURERS' ASSERTED CLAIMS IS PROPER

### A.    The Plan Grants the Insurers Two Valuable Protections in the Form of Trust-Payment Credits and Judgment-Reduction Credits

Upon the Plan's Effective Date, all Asbestos Claims and Demands will be enjoined and channeled to the Trust, where they will be resolved and, if eligible, paid in accordance with the TDP.[112]  To fund its operations and pay eligible asbestos claims, the Trust will receive $26 million from non-insurance assets in the following form:

- Cash in the amount of $10.5 million paid on the Effective Date by or on behalf of the Debtors, their shareholders, and their nondebtor affiliates.

- The Trust Note, in the original principal amount of $13.5 million, payable in installments over roughly 20 years, at an interest rate of 7.15% per annum.

- Rights to "Earn Out Payments," not to exceed $2 million, from the Reorganized Debtor's post-Consummation earnings.[113]

As for the Debtors' rights to asbestos-related insurance coverage, the Plan will address them as follows:  On the Plan's Effective Date, the Debtors will transfer all of their Asbestos Insurance Rights to the Trust, including insurance settlement proceeds and all rights to any unsettled coverage.  Asbestos Insurers will have until the start of the Confirmation Hearing to enter into acceptable Asbestos Insurance Settlements with the Debtors, resolving coverage issues.[114]  If an Asbestos Insurance Settlement is approved by the Court, the settlement proceeds will be contributed to the Asbestos Trust and, in exchange, the Settling Asbestos Insurer will be protected from Channeled Asbestos Claims by the § 524(g) injunction.[115]

---

[112]  Plan § 4.01.

[113]  *Id*. § 4.08.

[114]  *Id*. § 1.01(13).

[115]  *Id*. §§ 1.01(102), (115), 4.07(a), 4.08(c), 9.05.

Section 524(g) injunctive relief is an example of a judicial protection that fosters settlement.  Reading § 524(g) so that it could not protect settling asbestos insurers from asbestos tort litigation and contribution claims from non-settling insurers would thwart the clear purpose of § 524(g) to encourage settlements that fund victim compensation trusts.  Section 524(g) provides that parties who make contributions to a trust for the benefit of asbestos victims may be relieved from further litigation if their contributions are fair and equitable *to victims*.[116]  Under the Plan, the Debtors and Settling Asbestos Insurers will make contributions that meet that fairness standard, and each will be entitled to the protections of § 524(g).[117]

Asbestos Insurers who decide not to resolve their coverage disputes with the Debtors by the Confirmation Hearing will be deemed "Non-Settling Asbestos Insurers," and they will not receive the protection of the 524(g) injunction from Channeled Asbestos Claims.[118]  By rejecting settlement, these Non-Settling Asbestos Insurers will have chosen to continue litigating their coverage obligations and defending cases against the Debtors in the tort system—just as they were doing prebankruptcy.  To date, all of the objecting Insurers have elected to remain Non-Settling Asbestos Insurers.

Under the Plan, any asbestos personal-injury plaintiff (whether or not he chooses to pursue a claim in the tort system) can immediately submit a claim to the Trust for processing and payment from the Trust.  Asbestos plaintiffs may also simultaneously pursue claims against the Reorganized

---

[116] *See* § 524(g)(4)(B)(ii).

[117] *See* Plan § 1.01(102) (identifying the Debtors and Settling Asbestos Insurers, among others, as "Protected Parties").

[118] *See id*. § 1.01(89).

Debtor in the tort system, with any judgment enforceable solely against the Asbestos Insurance Policies.[119]

This option for asbestos plaintiffs to proceed in the tort system in order to access the non-settled insurance coverage is based on the so-called "open system" model approved in the *Plant Insulation* case.[120]  In a "closed system," asbestos claimants could file a claim only against the Trust.  The Trust would then have to seek indemnity from the Non-Settling Asbestos Insurers.  If the Trust were to seek indemnity from the Insurers for *its* payments to claimants, the Insurers could argue, as they have done in other cases, that the policies do not obligate them to indemnify the *Trust* for payments it makes to claimants.[121]  If this Plan were to provide for only payments by a trust, Insurers who chose not to settle and to continue contesting their coverage obligations would receive a windfall if they prevailed on that argument.  But, under the Plan's "open system," claimants may conduct tort litigation against the Reorganized Debtor nominally to obtain a judgment.  They will not be able to execute on any judgments obtained—recovery will be limited to available insurance coverage (whatever it turns out to be).  The Plan thus tracks the standard bankruptcy practice of allowing tort claimants to proceed formally against the debtor, with recovery limited to available insurance.[122]  It is contemplated that tort suits will be tendered to the Insurers, who will then determine whether to defend or settle the lawsuit.

---

[119]  *See id*. § 4.13.

[120]  *See In re Plant Insulation Co.*, 734 F.2d 900, 907 (9th Cir. 2013).

[121]  *See, e.g.*, *In re Burns & Roe Enters., Inc.*, District Court Case No. 08-4191, 2009 WL 438694, at *8 (D.N.J. Feb. 23, 2009).

[122]  *See In re Edgeworth*, 993 F.2d 51, 54 (5th Cir. 1993) (citing cases); *In re Beeney*, 142 B.R. 360, 362 (B.A.P. 9th Cir. 1992).

In connection with the "open system," two Plan mechanisms will provide substantial and tangible benefits to the Insurers, should they choose to remain as Non-Settling Asbestos Insurers and thus outside the protection of § 524(g). If an asbestos plaintiff obtains a judgment in the action against the Reorganized Debtor, the amount of the judgment will be reduced, dollar-for-dollar, by the amount of the payments the plaintiff receives from the Trust.[123] Insurers who must indemnify against such judgments will benefit because the amount they must indemnify will be reduced. This benefit will be hereinafter referred to as the "**Trust-Payment Credit**."

In addition to the Trust-Payment Credit, the Insurers will receive another Plan benefit on account of their claims, which will work as follows: If an asbestos personal-injury judgment is obtained against the Reorganized Debtor, the holder of the judgment, after obtaining Trust permission, will be able to pursue a direct action or judgment-enforcement action against the Non-Settling Asbestos Insurers. As a precondition to the Trust permitting such an action, however, a claimant must agree that any judgment obtained against an insurer determined by the state court to be responsible to pay the tort judgment is to be reduced to account for any lost contribution rights against the Settling Asbestos Insurers.[124] This benefit will be hereinafter referred to as the "**Judgment-Reduction Credit**."

The Insurers assert contribution claims against the Debtors and other Asbestos Insurers. They argue that their claims are for payments, both made and to be made, of indemnity and defense costs that are in excess of their apportioned or equitable "fair" share of those costs. The New York coverage court has not yet adjudicated what the respective allocated shares of the Insurers are, if any. As a result, the Insurers' claims remain disputed, unliquidated, and, with respect to indemnity

---

[123] *See* Plan § 4.15(b).

[124] *See id*. § 4.14(a).

and defense costs to be incurred in the future, contingent. Nevertheless, the Insurers are asserting claims for *contribution* in the classic sense of that term.[125]

The Insurers object to the Plan because it proposes to pay them "nothing" on account of their asserted contribution claims. Although the Plan does not provide for cash payments from the Trust to the Insurers, it does propose to treat their claims by granting them Trust-Payment Credits for their contribution claims against the Debtors and Judgment-Reduction Credits for their contribution claims against Settling Asbestos Insurers. This proposed treatment is valid and permissible under the Bankruptcy Code, as the Court of Appeals determined in the *Plant Insulation* case.

*Plant Insulation* was an asbestos mass-tort bankruptcy case involving a § 524(g) plan of reorganization. As with the Plan here, the plan in *Plant* provided for an "open system," allowing asbestos plaintiffs to pursue lawsuits nominally against the debtor in the tort system to access the non-settled insurance coverage.[126] The plan also proposed to enjoin the contribution claims of the non-settling insurers in exchange for a similar trust-payment credit and judgment-reduction credit.[127] The non-settling insurers objected to confirmation, arguing that the proposed treatment was impermissible under the Bankruptcy Code and that they were entitled to full compensation from the 524(g) trust for their enjoined claims. The bankruptcy court overruled the insurers' objections and confirmed the plan, which the district court affirmed. On further appeal, the Ninth

---

[125] Contribution means "[t]he right that gives one of several persons who are liable on a common debt the ability to recover proportionately from each of the others when that one person discharges the debt for the benefit of all." Contribution, Black's Law Dictionary (10th ed. 2014).

[126] *See Plant Insulation Co.*, 734 F.3d at 907.

[127] *See id.*

Circuit upheld the plan's treatment of the insurers' contribution claims.[128]  The Court of Appeals

explained that the treatment of the insurers' claims must be evaluated under § 524(g)'s "fair and

equitable" standard.  Under this standard, to be enforceable, the § 524(g) injunction must be "fair

and equitable with respect to [future claimants], in light of the benefits provided, or to be provided,

to such trust on behalf of [a party protected by the injunction]."[129]  This statutory standard requires

courts to "ensure that the [§ 524(g)] remedy is 'fair and equitable' to future asbestos plaintiffs . . .

when viewed in comparison to the benefits provided by the bankrupt and its [settling]

insurers[.]"[130]  Applying this standard, the Court of Appeals agreed with the lower courts that

"enjoining the Non-Settling Insurers' contribution claims was 'fair and equitable' to future

asbestos plaintiffs and, in providing the finality and protection from future suit, *supplied the*

*necessary incentive for insurers to settle in the first place*."[131]  As for the rights and interests of the

non-settling insurers, the Court of Appeals stated that § 524(g) does not "explicitly direct" the

courts to "take cognizance [of them]."[132]  Nevertheless, the Court of Appeals agreed with the lower

courts that the plan's trust-payment and judgment-reduction credits provided "not unsubstantial

protection" for the non-settling insurers and rejected the insurers' argument that they were entitled

to full compensation for the cost of defending tort claims.[133]

    As in *Plant*, the "fair and equitable" standard in § 524(g)(4)(B)(ii) supplies the governing

principle here.  Congress specified this as the standard by which the availability of injunctions

---

[128]  *See id*. at 913.

[129]  *Id*. at 912 (alteration in original) (quoting 11 U.S.C. § 524(g)(4)(B)(ii)).

[130]  *Id.*

[131]  *Id*. at 913 (emphasis added).

[132]  *Id*.

[133]  *Id*. at 912.

under § 524(g) should be determined—§ 524(g)(4)(B)(ii) requires the court to find that a § 524(g) injunction is "fair and equitable" only *with respect to the benefits afforded to future asbestos plaintiffs*. The statutory language demonstrates that fairness to future asbestos plaintiffs, but not enjoined insurers, is required. As the Court of Appeals noted in *Plant*, "the plain language of § 524(g) explicitly permits injunctions of the Non-Settling Insurers claims and nowhere provides for any compensation for their lost rights."[134] There is no statutory or legal requirement that the injunction of contribution claims in a § 524(g) plan needs to be fair and equitable to non-settling insurers. No prior court in a § 524(g) case has imposed such a requirement.

The recent decision in the *Fraser's* case is also instructive, even though it arose in the context of an insurance settlement rather than plan confirmation.[135] In *Fraser's*, the court approved a settlement agreement between a debtor and certain of its insurers that enjoined contribution claims of non-settling insurers. Similar to the Plan here, the settlement agreement included a provision reducing any judgment against non-settling insurers by the value of their indemnity contribution claims.[136] The court approved the injunction on the basis that (1) the settlement agreement's judgment-reduction provision "provide[d] . . . non-settling insurers with mechanisms to protect themselves from overpayment" and (2) the non-settling insurers benefited from the settlement agreement by, among other reasons, avoiding "the costs and risks associated with processing certain claims."[137] The court required no protection of the non-settling insurers' defense-cost contribution claims.

---

[134] *Id*.

