**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Jeffrey D. Prol, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Counsel to the Debtors and*
*Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| Duro Dyne National Corp., *et al.*[1] | Case No. 18-27963 (MBK) |
| Debtors. | (Jointly Administered) |

**CERTIFICATION OF MARK PODGAINY IN SUPPORT OF**
**CONFIRMATION OF THE SECOND AMENDED PRENEGOTIATED PLAN OF**
**REORGANIZAITON FOR DURO DYNE NATIONAL CORP., ET AL. UNDER**
**CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

Mark Podgainy, being duly sworn, represents as follows:

1.      I am a Managing Director at Getzler Henrich & Associates, LLC, financial

advisor for the above captioned debtors and debtors-in-possession (together, the "**Debtors**" or

the "**Company**").  I submit this certification (the "**Certification**") in support of confirmation of

the *Second Amended Prenegotiated Plan of Reorganization Pursuant to Chapter 11 of the*

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Duro Dyne National Corp. (4664); Duro Dyne Machinery Corp. (9699); Duro Dyne Corporation (3616); Duro Dyne West Corp. (5943); and Duro Dyne Midwest Corp. (4662).

*Bankruptcy Code for Duro Dyne National Corp., et al* [Docket No. 270] (as may be amended, the "**Plan**")[2].

2.    I have reviewed and am familiar with the terms and conditions of the Plan. Except as otherwise indicated, all facts set forth in this Certification are based on my personal knowledge, information and belief, review of relevant documents, inquiries made to others, my knowledge of the Debtors' business affairs and financial condition and the legal and financial advice provided by the professionals retained by the Debtors.  I am at least eighteen years old and am authorized to submit this Certification on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this Certification.

3.    The primary reason for the filing of the Debtors' Chapter 11 Cases was the need to address the Company's asbestos liability. As of the Petition Date, the Company was a defendant in approximately 956 pending personal injury cases stemming from alleged asbestos exposure.  Prior to the Petition Date, the Company settled more than 650 asbestos claims that had been filed against them and obtained dismissals of more than 8,100 asbestos claims.

4.    Since the first asbestos claims were filed against the Company in 1988, the Company worked with its insurance carriers to seek dismissal of a large portion of the claims and to settle the remaining claims in advance of trial.  At the rate the asbestos claims were being filed and settled by the Company and its insurance carriers, it originally appeared that the Company would be able to address all of the claims through proceeds of insurance and cash flow from operations.  However, in recent years, the Company has been forced to bear an increasing share of settlements and claims for reimbursement of indemnity and defense costs due to the

---

[2]    All capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Plan.

insolvency of one of the Company's insurance carriers, the exhaustion of the Company's primary

insurance coverage, and disputes with insurance carriers providing excess level coverage.

**I.      PREPETITION SETTLEMENT NEGOTIATIONS**

      **A.      The Ad Hoc Committee Representing Current Asbestos Personal Injury
Claim Holders**

      5.      In the spring of 2015, counsel for the Company began discussions with plaintiffs'

counsel who represent numerous current holders of Asbestos Personal Injury Claims against the

Company in order to explore the feasibility of and the potential for a prenegotiated chapter 11

plan of reorganization that would include an Asbestos Trust and a channeling injunction pursuant

to section 524(g) of the Bankruptcy Code.  Plaintiffs' counsel, without the involvement of the

Company, formed an ad hoc committee (the "**Ad Hoc Committee**") for the purpose of

negotiating the terms of a possible plan of reorganization.

      6.      The Ad Hoc Committee selected the law firm of Caplin & Drysdale, Chartered as

its bankruptcy counsel, the law firm of Gilbert, LLP as its insurance counsel, and Charter Oak

Financial Consultants, LLC as its financial advisors.

      **B.      The Pre-Petition Future Claimants' Representative**

      7.      The Company and the Ad Hoc Committee determined that it was necessary and

appropriate to engage an independent third-party representative (the "**Pre-Petition Future**

**Claimants' Representative**") for the purpose of protecting the rights of persons that might

subsequently assert asbestos-related personal injury or wrongful death claims against the

Company.

      8.      In conducting its search for possible candidates to serve as Pre-Petition Future

Claimants' Representative, the Company and the Ad Hoc Committee focused on persons with

reputations of high integrity and with recognized experience and expertise in dealing with mass

torts, particularly asbestos, and who would not have any actual or perceived conflict of interest. Lawrence Fitzpatrick was ultimately selected to serve as the Pre-Petition Future Claimants' Representative and, if appointed by the Court, to continue to serve as the postpetition legal representative for all holders of Demands pursuant to section 524(g) of the Bankruptcy Code (the "**Legal Representative**").  This selection was based on Mr. Fitzpatrick's reputation for integrity, renown in the field of complex mass tort proceedings, and extensive experience with asbestos-related personal injury litigation.

9.    Mr. Fitzpatrick selected Young, Conaway, Stargatt & Taylor LLP as his counsel.

**C.    Due Diligence and Plan Negotiations**

10.    The Ad Hoc Committee and the Pre-Petition Future Claimants' Representative, personally and/or through their various representatives, conducted extensive due diligence concerning the background, nature, and scope of the Company's liability for Asbestos Claims. This investigation included, among other things, careful review of the facts concerning the Company's historical involvement with asbestos; the nature and extent of past and pending asbestos litigation against the Company, including the types of claims asserted and the legal issues raised; the projected value of present and future Asbestos Claims and Demands; and the extent to which insurance and other assets may be available to satisfy these liabilities in whole or in part.  The Ad Hoc Committee and the Pre-Petition Future Claimants' Representative also examined the potential for recovery by claimants asserting asbestos-related claims against affiliates of the Company based upon a variety of legal theories, including derivative liability theories such as alter ego, successor liability, and/or fraudulent conveyance.

11.    Following extensive due diligence, representatives of the Company, the Ad Hoc Committee and the Pre-Petition Future Claimants' Representative spent considerable time

negotiating the terms of a possible plan of reorganization.  These negotiations addressed all of the material provisions of a plan, including without limitation the funding for a trust to be established by the plan, the contributions to be made by the Company, the terms of a channeling injunction, issues relating to insurance coverage, and indemnification provisions.  Ultimately, the Company, the Ad Hoc Committee, and the Pre-Petition Future Claimants' Representative reached an agreement on the terms for a proposed plan of reorganization for the Company which were incorporated into a term sheet dated January 6, 2018.  Following execution of the term sheet, the Debtors, Committee and Pre-Petition Future Claimants' Representative negotiated the terms of a Prenegotiated Plan of Reorganization for Duro Dyne National Corp., *et al*.

## II.    THE BANKRUPTCY FILING

12.    On September 7, 2018, each of the Debtors filed voluntary petitions pursuant to chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey.  On the same date, the Debtors filed the Prenegotiated Plan and a Disclosure Statement with respect thereto.  The Prenegotiated Plan was subsequently amended and First Amended and Second Amended Prenegotiated Plans were subsequently filed with the Court.  The Second Prenegotiated Plan is hereinafter referred to as the "**Plan**".

13.    On September 26, 2018, the United States Trustee formed an official committee of asbestos personal injury claimants (the "**Asbestos Claimants Committee**"), in accordance with § 1102(a)(1) of the Bankruptcy Code.  On November 9, 2018, the Court entered Orders approving the retention of Caplin & Drysdale, Chartered as counsel and The Law Office of John A. Fialcowitz, LLC as local counsel to the Asbestos Claimants Committee.

14.    On October 17, 2018, the Court entered an Order Appointing Lawrence Fitzpatrick as the legal representative to represent the interests of future personal injury

claimants (the "**Legal Representative**").  On November 14, 2018, the Court entered an Order

approving the retention of Young Conaway Stargatt & Taylor, LLP as counsel to the Legal

Representative.

## III.    THE PLAN

### A.    Administrative and Professional Claims

15.    The Plan provides that Administrative Claims, other than Claims for Professional

Compensation and Reimbursement, shall be paid in Cash on the Effective Date or on the Date

on which such Administrative Claim becomes an Allowed Administrative Claim, provided that

any Allowed Administrative Claim incurred in the ordinary course of business shall be paid by

the Reorganized Debtor in the ordinary course of business. The Debtors are unaware of any

Administrative Claims in this category other than Administrative Claims incurred in the

ordinary course of business.  As of the date hereof, post-petition trade accounts payable total

approximately $7.05 million.   Annexed hereto as **Exhibit A** is revised 13-week cash flow

projection which confirms that all post-petition trade payables will be paid in the ordinary

course of business (the "**Cash Flow Projection**").

16.    The Plan provides that holders of Professional Claims shall file final fee

applications for fees and expenses incurred through the Effective Date by not later than thirty

(30) days after the Effective Date or within such other time period provided by the Court. As of

February 15, 2019, accrued but unpaid Professional Claims total $450,000.   The Debtors

estimate that Professional Claims from the date hereof through the Effective Date will be

approximately $750,000.  Allowed Professional Claims shall be paid from cash on hand and

cash flow from operations.

17.    The Debtors are not aware of any outstanding or unpaid Priority Tax Claims.

However, it is estimated that approximately $15,000 in certain state and local tax claims may

accrue before the Effective Date, and therefore they are included the Cash Flow Projection. The IRS filed priority tax claims against the Debtors in the total amount of $85,359.48 and an unsecured claim in the amount of $557.07 (together, the "**IRS Claims**").  The Debtors intend to file a motion to expunge the IRS Claims as the IRS Claims have been paid in full.

18.    The Plan provides that the Reorganized Debtor shall pay applicable fees due to the United States Trustee when due in the ordinary course of business.  If Plan provisions regarding substantive consolidation are not approved, the Reorganized Debtors shall pay all applicable fees due to the United States Trustee for all Debtors that are reorganized.  United States Trustee fees shall be paid from cash on hand and cash flow from operations. There are currently no Trustee Fees due and owing.

19.    The Plan provides for the classification of Claims and Interests as follows:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote |
| 3 | Employee Benefit Claims | Unimpaired | Not Entitled to Vote |
| 4 | Worker Compensation Claims | Unimpaired | Not Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote |
| 6 | Prepetition Defense-Cost Contribution Claims | Impaired | Entitled to Vote |
| 7 | Channeled Asbestos Claims | Impaired | Entitled to Vote |
| 8 | Bonded Claims | Unimpaired | Not Entitled to Vote |
| 9 | Intercompany Claims | Impaired | Not Entitled to Vote |
| 10 | Related-Party Claims | Impaired | Not Entitled to Vote |
| 11 | Equity Interests in Duro Dyne National | Impaired | Not Entitled |

| | Corp. | | to Vote |
|---|---|---|---|
| 12 | Equity Interests in Duro Dyne Corporation, Duro Dyne Midwest Corp., Duro Dyne West Corp., and Duro Dyne Machinery Corp. | Impaired | Not Entitled to Vote |

20.      The foregoing Classes of Claims will be treated as follows:

**B.      Priority Non-Tax Claims**

21.      The Debtors are not aware of any Priority Non-Tax Claims.

**C.       Secured Claims**

22.      Duro Dyne is party to a revolving credit note dated February 3, 2003 (as amended) with a non-debtor affiliate, 4 Site, LLC (the "**Prepetition Lender**") pursuant to which the Prepetition Lender extended a revolving credit facility to Duro Dyne in the original principal sum of five million dollars ($5,000,000.00) (the "**Prepetition Loan**").  As of the date hereof, the total outstanding balance due on the Prepetition Loan is approximately $1.08 million.  Pursuant to the Plan, the Reorganized Debtor shall continue to make payments to the Prepetition Lender in the ordinary course of business.  The Cash Flow Projection shows that the Reorganized Debtor will have sufficient funds to pay all obligations due to the Prepetition Lender in the ordinary course of business.

