**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| DURO DYNE NATIONAL CORP., *et al.*,[1] | Case No. 18-27963 (MBK) |
| Debtors. | Jointly Administered |
| | **Ref. Docket No. 279** |

**DECLARATION OF LAWRENCE FITZPATRICK IN SUPPORT OF
CONFIRMATION OF SECOND AMENDED PRE-NEGOTIATED PLAN
OF REORGANIZATION FOR DURO DYNE NATIONAL CORP., *et al.*
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

I, Lawrence Fitzpatrick, the legal representative for future asbestos claimants (the "Future Claimants' Representative"), pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I submit this declaration in support of confirmation of the Second Amended PreNegotiated Plan of Reorganization for Duro Dyne National Corp., *et al*. Under Chapter 11 of the Bankruptcy Code (as such may be modified or supplemented, the "Plan") [Docket No. 279].[2]

2. On October 17, 2018, the Bankruptcy Court entered an order appointing me as the Future Claimants' Representative [Docket No. 191] and on November 13, 2018, the Bankruptcy Court approved my application to retain and employ Young Conaway Stargatt & Taylor, LLP ("YCST") as my counsel [Docket No. 269].

3. This declaration is based upon my personal knowledge and experience in these Chapter 11 Cases, my review of various documents, the work of YCST, and other due diligence. This proffer describes my recollection and analysis at this time based on the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Duro Dyne National Corp. (4664); Duro Dyne Machinery Corp. (9699); Duro Dyne Corporation (3616); Duro Dyne West Corp. (5943); and Duro Dyne Midwest Corp. (4662).
[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

01:24162588.5

information currently available to me.  It does not attempt to capture every detail of every topic addressed.  I reserve the right to revise, amend, and/or supplement my testimony as appropriate in my judgment to address other matters or to the extent additional or updated information becomes available to me.

**I.    Qualifications of the Future Claimants' Representative**

4.     I have more than 30 years of experience in dealing with asbestos related matters.  A copy of my curriculum vitae is attached hereto as Exhibit A.

5.     Beginning in 1980, I was an attorney for Owens Illinois, a relatively prominent asbestos defendant.  As counsel for Owens Illinois, I became involved in negotiations between 35 asbestos defendants and 16 asbestos insurers to resolve the then-pending insurance coverage litigation over asbestos losses and set up a centralized claims handling organization to handle asbestos claims on behalf of the negotiating parties.  Those negotiations ultimately led to the signing of a document known as the Wellington Agreement and the establishment of the Asbestos Claims Facility, an organization formed to handle all asbestos claims against its members to save costs associated with the defense of claims.

6.     In 1985, I went to work for the Asbestos Claims Facility as a borrowed or seconded employee because it had no permanent staff at that point.  In February 1986, I joined the Asbestos Claims Facility full time as its vice president of law, and I also was its acting chief executive officer during most of its existence.  In October 1988, the Asbestos Claims Facility was dissolved, primarily because of disputes among the members over their shares of facility settlements.

7.     I helped found the Center for Claims Resolution (the "CCR"), an organization formed to handle asbestos claims centrally on behalf of its twenty member

companies. From 1988 through 1998, as the president and chief executive officer of the CCR, I oversaw the resolution of more than 270,000 asbestos claims and the billing, collection, and dispersal of over $2 billion in payments. I resigned from my positions with the CCR in January 1999, but returned in November 2001 as executive director to assist with the winding down of affairs after the CCR ceased operations during my absence.

8. In addition to the instant case, I currently serve as the legal representative for future asbestos personal injury claimants pursuant to section 524(g) of the Bankruptcy Code in the pending chapter 11 cases of *In re Rapid-American Corporation*, No. 13-10687 (SMB) (Bankr. S.D.N.Y.), *In re Kaiser Gypsum* Company, Inc., No. 16-31602 (JCW) (Bankr. W.D.N.C.), and *In re Sepco Corporation,* No. 16-50058 (Bankr. N.D. Ohio).

