## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re:<br><br>DURO DYNE NATIONAL CORP., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 18-27963 MBK<br><br>(Jointly Administered) |

### THE NORTH RIVER INSURANCE COMPANY'S OBJECTION TO MOTIONS PURSUANT TO 11 U.S.C. §§ 107(b) AND 105(a), FEDERAL RULE OF BANKRUPTCY PROCEDURE 9018, AND LOCAL CIVIL RULE 5.3 FOR AUTHORITY TO (I) FILE DOCUMENTS UNDER SEAL AND (II) REDACT COMMERCIALLY SENSITIVE, NONPUBLIC INFORMATION

In support of its Objection to Motion Pursuant to 11 U.S.C. §§ 107(b) and 105(a), Federal Rule of Bankruptcy Procedure 9018, and Local Civil Rule 5.3 for Authority to (I) File Documents Under Seal and (II) Redact Commercially Sensitive, Nonpublic Information (Dkt. No. 470) (the "Seal Motion"), The North River Insurance Company ("North River"), by undersigned counsel, states as follows:

### BACKGROUND

1. Pre-petition, Duro Dyne manufactured and sold sheet metal accessories and equipment for the HVAC industry.[2] From 1952 until about 1978, some of Duro Dyne's products contained asbestos.[3] Beginning in approximately 1988, Duro Dyne began to be named as a defendant in asbestos bodily injury cases.[4]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Duro Dyne National Corp. (4664); Duro Dyne Machinery Corp. (9699); Duro Dyne Corporation (3616); Duro Dyne West Corp. (5943); and Duro Dyne Midwest Corp. (4662).
[2] *See* Second Amended Disclosure Statement (the "Disclosure Statement," Dkt. No. 278) at 7.
[3] *Id.* at 13.
[4] *Id.* at 14.

1

2.  Disputes arose between Duro Dyne and Insurers regarding how much of the defense and indemnity costs in connection with the asbestos lawsuits were properly allocable to Duro Dyne. Following exhaustion of Duro Dyne's primary policies, several of the excess insurers, including North River, asserted that Duro Dyne was obligated to contribute to defense and indemnity costs of such litigation for underlying claims implicating injuries or loss occurring outside of excess insurers' respective policy periods.[5]

3.  On or about September 19, 2013, North River filed an insurance coverage action in the New York Supreme Court, Suffolk County (the "New York State Court Action")[6], in which it named as defendants Duro Dyne and Duro Dyne's other insurers, including Hartford Accident and Indemnity Company ("Hartford") and Federal Insurance Company ("Federal"). Resolution of the New York State Court Action will determine (a) whether, and to what extent, Duro Dyne's insurers owe coverage for asbestos-related bodily injury claims against Duro Dyne and (b) what amounts Duro Dyne is obligated to contribute to and/or reimburse Insurers for defense and/or indemnity costs of such claims.

4.  In an order dated July 10, 2014, (the "Trial Court Order"), the court in the New York State Court Action made several rulings regarding the parties' respective rights and obligations, including:

- That "[a]ll parties agree that New York law applies and that New York law employs an injury-in-fact trigger to bodily injury claims arising from exposure to asbestos (*see Continental Cas. Co v Rapid-American Corp.*, 80 N.Y.2d 640 [(N.Y. 1993)])."

- The court held, consistent with the parties' agreement, that "New York law applies and that . . . New York law applies a pro rata allocation for indemnity costs among successive insurance carriers, including to the policyholder for a period where no coverage exists."

---

[5] *See North River Ins. Co. v. Duro Dyne Nat. Corp.*, 61 N.Y.S.3d 78, 82 (N.Y. App. Div. 2017).
[6] *The North River Ins. Co. v. Duro Dyne Nat. Corp., et al.*, Index No. 062947/13 (N.Y. Supr. Ct., Suffolk Cnty.).

