**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re: | Chapter 11 |
| DURO DYNE NATIONAL CORP., *et al.*,[1] | Case No. 18-27963 MBK |
| Debtors. | (Jointly Administered) |

**THE NORTH RIVER INSURANCE COMPANY'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.      Introduction**

The Court held a confirmation hearing on March 6 and 7, 2019, to hear evidence and argument concerning the Plan Proponents' Second Amended Plan of Reorganization for Duro Dyne National Corp., *et al.*, Under Chapter 11 of the Bankruptcy Code, as modified (the "Plan"), Dkt. 517.  Prior to the hearing, the Court announced a tentative ruling in which it stated that it was "prepared to rule that the plan complies with all of the requisite  1129(a) and 1129(b) criteria."  March 6, 2019 Confirmation Hrn'g Tr. ( "Mar. 6 Tr.") at 15.  The Court cautioned, however, that this preliminary view was not based on a review of the evidence or argument.  At the conclusion of the confirmation hearing, the Court requested that the parties submit proposed findings of fact and conclusions of law.  The evidence adduced at the hearing does not support the Court's preliminary view.  To the contrary, the Plan Proponents' failure to carry their evidentiary burden as to multiple issues is obvious.  Accordingly, the Court is unable to make findings of fact that are required to hold that the Plan is confirmable and the Court must deny confirmation.

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Duro Dyne National Corp. (4664); Duro Dyne Machinery Corp. (9699); Duro Dyne Corporation (3616); Duro Dyne West Corp. (5943); and Duro Dyne Midwest Corp. (4662).

## II.    General Findings and Conclusions.

1.    The findings and conclusions set forth herein, in the recitals, and in the record of the hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, or vice versa, they are adopted as such.

2.    This Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of this Court or its duly-appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at, the hearings held before this Court during the pendency of the Chapter 11 Cases.

3.    The Court has an independent duty under the Bankruptcy Code to determine whether a plan satisfies each element of 11 U.S.C. § 1129, even in the absence of objections to confirmation.  *In re H.H. Distributions, L.P.*, 400 B.R. 44, 50 (Bankr. E.D. Pa. 2009); *In re MJ Metal Products, Inc.*, 292 B.R. 702, 704 (Bankr. D. Wyo. 2003).

4.    In order to be confirmed, every Chapter 11 plan, whether consensual or nonconsensual, must comply with all the requirements enumerated in 11 U.S.C. §§ 1129(a) and 1129(d) (except in some cases 11 U.S.C. § 1129(a)(8) that each class of claims or interests either have accepted the plan or not be impaired under the plan).

5.    A nonconsensual plan requires the proponent to satisfy all but one of the sixteen elements, that all classes consent or are unimpaired, 11 U.S.C. § 1129(a)(8), plus the additional requirements of § 1129(b), including that the plan does not unfairly discriminate against dissenting classes and that the dissenting classes are treated fairly and equitably.

6.    The Plan Proponents have the burden of proving that they have satisfied the

elements of §§ 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.

7.      In an effort to meet their burden, the Plan Proponents offered testimony by two witnesses, the Debtors' financial advisor Mark Podgainy, and the Future Claimants' Representative Lawrence Fitzpatrick.   Mr. Podgainy, in particular, lacked first-hand knowledge concerning many of the subjects contained within his certification.   Although the Court admitted Mr. Podgainy's certification, it has placed little or no weight on those topics about which Mr. Podgainy testified that he lacked first-hand knowledge, which included satisfaction of a number of § 1129 requirements.

**III.     The Plan's Improper Treatment of North River's Claims**

     **A.      Proposed Findings of Fact**

North River Insurance Company ("North River") timely submitted proofs of claim (Nos. 30–34) against each of the Debtors asserting claims in Class 6 (pre-petition defense cost claims) and Class 7 (for post-petition indemnity claims and post-petition defense cost claims respectively).

On February 8, 2019, the Court temporarily allowed for voting purposes North River's proofs of claim: (i) with respect to pre-petition defense costs as a Class 6 Claim in the amount of $7,889,058.07; (ii) with respect to pre-petition indemnity payments, as a Class 7 Claim in the amount of $462,166.79; and (iii) with respect to post-petition defense costs, as a Class 7 Claim in the amount of $24.53 million.  *See* Order Granting The North River Insurance Company's Motion Pursuant to Bankruptcy Rule 3018 for Temporary Allowance of Its Proofs of Claim for Voting Purposes ("Temporary Allowance Order"), Dkt. 448.

Since North River filed its proof of claim, settlements with the various Settling Insurers[2]

were submitted for approval.  If approved, North River's claims against those third parties also

would be channeled to the proposed Trust and thus, presumably, also would be included in North

River's Class 7 claims.  Thus, North River has two Class 7 claims arising out of potential

defense costs claims: one that arises from Duro Dyne's obligations to reimburse North River for

its share of defense costs, and one that arises from Settling Insurers' independent obligation to

reimburse North River for their share of defense costs.

The Plan provides North River no opportunity to recover on its claims even though other

claims classified in Class 7 have that opportunity.  Plan Proponents previously admitted that

"Asbestos Insurers will not receive any payment or distribution from the Asbestos Trust on

account of such claims . . . ."  Second Amended Disclosure Statement for Second Amended

Prenegotiated Plan of Reorganization for Durodyne [sic] National Corp., *et al.*, ("Disclosure

Statement"), Dkt. 278, at 17.  On the eve of the confirmation hearing, the Plan Proponents

modified the proposed Trust Distribution Procedures ("TDPs") to provide:

> Notwithstanding any provision in this TDP or any other Plan Document, because
> the Non-Settling Asbestos Insurers have received the benefit of certain credits and
> judgment reduction, as set forth in and subject to the terms and conditions of
> Sections 4.14 and 4.15 of the Plan, any claim of a Non-Settling Asbestos Insurer
> shall not be eligible for payment or compensation from the Asbestos Trust under
> this Section 5.5.

Certification of J. Prol in Support of Confirmation, Dkt. 512, Ex. D § 5.5.  The Plan also enjoins

North River from seeking to recover on its reimbursement claims in court.  Plan §§ 9.05–9.07.

Because the Plan bars any recovery by Insurers on their reimbursement claims in Class 7, the

actual effect of the Plan is to extinguish North River's valid claims.

---

[2] The "Settling Insurers" consist of Hartford Accident and Indemnity Company, Federal Insurance
Company, MidStates Reinsurance Corporation, f/k/a Mead Reinsurance Corporation, and Munich Re
Insurance Company.

In contrast, the Plan provides that Class 7 Asbestos Personal Injury Claims can obtain

payments from the Trust and also obtain recoveries in court.  Plan § 4.13; TDPs §§ 5.10, 7.6–7.7.

Debtors' witness, Mark Podgainy, admitted that among Class 7 claimants, the treatment of

asbestos tort claimants differed from that of North River.  March 6 Tr. at 74:2–5.

### B.    Improper Classification of North River's Class 7 Claims

Under § 1122(a) of the Bankruptcy Code, "a plan may place a claim or an interest in a

particular class *only if* such claim or interest is *substantially similar* to the other claims or

interests of such class."  11 U.S.C. § 1122(a) (emphasis added).  The Third Circuit stated in *W.R.*

*Grace* that "[t]o determine whether claims are 'substantially similar,' the proper focus is on 'the

legal character of the claims as it relates to the assets of the debtor.'"  *In re W.R. Grace & Co.*,

729 F.3d 311, 326 (3d Cir. 2013) (quoting *In re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C.

Cir. 1986)).  *See also In re Congoleum Corp.*, 362 B.R. 198, 203 (Bankr. D.N.J. 2007) ("the

foremost consideration in bankruptcy classification 'is the legal character of the claim as it

relates to the assets of the debtor'" (quoting *AOV Indus*, 792 F.2d at 1150)).  "[T]he phrase

'substantially similar' reflects 'the legal attributes of the claims, not who holds them.'"  *W.R.*

*Grace*, 729 F.3d at 326 (quoting *In re Tribune Co.*, 476 B.R. 843, 855 (Bankr. D. Del. 2012)).

"Claims are similar if they have substantially similar rights to the debtor's assets."  *Id.* (quoting

*In re Quigley Co.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007)).  The Third Circuit has also stated

that a plan's classification scheme will not be upheld if it is unreasonable or arbitrarily

designates classes in a manner that "would not serve any legitimate purpose."  *John Hancock*

*Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993).  *See also In*

*re Jersey City Med. Ctr.*, 817 F.3d 1055, 1061 (3d Cir. 1987) ("the classification of the claims or

interests must be reasonable").  Here, the Plan's classification of North River's claims for

reimbursement of post-petition defense expenses and pre- and post-petition indemnity expenses

in Class 7, which otherwise consists of Asbestos Personal Injury Claims, is improper for several

reasons.

Class 7 is comprised of "all Channeled Asbestos Claims," which include, in pertinent

part, "any (a) Asbestos Personal Injury Claim, [or] (b) Indirect Trust Claim."  Plan § 1.01(7).

"Indirect Trust Claims" include:

> any Claim, now existing or hereafter arising, that is (a) held by a Non-Settling
> Asbestos Insurer . . . to the extent based on, arising out of, or attributable to an
> Asbestos Personal Injury Claim, *and* (b) on account of alleged liability of a Debtor
> for reimbursement, indemnification, subrogation, or contribution of any portion of
> any *damages* such Entity has paid or may pay . . . on account of . . . personal injury
> . . . caused or allegedly caused . . . by asbestos or asbestos-containing products
> manufactured, supplied, distributed, handled, fabricated, stored, sold, installed, or
> removed by a Debtor.

Plan § 1.01(79) (emphasis added).  Of claims classified in Class 7, only insurer defense cost

claims are ineligible for payment.

Although the Plan Proponents contend that North River's post-petition defense cost

claims constitute Class 7 Claims and should be channeled to the proposed Trust, North River's

claims for reimbursement of post-petition defense costs do not meet the definitional requirements

to be considered Indirect Trust Claims in Class 7.  To be an "Indirect Trust Claim," a claim must

seek recovery "on account of alleged liability of a Debtor for reimbursement, indemnification,

subrogation, or contribution of any portion of any *damages* such Entity has paid or may pay . . .

on account of . . . personal injury . . . caused or allegedly caused . . . by asbestos."  *See* Plan §

1.01(79) (emphasis added).  North River's reimbursement claims for recovery of Debtors' share

of post-petition defense expenses do not encompass any payments that would be owed to

asbestos personal injury claimants as "damages"; rather, the amounts sought to be reimbursed

will be paid by North River to defense counsel representing Debtors against the asbestos

claimants.  More strikingly, North River's defense costs claims arising from its claims against

other insurers do not seek recovery "on account of alleged liability of a Debtor."  Because the

Plan's definition of "Indirect Trust Claim" refers only to reimbursement of "damages" and

pertains to liability of the Debtors, North River's claims for reimbursement of defense costs do

not fall within Class 7.

Plan Proponents later contended that North River's Class 7 claims were not Indirect Trust

Claims, but Asbestos Personal Injury Claims.  An "Asbestos Personal Injury Claim" is defined in

the Plan as:

> . . . any Claim whenever and wherever arising or asserted *against a Debtor, or
> for which a Debtor is liable*, whether in the nature of or sounding in tort, contract,
> warranty, or any other theory of law, equity, or admiralty, *for or arising by reason
> of, directly or indirectly, physical, emotional, bodily, or other personal injury,
> death, or damages arising from personal injury or death* (including any claim or
> demand for compensatory damages; loss of consortium; proximate,
> consequential, general, special, or punitive damages; or reimbursement,
> indemnity, contribution, or subrogation), whether or not diagnosable or
> manifested before Confirmation or the close of the Chapter 11 Cases, caused or
> allegedly caused, in whole or in part, directly or indirectly, (a) by asbestos or
> asbestos-containing products manufactured, supplied, distributed, handled,
> fabricated, stored, sold, installed, or removed by a Debtor or (b) by services,
> actions, or operations provided, completed, or taken by a Debtor with respect to
> asbestos or asbestos-containing products; *provided, however*, that, for the
> avoidance of doubt, the term "Asbestos Personal Injury Claim" shall not include
> . . . a Prepetition Defense-Cost Contribution Claim.