[135] *See In re Fraser's Boiler Serv., Inc.*, No. 18-41245-BDL, 2018 Bankr. LEXIS 2122 (Bankr. W.D. Wash. July 18, 2018).

[136] *Id*. at *12.

[137] *Id*.

As in *Fraser's* and *Plant*, the Plan provides benefits and protection to the Insurers in lieu of their enjoined claims, including Trust-Payment Credits and Judgment-Reduction Credits in a case where a claimant recovers both from the Trust and in the tort system.  These mechanisms will operate to reduce amounts that the Insurers may be required to pay under their policies.  Although *Fraser's* and *Plant* addressed contribution claims only against settling insurers, the same principles apply to such claims against the Debtors.  Both courts based their rulings on the well-established public policy favoring voluntary settlements of insurance disputes and the orderly administration of asbestos-related tort claims in the bankruptcy context.[138]  Both courts rejected the notion that bankruptcy injunctions must preserve exactly the same costs, risks, and relationships that a non-settling insurer had pre-bankruptcy.  The *Plant* and *Fraser's* decisions provide this Court with ample basis to confirm the Plan over the Insurers' objections.

### B.    The Insurers Are Not Entitled to Full Compensation for Their Claims

The Insurers complain that judgment reduction is inadequate because it would not fully offset their contribution claims for defense and indemnity costs in every instance, and they suggest that the Plan should give them the right "to bring suit against the Trust to obtain whatever contribution they are entitled to but cannot obtain via the judgment reduction mechanism."[139]  This is similar to the "trust backstop" that the non-settling insurers demanded, and the courts rejected, in *Plant*.  This Court should reject similar calls for a backstop here, not only because there is no statutory requirement to fully compensate non-settling insurers for their contribution claims but also because doing so would undercut the purposes of § 524(g).

---

[138]  *See Plant Insulation Co.*, 734 F.3d at 911-13; *Fraser's*, 2018 Bankr. LEXIS 2122, at *9.

[139]  Jt. Obj. at 25; *see also* MidStates Obj. at 6.

Simply put, the Insurers are not entitled to full compensation from the Trust.  Section 524(g) does not require that the Trust act as a "backstop" for indemnity and defense costs paid by non-contributing Insurers in excess of their allocated or "fair" share.  Among other problems, a trust backstop would take funds that would otherwise go to future asbestos claimants and use them to pay the Insurers' claims.  As noted above, Congress specified the standard by which the availability of injunctions under § 524(g) should be determined—§ 524(g)(4)(B)(ii) requires the court to find that a § 524(g) injunction is "fair and equitable" only *with respect to the benefits afforded to future asbestos claimants*.  The statutory language demonstrates that fairness to future asbestos plaintiffs, not enjoined insurers, is required.  In this respect, a trust backstop would not meet the standard of being fair and equitable to future claimants.

Moreover, a trust backstop would effectively impose on one set of asbestos claimants (those relying exclusively on the Trust for compensation) the costs of litigating against another set of asbestos claimants (those using the tort system).  If the Insurers are entitled to recover uncompensated costs from the Trust, then the recovery by the claimants relying exclusively on the Trust would be reduced.  In essence, claimants relying solely on the Trust would be paying the Insurers to defend cases against asbestos claimants who chose to pursue their claims outside the Trust.  This shifting of liability to claimants who rely solely on the Trust for payment makes little sense, is inequitable, and is therefore inferior to the Plan's proposed treatment of the Insurers' asserted claims.

Contrary to the Insurers' arguments,[140] the *ASARCO* and *Thorpe Insulation* cases are distinguishable and do not require a 100% payout on contribution claims.  In *ASARCO*, the debtor had run a successful mining operation, accumulating over $1 billion in cash while awaiting plan

---

[140]  Jt. Obj. at 25.

confirmation, and the bankruptcy court there was choosing between two competing plans of reorganization that were "full payment" plans.[141]  The 100% payout to insurers had more to do with the underlying economics and financial condition of the debtor rather than what the insurers were owed by dint of bankruptcy law.  Similarly, *Thorpe* involved a plan "in which the debtor provided for full payment of the non-settling insurers' equitable contribution claims, but there was no decision by the court holding that such treatment was required . . . ."[142]  As there is no requirement for a "trust backstop" or for full compensation of the claims of non-contributing Insurers, this Court should reject the Insurers' demands for such.[143]

**C.    Although Directly Applicable to Judgments, the Trust-Payment and Judgment-Reduction Credits Will Influence and Shape Settlements**

MidStates complains that the Plan's judgment-reduction mechanism is inadequate because it would apply only in cases resulting in plaintiffs' judgments, not cases resolved by settlements.[144]  This is not correct.  The Insurers will be able to take advantage of these two mechanisms if and when they negotiate to settle future tort cases.  Most asbestos tort cases settle in a way that reflects

---

[141]  *See In re ASARCO LLC*, 420 B.R. 314, 319 (S.D. Tex. 2009); *see also id*. at 357 ("This Court agrees that the Parent's Plan is both feasible and confirmable.  It offers the creditors *full payment* and is more likely to close than the Debtor's Plan."  (emphasis added)).

[142]  *In re Plant Insulation Co.*, 469 B.R. 843, 888 (Bankr. N.D. Cal.) (citing *In re Thorpe Insulation Co.*, No. 2:07–bk–19271 (Bankr. C.D. Cal.)), *aff'd*, 485 B.R. 203 (N.D. Cal. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013), *and aff'd*, 544 F. App'x 669 (9th Cir. 2013).

[143]  The Insurers assert that their claims must be paid by the Trust because they have not been disallowed.  Jt. Obj. at 10.  This argument is flawed.  To begin with, the Insurers' claims have not been allowed; they are disputed and remain the subject of litigation in the New York coverage court.  In addition, by channeling claims to an asbestos settlement trust for resolution and, if eligible, payment, § 524(g) takes the resolution and liquidation of claims out of the normal allowance process under § 502(b).  Moreover, allowed claims are always subject to treatment and impairment in a plan of reorganization pursuant to § 1123(a)(3) of the Bankruptcy Code.  Whether the Insurers' claims are allowed is thus irrelevant.

[144]  MidStates Obj. ¶ 16, at 6.

61

potential liability rules and likely results at trial, discounted by risks of litigation. The bankruptcy

court in *Plant* found that the judgment-reduction and trust-payment credit provisions would be

taken into account in settlement negotiations between the insurers and tort claimants:

> The Judgment-Reduction and Trust-Payment Credits will be largely effective in restoring to Non-Settling Insurers the value of their lost contribution rights in cases brought in the tort system and settled before trial. The process of settling asbestos claims is a very rational one in which both sides are represented by expert counsel who take account of the likely amount the claimant would be awarded if the case went to trial. The credits that the Non-Settling Insurers would be able to assert are among the factors regarding the likely outcome of trial that the parties would take into account in reaching a settlement.[145]

Here, post-confirmation settlement negotiations will take into account the fact that the Plan

significantly strengthens the negotiating position of the Insurers vis-à-vis tort plaintiffs because of

the setoffs and credits against any tort judgment and the costs of pursuing litigation. Plaintiffs

negotiating with Insurers will face the fact that, absent settlement, they cannot recover unless they

first win a jury trial and obtain a judgment and then prosecute and win a second judgment-

enforcement coverage action against the Insurers who are determined to be responsible to pay the

claim. Asbestos plaintiffs may have to bear the added costs of engaging their own insurance

coverage counsel to pursue the second, judgment-enforcement action. And the second, judgment-

enforcement trial might take years to complete. Any tort settlements negotiated by the Insurers

will necessarily reflect the provisions of the Plan that apply to case litigated to judgment. They

will tend to reduce any tort settlements voluntarily paid by the Insurers to their "fair share" after

consideration of their contribution claims against the Debtors and the Settling Asbestos Insurers.

If either the Insurers or the plaintiff believe the other side is not taking all of the necessary factors

into account during settlement negotiations, the judgment-enforcement case will proceed to trial,

---

[145] *Plant Insulation Co.*, 469 B.R. at 878.

and the plaintiff will have his or her resulting judgment against the Insurers reduced to the extent

of any valid contribution claim against the Debtors or Settling Asbestos Insurers.

### D.    The Trust-Payment and Judgment-Reduction Credits Would Benefit Insurers by Discouraging the Prosecution of Claims in the Tort System

MidStates complains that the Judgment-Reduction Credit is inadequate because it would

not enable Non-Settling Insurers to offset their defense costs if they prevailed on the defense of

the claim.[146]  The bankruptcy court in *Plant*, however, found on substantial evidence that the plan

*would* effectively compensate insurers for lost contribution claims in connection with dismissed

cases:

> The Judgment-Reduction and Trust-Payment Credits will be substantially effective in ***indirectly*** restoring Non-Settling Insurers the value of their lost contribution rights, including those arising in cases brought in the tort system and dismissed without payment to the claimant.  This is so because the Judgment-Reduction and Trust-Payment Credits will substantially reduce the number of claims brought in the tort system that the Non-Settling Insurers are called upon to defend.[147]

Here, plaintiffs' counsel will be aware of their clients' rights under the Plan and the TDP,

including their right to a definite and relatively hassle-free recovery from the Trust, and the effects

that judgment reduction would have on any recoveries obtained through the tort system.  Likewise,

the Insurers and the defense counsel they retain to defend cases in the tort system will know that

they have recourse to judgment reduction.  Armed with this information and the greater degree of

certainty it provides with respect to ultimate outcomes, more tort settlements should result, on

terms that account for the Insurers' potential contribution claims.  Cases that settle produce no

orphan defense costs.

---

[146]  MidStates Obj. ¶ 15, at 6.

[147]  *Plant Insulation Co.*, 469 B.R. at 878.

In the future, the higher percentage of asbestos-related claims prosecuted in the tort system against the Reorganized Debtor will be high-value claims.  Incentives created by the Plan will reduce the assertion of tort claims of lower or marginal value.  The incentive structure permits the Court to find that it likely a material number of claims that would otherwise be asserted against the Debtors in the tort system will be satisfied exclusively by the Trust.  The incentives will have the largest impact on, and will discourage, tort-system asbestos claims of marginal merit or low value—the very claims that are much more likely to give rise to orphan defense costs.

The Insurers will thus have a significant benefit in the reduction of lawsuits after the Effective Date.  Assuming the Trust is well-funded, Trust payments will result in a significant number of claimants' decisions not to pursue tort recoveries.  The result is that pursuit of additional compensation through the tort system will become uneconomic or of marginal value in many cases, especially considering that asbestos victims are often aged, grief-stricken, and unwilling to risk uncertain outcomes at trial.  For these reasons, the Insurers' objections should be overruled.

## XII.  THE INSURERS' OTHER OBJECTIONS ARE UNAVAILING AND SHOULD BE OVERRULED

### A.    The Insurers' Claims Are Properly Classified as Class 7 Channeled Asbestos Claims

The Insurers argue that the Plan improperly places their contribution claims for postpetition defense costs and pre- and postpetition indemnity costs in Class 7, in violation of § 1122(a).[148] They contend that their claims represent "ordinary commercial debt" that arises from their contractual relationship with the Debtors and thus bear little resemblance to the asbestos tort claims in Class 7.[149]  They also contend that their contribution claims for defense costs do not fit within

---

[148]  Jt. Obj. at 3.

[149]  *Id.* at 4, 6.

the Plan's definition of "Indirect Trust Claims" because the claims are for defense costs, not

"damages."[150]  All of these arguments are unavailing.