**D.      Leases**

23.      The Debtors are party to the following personal property leases which will be assumed pursuant to section 8.01 of the Plan:

| Lessor Name | Type | Debtor(s) |
|---|---|---|
| Avaya Financial Services | Telephone equipment | Duro Dyne National Corp |
| CIT Communications Finance Corp. | IP Office | Duro Dyne National Corp |
| CIT Finance, LLC | Equipment | Duro Dyne National Corp |
| Dell Financial Services | 13 laptop computers | Duro Dyne National Corp |

| Dell Financial Services | 15 laptop computers | Duro Dyne National Corp |
|---|---|---|
| U.S. Bank Equipment Finance | Equipment | Duro Dyne National Corp |
| PRO4MA, LLC | Equipment | Duro Dyne National Corp. Duro Dyne Corporation Duro Dyne Machinery Corp Duro Dyne Midwest Corp Duro Dyne West Corp. |
| PRO4MA II, LLC | Equipment | Duro Dyne National Corp. Duro Dyne Corporation Duro Dyne Machinery Corp Duro Dyne Midwest Corp Duro Dyne West Corp. |
| Hilo Equipment & Services | Forklift truck | Duro Dyne Corporation |
| Koneranes, Inc | Machine hoist | Duro Dyne Corporation |
| HYG Financial Services | Forklifts | Duro Dyne Corporation |
| Electronix Systems Central Station Alarm | Security System and equipment | Duro Dyne Corporation |
| De Lage Landen Financial Services, Inc. | 3 Forklifts and copier | Duro Dyne Corporation |
| Mailfinance/Neopost Company | Mail equipment rental agreement | Duro Dyne Midwest Corp |
| DJJ Technologies | Phone system | Duro Dyne Midwest Corp |
| E&J Trailer Services | Storage trailer rental | Duro Dyne Midwest Corp |
| HYG Financial Services | Forklifts | Duro Dyne Midwest Corp. |
| E&J Trailer Services | Storage trailer rental | Duro Dyne Midwest Corp |
| Mailfinance/Neopost Company | Mail equipment rental agreement | Duro Dyne Midwest Corp |
| DJJ Technologies | Phone system | Duro Dyne Midwest Corp |
| Mailfinance/Neopost Company[3] | Mail equipment rental agreement | Duro Dyne West Corp. |
| Wells Fargo Equipment Finance | 2 Komatsu Forklifts | Duro Dyne West Corp. |

---

[3]    The Debtors intend to reject this lease.

24.    The Debtors are current on all leases, and will continue to pay obligations due thereunder in the ordinary course of business.  The Cash Flow Projection shows that the Reorganized Debtor will have sufficient funds to continue to pay these leases in full.  To the extent any of these lessors filed a proof of claim for unpaid lease amounts, the Debtors will file a motion to expunge the claim.

### E.    Employee Benefit Claims

25.    The Plan at section 3.03(c) leaves unaltered the legal, equitable, and contractual rights to which each such Allowed Employee Benefit Claim entitles the holder of such Claim, including, for the avoidance of doubt, quarterly installment payments on account of any Allowed Withdrawal Liability Claims as provided pursuant to Title IV of ERISA, and such Claims shall be paid in the ordinary course of business.  The Debtors estimate that Employee Benefit Claims total approximately $1.6 million.  The Cash Flow Projection shows that the Reorganized Debtor will have sufficient funds to pay all Employee Benefit Claims in the ordinary course of business.

26.    The Pension Benefit Guarantee Corporation filed Proofs of Claim against each Debtor asserting potential statutory Liability under 29 U.S.C. Section 1362 and 1368 for unfunded benefit liabilities. The claims total approximately $2 million.  The Debtors intend to file a motion to expunge the PBGC's Claim as the Debtors have not defaulted under their Pension Plans.

### F.    Worker Compensation Claims

27.    The Debtors books and records reflect two pending Worker Compensation Claims, the total amounts of which have not yet been determined.  The Debtor believes these claims will be paid under its existing insurance plan. No proofs of claim have been filed asserting Worker Compensation Claims.

G.     **General Unsecured Claims**

28.     Per prior Court Order all pre-petition ordinary course trade claims have been paid in full in the ordinary course of business.  Various ordinary course trade creditors have filed proofs of claim asserting General Unsecured Claims in the aggregate sum of $595,590.33 which have already been paid in the ordinary course.  The Debtors intend to file a motion to expunge these claims.

29.     SMART has filed a proof of claim asserting a General Unsecured Claim in the sum of $7.6 million on account of alleged trade mark violations relating to an alleged improper use of SMART's union label.  The Debtors dispute this Claim and have filed a motion to expunge it.

H.     **Prepetition Defense-Cost Contribution Claims**

30.     The Plan provides that Allowed Prepetition Defense-Cost Contribution Claims will be paid in full over eight years following the Effective Date with interest at the federal judgement rate.

31.     North River Insurance Company ("**North River**"), Hartford Accident and Casualty Company ("**Hartford**") and Federal Insurance Company ("**Federal**") have filed proofs of claim asserting Prepetition Defense-Cost Contribution Claims. The Debtors have filed an objection to North River's Prepetition Defense-Cost Contribution Claim and believe that based on underlying state law that this Claim should be expunged in its entirely. The Debtors intend to file an objection to Federal's claim on similar grounds.  To the extent that North River's or Federal's Prepetition Defense-Cost Contribution Claim becomes an Allowed Claim, the Claim will be paid from cash on hand and cash flow from operations.

32.     The Debtors and Hartford have reached the terms of a settlement, which is subject to approval by this Court on a motion under Fed. R. Bankr. P. 9019, pursuant to which all

claims between the Debtors and Harford have been resolved, and Hartford has agreed to withdraw all of its Claims against the Debtors, including its Prepetition Defense-Cost Contribution Claim.

## I.     Channeled Asbestos Claims

33.     North River and Federal  assert that their Claims for (i) pre-petition and post-petition indemnity payments and (ii) post-petition defense costs should be classified as General Unsecured Claims. For reasons set forth in the Plan Proponents' Brief in Support of Confirmation of the Plan, the Debtors assert that these claims are properly classified as Class 7 Channeled Asbestos Claims

34.     The Plan contemplates the establishment of a trust under section 524(g) of the Bankruptcy Code and an Asbestos Permanent Channeling Injunction that will channel all current Asbestos Claims, future asbestos-related Demands, and Indirect Trust Claims to the Asbestos Trust.  The Asbestos Permanent Channeling Injunction will cover all Asbestos Claims and Demands based in whole or in part on the alleged conduct or products of the Company. The Asbestos Permanent Channeling Injunction will also channel all current Asbestos Claims and Demands based in whole or in part upon asbestos-related personal injury and wrongful death Claims and Demands against certain parties related to the Company, including, but not limited to, past and present affiliates of the Company, past and present officers and directors of the Company, predecessors in interest to the Company, and any entity that owned a financial interest in the Company or its affiliates or predecessors.

35.     The effect of "channeling" Asbestos Claims, Demands and Indirect Asbestos Claims to the Asbestos Trust is that they may only be pursued through, and paid from the

Asbestos Trust. Asbestos Claims and Demands may not be asserted against the Company or any

Protected Parties following the confirmation of the Plan.

36.    The Asbestos Trust will be funded with:

(a) a cash contribution from the Company in the sum of $7,500,000;

(b) a cash contribution from the Hinden Family Entities and Hinden Family Members in the total amount of $3,000,000[4];

(c) a Trust Note  in the original principal sum of $13,500,000 executed by the Company and secured by a pledge of 50.1% of the voting shares of the Reorganized Debtor and non-debtor affiliate Duro Dyne Canada, and by mortgages on two parcels of real estate owned by non-debtor affiliates and the improvements thereon;

(d) The Earn Out Amount in the sum of $2,000,000; and

(e) an assignment and contribution by the Debtors of all rights to insurance coverage responsive or potentially responsive to asbestos personal injury claims, and any and all proceeds of or from such rights, regardless of whether such rights and proceeds arise or result from insurance policies, settlement agreements, or other insurance-related agreements.

The assets of the Asbestos Trust will be used to pay current and future asbestos-related person

injury and wrongful death claimants in accordance with the terms of the asbestos Trust

Distribution Procedures established under the Plan.

37.    The Asbestos Trust's assets, which are limited, must be managed by the Asbestos

Trustee to ensure that funds are available to pay all current claimants we well as all expected

future claimants.  Nevertheless, for all the reasons detailed in the Disclosure Statement, the

Company believes that there will be substantially more assets available to pay claimants under

the Plan than would be the case if there were no Plan and the Company was forced to pay

Asbestos Claims and Demands solely from its own assets.

**J.    Bonded Claims**

38.    The Debtors are unaware of any Bonded Claims

---

[4] An allocation schedule of The Hinden Contribution to the Asbestos Trust is attached hereto as **Exhibit B.**

### K.    Intercompany Claims

39.    Intercompany Claims are expunged under the Plan, and no distributions shall be made on account of Intercompany Claims.

### L.    Related-Party Claims

40.    Related-Related-Party Claims shall be paid in the ordinary course according to any terms or agreements governing such Claims, except that all Related-Party Claims shall be subordinated to the Trust Note.  All pre-petition Related-Party Claims have been paid in the ordinary course of business. The Cash Flow Projection shows that the Reorganized Debtor will have sufficient funds to pay all Related Party Claims going forward in the ordinary course of business

### M.    Equity Interests in Duro Dyne National Corp

41.    Subject to the provisions of Section 5.02(c) of the Plan, holders of Equity Interests in Debtor Duro Dyne National Corp. shall receive and retain their Equity Interests in Reorganized Duro Dyne National Corp. to the same extent held in the Debtor Duro Dyne National Corp. on the Petition Date.

### N.    Equity Interests in Duro Dyne Corporation, Duro Dyne Midwest Corp., Duro Dyne West Corp., and Duro Dyne Machinery Corp.

42.    Equity Interests in Duro Dyne Corporation, Duro Dyne Midwest Corp., Duro Dyne West Corp., and Duro Dyne Machinery Corp. are cancelled and extinguished under the Plan.

### O.    Feasibility

43.    As of the date hereof, the Debtors have cash on hand of approximately $2.6 million.  The Debtors estimate that as of the Effective Date of the Plan, the approximate amount of the cash on hand will be approximately $2.6 million.

44.    In addition, on or before the Effective Date, the Debtors will close on the Senior Lending Facility with Bank of America pursuant to which the Bank of America will extend a line of credit to the Reorganized Debtor in the aggregate sum of $9,950,000 to fund distributions under the Plan and post-Effective Date working capital needs. It is estimated that the fees associated with the closing of the Senior Lending Facility will be approximately $176,000. *See* **Exhibit C.**

45.    As reflected in the Cash Flow Projection and the revised five (5) year long term projections (the "**Long Term Projections**") annexed hereto as **Exhibit D** based on the amount of the available cash on hand, the Senior Lending Facility, and cash flow from operations, the Reorganized Debtor will have sufficient funds available to pay all obligations due under the Plan and to operate its business subsequent to the Effective Date.  The Plan is therefore feasible. *See* Exhibits A and D.

## V.    Balloting

46.    Pursuant to the *Amended Order (i) Approving Second Amended Disclosure Statement As Providing Adequate Information Within the Meaning of Section 1125(a) of the Bankruptcy Code; (ii) Establishing Procedures for Solicitation and Tabulation of Votes on Amended Plan of Reorganization; (iii) Approving the Form of Ballots; (iv) Scheduling a Hearing on Confirmation of the Plan; (v) Approving the Form, Manner and Scope of Mailed and Published Notices of the Time Fixed to (a) Vote on the Amended Plan, and (b) File Objections to Confirmation of the Amended Plan; and (vi) Granting Related Relief* (the "**Disclosure Statement Order**"), the Court established a deadline of January 24, 2018 (the **Voting Deadline**") for creditors entitled to vote on the Second Amended Plan (creditors in Classes 6 and 7) to submit their ballots.