9. I served as the legal representative for future asbestos personal injury claimants pursuant to section 524(g) of the Bankruptcy Code in the chapter 11 cases of *In re Pittsburgh Corning Corporation*, No. 00-22876 (JKF) (Bankr. W.D. Pa.), *In re ACandS, Inc.*, No. 02-12687 (JKF) (Bankr. D. Del.), *In re North American Refractories Company*, No. 02-20198 (JKF) (Bankr. W.D. Pa.), *In re Global Industrial Technologies, Inc.*, No. 02-21626 (JKF) (Bankr. W.D. Pa.), *In re Durabla Manufacturing Company*, No. 09-14415 (MFW) (Bankr. D. Del.), and *In re Metex Mfg. Corporation*, No. 12-14554 (BRL) (Bankr. S.D.N.Y.), and continue to serve as the legal representative for future asbestos personal injury claimants with respect to the various settlement trusts established through those cases pursuant to section 524(g) of the Bankruptcy Code.

10. While not an asbestos-liability case, I serve as trustee of the Met-Coil Systems Corporation TCE PI Trust, which was created through the bankruptcy case of *In re Met-Coil Systems Corporation*, No. 03-12676 (MFW) (Bankr. D. Del.) to compensate future personal

injury tort claimants who were exposed to trichloroethylene (TCE).

## II. Due Diligence of the Future Claimants' Representative

11. With the Debtors and the Asbestos Claimants Committee, I am a co-proponent of the Plan.

12. I served as the pre-petition Future Claimants' Representative in connection with the formulation of the Debtors' pre-negotiated plan and I retained YCST to advise me in that capacity. YCST and I continued to participate in the negotiation of the Plan and Plan Documents following my appointment in these Chapter 11 Cases.

13. YCST and I conducted due diligence in connection with negotiating the Plan and the Plan Documents. We reviewed (i) the background, nature, and scope of the Debtors' liability for Asbestos Personal Injury Claims, (ii) the number and value of the Asbestos Personal Injury Claims historically asserted against the Debtors, (iii) the Debtors' pre-petition asbestos settlement and litigation history, (iv) the nature and extent of the Asbestos Personal Injury Claims pending against the Debtors as of the Petition Date, and (v) the likelihood and potential value of future Asbestos Claims and Demands against the Debtors and the Protected Parties.

14. The due diligence efforts of YCST and me also included analyzing the businesses, capital structures, insurance, and general affairs of the Debtors and certain related parties. Our due diligence also included a review of matters relating to the Debtors' insurance assets and their availability to pay Asbestos Claims and Demands. The due diligence enabled me to evaluate the pool of assets potentially available for holders of Asbestos Claims and Demands, as well as the prospects that holders of Asbestos Claims and Demands would have absent the Plan and the Asbestos Permanent Channeling Injunction.

**III.    Overview of the Plan, the Asbestos Trust,
the Trust Distribution Procedures, and the
<u>Asbestos Permanent Channeling Injunction</u>**

15.    Based on the due diligence conducted by YCST and me and our work on the Plan and the Plan Documents, I believe the Plan represents a reasonable resolution of the Debtors' liabilities and is fair and equitable to the future holders of Demands ("<u>Future Demand Holders</u>").

16.    The centerpiece of the Plan is the establishment of the Asbestos Trust that will assume liabilities for Channeled Asbestos Claims, including Demands.  <u>See</u> Plan at § 4.01; Asbestos Trust Agreement (Plan Exhibit A) at § 1.2.

17.    Pursuant to § 4.08 of the Plan, the Asbestos Trust will be funded on the Effective Date by the Asbestos Trust Assets, which consist of: (a) the Debtors' Contribution; (b) the Hinden Contribution; (c) the Asbestos Trust's rights under the Trust Note, the Note Issuance Agreement, the Pledge and Security Agreement, the Bay Shore Mortgage, and the Fairfield Mortgage; (d) the Asbestos Trust's rights in and to the Earn Out Payments; (e) the Asbestos Insurance Rights; (f) the Asbestos-Related Defenses; and (g) following the transfer and vesting of the foregoing pursuant to Article IV of the Plan, any Proceeds thereof and earnings and income thereon.