2

- Citing the Second Circuit's reliance on the "unavailability rule" in the *Stonewall Ins. Co. v. Asbestos Claim Mgt. Corp.* decision (a doctrine providing that liability should not be allocated to the insured for years in which insurance was not available to it),[7] the court also held that the proper cutoff date for allocation of costs to Duro Dyne was 1990 or 1991, when insurance for asbestos-related claims became commercially unavailable to Duro Dyne because of the presence of asbestos exclusions in Duro Dyne's policies.

- The court held that Hartford and North River have a duty to defend Duro Dyne under their respective policies but only "to the extent that the underlying actions contain any allegations that fall within the policy periods."

- The court held that Duro Dyne is required to contribute to defense costs.

- The court held that Insurers had not waived, and were not estopped from asserting, their rights to payment from Duro Dyne and/or other insurers for payments Insurers made in excess of their allocable shares.

5.     The New York Appellate Division affirmed these rulings on August 23, 2017 (the "Appellate Order").[8] Pursuant to those rulings, Hartford and North River have fronted the costs for defending claims against the Debtors. North River has filed claims for reimbursement in connection with those costs in this case and has a motion pending in the New York State Court Action seeking summary judgment on a portion of those claims. North River has present and future reimbursement claims beyond those sought in the pending motion in the New York State Court Action.

6.     On September 7, 2018, the Debtors commenced their respective bankruptcy cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

7.     On November 16, 2018, the Debtors filed the Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., *et al.*, Under Chapter 11 of the Bankruptcy Code (Dkt. No. 279), which provides that Asbestos Claims and Demands will be permanently channeled to a trust established under Section 524(g) of the Bankruptcy Code.

---

[7] *Stonewall Ins. Co. v. Asbestos Claims Mgt. Corp.*, 73 F.3d 1178 (2d Cir. 1995).
[8] *See North River Ins. Co. v. Duro Dyne Nat. Corp.*, 61 N.Y.S.3d 78 (N.Y. App. Div. 2017).

3

8. Although the Plan purports to be a § 524(g) plan that pays claimants through a trust, the Plan permits Asbestos Claimants to pursue litigation in the tort system post-confirmation "to obtain the benefit of Asbestos Insurance Coverage provided by Non-Settling Insurers."

9. Specifically, the Plan provides that "[i]n addition to" seeking payment from the Asbestos Trust, Asbestos Claimants may also file a tort system lawsuit against the Reorganized Debtor (under the pseudonym "RDD Company," or a similar name) in order to obtain a judgment, which they can then seek to enforce against Duro Dyne's non-settling insurers. The Plan allows the suit to be served on the Asbestos Trust, which would then tender the lawsuit to any non-settled insurers, who would presumably defend the lawsuit in order to avoid entry of a default judgment. Any judgment would be paid solely by the Non-Settling Insurers; indeed, the Plan is clear that any award arising out of such claims "shall be enforceable only against the Asbestos Insurance Coverage provided by Non-Settling Insurers."

10. Accordingly, if the Plan is confirmed and becomes effective, Duro Dyne's non-settling insurers will incur defense expenses in suits brought in the tort system. Such insurers also may be required to pay their pro rata share of any judgments or settlements in such actions in accordance with their insurance policies and state law.

11. North River timely filed proofs of claim against Duro Dyne and its co-debtors. North River's claims arise from (1) its payment of defense and indemnity costs in excess of its pro rata share with respect to underlying asbestos lawsuits, and (2) anticipated future payment of such defense and indemnity costs in connection with asbestos lawsuits pursued following confirmation. The Court allowed North River's Class 7 claims for voting purposes on February 8, 2019 in the amount of $462,166.79 and $24.53 million respectively.

12. On February 11, 2019, the Debtors and Hartford entered into the Agreement to resolve disputes between them in the Coverage Action regarding the extent of Hartford's duty to defend and indemnify the Debtors against asbestos-related bodily injury claims. The Debtors and Federal entered into a similar agreement on March 4, 2019 (the Debtors agreements with Hartford and Federal are collectively referred to herein as the "Agreements"). The Agreements are the subject of Debtors' 9019 Motions.