Plan § 1.01(18) (emphasis added).  This definition in no way encompasses North River's

contribution claims against Settling Insurers.  Because defense cost claims are not claims arising

out of personal injury or death, but from contract, the definition also does not encompass North

River's defense costs claims against the Debtors.  Indeed, although the Plan is silent on post-

petition defense costs claims, the definition clarifies that it does not encompass pre-petition

defense cost claims.

Apart from the definitional issue, North River's claims for reimbursement of amounts it paid to defense counsel cannot be considered claims that are similar in character to asbestos claimants' personal injury claims against Debtors. North River's claims seek recovery of amounts North River paid that were in excess of such North River's proper ratable shares and are thus rightfully owed by Debtors (or Settling Insurers) to North River. North River's reimbursement claims, which arise from their contractual relationship with Debtors, are not substantially similar to Asbestos Personal Injury Claims, which are tort claims.

North River's claims against the Debtors have been addressed in the pending coverage litigation between Debtors and North River. Both the New York Supreme Court and the Appellate Division have held that Debtors must contribute to both defense costs and indemnity payments on a pro rata basis for injuries occurring during uninsured or self-insured periods and that North River is only liable to pay such expenses due to injury or loss occurring during its policy periods. *See* North River's Motion Pursuant to Bankruptcy Rule 3018 for Temporary Allowance of its Proofs of Claim, Dkt. 368. North River's reimbursement claims, consistent with applicable New York law, seek to enforce obligations between sophisticated commercial entities within a contractual relationship governed by the parties' insurance policies. These claims bear little resemblance to the tort claims of asbestos personal injury claimants and are resolved based on entirely different factors. North River's claims bear greater similarity to the ordinary commercial and contract claims classified as general unsecured claims in Class 5.

Judge Ferguson of this Court held in *Congoleum*, an asbestos bankruptcy case, that insurer claims like those at issue here should be classified along with general unsecured claims. There, an insurer-sponsored plan sought to classify insurer claims in a stand-alone class, separate from general unsecured claims. The insurer claims at issue were not fully defined but were

alleged to include, *inter alia*, claims resulting from the insurers' "overpayment of indemnity and defense costs." *Congoleum Corp.*, 362 B.R. at 203. The Court rejected the proposed stand-alone classification of the insurers' claims, stating: "The legal character of insurer claims *vis-à-vis* the debtor is that they would be unsecured claims. As such, absent compelling justification, insurer claims should not be separately classified from other unsecured claims." *Id.* The same is true here: North River's claims are substantially similar to, and therefore should be classified as, general unsecured claims in Class 5. They are not similar to the asbestos claimants' claims in Class 7 and therefore may not be classified along with them. *See, e.g.*, *Quigley*, 377 B.R. at 116 ("Dissimilar claims may not be classified together." (quoting *In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996))).

The Third Circuit's *W.R. Grace* decision does not permit North River's defense reimbursement claims to be classified in Class 7. There, the court held that because the indemnification and contribution claims asserted by Montana and the Crown were subject to the plan's § 524(g) channeling injunction, those claims could be classified along with asbestos tort claims. The claims asserted by Montana and the Crown in that case did not include claims for reimbursement of defense costs owed by the debtor or settling insurers, as do North River's claims here.[3] Because the Plan improperly classifies North River's reimbursement claims in Class 7 instead of Class 5, §§ 1129(a)(1) and 1122(a) preclude confirmation of the Plan.

This conclusion is buttressed by the fact that the proposed Trust and TDPs do not treat North River's claims the same way that they treat Asbestos Personal Injury Claims. As

---

[3] This distinction is significant because the costs of defending against Asbestos Personal Injury Claims – whether incurred by North River or the Reorganized Debtor – are not being paid, directly or indirectly, by the Trust. Thus, as explained below, the portion of North River's claims that seek reimbursement of post-petition defense costs cannot lawfully be enjoined under § 524(g)(1)(B). Therefore, *W.R. Grace* provides no authority for classifying defense cost claims along with Asbestos Personal Injury Claims.

discussed below, the Bankruptcy Code requires that claims in a class be treated in substantially

the same manner.  The Plan Proponents' artificial placement of North River's claims into Class 7

violate this principle.

> ### C.    Improper Discrimination Among Class 7 Claims

Even if North River's claims are properly classified in Class 7, the Plan cannot be

confirmed because it does not provide North River's claims with the same treatment provided to

other Class 7 claims.

The Third Circuit observed in both *W.R. Grace* and *Combustion Engineering* that

"[e]quality of distribution among creditors is a central policy of the Bankruptcy Code."  *W.R.*

*Grace*, 729 F.3d at 327 (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239 (3d Cir. 2004)

(quoting *Begier v. IRS*, 496 U.S. 53, 58 (1990))).  The Bankruptcy Code furthers the policy of

"equality of distribution among creditors" by requiring that a plan of reorganization provide

similar treatment to similarly situated claims.  Several sections of the Code are designed to

ensure equal treatment of similarly situated claims.  For example:

- Section 1123(a)(4) requires that a plan of reorganization "provide the same treatment for each claim or interest of a particular class;" and

- Section 524(g)(2)(B)(ii)(V) requires that present claims and future demands that are channeled to an asbestos trust be paid "in substantially the same manner."

As the Third Circuit explained in *W.R. Grace*, the "same treatment" requirement in § 1123(a)(4)

means "that all claimants in a class must have 'the same opportunity' for recovery."  *Id.*  "What

matters, then, is not that claimants recover the same amount but that they have equal opportunity

to recover on their claims."  *Id.*

Here, the Plan and accompanying TDPs specifically provide that North River's Class 7

claims "shall not be eligible for payment or compensation from the Asbestos Trust . . . ."

Certification of J. Prol in Support of Confirmation, Dkt. 512, Ex. D § 5.5.  The Plan also enjoins

North River from seeking to recover on its reimbursement claims in court.  Plan §§ 9.05–9.07.

The Future Claims Representative ("FCR"), Mr. Fitzpatrick, forthrightly testified that "the trust

does not . . . pay insurer claims."  March 6 Tr. at 124:25-125:1.  When asked whether insurers

would "get nothing" from the Trust, Mr. Fitzpatrick confirmed: "Not from the trust in terms of

monetary value."  *Id.* at 125.

    The only thing that North River might potentially receive under the proposed Plan is a

credit for any amount paid to a claimant by the Trust and/or a judgment reduction credit for any

Settling Insurer's share of a judgment.[4]  *See* Plan at §§ 4.14(a), 4.15.  Both of these allowances

apply only to indemnity liability and do not address North River's claims for post-petition

defense costs.  *See* March 6 Tr. at 137.[5]  North River's claims, however, consist primarily of

defense costs.  *See* Temporary Allowance Order; *see also* Ex. C – 1, Rpt. Of Marc C. Scarcella.

M.A. ( "Scarcella Rpt."), Dkt. 368-5.  With respect to North River's claims for future defense

costs, the Plan and accompanying TDPs make no provision for any setoff or reduction that would

compensate North River in any manner (direct payment, offset, or otherwise).  Instead, the Plan

Proponents admittedly hope to use the threat of uncompensated defense costs as "leverage"

against North River.  Mar. 6 Tr. at 111–112.

    In contrast, no other Class 7 creditor is treated in such a manner.  All Asbestos Personal

Injury Claims are also channeled to the Trust but are then eligible for payment in accordance

---

[4] It is axiomatic that a tort claimant is entitled to only one recovery.  To the extent that the Trust or a third party already has paid a portion, the law already provides that North River would be entitled to credit for payments made to the claimant.  *AAA Mid-Atl. Ins. Co. v. Ryan*, 84 A.3d 626, 634 (Pa. 2014) (recognizing a "long-standing prohibition" on "double recovery" for the same injury); *Robichaux v. Nationwide Mut. Fire Ins. Co.*, 81 So. 3d 1030, 1038 (Miss. 2011) (stating that "double recovery for the same harm is not permissible"); 12 *Couch on Insurance* § 175:6 (discussing when the issue of "double recovery" arises).
[5] "Q: How does this provision take into account North River's claims for defense costs against other settled insurers?  A: [Mr. Fitzpatrick] I don't believe that it does."

with the criteria of the TDPs.[6]  Plan § 3.03(g).  So too, indirect claimants are paid based on

satisfaction of the Trust's criteria.  *Id.*; TDPs § 5.5.  Only North River's claims are singled out

for differing treatment.  Not only are North River's defense costs claims ineligible for payment,

it makes no sense to apply medical and exposure criteria to a contractual or equitable claim for

the reimbursement of defense costs.  The claims simply do not have the same character—further

demonstrating the misclassification of North River's claims.

Plan Proponents contend that the requirement that all creditors in a class be treated in the

same manner is satisfied because both tort claimants' and North River's claims will be channeled

to the Trust.  *See* Plan Proponents' Mem. of Law in Support of Entry of An Order Confirming

the Second Am. Prenegotiated Plan of Reorganization and Response to Plan Objections ("Plan

Proponents' Mem."), Dkt. 482, at 68.  That argument fails as a matter of law because, as

admitted by Mr. Podgainy, the TDPs mandate disparate treatment.  March 6 Tr. at 74:2–5.

Plan Proponents also argue that the proposed treatment of North River's claims is

appropriate because North River arguably will be treated the same or better than holders of

Indirect Claims.  Plan Proponents' Mem. at 68–70.  But the day of confirmation, the Plan

Proponents modified their Plan to further specify that non-settling insurers like North River were

not holders of Indirect Claims and are not eligible for treatment as such.  *See* March 6 Tr. at 29–

---

[6]Although the TDPs unequivocally provide that insurers are ineligible for payment, they are quite flexible
when it comes to Asbestos Personal Injury Claims.  For example, the TDPs grant the Trustee broad
discretion to pay Asbestos Personal Injury Claims that do not meet the stated criteria.  Under the TDPs,
the Trustee has discretion to change or eliminate the Medical/ Exposure Criteria, to pay asbestos claims
that do not meet those criteria, or to pay asbestos claims lacking medical evidence.  TDPs § 5.3(a)(3)
("with the consent of the TAC and FCR, the Trustee may . . . change, or eliminate Disease Levels,
Scheduled Values or Medical/Exposure Criteria . . . or determine that a novel or exceptional asbestos
personal injury claim is compensable even though it does not meet the Medical/Exposure Criteria for any
of the then-current Disease Levels"); TDPs § 5.6(a)(4) ("The Trustee, with the consent of the TAC and
FCR, may exempt claimants from the obligation to submit medical evidence or certain types of medical
evidence").  Thus, even asbestos personal injury claimants with the weakest of claims will have an
opportunity to receive a distribution from the Trust, while Insurers are guaranteed to be paid nothing on
their valid claims.

30.[7]  Nor would Indirect Claimants hold defense cost claims.

The fact that some Asbestos Personal Injury Claims will not be paid under the Trust because they fail to satisfy the necessary medical or exposure criteria in the TDPs does not save the Plan from discriminatory treatment.  In the case of asbestos claimants, this requirement simply means that claimants who fail to prove that they have a valid underlying claim will not be paid by the Trust.  Those claimants still are "eligible" for payment and still may seek recovery from non-settling insurers outside of the Trust.  Moreover, they have the right under the TDPs to seek a judicial determination of their right to payment.  Plan § 4.13; TDPs §§ 5.10, 7.6–7.7.