With respect to how the Plan defines Class 7 claims, the Insurers' claims for indemnity and

defense costs handily fit within the definition of "Asbestos Personal Injury Claim," one type of

claim in Class 7 that will be enjoined and channeled to the Asbestos Trust.  In relevant part, the

Plan defines "Asbestos Personal Injury Claim" as

> any Claim . . . asserted against a Debtor, or for which a Debtor is liable, whether in
> the nature of or sounding in tort, **contract**, warranty, or any other theory of law . . .
> arising by reason of, directly **or indirectly**, . . . bodily, or other personal injury,
> death, or damages arising from personal injury or death (including any claim or
> demand for . . . **reimbursement**, indemnity, **contribution**, or subrogation), . . .
> caused or allegedly caused, in whole or in part, directly or indirectly, . . . by asbestos
> or asbestos-containing products [for which a Debtor is legally responsible].[151]

By the Insurers' own admission, their claims are for contribution.  Their claims arise *indirectly*

from bodily or personal injury resulting from exposure to asbestos or asbestos-containing products.

And, even as claims based on "contract," their claims are swept in the definition.  Accordingly,

the Insurers' argument that the Plan has not placed their defense-cost claims in Class 7 fails.

In addition, the Plan properly places the Insurers' claims in Class 7, with the tort claims of

asbestos victims.  Section 1122(a) provides that "a plan may place a claim or an interest in a

particular class only if such claim or interest is substantially similar to the other claims or interests

of such class."[152]  "Claims are similar if they have substantially similar rights to the debtor's

assets."[153]  "The fact that some members of the class may also look to third parties for payment,

---

[150] *Id*. at 5.

[151] Plan § 1.01(18) (emphasis added).

[152] 11 U.S.C. § 1122(a).

[153] *In re Quigley Co.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) (citation and internal quotation
marks omitted).

while others in the class do not have the same right, does not mandate separate classification."[154]

Bankruptcy courts have broad discretion in determining whether a plan classification scheme

satisfies § 1122(a) and will uphold such a scheme so long as it is "reasonable" and does not

"arbitrarily designate classes."[155]   Here, the Insurers' indirect claims and the direct claims of

asbestos tort victims share substantially similar rights to the Debtors' assets insofar as both kinds

of claims are unsecured.   It makes no difference whether the Insurers' claims are contract-based

or represent "ordinary commercial debt" because, like the tort claims, they arise (albeit indirectly)

from one root cause:  exposure to asbestos or asbestos-containing products.

For this very reason, the Third Circuit in *W.R. Grace* determined that the Grace plan had

"reasonably classified" the indemnification and contribution claims of Montana and Canada "with

direct personal injury claims."[156]   The Court of Appeals explained that "[b]oth direct and indirect

claims under the Plan exhibit a similar effect on Grace's bankruptcy estate—they seek recovery

from the trust for actions related to Grace's asbestos liability."[157]   Similarly, in *Armstrong World*

*Industries*, the district court in Delaware upheld the classification of contract-based indirect claims

with direct personal-injury claims in one asbestos class under the plan.[158]   The court explained:

> Because all Asbestos Personal Injury Claims in Class 7 (including Indirect PI Trust
> Claims) relate, directly or indirectly, to AWI's liability for asbestos-related
> personal injury and wrongful death claims, whether arising under tort law (as is the
> case with direct Asbestos Personal Injury Claims . . .) or under contract (as may be
> the case with certain direct Asbestos Personal Injury Claims [such as unpaid settled

---

[154]   *Id*. (citing *In re AOV Indus., Inc.*, 792 F.2d 1140, 1151 (D.C. Cir. 1986)).

[155]   *W.R. Grace*, 729 F.3d at 326.

[156]   *Id*.

[157]   *Id*. (quoting *W.R. Grace*, 475 B.R. at 110).

[158]   *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159-60 (D. Del. 2006).

claims] and certain Indirect PI Trust Claims), a reasonable basis exists for the classification of the Asbestos Personal Injury Claims together in a single class.[159]

As with the indirect claims in *W.R. Grace* and *Armstrong*, a reasonable basis exists for classifying the Insurers' claims for indemnity and defense costs with the asbestos tort claims in Class 7, as all of these claims relate, directly or indirectly, to asbestos or asbestos-containing products for which the Debtors are legally responsible.

The Insurers try to distinguish *W.R. Grace* by arguing that the claims of Montana and Canada "did not include claims for reimbursement of defense costs owed by the debtor, like the Insurers' claims do."[160] This distinction is artificial and meaningless. The Insurers would not be incurring defense costs in the first place but for the asbestos exposures that are giving rise to the tort claims of asbestos victims. The Insurers have incurred, and will incur (if they choose not to settle), defense costs because they wrote insurance policies providing coverage responsive to asbestos personal injury claims. The root element common to all Class 7 claims is asbestos, and the Insurers' claims are properly classified in Class 7, regardless of whether they are for damages or defense costs. The Third Circuit's *W.R. Grace* decision is applicable and controlling here.

The Insurers also argue that, per the decision in *Congoleum*, their claims should be classified with the general unsecured claims in Class 5.[161] But *Congoleum* does not compel such a result. The court in *Congoleum* held that the insurers' claims could not be separately classified in an insurer-sponsored plan to obtain an impaired consenting class.[162] In other words, *Congoleum*

---

[159] *Id.*

[160] Jt. Obj. at 6.

[161] *Armstrong World Indus., Inc.*, 348 B.R. at 159-60 (citing *In re Congoleum Corp.*, 362 B.R. 198, 203 (Bankr. D.N.J. 2007)).

[162] *Congoleum*, 362 B.R. at 203.

is about separate classification.  It does not prevent the Plan Proponents from *including* the asbestos-related contribution claims of the Insurers with other asbestos claims in Class 7.  Indeed, § 524(g) requires that there be "a *separate* class or classes of the claimants whose claims are to be addressed" by the § 524(g) trust.[163]  Under the Plan, the Insurers' claims will be "addressed" by the Trust because they will be channeled to the Trust, and the Insurers will receive the Trust-Payment Credit and Judgment-Reduction Credit on account of those channeled claims.  Accordingly, the claims of the Insurers have been properly placed in Class 7, and their classification objections should be overruled.

### B.    Under the Plan, the Insurers' Class 7 Claims Will Receive Treatment That Is the Same as, if Not Better Than, the Treatment Afforded to Other Indirect Asbestos Claims

The Insurers assert that the Plan cannot be confirmed because it does not treat their claims the same as the other asbestos claims in Class 7.  Specifically, they contend that the Plan will give them "*no opportunity*" to recover on their claims.[164]  This is incorrect.  The Plan will treat their asserted claims in a manner that is at least the same, if not superior to, the treatment of indirect asbestos claims held by entities that are not insurers.

To understand why this is the case, it is necessary to consider first how the indirect claims—chiefly, claims for reimbursement, contribution, or indemnity—of non-insurers (such as co-defendants) will be treated under the Plan.  Under the Plan's TDP, indirect claims will be treated as presumptively valid if four separate conditions are met.  First, the indirect claimant's liability for the underlying direct claim must be fixed and liquidated by either settlement or Final Order,

---

[163] § 524(g)(2)(B)(ii)(IV)(bb) (emphasis added).

[164] Jt. Obj. at 8 (emphasis in original).

and the indirect claimant must fully pay its share of the liability to the underlying direct claimant.[165]

Second, the indirect claimant must fully pay the Trust's share of the liability to the underlying direct claimant.[166]  Third, in any case in which the indirect claimant satisfies the underlying direct claim by way of settlement, the indirect claimant must obtain for the benefit of the Trust a release of liability.[167]  Fourth, the indirect claim must not be barred by a statute of limitations or repose or by other applicable law.[168]  If each of these four conditions is satisfied, the validity of the indirect claim will be established.  And, once validity is established, the indirect claim will be subject to the same categorization, evaluation, and payment provisions of the TDP as all other asbestos claims.[169]  Thus, the indirect claim will be paid in first-in-first-out (FIFO) order based on the date the indirect claim is liquidated in the claims review process,[170] and the indirect claimant will receive an amount equal to the lesser of the liquidated value of the indirect claim multiplied by the payment percentage or the scheduled TDP value of the underlying claim multiplied by the payment percentage.[171]

The Insurers will receive the same benefit that the non-insurer indirect claimants will receive, in the form of Trust-Payment Credit.  And the Insurers will receive the Trust-Payment Credit without having to satisfy the four conditions to presumptive claim validity that indirect claimants will have to meet to receive a payment from the Trust.  Moreover, indirect claimants

---

[165] *See* Plan Ex. F, § 5.5, at 24-25 (ECF No. 279-6).

[166] *Id.*

[167] *Id*.

[168] *Id.*

[169] *Id.* § 2.6.

[170] *Id.* § 5.1(b).

[171] *Id*. §§ 4.1–4.3, 5.5.

who are not Non-Settling Asbestos Insurers will not receive the benefit of the Judgment-Reduction

Credit. In this respect, the Insurers will receive treatment more favorable than that afforded to

indirect claimants who are not Non-Settling Asbestos Insurers.

### C.    Section 524(g) Mandates the Injunction and Channeling of the Insurers' Claims Even if the Insurers Receive No Payment From the Trust

The Insurers argue that, because the Plan allegedly deprives them of any recovery on

account of their claims, those claims cannot be enjoined under § 524(g). They contend that

asbestos claims may be enjoined only if the claims are to be "paid in whole or in part by [the]

trust."[172] The entire premise of this argument is wrong because, under the Plan, the Insurers are

receiving value on account of their claims, in the form of the Trust-Payment and Judgment-

Reduction Credits. Furthermore, this argument relies on a cramped reading of § 524(g)(1)(B),

under which a channeling injunction may enjoin any entity from "*indirectly* collecting, recovering,

or receiving payment or recovery *with respect to* any claim or demand that, under a plan of

reorganization, is to be paid in whole or in part by a trust . . . ."[173] The Insurers' argument

essentially ignores the "with respect to" language in the statute. As the Court of Appeals in *Plant*

explained in rejecting a similar argument by the non-settling insurers, the "phrase 'with respect to'

is generally understood to be synonymous with the phrases 'relating to,' 'in connection with,' and

'associated with.'"[174] Thus, the "with respect to" language only requires that the claim be *related*

*to* a claim to be paid by the Trust, not that the claim enjoined be converted into a claim against the

Trust and otherwise paid.[175] The Insurers' contribution claims for indemnity and defense costs are

---

[172] Jt. Obj. at 10 (quoting 11 U.S.C. § 524(g)(1)(B)).

[173] 11 U.S.C. § 524(g)(1)(B) (emphasis added).

[174] *Plant Insulation Co.*, 734 F.3d at 910 (citing *Huffington v. T.C. Group, LLC*, 637 F.3d 18, 22 (1st Cir. 2011)).

[175] See id.

related to claims for asbestos personal injury. Indeed, the Insurers' claims never would arise in the first place but for the latter set of claims.

By arguing that their claims cannot be enjoined because tort indemnity and defense costs are not to be paid by the Trust, the Insurers necessarily urge that a § 524(g) injunction is available only if all *amounts* associated with an underlying claim are actually paid by the Trust. This argument fails because the phrase "to be paid by a trust" in § 524(g)(1)(B) logically can refer only to claims *of the kind* that the plan provides are to be paid by a trust, rather than only those particular claims or demands that are actually paid by that trust. For example, § 524(g)(4)(B) looks prospectively to the "kind of demand" described in the plan and permits the injunction to be "enforceable with respect to a *demand of such kind* made, after such plan is confirmed," thus describing a category of claims rather than specific claims actually paid.[176]

To hold otherwise would render § 524(g) injunctions full of holes and set up a situation in which the scope of injunctive relief could not be ascertained for years or decades. Whether a claim is actually paid by the Trust will depend on whether it is (a) submitted for payment and (b) determined to be valid. By the nature of a § 524(g) trust and given the long latency period of asbestos diseases, claims will be presented over many years as people die or manifest disease. Unless the statute is read to authorize the injunction to apply to all efforts to recover indirectly with respect to any and all claims of a "kind" to be paid by the Trust, parties could never know with any precision which "indirect actions" were covered by the injunction; the injunction would be of little value to settling insurers or other parties for whose benefit it is intended; and those parties would have little or no incentive to make contributions to fund the trust because they would

---

[176] 11 U.S.C. § 524(g)(4)(B) (emphasis added).

not be able to buy peace in any meaningful sense.  The statute should not be construed to set up

such an unworkable result, and one so demonstrably at odds with the core purpose of § 524(g).