47.    On November 22, 2018 the Debtors served the Confirmation Hearing Notice, Solicitation Packages and Notice of Non-Voting Status (each as defined in the Disclosure Statement Order) on the appropriate parties in accordance with the terms of the Disclosure Statement Order.

48.    On January 30, 2019, the Debtors filed the *Declaration of Balloting Agent Regarding the Solicitation and Tabulation of Votes in Connection with the Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al* which includes a report summarizing the votes received on the Second Amended Plan (the "**Tabulation Report**").  As reflected in the Tabulation Report and as modified by the *Order granting North River's Motion Pursuant to Bankruptcy Rule 3018 for Temporary Allowance of Its Proofs of Claim for Voting Purposes*, filed Feb. 8, 2019 [ECF No. 448] (the "**3018 Order**"), on or before the Voting Deadline, two holders of Class 6 Prepetition Defense-Cost Contribution Claims timely submitted Ballots. Of these Ballots, zero (0%) voted in favor of the Plan, and two (100%) ballots, representing $8,881,493.39 (100%), voted to reject the Plan.

49.    As also reflected in the Tabulation Report and as modified by the 3018 Order, on or before the Voting Deadline, 1,473 holders of Class 7 Channeled Asbestos Claims timely submitted Ballots.  Of these Ballots, 1,470 (99.8%) representing $83,729,900.00 (77.1%) voted to accept the Plan, and three ballots (.2%) representing $24,992,118.79 (22.9%) voted to reject the Plan

50.    Thus, Holders of Claims in Class 6 voted to reject the Plan and Holders of Claims in Class 7 overwhelmingly voted in favor of the Plan.

## VI.    <u>Substantive Consolidation</u>

51.    The Plan provides for the substantive consolidation of the Debtors to simplify the Debtors' corporate structure post-Effective Date.  Substantive consolidation is appropriate in these chapter 11 cases for the following reasons.

52.    There is a substantial interrelationship between and among the Debtors. Because the Debtors historically operated on a consolidated basis, the Debtors' finances are completely intertwined.[5] The Debtors have the same officers, directors and shareholders. They conduct "virtually identical" business operations under similar names, and use the same general methods of operation. The Debtors' management works out of, and most administrative and accounting functions are all performed from one centralized location.

53.    In addition, customers and vendors identified the Debtors generally as "Duro Dyne" as opposed to any individual corporate identity. The Debtors' trade creditors and customers view the Debtors as a single entity when extending credit.  The Debtors as a whole capitalized upon the scale and operations of the entirety of the Debtors' business operations to negotiate agreements and maximize value. Moreover, no class of creditors is negatively impacted by substantive consolidation. For these reasons, substantive consolidation is appropriate.

## VII.    <u>Compliance with Section 1123 of the Bankruptcy Code</u>

54.    I believe that the Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.

55.    Article 3 of the Plan designates twelve Classes of Claims and Interests.  I am familiar with the classification of Claims and Interests in the Plan and believe that such

---

[5]    See, Debtors' motion for entry of an order authorizing the Debtors to continue and maintain their existing cash management system, para. 11.

classification system is based upon the legal nature and relative rights of the Claims and Interests, and is not proposed for any improper purpose. Each Class contains only Claims or Interests that are substantially similar to other Claims and Interests therein. As such, I believe the Plan complies with Bankruptcy Code section 1123(a)(1)

56.    Article 3 of the Plan specifies whether each Class of Claims and Interests is unimpaired under the Plan, and sets forth the treatment of such Classes of Claims and Interests. As such, I believe that the Plan complies with Bankruptcy Code sections 1123(a)(2) and (3).

57.    I believe that pursuant to the Plan, in accordance with Bankruptcy Code section 1123(a)(4), the treatment of each Claim or Interest in each particular Class is the same as the treatment of each other Claim or Interest in such Class, unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such particular Claim or Interest.

58.    I believe that, in accordance with Bankruptcy Code section 1123(a)(5), Article 4, Article 5, and various other provisions of the Plan provide adequate and proper means for implementation of the Plan.

59.    Section 5.02(a) of the Plan provides that the certification of incorporation of the Reorganized Debtor shall be amended consistent with Section 1123(a)(6) of the Bankruptcy Code, and the proposed amended charter is annexed as Schedule 5.02(a) of the Plan Supplement.  Accordingly, the Plan complies with Section 1123(a)(6).

60.    The Plan provides that on and after the Effective Date, the business affairs of the Reorganized Debtor will be managed by the same board of directors and same management that was in place prior to the Petition Date. The Plan proposes no changes in how Officers and Directors are appointed or elected.  I believe that the foregoing is in the best interests of

creditors, equity holders and public policy (to the extent applicable) in accordance with Bankruptcy Code section 1123(a)(7).

61.     The Debtors are not individuals and, accordingly, I believe that Bankruptcy Code section 1123(a)(8) is inapplicable.

**VIII.    Compliance with Section 1129 of the Bankruptcy Code**

62.     I believe that the Plan complies with the applicable provisions of Chapter 11 of the Bankruptcy Code, thereby satisfying section 1129(a)(1)

63.     I believe that the Debtors, the Committee and the Legal Representative, as joint proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying Bankruptcy Code section 1129(a)(2).

64.     I believe that the Plan has been proposed in good faith and not by any means forbidden by law, and that Bankruptcy Code section 1129(a)(3) is satisfied.

65.     I believe that Bankruptcy Code section 1129(a)(4) is satisfied because any payment made or promised by the Debtors or a person acquiring property under the Plan, for services or for services or costs and expenses in or in connection with, the Debtors' chapter 11 cases, or in connection with the Plan and incident to the Debtors' chapter 11 cases, has been approved by, or is subject to approval of the Court as reasonable.

66.     I believe that the Plan satisfies section 1129(a)(5) of the Bankruptcy Code because the Plan provides that on and after the Effective Date, the business affairs of the Reorganized Debtor will be managed by the same board of directors and same management that was in place prior to the Petition Date.

67.     I believe that section 1129(a)(6) of the Bankruptcy Code is inapplicable to these chapter 11 cases and the Plan because there are no rate changes provided for in the Plan for

which a governmental regulatory commission will have jurisdiction over the Debtors after
confirmation of the Plan.

68.     I have prepared a liquidation analysis setting forth the estimated potential
recoveries by creditors in a hypothetical chapter 7 liquidation (the "**Liquidation Analysis**"), a
copy of which is attached hereto as **Exhibit E.**   As set forth in the Liquidation Analysis, I
estimate that the liquidation of the Debtors' assets would generate approximately $19 million in
proceeds.   This estimation assumes that the Debtors assets will be sold at fire-sale prices and the
Debtors would lose the benefit of the Hinden Contribution of $3 million.   In addition, the
chapter 7 trustee would likely not be able to negotiate insurance settlements anywhere near the
terms that could be negotiated in a § 524(g) plan.

69.     After payment of chapter 11 and chapter 7 administrative claims (other than
counsel fees for the chapter 7 trustee) and priority claims, I estimate that there would be
approximately $8.4 million remaining.   I believe the lion's share of these remaining funds will
be utilized by the chapter 7 trustee liquidating the avalanche of asbestos claims that will be filed
in response to the bar date notice that will be issued in the chapter 7 case. Moreover, in a
chapter 7 case, the trustee would have to go through a very lengthy and expensive asbestos
claims allowance process, which for any contested claim would have to be adjudicated by the
District Court in a jury trial under 28 U.S.C. §§ 157(b)(5) and 1411(a), thereby exponentially
increasing the administrative expenses incurred in determining the allowance of present
asbestos claims compared to the Trust's efficient mechanism for liquidating claims.   During the
ensuing years, while the chapter 7 trustee would be litigating over whether these claims should
be allowed, many of the previously unimpaired claimants would begin manifesting physical
injuries from their asbestos exposures, thereby increasing the pool of allowable "present"

claims.  While the chapter 7 claims allowance process is ongoing, future asbestos personal-injury claims would ripen and become eligible for payment.  In accordance with § 726(a)(2)(C) of the Code, holders of future asbestos personal-injury claims would be allowed to "tardily file" claims and would be entitled to distributions in parity with existing asbestos personal-injury claims and other general unsecured claims.  In what might be a never-ending process, scores, if not hundreds, of such "tardily filed" claims would be filed each year that the case was open, a process that could delay distributions to creditors for decades, which, in turn, would substantially reduce the present value of any distribution in a chapter 7 case.  Creditor recoveries in a chapter 7 liquidation—*if any*—would not only be diluted by distributions to maturing future claims; the delays would diminish their present value, and the assets available for distribution would be substantially diluted, if not exhausted, by the costs of administering the chapter 7 claims allowance process.

70.   Because the Plan provides for significantly greater recoveries for creditors than would be available in a chapter 7, the Plan satisfies section 1129(a)(7).

71.   I believe that the Plan satisfies section 1129(a)(8) of the Bankruptcy Code because each holder of an impaired Claim or an Interest: (i) has accepted the Plan; or (ii) unless such holder agrees to less favorable treatment, will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  Although Class 6 has voted to reject the Plan, Holders of Allowed Claims in Class 6 shall receive payment in full of their Allowed Claims over time with interest.

72.     Except to the extent that the holder of a particular Claim agrees to a different treatment of such Claim, I believe that the treatment of Claims under the Plan of the type specified in sections 507(a)(2) through 507(a)(8) of the Bankruptcy Code, if any, complies with the provisions of section 1129(a)(9) of the Bankruptcy Code because such creditors will be paid in full in cash.

73.     I believe that section 1129(a)(10) of the Bankruptcy Code is satisfied as at least two-thirds (2/3) in amount of those holders of Class 7 Claims and at least seventy-five percent (75%) of those holders of Class 7 Claims actually voting on the Plan voted in favor of the Plan in accordance with section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

74.     As discussed above the Cash Flow Projection and the Long Term Projections show that cash on hand, cash flow from operations and the proceeds from the Senior Lending Facility are sufficient for the Reorganized Debtor to pay its post-Effective Date operating expenses and to make all payments required under the Plan.  Accordingly, I believe that the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

75.     I believe that section 1129(a)(12) of the Bankruptcy Code is satisfied as all fees payable under section 1930 of title 28 of the United States Code either have been paid or will be paid under the Plan.

76.     Section 3.03(c) of the Plan provides for the Reorganized Debtor to continue making payments to retiree benefit plans, funds or programs, including Allowed Withdrawal Liability Claims, as defined in section 1114 of the Bankruptcy Code.  Accordingly, the Plan complies with section 1129(a)(13) of the Bankruptcy Code.

77.     The Debtors are not required by a judicial or administrative order, or by statute, to pay a domestic support obligation, and Bankruptcy Code section 1129(a)(14) is therefore inapplicable.

78.     The Debtors are not individuals, and I believe that Bankruptcy Code section 1129(15) is therefore inapplicable.

79.     I believe that section 1129(a)(16) of the Bankruptcy Code is satisfied as all transfers of property under the Plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

80.     No other chapter 11 plan has been proposed for confirmation, and I believe that Bankruptcy Code section 1129(c) is therefore inapplicable.

81.     I believe that Bankruptcy Code section 1129(d) is satisfied because the primary purpose of the Plan is not the avoidance of taxes or the requirements of section 5 of the Securities Act of 1933.

82.     As required by Bankruptcy Rule 3016(a), the Plan is dated and identifies the plan proponents as the Debtors, the Committee, and the Legal Representative.

83.     I believe that the Debtors, the Committee and their respective present and former officers, directors, members, managers, employees, representatives, counsel and other agents, successors and assigns have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all their respective activities relating to the solicitation of acceptances to the Plan and their participation in the activities described in section 1125 of the

Bankruptcy Code and should be entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the injunction and exculpation provisions set forth in the Plan.