18.    Among the Asbestos Insurance Rights provided to the Asbestos Trust, the Plan contemplates that, in addition to the potential for recoveries from the Asbestos Trust under the Trust Distribution Procedures, the Asbestos Trust, subject to the consent of the Trust Advisory Committee and the Future Claimants' Representative, may permit current and future claimants to commence actions and pursue their claims in the tort system to obtain the benefit of

Asbestos Insurance Coverage provided by Non-Settling Asbestos Insurers. See Plan at §§ 4.13-4.14; Asbestos Trust Distribution Procedures §§ 5.10-5.11.

19. The Asbestos Trust is required by its terms to use the Asbestos Trust Assets and the income therefrom to pay holders of valid Channeled Asbestos Claims in accordance with the terms of the Asbestos Trust Agreement and the Trust Distribution Procedures. The Trust Distribution Procedures establish a set of procedures that the Asbestos Trust will follow to review, process, and resolve the Channeled Asbestos Claims. See Plan at § 4.01; Asbestos Trust Agreement; Trust Distribution Procedures (Plan Exhibit F).

20. In connection with the channeling of Asbestos Claims and Demands to the Asbestos Trust, § 9.05 of the Plan contemplates the issuance of an Asbestos Permanent Channeling Injunction, which will enjoin any Entity that holds or asserts, or who may in the future hold or assert, a Channeled Asbestos Claim from taking any action for the purpose of directly or indirectly recovering on such Channeled Asbestos Claim from the Debtors or the other Protected Parties identified in the Plan.

21. I believe that the issuance of the Asbestos Permanent Channeling Injunction under the Plan is necessary to secure the contributions by the Debtors and the other Protected Parties to the Asbestos Trust.

22. The scope of the Asbestos Permanent Channeling Injunction and the issue of who would be included among the Protected Parties were the subject of extensive negotiations by and between the Asbestos Claimants Committee and me, on the one hand, and representatives of the Entities who ultimately would become Protected Parties, on the other.

**IV.**     **Section 524(g) Requirements**

23.     Based on my previous and ongoing experience, I am familiar with the requirements of section 524(g) of the Bankruptcy Code. I believe that the Plan complies with the requirements set forth in section 524(g) of the Bankruptcy Code for the Bankruptcy Court to issue the Asbestos Permanent Channeling Injunction.

**A.     The Asbestos Trust will assume the asbestos-related liabilities of the Debtors.**

24.     Section 524(g) requires that a trust be created to assume liability for the debtor's asbestos-related torts before a court may order an injunction to supplement a plan's discharge injunction. As noted above, the Plan provides for the creation of the Asbestos Trust, which will assume liability for all Channeled Asbestos Claims and will use the Asbestos Trust Assets to resolve and, if eligible, compensate the holders of Channeled Asbestos Claims. See Plan at § 4.01; Asbestos Trust Agreement at § 1.2.

**B.     The Asbestos Trust will be funded partially by the obligation of the Reorganized Debtor to make future payments to the Asbestos Trust and, upon the occurrence of specified contingencies, the majority of the common stock of the Reorganized Debtor.**

25.     Section 524(g)(2)(B)(i)(II) requires that a trust be funded, in part, by the obligation of a reorganized debtor to make future payments to the trust that would enable the trust to own, upon the occurrence of specified contingencies, the majority of the voting shares of the reorganized debtor.

26.     The Asbestos Trust funding includes the Trust Note, which provides for a lien on securities, and rights to the Earn Out Payments. See Plan at § 4.08.