13. The settling parties seek to seal a portion of the Agreements to prevent parties-in-interest from knowing the amount of the settlements.

## ARGUMENT

The Plan Proponents' Motions to Seal lack a legal basis and contradict established Third Circuit precedent. It is an effort by the Plan Proponents to deny North River and other parties information that they need to fully evaluate and/or object to the proposed settlements. The Court should deny the Motions to Seal and require that full information concerning the proposed settlements be provided to North River and other parties-in-interest so that they can fully vet the proposed settlements. Only then can the parties properly evaluate the proposed settlements.

The Supreme Court stated in *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 591 (1978), that "[i]t is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." There exists in civil cases a common law public right of access to judicial proceedings and records. *Goldstein v. Forbes (In re Cendant Corp.)*, 260 F.3d 183, 192 (3d Cir. 2001) (citing *Littlejohn v. BIC Corp.*, 851 F.2d 673, 677–78 (3d Cir. 1988)). The Third Circuit further recognized a right of access to judicial records and that this right of access is "beyond dispute." *Littlejohn v. Bic Corp.*, 851 F.2d 673, 677-78 (3d Cir.1988) (*quoting Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1066

(3d Cir.1984)). Section 107(a) of Chapter 11 of the United States Code embodies the "codification of the common law general right to inspect judicial records and documents." *In re Alterra Healthcare Corp.*, 353 B.R. 66, 75 (Bankr. D. Del. 2006).

In this case, the Agreements have been publicly filed and the settling parties seek judicial approval and implementation of the Agreements. Without the injunctions and orders requested by the settling parties, there is no settlement. In this context, there is no question that the Agreements are a judicial document and thus the presumption of access applies.

Section 107(a) provides in pertinent part that "except as provided in subsections (b) and (c) of this section and subject to Section 112, a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge." 11 U.S.C. § 107(a). Congress has codified a few limited exceptions to this general rule in Section 107(b) and (c). *Alterra*, 353 B.R. at 75.

In order to successfully move to seal information in a bankruptcy matter, the burden is on the moving party to show that a request to place documents under seal falls within the parameters of an exception by demonstrating "that the interest in secrecy outweighs the presumption in favor of access." *See In re Continental Airlines*, 150 B.R. 334 (D. Del. 1993). The burden of proof is heavy, requiring an "extraordinary circumstance or compelling need." *Id.* at 47 (quoting *City of Hartford v. Chase*, 942 F.2d 130, 135–36 (2d Cir. 1991)). *See also* 2 Collier on Bankruptcy ¶ 107.03[1][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2016) (stating that the act of sealing from public disclosure must be viewed as an extraordinary measure only warranted in rare circumstances; "the dissemination of merely prejudicial material cannot be enjoined under the provision") (cases collected).

Here, the Plan Proponents must demonstrate one of the limited exceptions to the general

6

rule of public access, either in 11 U.S.C. §§ 107(b)[9] or Federal Rule of Bankruptcy Procedure 9018.[10] The Seal Motions rely on Section 107(b)(1) of the Bankruptcy Code as the basis for redacting and sealing the settlement information, claiming that the information therein is "confidential commercial information" because if it is not protected, "the Debtors' ability to settle with other insurers for appropriate sums may be seriously impaired[.]"[11] Seal Motion (Dkt. No. 470-1) ¶ 15.

The settlement amount does not, however, constitute confidential commercial information. "Commercial information" has been defined as "information which would cause an 'unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'" *Orion Pictures Corp. v. Video Software Dealers Assoc.*, 21 F.3d 24, 27 (2d Cir. 1994) (citations omitted). In *In re Alterra Healthcare Corp.*, 353 B.R. 66 (Bankr. D. Del. 2006), the court adopted the *Orion* definition of "commercial information," stating that:

> Commercial information is information which would result in an unfair advantage to competitors by providing them information as to the commercial operations of the debtor. Disclosure of the information must reasonably be expected to cause the entity commercial injury. Moreover, the Court must find that information contained in the sealed settlement agreements is so critical to the operations of the entity

---

[9] Section 107(b) provides in relevant part:

On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may –
  (1) protect an entity with respect to a trade secret or confidential research, development, or commercial information . . .