In short, the treatment of asbestos claimants' claims is unlike the treatment given North River's claims, which are treated as *per se* invalid.  Regardless of whether the proposed treatment of insurer claims could be approved in a plan of reorganization, by classifying North River's claims in Class 7 with the asbestos tort claimants, the Plan Proponents were obligated to provide the same treatment to those claims as asbestos tort claims.  11 U.S.C. § 1123(a)(4).  If they desire to provide for differing treatment of insurer claims, as they have done, the Plan must separately classify those insurer claims.  Because the Plan improperly discriminates among creditors in Class 7, it cannot be confirmed.

## IV.   The Plan Fails to Pass the "Best Interests of Creditors" Test

### A.   Proposed Findings of Fact

The Plan does not satisfy the "best interests" test as to North River because the evidence demonstrates that North River would fare better under a Chapter 7 bankruptcy than it would under the Plan.  The Plan proposes to pay North River nothing on its claims, regardless of the

---

[7] "We've modified the definition of indirect trust claim to make it clear that claims of non-settling asbestos insurers are not indirect trust claims.  As we assert in our brief, the non-settling asbestos insurer claims are – fall within the category of asbestos personal injury claims."

amount of such claims, offset rights, or North River's entitlement to payment.  Disclosure

Statement at 17 ("Asbestos Insurers will not receive any payment or distribution from the

Asbestos Trust on account of such claims . . . ."); TDPs § 5.5.

The Debtors submitted a liquidation analysis prepared by Mark Podgainy.  *See* Ex. P-4

(Cert. of Mark Podgainy in Support of Confirmation of the Second Am. Prenegotiated Plan of

Reorganization for Duro Dyne National Corp., *et al.* Under Chapter 11 of the United States

Bankruptcy Code ("Podgainy Cert."), Dkt. 483.  Mr. Podgainy's analysis is the only evidence

submitted by the Plan Proponents to satisfy the best interest of creditors requirement.  Mr.

Podgainy, however, studiously avoided comments about the treatment of North River's Class 7

claims in a liquidation.  Rather than conduct that analysis, his certification stated that the

treatment of North River's claims in a Chapter 7 was "TBD."  *Id.* at 36; Mar. 6 Tr. at 67:1–12,

67:19–68:11, 82:1–24.  In his testimony, Mr. Podgainy admitted that he did not conduct a

liquidation analysis with respect to North River's claims.  Mar. 6 Tr. at 89:3–6.  Moreover, Mr.

Podgainy admitted that the conclusory allegations concerning satisfaction of the best interest test

were written by Debtors' counsel and that he did not know what the results would be:

> Q: In paragraph 70 you state that the plan – because the plan provides for
> significantly greater recoveries for creditors than would be available in Chapter 7,
> the plan satisfies Section 1129(a)(7).  Did you write that?
>
> A: No.
>
> Q: And, because you didn't factor in for example the insurance recoveries, you
> don't know whether that would actually be the case, do you?
>
> A: No.

Mar. 6 Tr. at 78.  When questioned by Debtors' counsel on redirect, Mr. Podgainy further

admitted that North River might receive a distribution in a Chapter 7 liquidation.  Mar. 6 Tr. at

146:5–16.  The Court therefore finds that North River would be entitled to a pro rata distribution

in a Chapter 7 liquidation and that it possibly would receive at least some payment based on the liquidated assets of the Debtors.

In addition, the Court finds that in a Chapter 7 liquidation, North River's rights to recover from non-debtor third parties would not be impaired.

B.      **Proposed Conclusions of Law**

Section 1129(a)(7) of the Bankruptcy Code provides, in relevant part, that the Court "shall confirm a plan only if" each creditor in an impaired class "(i) has accepted the plan; or (ii) will receive *or retain* under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive *or retain* if the debtor were liquidated under chapter 7 of this title on such date." (Emphasis added.)  Section 1129(a)(7) requires Plan Proponents to show that creditors of the estate will fare at least as well under the Plan as they would if this case were converted to a case under Chapter 7.  This requirement, known as the "best interest of creditors test," is a cornerstone of Chapter 11.  *See, e.g.*, *In re Tribune Co.*, 506 B.R. 613, 617 (Bankr. D. Del. 2013); *In re Johns-Manville Corp.*, 68 B.R. 618, 633 (Bankr. S.D.N.Y. 1986), *aff'd In re Johns-Manville Corp.*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); 7 *Collier on Bankruptcy* ¶ 1129.03[7] (15th ed. rev. 1997) (The "best interest" test stands as an "individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation.").

Section 1129(a)(7) is designed to protect individual dissenting members of an impaired class, establishing the minimum that they must receive or retain under the plan.  *See, e.g.*, *In re Quigley Co., Inc.*, 437 B.R. 102, 144 (Bankr. S.D.N.Y. 2010).  The "best interests" test applies even to contingent and disputed claims not allowed to vote on the plan, and gives creditors who

did not vote to accept the plan a "pocket veto" to prevent confirmation.  *In re Sierra-Cal*, 210

B.R. 168, 172, 176 (Bankr. E.D. Cal. 1997) ("[i]f a prompt chapter 7 liquidation would provide a

better return to particular creditors or interest holders than a chapter 11 reorganization.").  The

best interests test reflects one of the foundational precepts of Chapter 11: the debtor's various

constituencies are free to negotiate and formulate a plan of reorganization via the structures of

Chapter 11, but the final product of this process may not deprive any objecting creditor of the

amount it would receive upon liquidation of the debtor without the objecting creditor's consent.

7 *Collier on Bankruptcy* ¶ 1129.03[7][b], at 1129-45–1129-46 (15th ed. Rev. 2004).

The Plan Proponents have not satisfied the best interest of creditors test.  The evidence is

undisputed that the Plan Proponents conducted no analysis of what North River might receive in

a hypothetical liquidation.  As such, the Plan Proponents wholly failed to carry their burden on

satisfaction of § 1129(a)(7).  To the contrary, the Plan Proponents' witness conceded that: (i) he

did not consider the impact of insurance on creditor recoveries, (ii) North River would be eligible

for a pro rata payment in a hypothetical Chapter 7 proceeding, and (iii) that such payment likely

would be greater than the zero payment that is proposed under the Plan.  *See supra*.  Debtors'

counsel attempted to rehabilitate this testimony in argument, but has presented the Court with no

analysis or facts to support the hypothetical arguments made to attack their witnesses' testimony.

March 7, 2019 Confirmation Hrn'g Tr. (hereinafter "Mar. 7 Tr.") at 150:11–151:7.[8]  *See also id.*

at 138:10–139:19.  Because the Plan Proponents have failed to carry their burden on this regard,

and the evidence shows that the Plan fails the best interest test, the Plan cannot be confirmed.

---

[8] Without referencing any evidence in the record, Debtor's counsel argued that "Mr. [Podgainy] *flippantly indicated*, you know, that, oh gee, there might be something available for distribution to unsecured creditors. But we think it more likely that, you know, the resources would be utilized liquidating claims and there would be no dividend in a chapter 7.  And the bottom line here is that all creditors, Including the non-settling insurers fare better under the plan than they would in a chapter 7."  *Id.* (emphasis added).

Although the Court need not reach the issue because the Plan Proponents unquestionably have failed to carry their burden, the Court concludes that the Plan also fails the best interest test because it fails to provide for the retention of North River's pre-petition rights against other insurers.  The Plan Proponents disagree as to whether the best interest of creditors test requires consideration of a creditor's rights outside of bankruptcy against non-debtors.  *See* Plan Proponents' Mem., Dkt. 482, at 105.

Courts in other recent asbestos bankruptcy cases have held that the best interests test requires that a Plan take into account a creditor's rights against third parties.  *See, e.g.*, *In re Quigley Co.*, 437 B.R. 102, 146 (Bankr. S.D.N.Y. 2010).  In *Quigley*, the plan sought to establish a § 524(g) channeling injunction that would have enjoined asbestos claimants from pursuing claims against Pfizer, debtor's solvent non-debtor parent company.  The court explained that, because "[i]n a Chapter 7 liquidation proceeding, creditors retain their rights to pursue non-debtors for full payment," "giving at least liquidation value to each creditor [in a Chapter 11 case] requires protection of the Chapter 7 right to pursue non-debtor actions."  *Id.* at 145.  The court dismissed as a "lopsided view of creditor equality" any plan "which sanctions confiscation of these non-debtor rights," noting that only plans that respect "creditors' Chapter 7 right to seek full satisfaction from non-debtors" will satisfy the "best interests test."  *Id.* (emphasis added).  *See also Combustion Eng'g*, 391 F.3d at 234, 243 n.59.[9]  The *Quigley* court thus held that the

---

[9] Other courts similarly have held that plans do not satisfy the "best interests" test when they provide recoveries from non-debtors that are less than what would be available under a Chapter 7 plan.  *See Mercury Capital Corp. v. Milford Connecticut Assocs.*, 354 B.R. 1, 9 (D. Conn. 2006) (remanding confirmation order where plan released certain non-debtor guarantors and, therefore, appeared to extinguish pre-petition guarantees benefitting the creditor and holding that the objecting creditor "may be significantly less secured under the debtor's plan than under a Chapter 7 liquidation"); *In re Union Meeting Partners*, 165 B.R. 553, 576 (Bankr. E.D. Pa. 1994) (denying confirmation for failure to satisfy "best interests" test where plan proposed to cut off rights against debtor's non-bankrupt partners).

plan could not be confirmed because the dissenting claimants would not receive the full value of

their third-party claims against non-debtor Pfizer. *Quigley*, 437 B.R. at 143–46. Precisely the

same is true here: North River, who voted against the Plan, in addition to receiving nothing on its

claims against the Debtors, would be enjoined under the Plan from receiving the full value of its

third-party claims against non-debtors. The Court concludes that it is appropriate to take into

account North River's rights vis-à-vis third parties as it would retain those rights in a Chapter 7

proceeding.

In sum, (1) North River, member of an impaired class, has not accepted the Plan; (2) the

Plan proposes no distribution on account of North River's Class 7 Claims or its contribution

claims against any Settling Asbestos Insurer; and (3) in a Chapter 7 case, North River would be

entitled to (i) at least a pro rata distribution of the Debtors' assets and (ii) would retain, and

would not be enjoined from pursuing, its rights against third parties (*e.g.*, the Settling Insurers)

for contribution or reimbursement claims. Accordingly, the Plan fails the "best interests" test set

forth in § 1129(a)(7) and therefore cannot be confirmed.

**V.      The Plan Fails to Comply with Section 524(g)**

**A.      Proposed Findings of Fact**

Section 524(g) of the Bankruptcy Code requires that the Debtors prove satisfaction of

multiple elements, including that:

- Present claims and future demands that are to be channeled to an asbestos trust will be paid "in substantially the same manner," satisfying § 524(g)(2)(B)(ii)(V);

- Pursuit of demands outside the procedures is likely to threaten the Plan's purpose to equitably deal with claims and demands, satisfying § 524(g)(2)(B)(ii)(III);

- The Trust would be in a position to own 51% of the company's stock if specified contingencies occur, satisfying § 524(g)(2)(B)(i)(III);

- The trust is to be funded in whole or in part by the securities of 1 or more debtors

involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends, satisfying § 524(g)(2)(B)(i)(II);

- The proposed injunction satisfies the standards of § 524(g) including that it applies only to "any claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust," satisfying § 524(g)(1)(B); and

- The proposed injunction is fair and equitable, satisfying § 524(g)(4(B)(ii).

The Plan Proponents submitted limited evidence to support these requirements.

Plan Proponents failed to demonstrate that the Trust is funded by securities and by the obligation of the Debtors to make future payments including dividends. Mr. Podgainy testified that there is no evergreen funding of this Trust. Mar. 6 Tr. at 162:7–10. There are no dividends being contributed to this Trust and, instead, there exists a fixed buy-out by the Debtors of this liability. Plan at § 4.08.

Debtors failed to introduce evidence to meet the requirement of § 524(g)(2)(B)(ii)(III): pursuit of demands outside the procedures is likely to threaten the Plan's purpose to equitably deal with claims and demands.