### D.    The Plan Is Fair and Equitable

The Insurers argue that the Plan is not fair and equitable as required by § 1129(b) because

it fails to satisfy the absolute priority rule with respect to their Class 6 claims due to the fact that

the shareholders of Duro Dyne National Corp. (the Reorganized Debtor on and after the Effective

Date) will be retaining their equity interests in that entity.[177]  This argument fails because, under

the Plan, allowed Class 6 claims will be paid in full.  In order for shareholders to retain their shares

or equity interests, a plan must provide that each creditor in the class of unsecured claims "receive

or retain on account of such claim property of a value, as of the effective date of the plan, equal to

the allowed amount of such claim."[178]   Under the Plan, holders of allowed Class 6 claims

(Prepetition Defense-Cost Contribution Claims)

> shall receive . . . ***payment in full*** of the Allowed Amount of such Prepetition
> Defense-Cost Contribution Claims, to be payable as follows:  (a) annual payments
> of principal based on a twenty (20) year amortization schedule plus interest at the
> federal judgment rate in effect as of the Petition Date to be made on the first (1st)
> through seventh (7th) anniversaries of the Effective Date; and (b) a balloon
> payment of all outstanding principal and interest on the eighth (8th) anniversary of
> the Effective Date.[179]

Thus, any allowed Class 6 claims will be paid in full, albeit over time with interest.  As a result,

holders of allowed Class 6 claims will be receiving "value, *as of the effective date of the plan*,

---

[177]  Jt. Obj. at 11.

[178]  11 U.S.C. § 1129(b)(2)(B)(i).

[179]  Plan § 3.03(f)(ii) (emphasis added).

equal to the allowed amount" of their claims.[180]  This treatment satisfies the requirements of § 1129(b).[181]

The fact that the Reorganized Debtor's shareholders will be retaining their shares before the Insurers receive full payment of any allowed Class 6 claims does not change the analysis. "[T]he absolute priority rule does not require sequential distributions (i.e., cash payment in full to senior creditors before any distribution is made to junior creditors), but merely that the values represented by the higher-ranking claims are fully satisfied by the values distributed under the Plan."[182]  Thus, courts have held that the absolute priority rule "merely means that senior classes must be fully provided for in order for junior classes to receive anything."[183]  The Plan provides for full payment of any allowed Class 6 claim.  Accordingly, the Reorganized Debtor's shareholders are permitted to retain their shares under the absolute priority rule.  Because the Plan

---

[180]  11 U.S.C. § 1129(b)(2)(B)(i) (emphasis added).

[181]  *See In re Renegade Holdings, Inc.*, 429 B.R. 502, 523-25 (Bankr. M.D.N.C. 2010) (debtors satisfied § 1129(b)(2)(B)(i) and demonstrated a good faith effort to repay creditors 100% of the principal amount of the claims plus interest); *In re STC, Inc.*, No. 14-41014, 2016 Bankr. LEXIS 1110 (Bankr. S.D. Ill. Apr. 7, 2016) (payment of impaired unsecured class 4 paid in full over nine years with interest satisfied § 1129(b)(2)(B)(i); *In re LMR, LLC*, 496 B.R. 410 (Bankr. W.D. Tex. 2013) (concluding that payment of claim in full with interest provides such claims with the "present value" and therefore, the plan satisfies the requirement for a cramdown of an unsecured creditor class set forth in § 1129(b)(2)(B)(i), and the plan may be confirmed over the rejecting class).

[182]  *In re Penn Cent. Transp. Co.*, 458 F. Supp. 1234, 1283 (E.D. Pa. 1978).

[183]  *In re Arden Props., Inc.*, 248 B.R. 164, 174 (Bankr. D. Ariz. 2000); *see also In re Johnston*, 21 F.3d 323, 330-31 (9th Cir. 1994) ("Must the money be in hand at the date of confirmation to satisfy the absolute priority rule?  We think not, so long as its provision is established by uncontested findings of the bankruptcy court which are not clearly erroneous, and which 'provide for' such payments in accordance with the feasible confirmed plan."); *Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 5 (D. Conn. 2006) ("In this case, the debtor's plan provides that Mercury will be paid in full at the end of the thirty-month period.  Such a plan does not violate the absolute priority rule 'simply because the payment term to secured creditors is longer than the payment term to unsecured creditors.'" (quoting *Arden Props., Inc.*, 248 B.R. at 174)).

as written satisfies the absolute priority rule, it is not necessary to address the Insurers' arguments regarding the "new value exception."[184]  The Insurers' objections should be overruled.

     **E.**    **The Insurers Are Not Entitled to "Cramdown" Protection Under § 1129(b) with Respect to Their Class 7 Claims**

Remarkably, for the first time the Insurers are claiming that they are secured creditors by virtue of allegedly holding "setoff rights" under § 553 of the Bankruptcy Code.[185]  Because the Plan would allegedly "strip" them of their setoff rights, the Insurers argue that the Plan cannot be confirmed because they are not receiving the "indubitable equivalent" of their setoff claims, as required by § 1129(b).[186]  These arguments are unavailing.  As noted above, the Plan provides that any allowed Class 6 claims (Prepetition Defense-Cost Contribution Claims) will be paid in full, so these claims will not be "stripped" or extinguished.  As for the Insurers' claims in Class 7, the Insurers cannot invoke the cramdown protections under § 1129(b), such as the "indubitable equivalent" requirement, because Class 7 voted to accept the Plan.  The cramdown protections under § 1129(b) apply only to a "class of claims or interests that is impaired under, *and has not accepted*, the plan . . . ."[187]  Thus, even if their Class 7 claims were "secured" by virtue of "setoff rights," which they are not, the Insurers still could not invoke the "indubitable equivalent" requirement under § 1129(b)(2)(A)(iii).

In addition, the Insurers have no setoff rights under New York law, so their claims are not "secured" under 11 U.S.C. § 506 and 11 U.S.C. § 553.  Section 553 does not create a right of setoff; it merely preserves "whatever right of setoff otherwise exists" under applicable

---

[184]  *See* Jt. Obj. at 12-16.

[185]  *See id*. at 16.

[186]  *Id*.

[187]  11 U.S.C. § 1129(b)(1) (emphasis added).

nonbankruptcy law.[188]  "In order to establish a right to setoff under § 553, a creditor must first

demonstrate a preexisting right of setoff under nonbankruptcy or state law."[189]  "New York law

does not recognize a right to setoff for contingent claims."[190]  "A claim is contingent and ineligible

to be set off under New York law when it is dependent on some future event that may never happen

or has not yet accrued."[191]   The Insurers' claims for future indemnity and defense costs are

contingent claims and are therefore ineligible for setoff under New York law.  Moreover, even

"when a lawsuit has been filed, claims that are not finally adjudicated are contingent."[192]   The

Insurers' claims for prepetition indemnity and defense costs are disputed and have not been finally

adjudicated in the New York coverage action.  As a result, they are ineligible for setoff, and the

Insurers have no setoff right.  Accordingly, the Insurers' claims are not "secured" under §§ 506

and 553, and their related arguments should be rejected.

## F.    As Unsecured Creditors, the Insurers Are Not Entitled to "Adequate Protection"

The Insurers argue that they deserve to receive money from the Trust on account of their

claims because they are entitled to "adequate protection."[193]  In bankruptcy, "adequate protection"

---

[188]  *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995); *see also In re Corp. Res. Servs., Inc.*, 564 B.R. 196, 201-02 (Bankr. S.D.N.Y. 2017).

[189]  *Corp. Res. Servs., Inc.*, 564 B.R. at 203 (footnote and citations omitted).

[190]  *Id*. at 204.

[191]  *Id*. at 201.

[192]  *Id*. (citations omitted); *see also Cytec Indus., Inc. v. Allnex (Luxembourg) & Cy S.C.A.*, 2015 WL 3762592, at *13 (S.D.N.Y. May 15, 2015) ("Courts have declined to permit offsets directed toward damages in a pending litigation."); *Correspondent Servs. Corp. v. J.V.W. Inv. Ltd.*, 524 F. Supp. 2d 412, 424 (S.D.N.Y. 2007) (stating that defendant "has no right to setoff its pending disputed and unliquidated claim against [plaintiff's] present entitlement to damages owed"); *Willett v. Lincolnshire Mgmt.*, 756 N.Y.S.2d 9 (A.D. 1st Dep't 2003) (affirming dismissal of setoff affirmative defense where obligation was currently being disputed).

[193]  Jt. Obj. at 16-18.

is a specific term of art that the Insurers misapprehend.  As the bankruptcy court explained in the

*SunEdison* case,

> Adequate protection must be provided to protect against the decline in value to a
> non-debtor's interest in property of the estate resulting from the imposition of the
> automatic stay, . . . the use, sale or lease of that property, . . . or the granting of a
> priming lien on that property to secure post-petition financing.[194]

Importantly, "[u]nsecured creditors . . . do not have an interest in property of the estate that merits

adequate protection, and *there is no express statutory requirement that unsecured creditors receive*

*adequate protection*."[195]  The Insurers are not lien creditors.  As holders of unsecured claims, the

Insurers are not entitled to adequate protection.

The Insurers' reliance on the *Johns-Manville* and *W.R. Grace* decisions to support their

alleged entitlement to "adequate protection" is misplaced.  Neither decision stands for the

proposition that the Insurers are entitled to adequate protection.  Indeed, the Second Circuit was

merely analogizing the effect of an asbestos channeling injunction to a sale free and clear of

interests, where liens on the assets sold attach to the sale proceeds.[196]  Moreover, the Trust-

Payment Credit and Judgment-Reduction Credit were not before the courts of appeals in *Johns-

Manville* and *W.R. Grace*.  As a result, those decisions cannot support the Insurers' "adequate

protection" arguments at all.

---

[194] *In re SunEdison, Inc.*, 562 B.R. 243, 252 (Bankr. S.D.N.Y. 2017) (citations omitted); *see also
In re 354 E. 66th St. Realty Corp.*, 177 B.R. 776, 782 (Bankr. E.D.N.Y. 1995) ("The purpose or
intent of granting adequate protection payments are to maintain the status quo for that creditor and
to protect the creditor from diminution or loss of the value of its collateral during the ongoing
Chapter 11 case.  If that creditor is oversecured or if there is no reason to believe that the collateral
will diminish, then adequate protection payments may not be granted.").

[195] *SunEdison, Inc.*, 562 B.R. at 252 (emphasis added) (citation omitted).

[196] *See In re Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988); *see also* 11 U.S.C. § 363(e).

The Insurers argue that the Judgment-Reduction Credit falls short because, even though it provides "adequate protection" with respect to the Insurers' contribution claims against settling insurers for indemnity costs, it fails to provide such protection with respect to contribution claims for defense costs.[197]  As noted above, this argument fails because the Insurers are not entitled to adequate protection.  The argument also fails because it is incorrect.  If the Insurers have equitable contribution claims for defense costs against settling insurers, then the Judgment-Reduction Credit will take those claims into account, further reducing any judgment that an asbestos plaintiff obtains in a judgment-enforcement action against Non-Settling Asbestos Insurers.  Indeed, if the accumulated defense costs are sizeable enough, this will likely deter asbestos plaintiffs from pursuing judgment-enforcement actions against the Non-Settling Asbestos Insurers in the first place.[198]

### G.    The Pledge of 50.1% of the Reorganized Debtor's Voting Stock to Secure Payment of the Trust Note Satisfies § 524(g)

One of the requirements for a channeling injunction under § 524(g) is that the asbestos trust must "own, or by the exercise of rights granted under such plan would be entitled to own *if specified contingencies occur*, a majority of voting shares of . . . each . . . debtor . . . ."[199]  The Plan satisfies this requirement, as it provides for the Reorganized Debtor's issuance of the Trust Note to the Asbestos Trust and a pledge of 50.1% of the Reorganized Debtor's voting stock to secure

---

[197]  Jt. Obj. at 17.