**IX.    Cooperation Agreement**

84.    In satisfaction of one of the Objections to the Plan raised by the United States Trustee, attached hereto as **Exhibit F** is the Cooperation Agreement, referenced as Exhibit B to the Plan.

## <u>CONCLUSION</u>

85.    As a result of the foregoing, I believe that the Plan satisfies the requirements of the Bankruptcy Code and that the Court should confirm the Plan.

86.    I declare under penalty of perjury that the foregoing statements made by me are true and correct to the best of my knowledge, information and belief.

Dated:  February 26, 2019

Getzler Henrich & Associates, LLC

By:/s/ Mark Podgainy___
      Mark Podgainy
      Managing Director

**EXHIBIT A**
[Cash Flow Projection]

**DURO DYNE CORPORATION**
**CASH FLOW FORECAST**
**FOR THE THIRTEEN WEEKS ENDED MAY 10, 2019**
**FEBRUARY 11, 2019 - MAY 10, 2019**

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending ----> | | 2/15/2019 | 2/22/2019 | 3/1/2019 | 3/8/2019 | 3/15/2019 | 3/22/2019 | 3/29/2019 | 4/5/2019 | 4/12/2019 | 4/19/2019 | 4/26/2019 | 5/3/2019 | 5/10/2019 | |
| **Opening Cash Balance** | $ | 2,800,831 $ | 2,469,066 $ | 2,638,977 $ | 2,644,174 $ | 2,445,032 $ | 2,014,767 $ | 2,198,655 $ | 2,469,171 $ | 2,620,156 $ | - $ | - $ | - $ | - | |
| **Cash Receipts** | | 1,702,997 | 1,512,447 | 1,592,303 | 1,490,612 | 1,465,064 | 1,468,618 | 1,528,264 | 1,502,196 | 1,456,229 | 1,467,809 | 1,519,182 | 1,475,060 | 1,467,891 | $ 19,648,672 |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| Payroll and Payroll Taxes | | 535,000 | 205,000 | 205,000 | 205,000 | 455,000 | 205,000 | 205,000 | 205,000 | 455,000 | 210,000 | 210,000 | 210,000 | 455,000 | 3,760,000 |
| Benefits | | 155,000 | - | - | 165,000 | 15,000 | - | - | - | 165,000 | 101,000 | - | - | 155,000 | 756,000 |
| 401K | | 26,000 | 10,000 | 10,000 | 10,000 | 26,000 | 10,000 | 10,000 | 10,000 | 26,000 | 10,000 | 10,000 | 10,000 | 20,000 | 188,000 |
| Leases | | - | 98,805 | 6,293 | 113,805 | - | - | - | 120,098 | - | - | - | 6,293 | 113,805 | 459,098 |
| Taxes | | - | 17,000 | - | - | - | - | - | - | - | - | - | - | - | 17,000 |
| Insurance | | 29,405 | - | - | - | 29,405 | - | - | - | - | 29,405 | - | - | - | 88,214 |
| Utilities | | 5,000 | 15,000 | - | - | 6,500 | 15,000 | - | - | 6,000 | 15,000 | - | - | 6,000 | 68,500 |
| Amex | | 217,220 | - | - | - | 300,000 | - | - | - | 300,000 | - | - | - | 300,000 | 1,117,220 |
| Freight | | 108,509 | 112,451 | 144,521 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 1,465,481 |
| Suppliers | | 651,866 | 694,613 | 868,362 | 911,949 | 725,925 | 841,730 | 709,348 | 851,113 | 742,045 | 876,012 | 958,307 | 719,466 | 706,712 | 10,257,447 |
| Selling Expenses | | 119,931 | 15,000 | 189,931 | - | 30,000 | - | 100,000 | - | 30,000 | - | 95,000 | - | 30,000 | 609,863 |
| Ordinary Course Professional Fees | | 8,933 | - | - | - | 17,000 | - | - | - | 27,000 | - | - | - | - | 52,933 |
| Other | | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 715,000 |
| Contingency | | | | | | | | | | | | | | | - |
| **Total Operating Disbursements** | $ | 1,911,863 $ | 1,222,869 $ | 1,479,107 $ | 1,570,754 $ | 1,769,829 $ | 1,236,730 $ | 1,189,348 $ | 1,351,211 $ | 1,916,045 $ | 1,406,417 $ | 1,438,307 $ | 1,110,759 $ | 1,951,517 | $ 19,554,756 |
| **Operating Cash flow** | $ | (208,867) $ | 289,577 $ | 113,196 $ | (80,142) $ | (304,765) $ | 231,888 $ | 338,916 $ | 150,985 $ | (459,816) $ | 61,392 $ | 80,875 $ | 364,301 $ | (483,626) | $ 93,916 |
| **Accumulated** | $ | (208,867) $ | 80,711 $ | 193,907 $ | 113,765 $ | (191,000) $ | 40,888 $ | 379,804 $ | 530,790 $ | 70,974 $ | 132,365 $ | 213,241 $ | 577,542 $ | 93,916 | $ 93,916 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | |
| Senior Debt | | - | - | - | - | - | - | 68,400 | - | - | - | - | - | - | 68,400 |
| Claim Payments | | - | - | - | - | - | - | - | - | 75,000 | - | - | - | - | 75,000 |
| Asbestos Settlement Payment | | - | - | - | - | - | - | - | - | 7,500,000 | - | - | - | - | 7,500,000 |
| U.S. Trustee Fees | | - | - | - | - | - | - | - | - | 200,000 | - | - | - | - | 200,000 |
| Professional Fees | | 122,898 | 119,666 | 48,000 | 119,000 | 125,500 | 48,000 | - | - | 753,000 | - | - | - | - | 1,336,064 |
| Capital Expenditures | | - | - | 60,000 | - | - | - | - | - | - | - | - | - | - | 60,000 |
| **Total Non-Operating Disbursements** | $ | 122,898 $ | 119,666 $ | 108,000 $ | 119,000 $ | 125,500 $ | 48,000 $ | 68,400 $ | - $ | 8,528,000 $ | - $ | - $ | - $ | - | $ 9,239,464 |
| **Net Cash Flow** | $ | (331,765) $ | 169,911 $ | 5,196 $ | (199,142) $ | (430,265) $ | 183,888 $ | 270,516 $ | 150,985 $ | (8,987,816) $ | 61,392 $ | 80,875 $ | 364,301 $ | (483,626) | $ (9,145,548) |
| **Accumulated** | $ | (331,765) $ | (161,854) $ | (156,657) $ | (355,799) $ | (786,064) $ | (602,176) $ | (331,660) $ | (180,675) $ | (9,168,491) $ | (9,107,099) $ | (9,026,223) $ | (8,661,922) $ | (9,145,548) | $ (9,145,548) |
| **Ending Cash Balance** | $ | 2,469,066 $ | 2,638,977 $ | 2,644,174 $ | 2,445,032 $ | 2,014,767 $ | 2,198,655 $ | 2,469,171 $ | 2,620,156 $ | (6,367,660) $ | 61,392 $ | 80,875 $ | 364,301 $ | (483,626) | $ (483,626) |
| **Advances/(Repayments)** | | - | - | - | - | - | - | - | - | 6,367,660 | (61,392) | (80,875) | (364,301) | 483,626 | $ 6,344,717 |
| **Ending Cash Balance Including Exit Loan** | $ | 2,469,066 $ | 2,638,977 $ | 2,644,174 $ | 2,445,032 $ | 2,014,767 $ | 2,198,655 $ | 2,469,171 $ | 2,620,156 $ | - $ | - $ | - $ | - $ | - | $ - |
| **Exit Loan Balance** | $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | 6,367,660 $ | 6,306,268 $ | 6,225,392 $ | 5,861,091 $ | 6,344,717 | $ 6,344,717 |

**EXHIBIT B**

[The Hinden Contribution to the Asbestos Trust]

**Shareholder and Hinden Family Entity Contributions to Trust**

| Shareholder | Shares | % | Contribution to Settlement | | Non-Shareholder Hinden Entities | Contribution to Settlement | Quick Est. of Value | % of Total Value | Contribution to Settlement |
|---|---|---|---|---|---|---|---|---|---|
| Abby Geller | 656.25 | 3.1391% | $ 72,982.94 | | Duro Dyne Canada, Inc. | $140,000 | 5,000,000 | 20.6% | 139,175 |
| David Krupnick | 1,245.00 | 5.9552% | 138,459.05 | | 4Site LLC | 15,000 | 500,000 | 2.1% | 13,918 |
| Fallyn Hinden shares | 656.25 | 3.1391% | 72,982.94 | | Rize LLC | 85,000 | 3,000,000 | 12.4% | 83,505 |
| Hayley Geller | 656.25 | 3.1391% | 72,982.94 | | Rize Enterprises Canada Inc. | 20,000 | 750,000 | 3.1% | 20,876 |
| Hinden Grand Children Trust shares | 656.25 | 3.1391% | 72,982.94 | | Pro4ma LLC | 10,000 | 500,000 | 2.1% | 13,918 |
| Irene Hinden | 2,741.50 | 13.1135% | 304,887.95 | | Pro4ma II LLC | 10,000 | 500,000 | 2.1% | 13,918 |
| Irene Lee Hinden Trust | 735.00 | 3.5157% | 81,740.89 | | Foma LLC | 5,000 | 250,000 | 1.0% | 6,959 |
| Jessie Geller | 656.25 | 3.1391% | 72,982.94 | | ISWR Ohio LLC | 50,000 | 1,750,000 | 7.2% | 48,711 |
| Joshua Blumenthal | 901.25 | 4.3110% | 100,229.90 | | Duro Dyne Spence LLC | 340,000 | 12,000,000 | 49.5% | 334,021 |
| Lindsay Blumenthal | 995.00 | 4.7594% | 110,656.03 | | Hinden Family Entities | $675,000 | 24,250,000 | 100.0% | 675,000 |
| Max Hinden | 656.25 | 3.1391% | 72,982.94 | | | | | | |
| Randall Hinden | 2,741.50 | 13.1135% | 304,887.95 | | Shareholder Contribution | 2,325,000 | | | |
| The Randall Scott Hinden Trust | 735.00 | 3.5157% | 81,740.89 | | | | | | |
| The Wendy Lynn Hinden Trust | 735.00 | 3.5157% | 81,740.89 | | | | | | |
| Tobey Geller | 656.25 | 3.1391% | 72,982.94 | | Total Contribution | $ 3,000,000 | | | |
| Trust Under Article 3rd of Last Will Test. | 2,741.50 | 13.1135% | 304,887.95 | | | | | | |
| Wendy Hinden | 2,741.50 | 13.1135% | 304,887.95 | | | | | | |
| | 20,906.00 | 100.0000% | $ 2,325,000.00 | | | | | | |

**EXHIBIT C**
[Senior Lending Facility Fee]

**Fees and Expenses Related to Bank of America Financing**

Fees and Expenses Paid to Date

| | |
|---|---|
| Due diligence/legal deposit | $ 50,000.00 |
| Horizon Group Collateral Audit | 15,449.86 |
| Tiger Group Inventory Appraisal | 15,621.47 |
| | 81,071.33 |

Fees Remaining Before Closing

| | |
|---|---|
| Closing Fee | 24,875.00 |
| Annual Monitoring Fee | 5,000.00 |
| Tiger Group Appraisal Update (est.) | 15,000.00 |
| Balance of due diligence / legal (est.) | 50,000.00 |
| | 94,875.00 |

| | |
|---|---|
| | $ 175,946.33 |

**EXHIBIT D**

[Long Term Projections]