**C.     The Debtors are likely to be subject to substantial Demands, the amounts, number, and timing of which cannot be determined.**

27.     Relief under section 524(g) of the Bankruptcy Code is available upon a determination by the bankruptcy court that the debtor likely will continue to be subject to

substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the supplemental injunction. Section 524(g) also requires the court to find that the actual amounts, numbers, and timing of such future demands against the debtor cannot be determined.

28. Because of the lengthy and unpredictable latency periods associated with various asbestos diseases, I believe that it is impossible to predict with certainty the timing or extent of future Demands. However, based upon my experience, my knowledge of asbestos epidemiology and my review of the Debtors' asbestos claim history, I believe the Debtors likely will be subject to substantial Demands.

**D.    Pursuit of Demands outside of the Asbestos Trust will threaten the Plan's ability to deal equitably with such Demands.**

29. Without the creation of the Asbestos Trust as provided by the Plan, Future Demand Holders would be forced to litigate their claims in the tort system as they arise. That would devolve into a race to the courthouse, with the inevitable result that the Debtors' very limited resources would be consumed by those claimants who are first to file suit, leaving little or nothing for Future Demand Holders. Equitable treatment of both holders of Asbestos Claims and Future Demand Holders depends on all claimants being subject to the same rules and procedures as provided under the terms of the Asbestos Trust Agreement and the Trust Distribution Procedures.

**E.    The terms of the Asbestos Permanent Channeling Injunction are fully set forth in the Plan and the Disclosure Statement.**

30. Section 9.05 of the Plan sets forth the terms of the Asbestos Permanent Channeling Injunction. The terms of the Asbestos Permanent Channeling Injunction are discussed in Article XIII of the Disclosure Statement that was approved by the Bankruptcy Court

on November 20, 2018 [Docket No. 289] and served on all parties in interest [Docket Nos. 304 and 375].

**F.   The Asbestos Trust will treat present Channeled Asbestos Claims in substantially the same manner.**

31. I believe that the Asbestos Trust will be in a position to pay present Asbestos Claims and Demands that involve similar claims in substantially the same manner. To ensure this result, YCST and I engaged in negotiations with the Asbestos Claimants Committee over the terms of the Asbestos Trust Agreement and the Trust Distribution Procedures.

32. As noted above in paragraph 19, the Trust Distribution Procedures are a set of guidelines that the Asbestos Trust will use to receive, process, and resolve Channeled Asbestos Claims. The processes set forth in the Trust Distribution Procedures provide reasonable assurance that the Asbestos Trust will value, and be in a financial position to pay, Channeled Asbestos Claims that involve similar claims in substantially the same manner. See Plan at § 4.01; Trust Distribution Procedures at § 2.1.

33. The Trust Distribution Procedures further the goal of treating all beneficiaries of the Asbestos Trust equitably by setting forth procedures for processing and paying the Debtors' several share of the unpaid portion of the liquidated value of Channeled Asbestos Claims generally on an impartial, first-in-first-out basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system. To this end, the Trust Distribution Procedures establish a schedule for five (5) asbestos-related diseases, which have presumptive medical and exposure requirements and specific liquidated values. The disease levels, medical and exposure criteria, and scheduled values, all have been selected and derived with the intention of achieving a fair allocation of the Asbestos Trust funds to claimants

suffering from different disease processes, in light of the best available information and considering the settlement history of the Debtors and the rights claimants would have in the tort system absent these Chapter 11 Cases. See Trust Distribution Procedures (Plan Exhibit F) at § 2.1.

34. Requiring evidence that will satisfy the medical and exposure criteria set forth in the Trust Distribution Procedures is the principal mechanism by which meritorious claims will be distinguished from claims lacking merit and more serious claims from those that are less serious. Every dollar the Asbestos Trust spends on a non-meritorious or less serious claim represents one less dollar the Asbestos Trust otherwise would have to pay a future meritorious or more serious claim. Accordingly, it was critically important to me that the Trust Distribution Procedures be formulated to provide for the payment of Channeled Asbestos Claims based only on certain diseases, primarily malignant claims, and to those claims that provide evidence of the type of exposure patterns that were required by the Debtors for payment of claims in the tort system based on the specialized nature of the Debtors' products.