[10] Federal Rule of Bankruptcy Procedure 9018 provides:

On motion or on its own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information. . . .

[11] Section 107(b)(1), upon which the movants rely, provides that the bankruptcy court may protect "confidential research, development, or commercial information . . . ." 11 U.S.C. § 107(b)(1).

>seeking the protective order that its disclosure will unfairly benefit that entity's competitors.

*Id.* at 75–76 (citations, quotation marks, and brackets omitted). Other courts have observed that "[a]lthough the information need not rise to the level of a 'trade secret,' the information must be 'so critical to the operations of the entity seeking the protective order that its disclosure will unfairly benefit the entity's competitors.'" *In re Motors Liquidation Co.*, 561 B.R. 36, 43 (Bankr. S.D.N.Y. 2016) (quoting *In re Borders*, 462 B.R. 42, 47–48 (Bankr. S.D.N.Y. 2011), and *In re Barney's, Inc.*, 201 B.R. 703, 708–09 (Bankr. S.D.N.Y. 1996)). There is no serious allegation that the settlement amount in the Agreements constitute such critical trade secret or confidential business information.

To the contrary, federal courts generally prohibit the sealing of settlement agreements, even where disclosure of the settlement may have ancillary adverse impact on the settling parties. In *Bank of Am. Nat'l Trust and Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339, 344 (3d Cir.1986), the Third Circuit specifically held that a settlement agreement deemed a judicial record is accessible under the right of access doctrine and that the strong presumption of access outweighed the interest in promoting settlements. 800 F.2d at 344-45. *See also Herrnreiter v. Chicago Housing Authority*, 281 F.3d 634, 637 (7th Cir. 2002) ("[Defendant's] desire to keep the amount of its payment quiet (perhaps to avoid looking like an easy mark, and thus drawing more suits) is not nearly on a par with national security and trade secret information. Now that the agreement itself has become a subject of litigation, it must be opened to the public just like other information … that becomes the subject of litigation."); *Brown v. Advantage Engineering Inc.*, 960 F.2d 1013, 1016 (11th Cir. 1992) ("It is immaterial whether the sealing of the record is an integral part of a negotiated settlement between the parties, even if the settlement comes with the court's active encouragement. Once a matter is brought before a court

for resolution, it is no longer solely the parties' case, but also the public's case. Absent a showing of extraordinary circumstances ..., the court file must remain accessible to the public."). *Jessup v. Luther,* 277 F.3d 926, 928-29 (7th Cir. 2002) ("The public has an interest in knowing what terms of settlement a federal judge would approve and perhaps therefore nudge the parties to agree to.").

Bankruptcy courts also routinely hold that information contained in settlement agreements do not qualify as "confidential commercial information." *See, e.g.*, *In re Gibbs*, No. 11-03070, 2017 WL 6506324, at *2 (Bankr. D. Haw. Dec. 19, 2017) (denying motion to seal settlement agreement and stating that "[t]he filings make clear that [debtor] is not really concerned about its competitors. Rather, it worries that, if the settlement amount in this case is disclosed, other parties claiming that BANA engaged in wrongful foreclosure conduct will demand similar amounts. This does not amount to "confidential commercial information" within the meaning of section 107."); *Alterra*, 353 B.R. at 76 (holding that information regarding Chapter 11 debtor's settlements with tort claimants was not "confidential commercial information" such that bankruptcy court could protect from disclosure under bankruptcy statute excepting from general right of public access "confidential research, development, or commercial information," though disclosure of this information would allegedly give claimants who had not yet settled their tort claims an unfair advantage in extracting higher settlements from debtor; unfair advantage to tort claimants did not equate to unfair advantage to market competitors, a condition required for information to be treated as confidential commercial information); *Geltzer v. Andersen Worldwide, S.C.*, No. 05 Civ. 3339, 2007 WL 273526, at *3 (S.D.N.Y. Jan. 30, 2007) (refusing to approve settlement that was redacted to exclude the settlement amount; rejecting claim that the amount was protected as "commercial