The Plan Proponents offered testimony from Mr. Podgainy and Mr. Fitzpatrick. Mr. Podgainy admitted that he did not conduct any analysis of the projected value of future asbestos claims against the Debtors. Mar. 6 Tr. at 48:11–15, 76. Similarly, he did not conduct an analysis of the insurance available. *Id.* at 48:20.

Mr. Fitzpatrick, the FCR, also admitted that no estimate of future asbestos claims had been done. Mr. 6 Tr. at 121. He further testified that although he had "eyeballed" the potential future claims, he admitted that he did not have an opinion, "one way or the other" concerning the future value of asbestos claims against Duro Dyne. Mar. 6 Tr. at 143. Mr. Fitzpatrick also testified that, from his perspective, Duro Dyne has a minimal claims history and that the Duro Dyne case is a "relatively small asbestos case." Mar. 6 Tr. at 142. Finally, Mr. Fitzpatrick

testified that he had not considered whether Duro Dyne's insurers would be obligated to defend it in the tort system if it were liquidated. Mar. 6 Tr. at 146.

The Plan establishes a Trust that is to be funded by:

- A note from the Debtors in the amount of $13.5 million and payable over twenty years;

- A cash contribution from the Debtors of $7.5 million;

- An earn out payment from the Debtors of up to $2 million;

- A contribution from the Hinden Family Entities and Hinden Family Members of $3 million, and

- Assignment and contribution of the Debtors' insurance rights and insurance settlements.

Debtors contend that the insurers in this case have $57 million in available limits (not accounting for proposed settlements). Disclosure Statement at 15. Mr. Fitzpatrick testified that the proposed settlements with the Settling Insurers reflected a discount of more than $3 million from the limits of the Settling Insurers' policies. Mar. 6 Tr. at 163.

The Debtors' financial projections show that the Debtors will have earnings before interest, tax, depreciation and amortization ("EBITDA") in excess of $7 million (and approaching $9 million in some years) beginning in 2019. Podgainy Cert., Ex. D at 32. Those projections also show that the Debtors will have in excess of $5 million in net income each year beginning in 2021, with over $4 million in 2020. *Id.*, Ex. D at 33.[10] Mr. Podgainy's projections end in 2022, but he testified that he knew of no reason why the projections beyond 2022 would result in lower income to the Debtors. Mar. 6 Tr. at 64. He further testified that the projections were consistent with the Debtors' past performance. Mar. 6 Tr. at 58–59. Based on Mr.

---

[10] Mr. Podgainy's financial projections are adjusted for payments to be made under the proposed Plan and, as such, are not "raw" financial projections.

Podgainy's projections, over the term of the twenty-year trust note, the Debtors will have at least

$100 million in net income.

Although Plan Proponents chose not to analyze the asbestos liability, Marc Scarcella

prepared a report addressing the likely future claims against the Debtors.  Projected asbestos

liabilities are estimated to be a maximum of $34.7 million (undiscounted) over thirty years.

Scarcella Rpt. at 7.  The median and minimum scenarios are far less: $24.7 and $12.6 million,

respectively.  *Id*.  Defense costs are estimated to be a maximum of $51.3 million (undiscounted

for present value).  *Id.*

Historically, Duro Dyne's insurers have paid for defense costs up front and also paid a

share of indemnity expense for settled claims.  Disclosure Statement at 14–15; Scarcella Rpt.,

Ex. C-11 at 11–12.  Under each scenario, however, the Debtors have sufficient income to pay

their share of present and future claims in full.  *Cf.* Podgainy Cert.; Scarcella Rpt.  Moreover,

based on the Debtors' anticipated future revenues, the Debtors are projected to have net income

in excess of their projected asbestos exposure.  *Cf.* Podgainy Cert, Ex. 4; Ex. C-2 (Scarcella

Breakdown of Future Costs by Year).  Further, Debtors adduced no testimony on this to counter

North River's evidence that Debtors were solvent and could pay all present and future claims in

full.

Finally, Debtors failed to produce evidence that the Trust would be in a position to own

51% of the company's stock if specified contingencies occurred to satisfy the requirements of §

524(g)(2)(B)(i)(III).

### B.    Treatment of Present and Future Claims

For the same reasons that the Court concluded that the Plan discriminates against the

claims of North River, the Court concludes that the Plan fails to satisfy § 524(g)(2)(B)(ii)(V).

Section 524(g) requires that present claims and future demands will be paid "in substantially the same manner."  Here, although the Plan Proponents have channeled North River's claims to the Trust, they have not proposed to treat those claims in a way that is "substantially" the same as other channeled claims.  It is no solace that the Plan Proponents look upon insurers with disfavor.[11]

### C.      Plan Proponents Have Not Shown Risk of Inequitable Treatment

Before a court may issue a channeling injunction, § 524(g) requires that the Court find that "pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands . . .."  11 U.S.C. § 524(g)(2)(B)(ii)(III).  The Court cannot make that determination in the absence of evidence.  As established above, the Plan Proponents conducted no analysis of the future claims against the Debtors.  Nor did they consider the insurance available to the Debtors or the Debtors' projected net income in considering how asbestos creditors would be treated outside of the Plan.

In most asbestos bankruptcy cases, the liability faced by the Debtor is overwhelming and relatively obvious.  This case is different.  Mr. Fitzpatrick admitted that it was a relatively small case.  Mr. Podgainy conceded that the Debtor was profitable pre-petition and would remain so.  In these circumstances, it is incumbent upon the Plan Proponents – to say nothing of the

---

[11] Mr. Fitzpatrick's answers with respect to insurer claims demonstrate that the Plan Proponents gave no regard to North River's rights:

> Q: . . . And do you believe that to be accurate, that there's no circumstances under which the Trust will pay claims of non-settling insurers?
> A: Well, again, never say never, but I – normally I would not think the Trust would pay such claims.
> Q: Why not?
> A: Why should the Trust pay a non-settling insurer?
> Q: Well, they're claimants, are they not?
> A: They're insurers.

Mar 6. Tr. at 150.

responsibility of individuals appointed to represent the interest of future claimants – to fully

evaluate whether the provisions of § 524(g) are necessary to ensure equitable treatment of future

demands.  But rather than conduct such analysis, the Plan Proponents ask that the Court simply

assume that § 524(g) is necessary.  While § 524(g) is an appropriate remedy for debtors

burdened by asbestos liability, its application is not automatic upon invocation of the specter of

asbestos liability.

The analysis of Mr. Scarcella casts significant doubt on the need for § 524(g) relief.  Mr.

Scarcella provided the only analysis of future claims and the Court finds his report to be credible.

Based on his analysis, the Debtors (and its insurers) are in positions to pay *all* of the asbestos

claims against the Debtors in full.  There is no need for this bankruptcy to ensure equity in the

treatment of future claims.  To the contrary, all that the Plan accomplishes is to relieve the

Debtors of defense costs and mandate that the few future claimants that might hold valid claims

forego their opportunity to be paid in full in the tort system.[12]

### D.     The Plan Does Not Provide for the Trust to Own a Majority of Voting Shares

The Plan violates § 524(g)(2)(B)(i)(III) because no realistic possibility exists of the Trust

owning a majority of the voting shares.  A plan providing for a § 524(g) trust and channeling

injunction must provide for the trust to "own, or by the exercise of rights granted under such plan

would be entitled to own if specified contingencies occur, a majority of the voting shares" of

"each such debtor," "the parent corporation of each such debtor," or "a subsidiary of each such

debtor that is also a debtor."  11 U.S.C. § 524(g)(2)(B)(i)(III).  "This provision is to ensure that,

if there are not sufficient funds in the trust otherwise, the trust may obtain control of the debtor

---

[12] This is so because, as described by the FCR's counsel, the trust will be a claimant's trust that
will not defend claims and will impose a payment percentage.  As a result, more claims will be allowed at
a lower value than that which the holder of a valid might receive in the tort system.

company."  4 *Collier on Bankruptcy* ¶ 524.07 (16th ed. 2013).

Here, the Plan Proponents argue that the Trust Note and stock pledge satisfy the voting

control requirement of § 524(g).  The Plan's compliance with the control requirement therefore

is completely dependent on the occurrence of a "specified contingency."  To satisfy the

"specified contingency" the Plan requires that the Debtors provide the Trust with the "Trust

Note."  *See* Plan § 1.01(123).  Based on the Trust Note documents, the Plan Proponents contend

that the Trust could own 50.1% of the Reorganized Debtors' voting shares in the event of a

payment default on the Trust Note.  *See* Mar. 6 Tr. at 155:23–156:11.

Courts have found note-default provisions similar to the one at issue here insufficient to

satisfy § 524(g)(2)(B)(i)(III).  *See Congoleum Corp.*, 362 B.R. at 179 (plan providing that trust

would not be granted immediate majority ownership but would instead receive promissory note

from debtors that, upon the debtors' continuing default, could be converted to 51% of the

debtors' shares did not satisfy § 524(g)(2)(B)(i)(III) because there was no plausible scenario in

which a trust would be able to convert shares when they were still valuable, so trust would obtain

control of the debtors only when control was not meaningful); *see also In re Plant Insulation*

*Co.*, 734 F.3d 900, 916 (9th Cir. 2013).  The *Congoleum* court explained that if the reorganized

debtor were to "default on such insignificant payments, it is essentially insolvent, making the

value of the shares negligible . . . . That cannot be the kind of contingency Congress envisioned

when it drafted § 524(g)(2)(B)(i)(III)."  *Congoleum Corp.*, 362 B.R. at 179.  The Ninth Circuit in

*Plant* similarly explained:

> The history of § 524(g) also suggests that this subsection is not to be lightly
> discarded.  In the model Johns-Manville bankruptcy, the trust came out of the
> bankruptcy with 80% of Johns-Manville's common stock.  *In re Johns-Manville*
> *Corp.*, 68 B.R. 618, 621 (Bankr. S.D.N.Y. 1986).  Indeed, taking less than 100% of
> the common stock was viewed as a "significant concession" by the Asbestos Health
> Committee at the time.  *In re Johns-Manville Corp.*, 66 B.R. 517, 529–30 (Bankr.

S.D.N.Y. 1986).  It strains credulity to believe that, against this backdrop, Congress
would have drafted such a toothless provision.

734 F.3d at 916.  The reasoning of those courts applies with equal force here.

Simply put, a security interest such as a pledge does not grant the Trust the right to own
any of the Debtors' equity.  It grants the Trust only a right to foreclose on collateral.  This fact is
black-letter law under the Uniform Commercial Code ("UCC"): a foreclosing creditor is entitled
only to satisfaction of its debt and is liable to the debtor for any surplus.  *See* UCC § 9-608(a)
("If a security interest . . . secures payment or performance of an obligation, the following rules
apply: . . . (4) A secured party shall account to and pay a debtor for any surplus, and the obligor
is liable for any deficiency . . . .").  The UCC also makes clear that an oversecured creditor can
keep all of the collateral only if the debtor consents after the default occurs.  A debtor's consent
given prior to a default is invalid.  *See* UCC § 9-620(c)(2) ("a debtor consents to an acceptance
of collateral in full satisfaction of the obligation it secures only if the debtor agrees to the terms
of the acceptance in a record authenticated after default").  These provisions of the UCC are non-
waivable.  *See* UCC § 9-602; *Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc.*, 602 F.2d
538, 542 (3d Cir. 1979) (secured creditor "was obligated to account for and pay over the surplus
proceeds to [the debtor] . . . as a debtor's right to surplus . . . cannot be waived even by an
express agreement").

Just as in *Congoleum* and *Plant*, in the unlikely event that a payment default on the Trust
Note does occur – meaning that the Reorganized Debtors cannot pay it – the shares the Trust
would be entitled to receive will be worthless.[13]  The Trust Note is a debt obligation of the
Reorganized Debtors senior to their equity.  If the Reorganized Debtors cannot pay the Trust

---

[13] As noted above, the Trust would only be entitled to receive the shares if they successfully credit bid for
the shares and the value of the default was equal or greater than the value of a majority of the shares.