[198]  The Insurers also rely on *In re SportStuff, Inc.*, 430 B.R. 170 (B.A.P. 8th Cir. 2010) in support of their adequate protection arguments, but that case is distinguishable because, among other things, it was a liquidating chapter 11 that did not involve asbestos claims.  In addition, the case did not have the Trust-Payment Credit and Judgment-Reduction features that would benefit the Insurers here.

[199]  11 U.S.C. § 524(g)(2)(B)(i)(III)(aa) (emphasis added).

payment and performance under the Trust Note.[200]  Under the Pledge and Security Agreement,

which the Reorganized Debtor will execute and deliver on the Effective Date, the Trust will be

entitled to own the pledged shares if an "Event of Default" occurs.  As defined, an "Event of

Default" includes not only a payment default under the Trust Note but also an uncured violation

of an affirmative or negative covenant in the Plan Documents and a representation that is found to

be false.[201]  If an Event of Default were to occur, the Trust would not only have the right to enforce

its possessory lien against 50.1% of the Reorganized Debtor's voting stock but would also have

"drag-along" rights that would enable it to sell 100% of the voting stock in order to realize a

"control premium" in the sale value.[202]

Relying on decisions rendered in *Congoleum* and *Plant Insulation*, the Insurers object to

the pledge of voting stock as inadequate and "inconsequential" because, if a payment default were

to occur, the Reorganized Debtor most likely would be insolvent and therefore the voting stock

would be worthless.[203]  In making this argument, the Insurers essentially echo *Congoleum*, in

which the court read into the statute a requirement that the trust's stock ownership occur before a

debtor is beyond the "financial point of no return."[204]  The *Congoleum* court's reasoning was based

on the fact that the only default that would allow the trust to exercise its right to the stock was a

payment default under the note, which is not the case here.[205]  The language of § 524(g) does not

specify the timing of the Trust's stock ownership, much less that it cannot occur upon a note

---

[200]  *See* Plan § 4.09; Pledge and Security Agreement § 3 (ECF No. 279-5).

[201]  Pledge and Security Agreement § 11(a).

[202]  *Id.* § 13.

[203]  Jt. Obj. at 19.

[204]  *In re Congoleum Corp.*, 362 B.R. 167, 176 (Bankr. D.N.J. 2007) (internal quotation marks
omitted).

[205]  *See id.* at 175, 179

default.  In any event, *Congoleum* is distinguishable because the Plan Documents here provide for a number of circumstances, other than a payment default, in which the Trust could exercise its rights to the voting stock, such as an uncured covenant violation.  *Plant Insulation* is also distinguishable because there is no indication in the Ninth Circuit's opinion that the Plant Insulation trust would be receiving the same type of "drag-along rights" that the Trust would be receiving here.  This Court should follow the lead of the U.S. District Court for the District of New Jersey in *Burns and Roe*, in which the court held—more than a year after *Congoleum*—that a pledge of 50.1% of the voting shares to secure the reorganized debtors' deferred obligations under the plan satisfied § 524(g).[206]  The Insurers' objection to the pledge arrangement should be overruled.[207]

## H.      It Is a Basic Tenet of Bankruptcy That a Plan May Alter a Creditor's State-Law Rights; a Plan Need Not Be "Insurance Neutral"

The Plan provides that the Asbestos Insurance Rights of the Debtors will be transferred to the Asbestos Trust on the Plan's Effective Date.  The Insurers object to this transfer, suggesting that it constitutes a "means forbidden by law" in violation of § 1129(a)(3).  They argue that, by attempting to transfer their policy rights without the Insurers' consent, the "Debtors are attempting to change the entity that the Insurers are required to indemnify to one that has, as its beneficial

---

[206] *Burns & Roe Enters., Inc.*, 2009 WL 438694, at *35.

[207] The Insurers try to craft a technical argument under the Uniform Commercial Code to posit that the pledge is inadequate because the "Trust would be able to obtain only so much stock as was necessary to satisfy the outstanding obligations under the Note."  Jt. Obj. at 19-20 n.9.  Section 524(g) does not require that the Trust actually own 50.1% of the voting stock; it merely requires that the Trust be "*entitled to own*" the stock "*if specified contingencies occur.*" § 524(g)(2)(B)(i)(III)(aa) (emphasis added).  The Insurers appear to overlook the fact that the Trust could own the pledged stock, following an Event of Default, by making a successful credit bid for the stock.  *See* UCC § 9-610(c); *In re Finova Capital Corp.*, 356 B.R. 609, 624-25 (Bankr. D. Del. 2006).

owner, the very Asbestos Claimants that are adverse to the Debtors, and thus to the Insurers."[208]

Thus, from the Insurers' point of view, the Plan "improperly expands the rights of coverage under

such insurance policies pursuant to the assignment."[209]

In making this argument, the Insurers wholly ignore controlling Third Circuit precedent

that authorizes the transfer of a debtor's insurance rights to § 524(g) trusts.  In the *Federal-Mogul*

case, a number of insurers had objected to confirmation, arguing that the plan's proposed

assignment of the insurance rights violated their policies' anti-assignment provisions.[210]  The

bankruptcy court ruled against the objecting insurers, holding that the Bankruptcy Code preempted

the anti-assignment clauses in their policies.  The bankruptcy court also relied on state insurance-

law doctrine that assignments made after the occurrence giving rise to liability do not violate anti-

assignment clauses because "there will be no additional risk to the insurance companies by virtue

of the assignments."[211]  On appeal, the district court affirmed the bankruptcy court's decision in

favor of assignment.[212]  On further appeal, the Third Circuit also affirmed, concluding that federal

bankruptcy law preempted the policies' anti-assignment provisions.  In upholding preemption, the

Third Circuit looked to § 1123(a)(5)(B), which provides in relevant part as follows:

> *Notwithstanding any otherwise applicable nonbankruptcy law*, a plan shall . . .
> provide adequate means for the plan's implementation, such as . . . transfer of all

---

[208]  Jt. Obj. at 21.

[209]  *Id.*

[210]  *Federal-Mogul Glob., Inc.*, 684 F.3d at 363.

[211]  *Id.* (internal quotation marks omitted) (quoting *In re Federal-Mogul Glob. Inc.*, 385 B.R. 560, 568 (Bankr. D. Del. 2008)); *see also, e.g.*, *Viola v. Fireman's Fund Ins. Co.*, 965 F. Supp. 654, 658 (E.D. Pa. 1997) ("Under Pennsylvania law, an insurer may not limit an insured's ability to assign his or her rights under a policy after the occurrence of the event which gives rise to the insurer's liability.").

[212]  *See In re Federal-Mogul Glob., Inc.*, 402 B.R. 625 (D. Del. 2009).

or any part of the property of the estate to one or more entities, whether organized
before or after the confirmation of such plan.[213]

The Third Circuit determined that the language of § 1123(a)—most notably its "notwithstanding"
or super-preemptory clause—evinced Congress's "clear intent" to preempt state law.[214]   As a
result, the Third Circuit concluded that assignment of the debtor's coverage rights was permissible
under the Bankruptcy Code.  And so it is permissible here.

The Insurers suggest that, by transferring the Asbestos Insurance Rights to the Trust, the
Plan "improperly expands the rights to coverage," thereby putting the Insurers at greater risk.[215]
But courts have agreed that no such material increase in risk is present where the events giving
rise to a covered loss already have occurred.[216]   As the Third Circuit noted in *Federal-Mogul*,
"after events giving rise to the insurer's liability have occurred, the insurer's risk cannot be

---

[213]  11 U.S.C. § 1123(a)(5)(B) (emphasis added).

[214]  *Federal-Mogul*, 684 F.3d at 369; *see also Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18
(1993) (observing that courts generally have interpreted similar "notwithstanding" language as
superseding all other laws).

[215]  Jt. Obj. at 21.

[216]  *See, e.g.*, *OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. 06-167, 2006 WL 1473004 at *2–3 (D.
Minn. 2006) (noting general consensus among courts that assignment of loss does not expand
insurer's risk; simply allows change in identity to "reconnect the policy's coverage to the insured
loss"); *In re ACandS, Inc.*, 311 B.R. 36, 41 (Bankr. D. Del. 2004) (holding that policies may be
vested in personal injury trust because loss giving rise to liability already accrued); *CNH Am., LLC
v. Am. Cas. Co.*, C.A. No. N12C-07-108 JTV, 2014 WL 626030, at *7–8 (Del. Super. Ct. Jan. 6,
2014) (refusing to enforce transferred policy's anti-assignment clause in the context of a corporate
transaction based on finding that "[a]n anti-assignment provision intends only to limit the
assignability of an interest in the policy before the insured-against loss has occurred"); *Viking
Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 103 (Del. Ch. 2009) (stating that anti-
assignment clauses in policies cannot be "erected as a barrier to the transfer of 'post-loss claims,'
that is to say claims for losses that have already happened"); *Nat'l Union Fire Ins. Co. of
Pittsburgh, Pa. v. Stauffer Chem. Co.*, No. C.A. 87C-SE-11, 1991 WL 138431, at *11 (Del. Super.
Ct. July 15, 1991) ("'[A]nti-assignability' clauses are generally interpreted to limit the
assignability of insurance contracts before the insured-against loss has occurred.").

increased by a change in the insured's identity."[217]   The transfer of coverage rights merely shifts

liabilities "for which the insurers were already potentially responsible" to the 524(g) trust.[218]

The Insurers also object to section 4.13 of the Plan, which they claim attempts "to rewrite

the Debtors' insurance contracts to eliminate the Debtors' cooperation obligations" thereunder.[219]

Section 4.13 of the Plan provides that, in the event the Reorganized Debtor is sued nominally in

the tort system in order to access available coverage, the "Reorganized Debtor shall have no

obligation to defend or otherwise appear or incur any costs or expenses in connection with" such

an action.[220]   The provision merely makes clear that the Reorganized Debtor is not expected to

become an active defendant if it is sued nominally in the tort system on account of a Channeled

Asbestos Claim.   Through § 524(g), the Debtors are buying peace from asbestos lawsuits.   That

does not mean that the Reorganized Debtor would refuse to cooperate in the defense of such actions

or that the Trust could not step into the Debtors' shoes to do so.   The Plan does not cut off policy

cooperation obligations.   Under the Plan, the Insurers will retain any rights to assert failure to

cooperate.   If in the future the Reorganized Debtor (or the Trust in its shoes) breaches the policies

by failing to comply with any duty to cooperate, there may be consequences under controlling state

law.   Such a breach of cooperation obligations may give rise to coverage defenses.   Nothing in the

Plan takes away or modifies the Insurers' rights to cooperation.   If there *is* a breach of any duty to

cooperate, the Insurers have meaningful remedies, most importantly the right to refuse coverage

for a prejudicial failure to cooperate.[221]

---

[217]   *Federal-Mogul*, 684 F.3d at 379 (quoting 3 Couch on Insurance § 35.8).

[218]   *Id.*

[219]   Jt. Obj. at 22.

[220]   Plan § 4.13.