**DURO DYNE NATIONAL CORP. AND SUBSIDIARIES**
**CONSOLIDATED FINANCIAL PROJECTIONS**
**2018 - 2022**

| Income Statement | 2017A | 2018E | 2019P | 2020P | 2021P | 2022P |
|---|---|---|---|---|---|---|
| **Net Sales** | $ 72,698,577 | $ 83,491,447 | $ 87,244,943 | $ 90,699,850 | $ 94,291,046 | $ 98,023,930 |
| *Growth %* | | *14.8%* | *4.5%* | *4.0%* | *4.0%* | *4.0%* |
| **COGS** | 45,463,686 | 53,986,508 | 57,609,544 | 59,825,107 | 62,202,340 | 64,666,435 |
| **Gross Profit** | 27,234,891 | 29,504,939 | 29,635,398 | 30,874,743 | 32,088,706 | 33,357,495 |
| *Margin %* | *37.5%* | *35.3%* | *34.0%* | *34.0%* | *34.0%* | *34.0%* |
| | | | | | | |
| **Total Operating Expenses** | 21,781,714 | 21,526,347 | 23,403,339 | 24,353,232 | 25,246,218 | 25,928,954 |
| *Margin %* | *30.0%* | *25.8%* | *26.8%* | *26.9%* | *26.8%* | *26.5%* |
| | | | | | | |
| **Income from Operations** | **5,453,177** | **7,978,592** | **6,232,060** | **6,521,511** | **6,842,488** | **7,428,540** |
| | | | | | | |
| **Other Income** | 10,118 | 20,884 | - | - | - | - |
| | | | | | | |
| **Total Other Expense** | 267,719 | 4,690,542 | 23,729,683 | 2,713,815 | 1,873,012 | 1,233,115 |
| | | | | | | |
| **Net Profit (Loss)** | **$ 5,195,575** | **$ 3,308,934** | **$ (17,497,623)** | **$ 3,807,696** | **$ 4,969,475** | **$ 6,195,426** |
| | | | | | | |
| **EBITDA, EBITDA and Earnout Calculations** | | | | | | |
| **Income From Operations** | $ 5,453,177 | $ 7,978,592 | $ 6,232,060 | $ 6,521,511 | $ 6,842,488 | 7,428,540 |
| Add: Depreciation | 212,816 | 591,551 | 591,776 | 907,982 | 1,055,957 | 1,203,933 |
| Less: Non Debt and Non Tax Cash Expenses | - | (4,469,529) | (1,489,280) | (43,217) | (43,750) | (44,305) |
| Add: Other Income | 10,118 | 20,884 | - | - | - | - |
| **EBITDA** | **$ 5,676,110** | **$ 4,121,498** | **$ 8,313,115** | **$ 7,472,709** | **$ 7,942,195** | **$ 8,676,778** |

| Related Party Rent and Lease Payments[2] : | | | | | | |
|---|---|---|---|---|---|---|
| **Add: Rent and Lease Payments [2]** | | 1,371,297 | 1,371,297 | 1,376,192 | 1,376,192 | 1,376,192 |
| **EBITDAR (EBITDA + Rent and Lease Payments)/Test EBITDA** | | $ 5,492,795 | $ 9,684,412 | $ 8,848,901 | $ 9,318,387 | $ 10,052,970 |
| **Average** | | | $ 7,588,604 | $ 9,266,657 | $ 9,083,644 | $ 9,685,679 |
| **Threshold** | | | **3,000,000** | **3,000,000** | **3,000,000** | **3,000,000** |
| **Excess** | | | 4,588,604 | 6,266,657 | 6,083,644 | 6,685,679 |
| **Earnout (30% of Excess)** | 30% | | 1,376,581 | 623,419 | | |
| *EBITDA Margin %* | | | *9.5%* | *8.2%* | *8.4%* | *8.9%* |
| *EBITDAR Margin %* | | | *11.1%* | *9.8%* | *9.9%* | *10.3%* |

**DURO DYNE NATIONAL CORP. AND SUBSIDIARIES**
**CONSOLIDATED FINANCIAL PROJECTIONS**
**2018 - 2022**

| Income Statement | 2017A | 2018E | 2019P | 2020P | 2021P | 2022P |
|---|---|---|---|---|---|---|
| **BALANCE SHEET** | | | | | | |
| **ASSETS** | | | | | | |
| **Current Assets** | | | | | | |
| Cash | $ 5,272,699 | $ 6,378,816 | $ 1,978,019 | $ 1,476,094 | $ 3,375,561 | $ 6,444,116 |
| Accounts Receivable, Net | 7,113,727 | 8,791,208 | 9,221,911 | 9,583,704 | 9,964,768 | 10,355,667 |
| Inventory (net of LIFO reserve) | 12,827,095 | 12,270,682 | 13,057,151 | 13,457,513 | 13,980,607 | 14,522,465 |
| Prepaid Expenses and other Assets | 810,216 | 837,597 | 713,662 | 739,556 | 766,486 | 794,494 |
| **Total Current Assets** | 26,023,736 | 28,278,302 | 24,970,742 | 25,256,868 | 28,087,422 | 32,116,741 |
| **Property & Equipment at Cost, Net** | 1,170,158 | 1,860,261 | 2,137,055 | 2,252,473 | 2,219,915 | 2,039,382 |
| **Other Assets** | | | | | | |
| Security Deposits and Other Assets | 1,399,397 | 1,444,077 | 1,444,077 | 1,444,077 | 1,444,077 | 1,444,077 |
| **Total Assets** | $28,593,291 | $ 31,582,640 | $ 28,551,874 | $ 28,953,418 | $ 31,751,415 | $ 35,600,201 |
| **LIABILITIES AND EQUITY** | | | | | | |
| **Current Liabilities** | | | | | | |
| Due to Stockholders | - | - | | - | - | - |
| *Revolving Line of Credit* | - | - | 1,369,387 | | | |
| Notes Payable - Related Parties - Current Portion | 254,845 | 228,480 | 235,266 | 216,047 | 135,921 | 142,753 |
| Accounts Payable | 6,434,447 | 5,989,844 | 6,349,280 | 6,605,969 | 6,877,469 | 7,146,251 |
| Accrued Expenses and Other Current Liabilities | 1,824,530 | 2,338,046 | 2,947,281 | 3,065,172 | 3,187,779 | 3,315,290 |
| Income Taxes Payable | 53,174 | - | 39,000 | 39,000 | 39,000 | 39,000 |
| **Total Current Liabilities** | 8,566,996 | 8,556,370 | 10,940,214 | 9,926,189 | 10,240,169 | 10,643,294 |
| **Long Term Liabilities** | | | | | | |
| Debt | 33,000 | 33,000 | 33,000 | 33,000 | 33,000 | 33,000 |
| *Asbestos Trust Note* | - | - | 13,500,000 | 13,169,135 | 12,814,190 | 12,433,412 |
| Notes Payable - Related Party, Less Current Maturities | 1,036,129 | 810,107 | 574,841 | 358,794 | 222,873 | 80,121 |
| **Total Long Term Liabilities** | 1,069,129 | 843,107 | 14,107,841 | 13,560,928 | 13,070,063 | 12,546,533 |
| **Total Liabilities** | 9,636,125 | 9,399,477 | 25,048,055 | 23,487,117 | 23,310,231 | 23,189,827 |
| Common Stock - Class A | 68,615 | 68,608 | 68,610 | 68,610 | 68,610 | 68,610 |
| Common Stock - Class B | 4 | 4 | 4 | 4 | 4 | 4 |
| Additional Paid-In Capital | 968,372 | 968,372 | 968,372 | 968,372 | 968,372 | 968,372 |
| Retained Earnings | 17,920,175 | 21,146,178 | 2,466,833 | 4,429,315 | 7,404,198 | 11,373,387 |
| Accumulated Other Comprehensive Income | - | - | - | - | - | - |
| **Total Equity** | 18,957,166 | 22,183,162 | 3,503,819 | 5,466,301 | 8,441,184 | 12,410,373 |
| **Total Liabilities and Stockholders' Equity** | $28,593,291 | $ 31,582,639 | $ 28,551,874 | $ 28,953,418 | $ 31,751,415 | $ 35,600,200 |

**DURO DYNE NATIONAL CORP. AND SUBSIDIARIES**
**CONSOLIDATED FINANCIAL PROJECTIONS**
**2018 - 2022**

| Income Statement | 2017A | 2018E | 2019P | 2020P | 2021P | 2022P |
|---|---|---|---|---|---|---|
| **CASHFLOW** | | | | | | |
| **Cashflow from Operations** | | | | | | |
| Net Income | | 3,308,934 | (17,497,623) | 3,807,696 | 4,969,475 | 6,195,426 |
| Add: Depreciation | | 591,551 | 591,776 | 907,982 | 1,055,957 | 1,203,933 |
| Add: Non Cash Expense due to Asbestos Trust Note | | - | 13,500,000 | - | - | - |
| (Inc.)/Dec. in AR | | (1,677,481) | (430,703) | (361,794) | (381,063) | (390,899) |
| (Inc.)/Dec. in Inventory | | 556,413 | (786,469) | (400,363) | (523,094) | (541,858) |
| (Inc.)/Dec. in Security Deposits | | (44,680) | - | - | - | - |
| (Inc.)/Dec. in Prepaid Expenses | | (27,381) | 123,935 | (25,894) | (26,930) | (28,007) |
| Inc./(Dec.) in Accounts Payable | | (444,603) | 359,436 | 256,689 | 271,500 | 268,782 |
| Inc./(Dec.) in Accrued Expenses | | 513,516 | 609,235 | 117,891 | 122,607 | 127,511 |
| Inc./(Dec.) in Income Taxes Payable | | (53,174) | 39,000 | - | - | - |
| **Total** | - | 2,723,096 | (3,491,412) | 4,302,207 | 5,488,452 | 6,834,888 |
| | | | | | | |
| Capital Expenditure | | (1,364,591) | (810,291) | (1,003,400) | (1,003,400) | (1,008,399) |
| **Total** | - | (1,364,591) | (810,291) | (1,003,400) | (1,003,400) | (1,008,399) |
| | | | | | | |
| Asbestos Trust Note Repayment | | - | - | (330,865) | (354,945) | (380,777) |
| Revolver Draw/(Repayment) | | - | 1,369,387 | (1,369,387) | - | - |
| Tax Distribution to Shareholders | | - | (1,240,000) | (1,865,213) | (2,014,593) | (2,241,236) |
| Notes Payable | | (252,387) | (228,480) | (235,266) | (216,047) | (135,921) |
| **Total** | - | (252,387) | (99,093) | (3,800,732) | (2,585,585) | (2,757,934) |
| | | | | | | |
| **TOTAL CASHFLOW** | - | 1,106,118 | (4,400,796) | (501,924) | 1,899,467 | 3,068,555 |

**EXHIBIT E**

[Liquidation Analysis]

**DURO DYNE CORPORATION**
**BEST INTEREST OF CREDITORS TEST**
**ESTIMATED VALUES AS OF FEBRUARY 28, 2019**

Under the proposed Chapter 11 Plan of Reorganization, General Unsecured Creditors would be paid in full, and $26 million, not including potential proceeds from insurance policies, would be available for distribution to Trust Creditors.  In a Chapter 7 liquidation $8.5 million would be available to both General Unsecured Creditors (with claims totaling $4.6 million) and Asbestos Claimants.