35. After the Asbestos Trust has determined the liquidated value of a Channeled Asbestos Claim pursuant to the procedures set forth in the Trust Distribution Procedures, the Asbestos Trust shall pay the claimant a pro-rata share of that value based on the then-current Payment Percentage (as defined in the Trust Distribution Procedures) for such claims. See Trust Distribution Procedures at § 2.3.

36. The Payment Percentage will be established by the Asbestos Trust, with the consent of the Trust Advisory Committee and the Legal Representative for Demand Holders (which will be me initially) after the Asbestos Trust becomes effective. The Payment Percentage can be adjusted upwards or downwards by the Asbestos Trustee with the consent of the Trust

Advisory Committee and the Legal Representative for Demand Holders to assure that the Asbestos Trust shall be in a financial position to pay holders of unliquidated and/or unpaid Channeled Asbestos Claims in substantially the same manner. Furthermore, the Trust Distribution Procedures require the Asbestos Trustee to re-evaluate the Payment Percentage no less frequently than once every three (3) years to assure that it is based on accurate, current information. The Trust Distribution Procedures thus provide the Asbestos Trust with the flexibility to modify the Payment Percentage over time based upon updated information on the number, types, and values of present and future Channeled Asbestos Claims, the value of the assets then available to the Asbestos Trust, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of the full value to all holders of Channeled Asbestos Claims. See Trust Distribution Procedures (Plan Exhibit F) at § 4.2.

37. Based on the due diligence conducted by YCST and me, as well as my own experience as the Future Claimants' Representative in these Chapter 11 Cases and others, and considering the structure of the Asbestos Trust Agreement and the Trust Distributions Procedures described above, I believe that the Asbestos Trust Agreement and the Trust Distribution Procedures will ensure that Future Demand Holders will be treated in substantially the same manner as holders of similar Channeled Asbestos Claims.

**G.    The issuance of the Asbestos Permanent Channeling Injunction is fair and equitable to Future Demand Holders.**

38. Pursuant to the Plan, the following Protected Parties will be protected by the scope of the Asbestos Permanent Channeling Injunction: the Debtors, the Reorganized Debtor, any current or former Affiliate of each of the Debtors or Reorganized Debtor, each of the

Hinden Family Members, each of the Hinden Family Entities, and each Settling Asbestos Insurer. See Plan at § 1.01(102).

39. On February 22, 2019, the Plan Proponents filed a motion to approve the Debtors' entry into a settlement agreement with Hartford Accident and Indemnity Company (the "Insurance Settlement Agreement") [Docket No. 468]. The Insurance Settlement Agreement contemplates that Hartford Accident and Indemnity Company will pay a settlement amount to the Asbestos Trust in exchange for certain Hartford Entities (identified in the Insurance Settlement Agreement) being designated as Settling Asbestos Insurers under the Plan.

40. A valuable contribution to the Asbestos Trust is being made by or on behalf of each of the Debtors, the Hinden Family Members, the Hinden Family Entities, and the Settling Asbestos Insurers. I believe that receipt of the benefit of the Asbestos Permanent Channeling Injunction by all of the Protected Parties is fair and equitable with respect to persons that might assert Demands as required by section 524(g) of the Bankruptcy Code.

41. In light of the Insurance Settlement Agreement and the valuable contributions to the Asbestos Trust made thereunder, I also believe that receipt of the benefits of the Settling Asbestos Insurer Injunction by the Settling Asbestos Insurers is fair and equitable with respect to persons that might assert Demands.