9

information" under § 107(b)(1)); *In re Lawlor*, No. 01-11402, 2003 WL 21288634, at *1 (Bankr. D. Vt. May 30, 2003) (denying trustee's motion to file settlement under seal); *In re Gen. Homes Corp.*, 181 B.R. 898, 903 (Bankr. S.D. Tex. 1995) (holding that sealing parties' proposed settlement was unwarranted because it did not find "that the interest of secrecy outweigh[ed] the presumption in favor of access"); *In re Analytical Systems, Inc.*, 83 B.R. 833, 835–36 (Bankr. N.D. Ga. 1987) (holding that settlement agreement entered into between debtor and creditor contained no trade secrets or confidential research, development, or commercial information, or any scandalous or defamatory matters within meaning of provision to Bankruptcy Code governing protective orders, and thus, agreement would be unsealed).

Here, Debtors seek to seal (or redact the amount of) its settlement agreement with Hartford and Federal. The Seal Motions are lacking the factual and legal bases for the redaction and sealing requested, save for Debtors' conclusory statements, which are insufficient. *See Gibbs*, 2017 WL 6506324 at *2 (stating in the context of a motion to seal a settlement that "[l]awyers' statements in memoranda are no substitute for evidence"); *In re Motors Liquidation Co.*, 561 B.R. 36, 43 (Bankr. S.D.N.Y. 2016) (holding that "[e]vidence—not just argument—is required to support the extraordinary remedy of sealing."); *In re Dreier LLP*, 485 B.R. 821, 823 (Bankr. S.D.N.Y. 2013) (stating that movant who submitted only "conclusory statements" "failed to show that [the information's] disclosure in a public filing would place [the movant] at a competitive disadvantage").

The requests to seal the settlement amounts are not just a theoretical violation of core principles, they are an attempt to prejudice North River. Sealing the settlement amounts would work an inequity for North River: not only does North River have contribution rights against Hartford and Federal that these insurers are trying to eliminate, North River has claims in Class 7

10

of the Plan, which are to be channeled to the trust under Debtors' Plan to which the Hartford and Federal settlement amounts will be contributed.  The proposed settlement order provides that North River's claims against Hartford and Federal "shall attach to the proceeds of sale with the same validity, priority, force, and effect as such Interests had in the Policies and the Released Overseas Policy Interests prior to entry of this Order…"[12]  The settling parties thus propose that North River's significant claims against Hartford and Federal will attach to the settlement proceeds, but are attempting to conceal the amount of those proceeds from North River.  Without knowing the settlement amount, North River cannot possibly evaluate whether this relief constitutes adequate protection of its claims and interests as required by 11 U.S.C. § 363(e).  The motion to seal therefore violates the open access rules and seeks to work an inequity on North River.  It is inappropriate for both reasons.  Debtors' Seal Motion should be denied.

DATED:  March 5, 2019

Respectfully submitted,

/s/ Christina R. Salem
Margaret F. Catalano
Christina R. Salem
KENNEDYS CMK LLP
570 Lexington Avenue – 8th Floor
New York, New York 10022
Telephone:    (212) 252-0004
Facsimile:    (212) 832-4920
Email:    meg.catalano@kennedyscmk.com
christina.salem@kennedyscmk.com

George R. Calhoun
IFRAH PLLC
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone:    (202) 525-4147
Email:    george@ifrahlaw.com

Attorneys for The North River Insurance Company

---

[12] North River contends that this provision is an attempt to comply with § 363, but is in actuality illusory because other provisions of the order and plan provide that North River's claims are ineligible for distribution.

11