Note – and thus do not have the financial wherewithal to pay their debt obligations – they will be insolvent.  The Reorganized Debtors' equity would therefore be inconsequential.  The possibility of the Trust ever acquiring a majority of the voting shares of the Reorganized Debtors is illusory; the Plan therefore does not satisfy § 524(g)(2)(B)(i)(III) and cannot be confirmed.

The default provisions of the Trust Note result in only an illusory possibility that the Trust can own a majority of the Debtors' voting shares.  This does not satisfy the statutory standard.

### E.    The Plan Does Not Provide for Evergreen Funding

Section 524(g)(2)(B)(i)(II) provides that the asbestos personal injury trust must be "funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends."  11 U.S.C. § 524(g)(2)(B)(i)(II).  The implication of this requirement is that the funding of a trust must be a going concern for the reorganized debtor, such that it is able to make future payments into the trust to provide an "evergreen" funding source for future asbestos claimants.[14] *Combustion Eng'g*, 391 F.3d at 248.

Mr. Fitzpatrick conceded that the Plan does not propose an evergreen funding source for the Trust:

> Q:  Do you understand – do you have an opinion as to whether or not the contributions to this Trust constitute an evergreen source of funding?
>
> A: I don't believe that they do, no.

---

[14] *See* 140 Cong. Rec. S4521-01, S4523 (Apr. 20, 1994) (statement of Senator Heflin) ("[W]hen an asbestos-producing company goes into bankruptcy and is faced with present and future asbestos-related claims, the bankruptcy court can set up a trust to pay the victims.  The underlying company funds the trust with securities and the company remains viable.  Thus, the company continues to generate assets to pay claims today and into the future.  In essence, the reorganized company becomes the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims.")

Mar. 6 Tr. at 162.  The only provision that gives the Trust an interest in the performance of the company is the proposed earn-out payment.  But that obligation will be satisfied in two years. Mar. 6 Tr. at 57–58.  Debtors have failed to show that the Trust satisfies the evergreen funding requirement because they failed to demonstrate that the Trust is funded by securities of any sort (and certainly not future dividends as envisioned by the statute).

Because the Trust is not funded by future payments including dividends, the Plan violates §524(g)(2)(B)(i)(II) and cannot be confirmed as structured.

### F.      The Proposed Injunction is Overbroad

Section 524(g) provides that an "injunction may be issued under subparagraph (A) to enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery *with respect to any claim or demand that*, under a plan of reorganization, *is to be paid in whole or in part by a trust* described in paragraph (2)(B)(i), except such legal actions as are expressly allowed by the injunction, the confirmation order, or the plan of reorganization."  11 U.S.C. § 524(g)(1)(B) (emphasis added).  The statute clearly specifies that the injunction reaches only claims that are to be paid in whole or in part by a trust.  With respect to North River's post-petition defense cost claims, however, the proposed Plan and TDPs specify clearly that such claims are not eligible for payment whatsoever.  As a matter of basic statutory interpretation, the Plan Proponents cannot propose to channel a claimant to a trust, strip the claimant of any entitlement to recovery whatsoever, and then enjoin the claimant from pursuing its legal rights.

The Plan Proponents respond that this Section means only that the Trust must pay the claims "of the kind" channeled to the Trust.  Plan Proponents' Mem. at 71.  The Plan Proponents are attempting to have their cake and eat it too.  Although North River's claims may be loosely

related to underlying asbestos claims in that the defense costs are incurred in connection with

defending claims, the nature of the liability is different.  This conclusion is evident from the fact

that the Plan and TDPs contain express provisions preventing the payment of North River's

defense cost claims.[15]  Since such claims are *never* paid and are not even eligible for payment,

they cannot be "of the kind" of claims paid by the Trust.  As such, the statute prevents the

channeling of North River's claims to the Trust and the injunction of its rights as to the Debtors

and third parties.

### G.    The Proposed Injunction Is Not Fair and Equitable

Section 524(g)(4)(B)(ii) requires that any injunction under that section be "fair and

equitable."  The Third Circuit discussed the requirements of § 524(g)(4)(B)(ii) in *W.R. Grace*.

*See W.R. Grace*, 729 F.3d at 330–32.  Critically, the Third Circuit observed that the injunction in

that case was not fair and equitable when the value of the proposed injunction greatly exceeded

the benefit to the party contributing to the Trust.  Here, the Hindens and the Debtors are

contributing a total of $26 million to the Trust over a twenty-year period.  Plan at § 4.08.  Over

that same period, the Debtors are projected to have income in excess of $100 million.  *See supra*

at 20.  This disparity far exceeds that found by the Third Circuit to violate the requirements of

equity.

As made clear by Mr. Scarcella's report, the Debtors are potentially responsible for a

---

[15] To be sure, § 524(g) allows an injunction preventing claimants from seeking recovery from insurers of
a debtor.  11 U.S.C. § 524(g)(4)(A)(ii)(II).  But in doing so, it requires that claims against such insurers be
channeled to the Trust and be eligible for payment.  For example, the plan in *Motor Vehicle Cas. Co. v.
Thorpe Insulation Co.*, 671 F.3d 980 (9th Cir. 2012), and the confirmation order in *In re ASARCO LLC*,
420 B.R. 314, 376–78 (S.D. Tex. 2009), were explicit that although insurers' contribution claims were
enjoined, such claims were channeled to the Trust where the insurers had the right to be paid by the Trust
in 100-cent dollars.  Such treatment was a recognition of the requirements imposed by §§ 524(g) and
1129(a)(7): the Plan could not enjoin the non-settling insurers' contribution claims without providing
compensation, and channeling those claims to the § 524(g) trust for payment in less than 100-cent dollars
provided the insurers with worse treatment than they would be entitled to in a Chapter 7 case.

large percentage of defense and indemnity costs moving forward.  Scarcella Rpt. at 32, fig. 36.

Equally clear, however, is that the Debtors are projected to have the ability to pay 100% of their

share of such costs.  *Compare* Ex. C-2; Podgainy Cert. at Ex. B.  What the proposed Plan

accomplishes is to eliminate the Debtors' share of future defense costs and to provide favorable

treatment to asbestos claimants.[16]  To accomplish this, Debtors seek to shift liability on to North

River and then to eliminate its rights to recover from other responsible parties.  A side impact of

this tactic is that the Trust will impose a payment percentage on present and future claimants that

otherwise are likely to be paid in full in the tort system.  *See* Mar. 6 Tr. at 97, 121.

The Hindens are contributing only $3 million to the Trust and are retaining their equity

interests.  Disclosure Statement at 77; Podgainy Cert., Ex. B.  As shown by Mr. Podgainy's

certification, the Debtors' projected future income is significantly greater than the $3 million

being contributed by the various Hinden parties.  Podgainy Cert., Ex. D.  As such, the value of

the proposed Plan to the Hindens is enormous in comparison to their contribution.  Indeed,

although the dollar contribution of the Settling Insurers to the Trust was maintained by the Court

under seal, Mr. Fitzpatrick admitted that those settlements discounted the insurers' limits by

more than $3 million amount being contributed to the Trust by the Hindens.  Mar. 6 Tr. at 163.

In order to receive that $3 million, the Plan has foregone any opportunity to reap the benefit of

future income from the Debtors.  At the same time, Plan Proponents have extracted settlements

from certain insurers that discounts the available insurance by more than the amount secured

from the Hindens.[17]  There is no rational reason that securing the Hinden contribution has any

---

[16] Counsel for the FCR claimed in argument that they would not agree to a Trust that defended claims.
Mar. 7 Tr. at 99 ("[T]he trust isn't in the business of defending claims.  Rather it's a claimant trust funded
by claimant indemnity dollars.")
[17] Because North River does not know the amounts of the settlements, it cannot comment on the overall
fairness of the proposed amounts.  Based on Mr. Scarcella's analysis, North River believes that the

importance in this context.  There is no discernable benefit to future demand holders.

As to whether the injunction is fair to all parties, there is no question that it is not fair and equitable to North River.  The FCR admitted that the Plan was designed to "put leverage" on insurers.  Mar. 6 Tr. at 135.  It does so by shifting defense costs onto non-settling insurers and then stripping those insurers of all right to recovery from the Debtor or other third parties.  Because over 90% of claims against Duro Dyne have been resolved without any payment, those defense costs are normally a multiple of indemnity expense.  *See generally* Scarcella Rpt.  As it stands, North River is the only creditor whose Class 7 claim has no opportunity for payment.  The proposed injunction is not fair and equitable as required by § 524(g).

## VI.    The Plan Violates the Absolute Priority Rule

### A.    Proposed Findings of Fact

Class 6 claimants, including North River, are impaired under the Plan because they will not receive payment in full.  Plan § 3.03(f) ("Class 6 Prepetition Defense-Cost Contribution Claims are Impaired.").  Class 6 claimants voted to reject the Plan.   Class 6 claimants, including North River, are impaired under the Plan because they will not receive payment in full.  Plan § 3.03(g) ("Class 7 Channeled Asbestos Claims are Impaired.").

Class 7 voted to accept the Plan.  North River challenged the voting rights of Asbestos Personal Injury Claimants because those claims were allowed to vote at 100% of the value allowed for their self-selected claims under the TDPs (which in turn proposed values in excess of the average tort system recoveries for such claimants).  As Mr. Scarcella testified, 90% of asbestos claims against the Debtors were resolved without payment.  Scarcella Rpt. at 9.  If the Court had reduced the value of asbestos tort claimants' claims for voting purposes, Class 7

---

indemnity exposure of the Settling Insurers is modest.  In proposing to cut off the Settling Insurers' defense cost contribution obligations, however, the proposed settlements are unfair.

would have rejected the Plan.

After the temporary allowance of North River's claims, the Plan Proponents sought court approval of various insurer settlements.  Motion to Approve Compromise under Rule 9019 with Hartford Accident and Indemnity Co., Dkt. 468; Motion to Approve Compromise under Rule 9019 with Federal Insurance Co., Dkt. 500.  Pursuant to the terms of those settlements, North River's claims against those Settling Insurers would be channeled to the Trust or otherwise barred.  *Id.*  As such, North River could be responsible for a greater percentage of defense costs and its claims in Class 7 would need to be increased accordingly.  If the Settlements were approved, North River's claims would increase by an amount sufficient to have caused Class 7 to reject the Plan.

The Plan provides that the equity holders in Duro Dyne National Corp. will retain their interests "to the same extent" as their interests on the petition date.  *See* Plan §§ 3.03(k) and 3.03(l).

### B.    Proposed Conclusions of Law

Codified at § 1129(b)(2) of the Bankruptcy Code, the absolute priority rule requires that creditors be paid in full before holders of equity receive any distribution.  The Code provides, in pertinent part:

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
> ***
> (B) With respect to a class of unsecured claims—
> ***
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

*See* 11 U.S.C. § 1129(b)(2).  In other words, a plan is not fair and equitable if a junior class receives a distribution over the objection of an impaired rejecting senior class.  *See In re*

*Armstrong World Indus.*, 432 F.3d 507, 513 (3d Cir. 2005); *In re PWS Holding Corp.*, 228 F.3d 224, 237 (3d Cir. 2000).  The Plan violates § 1129(b)(2) and cannot be confirmed.

Here, Debtors admit that Class 6 is impaired and voted to reject the Plan.   The Plan Proponents contend, however, that Class 6 is being paid in full based on the promise to pay Class 6 in full over time plus interest at the federal judgment rate.[18]  The judgment rate does not fully compensate North River for the value of the forced loan reflected in the Plan.  Mr. Scarcella provided testimony concerning the discount rate utilized in the insurance industry to reflect the time-value/opportunity cost value of funds in that industry:

> Therefore, a more appropriate Discount Rate to mimic the expected growth rates for a riskbearing entity, such as a building material manufacturing company or insurance company, is typically measured by the company's weighted-average cost of capital ("WACC").
>
> WACC reflects the minimum rate of return acceptable to investors for use of the company's funds that could otherwise be used to retire debt, thus avoiding future interest expenditure, or invest in activity generating equity returns for shareholders.