[221]   *See, e.g.*, *Admiral Ins. Co. v. Grace Indus., Inc.*, 409 B.R. 275, 283 (E.D.N.Y. 2009) (setting

The Insurers complain that the Plan in its totality seeks "a declaration concerning the rights and obligations of the parties with respect to insurance policies in the context of a confirmation hearing," which they contend is improper.[222]  This is inaccurate.  The Plan Proponents are not asking this Court to make coverage rulings.  They are merely proposing treatment of the Insurers' asserted rights and claims under the Plan.  By necessity, treatment may involve alteration or interference with an insurer's state-law rights, and indeed, § 524(g) contemplates interference with the Insurers' contractual rights, including rights against other insurers.[223]

It is incontrovertible that the impact of the Bankruptcy Code is to modify parties' contractual and equitable rights with respect to a debtor, and there is no absolute bar from doing so.  Sections 1129(a)(1) and 1129(a)(3) of the Bankruptcy Code do not contain anything like a requirement that a chapter 11 plan leave the Insurers' rights unaffected.  Section 1129(a)(1) simply requires that a plan comply with the *applicable provisions* of the Bankruptcy Code—a plan cannot violate § 1129(a)(1) unless it violates some other Code provision.  Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law."  Thus, the plain language of that provision is narrowly focused and prevents confirmation of plan *proposed by* means forbidden by law.

The Insurers' alleged rights can be impacted by a plan even if there is no affirmative provision of the Bankruptcy Code that explicitly *permits* a debtor to do so.  A plan proponent's ability to include items in a plan is extensive.  Section 1123(b)(6) makes clear that a plan can

---

forth standard under with insurer may disclaim coverage based on failure to cooperate).

[222]  Jt. Obj. at 22.

[223]  *See Thorpe Insulation*, 677 F.3d at 887.

contain "any other appropriate provision."[224]  Applicable state law requires the Insurers to perform

their obligations, even in the event of the policyholder's insolvency.[225]  Thus, state law requires

the Insurers to perform their obligations, while the Bankruptcy Code excuses the debtor from

performance.  This is not a violation of the law—it is precisely what the law provides.

MidStates demands that the Plan and Confirmation Order include "insurance neutrality

language."[226]  The other Insurers make a similar demand, albeit indirectly.[227]  The Court should

reject these demands, as there is no requirement in the law or any authority supporting the

proposition that a bankruptcy plan must be "insurance neutral."   Nor have the Plan Proponents

requested a factual finding that the Plan does not constitute a breach of the Debtors' insurance

policies or included any coverage-related conditions to confirmation.  No doubt there are cases in

which other courts have confirmed plans containing consensual insurance neutrality provisions,

but that does not indicate that the Bankruptcy Code prevents confirmation of plans lacking such

provisions, as plans in asbestos bankruptcies have been confirmed without insurance neutrality

provisions.  For example, the plans in *Western Asbestos Co.*, *J.T. Thorpe, Inc.*, and *Babcock &*

*Wilcox* were confirmed even though none contains language stating that there will be no impact

---

[224]  11 U.S.C. § 1123(b)(6).

[225]  *See, e.g.*, *Grace Indus., Inc.*, 409 B.R. at 282 ("New York Insurance Law § 3420 makes clear that bankruptcy does not relieve the insurance company of its obligation to pay damages for injuries or losses covered under an existing policy."  (quoting *Lang v. Hanover Ins. Co.*, 3 N.Y.3d 350, 355-56 (2004))).  Indeed, New York Insurance Law § 3420 requires that every liability policy "*must* contain a provision asserting that bankruptcy or insolvency does not release the insurer from its obligations under the policy."  *See id.* (emphasis added).  All policies issued by the objecting Insurers contain such bankruptcy clauses.

[226]  MidStates Obj. at 8-9.

[227]  Jt. Obj. at 23 n.10.

on insurance coverage.  In sum, the Insurers' objections that the Plan impermissibly alters their

rights should be overruled.

## I.     The Plan Provides for an Asbestos Channeling Injunction Within the Proper Scope of § 524(g)

MidStates argues that the Plan provides for injunctive relief in excess of the scope

delimited by § 524(g) because it would allegedly grant the protection of the 524(g) injunction to

the Debtors' affiliates without regard to whether they qualify under the four "by reason of"

relationships enumerated in the statute.[228]  This argument fails because it relies on a misreading of

§ 524(g).  The applicable provision is § 524(g)(4)(A)(ii), which sets forth the basis on which

nondebtor third parties may be shielded by the channeling injunction from claims arising from the

debtor's asbestos torts.  In particular, § 524(g)(4)(A)(ii) provides:

> Notwithstanding the provisions of § 524(e), [an asbestos channeling] injunction
> may bar any action directed against *a third party who is identifiable from the terms
> of such injunction* (by name or as *part of an identifiable group*) and is alleged to
> be *directly or indirectly liable* for the conduct of, *claims against, or demands on
> the debtor* to the extent such alleged liability of such third party arises *by reason
> of*—
>
> (I)     the third party's ownership of a financial interest in the debtor, a past or
> present affiliate of the debtor, or a predecessor in interest of the debtor;
>
> (II)     the third party's involvement in the management of the debtor or a
> predecessor in interest of the debtor, or service as an officer, director or employee
> of the debtor or a related party;
>
> (III)     the third party's provision of insurance to the debtor or a related party; or
>
> (IV)     the third party's involvement in a transaction changing the corporate
> structure, or in a loan or other financial transaction affecting the financial condition,
> of the debtor or a related party . . . .[229]

---

[228]  MidStates Obj. at 7-8.

[229]  11 U.S.C. § 524(g)(4)(A)(ii)(I)—(IV) (emphasis added).

By the express terms of the statute, the third party receiving § 524(g) protection need only be "identifiable from the terms of [the] injunction . . . or as part of an identifiable group." And that is precisely what the Plan does when it identifies "any current or former Affiliate of each of the Debtors or Reorganized Debtor" as being among the Protected Parties shielded by the § 524(g) injunction.[230]

Contrary to the assertions of MidStates, subdivisions (I) through (IV) of § 524(g)(4)(A)(ii) do not identify four categories of "eligibility" for § 524(g) protection. Rather, as the words *by reason of* signify, they identify four relationships that give rise to derivative liability for the debtor's asbestos torts—the type of liability that § 524(g) shields an identified third party from. Thus, if a nondebtor is identified (or identifiable) as a third party protected by the § 524(g) injunction, the nondebtor will be protected from asbestos-related liability that "directly or indirectly . . . arises by reason of" those four relationships—no more, no less. The § 524(g) injunction will *not* protect the nondebtor from its *own* asbestos torts. The Plan does not purport to shield any of the nondebtor Protected Parties from their own asbestos torts, if any. MidStates' objection should be overruled.

## J.     The Plan Satisfies the "Best Interest of Creditors" Test

The Insurers' objections based on the "best interests of creditors" test lack merit. The best interests of creditors test of § 1129(a)(7) requires that dissenting creditors receive a distribution under a chapter 11 plan in an amount that is not less than what such creditors would receive in a chapter 7 liquidation.[231] The Insurers argue that the Plan fails the best interests test because the Plan proposes to pay them "nothing on their claims," while in a chapter 7 liquidation "the Insurers'

---

[230] Plan § 1.01(102)(c).

[231] § 1129(a)(7).

claims would be entitled to some pro rata payment based on the liquidated assets of the Debtors."[232]

This argument fails for a number of reasons. First, when asserting that the Plan would pay them "nothing on their claims," the Insurers fail to take into account the value that they would receive on account of their claims in the form of the Trust-Payment Credit and the Judgment-Reduction Credit.

Second, the Insurers' naked prediction that they would receive "some pro rata payment" in a chapter 7 case fails to grasp the practical realities of what an asbestos-related chapter 7 liquidation would entail. It almost goes without saying that, in a chapter 7 liquidation, the Debtors would lose going-concern value, and their assets would be sold at fire-sale prices. In addition, the Debtors' estates would lose the benefit of the Hinden Contribution ($3,000,000) and of any insurance settlement that is contingent on a confirmed chapter 11 plan or the granting of a § 524(g) channeling injunction. A chapter 7 trustee could not expect to negotiate insurance settlements anywhere near the favorable terms that can be achieved with a 524(g) plan. Furthermore, in a chapter 7 case, the trustee would have to go through a very lengthy and expensive asbestos claims allowance process, which for any contested claim would have to be adjudicated by the District Court and before a jury under 28 U.S.C. §§ 157(b)(5) and 1411(a), thereby exponentially increasing the administrative expenses incurred in determining the allowance of present asbestos claims compared to the Trust's efficient mechanism for liquidating claims. Any bar date notice for asbestos claims sent out in a chapter 7 case would precipitate an avalanche of protective claim filings by claimants who have been exposed to asbestos but who are currently unimpaired. During the ensuing years, while the chapter 7 trustee would be litigating over whether these claims should be allowed, many of the previously unimpaired claimants would begin manifesting physical

---

[232] Jt. Obj. at 25.

injuries from their asbestos exposures, thereby increasing the pool of allowable "present" claims.

While the chapter 7 claims allowance process is ongoing, future asbestos personal-injury claims

would ripen and become eligible for payment.  In accordance with § 726(a)(2)(C) of the Code,

holders of future asbestos personal-injury claims would be allowed to "tardily file" claims and

would be entitled to distributions in parity with existing asbestos personal-injury claims and other

general unsecured claims.  In what might be a never-ending process—described by one court as

"a seemingly indefinite period of time"[233]—scores, if not hundreds, of such "tardily filed" claims

would be filed each year that the case was open, a process that could delay distributions to creditors

for decades, which, in turn, would substantially reduce the present value of any distribution in a

chapter 7 case.  Creditor recoveries in a chapter 7 liquidation—*if any*—would not only be diluted

by distributions to maturing future claims; the delays would diminish their present value, and the

assets available for distribution would be substantially diluted, if not exhausted, by the costs of

administering the chapter 7 claims allowance process.

While this lengthy claims allowance process ran its course, the Insurers would continue to

owe policy obligations to provide tort defense and indemnity, notwithstanding the chapter 7

proceeding, and asbestos plaintiffs could pursue available insurance coverage from them.  In sum,

the Insurers' purely theoretical notion that they would obtain "some pro rata payment" in a chapter

7 liquidation, in excess of the value they would receive through Trust-Payment Credits and

---

[233] "A Chapter 7 liquidation would need to be held open for a seemingly indefinite amount of time
while all personal injury claimants pursued jury trials and settlements in the tort system.  Such a
process would result in inevitable delay and disparate—or, even worse, unavailable—recovery
amongst personal injury claimants.  Such uncertainty is certainly not within the creditors' best
interests.  In comparison, the procedural safeguards and guaranteed recovery mechanisms that are
in place under the Joint Plan will allow personal injury claimants to receive at least as much—if
not more—than they would in liquidation.  Thus, it is evident to the Court that the guaranteed
certainty of the Chapter 11 Joint Plan, as opposed to the high degree of uncertainty in a hypothetical
Chapter 7 proceeding, is in the creditors' best interest."  *W.R. Grace*, 475 B.R. at 144–45.

Judgment-Reduction Credits under the Plan, is speculative and without foundation, and fails to grasp the practical realities of how the Debtors' chapter 7 proceedings would unfold and how asbestos personal-injury claims would be allowed.

The Insurers also argue that they would fare better in a chapter 7 case because, without any § 524(g) injunction, they "would be free to pursue contribution claims against Settling Asbestos Insurers to the full extent allowed by law."[234]   Yet, the Insurers' contribution claims against Settling Asbestos Insurers are not relevant to the best interests test.  Under the best interests test, the Court must consider only the value of the property that each dissenting creditor will receive or retain on account of his or her claim *against the debtor* in a chapter 7 liquidation.[235]  Nothing in the statute suggests that a court look at how a plan impacts a creditor's other interests.[236]

In an analogous case involving contribution claims, a federal district court affirmed the bankruptcy court's determination that the best interests test was satisfied.[237]  In that case, a debtor-partnership's plan proposed to enjoin the contribution claims of nondebtor partners against other nondebtor partners.  One partner argued that the plan violated the best interests test because, as a result of this facet of the plan and resulting inability to sue his partners, he was worse off under

---

[234]  Jt. Obj. at 25.