| | Notes | Chapter 11 Plan | Chapter 7 Liquidation |
|---|---|---|---|
| **Total Sources:** | | | |
| Non-Trust | [1] | $      13,132,010 | $      18,602,854 |
| Trust | [2] | 26,000,000 | - |
| **Total Sources** | | **39,132,010** | **18,602,854** |
| | | | |
| **Uses:** | | | |
| Post-Petition Accounts Payable (Administrative Liabilities) | [3] | 7,054,491 | 7,054,491 |
| Pension Funding Obligation | [4] | 2,000,000 | - |
| SMART Local 210 Pension Withdrawal Liability | [5] | 1,142,135 | - |
| SMART Local 170 Pension Withdrawal Liability | [6] | 350,000 | - |
| 4Site Subordinated Secured Note | [7] | 1,045,384 | 1,045,384 |
| Professional Fees | [8] | 1,200,000 | 1,200,000 |
| Chapter 11 Trustee Fees | [9] | 225,000 | 225,000 |
| Priority Tax Claims | [10] | 15,000 | 15,000 |
| Other Claims | [11] | 100,000 | - |
| Chapter 7 Trustee | [12] | - | 581,336 |
| Chapter 7 Trustee Counsel Fees | | | TBD |
| **Total Uses** | | **13,132,010** | **10,121,210** |
| | | | |
| **Total Available for Distribution to Non-Trust Creditors** | | - | 8,481,644 |
| Available for Distribution to Trust Creditors | [13] | 26,000,000 | - |
| **Total Available for Distribution to Creditors** | | **$      26,000,000** | **$      8,481,644** |

| Plan Class | Plan Recovery | Chapter 7 Recovery |
|---|---|---|
| Administrative Expense Claims | 100% | 100% |
| Professional Fee Claims | 100% | 100% |
| Priority Non-Tax Claims (Class 1) | 100% | 100% |
| Secured Claims (Class 2) | 100% | 100% |
| Employee Benefit Claims (Class 3) | 100% | TBD |
| Worker's Compensation Claims (Class 4) | 100% | 100% |
| General Unsecured Claims (Class 5) | 100% | TBD |
| Prepetition Defense-Cost Contribution Claims (Class 6) | TBD | TBD |
| Channeled Asbestos Claims (Class 7) | TBD | TBD |
| Bonded Claims (Class 8) | 100% | 100% |
| Intercompany Claims (Class 9) | 0% | 0% |
| Related Party Claims (Class 10) | 0% | 0% |
| Equity Interests in Duro Dyne National Corp. (Class 11) | 0% | 0% |
| Equity Interests in Duro Dyne Corp, West, Midwest, Machinery (Class 12) | 0% | 0% |

**Notes:**

[1] See Chapter 11 Sources of Cash and Chapter 7 Sources of Cash appendices
[2] See Chapter 11 Sources of Cash appendix
[3] Estimated liabilities as of February 28, 2019
[4] Related to Duro Dyne Pension Plan
[5] Any allowed amount will be paid in full
[6] Total estimated withdrawal liability. Any allowed amount will be paid in full.
[7] Existing senior secured debt will be subordinated to new secured exit financing and trust note
[8] Estimated accrued and unpaid professional fees as of Effective Date.
[9] Estimated fees based on projected disbursements during Chapter 11 proceedings.
[10] Estimated state and local taxes.
[11] Includes lease rejection damages.

**DURO DYNE CORPORATION**
**BEST INTEREST OF CREDITORS TEST**
**CHAPTER 7**
**LIQUIDATION OF DEBTORS**
**ESTIMATED VALUES AS OF FEBRUARY 28, 2019**

| | Notes | Ending Balance ($) | % Recovery | Recovery Amount |
|---|---|---|---|---|
| **Chapter 7 Sources:** | | | | |
| Cash | | $2,638,977 | 100% | $2,638,977 |
| Accounts Receivable, Net | [1] | 8,031,438 | 79% | 6,378,294 |
| Inventory | [2] | 17,429,404 | 43% | 7,512,073 |
| Prepaid Expenses and other Assets | [3] | 383,453 | 5% | 19,173 |
| Property & Equipment at Cost, Net | [4] | 1,743,442 | 17% | 293,437 |
| Security Deposits and Other Assets | [5] | 116,117 | 0% | - |
| Liquidation of Canadian Subsidiary | [6] | 1,760,900 | 100% | 1,760,900 |
| Causes of Action | [7] | Unknown | Unknown | Unknown |
| **Total Chapter 7 Sources** | | **32,103,731** | **57.9%** | **18,602,854** |
| | | | | |
| **Uses:** | | | | |
| Chapter 7 Trustee | [8] | | | 581,336 |
| **Total Uses** | | | | **581,336** |
| | | | | |
| **Available for Distribution to Creditors** | | | | **18,021,518** |
| | | | | |
| Professional Fees | [9] | | | 1,200,000 |
| Administrative Expenses | [10] | | | 7,054,491 |
| US Trustee Fees | [11] | | | 225,000 |
| Secured Claims | [12] | | | 1,045,384 |
| | | | | |
| **Available for Distribution to Priority Claims** | | | | **8,496,643.71** |
| | | | | |
| Priority Non-Tax Claims | | | | - |
| Priority Tax Claims | [13] | | | 15,000 |
| | | | | |
| **Available for Distribution to General Unsecured Claims** | | | | **8,481,644** |
| | | | | |
| Rejection Damages | [14] | | | 1,152,000 |
| Prepetition Defense Costs | | | | TBD |
| SMART Local 210 Pension Withdrawal Liability | | | | 1,142,135 |
| SMART Local 170 Pension Withdrawal Liability | | | | 350,000 |
| Employee Benefit Claims | [15] | | | 2,000,000 |
| Asbestos Liability | | | | - |
| Total GUC and Employee Benefit Claims | | | | **4,644,135** |

[1] Assumes retention of existing staff to handle collections effort; 90% recovery of domestic AR and 20% of foreign AR.
[2] Recovery % based on NOLV analysis prepared by Tiger Group dated October 20, 2017.
[3] Includes due from affiliates and prepaid real estate taxes not expected to yield significant recoveries.
[4] Based on recoveries in the Fixed Asset Schedule Exhibit.
[5] Assumes these assets will be offset against respective claims.
[6] See liquidation analysis of Canadian subsidiary.
[7] Causes of action may include preferences, fraudulent conveyances or other actions; related recoveries are unknown.
[8] Trustee fees based on assets distributed.
[9] Estimated unpaid fees as of the Effective Date.
[10] Esitmated balance.
[11] Estimated accrued but unpaid fees as of the Effective Date.
[12] Principal plus accrued but unpaid interest.
[13] Estimate of state and local taxes.
[14] Includes rejection of real estate leases in Bay Shore NY and Fairfield OH.
[15] Related to Duro Dyne Pension Plan.

**DURO DYNE CORPORATION**
**BEST INTEREST OF CREDITORS TEST**
**CHAPTER 7**
**LIQUIDATION OF CANADIAN SUBSIDIARY**
**VALUES AS OF DECEMBER 31, 2018**
**In $US [1]**

| | Notes | Ending Balance ($) | % Recovery | Recovery Amount |
|---|---|---|---|---|
| **Chapter 7 Sources:** | | | | |
| Cash | | $1,443,536 | 100% | $1,443,536 |
| Accounts Receivable, Net | [2] | 478,828 | 79% | 378,274 |
| Inventory | [3] | 1,656,188 | 43% | 713,817 |
| Prepaid Expenses and other Assets | [4] | 217,210 | 20% | 43,442 |
| Property & Equipment at Cost, Net | [5] | 74,926 | 17% | 12,611 |
| **Total Chapter 7 Sources** | | **3,870,688** | **67.0%** | **2,591,680** |
| | | | | |
| **Uses:** | | | | |
| Trade Payables | | | | 454,006 |
| Taxes Payable | | | | - |
| Other Accrued Liabilities | | | | 126,774 |
| Professsional fee to conduct liquidation | | | | 250,000 |
| **Total Uses** | | | | **830,780** |
| | | | | |
| **Net Proceeds** | | | | **$1,760,900** |

[1] Based on exchange rate of USD 0.77 / CD.

[2] Assumes retention of existing staff to handle collections effort

[3] Recovery rate based on NOLV analysis prepared by Tiger Group dated October 20, 2017

[4] Primarily prepaid taxes to be applied against net income

[5] Based on recoveries in the Fixed Asset Schedule Exhibit

**DURO DYNE CORPORATION**
**BEST INTEREST OF CREDITORS TEST**
**CHAPTER 7**
**FIXED ASSET RECOVERY CALCULATIONS**
**BASED ON FIXED ASSETS AS OF JANUARY 31, 2019**

| Fixed Asset Category | Gross PP&E | Accumulated Depreciation | Net PP&E | Estimated Recovery | Recovery Amount |
|---|---|---|---|---|---|
| Machinery & Equipment | $1,825,743.3 | ($700,497.0) | $1,125,246.3 | 25% | $281,311.58 |
| Tools & Dies | 248,608.00 | (189,712.00) | 58,896.00 | 20% | $11,779.20 |
| Vehicles | 36,955.16 | (36,523.00) | 432.16 | 80% | $345.73 |
| Leasehold Improvements | 2,178,615.77 | (1,710,979.00) | 467,636.77 | 0% | $0.00 |
| Computer | 84,087.17 | (37,808.00) | 46,279.17 | 0% | $0.00 |
| Capital Lease | 7,135,245.62 | (7,135,245.62) | 0.00 | 0% | $0.00 |
| Facility Improvements | 106,000.00 | (61,048.00) | 44,952.00 | 0% | $0.00 |
| **Total** | **$11,615,255.0** | **($9,871,812.6)** | **$1,743,442.4** | **17%** | **$293,436.51** |

**DURO DYNE CORPORATION**
**BEST INTEREST OF CREDITORS TEST**
**SOURCES OF CASH PER PLAN OF REORGANIZATION**
**ESTIMATED AS OF FEBRUARY 28, 2019**

| **Chapter 11 Plan Sources:** | **Notes** | **Amount ($)** |
|---|---|---|
| *Non-Trust Class* | | |
| Accrued and unpaid professional fees | | $1,200,000 |
| US Trustee Fees | | 225,000 |
| Remaining administrative liabilities as of confirmation | | 7,054,491 |
| Reinstatement of secured note | | 1,045,384 |
| Local 210 withdrawal liability obligation | | 1,142,135 |
| Reinstatement of defined pension plan obligation | | 2,000,000 |
| California pension withdrawal liability obligation | | 350,000 |
| Prepetition Defense Cost Contributions | | - |
| Payment of Priority Tax Claims | | 15,000 |
| Cash contribution for other claims | | 100,000 |
| SMART | | |
| | | 13,132,010 |
| | | |
| *Trust Class* | | |
| Hinden Family Cash Contribution | | 3,000,000 |
| Net Cash Proceeds from Exit Financing | | 7,500,000 |
| Trust Note | | 13,500,000 |
| Earn Out | [1] | 2,000,000 |
| *Total Trust Class Sources* | | 26,000,000 |
| **Total Chapter 11 Plan Sources** | | **$ 39,132,010** |

[1] The Earn Out is contingent upon the achievement of certain financial targets as
   described in the Plan of Reorganization

**EXHIBIT F**

[Cooperation Agreement]

## COOPERATION AGREEMENT

This COOPERATION AGREEMENT (this "**Agreement**") is made as of the Effective Date by and between DURO DYNE NATIONAL CORP. ("**Reorganized Duro Dyne**" or the "**Reorganized Debtor**") and the DURO DYNE ASBESTOS PERSONAL INJURY TRUST (the "**Asbestos Trust**," and together with Reorganized Duro Dyne, collectively the "**Parties**" and each separately a "**Party**").

## RECITALS

WHEREAS, on September 7,  2018, Duro Dyne National Corp., Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp. (collectively, "**Duro Dyne**" or the "**Debtors**") filed a petition for relief under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**");

WHEREAS, on September 7, 2018, the Debtors, the Asbestos Claimants Committee, and the Legal Representative jointly filed the *Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al., Under Chapter 11 of the Bankruptcy Code* (as it may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "**Plan**") with the Bankruptcy Court;

WHEREAS, the Bankruptcy Court has entered an order confirming the Plan;

WHEREAS, it is a condition to the effectiveness of the Plan that the Parties enter into this Agreement; and

WHEREAS, the Parties wish to implement, *inter alia*, the terms of the Plan establishing the Asbestos Trust and permitting actions against the Reorganized Debtor to obtain the benefit of Asbestos Insurance Coverage.