42. Based upon my involvement and due diligence in these Chapter 11 Cases, it is my belief that the funding and structure of the Asbestos Trust serves the interests of Future Demand Holders. I also am confident that the structure of the Asbestos Trust and the Trust Distribution Procedures ensures that funds will be available to satisfy Channeled Asbestos Claims where, absent the Asbestos Trust and considering the Debtors' limited resources, there

otherwise would be no assurance that the Debtors would have any ability to continue to satisfy such Asbestos Claims and Demands.

43. Based upon my own experience and personal knowledge of the facts of these Chapter 11 Cases and the terms of the Plan and the Plan Documents, I believe that the Plan provides reasonable assurance that Future Demand Holders will be treated substantially similarly to holders of Asbestos Claims. Specifically, as I noted above, the Plan Documents provide for mechanisms (including structured, periodic, or supplemental payments; pro rata distributions; matrices; periodic review of estimates and numbers and values of Channeled Asbestos Claims; and periodic adjustment of the Payment Percentage) that will help ensure that the Asbestos Trust will value and be in a financial position to pay Channeled Asbestos Claims that involve similar claims in substantially the same manner.

44. Finally, I believe that the Plan is fair and equitable with respect to persons that might assert Demands in light of benefits provided to the Asbestos Trust by or on behalf of the Debtors, the Settling Asbestos Insurers, and the other Protected Parties.

[*The remainder of this page is intentionally left blank. Signature page follows*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 26, 2019

*Lawrence Fitzpatrick*
_____
Lawrence Fitzpatrick
Future Claimants' Representative

# **EXHIBIT A**

Curriculum Vitae

# LAWRENCE FITZPATRICK

---

100 American Metro Boulevard, Suite 108, Hamilton, NJ  08619 · Phone: (609) 219-8862

14 Stonelea Drive, Princeton Junction, New Jersey 08550 · Phone: (609) 275-8840

## PROFESSIONAL EXPERIENCE

<u>Positions Held Since January, 1999</u>

*October, 2014 – Present*
SOLE TRUSTEE OF MET-COIL TCE PI SETTLEMENT TRUST
> Responsible for managing a multi-million dollar Trust established to compensate victims of TCE (trichloroethylene) exposure in two Chicago suburbs where the drinking water was contaminated by decades of spillage of TCE at a metal fabrication facility.

*February, 2001 – Present*
FUTURE CLAIM REPRESENTATIVE IN PITTSBURGH CORNING BANKRUPTCY
> Appointed by the United States Bankruptcy Court for the Western District of Pennsylvania to represent the interests of claimants who have not yet manifested an asbestos-related disease but may do so in the future.

*November, 2001 – Present*
EXECUTIVE DIRECTOR OF THE CENTER FOR CLAIMS RESOLUTION
> Rehired by the CCR to help finalize settlements, litigate against surety bond companies and others, and provide testimony as required.

*December, 2002 – Present*
FUTURE CLAIM REPRESENTATIVE IN NARCO BANKRUPTCY
> Appointed by the United States Bankruptcy Court for the Western District of Pennsylvania to represent the interest of claimants who have not yet manifested an asbestos-related disease but may do so in the future.

*February, 2003 – Present*
FUTURE CLAIM REPRESENTATIVE IN AC&S BANKRUPTCY
> Appointed by the United States Bankruptcy Court for the District of Delaware to represent the interests of claimants who have not yet manifested an asbestos-related disease but may do so in the future.

*April, 2003 – Present*
FUTURE CLAIM REPRESENTATIVE IN A.P. GREEN BANKRUPTCY
> Appointed by the United States Bankruptcy Court for the Western District of Pennsylvania to represent the interests of claimants who have not yet manifested an asbestos-related disease but may do so in the future.

*May, 2010 – Present*
FUTURE CLAIM REPRESENTATIVE IN DURABLA MANUFACTURING COMPANY BANKRUPTCY
> Appointed by the United States Bankruptcy Court for the District of Delaware to represent the interests of claimants who have not yet manifested an asbestos-related disease but may do so in the future.