Scarcella Rpt. at 41.  Mr. Scarcella concluded that the "WACC based Discount Rate over the duration of the asbestos loss projections should be applied at 8.2% (5.7% Real-WACC)" for the insurance industry.  *Id.* at 48.  As the judgment rate proposed by the Debtors does not fully compensate North River, the absolute priority rule prevents the equity holders from retaining their interest.

---

[18] North River contends that Class 7 also should have rejected the Plan or that North River's claims should have been classified separately or in Class 5.  In either case, that class would have rejected the Plan and the Absolute Priority Rule would prevent confirmation of the Plan.

VII.    **The Plan Fails to Satisfy § 1129(a), and the Proposed Settlements Cannot Be Approved, Because the Plan Proponents Have Not Provided Adequate Protection for North River's Interests**

A.    **Proposed Findings of Fact**

The Plan violates 11 U.S.C. § 363 by failing to protect the interests of North River in settlements that are proposed in conjunction with the Plan.  The Debtors have failed to establish an evidentiary basis for their plan or approval of the proposed insurer settlements.  That failure of proof dooms the Plan as a factual matter.

At the confirmation hearing, the Debtors adduced no evidence that the proposed sales of their insurance policies (pursuant to the proposed buybacks) is fair and equitable.  Further, the FCR testified that Plan Proponents did not even consider it.  Mar. 6 Tr. at 140:4–16.

In argument, counsel for the Official Committee of Asbestos Claimants claimed that North River had no protectible interest.  Mar. 6 Tr. at 122:20–123:14.[19]

The proposed settlements seek to eliminate the reimbursement, contribution, subrogation and/or indemnification rights of non-settling insurers against the Settling Insurers.  *See generally*, proposed orders approving settlements; Plan at §§ 9.05-9.07.

The cost of defending claims against Duro Dyne has significantly exceeded the actual

---

[19] The Court: So in this case there's a sale of a policy as part of the settlement for X dollars. Is it the plan proponent's position that North River has an interest in that policy?
Mr. Liesemer: No, North River has a claim as arising from those policies, like the equitable contribution claims against –
The Court: A claim against –
Mr. Liesemer: Against the settling insurers.
The Court: – its own insurers.
Mr. Liesemer: But that claim arises from equity, it doesn't arise from the policy.
The Court: But it's not an interest in – that's what I'm trying to –
Mr. Liesemer: No.
The Court: – to glean, it's not –
Mr. Leisemer: No.
The Court: – an interest in the policy, in the subject -- in the asset of a bankruptcy estate that's being sold for – as part of the compromise.

payments to asbestos claims – over 90% of which have been dismissed without payment.  *See* Scarcella Rpt. at 9.

The New York State Court has previously held that pro rata allocation applies to the Duro Dyne's asbestos claims and that Duro Dyne is obligated to contribute to defense costs for claims/occurrences during uninsured periods.  This is the reason that Duro Dyne stated in its Disclosure Statement that it "has been forced to bear an increasing share of settlements and defense costs…"  Disclosure Statement at 13.  There currently is a dispute as to the percentages of that liability for which each insurer and the Debtors will be responsible.  *Id.* at 15-16. Based on the application of the New York Court of Appeal's decision in *Keyspan Gas East Corp. v Munich Reins. Am., Inc.*, 96 N.E.3d 209 (N.Y. 2018), Mr. Scarcella calculated that the Settling Insurers would be responsible for approximately $7.53 million in future defense costs.  Scarcella Rpt. at 32, fig. 36 (median scenario).

The proposed settlements with the Settling Insurers would have the effect of granting the Settling Insurers discharges for millions of dollars in defense costs that they otherwise would potentially be obligated to contribute.

In the tort system, North River's right to collect from the Settling Insurers would be determined under applicable state law and the solvency of each respective Settling Insurer.  No one has disputed that North River likely would be paid in full for any such rights.

Here, the original proposed Settlement Orders provided that:

> Any and all Interests that the Court determines are entitled to protection under Section 363(e) of the Bankruptcy Code shall attach to the proceeds of sale with the same validity, priority, force, and effect as such Interests had in the Policies and the Released Overseas Policy Interests prior to entry of this Order . . . .

Proposed Orders, Dkts. 470-3 and 502-3, at 10–11.  The Proposed Orders continue to state that such attachment is "*subject to the terms and conditions of any Plan confirmed for the Debtors, to*

*the extent such terms and conditions are valid, binding and enforceable*." *Id.* (emphasis added).

On or about April 8, 2019, the Plan Proponents submitted Amended and Restated

Agreements and proposed orders that eliminated these provisions.  Dkts. 607–609.

This additional language renders the provision illusory because the Plan and TDPs

provide – to the extent they address defense cost claims at all – that claims of non-settling

insurers are not entitled to any payment.

### B.    Proposed Conclusions of Law

In order to be confirmed, every bankruptcy plan, whether consensual or nonconsensual,

must comply with all the requirements enumerated in §§ 1129(a) and 1129(d) (except in some

cases § 1129(a)(8) that each class of claims or interests either have accepted the plan or not be

impaired under the plan).  Here, because the Plan violates § 363 by not providing adequate

protection for North River's interests in settlements that are proposed in conjunction with the

plan, the Plan fails the following § 1129(a) requirements:

- Section 1129(a)(1), which requires that the plan be in compliance with the Bankruptcy Code; and

- Section 1129(a)(2), which requires that the plan proponent be in compliance with the Bankruptcy Code.

The Plan cannot be confirmed because it does not protect North River's claims against third-

party insurers and the proposed settlements violate § 363.

A bankruptcy court has the authority to "approve a compromise or settlement" of a claim

"after notice and a hearing" on the compromise.  Fed. R. Bankr. P. 9019(a).  Similarly, pursuant

to § 363(b), a debtor may use estate property outside the ordinary course of business, upon notice

and a hearing, to settle claims with the approval of the bankruptcy court.  *Northview Motors, Inc.*

*v. Chrysler Motors Corp.*, 186 F.3d 346, 350 (3d Cir. 1999).  The bankruptcy court must then

decide whether the settlement is "fair and equitable," *In re Nutraquest Inc*., 434 F.3d 639, 644

(3d Cir. 2006) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.*

*Anderson*, 390 U.S. 414, 424 (1968)), and "assess and balance the value of the claim that is being

compromised against the value to the estate of . . . accept[ing] . . . the compromise" by

considering: "(1) the probability of success in ligation; (2) the likely difficulties in collection; (3)

the complexity of the litigation involved, and the expense, inconvenience and delay necessarily

attending it; and (4) the paramount interest of the creditors." *In re Martin*, 91 F.3d 389, 393 (3d

Cir. 1996). A settlement's fidelity to the requirements of the Bankruptcy Code will generally be

the most important factor in determining whether a settlement is fair and equitable. *In re Jevic*

*Holding Corp*., 787 F.3d 173, 184 (3d Cir. 2015), *rev'd on other grounds*, *Czyzewski v. Jevic*

*Holding Corp.*, 137 S. Ct. 973 (2017). As the Supreme Court has stated, bankruptcy courts can

not approve settlements that violate the tenets of the Bankruptcy Code. *See Czyzewski*, 137 S.

Ct. at 983–84.

In a bankruptcy proceeding, the fairness and equity of an agreement necessarily has a

broader meaning. The Fifth Circuit has articulated the scope of the intended analysis as follows:

> While it is true that the bankruptcy court has jurisdiction to determine whether a
> settlement between the debtor and other parties is fair and equitable, "looking
> only to the fairness of the settlement as between the debtor and the settling claimant [and
> ignoring third-party rights] contravenes a basic notion of fairness." *In re AWECO,*
> *Inc.*, 725 F.2d at 298; *see also F.D.I.C. v. Jones (In re Jones)*, 966 F.2d 169, 173
> (5th Cir.1992) (discussing § 105(a) and court's duty to avoid unfairness and
> injustice); *Cullen v. Riley (In re Masters Mates & Pilots Pension Plan)*, 957 F.2d
> 1020, 1026, 1031 (2d Cir. 1992) (holding that "where the rights of one who is not
> a party to a settlement are at stake, the fairness of the settlement to the settling
> parties is not enough to earn the judicial stamp of approval," and requiring
> determination that "no one has been set apart for unfair treatment").

*Feld v. Zale Corp. (Matter of Zale Corp.*), 62 F.3d 746, 754 (5th Cir. 1995). That is precisely

what is happening here – non-settling insurers have "been set apart for unfair treatment."

The proposed sale violates § 363 because the Debtors have not provided adequate
protection for North River's interests.  Under New York law, the Settling Insurers have no ability
to extinguish reimbursement obligations or duties (outside of a global settlement).  *See, e.g.*,
*Maryland Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 2010 (2d Cir. 2000) (rejecting as
"untenable" under New York law the "notion that any settlement by which an insurer obtains a
release from its insured, regardless of its terms, insulates that insurer from all contribution
claims."); *DaimlerChrysler Ins. Co. v. Universal Underwriters Ins. Co*., 2010 N.Y. Misc. Lexis
1686 (N.Y. Sup. Ct. N.Y. Cnty. Mar. 31, 2010) ("The contract of settlement an insurer enters
into with the insured cannot affect the rights of another insurer who is not a party to it.  Instead,
whatever obligations or rights to contribution may exist between two or more insurers of the
same event flow from equitable principles."); *Scotts Co., LLC v. Ace Indem. Ins. Co*., 18 Misc.
3d 1139(A) (N.Y. Sup. Ct. N.Y. Cnty. Feb. 26, 2008) (permitting contribution suit against settled
co-insurer).  The Plan Proponents and Settling Insurers' proposed settlement offers the non-
settling insurers no protection for these state law rights.  That result would be a complete
nullification of the parties' state law rights and turns the Bankruptcy Code on its head by
allowing the Settling Insurers' to buy releases from liability to third parties by making a payment
to the Debtor or asbestos Trust.

As the Second Circuit observed in *MacArthur Co. v. Johns-Manville*, cited with approval
by the Third Circuit in *Combustion Engineering*, the bankruptcy court has the authority to
approve settlements "and to channel claims arising under the policies to the proceeds of the
settlement."  837 F.2d at 92–93 (2d Cir. 1988) (citing *In Van Huffel v. Harkelrode*, 284 U.S. 225
(1931)).  The Second Circuit found this power under § 363(f) of the Bankruptcy Code, which
permits, under certain circumstances, sales of property in the debtor's estate "free and clear of

any interest in such property of an entity other than the estate." To do so, however, the interest

being stripped must follow and apply with equal force and priority to the proceeds of the

settlement:

> It has long been recognized that when a debtor's assets are disposed of free and
> clear of third-party interests, the third party is adequately protected if his interest is
> assertable against the proceeds of the disposition. *See Ray v. Norseworthy, supra*,
> 90 U.S. at 134–35; S. Rep. No. 989, 95th Cong., 2d Sess. 56 (1978), reprinted in
> 1978 U.S. Code Cong. & Admin. News 5787, 5842 (committee report on 11 U.S.C.
> § 363(f)) ("Most often, adequate protection in connection with a sale free and clear
> of other interests will be to have those interests attach to the proceeds of the sale.").

*MacArthur Co. v. Johns–Manville*, 837 F.2d at 93.[20]

Recognizing the common law requirements highlighted by the Second Circuit, Congress

codified the protection of third-party interests in § 363(e). It provides, in relevant part:

> Notwithstanding any other provision of this section, at any time, on request of an
> entity that has an interest in property used, sold, or leased, or proposed to be used,
> sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or
> condition such use, sale, or lease as is necessary to provide adequate protection of
> such interest.