[235]  *See* 11 U.S.C. § 1129(a)(7).

[236]  *See In re Dow Corning Corp.*, 237 B.R. 380, 411-12 (Bankr. E.D. Mich. 1999) ("When employing the best-interest-of-creditors test, courts look at the dividend the creditor would receive from the chapter 7 trustee—and only that amount—for comparison with the dividend available under the plan."); *In re Catholic Bishop of N. Alaska*, 2009 WL 8412175, at *6 (Bankr. D. Alaska Sept. 11, 2009) (stating that the court could not locate any case in which the "best interests" test of § 1129(a)(7) had been applied to account for the value of any cause of action that a creditor would *retain* in a liquidation and applying the "best interests" test to examine "the dividend the creditor would receive from the chapter 7 trustee—and only that amount—for comparison with the dividend available under the plan").

[237]  *See In re Gaston & Snow*, 1996 WL 694421, at *8 (S.D.N.Y. Dec. 4, 1996).

the Plan than he would have been under a chapter 7."[238]   But the district court rejected the best

interests objection as not applying to plan treatment regarding the objector's status as a creditor of

the debtor.[239]

The Insurers rely on *In re Quigley Co.*[240] to support their best interests arguments regarding

their contribution claims against Settling Asbestos Insurers.   But the decision does not help their

case.   In *Quigley*, the § 524(g) plan proposed a release of the debtor's parent company from liability

in exchange for a cash contribution from the parent.[241]   In a chapter 7 liquidation, however,

claimants would have simply retained their rights to assert claims against the parent company.   The

*Quigley* court found that, as factual matter, the amount of the parent company's contribution was

substantially less than the parent's liabilities.[242]   In addition, the *Quigley* court found that those

liabilities were "neither speculative nor incapable of estimation" and concluded that the plan could

not be confirmed.[243]   The court in *Quigley* held, differently from all other courts that have

considered the question, that the best interests test should not be limited to comparing the amounts

that creditors will receive on account of their claims against the debtor.[244]

This part of *Quigley*'s analysis was in error, as the court failed to explain or address how

retained property in the form of suits against *nondebtors* could conceivably be deemed to have

been received "on account of such claim or interest" *against the debtor*.   Instead, the court focused

---

[238]   *Id.*

[239]   *Id.*

[240]   437 B.R. 102 (Bankr. S.D.N.Y. 2010).

[241]   *Id.* at 145.

[242]   *Id.* at 140.

[243]   *Id.* at 145.

[244]   *Id.* at 144.

90

on the statute's use of the word *retain*.  Yet, as other courts have noted, the statute's use of the word *retain* "merely reflects the fact that § 1129(a)(7) is intended to protect secured creditors and equity interest holders as well as unsecured creditors"—and secured creditors in bankruptcy "retain" their security interests instead of receiving distributions on account of them.[245]

In addition, the court in *Quigley* was protecting asbestos claimants who asserted that the parent company was not making an adequate contribution to receive protection under § 524(g). This is exactly the opposite of the situation here, where the parties with the true economic interests in amounts being contributed to the Trust (*i.e.*, the asbestos tort victims) believe that the contributions being proposed are sufficient.  Moreover, the parent liabilities in *Quigley* were concrete in nature, not speculative.  By contrast, the Insurers' asserted contribution claims against Settling Asbestos Insurers are highly contingent and speculative.[246]  The holding in *Quigley*, clearly intended to protect asbestos claimants, should not be used as a sword in the hands of the Insurers against them.

---

[245] *Dow Corning Corp.*, 237 B.R. at 412 (comparing § 1129(a)(7), which refers to amounts received or retained and protects secured creditors, unsecured creditors, and equity interest holders, with § 1325(a)(4), which refers to amounts that would be paid and protects only unsecured creditors).

[246] An insurer that pays to settle a covered claim and thinks it paid more than its proper allocation in defense or indemnity costs may seek equitable contribution from coinsurers "that *share the same level of liability on the same risk as to the same insured*," where the coinsurers refused to settle or defend the claim.  1 Steven Plitt & Jordan Ross Plitt, PRACTICAL TOOLS FOR HANDLING INSURANCE CASES § 8:2 (2018) (emphasis added) (footnote omitted).  This means that there is only a valid contribution claim when an insurer's policy *actually covers a risk* and another insurer's policy *actually covers that same risk*.  Here, the Insurers have not established any factual predicate showing that they have policies actually covering the same risk that policies of the Settling Asbestos Insurers cover.  In other words, the Insurers have done nothing but speculate that they would have valid equitable contribution claims against Settling Asbestos Insurers.

Additionally, the case of *In re Union Meeting Partners*[247] does not support the Insurers'

best interests arguments regarding their contribution claims against Settling Asbestos Insurers.  In

*Union*, the debtor was a general partnership, and the bankruptcy court held that the debtor's best

interests analysis had to take into account the recoveries from general partners that would be

available to a chapter 7 trustee under § 723(a) of the Bankruptcy Code.  The *estate's* right to

recover from nondebtor third parties is different from a *creditor's* right to recover from such

parties, an "important distinction" that the *Union* court expressly recognized.[248]  Here, the Insurers

are addressing their own equitable contribution claims against Settling Asbestos Insurers, not

claims or rights available to a trustee under the Bankruptcy Code.[249]  The Insurers' best interests

objections should be overruled.

### K.    The Plan Is Proposed in Good Faith

The Plan satisfies the requirement under § 1129(a)(3) that it be "proposed in good faith and

not by any means forbidden by law."[250]  The Plan creates the Trust to pay the Debtors' present and

future asbestos creditors under § 524(g), taking advantage of funds that will become available to

asbestos victims only under a confirmed 524(g) plan.  The Plan furthers the goals of § 524(g).

Section 524(g) offers a means of resolving asbestos liabilities that is uniquely valuable not only to

---

[247]  165 B.R. 553 (Bankr. E.D. Pa. 1994).

[248]  *Id*. at 576 ("There is an important distinction between the recourse claims of individual creditors of a partnership against general partners and a contribution action by a debtor/partnership against its general partners . . . .").

[249]  Nor is the decision in *Mercury Capital Corp. v. Milford*, 354 B.R. 1 (D. Conn. 2006) supportive on the best interests issue.  There, the assumption was that, because the plan in question was silent on the treatment of two guaranties held by a creditor, the guaranties might end up being extinguished under the plan.  Rather than ruling on the best interests issue, the district court remanded the matter to the bankruptcy court for further findings.  *See id*. at 9.

[250]  11 U.S.C. § 1129(a)(3).

debtors but also to the victims of a debtor's use of asbestos, and to insurers who agree to contribute

to the trust under § 524(g).  There is no effective mechanism other than § 524(g) to fairly address

the claims of future asbestos claimants or provide complete protection from litigation for parties

that contribute to the settlement.[251]  The Debtors invoked § 524(g) in good faith, as chapter 11, not

some other chapter of the Code or a nonbankruptcy resolution, offers all participating parties the

only means to fully resolve the Debtors' asbestos liabilities.  The Plan preserves going-concern

value, furthering another goal of § 524(g).  It is not bad faith to propose a plan that takes advantage

of provisions of the Bankruptcy Code.[252]

The unanimous support for the Plan from the true asbestos creditor constituency is a strong

indication of good faith.  Caselaw instructs that "[t]he fact that the plan is proposed by the

committee as well as the debtors is strong evidence that the plan is proposed in good faith."[253]

Here, the Plan was proposed by the Debtors, the Legal Representative, and the Committee; *and

100% of the asbestos disease victims voting on the Plan approved it*.

The Insurers try to paint the Plan as a cynical ploy by the Plan Proponents to gain

bargaining leverage over them in coverage disputes, which supposedly evidences "bad faith."[254]

But the Insurers overlook some fundamentals.  Liability insurance policies are property of the

Debtors' bankruptcy estates, and the estates are "worth more with them than without them."[255]  As

---

[251] *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 860 n.34 (1999) (denying class action relief to resolve asbestos-related claims); *Federal-Mogul*, 684 F.3d at 358-59.

[252] *Sylmar Plaza*, 314 F.3d at 1075.

[253] *Leslie Fay Cos.*, 207 B.R. at 781.

[254] Jt. Obj. at 1, 28-29.

[255] *In re Minoco Grp.*, 799 F.2d 517, 519 (9th Cir. 1986); *see also In re Vitek, Inc.*, 51 F.3d 530, 534 (5th Cir. 1995) (stating that "virtually every court to have considered the issue has concluded that the [liability insurance] policies—and clearly the proceeds of those policies—are part of debtor's bankruptcy estate"); *In re W. Asbestos Co.*, 313 B.R. 859, 864 (N.D. Cal. 2004)

fiduciaries, the Debtors have a duty to maximize the value of estate assets, including insurance assets, for the benefit of creditors.[256]  The Insurers, on the other hand, are incentivized to oppose maximizing the value of the Debtors' insurance assets and are thus contesting the extent of their coverage obligations.  The Plan was shaped to preserve the contested coverage available to the Debtors and their asbestos victims *and* to make the benefits of a § 524(g) reorganization available to all of the Debtors' constituencies, including Asbestos Insurers.  The Insurers are confronted with a choice:  They can choose to settle their differences with the Debtors and make a satisfactory contribution to the Trust, thereby gaining the protections of a Settling Asbestos Insurer and putting the coverage disputes and asbestos tort litigation against the Debtors behind them.  Or they can elect to continue litigating their coverage obligations and exercising their right to defend cases against the Debtors in the tort system—just as they were doing prebankruptcy.  As to the latter option, the Plan follows the standard bankruptcy practice under which liability insurers continue to owe policy obligations to provide tort defense and indemnity even after a policyholder bankruptcy.[257]

---

("Insurance contracts, particularly products liability policies, are included in this definition, and can even be an estate's most valuable asset.  A debtor's estate is worth more with the insurance policy than without.").

[256] *See In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004) (observing that debtor-in-possession has a fiduciary duty to protect and maximize the estate's assets); *Official Comm. of Unsecured Creditors of Cybergenics Corp., v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same); *In re Marvel Entertainment Grp., Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (stating that debtor-in-possession's fiduciary duty to maximize includes the "duty to protect and conserve property in its possession for the benefit of creditors" (internal quotation marks omitted)).

[257] *See supra* note 123.  The conventional rule is that tort claimants can pursue available insurance coverage even after the debtor is discharged of its tort liability.  *See, e.g.*, *Lang v. Hanover Ins. Co.*, 3 N.Y.3d 350, 355-56 (confirming that New York Insurance Law § 3420 specifically allows for a direct action by an injured creditor against an insurer of an insolvent entity); *Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992) ("Numerous courts, confronted with a tort claimant who seeks to proceed against a discharged debtor only for the purpose of recovering against an insurer, have . . . conclude[ed] that the discharge injunction does not bar such a suit." (citing cases)); *Owaski v. Jet*

In challenging the good-faith basis of the Plan, the Insurers raise the familiar and worn arguments of "gerrymandering" and alleged efforts by the Debtors to "manipulate the votes."[258] In doing so, the Insurers once again ignore the fact that this Court approved the Plan's voting procedures and the voting amounts allocated to asbestos claimants after notice and hearing and *without objection from the Insurers.* This Court also rejected a recent demand by one of the Insurers to "revisit" the voting amounts assigned to asbestos claimants. Simply put, the Insurers' allegations of voting "machinations" by the Plan Proponents ring hollow and are without substance. The Court should reject them.