## AGREEMENT

NOW, THEREFORE, subject to and on the terms and conditions set forth herein, for good and valuable consideration, the receipt of which the Parties hereby acknowledge, the Parties hereby agree as follows:

1.      All capitalized terms used herein without definition, including those in the introductory paragraph and recitals, have the meanings ascribed to them in the Plan.  As used in this Agreement, the following terms have the following meanings:

(a)     "**Access**" means that:

(i)     with respect to all Asbestos Records kept in paper form, the Reorganized Debtor will provide, and cause Duro Dyne Defense Counsel to provide, the Asbestos Records in the manner and location in which the Reorganized Debtor or Duro

Dyne Defense Counsel generally retain their business records in the ordinary course of business at a date and time (or series of set dates, depending on the amount of time necessary to review and copy the Asbestos Records) that is reasonably acceptable to the Asbestos Trust and the Reorganized Debtor, the Asbestos Trust and Duro Dyne Defense Counsel, or the Reorganized Debtor or Duro Dyne Defense Counsel and the Entities referenced in Paragraphs 23 and 24 herein, as applicable;

(ii)     with respect to Asbestos Records kept in electronic form, the Reorganized Debtor will provide, and cause Duro Dyne Defense Counsel to provide, the Asbestos Records on disc or other electronic media as maintained by the Reorganized Debtor or Duro Dyne Defense Counsel; and

(iii)     with respect to any Asbestos Records kept in microfiche form, the Reorganized Debtor will provide, and will cause Duro Dyne Defense Counsel to provide, the Asbestos Records on microfiche or other media as maintained by the Reorganized Debtor or Duro Dyne Defense Counsel.

(b)     "**Asbestos Records**" has the meaning ascribed to such term in Paragraph 3.

(c)     "**Document**" means all documents, data, information, compilations, correspondence, materials, records, and writings of any type or description, however created, reproduced or retrieved, and in every form, including databases, computer/electronic files, drafts and partially completed documents maintained by, or in the possession or control of, the Debtors or the Reorganized Debtor as of the Effective Date.

(d)     "**Duro Dyne Defense Counsel**" means Charles M. McGivney, Esq., McGivney & Kluger, PC, 23 Vreeland Road, Suite 220, Florham Park, New Jersey 07932.

2.     The following rules of interpretation will apply to this Agreement:

(a)     All terms defined in this Agreement in the singular form shall have comparable meanings when used in the plural form, and vice-versa.

(b)     Whenever the context may require, each term stated in the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the other genders.

(c)     The words "must," "will, and "shall" are considered to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(d)     Any definition of or reference to any agreement, instrument, or other document herein shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, or otherwise modified.

- 2 -

(e)      All references herein to paragraphs shall be deemed references to paragraphs of this Agreement unless the context otherwise requires.

(f)      Unless otherwise provided herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

3.      The Reorganized Debtor shall provide, or cause to be provided, to the Asbestos Trust the following (collectively, the "**Asbestos Records**"):

(a)      To the extent the following information has been recorded as of the Effective Date and is retrievable using reasonable effort and at reasonable expense, copies of any and all databases pertaining to Asbestos Claims, containing (to the extent available):  case name, state of lawsuit, county of lawsuit, case number, entity named or served, case status, date filed or opened, date served, plaintiff counsel, plaintiff name, alleged disease, occupation, exposure period, demand amount, settlement amount, defense costs incurred, year closed, settled date, dismissed date, number of active plaintiffs, number of non-active or dismissed plaintiffs, number of total plaintiffs. Such databases shall be provided even if the Reorganized Debtor does not have all the information for every plaintiff.

(b)      To the extent the following information exists and is reasonably available on the Effective Date:

(i)      all records of the Debtors relating to the manufacture, production, installation, sale, or distribution of products which may have resulted in, or given rise to, an Asbestos Claim, including:

a.   all Documents relating to listings of all asbestos and asbestos-containing products, equipment, components, parts, improvements to real property, or materials engineered, designed, marketed, manufactured, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, or in any way used by Duro Dyne;

b.   all Documents referring to or otherwise identifying locations where Duro Dyne engineered, designed, marketed, manufactured, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, or in any way used asbestos or asbestos-containing products, equipment, components, parts, improvements to real property, or materials; and

c.   all Documents relating to the manufacture, construction, sale, supply, production, installation, maintenance, service, selection,

- 3 -

repair, removal, replacement, release, distribution, or use by Duro Dyne of asbestos-containing material.

(ii)    Any existing electronic databases of the information from records maintained by the Debtors or the Reorganized Debtor that contain customer information relating to the manufacture, construction, sale, supply, production, installation, maintenance, service, selection, repair, removal, replacement, release, distribution, or use of products which may have resulted in, or given rise to, an Asbestos Claim;

(iii)    all Documents concerning the purchase by, or distribution to, Duro Dyne of asbestos or asbestos-containing products, the use or sale of which may have resulted in, or given rise to, an Asbestos Claim;

(iv)    all product lists, technical specifications, material data sheets, test results, catalogs, advertisements, and marketing materials for products Duro Dyne engineered, designed, marketed, manufactured, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, or in any way used, which may have resulted in, or given rise to, an Asbestos Claim;

(v)    all Documents concerning the transition from asbestos-containing to non-asbestos-containing of products that Duro Dyne engineered, designed, marketed, manufactured, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, or in any way used, which may have resulted in, or given rise to, an Asbestos Claim; and

(vi)    all Documents and information relating to Duro Dyne's insurance coverage for asbestos liabilities, including liability insurance policies issued prepetition to Duro Dyne; all correspondence with insurance companies, brokers, or other Entities regarding insurance coverage provided for asbestos liabilities; insurance files and insurance-related memoranda, pleadings, or court submissions maintained or stored by the Debtors' insurance recovery counsel; all loss runs or other records of erosion or exhaustion of any Asbestos Insurance Policy; and any other data or information that may be relevant to the Trust's efforts to preserve, secure, or obtain the benefit of the Asbestos Insurance Rights.

(c)    Copies of or Access to all relevant Documents maintained by, or in the possession, custody, or control of Reorganized Duro Dyne, Duro Dyne's consultants or experts, or Duro Dyne Defense Counsel, relating to the prepetition defense of Asbestos Claims, including:

(i)    all depositions, transcripts, and affidavits;

(ii)    all Duro Dyne discovery responses;

- 4 -

(iii)    all Duro Dyne exhibit lists prepared for use at trials, which include Documents relating to Duro Dyne or co-defendants that were alleged to have used asbestos or asbestos-containing products supplied by Duro Dyne;

(iv)    all depositions, transcripts, affidavits, or any other sworn statements of employees or customers of Duro Dyne and all discovery responses of Duro Dyne employees or customers obtained in the course of defense of Duro Dyne;

(v)    all case pleadings and bankruptcy case files;

(vi)    all dismissal orders and all executed releases;

(vii)    any database of proofs of claim regarding Asbestos Claims and copies of the proofs of claim;

(viii)    any database of ballots cast in the bankruptcy case that pertain to Asbestos Claims and copies of the ballots themselves;

(ix)    any complaint, demand letter, or similar Document identifying individuals that have asserted or may assert Asbestos Claims;

(x)    any database or Document that identifies or provides contact information for individuals that have asserted unresolved Asbestos Claims;

(xi)    all physical repositories of Documents made available to asbestos personal injury claimants and their attorneys;

(xii)    a listing of the location of all physical repositories of Documents relating to Asbestos Claims; and

(xiii)    all Documents or any database listing Worker Compensation Claims that are based on, arise from, or are attributable to asbestos exposure.

If necessary, the Reorganized Debtor will provide such direction to Duro Dyne Defense Counsel or to such consultants and experts as the Asbestos Trust may reasonably request.

(d)    All written settlement agreements and releases, and any other Documents reflecting the settlement, payment, or other disposition of Asbestos Claims against Duro Dyne.

4.    At its option, the Asbestos Trust may employ an outside contractor to photocopy, electronically reproduce, or otherwise reproduce any of the Asbestos Records.  When providing the Asbestos Records or Access thereto, the Reorganized Debtor will provide, and will cause Duro Dyne Defense Counsel to provide, the Asbestos Trust with any available electronic or paper index that identifies or describes the contents of any relevant files, boxes, discs, and databases.  To the extent any Asbestos Records in electronic form are stored in a format with full

- 5 -

text or other searchable capabilities, the Reorganized Debtor will provide, and will cause Duro Dyne Defense Counsel to provide, (a) all search engines, software, and programs necessary to enable all potential search functions as to such Asbestos Records in electronic form, and (b) descriptions of the data tables and fields used in the database.

5.    With respect to any database covered by this Agreement, to the extent necessary to resolve any difficulties in accessing the information in such database, the Reorganized Debtor will provide such direction to Duro Dyne Defense Counsel, consultants, and experts as the Asbestos Trust may reasonably request, including Access to the physical records from which the database was created.

6.    The Reorganized Debtor hereby authorizes the Legal Representative and his agents and professionals to provide to the Asbestos Trust all data and any other information concerning Asbestos Claims against Duro Dyne or Duro Dyne's insurance coverage or settlements that was provided by Duro Dyne, directly or indirectly, to the Legal Representative or his agents or professionals on or prior to the Effective Date.

7.    The Reorganized Debtor hereby authorizes the Asbestos Claimants Committee and its agents and professionals to provide to the Asbestos Trust all data and any other information concerning Asbestos Claims against Duro Dyne or Duro Dyne's insurance coverage or settlements that was provided by Duro Dyne, directly or indirectly, to the Asbestos Claimants Committee, or its agents or professionals on or prior to the Effective Date.

8.    To the extent that providing information as contemplated by this Agreement would involve the property or other rights of third parties unaffiliated with the Reorganized Debtor, the Reorganized Debtor shall undertake reasonably appropriate efforts to facilitate the provision of such information by such unaffiliated third parties in compliance with the requirements of this Agreement.

9.    The Reorganized Debtor shall use commercially reasonable efforts, and shall cause Duro Dyne Defense Counsel to use commercially reasonable efforts, to provide the Asbestos Records to the Asbestos Trust within twenty-eight (28) calendar days after the Effective Date.  The Asbestos Trust may retain copies of all the Asbestos Records which have been provided to it or that it has caused to be reproduced at its expense.

10.    The costs and expenses of storing the Asbestos Records shall be paid by the Reorganized Debtor until it provides the Asbestos Records to the Asbestos Trust, and thereafter shall be paid by the Asbestos Trust.  The reasonable costs and expenses of reviewing, copying, searching and providing the Asbestos Records shall be paid by the Asbestos Trust.

11.    Upon the request of the Asbestos Trust, the Reorganized Debtor shall provide, or shall cause Duro Dyne Defense Counsel to provide, the Asbestos Trust with a written and sworn certification that, in responding to a particular request by the Asbestos Trust for one or more Asbestos Records, the Reorganized Debtor or Duro Dyne Defense Counsel, as applicable, used all reasonable efforts to meet the requirements of this Agreement.

12.     Nothing in this Agreement shall require the Reorganized Debtor or Duro Dyne Defense Counsel to create any new Documents or to provide any Documents not in its respective possession, custody, or control.

13.     The Asbestos Trust shall use the Asbestos Records solely for the purposes of processing, evaluating, defending, and resolving Asbestos Claims, and for such other responsibilities that are assigned to the Asbestos Trust under the Plan, including accessing insurance coverage or exercising insurance rights; *provided, however*, that the Asbestos Trust may share those Asbestos Records with a holder of an Asbestos Claim that are relevant to that Asbestos Claim.

14.     The Reorganized Debtor shall have no duty to check or verify the accuracy of any information contained in the Asbestos Records and does not make any representation or warranty, express or implied, as to the accuracy of such information.