*January 2013 – Present*
FUTURE CLAIM REPRESENTATIVE IN METEX MFG. CORPORATION BANKRUPTCY
> Appointed by the United States Bankruptcy Court for the Southern District of New York to represent the interests of claimants who have not yet manifested an asbestos-related disease but may do so in the future.

*September, 2013 – Present*
FUTURE CLAIM REPRESENTATIVE IN RAPID-AMERICAN CORPORATION BANKRUPTCY
> Appointed by the United States Bankruptcy Court for the Southern District of New York to represent the interests of claimants who have not yet manifested an asbestos-related disease but may do so in the future.

*October, 2016 – Present*
FUTURE CLAIM REPRESENTATIVE IN KAISER GYPSUM COMPANY BANKRUPTCY
> Appointed by the United States Bankruptcy Court for the Western District of North Carolina to represent the interests of claimants who have not yet manifested an asbestos-related disease but may do so in the future.

*September, 2017 – Present*
FUTURE CLAIM REPRESENTATIVE IN THE SEPCO CORPORATION BANKRUPTCY
> Appointed by the United States Bankruptcy Court for the Northern District of Ohio to represent the interests of claimants who have not yet manifested an asbestos-related disease but may do so in the future.

August, 1999 – December, 2006
SOLE TRUSTEE OF FIBREBOARD SETTLEMENT TRUST
> Responsible for prudently investing a $1.8 billion Trust set up to pay Fibreboard's asbestos claimants and for approving all payments out of the Trust's funds. Paid approximately $800 million asbestos claims.

October, 1988 – December, 1998
PRESIDENT AND CHIEF EXECUTIVE OFFICER
Center for Claims Resolution, Inc., Princeton, New Jersey
> The Center for Claims Resolution, Inc. (CCR) handled asbestos claims on behalf of its 20 member companies, their insurers and reinsurers. It also provided a variety of services (insurance billing, data processing, consulting, etc.) to select non-member companies. During my tenure at the CCR, it disposed of over 270,000 claims and billed, collected and dispersed over $2 billion in payments. It also closely controlled legal costs associated with processing claims through a computer-monitored case management system, utilization of salaried staff counsel to perform functions normally done by outside lawyers,

captive CCR law offices in selected jurisdictions, and the implementation of an administrative claims program to handle claims outside the tort system.

February, 1986 – October, 1988
VICE PRESIDENT, LAW
Asbestos Claims Facility, Princeton, New Jersey

The ACF was a joint venture of 35 companies and 16 of their insurers formed at handle asbestos claims against the members. As Vice President, Law, I was responsible for managing the defense of the members in all litigation nationwide. My accomplishments included reducing the number of law firms engaged in defending the members from over 1,100 to 65, resulting in savings of over $100 million annually, improving the success rate in cases that went to trial from 28% to 65% and the institution of programs to deal with persons with physical changes from exposure to asbestos, but no impairment from that exposure, outside the tort system.

February, 1980 – February, 1986
LEGAL COUNSEL
Owens-Illinois, Inc., Toledo, Ohio

Responsible for managing asbestos personal injury claims, property damage claims and insurance litigation involving the company. Also had responsibility for a variety of non-asbestos matters, including major real estate acquisitions and divestitures, advertising and consumer affairs, labor matters and anti-trust compliance.

August, 1975 – February, 1980
ASSISTANT GENERAL ATTORNEY
Roper Corporation, Kankakee, Illinois

Responsible for all product liability and insurance matters, as well as labor negotiations and arbitration, tax matters, anti-trust and consumer affairs.

## EDUCATION

University of Illinois, B.S. in Accounting, 1970
University of Illinois, J.D., 1975

## PUBLICATIONS IN THE LAST 10 YEARS

Prepackage Bankruptcies: Down but not Out, New York University Annual Survey of American Law, Volume 63, Issue 4 (2008). (With E. Green, J. Patton, E. Harron and T. Turner)