The Third Circuit has also recognized this controlling principle applicable to claim stripping §

363 sales. *See Folger Adam Security, Inc. v. Dematteis/Macgregor, JV*, 209 F.3d 252, 257 (3d

Cir. 2000) ("[T]he holdings of the courts suggest that any interest in property that can be reduced

to a money satisfaction constitutes a claim for purposes of section 363(f) and, therefore, attaches

to the proceeds of the sale.") (internal citations omitted). Section 524(g) operates in the same

manner as § 363. *In re W.R. Grace & Co.*, 900 F.3d 126, 130 (3d Cir. 2018) ("claims against

certain third parties who are alleged to be directly or indirectly liable for the debtor's conduct . . .

are directed to the trust . . . which assumes the asbestos liabilities."). The Plan Proponents

---

[20] *See also Ray v. Norseworthy*, 90 U.S. 128, 134–35 (1874) (court may sell property encumbered by
third-party claims as long as third parties retain their respective priorities in the proceeds of the sale); *In
re Penn Central Transportation Co.*, 383 F. Supp. 1128, 1130 (E.D. Pa. 1974) (power of a reorganization
court to transfer interests in debtor's property to the proceeds of a sale is well established)).

originally paid lip service to this requirement in the proposed orders, which facially provided that

North River's interests would attach to the proceeds of the sales.  After North River objected that

these provisions were illusory because the claims were actually channeled to the Trust where

they would be ineligible for payment, the Plan Proponents dropped the charade.  Instead, they

now ask the Court to strip North River's claims against the Settling Insurers and provide them no

compensation.  Section 363(f) does not permit the Court to do so.

The Settling Parties are improperly seeking to discharge Settling Insurers' liability to the

non-settling insurers.  The Bankruptcy Code does not allow the Settling Parties' contemplated

non-debtor discharge.  Although § 524(g) allows the channeling of claims related to a person's

provision of insurance to the debtor, the Settling Parties purportedly are not seeking a § 524(g)

injunction.  Instead, they are attempting to use §§ 363 and 105 to accomplish an otherwise-

impermissible objective.  The Debtors cannot accomplish under § 105 that which the Bankruptcy

Code requires to be done under § 524(g).  Section 105 of the Bankruptcy Code does not provide

an independent source of federal subject matter jurisdiction. *Combustion Eng'g*, 391 F.3d at

224–225.  *See also In re Johns-Manville Corp.*, 801 F.2d 60, 63 (2d Cir. 1986) ("Section 105(a)

does not, however, broaden the bankruptcy court's jurisdiction, which must be established

separately").  "Related to" jurisdiction must therefore exist independently of any plan provision

purporting to involve or enjoin claims against non-debtors.  *In re Zale Corp.*, 62 F.3d 746, 756

(5th Cir. 1995).  Although the Plan proponents likely will contend that the requested injunction

under § 105(a) will create a "bigger pot" of assets for asbestos claimants, the exercise of

bankruptcy power must be grounded in statutory bankruptcy jurisdiction.  *Id.*

The bankruptcy court may not enjoin claims brought against a third-party non-debtor

solely on the basis of that third-party's financial contribution to a debtor's estate.  *In re Johns-*

*Manville Corp.*, 517 F.3d 52 (2d Cir. 2008), *rev'd on other grounds*, *Travelers Indemn. Co. v.*

*Bailey*, 557 U.S. 137 (2009). If that were possible:

> a debtor could create subject matter jurisdiction over any non-debtor third-party by
> structuring a plan in such a way that it depended upon third-party contributions. As
> we have made clear, subject matter jurisdiction cannot be conferred by consent of
> the parties. Where a court lacks subject matter jurisdiction over a dispute, the
> parties cannot create it by agreement even in a plan of reorganization.

*Combustion Eng'g*, 391 F.3d at 228 (citation and quotation marks omitted).

In *Combustion Engineering*, the Third Circuit discussed the limits of third-party

channeling inunctions, noting that such injunctions are limited to those "where a third party . . .

'is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the

debtor.'" *Id.* at 234. The application of a § 524 channeling injunction to enjoin actions against

third parties is limited to "situations where . . . a third party has derivative liability for the claims

against the debtor." *Id.* As the Second and Third Circuits have recognized, a bankruptcy court

only has jurisdiction to enjoin third-party, non-debtor claims that directly affect the *res* of the

bankruptcy estate. "[I]n both instances, third parties seek to collect out of the proceeds of

Manville's insurance policies on the basis of Manville's conduct . . . . [P]laintiffs' claims are

inseparable from Manville's own insurance coverage and are consequently well within the

Bankruptcy Court's jurisdiction over Manville's assets." *MacArthur*, 837 F.2d at 92–93

(emphasis added). Relying on *MacArthur*, the Third Circuit similarly noted that §

524(g)(4)(A)(ii) is consistent with the purposes underlying § 524(g):

> The channeling injunction issued in the Johns-Manville bankruptcy, after which §
> 524(g) was modeled, *see* 140 Cong. Rec. H10752, H10765 (1994) . . . was limited
> to third-party actions against non-debtors in which the liability alleged was
> derivative of the debtor. *See MacArthur Co. v. Johns-Manville*, 837 F.2d at 92–93
> (2d Cir. 1988) (explaining that the channeling injunction applied only to third
> parties [who] seek to collect out of the *proceeds* of Manville's insurance policies
> on the basis of Manville's conduct).

*Combustion Eng'g.*, 391 F.3d at 235 n.47 (emphasis added, citations and internal quotation

marks omitted).  Unlike the *Johns-Manville* injunction, North River's claims against the Settling

Insurers do not seek to collect from the proceeds of the insurance policies at issue.  North River's

defense costs claims against the Settling Insurers do not involve property of the estate and do not

affect the *res* available to pay claims.[21]  For example, defense payments made by Hartford do not

reduce the limits under their policies and thus do not impact the amount available to reimburse

claims against the estate.[22]  Because the Settling Insurers' policies generally provide for the

payment of defense costs outside of policies' limits, reimbursement claims for defense costs by

non-settling insurers against the Settling Insurers do not impact the amount of the Settling

Insurers' policy limits that might be available to pay claims.  The requested injunction is unfair

and impermissible under the Bankruptcy Code.

For all of these reasons, the settlements/sales are not fair and equitable and the Plan

Proponents are in violation of 11 U.S.C. § 1129(a)(2).

> **C.    In the Alternative, If North River's Claims Against the Settling Insurers Are
> Not "Interests," The Court Lacks Jurisdiction to Grant the Requested Relief
> Under Either § 363 Or § 105.**

The Plan Proponents argue that North River's claims against the Settling Insurers are not

---

[21] The Plan deals, however imperfectly, with North River's claims for indemnity costs in that it requires that any Settling Insurer liability for indemnity be offset against any amount owed by North River.  Plan § 4.14.  As a practical matter, however, no claimant would settle for anything other than actual dollars and so this protection is illusory.

[22] Each Hartford policy at issue here provides: "With respect to bodily injury, personal injury . . . . The company will (a) defend any suit against the insured seeking damages on account thereof, even if such suit is groundless, false or fraudulent . . . and the amounts so incurred, except settlement of claims and suits, are not subject the insured's self-insured retention as stated in the declarations and are payable by the company in addition to the applicable limit of liability of this policy."  (Section II. INVESTIGATION, DEFENSE, SETTLEMENT).  Similarly, Federal Policy No. FXL 77702037 states, in relevant part, that "THE COMPANY SHALL: (A) DEFEND ANY SUIT AGAINST THE INSURED ALLEGING SUCH INJURY OR DESTRUCTION. . . . AND THE AMOUNTS SO INCURRED, EXCEPT SETTLEMENTS OF CLAIMS AND SUITS ARE PAYABLE BY THE COMPANY IN ADDITION TO THE APPLICABLE LIMIT OF LIABILITY ON THIS POLICY."

"interests."  Mar. 7 Tr. at 122–123.  The Court disagrees with that argument. The Third Circuit

has interpreted the term "interest" broadly to include claims against the debtor or settling party

arising out of the property to be sold.  *See, e.g, In re Trans World Airlines, Inc.* ("TWA"), 322

F.3d 283 (3d Cir. 2003).

     If the Court were to accept the Plan Proponents' argument that North River's claims

against Settling Insurers were not an interest in the Debtors' property, however, the Court would

lack any power or jurisdiction to sell such property free and clear of such claim.  As noted above,

the Court's power to approve a sale free and clear of third party claims derives from § 363(f) of

the Bankruptcy Code.  Section 363(f) permits, under certain circumstances, sales of property in

the debtor's estate "free and clear of any interest in such property of an entity other than the

estate."

     If North River's claims against Settling Insurers do not constitute interests entitled to

adequate protection under § 363(f), then the Court has no jurisdiction over North River's claims

against Settling Insurers, which are governed by New York state law in the New York State

Coverage Action, and there is no bankruptcy basis to limit or enjoin North River's rights against

the Settling Insurers with respect defense costs.

## VIII.   The Plan is Not Proposed in Good Faith

### A.      Proposed Findings of Fact

     The Plan Proponents have violated numerous provisions and purposes of the Bankruptcy

Code.  While those violations individually provide grounds to deny confirmation – taken

together they collectively show that the Plan is not proposed in good faith.

     The Plan Proponents admittedly filed this Plan to gain "leverage" over insurers.  Mar. 6

Tr. at 135:6–25.[23]  In argument on January 31, 2019, counsel for the ACC admitted that the

design of the Plan is to "maximize" the recovery from insurers.  Dkt. 429.

The structure of the Plan bears out these admissions: the Plan proposes to strip North

River of its state law rights and to extinguish North River's claims without payment.  Plan §§

4.13, 4.14, TDPs § 5.5.  In contrast, similarly-situated unsecured creditors are paid in full,

asbestos creditors are treated favorably, and equity holders retain their interests.  *See* Plan § 3.3.

In their efforts to further these improper purposes, the Plan Proponents forced North

River's claims into Class 7 in an effort to gerrymander the vote (*i.e.*, to secure the vote of an

impaired class and to devalue insurers' claims so that Class 7 could not reject) and

simultaneously seek to effectively disallow all insurer claims by providing that insurer claims

will be ineligible for payment.

As discussed above, the Debtors were a solvent, operating company prior to seeking

bankruptcy protection.[24]  Although the future can never be predicted with certainty, the evidence

before the Court establishes that the Debtors were capable of paying their share of projected

---

[23] Mr. Calhoun: All right. So you understood these provisions were designed in part at least – or you understood the purpose of these provisions was to put leverage on the insurers, right?
Mr. Fitzpatrick: It's my understanding that that was one of the purposes, yes.
Mr. Calhoun: And when I asked you the question at your deposition a few months ago, that's exactly what you said. The purpose of this was to put leverage on the insurer, isn't that right? Mr. Fitzpatrick: Yes.
Mr. Calhoun: All right. And one of the ways it does that is that anyone can bring a claim, and when that happens insurers would presumably defend that claim, is that right?
Mr. Fitzpatrick: Again, to the best of my knowledge, yes.
Mr. Calhoun: All right. And if they – even though they defend that claim these provisions would prevent the insurer from settling that claim, wouldn't they?
Mr. Fitzpatrick: Well, like it still says in the claim, if they wished.
Mr. Calhoun: But they would have to – you would have to agree to that, wouldn't you?
Mr. Fitzpatrick: Yes.
[24] *See* Disclosure Statement at 8 (2017 EBITDA was "was approximately $5.2 million *after* adjustments for legal and other fees related to the Company's asbestos and insurance issues. . ..") (emphasis added). Debtors further stated, with respect to 2018: "The Company remains profitable and estimates that sales and EBITDA (after adjusting for costs related to this bankruptcy proceeding) for 2018 will be approximately $73.6 million and $5.2 million, respectively." *Id.  See also generally* Podgainy Cert.

asbestos liabilities in perpetuity. The Debtors and the Hindens are contributing $26 million to the proposed Trust. This amount is approximately equivalent to the Debtors' share of projected indemnity liability. *See* Scarcella Rpt. at 32, fig. 36.