Additionally, the Insurers' reliance on *In re SGL Carbon Corp.*[259] is misplaced. In *SGL Carbon*, the debtor was facing seven antitrust lawsuits when it filed for bankruptcy.[260] The Third Circuit found that the lawsuits would have no impact whatsoever on the debtor's financial condition, so the debtor had no need to reorganize under chapter 11 protection.[261] The creditors committee moved to dismiss the debtor's case as a bad faith filing under § 1112 of the Bankruptcy Code, and the Third Circuit agreed that the filing was in bad faith. By contrast, here the Debtors face not seven antitrust suits but potentially thousands of existing and future asbestos claims, and have filed chapter 11 to take advantage of a specific remedy granted by Congress for addressing such claims—§ 524(g). Rather than being adverse to the creditors committee, as the debtor in *SGL Carbon* was, the Debtors have worked with representatives for present and future asbestos

---

*Florida Sys., Inc.* 883 F.2d 970, 975 (11th Cir. 1989) ("The 'fresh start' policy [of a bankruptcy discharge] is not intended to provide a method by which an insurer can escape its obligations based simply on the financial misfortunes of the insured.").

[258]  Jt. Obj. at 33

[259]  200 F.3d 154 (3d Cir. 1999).

[260]  *Id*. at 157.

[261]  *Id*. at 166.

claimants in order to develop a § 524(g) plan—a plan that took three years to negotiate prior to

filing and is supported by the Committee and the Legal Representative.  Unlike the debtor in *SGL*

*Carbon*, which was trying to gain negotiating leverage in antitrust litigation, the Debtors are trying

to maximize the value of estate assets—namely, their insurance assets—an effort to which the

Insurers' economic self-interests are diametrically opposed.  That is the context giving rise to the

coverage disputes and the Insurers' confirmation objections.  But it is not evidence of bad faith on

the Debtors' part.  The Insurers' "bad faith" objections should be overruled. [262]

### L.    The Insurers' Arguments Regarding "Substantial Consummation" Lack Merit

The Insurers challenge section 13.05 of the Plan, which provides:  "On the Effective Date,

the Plan shall be deemed to be substantially consummated under §§ 1101 and 1127(b) of the

Bankruptcy Code."[263]  They allege that this provision attempts to alter the definition of "substantial

consummation" in § 1101(2) of the Bankruptcy Code and thus cause any post-confirmation

challenge to the Plan to become equitably moot, thereby cutting off their right of appeal.[264]  None

of these arguments has merit.

The essential point here is that section 13.05 of the Plan identifies the *Effective Date*—that

is, the date of closing or Plan consummation—as the point of substantial consummation, not the

Confirmation Date.  In order for the Effective Date to occur, the Confirmation Order must have be

---

[262] The Insurers assert that the TDP "assign higher values to asbestos claims than they were historically paid in the tort system and have less stringent standards of proof than the tort system." Jt. Obj. at 33.  The TDP are not intended to mirror litigation in the tort system; it provides a standard process for settling and resolving claims.  In any event, the Insurers fail to substantiate their assertions here.

[263] Plan § 13.05.

[264] Jt. Obj. at 34-35; MidStates Obj. at 3-4.

entered and become a final and non-appealable order, which means any timely noted appeals must have run their course without vacating or reversing the Confirmation Order.[265]  Furthermore, in order for the § 524(g) injunction to become "valid and enforceable," the order confirming a 524(g) plan must be "issued or affirmed by the district court . . . ."[266]  The effect of this provision is that review and signoff by the District Court will have to happen before the Effective Date can occur. In other words, contrary to their assertions of their appellate rights being cut off, the Insurers will have an opportunity to present their objections and arguments to the District Court before the Plan can be consummated.  And, because the Plan requires that the Confirmation Order be a final and non-appealable order (*i.e.*, a "Final Order") before the Effective Date can occur, the Insurers will likely have the opportunity to take a further appeal to the Third Circuit, if they wish to do so.

To be sure, the Plan Proponents have the right to waive the precondition of the Confirmation Order becoming a Final Order in order for the Effective Date to occur.[267]  This would allow the Plan Proponents, in the absence of a stay, to close and consummate the Plan in the face of a pending appeal before the Third Circuit.  But the Insurers could protect their interests and preserve their appeal by seeking a stay of the Confirmation Order pending appeal.  Section 13.05 of the Plan would not deprive the Insurers of their option to seek a stay.  And this Court should reject any invitation by the Insurers to interpret the Bankruptcy Code and the Plan in a way that would exempt them from the requirement of obtaining a stay if they wish to preserve their appeal to the Third Circuit.

---

[265]  *See* Plan § 10.02(a).

[266]  11 U.S.C. § 524(g)(3)(A)(i).

[267]  *See* Plan § 10.04.

In sum, the Insurers will have the ability to press their confirmation objections in the District Court without interference from section 13.05 of the Plan. Moreover, should the Insurers wish to press an appeal before the Third Circuit, it will be within their power to seek a stay to preserve their appeal, again without interference from section 13.05. The Insurers' arguments regarding section 13.05 should be rejected.

## XIII.   SMART'S OBJECTION SHOULD BE OVERRULED

The confirmation objections of the SMART arise from the Debtors' supposed violations of the trademark infringement and counterfeiting provisions of the Lanham Act, 15 U.S.C. § 1501 *et seq.*, and the Debtors purported failure to provide for treatment of its alleged $7,600,000.00 claim ("**SMART Claim**") under the Plan. SMART requests that the Court direct the Debtors to escrow $7,600,000 to provide for payment if the SMART Claim is ultimately allowed.

The Debtors have filed an objection to the SMART Claim, which is incorporated herein by reference ("**SMART Objection**").[268] In the SMART Objection, the Debtors dispute that there has been any violation of the Lanham Act that would give rise to liability. *Even if the Debtors are found to have violated the Lanham Act, SMART's damages would be less than $5,000.* Accordingly, there is no need to escrow any funds to provide for payment of the SMART Claim.

### A.      SMART Bears the Burden of Establishing Its Claim

Section 502(a) provides that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects."[269] Once an objection to

---

[268] *See* Debtors' Obj to Proof of Claim Filed by the Int'l Ass'n of Sheet Metal, Air Rail and Transit Workers.

[269] 11 U.S.C. § 502(a).

a claim is filed, the Court, after notice and a hearing, shall determine the allowed amount of the claim.[270]

As set forth in Bankruptcy Rule 3001(f), a properly executed and filed proof of claim constitutes *prima facie* evidence of the validity and the amount of the claim under § 502(a).[271] To receive the benefit of the *prima facie* validity, however, "the proof of claim must 'set forth facts necessary to support the claim.'"[272]  The failure to allege sufficient facts in support of a claim deprives the claim of *prima facie* validity.[273]

In addition, a claimant's proof of claim is entitled to the presumption of *prima facie* validity under Bankruptcy Rule 3001(f) only until an objecting party refutes at least one of the allegations that is essential to the claim's legal sufficiency.[274]  Once such an allegation is refuted, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.[275]  In other words, once the *prima facie* validity of a claim is rebutted, "it is for the claimant to prove his claim, not for the objector to disprove it."[276]  The burden of persuasion with respect to the validity of a claim is always on the claimant.[277]

---

[270]  *See id*. § 502(b).

[271]  Fed. R. Bankr. P. 3001(f); *see also In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).

[272]  *In re Chain*, 255 B.R. 278, 280 (Bankr. D. Conn. 2000) (quoting *In re Marino*, 90 B.R. 25, 28 (Bankr. D. Conn. 1988)).

[273]  *In re Jorczak*, 314 B.R. 474, 481 (Bankr. D. Conn. 2004) (discussing the evidentiary requirements and burden of proof with respect to the allowance of claims).

[274]  *See Allegheny Int'l*, 954 F.2d at 173-74.

[275]  *See id.* at 174; *In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009).

[276]  *In re Kahn*, 114 B.R. 40, 44 (Bankr. S.D.N.Y. 1990) (citations omitted).

[277]  *See Allegheny Int'l*, 954 F.2d at 174.

As set forth in detail in the SMART Objection, the SMART Claim fails both as to liability and the extent of its damages.  The Debtors assert that there has been no violation of the Lanham Act, and even if there has been a violation (which there has not), that SMART's damages are less than $5,000.  If SMART is ultimately allowed an unsecured claim after a hearing and the presentation of evidence, it will be paid as a Class 5 claim from cash on hand or cash flow from operations as with all other Allowed Class 5 claims.  Accordingly, there is no need to provide an escrow in favor of SMART.

### B.       SMART's Miscellaneous Objections Should Be Overruled.

The first of SMART miscellaneous objections is focused on the lack of disclosure.[278]  The time for disclosure objections has long passed.  The Court approved the Disclosure Statement in November of last year.  SMART did not object to the Disclosure Statement or seek inclusion of any additional information regarding its alleged claim.  Nor did it seek to add an escrow.  SMART had ample opportunity to voice its concerns then but failed to do so.  Moreover, SMART's assertion that the Debtors have failed to satisfy the requirements for substantive consolidation must be overruled for the reasons set forth in part VIII of this memorandum.  For the reasons stated above, this Court should overrule SMART's objections.

### XIV.   CAUSE EXISTS TO WAIVE A STAY OF THE CONFIRMATION ORDER

Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."[279]

The Plan Proponents respectfully submit that cause exists to waive the stay of any order confirming the Plan so it will be effective immediately upon its entry.  The Debtors have

---

[278]  SMART Obj. ¶¶ 8, 9 & 10.

[279]  Fed. R. Bankr. P. 3020(e).

undertaken great efforts to facilitate their restructuring to exit chapter 11 as soon as practicable. Each day the Debtors remain in chapter 11 they incur significant administrative and professional costs.  The Debtors believe that an expeditious effectuation of the Plan will reduce such costs and maximize the value of their estates.  Thus, the Plan Proponents respectfully request a waiver of the stay imposed by Bankruptcy Rule 3020(e) so the confirmation order may be effective immediately upon its entry.[280]

*[Remainder of page left intentionally blank]*

---

[280]  For the avoidance of doubt, although the Debtors are requesting this waiver, the Debtors may ultimately decide not to emerge until after the 14-day period expires.

## XV.    CONCLUSION

For all of the reasons set forth herein, the Plan Proponents respectfully request that the Court confirm the Plan, waive the stay of the confirmation order imposed by Bankruptcy Rule 3020(e), overrule any objections to confirmation of the Plan that have not been withdrawn or resolved, and grant such other and further relief as may be appropriate under the circumstances.

Respectfully submitted,

| | | |
|---|---|---|
| LOWENSTEIN SANDLER LLP | THE LAW OFFICE OF JOHN A. FIALCOWITZ, LLC | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
| */s/Jeffrey D. Prol*_____ | */s/John A. Fialcowitz*_____ | */s/ Edwin J. Harron*_____ |
| Kenneth A. Rosen, Esq. | John A. Fialcowitz | Edwin J. Harron, Esq. |
| Jeffrey D. Prol, Esq. | 89 Headquarters Plaza | Sara Beth A.R. Kohut, Esq. |
| One Lowenstein Drive | North Suite 1216 | Rodney Square |
| Roseland, NJ 07068 | Morristown, NJ 07960 | 1000 North King Street |
| Telephone: (973) 597-2500 | Telephone: (973) 532-7208 | Wilmington, DE 19801 |
| Facsimile:  (973) 597-2400 | Facsimile: (973) 993-1857 | Telephone: (302) 571-6703 |
| | | Facsimile:  (302) 576-3298 |
| *Counsel to the Debtors and Debtors in Possession* | —and— | |
| | | *Counsel to the Legal Representative* |
| | CAPLIN & DRYSDALE, CHARTERED | |
| | James P. Wehner, Esq. | |
| | Jeffrey A. Liesemer, Esq. | |
| | One Thomas Circle, N.W. | |
| | Washington, DC 20005 | |
| | Telephone:  (202) 862-5000 | |
| | Facsimile: (202) 429-3301 | |
| | *Co-Counsel to the Asbestos Claimants Committee* | |

Dated: February 26, 2019

102