15.     With respect to all Documents contemplated by or under Paragraph 3 of this Agreement that are or were in the possession, custody, or control of the Debtors or Reorganized Debtor, the Reorganized Debtor represents and warrants, to the best of its knowledge and information, that it has taken reasonable steps to preserve the Documents in its possession, custody, or control up to and through the Effective Date, except such Documents as may have been destroyed or otherwise disposed of pursuant to and in accordance with a document retention policy formally approved or established by such Entity, which policy with regard to any such Documents shall be provided to the Asbestos Trust upon request.  With respect to Documents contemplated under Paragraph 3 of this Agreement in the possession, custody, or control of Duro Dyne Defense Counsel up to and through the Effective Date, the Reorganized Debtor represents and warrants that it has instructed Duro Dyne Defense Counsel to take reasonable steps to preserve such Documents.

16.     The Reorganized Debtor shall take all reasonable steps to preserve the Asbestos Records in its possession, custody, or control until it provides those Asbestos Records to the Asbestos Trust. The Reorganized Debtor shall have no obligation to preserve the Asbestos Records from and after the date on which the Asbestos Records are provided to the Asbestos Trust.  The Reorganized Debtor, and any of its successors, shall not dispose of or destroy, any Asbestos Records that have not been provided to the Asbestos Trust. The Reorganized Debtor shall cause Duro Dyne Defense Counsel to take all reasonable steps to preserve the Asbestos Records in the possession, custody, or control of Duro Dyne Defense Counsel, at all times prior to the termination of this Agreement.  The Reorganized Debtor shall instruct Duro Dyne Defense Counsel not to dispose of or destroy, the Asbestos Records that are not duplicative and are capable of being produced under this Agreement until the tenth $(10^{th})$ anniversary of the Effective Date of the Plan, unless those Asbestos Records have already been provided to the Asbestos Trust.  Thereafter, Duro Dyne Defense Counsel shall not dispose of or destroy Asbestos Records that are not duplicative and are capable of being produced under this Agreement without providing at least one hundred and eighty (180) days' advance written notice to the Asbestos Trust, within which 180-day period the Asbestos Trust shall be entitled to take

- 7 -

possession, custody, or control of the Asbestos Records at its own expense. Notwithstanding the foregoing, nothing in this Agreement shall be construed as precluding the Asbestos Trust from taking possession, custody, or control of the Asbestos Records in the possession, custody, or control of Duro Dyne Defense Counsel, at its own expense at any time on or after the Effective Date with the agreement of Duro Dyne Defense Counsel.

17.    Privileges belonging to the Debtors on the Petition Date in the Asbestos Records shall belong to the Asbestos Trust as of the Effective Date. The Reorganized Debtor does not waive any privilege, including the attorney-client privilege or work-product doctrine, that may protect any Asbestos Record, and nothing in this Agreement shall be construed as a waiver of any privilege by any party hereto by virtue of entering this Agreement or providing or disclosing any Asbestos Record under this Agreement.

18.    In providing Asbestos Records pursuant to this Agreement, the Reorganized Debtor or Duro Dyne Defense Counsel may designate all or a portion of certain Asbestos Records as containing material protected from disclosure by the attorney-client privilege, work-product doctrine, or other privilege or protection available to the Debtor under applicable state or federal law ("**Privileged Material**").  The Trustee of the Asbestos Trust may not disclose the portions of Asbestos Records designated as containing Privileged Material to any person, including any member of, counsel for, or other agent of the Trust Advisory Committee or the Legal Representative, without first obtaining written consent from the Reorganized Debtor approving such disclosure. Nothing in this Agreement shall be construed as a waiver of any privilege of the Reorganized Debtor by virtue of entering this Agreement or providing or disclosing, or facilitating the provision or disclosure of, any Asbestos Records under this Agreement.

19.    If the Reorganized Debtor or Duro Dyne Defense Counsel (each, a "**Designating Party**") designate all or a portion of any Asbestos Records as Privileged Material in accordance with Paragraph 18 hereof, and the Asbestos Trust disputes such designation, the Asbestos Trust shall give written notice of the dispute to the Designating Party.  The Asbestos Trust and the Designating Party shall then negotiate in good faith by telephone or in person to attempt to resolve the dispute.  If any dispute cannot be resolved through negotiation, the Asbestos Trust shall have five (5) Business Days from the date of actually delivering a written notice to the Designating Party declaring an impasse to seek an order from the Bankruptcy Court or the District Court resolving the dispute.  The Asbestos Trust shall provide the Designating Party with at least five (5) Business Days' notice of any hearing on any pleading, petition, application, or motion that the Asbestos Trust has filed with the Bankruptcy Court or the District Court in order to resolve the dispute.  The disputed Asbestos Records shall be treated as Privileged Material pending the Court's decision and any appeal therefrom.

20.    Consistent with section 6.5 of the Trust Distribution Procedures, nothing herein shall preclude the Trust from providing Privileged Material or other information provided pursuant to this Agreement to any Asbestos Insurer as necessary to preserve, secure, or obtain the benefit of the Asbestos Insurance Rights.

- 8 -

21.      Within ninety (90) calendar days after the Effective Date, the Reorganized Debtor shall identify, and shall cause Duro Dyne Defense Counsel to identify, for the Asbestos Trust any present or former officers, employees, and agents of Duro Dyne, the Reorganized Debtor, or Duro Dyne Defense Counsel, who likely have significant knowledge about the Asbestos Records, including those who are competent to authenticate and prove the chain of custody of Documents for admissibility purposes in court or other proceedings.  Upon the request of the Asbestos Trust, the Reorganized Debtor will take reasonable steps, and will cause Duro Dyne Defense Counsel to take reasonable steps, to make such officers, employees, or agents available to the Asbestos Trust, and the Asbestos Trust will reimburse the Reorganized Debtor or Duro Dyne Defense Counsel, as applicable, for lost time and reasonable expenses incurred in making such employees or agents available.  To the extent information leading to or locating any Asbestos Records is held by any former officers, employees, or agents of the Debtors, the Reorganized Debtor, or Duro Dyne Defense Counsel, the Reorganized Debtor does not object to, and will instruct Duro Dyne Defense Counsel not to object to, the Asbestos Trust contacting those persons for such information.  Upon request, the Reorganized Debtor will provide, and will instruct Duro Dyne Defense Counsel to provide, any contact information it has for former officers, employees, and agents and for third parties having possession of or knowledge about Asbestos Records.  The Reorganized Debtor will, and shall instruct Duro Dyne Defense Counsel to, to the extent possible, cooperate with the Asbestos Trust and not take any action to dissuade any person from cooperating with the Asbestos Trust.

22.      The Reorganized Debtor shall have a continuing obligation to carry out all contractual or other obligations of the Debtors under the Asbestos Insurance Policies that the Debtors had prepetition and that were not specifically undertaken by the Asbestos Trust under the Plan, including any obligation to cooperate with an Asbestos Insurer in the investigation, objection to, and defense of any asbestos claims and litigation.

23.      If the Reorganized Debtor is served in a lawsuit in the tort system under Section 4.13 of the Plan, it will immediately notify the Asbestos Trust and provide the Asbestos Trust with a copy of the summons, complaint, and/or any other documents that were served on it within three (3) Business Days after being served.

24.      In the event of a lawsuit in the tort system under Section 4.13 or 4.14 of the Plan, the Reorganized Debtor (a) shall provide to the Non-Settling Asbestos Insurers that are involved in such a lawsuit Access to such Asbestos Records that are not in the possession of the Asbestos Trust as is required under any applicable Asbestos Insurance Policy; (b) shall not interfere with the provision by the Asbestos Trust of such Access to Asbestos Records in its possession to such Non-Settling Asbestos Insurers; and (c) shall identify and take reasonable steps to make available present or former officers, employees, and agents of Duro Dyne, the Reorganized Debtor, or Duro Dyne Defense Counsel, who likely have significant knowledge about the Asbestos Records to such Non-Settling Asbestos Insurers, consistent with Paragraph 21 hereof. For avoidance of doubt, the Reorganized Debtor shall have the right to access Asbestos Records in the possession of the Asbestos Trust as necessary for the purposes of a lawsuit brought under Section 4.13 or 4.14 of the Plan.

25.      If a Channeled Asbestos Claimant brings an action in the tort system against the Reorganized Debtor under Section 4.13 of the Plan or against a Non-Settling Asbestos Insurer under Section 4.14 of the Plan, the Reorganized Debtor (a) shall provide that Channeled Asbestos Claimant with Access to such Asbestos Records enumerated in Sections 3(b) and 3(c)(ix) of this Agreement and such other Asbestos Records as may be permitted in the course of tort system discovery that are not in possession of the Asbestos Trust; (b) shall not interfere with the provision by the Asbestos Trust of such Access to Asbestos Records in its possession to that Channeled Asbestos Claimant; and (c) shall identify and take reasonable steps to make available present or former officers, employees, and agents of Duro Dyne, the Reorganized Debtor, or Duro Dyne Defense Counsel, who likely have significant knowledge about the Asbestos Records to that Channeled Asbestos Claimant, consistent with Paragraph 21 hereof.  For avoidance of doubt, the Reorganized Debtor shall have the right to access Asbestos Records in the possession of the Asbestos Trust as necessary for the purposes of a lawsuit brought under Section 4.13 or 4.14 of the Plan.

26.      Each party to this Agreement shall take such steps and execute such documents as may be necessary or proper to effectuate the purpose and intent of this Agreement, and to preserve its validity and enforceability.  Without limitation to any part of the immediately preceding sentence, any provision in this Agreement that requires the Reorganized Debtor to provide Asbestos Records or any other information to the Asbestos Trust shall be construed as also requiring the Reorganized Debtor, whenever necessary or proper, to cause such Asbestos Records or other information to be provided or made Accessible to the Asbestos Trust, including the execution and delivery by the Reorganized Debtor of any written instructions to Duro Dyne Defense Counsel to provide or make Accessible such Asbestos Records or other information.

27.      This Agreement shall be construed in accordance with the laws of the State of New York, without regard to any New York conflict of law principles that would result in the application of laws of any other jurisdiction.

28.      This Agreement states the entire agreement among the Asbestos Trust and the Reorganized Debtor with respect to the subject matter hereof, and supersedes all prior representations and agreements among the parties as to such subject matter.  Any modification, waiver, or amendment of any provision of this Agreement must be in writing and executed by the Asbestos Trust and the Reorganized Debtor, and no waiver of any term or breach of this Agreement shall be deemed a waiver of such term for the future or any subsequent or other breach hereof.

29.      This Agreement shall be binding upon the Asbestos Trust, the Reorganized Debtor, and their respective successors or assigns.

30.      This Agreement may be executed in any number of counterparts, each of which shall constitute an original but all of which together shall constitute one and the same instrument. Facsimiles or scanned versions of signatures by the parties shall be treated as originals.

- 10 -

31.     The Bankruptcy Court or the District Court, as applicable, shall, to the fullest extent permitted by law, have exclusive jurisdiction over all matters regarding the interpretation, implementation, and enforcement of this Agreement.

32.     All notices or other communications required under this Agreement shall be in writing and mailed by certified mail, return receipt requested, hand delivered, or delivered by a nationally recognized overnight courier, at the address indicated below (or such other address as shall be designated by such party in a written notice to the other party):

To the Reorganized Debtor:

_____

Attn: _____

_____

_____

with a copy to:            _____

To Asbestos Trust:     Duro Dyne Asbestos Personal Injury Trust
Attn: _____

_____

_____

with a copy to:            _____

- 11 -

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed and delivered as of the date first above written.


**DURO DYNE NATIONAL CORP.**, a New York corporation

By: _____

Its: _____


**DURO DYNE ASBESTOS PERSONAL INJURY TRUST**,
a Delaware statutory trust


By: _____

Its: _____