Historically, the Debtors have obtained dismissals of more than 90% of the asbestos claims filed against them. *See* Scarcella Rpt. at 9. Because pro rata allocation applies to the asbestos claims as a matter of governing New York insurance law, however, the Debtors are responsible for a significant portion of any settlement or defense costs associated with those claims. As the Debtors' Chief Executive Officer, Randall S. Hinden, acknowledged, "the Company has been forced to bear an increasing share of settlements and defense costs due to the insolvency of one of the Company's insurance carriers, the exhaustion of the Company's primary insurance coverage, and disputes with insurance carriers providing excess level coverage . . . ." Declaration of Randall S. Hinden in Support of Chapter 11 Petitions and First Day Pleadings filed by Jeffrey D. Prol on behalf of Duro Dyne National Corp., Dkt. 3, at 8. The purpose of the Plan, therefore, was to relieve the Debtors of their share of defense costs and to shift that costs on to Debtors' insurers.

This case presents a prime example of a bankruptcy case filed to gain a litigation advantage, not to reorganize a business. The Debtors are seeking to avoid that potential liability, not because they must do so to preserve their business, but because they would prefer not to pay.

**B.    Proposed Conclusions of Law**

Pursuant to § 1129(a)(3), a bankruptcy plan must be proposed in good faith and may not be proposed by any means forbidden by law. While the Bankruptcy Code does not define the term "good faith," it is generally understood that, in determining whether the plan has been proposed in good faith, the court must decide whether there has been an abuse of the provisions

or the goals of Chapter 11.  *See, e.g.*, *In re Zenith*, 241 B.R. 92, 107–11 (Bankr. D. Del. 1999).

In determining whether a plan is proposed by any means forbidden by law, courts generally look

at whether the plan will violate any nonbankruptcy laws, such as relevant criminal, regulatory or

corporate laws.  As a practical matter, a court may find that a plan is proposed in bad faith if, for

example, the plan is proposed as a tactic to delay or frustrate the efforts of stakeholders to

enforce their rights.  *See In re Pikes Peak Water Co.*, 779 F.2d 1456, 1461 (10th Cir. 1985).  "A

court is allowed to confirm a plan under section 1129(b) if it determines that the plan does not

discriminate unfairly, is fair and equitable with respect to each class of impaired claims or

interests which have not accepted the plan, and all provisions of section 1129(a) except for

paragraph (8) have been met."  *Id*. (citing *In re Hoffman*, 52 B.R. 212, 215 (Bankr. D.N.D.

1985)).

Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means

forbidden by law."  11 U.S.C. § 1129(a)(3).  "[F]or purposes of determining good faith under

section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan

will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."

*Combustion Eng'g*, 391 F.3d at 246–47 (quoting *In re PWS Holding Corp*., 228 F.3d 224, 241

(3d Cir. 2000)).  Furthermore, a plan must be fundamentally fair, which requires that "the plan be

proposed with honesty, good intentions and a basis for expecting that a reorganization can be

effected with results consistent with the objectives and purposes of the Bankruptcy Code."  *In re

ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del. 2004) (citation omitted); *see also In re New

Valley Corp*., 168 B.R. 73, 80–81(Bankr. D.N.J. 1994) ("A further refinement of the test for

whether a plan is proposed in good faith is found in the notion that the plan must provide for

fundamental fairness in dealing with creditors." (citation omitted).[25]

The Plan Proponents bear the burden of establishing good faith and fundamental fairness. *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 221 (Bankr. D.N.J. 2000) ("The proponent bears the burden of establishing the plan's compliance with each of [the] requirements [of § 1129(a)]."); *In re Silberkraus*, 253 B.R. 890, 902 (Bankr. C.D. Cal. 2000) (debtor bears the burden of establishing "good faith" and fundamental fairness), *aff'd*, 336 F.3d 864 (9th Cir. 2003). In determining whether the Plan Proponents have satisfied this burden, the Court must examine "the totality of the circumstances surrounding the confection of the plan." *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984); *see also Combustion Eng'g*, 391 F.3d at 242 n.55 ("Only after analyzing the totality of circumstances surrounding a reorganization plan can the court exercise the informed, independent judgment which is an essential prerequisite for the confirmation of a plan." (citation omitted)).

Chapter 11 is intended for valid reorganization of "financially troubled businesses," not to permit financially solvent companies to "rapidly conclude litigation to enable a continuation of their business." *In re SGL Carbon Corp.*, 200 F.3d 154, 169 (3d Cir. 1999). This case is strikingly similar to *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999), in which the Third Circuit ordered the dismissal of a bankruptcy case that had been filed to gain an unfair advantage

---

[25] Similarly, Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith and the burden is on the bankruptcy petitioner to establish good faith. *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009) (citations, modifications, internal quotation marks and footnotes omitted).

> Whether the good faith requirement has been satisfied is a fact intensive inquiry in which the court must examine the totality of facts and circumstances and determine where a petition falls along the spectrum ranging from the clearly acceptable to the patently abusive. We focus on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose and (2) whether the petition is filed merely to obtain a tactical litigation advantage.

*Id.*

over the debtor's litigation adversaries.  In *SGL Carbon*, the debtor similarly admitted that it filed the plan to gain an advantage over its litigation opponents.  *Id.* at 158 (Debtor's vice president "testified that he believed filing for Chapter 11 would 'change the negotiating platform' with plaintiffs and 'increase the pressure on . . . plaintiffs to settle.'").  As the Third Circuit held, "filing a Chapter 11 petition merely to obtain tactical litigation advantages is not within "the legitimate scope of the bankruptcy laws."  *Id.* at 165 (citing *In re Argus Group 1700, Inc.*, 206 B.R. 757, 765–66 (E.D. Pa. 1997)); *see also Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D. Md. 1983) ("The Bankruptcy provisions are intended to benefit those in genuine financial distress.  They are not intended to be used as a mechanism to orchestrate pending litigation."); *In re HBA East, Inc.*, 87 B.R. 248, 259–60 (Bankr. E.D.N.Y. 1988) ("As a general rule where, as here, the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith."); *In re Martin*, 51 B.R. 490, 495 (Bankr. M.D. Fla. 1985).

In short, like *SGL Carbon*, Debtors operate a profitable business that has – with the assistance of its insurers – largely successfully defended themselves in the tort system.  And like the debtor in *SGL Carbon*, Debtors admittedly filed for bankruptcy to gain a litigation advantage against their insurers.  This is the only evidence before the Court with respect to the motivations for the filing of this bankruptcy.[26]

Under the Plan, Debtors propose to pay all non-asbestos and non-insurer creditors in full. With respect to asbestos creditors, Debtors have committed $26 million to the Trust, more – on a

---

[26] On redirect by counsel, Mr. Podgainy claimed that the Debtors had difficulty accessing the capital market.  Mar. 6 Tr. at 86.  The reference to capital markets has no relevance as the Debtors have not demonstrated a need or plan for such financing.  The forecasts prepared by Mr. Podgainy and submitted by the Debtors show that the Debtors project capital expenditures well within their operating budget. Podgainy Cert. at 34.

present dollar basis – than they would be expected to pay to asbestos creditors in the tort system. *Compare* Plan § 4.08 *with* Scarcella Rpt. at Fig. 1.  Asbestos creditors, in turn, get access to favorable TDPs.  The proposed TDPs assign higher values to asbestos claims than they were historically paid in the tort system and have less stringent standards of proof than the tort system. TDPs §§ 5.3(a)(3), 5.6; Mar. 7 Tr. at 99 (Mr. Harron: "[T]he trust isn't in the business of defending claims.  Rather it's a claimant trust funded by claimant indemnity dollars.").

The only creditor who fares worse under the Plan is North River – whose Class 6 claims are impaired and whose Class 7 claims are ineligible for *any* payment whatsoever.  The Plan Proponents went to great lengths to gerrymander a vote on this structure.  To prevent insurers from causing Class 5 (or any other class) from rejecting the Plan, Debtors artificially split North River's claims and placed the bulk of those claims in Class 7 with Asbestos Personal Injury Claims.  Then, so that Class 7 would not reject the Plan, the Plan Proponents proposed to temporarily allow insurers' claims at $1.00, but agreed to allow all speculative asbestos claims to vote at TDPs values regardless of the merit or historical dismissal rates of such claims.  *See supra.*  The result is that the only parties in this case who fare worse under the proposed bankruptcy plan are the insurers, who – by design – had no say in the formulation of the Plan and were precluded from voting in proportion to the value and proper treatment of their claims. Similarly, to accomplish their pre-petition goals, the Plan Proponents then created intra-class discrimination against North River's claims by precluding insurer claims from any recovery, unlike any other creditor.

As in *SGL Carbon*, the Debtors' efforts to manipulate the votes and classes to gain a litigation advantage show that the Plan was not proposed in good faith.  To the contrary, the Plan relies upon multiple violations of the Bankruptcy Code and its underlying principles of equitable

treatment.  Because the Plan thus violates § 1129(a)(3), it cannot be confirmed.

Consistent with their efforts to gain a litigation advantage over insurers, the Debtors seek to evade review of their improper Plan by unilaterally altering the definition of "substantial consummation" set forth in § 1101(2).  *See* Plan § 13.05.  Plan Proponents seek to avoid full compliance with these three conditions by deeming substantial confirmation to occur on the Effective Date of the Plan.  *See* Plan § 13.05 ("On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code").  Because nothing in the Plan indicates that distributions will commence on the Effective Date, the Plan cannot be deemed substantially consummated at that time.

Section 3.03 of the Plan states if, how, and when distributions will be made for Claims in Classes 1–10, and none of those provisions contemplate distributions commencing as early as the Effective Date.  No distributions under the Plan will be made for Claims in Classes 3 and 4, which are unaltered, or for Claims in Class 9, which are expunged.  *Id.* §§ 3.03(c), (d), and (i).  Claims in Classes 1, 2, 5, and 8 will be paid only on "the later of" the Effective Date or the date when the Claim is allowed.  *Id.* §§ 3.03(a), (b), (e), (h).  Allowed Claims in Class 6 will be paid on the first through eighth anniversaries of the Effective Date.  *Id.* § 3.03(f).  Claims in Class 10 will be paid in the ordinary course, but will be subordinated to the Trust Note.  *Id.* § 3.03(j).  Finally, Asbestos Claims in Class 7 will only be paid after the procedures set out in the TDPs have been established (including *inter alia* preparation of claim forms and establishment of the Payment Percentage), *id.* § 3.30(g), which is extremely unlikely to occur before the Effective Date.  Thus, the Plan improperly accelerates substantial confirmation by eliminating at least one of the definitional requirements under § 1101(2) of the Bankruptcy Code.

For all of the above reasons, the Court concludes that the Plan is not susceptible to

confirmation.

## **<u>CONCLUSION</u>**

Based on the foregoing, this Court should deny Plan Proponents' request for confirmation

of their Plan.

Dated:  April 15, 2019                          Respectfully submitted,

                                                KENNEDYS CMK LLP

                                                 */s/ Christina R. Salem*
                                                Margaret F. Catalano
                                                Christina R. Salem
                                                570 Lexington Avenue, 8th Floor
                                                New York, N.Y. 10022
                                                (212) 252-0004
                                                Emails:  meg.catalano@ kennedyscmk.com
                                                        christina.salem@kennedyscmk.com

                                                -and-

                                                IFRAH PLLC
                                                George R. Calhoun, V (*pro hac vice*)
                                                Ifrah PLLC
                                                1717 Pennsylvania Ave., NW
                                                Washington, D.C. 20006
                                                202.525.4147
                                                Email: george@ifrahlaw.com

                                                *Attorneys for The North River Insurance Company*