LOWENSTEIN SANDLER LLP
Kenneth A. Rosen, Esq.
Jeffrey D. Prol, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400
krosen@lowenstein.com
jprol@lowenstein.com

*Counsel to the Debtors and
Debtors in Possession*

CAPLIN & DRYSDALE,
CHARTERED
James P. Wehner, Esq.
(admitted *pro hac vice*)
Jeffrey A. Liesemer, Esq.
(admitted *pro hac vice*)
One Thomas Circle, N.W.
Washington, DC 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301
jwehner@capdale.com
jliesemer@capdale.com

*Counsel to the Asbestos
Claimants Committee*

YOUNG CONAWAY
STARGATT & TAYLOR, LLP
Edwin J. Harron, Esq.
Sara Beth A. R. Kohut, Esq.
(admitted *pro hac vice*)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6703
Facsimile: (302) 576-3298
eharron@ycst.com
skohut@ycst.com

*Counsel to the Legal
Representative*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| DURO DYNE NATIONAL CORP., *et al.*, [1] | : | Case No. 18-27963-MBK |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

## PLAN PROPONENTS' NOTICE OF FILING
## OF PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND
## PROPOSED FORMS OF ORDERS IN SUPPORT OF CONFIRMATION OF THE
## <u>MODIFIED SECOND AMENDED PRENEGOTIATED PLAN OR REORGANIZATION</u>

In response to this Court's directive that the parties file proposed findings of fact and

conclusions of law, the above-captioned Debtors and debtors-in-possession, the Official

Committee of Asbestos Claimants, and Lawrence Fitzpatrick in his official capacity as Legal

Representative (collectively, "**Plan Proponents**"), by and through their undersigned counsel,

hereby submit their proposed findings of fact and conclusions of law in support of confirmation of

---

[1]    The "**Debtors**" in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are Duro Dyne National Corp. (4664), Duro Dyne Machinery Corp. (9699), Duro Dyne Corporation (3616), Duro Dyne West Corp. (5943), and Duro Dyne Midwest Corp. (4662).

the *Second Amended Prenegotiated Plan for Duro Dyne National Corp., et al., Under Chapter 11 of the Bankruptcy Code, as Modified* (ECF No. 517), dated March 5, 2019 ("**Plan**")[2] and the issuance of the Asbestos Permanent Channeling Injunction under 11 U.S.C. § 524(g) and the other Plan-related Injunctions.

At the Confirmation Hearing on March 7, 2019, this Court instructed the Plan Proponents to provide their proposed findings and conclusions in a form that would allow for "referral up to the district court." (Hr'g Tr. 44:6–8, Mar. 7, 2019). Section 524(g) provides that the District Court will either "issue[]" or "affirm[]" the order confirming the Plan. 11 U.S.C. § 524(g)(3)(A). Since this Court is contemplating that the District Court would "issue" the Confirmation Order, rather than "affirming" it through an appellate proceeding, the Plan Proponents are tendering herewith two forms of proposed orders, one to be entered by this Court and the other to be entered by the District Court.

The first form of proposed order, to be entered by this Court, is the *Order (A) Recommending Confirmation of Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al., as Modified, and (B) Issuing Proposed Findings of Fact and Conclusions of Law Supporting Confirmation of the Plan* ("**Recommendation Order**"). The second form of order, attached as Appendix A to the Recommendation Order, is the *Order (A) Confirming Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al., as Modified, (B) Adopting Bankruptcy Court's Proposed Findings of Fact and Conclusions of Law, and (C) Issuing Asbestos Permanent Channeling Injunction and Other Plan-Related Injunctions* ("**Confirmation Order**"), which would be tendered to the District Court for its consideration following entry of the Recommendation Order by the Bankruptcy Court. The

---

[2] Capitalized terms not defined herein have the meanings ascribed to such terms in the Plan.

Confirmation Order contains the proposed findings of fact and conclusions of law that this Court directed the Plan Proponents to file.  In addition, the proposed Confirmation Order includes decretal paragraphs that the Plan Proponents believe are important to confirming and implementing the Plan, including paragraphs that set forth the terms of the Asbestos Permanent Channeling Injunction, the Settling Asbestos Insurer Injunction, and the Asbestos Insurer Injunction.

Consistent with this Court's instructions, the Plan Proponents believe that, because the District Court should "issue" the Asbestos Permanent Channeling Injunction under § 524(g) and the other Injunctions, the District Court should also "enter[]" the Confirmation Order.  *See* 11 U.S.C. § 524(g)(1)(A) (providing that "a court that enters an order confirming a plan of reorganization under chapter 11 may issue" the 524(g) channeling injunction).  Although confirmation of a plan is a core proceeding, *see* 28 U.S.C. § 157(b)(2)(L), this Court has authority to submit proposed findings of fact and conclusions of law in core proceedings.  *See In re Universal Mktg., Inc.*, 459 B.R. 573, 579–80 (Bankr. E.D. Pa. 2011).

[*Remainder of page intentionally left blank.*]

For the reasons noted in the accompanying proposed findings of fact and conclusions of law, the remaining objections to the Plan should be overruled, and the Plan should be confirmed. Accordingly, the Plan Proponents request that this Court enter the accompanying Recommendation Order and grant such other and further relief as this Court deems just and appropriate.

Respectfully submitted,

LOWENSTEIN SANDLER LLP

THE LAW OFFICE OF JOHN A. FIALCOWITZ, LLC

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Jeffrey D. Prol*
Kenneth A. Rosen, Esq.
Jeffrey D. Prol, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
Facsimile:  (973) 597-2400
*Counsel to the Debtors and Debtors in Possession*

*/s/ John A. Fialcowitz*
John A. Fialcowitz
89 Headquarters Plaza
North Suite 1216
Morristown, NJ 07960
Telephone: (973) 532-7208
Facsimile: (973) 993-1857

—and—

CAPLIN & DRYSDALE, CHARTERED
James P. Wehner, Esq.
Jeffrey A. Liesemer, Esq.
One Thomas Circle, N.W.
Washington, DC 20005
Telephone:  (202) 862-5000
Facsimile: (202) 429-3301
*Co-Counsel to the Asbestos Claimants Committee*

*/s/ Edwin J. Harron*
Edwin J. Harron, Esq.
Sara Beth A. R. Kohut, Esq.
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6703
Facsimile:  (302) 576-3298
*Counsel to the Legal Representative*

Dated:  April 15, 2019

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**

| LOWENSTEIN SANDLER LLP | CAPLIN & DRYSDALE, | YOUNG CONAWAY |
|---|---|---|
| Kenneth A. Rosen, Esq. | CHARTERED | STARGATT & TAYLOR, |
| Jeffrey D. Prol, Esq. | James P. Wehner, Esq. | LLP |
| One Lowenstein Drive | (admitted *pro hac vice*) | Edwin J. Harron, Esq. |
| Roseland, NJ 07068 | Jeffrey A. Liesemer, Esq. | Sara Beth A.R. Kohut, Esq. |
| Telephone: (973) 597-2500 | (admitted *pro hac vice*) | (admitted *pro hac vice*) |
| Facsimile:  (973) 597-2400 | One Thomas Circle, N.W. | Rodney Square |
| krosen@lowenstein.com | Washington, DC 20005 | 1000 North King Street |
| jprol@lowenstein.com | Telephone:  (202) 862-5000 | Wilmington, DE 19801 |
| *Counsel to the Debtors and* | Facsimile: (202) 429-3301 | Telephone: (302) 571-6703 |
| *Debtors in Possession* | jwehner@capdale.com | Facsimile:  (302) 576-3298 |
| | jliesemer@capdale.com | eharron@ycst.com |
| | *Counsel to the Asbestos* | skohut@ycst.com |
| | *Claimants Committee* | *Counsel to the Legal* |
| | | *Representative* |

|  | : |  |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| DURO DYNE NATIONAL CORP., *et al.*,[1] | : | Case No. 18-27963-MBK |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

### ORDER (A) RECOMMENDING CONFIRMATION OF SECOND AMENDED PRENEGOTIATED PLAN OF REORGANIZATION FOR DURO DYNE NATIONAL CORP., *ET AL.*, AS MODIFIED, AND (B) ISSUING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW SUPPORTING CONFIRMATION OF THE PLAN

The relief set forth on the following pages, numbered two (2) through five (5), is hereby

**ORDERED**.

---

[1]    The "**Debtors**" in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are Duro Dyne National Corp. (4664), Duro Dyne Machinery Corp. (9699), Duro Dyne Corporation (3616), Duro Dyne West Corp. (5943), and Duro Dyne Midwest Corp. (4662).

Page:      2
Debtor:    Duro Dyne National Corp., *et al.*
Case No.:  18-27963 (MBK)
Caption:   Order (A) Recommending Confirmation of Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., *et al.*, as Modified, and (B) Issuing Proposed Findings of Fact and Conclusions of Law Supporting Confirmation of the Plan

---

The above-captioned Debtors and debtors-in-possession, the Official Committee of Asbestos Claimants ("**Committee**"), and Lawrence Fitzpatrick in his official capacity as Legal Representative (together with the Committee, "**Plan Proponents**") having proposed the *Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al., Under Chapter 11 of the Bankruptcy Code* (ECF No. 279), dated November 16, 2018 (including all exhibits thereto, the "**Second Amended Plan**"), as supplemented by the Plan Supplement (ECF No. 222) and the *Amended Plan Supplement for Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al.* (ECF No. 481) (collectively, including all exhibits thereto, the "**Plan Supplements**"), and as modified by the *Second Amended Prenegotiated Plan for Duro Dyne National Corp., et al., Under Chapter 11 of the Bankruptcy Code, as Modified* (ECF No. 517) (collectively with the Second Amended Plan and the Plan Supplements, and as may be further amended, modified, or supplemented, the "**Plan**");[2] and

This Court having entered, on November 20, 2018, the *Amended Order (i) Approving Second Amended Disclosure Statement as Providing Adequate Information Within the Meaning of Section 1125(a) of the Bankruptcy Code; (ii) Establishing Procedures for Solicitation and Tabulation of Votes on Amended Plan of Reorganization; (iii) Approving the Form of Ballots; (iv) Scheduling a Hearing on Confirmation of the Plan; (v) Approving the Form, Manner and Scope of Mailed and Published Notices of the Time Fixed to (a) Vote on the Amended Plan, and (b) File Objections to Confirmation of the Amended Plan; and (vi) Granting Related Relief* (ECF No. 289)

---

[2]   Capitalized terms not defined herein have the meanings ascribed to such terms in the Plan. For the avoidance of doubt, this Confirmation Order shall be interpreted and construed in accordance with section 1.02 of the Plan.

Page:       3
Debtor:    Duro Dyne National Corp., *et al.*
Case No.:   18-27963 (MBK)
Caption:   Order (A) Recommending Confirmation of Second Amended Prenegotiated Plan of Reorganization
           for Duro Dyne National Corp., *et al.*, as Modified, and (B) Issuing Proposed Findings of Fact and
           Conclusions of Law Supporting Confirmation of the Plan

---

("**Solicitation Procedures Order**"), by which the Court, among other things, (1) established procedures for the solicitation and tabulation of votes to accept or reject the Plan; (2) approved the Disclosure Statement; and (3) scheduled a hearing to consider confirmation of the Plan to commence on March 6, 2019 ("**Confirmation Hearing**"); and

The Debtors having served the Confirmation Hearing Notice, Solicitation Packages, and Notices of Non-Voting Status (each as defined in the Solicitation Procedures Order) on the appropriate parties in accordance with the terms of the Solicitation Procedures Order;[3] and

The Debtors having filed, on January 30, 2019, the *Declaration of Balloting Agent Regarding the Solicitation and Tabulation of Votes in Connection with the Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al.* (ECF No. 427), which includes a report summarizing the votes received on the Plan ("**Tabulation Report**"); and

Two holders of Class 6 Prepetition Defense-Cost Contribution Claims having timely submitted ballots, and both ballots, representing $8,881,493.39, having voted to reject the Plan, as reflected in the Tabulation Report and as modified by the *Order Granting North River's Motion Pursuant to Bankruptcy Rule 3018 for Temporary Allowance of Its Proofs of Claim for Voting Purposes* (ECF No. 448), entered February 8, 2019 ("**Rule 3018 Order**"); and

A total of 1,473 holders of Class 7 Channeled Asbestos Claims having timely submitted ballots, and of these ballots, 1,470 (99.8%), representing $83,729,900.00, having voted to accept the Plan, and three (0.2%), representing $24,992,118.79 (22.9%), having voted to reject the Plan; and

---

3   *See* Certifications of Service (ECF Nos. 291, 292, 293, and 294).

Page:          4
Debtor:        Duro Dyne National Corp., *et al.*
Case No.:      18-27963 (MBK)
Caption:       Order (A) Recommending Confirmation of Second Amended Prenegotiated Plan of Reorganization
               for Duro Dyne National Corp., *et al.*, as Modified, and (B) Issuing Proposed Findings of Fact and
               Conclusions of Law Supporting Confirmation of the Plan

This Court having received objections to the Plan filed by the Acting United States Trustee

for Region 3 ("**UST**") (Bankr. ECF No. 447) ("**UST Obj.**"); North River Insurance Company,

MidStates Reinsurance Corporation, and Federal Insurance Company (collectively "**Objecting**

**Insurers**") (Bankr. ECF Nos. 445 and 446) ("**Jt. Obj.**"); and the International Association of Sheet

Metal, Air, Rail, and Transit Workers ("**Union**") (Bankr. ECF No. 438);[4] and

The Plan Proponents having filed a memorandum of law in support of confirmation of the

Plan and in response to the objections referenced above (ECF No. 482); and

The objection of the Union having been settled and resolved and a consent order approving

the settlement and resolution having been entered by this Court (ECF No. 568); and

This Court having received and accepted as proffered testimony the following declarations

submitted in support of the Plan (including exhibits attached thereto, the "**Declarations**"):

Certification of Mark Podgainy in Support of Confirmation of the Second Amended Prenegotiated

Plan of Reorganization for Duro Dyne National Corp., *et al.*, Under Chapter 11 of the United States

Bankruptcy Code (ECF No. 483 and marked for identification at the Confirmation Hearing as

Exhibit P-4) ("**Podgainy Cert.**"); and Declaration of Lawrence Fitzpatrick in Support of

Confirmation of Second Amended Pre-Negotiated Plan of Reorganization for Duro Dyne National

Corp., *et al.*, Under Chapter 11 of the Bankruptcy Code (ECF No. 484 and marked for

identification at the Confirmation Hearing as Exhibit P-7) ("**Fitzpatrick Decl.**"); and

---

[4]    North River Insurance Company and MidStates Reinsurance Corporation also joined in the objections of the UST
(ECF Nos. 452 and 453).

Page:       5
Debtor:     Duro Dyne National Corp., *et al.*
Case No.:   18-27963 (MBK)
Caption:    Order (A) Recommending Confirmation of Second Amended Prenegotiated Plan of Reorganization
            for Duro Dyne National Corp., *et al.*, as Modified, and (B) Issuing Proposed Findings of Fact and
            Conclusions of Law Supporting Confirmation of the Plan

---

This Court having admitted into evidence the Declarations, the Tabulation Report, and the

Plan Proponents' other exhibits that were marked for identification as P-1, P-2, P-3, P-5, P-6, and

P-8 (Hr'g Tr. 35, 83, 90–91, Mar. 6, 2019; Hr'g Tr. 5–6, Mar. 7, 2019); and

This Court having considered the testimony and evidence presented by the Plan Proponents

at the Confirmation Hearing; and

This Court having reviewed the Plan, the Disclosure Statement, the Solicitation Procedures

Order, the Tabulation Report, the Certifications of Service, the objections, responses thereto, the

statements of counsel, briefs, memoranda of law, the Declarations, and all other testimony and

evidence admitted as part of the Confirmation Hearing; and

This Court having found that just cause exists for the relief recommended herein;

NOW, THEREFORE, this Court recommends that the District Court enter an order

substantially in the form of the accompanying **Appendix A** (1) CONFIRMING the Plan, (2)

ADOPTING the proposed findings of fact and conclusions of law set forth therein, and (3)

ISSUING the Asbestos Permanent Channeling Injunction in accordance with 11 U.S.C.

§ 524(g)(3) and the Settling Asbestos Insurer Injunction and the Asbestos Insurer Injunction in

accordance with 11 U.S.C. §§ 105(a) and 524(g).

**Appendix A**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| In re: | : | Civil Action No. _____ |
|  | : |  |
| DURO DYNE NATIONAL CORP., *et al.*,[1] | : | Bankr. Case No. 18-27963 (MBK) |
|  | : |  |
| Debtors. | : | Chapter 11 |
|  | : |  |

**ORDER (A) CONFIRMING SECOND AMENDED PRENEGOTIATED PLAN OF
REORGANIZATION FOR DURO DYNE NATIONAL CORP., *ET AL.*, AS MODIFIED,
(B) ADOPTING BANKRUPTCY COURT'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW, AND (C) ISSUING ASBESTOS PERMANENT
CHANNELING INJUNCTION AND OTHER PLAN-RELATED INJUNCTIONS**

This matter comes before the Court, in accordance with 28 U.S.C. § 157(c)(1), on the

proposed findings of fact and conclusions of law ("**Proposed Findings and Conclusions**")

submitted by the United States Bankruptcy Court for the District of New Jersey ("**Bankruptcy

Court**") that were included in Appendix A to its *Order (A) Recommending Confirmation of Second

Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al., as Modified,

and (B) Issuing Proposed Findings of Fact and Conclusions of Law Supporting Confirmation of

the Plan* ("**Recommendation Order**").  Based on the Proposed Findings and Conclusions, the

Bankruptcy Court recommends that this Court confirm the *Second Amended Prenegotiated Plan

of Reorganization for Duro Dyne National Corp., et al., Under Chapter 11 of the Bankruptcy

Code, as Modified*, dated March 5, 2019 (ECF. No. 517), and issue the Asbestos Permanent

Channeling Injunction in accordance with 11 U.S.C. § 524(g)(3) and two other Plan-related

---

[1]     The "**Debtors**" in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number,
are Duro Dyne National Corp. (4664), Duro Dyne Machinery Corp. (9699), Duro Dyne Corporation (3616), Duro
Dyne West Corp. (5943), and Duro Dyne Midwest Corp. (4662).

injunctions, namely, the Settling Asbestos Insurer Injunction and the Asbestos Insurer Injunction, in accordance with 11 U.S.C. §§ 105(a) and 524(g).

Having received and considered *de novo* the testimony and other evidence presented at the Confirmation Hearing; and having reviewed the Plan, the Disclosure Statement, the Solicitation Procedures Order, the Tabulation Report, the Certifications of Service, the objections to confirmation, the responses thereto, the statements of counsel, briefs, memoranda of law, the Declarations, and all other testimony and evidence admitted at the Confirmation Hearing; and upon the record of these Chapter 11 Cases; and after due deliberation thereon, and good and sufficient cause appearing therefor, it is hereby found and determined that:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052, made applicable in this matter by Federal Rules of Bankruptcy Procedure 3015(f) and 9014(c).  To the extent any of the following conclusions of law constitute findings of fact, or vice-versa, they are adopted as such.[2]

## I.    JURISDICTION, VENUE, AND CORE PROCEEDING

1.    This Court has jurisdiction over the Debtors' Chapter 11 Cases in accordance with 28 U.S.C. §§ 157(d), 1334(a), and 1334(b).  Venue of these Chapter 11 Cases is proper under 28 U.S.C. §§ 1408 and 1409.  Each of the Debtors is qualified under § 109 of the Bankruptcy Code to be a debtor in a Chapter 11 Case and is a proper co-proponent of the Plan under § 1121(a) of the Bankruptcy Code.

---

[2]    Unless otherwise defined herein, all capitalized terms have the meaning ascribed to them in the Bankruptcy Court's Recommendation Order or in the Plan.

## II.    JUDICIAL NOTICE

2.    This Court takes judicial notice of the dockets of these Chapter 11 Cases and any related adversary proceedings maintained by the Clerk of the Bankruptcy Court or its duly appointed agent, including all pleadings and other documents filed, all orders entered, all hearing transcripts, and all evidence and arguments made at the hearings held before the Bankruptcy Court and this Court during the pendency of these Chapter 11 Cases, including the Confirmation Hearing.

## III.    OVERVIEW OF THE DEBTORS AND THEIR BUSINESS

3.    The Debtors (collectively, "**Company**") are a middle-market, family-owned business that has evolved into the leading manufacturer of sheet metal accessories and equipment for the heating, ventilating, and air conditioning industry. (Disclosure Statement at 7; Declaration of Randall S. Hinden in Support of Chapter 11 Petitions and First Day Pleadings ¶ 7 (Bankr. ECF No. 3) ("**Hinden Decl.**")). They employ approximately 170 people with sales and distribution channels throughout the United States, Canada, and internationally. (Disclosure Statement at 8; Hinden Decl. ¶ 13).

4.    Duro Dyne National Corp. ("**Duro Dyne National**") is a holding company whose primary asset is all of the issued and outstanding capital stock of the other Debtors. Duro Dyne National is owned by members of the Hinden family and various trusts for the benefit of Hinden family members. (Disclosure Statement at 7). The Company's operations are conducted through Duro Dyne Machinery Corp ("**Duro Dyne Machinery**"), Duro Dyne Corp. ("**Duro Dyne Corp.**"), Duro Dyne Midwest Corp. ("**Duro Dyne Midwest**") and Duro Dyne West Corp. ("**Duro Dyne West**"). (Hinden Decl. ¶ 8).

5.    The Company has sales offices and over 200,000 square feet of manufacturing and warehousing facilities in Trenton, New Jersey; Bay Shore, New York; Fairfield, Ohio; and Fontana, California (Los Angeles area). The Company leases its Bay Shore and Fairfield facilities

from non-debtor affiliates.  In addition to its U.S. operations, the Company has a Canadian affiliate located in Quebec[3] and a licensee that manufactures under the "Duro Dyne" label in the United Arab Emirates.  (Disclosure Statement at 7; Hinden Decl. ¶ 9).

6.       Duro Dyne Machinery manufactures machines for the sheet metal industry, which are sold to third party customers by the affiliated Debtors.  Duro Dyne Corp. manufactures and sells sheet metal parts and tools on the east coast of the United States.  Duro Dyne Midwest manufactures and sells sheet metal parts and tools in the Midwestern part of the United States, and Duro Dyne West sells sheet metal parts and tools on the west coast of the United States.  The Debtors operate as a consolidated and integrated entity.  (Disclosure Statement at 8; Hinden Decl. ¶ 10).

## IV.    ASBESTOS LITIGATION HISTORY AGAINST THE DEBTORS

7.       The primary reason for the filing of the Debtors' Chapter 11 Cases was the need to address the Company's asbestos liability.  (Podgainy Cert. ¶ 3; Hr'g Tr. 41, 86–87, Mar. 6, 2019 (Podgainy Testimony)).   As of the Petition Date, the Debtors were named as defendants in approximately 956 pending lawsuits asserting claims for personal injury or wrongful death resulting from alleged asbestos exposure.  Prior to the Petition Date, the Debtors settled more than 650 asbestos claims that had been filed against them, and more than 8,100 asbestos claims were dismissed.  (Disclosure Statement at 13; Podgainy Cert. ¶ 3).  These claims were asserted in various jurisdictions, including California, New York, Michigan, Illinois, Massachusetts, Missouri, and West Virginia.  (Disclosure Statement at 13).  The alleged asbestos liability arose as a result of the

---

[3]     Duro Dyne Corp. owns all the stock of Duro Dyne Canada Inc., a Canadian corporation, which manufactures and distributes the most complete line of sheet metal accessories and equipment for the heating, ventilating, and air conditioning industry in Canada.  Duro Dyne Canada is not a Debtor in these proceedings.

Debtors having sold products that allegedly contained asbestos beginning in approximately 1952 until about 1978.  (Disclosure Statement at 13; Hinden Decl. ¶ 21).

8.     Since the first asbestos claims were filed against the Company in 1988, the Company worked with its insurance carriers to seek dismissal of a large portion of the claims and to settle the remaining claims in advance of trial.  (Podgainy Cert. ¶ 4).  At the rate the asbestos claims were being filed and settled by the Company and its insurance carriers, it originally appeared that the Company would be able to address all of the claims through proceeds of insurance and cash flow from operations.  (*Id*.).  However, in recent years, the Company has been forced to bear an increasing share of settlements and claims for reimbursement of indemnity and defense costs due to the insolvency of one of the Company's insurance carriers, the exhaustion of the Company's primary insurance coverage, and disputes with insurance carriers providing excess level coverage.  (*Id*.).  In the past five years, the Debtors have paid millions of dollars to settle or resolve asbestos personal-injury claims against them.  (Hr'g Tr. 42, Mar. 6, 2019 (Podgainy Testimony)).

## V.     INSURANCE COVERAGE LITIGATION

9.     Beginning at least as early as 1968, the Company maintained comprehensive general liability insurance coverage applicable to asbestos personal injury claims.  The Company purchased primary general liability policies from North River Insurance Company ("**North River**"), Hartford Accident & Indemnity Company ("**Hartford**"), Federal Insurance Company ("**Federal**"), Aetna Insurance Company of Connecticut, and Insurance Company of North America, covering the policy periods from August 1, 1968 through June 23, 1991.  (Disclosure Statement at 14).  Additionally, Duro Dyne purchased umbrella or excess insurance policies from Hartford, North River, Federal, MidStates Reinsurance Corporation ("**MidStates**"), Munich

Reinsurance America, Inc. ("**Munich**"), and Great Atlantic Insurance Company of Delaware, covering the policy periods from May 15, 1972 through June 23, 1989. (*Id*.).

10.     The comprehensive general liability insurance policies described above are "occurrence-based" policies which, subject to other policy terms, generally insure against liability arising from bodily injury or property damage during the policy period, even if the injury or damage does not manifest itself until after the policy period.   The Company's pre-1991 "occurrence" policies provide insurance coverage for asbestos and other "long tail" claims, which are commonly asserted years or decades after the underling injuries are alleged to have occurred. After 1991, the policies purchased by the Company contain various exclusions for asbestos and asbestos-related claims.

11.     On September 19, 2013, North River commenced an action against the Company and the Company's other primary and umbrella/excess insurance companies in New York state court, seeking to limit its coverage obligations to the Company in connection with asbestos-related claims against the Debtors ("**Coverage Action**").   (Disclosure Statement at 15).   The Coverage Action remains pending, although, as discussed below, the Debtors have entered into proposed settlements with Hartford, Federal, MidStates, and Munich that would resolve the coverage disputes with those insurers.   To date, the parties have not undertaken any discovery but have filed motions for summary judgment on a variety of presently known legal issues. (*Id*.).   Critical issues in the coverage case include the insurance companies' argument, contested by the Company, that the Company is obligated to reimburse Asbestos Insurers for a share of the defense and indemnity costs incurred in asbestos tort litigation against the Debtors, and an argument by North River that one of its policies contains an absolute exclusion for asbestos liability. (*Id*.).

12.     The Bankruptcy Court has lifted the automatic stay to permit the Coverage Action to proceed.  (Bankr. ECF No. 350).[4]  A hearing on the pending summary-judgment motions is scheduled for June 6, 2019.

## VI.     PREPETITION NEGOTIATIONS REGARDING CHAPTER 11 PLAN

13.     The ongoing asbestos lawsuits against the Debtors have interfered with their ability to raise capital through bank financing and equity investment.  (Hr'g Tr. 86:14–87:4, Mar. 6, 2019 (Podgainy Testimony)).   The Debtors' overhanging asbestos liabilities have impacted the Company's valuation and created uncertainty as to the Debtors' ability to pay back a loan and have thus deterred prospective equity investors and bank lenders from infusing capital into the Company.  (*Id.*).

14.     In the spring of 2015, the Debtors' counsel began discussions with plaintiffs' counsel who represent numerous existing holders of Asbestos Personal Injury Claims against the Debtors in order to explore the feasibility of and the potential for a prenegotiated chapter 11 plan of reorganization that would include a settlement trust and a permanent channeling injunction pursuant to 11 U.S.C. § 524(g).  Plaintiffs' counsel, without the involvement of the Debtors, formed an ad hoc committee ("**Ad Hoc Committee**") for the purpose of negotiating the terms of a possible plan of reorganization.  (Podgainy Cert. ¶ 5).

15.     The Debtors and the Ad Hoc Committee determined that, in furtherance of discussions toward a potential plan of reorganization under 11 U.S.C. § 524(g), it was necessary and appropriate to engage an independent third-party representative ("**Prepetition Legal Representative**") for the purpose of protecting the shared interests of persons that might assert asbestos-related personal-injury or wrongful-death claims against the Debtors in the future.

---

[4]     Citations to "**Bankr. ECF**" refer to the Bankruptcy Court's docket in Case No. 18-27963.

Lawrence Fitzpatrick was ultimately selected to serve as the Prepetition Legal Representative. (Podgainy Cert. ¶¶ 7-8).

16.     The Ad Hoc Committee and the Prepetition Legal Representative, either personally or through their representatives, conducted due diligence concerning the background, nature, and scope of the Debtors' liabilities for asbestos claims.  (Podgainy Cert. ¶ 10; Hr'g Tr. 47:12–15, Mar. 6, 2019 (Podgainy Testimony)).   The investigation included, among other things, careful review of the facts concerning the Debtors' historical involvement with asbestos; the nature and extent of past and pending asbestos litigation against the Debtors, including the types of claims asserted and the legal issues raised; the projected value of present and future Asbestos Claims and Demands; and the extent to which insurance and other assets may be available to satisfy these liabilities in whole or in part.   (Podgainy Cert. ¶ 10).   The Ad Hoc Committee and Prepetition Legal Representative also examined the potential for recovery by claimants asserting asbestos-related claims against the Debtors' Affiliates based on a variety of legal theories, including derivative liability theories such as alter ego, successor liability, and fraudulent conveyance.  (*Id.*).

17.     Following due diligence, representatives of the Debtors, the Ad Hoc Committee, and the Prepetition Legal Representative spent considerable time negotiating the terms of a possible plan of reorganization.   (Podgainy Cert. ¶ 11).   These negotiations addressed all the material provisions of a plan, including the funding for a trust to be established by the plan, the contributions to be made by or on behalf of the Debtors, the terms of a channeling injunction, issues relating to insurance coverage, and indemnification provisions.   (*Id.*).   Ultimately, the Debtors, the Ad Hoc Committee, and the Prepetition Legal Representative reached an agreement on the terms for a proposed plan of reorganization, which were incorporated into a term sheet dated January 6, 2018.  (*Id.*).  Following execution of the term sheet, the Debtors, the Ad Hoc Committee,

and the Prepetition Legal Representative negotiated the terms of a prenegotiated plan of reorganization for the Debtors.  (*Id.*).

## VII.    THE CHAPTER 11 CASES

18.    On September 7, 2018, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.  On the same date, the Debtors filed the prenegotiated plan of reorganization and a disclosure statement relating thereto.  The prenegotiated plan was subsequently amended and eventually became the Plan now before this Court.  (Podgainy Cert. ¶ 12).

19.    On September 26, 2018, the UST formed the Committee in accordance with § 1102(a)(1) of the Bankruptcy Code.  On October 17, 2018, after a contested hearing, the Bankruptcy Court entered the *Order Appointing a Legal Representative for Future Asbestos Personal Injury Claimants Effective as of the Petition Date* (ECF No. 191), which appointed Lawrence Fitzpatrick as the Legal Representative and overruled the objections to his appointment.

## VIII.    OVERVIEW OF THE PLAN

20.    The Plan divides the Claims against and Equity Interests in the Debtors into separate classes that will determine their treatment thereunder.  (Plan §§ 3.02, 3.03).  A summary of the Plan's classification scheme is as follows:

| Class | Claim / Equity Interest | Status | Voting Rights |
|-------|-------------------------|--------|---------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote |
| 3 | Employee Benefit Claims | Unimpaired | Not Entitled to Vote |
| 4 | Worker Compensation Claims | Unimpaired | Not Entitled to Vote |

| Class | Claim / Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote |
| 6 | Prepetition Defense-Cost Contribution Claims | Impaired | Entitled to Vote |
| 7 | Channeled Asbestos Claims | Impaired | Entitled to Vote |
| 8 | Bonded Claims | Unimpaired | Not Entitled to Vote |
| 9 | Intercompany Claims | Impaired | Not Entitled to Vote |
| 10 | Related-Party Claims | Impaired | Not Entitled to Vote |
| 11 | Equity Interests in Duro Dyne National Corp. | Impaired | Not Entitled to Vote |
| 12 | Equity Interests in Duro Dyne Corporation, Duro Dyne Midwest Corp., Duro Dyne West Corp., and Duro Dyne Machinery Corp. | Impaired | Not Entitled to Vote |

21.    Central to the Plan is Class 7, which contains the Channeled Asbestos Claims, including current Asbestos Claims and future Demands.   Under the Plan, these Channeled Asbestos Claims will be enjoined against the Protected Parties and channeled under Bankruptcy Code § 524(g) to the Asbestos Trust ("**Trust**") that will be formed under the Plan.   (Plan §§ 3.03(g)(ii), 4.01, 9.05).   Once channeled to the Trust, the Channeled Asbestos Claims will be resolved, liquidated, and (if eligible) paid in accordance with the Asbestos Trust Agreement and the Trust Distribution Procedures or "**TDP**."   (Plan §§ 3.03(g)(ii), 4.01).

22.    To fund its operations and pay eligible asbestos claims, the Trust will receive $26 million from non-insurance assets in the following form:

- Cash in the amount of $10.5 million paid on the Effective Date by or on behalf of the Debtors, their shareholders, and their nondebtor affiliates.

- The Trust Note, in the original principal amount of $13.5 million, payable in installments over roughly 20 years, at an interest rate of 7.15% per annum.

- Rights to "Earn Out Payments," not to exceed $2 million, from the Reorganized Debtor's post-Consummation earnings.

(Plan § 4.08).

23.    Additionally, the Plan provides for the transfer of the Debtors' rights to asbestos-related insurance coverage, defined in the Plan as "Asbestos Insurance Rights," to the Trust. (Plan § 4.07). The Asbestos Insurance Rights include the proceeds from the Asbestos Insurance Settlements reached between the Debtors and their Asbestos Insurers, which have been submitted for approval by the Bankruptcy Court. (Plan § 1.01(14)). The details concerning the Asbestos Insurance Rights, the Asbestos Insurance Settlements, and the Plan's treatment of the disputed claims of any Non-Settling Asbestos Insurers are addressed below. *See infra* parts IX and X.D.

24.    The Plan provides for the issuance of the Asbestos Permanent Channeling Injunction under 11 U.S.C. § 524(g) that will shield the designated Protected Parties (*e.g.*, the Debtors, their Affiliates, the Hinden Family Members, the Hinden Family Entities, and the Settling Asbestos Insurers) from all Channeled Asbestos Claims on and after the Plan's Effective Date. (Plan §§ 1.01(17), (102), 9.05). In addition, the Settling Asbestos Insurers will receive the protection of the Settling Asbestos Insurer Injunction and the Asbestos Insurer Injunction that will be issued in accordance with §§ 105(a) and 524(g) of the Bankruptcy Code. (Plan §§ 1.01(16), (115), (116), 9.06, 9.07).

25.    On the Plan's Effective Date, the Debtors and their respective Estates will be substantively consolidated and merged into Debtor Duro Dyne National Corp., and Duro Dyne National Corp. will be the surviving entity and Reorganized Debtor on and after the Effective Date. (Plan § 1.01(108), 5.01).

## IX.    SETTLEMENTS WITH ASBESTOS INSURERS

26.    Prior to the Confirmation Hearing, the Debtors, with the consent of the Committee and the Legal Representative, entered into Asbestos Insurance Settlements with the following Asbestos Insurers:  Hartford, Federal, MidStates, and Munich.  The Plan Proponents have filed motions to approve these Asbestos Insurance Settlements under §§ 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9019(a).  (*See* Bankr. ECF Nos. 468, 500, 518, 522).  The Bankruptcy Court has set a hearing to consider these motions on May 22, 2019.  If approved, these Asbestos Insurance Settlements will resolve the outstanding coverage disputes between the Debtors and the aforementioned Asbestos Insurers, the proceeds of these Asbestos Insurance Settlements will be contributed to the Trust, and the Settling Asbestos Insurers will receive the protection of the Asbestos Permanent Channeling Injunction and the other Plan-related Injunctions.  The only known, remaining solvent Non-Settling Asbestos Insurer is North River.

27.    Prior to entering into their respective Asbestos Insurance Settlements with the Debtors, Federal and MidStates, together with North River, filed a joint objection to confirmation of the Plan.  (Bankr. ECF No. 445).  MidStates also filed a separate objection to confirmation. (Bankr. ECF No. 446).  The Bankruptcy Court has stated that the confirmation objections of Federal and MidStates are preserved while the motions to approve their respective Asbestos Insurance Settlements remain pending.  (Hr'g Tr. 10:6–17, Mar. 6, 2019).  Nevertheless, for ease of reference and in light of the Asbestos Insurance Settlements reached with Federal and MidStates, this Court will refer to the objections of Federal, MidStates, and North River as the objections of North River.

## X.      THE PLAN SATISFIES THE REQUIREMENTS FOR CONFIRMATION

### A.      *Burden of Proof*

28.      The Plan Proponents have the burden of proving the elements of § 1129(a) of the Bankruptcy Code by a preponderance of the evidence.   In support of confirmation, the Plan Proponents submitted the Declarations (Bankr. ECF Nos. 479, 483, 484).   This Court finds the written testimony in the Declarations to be credible and supportive of confirmation of the Plan. As detailed below, the Plan satisfies all applicable sections of the Bankruptcy Code, including § 524(g) of the Bankruptcy Code.

### B.      *Impaired Class That Has Voted to Accept the Plan*

29.      As set forth in the Plan, Class 7 Channeled Asbestos Claims are impaired and therefore were entitled to vote.   As set forth in the Tabulation Report, claimants in Class 7 voted to accept the Plan by at least two-thirds (2/3) in amount and seventy-five percent (75%) in number of Asbestos Claims actually voting on the Plan.   (*See also* Plan § 10.01(a) and (d)(xiii); Podgainy Cert. ¶ 49).

### C.      *Adequacy of Notice and Due Process*

30.      Adequate and sufficient notice of the Plan and the Confirmation Hearing, as well as the deadline for objecting to the Plan, has been given to all known creditors and holders of Interests.   (*See* Solicitation Procedures Order; Certifications of Service (Bankr. ECF Nos. 291, 292, 293, 294)).

31.      The program for providing notice of the Plan, the Confirmation Hearing, and the appointment of the Legal Representative to represent the shared interests of Demand holders— who are unknown asbestos creditors—was reasonably calculated under the circumstances to apprise holders of Asbestos Claims ("**Asbestos Claimants**") of the Plan, the Confirmation Hearing, and the appointment of the Legal Representative, and to afford Asbestos Claimants an

opportunity to present their objections, and such program therefore provided constitutionally effective notice to the fullest extent achievable by law.  (Podgainy Cert. ¶¶ 46-49, 83).

32.    All Channeled Asbestos Claimants have been afforded due process based on the notice program described above, the appointment of the Legal Representative to represent the interests of Demand holders, and the Plan's compliance with § 524(g) of the Bankruptcy Code.

### D.    *Treatment of Non-Settling Asbestos Insurers' Claims Under the Plan*

33.    Much of North River's objections focuses on the Plan's treatment of the asserted claims of Non-Settling Asbestos Insurers.  As a Non-Settling Asbestos Insurer, North River holds disputed, unliquidated, and, in many respects, contingent claims against the Debtors for contribution or reimbursement of asbestos-related indemnity costs and defense costs.  These asserted claims are the subject of the Coverage Action.  *See supra* part V.

34.    The Plan provides for the transfer of non-insurance assets and the Debtors' rights to asbestos-related insurance coverage to the Trust.  With respect to the Debtors' rights to asbestos-related insurance coverage, the Plan will address them as follows:  On the Plan's Effective Date, the Debtors will transfer all of their Asbestos Insurance Rights to the Trust, including insurance settlement proceeds and all rights to any unsettled coverage.  (Plan § 1.01(13)).  All of the Asbestos Insurers except North River have entered into proposed Asbestos Insurance Settlements that await Court approval under 11 U.S.C. § 363(f) and Bankruptcy Rule 9019(a).  If these Asbestos Insurance Settlements are approved, the settlement proceeds will be contributed to the Asbestos Trust and, in exchange, the Settling Asbestos Insurers will be protected from Channeled Asbestos Claims by the Asbestos Permanent Channeling Injunction issued under 11 U.S.C. § 524(g).  (Plan §§ 1.01(102), (115), 4.07(a), 4.08(c), 9.05).

35.    If North River decides not to resolve its coverage disputes with the Debtors by the settlement deadline set forth in the Plan (*see* Plan § 1.01(13)), it will be deemed a "Non-Settling

Asbestos Insurer" and will not receive the protection of the Asbestos Permanent Channeling Injunction from Channeled Asbestos Claims.  By rejecting settlement, North River will have chosen to continue litigating its coverage obligations and defending asbestos-related lawsuits against the Debtors in the tort system—just as it was doing prebankruptcy.

36.     Under the Plan, any asbestos personal-injury plaintiff (whether or not he or she chooses to pursue a claim in the tort system) can immediately submit a claim to the Trust for processing and payment from the Trust.  (Plan §§ 3.03(g)(ii), 4.01).  Asbestos plaintiffs may also simultaneously pursue claims against the Reorganized Debtor in the tort system, with any judgment enforceable solely against the Asbestos Insurance Policies that remain unsettled.  (*Id.* §§ 4.13, 4.14).

37.     This option for asbestos plaintiffs to proceed in the tort system is based on the so-called "open system" model approved in the *Plant Insulation* case.  *See In re Plant Insulation Co.*, 734 F.3d 900, 907 (9th Cir. 2013).  In a "closed system," asbestos claimants could file a claim only against the Trust.  The Trust would then have to seek indemnity from the Non-Settling Asbestos Insurers (in this particular case, North River).  If the Trust were to seek indemnity from Non-Settling Asbestos Insurers for *its* payments to claimants, the Non-Settling Asbestos Insurers could argue, as they have done in other cases, that the policies do not obligate them to indemnify the *Trust* for payments it makes to claimants.  *See, e.g.*, *In re Burns & Roe Enters., Inc.*, No. 08-4191, 2009 WL 438694, at *8 (D.N.J. Feb. 23, 2009).

38.     In addition, insurers have argued that "closed system" TDPs violate the policies because they deprive the insurer of the ability to defend claims in the tort system.  *See In re Combustion Engineering, Inc.*, 391 F.3d 190, 209 (3d Cir. 2004), *as amended* (Feb. 23, 2005).  If this Plan were to provide for only payments by a trust, Non-Settling Asbestos Insurers would

receive a windfall if they prevailed on any of these arguments, and the creditors would lose their ability to access a valuable estate asset. But, under the Plan's "open system," claimants may conduct tort litigation against the Reorganized Debtor nominally to obtain a judgment. They will not be able to execute against the Reorganized Debtor or its assets to recover on any judgments obtained—recovery will be limited to available insurance coverage (whatever it turns out to be). The Plan thus tracks the standard bankruptcy practice of allowing tort claimants to proceed formally against the debtor, with recovery limited to available insurance. *See In re Edgeworth*, 993 F.2d 51, 54 (5th Cir. 1993) (citing cases); *In re Beeney*, 142 B.R. 360, 362 (B.A.P. 9th Cir. 1992). It is contemplated that tort suits will be tendered to North River, as the sole remaining Non-Settling Asbestos Insurer, who will then determine whether to defend or settle the lawsuit.

### 1.    The Plan Grants Non-Settling Asbestos Insurers Protections in the Form of Trust-Payment Credits and Judgment-Reduction Credits

39.    In connection with the "open system," two Plan mechanisms will provide substantial and tangible benefits to North River, should it choose to remain a Non-Settling Asbestos Insurer and thus outside the protection of § 524(g). If an asbestos plaintiff obtains a judgment in the action against the Reorganized Debtor, the amount of the judgment will be reduced, dollar-for-dollar, by the amount of the payments the plaintiff receives from the Trust. (Plan § 4.15(b)). North River will benefit because the amount it must indemnify will be reduced. This benefit will be hereinafter referred to as the "**Trust-Payment Credit**." This also ensures that no tort plaintiff receives a "double recovery" for their claim.

40.    In addition to the Trust-Payment Credit, North River will receive another Plan benefit on account of their claims, which will work as follows: If an asbestos personal-injury judgment is obtained against the Reorganized Debtor, the holder of the judgment, after obtaining the Trust's permission, will be able to pursue a direct action or judgment-enforcement action

against North River.  As a precondition to the Trust permitting such an action, however, a claimant must agree that any judgment obtained against North River will be reduced to account for any lost contribution rights that North River will have against the Settling Asbestos Insurers.   (Plan § 4.14(a)).  This benefit will be hereinafter referred to as the "**Judgment-Reduction Credit**."

41.    North River objects to the Plan because it proposes to pay North River "nothing" on account of its asserted contribution claims. (Jt. Obj. at 25).  Although the Plan does not provide for cash payments from the Trust to North River, it does propose to treat North River's asserted claims by granting North River the Trust-Payment Credits for its contribution claims against the Debtors and Judgment-Reduction Credits for its contribution claims against Settling Asbestos Insurers.  This proposed treatment is valid and permissible under the Bankruptcy Code, as the Ninth Circuit determined in the *Plant Insulation* case.  *See Plant Insulation Co.*, 734 F.3d at 907, 912-13.

42.    *Plant Insulation* was an asbestos mass-tort bankruptcy case involving a § 524(g) plan of reorganization.  As with the Plan here, the plan in *Plant* provided for an "open system," allowing asbestos plaintiffs to pursue lawsuits nominally against the debtor in the tort system to access the non-settled insurance coverage.  *See Plant Insulation Co.*, 734 F.3d at 907.  The plan also proposed to enjoin the contribution claims of non-settling asbestos insurers in exchange for a similar trust-payment credit and judgment-reduction credit.  *See id.*  The non-settling asbestos insurers objected to confirmation, arguing that the proposed treatment was impermissible under the Bankruptcy Code and that they were entitled to full compensation from the 524(g) trust for their enjoined claims.  The bankruptcy court overruled the insurers' objections and confirmed the plan, which the district court affirmed.  On further appeal, the Ninth Circuit upheld the plan's treatment of the insurers' contribution claims.  *See id.* at 913.  The Court of Appeals explained that

the treatment of the insurers' claims must be evaluated under § 524(g)'s "fair and equitable" standard. Under this standard, to be enforceable, the § 524(g) injunction must be "fair and equitable with respect to [future claimants], in light of the benefits provided, or to be provided, to such trust on behalf of [a party protected by the injunction]." *Id*. at 912 (alteration in original) (quoting 11 U.S.C. § 524(g)(4)(B)(ii)). This statutory standard requires courts to "ensure that the [§ 524(g)] remedy be 'fair and equitable' to future asbestos plaintiffs . . . when viewed in comparison to the benefits provided by the bankrupt and its [settling] insurers." *Id*.

43.    Applying this standard, the Court of Appeals agreed with the lower courts that "enjoining the Non-Settling Insurers' contribution claims was 'fair and equitable' to future asbestos plaintiffs and, in providing the finality and protection from future suit, *supplied the necessary incentive for insurers to settle in the first place*." *Id*. at 913 (emphasis added). As for the rights and interests of the non-settling insurers, the Court of Appeals stated that § 524(g) does not "explicitly direct" the courts to "take cognizance [of them]." *Id.* Nevertheless, the Court of Appeals agreed with the lower courts that the plan's trust-payment and judgment-reduction credits provided "not unsubstantial protection" for the non-settling insurers and rejected the insurers' argument that they were entitled to full compensation for the cost of defending tort claims. *Id*. at 912.

44.    As in *Plant*, the "fair and equitable" standard in § 524(g)(4)(B)(ii) supplies the governing principle here. Congress specified this as the standard by which the availability of injunctions under § 524(g) should be determined—§ 524(g)(4)(B)(ii) requires the court to find that a § 524(g) injunction is "fair and equitable" only *with respect to the benefits afforded to future asbestos plaintiffs*. The statutory language demonstrates that fairness to future asbestos plaintiffs, but not enjoined insurers, is required. As the Court of Appeals noted in *Plant*, "the plain language

- 18 -

of § 524(g) explicitly permits injunctions of the Non-Settling Insurers claims and nowhere provides for any compensation for their lost rights." *Id*. There is no statutory or legal requirement that the injunction of contribution claims in a § 524(g) plan needs to be fair and equitable to non-settling insurers. No prior court in a § 524(g) case has imposed such a requirement.[5]

45.     North River has indicated that, because it holds contingent contribution claims for indemnity and defense costs that may be incurred in the future, it is a future asbestos claimant whose interests should be taken into account under the "fair and equitable" standard of § 524(g)(4)(B)(ii). (Hr'g Tr. 21–23; 139–41, Mar. 6, 2019). North River is not a future asbestos claimant for § 524(g) purposes. Section 524(g)(4)(B)(ii) provides that the injunction and channeling of claims must be "fair and equitable with respect to the persons that might subsequently assert . . . *demands*[.]" 11 U.S.C. § 524(g)(4)(B)(ii) (emphasis added). A "demand" holder is someone who has not yet manifested an asbestos-induced disease and is therefore unknown to, and cannot be ascertained by, the debtor. *See In re Kensington Int'l. Ltd.*, 368 F.3d 289, 304 n.15 (3d Cir. 2004) (describing future asbestos claimants as "a group of unknown individuals"). Moreover, without manifested disease symptoms, a demand holder is *unknowing—i.e.*, the holder does not have the information necessary to protect his or her interests in a bankruptcy case. *See In re Placid Oil Co.*, 753 F.3d 151, 160 (5th Cir. 2014) (describing "future claimants in bankruptcy" as "claimants who are not only unknown but unselfconscious and amorphous") (Dennis, J., dissenting) (citation and internal quotation marks omitted). This is why § 524(g) requires the appointment of a legal representative to "protect the rights of persons that might subsequently assert *demands*[.]"    11 U.S.C. § 524(g)(4)(B)(i) (emphasis added).

---

[5]    Moreover, courts applying New York law have held that judgment reduction is an appropriate means of protecting non-settling insurers' rights against settled insurers outside of the bankruptcy context. *See, e.g.*, *Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 880 (S.D.N.Y. 2018) (finding that a litigating insurer was not entitled to a contribution claim against settled insurers because a setoff was provided to the litigating insurer).

Additionally, as a precondition to granting § 524(g) relief, courts are required to determine, among other things, that "the actual amounts, numbers, and timing of such future *demands* cannot be determined." *Id.* § 524(g)(2)(B)(ii)(II) (emphasis added); *cf. also In re Eagle-Picher Indus., Inc.*, 137 B.R. 679, 680 (Bankr. S.D. Ohio) (describing future asbestos claimants as "a class inherently unknown and unknowable"). This underscores the point that "demands" are unknown and cannot be ascertained. Indeed, the Third Circuit in the *Grossman's* case refers to demands as "*unknown future claims*" and explains that the "fair and equitable" standard is one of the essential due process protections afforded to them under § 524(g). *See In re Grossman's Inc.*, 607 F.3d 114, 127 (3d Cir. 2010); *see also Combustion Eng'g*, 391 F.3d at 234 n.45.

46.     Far from being an unknown and unknowing claimant, North River is a known party holding contingent, unliquidated, and disputed claims, some of which were estimated and temporarily allowed for voting purposes in these Chapter 11 cases. (*See* Rule 3018 Order). Furthermore, unlike demand holders, North River has no need for a legal representative to protect its rights; it has appeared through its own counsel in these proceedings and taken steps to protect its perceived interests. North River is not a future asbestos claimant whose interests must be taken into account under § 524(g)'s "fair and equitable" standard. (*See also* Hr'g Tr. 141:1–11, Mar. 6, 2019 (Mr. Fitzpatrick's testimony that he does not consider North River to be a future demand holder)).

## 2.     Although Directly Applicable to Judgments, the Trust-Payment and Judgement-Reduction Credits Will Influence and Shape Settlements

47.     North River argues that the Plan's judgment-reduction mechanism is inadequate because it would apply only in cases resulting in plaintiffs' judgments, not cases resolved by settlements. (Hr'g Tr. 73:19–74:5, Mar. 7, 2019). This is not correct. As a Non-Settling Asbestos Insurer, North River will be able to take advantage of these two mechanisms if and when it

negotiates to settle future tort cases.  Like most litigation, asbestos tort cases settle in a way that

reflects potential liability rules and likely results at trial, discounted by risks of litigation.  The

bankruptcy court in *Plant* found that the judgment-reduction and trust-payment credit provisions

would be taken into account in settlement negotiations between the insurers and tort claimants:

> The Judgment-Reduction and Trust-Payment Credits will be largely effective in
> restoring to Non-Settling Insurers the value of their lost contribution rights in cases
> brought in the tort system and settled before trial.  The process of settling asbestos
> claims is a very rational one in which both sides are represented by expert counsel
> who take account of the likely amount the claimant would be awarded if the case
> went to trial.  The credits that the Non-Settling Insurers would be able to assert are
> among the factors regarding the likely outcome of trial that the parties would take
> into account in reaching a settlement.

*In re Plant Insulation Co.*, 469 B.R. 843, 878 (Bankr. N.D. Cal.) (citing *In re Thorpe Insulation*

*Co.*, No. 2:07-bk-19271 (Bankr. C.D. Cal.)), *aff'd*, 485 B.R. 203 (N.D. Cal. 2012), *rev'd on other*

*grounds*, 734 F.3d 900 (9th Cir. 2013), *and aff'd*, 544 F. App'x 669 (9th Cir. 2013)).

48.    Here, post-confirmation settlement negotiations will take into account the fact that

the Plan significantly strengthens the negotiating position of North River vis-à-vis tort plaintiffs

because of the setoffs and credits against any tort judgment and the costs of pursuing litigation.

Plaintiffs negotiating with North River will face the fact that, absent settlement, they cannot

recover unless they first win a jury trial and obtain a judgment and then prosecute and win a second

judgment-enforcement coverage action against North River (to the extent North River is

determined to be responsible to pay the claim).  Asbestos plaintiffs may have to bear the added

costs of engaging their own insurance coverage counsel to pursue the second, judgment-

enforcement action.  And the second, judgment-enforcement trial might take years to complete.

Any tort settlements negotiated by North River will necessarily reflect the provisions of the Plan

that apply to cases litigated to judgment.  (Hr'g Tr. 133:15–134:4, Mar. 6, 2019 (Fitzpatrick

Testimony)).  They will tend to reduce any tort settlements voluntarily paid by North River to its

"fair share" after consideration of its contribution claims against the Debtors and the Settling

Asbestos Insurers. (*Id.*). If either North River or the plaintiff believes the other side is not taking

all of the necessary factors into account during settlement negotiations, the judgment-enforcement

case will proceed to trial, and the plaintiff will have his or her resulting judgment against North

River reduced to the extent of any valid contribution claim against the Debtors or Settling Asbestos

Insurers.

### 3. The Trust-Payment and Judgment-Reduction Credits Would Benefit Non-Settling Asbestos Insurers by Discouraging the Prosecution of Claims in the Tort System

49.     North River argues that the Judgment-Reduction Credit is inadequate because it

would not enable North River to offset its defense costs if they prevailed on the defense of the

claim. (Hr'g Tr. 71:14–22, Mar. 7, 2019). The bankruptcy court in *Plant*, however, found on

substantial evidence that the plan *would* effectively compensate insurers for lost contribution

claims in connection with dismissed cases:

> The Judgment-Reduction and Trust-Payment Credits will be substantially effective in ***indirectly*** restoring Non-Settling Insurers the value of their lost contribution rights, including those arising in cases brought in the tort system and dismissed without payment to the claimant. This is so because the Judgment-Reduction and Trust-Payment Credits will substantially reduce the number of claims brought in the tort system that the Non-Settling Insurers are called upon to defend.

*Plant Insulation Co.*, 469 B.R. at 878.

50.     Here, plaintiffs' counsel will be aware of their clients' rights under the Plan and the

TDP, including their right to a definite and efficient recovery from the Trust, and the effects that

judgment reduction would have on any recoveries obtained through the tort system. Likewise,

North River and the defense counsel it retains to defend cases in the tort system will know that

they have recourse to judgment reduction. Armed with this information and the greater degree of

certainty it provides with respect to ultimate outcomes, more tort settlements should result, on

terms that account for North River's potential contribution claims.  Cases that settle produce no orphan defense costs.

51.    In the future, the higher percentage of asbestos-related claims prosecuted in the tort system against the Reorganized Debtor will be high-value claims.  The unrebutted testimony of Mr. Fitzpatrick, who has decades of experience resolving asbestos-related claims, is that claimants with the "stronger" or "higher value" claims will most likely pursue the unsettled insurance coverage in the tort system.  (Hr'g Tr. 114:13–24; 116:9–17, Mar. 6, 2019).  Incentives created by the Plan will reduce the assertion of tort claims of lower or marginal value.  (Hr'g Tr. 116:15–17, Mar. 6, 2019 (Fitzpatrick Testimony)).  The incentive structure permits the Court to find it likely that a material number of claims that would otherwise be asserted against the Debtors in the tort system will be satisfied exclusively by the Trust.  The incentives will have the largest impact on, and will discourage, tort-system asbestos claims of marginal merit or low value—the very claims that are much more likely to give rise to orphan defense costs.

52.    Indeed, the Trust is entitled to permit only certain claims to pursue the second, judgment enforcement action against insurers.  *See* TDP § 5.10.  This is designed to allow the Trust to prevent lower or marginal value claims from diluting the insurance assets (through payment of defense costs) that are available to pay future claimants.

53.    North River will thus have a significant benefit in the reduction of lawsuits after the Effective Date.  Trust payments will result in a significant number of claimants' decisions not to pursue tort recoveries.  The result is that pursuit of additional compensation through the tort system will become uneconomic or of marginal value in many cases, especially considering that asbestos victims are often aged, grief-stricken, and unwilling to risk uncertain outcomes at trial. For these reasons, North River's objections here are overruled.

### 4.    North River Is Not Entitled to Full Compensation for Its Claims

54.    North River complains that judgment reduction is inadequate because it would not fully offset its contribution claims for defense and indemnity costs in every instance and suggests that the Plan should give it the right "to bring suit against the Trust to obtain whatever contribution they are entitled to but cannot obtain via the judgment reduction mechanism." (Jt. Obj. at 25). This is similar to the "trust backstop" that the non-settling insurers demanded, and the courts rejected, in *Plant*. Section 524(g) does not require that the Trust act as a "backstop" for indemnity and defense costs paid by non-contributing Insurers in excess of their allocated or "fair" share. Among other problems, a trust backstop would take funds that would otherwise go to future asbestos claimants and use them to pay the Non-Settling Asbestos Insurers' claims. As noted above, Congress specified the standard by which the availability of injunctions under § 524(g) should be determined—§ 524(g)(4)(B)(ii) requires the court to find that a § 524(g) injunction is "fair and equitable" only *with respect to the benefits afforded to future asbestos claimants*. The statutory language demonstrates that fairness to future asbestos plaintiffs, not enjoined insurers, is required. In this respect, a trust backstop would not meet the standard of being fair and equitable to future claimants.

55.    Moreover, a trust backstop would effectively impose on one set of asbestos claimants (those relying exclusively on the Trust for compensation) the costs of litigating against another set of asbestos claimants (those using the tort system). If the Non-Settling Asbestos Insurers are entitled to recover uncompensated costs from the Trust, then the recovery by the claimants relying exclusively on the Trust would be reduced. In essence, claimants relying solely on the Trust would be paying the Non-Settling Asbestos Insurers to defend cases against asbestos claimants who chose to pursue their claims outside the Trust. This shifting of liability to claimants

who rely solely on the Trust for payment makes little sense, is inequitable, and is therefore inferior to the Plan's proposed treatment of North River's asserted claims.

56.    Contrary to North River's arguments (Jt. Obj. at 25), the *ASARCO* and *Thorpe Insulation* cases are distinguishable and do not require a 100% payout on contribution claims.  In *ASARCO*, the debtor had run a successful mining operation, accumulating over $1 billion in cash while awaiting plan confirmation, and the bankruptcy court there was choosing between two competing plans of reorganization that were "full payment" plans.  *See In re ASARCO LLC*, 420 B.R. 314, 319 (S.D. Tex. 2009); *see also id*. at 357 ("This Court agrees that the Parent's Plan is both feasible and confirmable.  It offers the creditors *full payment* and is more likely to close than the Debtor's Plan."  (emphasis added)).  The 100% payout to insurers had more to do with the underlying economics and financial condition of the debtor rather than what the insurers were owed by dint of bankruptcy law.  Similarly, *Thorpe* involved a plan "in which the debtor provided for full payment of the non-settling insurers' equitable contribution claims, but there was no decision by the court holding that such treatment was required . . . ."  *In re Plant Insulation Co.*, 469 B.R. at 888 (citing *In re Thorpe Insulation Co.*, No. 2:07-bk-19271 (Bankr. C.D. Cal.)).  As there is no requirement for a "trust backstop" or for full compensation of the claims of non-contributing insurers, this Court should reject North River's demands for such.

### E.    The Plan Satisfies § 1129(a)(1) of the Bankruptcy Code

57.    The Plan complies with all applicable provisions of the Bankruptcy Code, thereby satisfying § 1129(a)(1).  Among other provisions, as shown below, the Plan meets the requirements of §§ 1122 and 1123 of the Bankruptcy Code and Bankruptcy Rule 3016.

### 1.    The Plan's Classification of Claims Is Proper Under § 1122(a)

58.    The Bankruptcy Code imposes a limitation on the classification of claims and interests, requiring that only substantially similar claims may be included in the same class.  *See*

11 U.S.C. § 1122(a).  The Plan complies with § 1122(a) because each class of claims and interests

set forth in Article III of the Plan consists solely of substantially similar claims.

59.    North River argues that the Plan improperly places their contribution claims for

postpetition defense costs and pre- and postpetition indemnity costs in Class 7, in violation of

§ 1122(a).  (Jt. Obj. at 3).  It contends that its claims represent "ordinary commercial debt" that

arises from their contractual relationship with the Debtors and thus bear little resemblance to the

asbestos tort claims in Class 7.  (*Id.* at 4, 6).  North River also contends that its contribution claims

for defense costs do not fit within the Plan's definition of "Indirect Trust Claims" because the

claims are for defense costs, not "damages."  (*Id*. at 5).  All of these arguments are unavailing.

60.    With respect to how the Plan defines Class 7 claims, North River's claims for

indemnity and defense costs handily fit within the definition of "Asbestos Personal Injury Claim,"

one type of claim in Class 7 that will be enjoined and channeled to the Asbestos Trust.  In relevant

part, the Plan defines "Asbestos Personal Injury Claim" as

> any Claim . . . asserted against a Debtor, or for which a Debtor is liable, whether in
> the nature of or sounding in tort, ***contract***, warranty, or any other theory of law . . .
> arising by reason of, directly ***or indirectly***, . . . bodily, or other personal injury,
> death, or damages arising from personal injury or death (including any claim or
> demand for . . . ***reimbursement***, indemnity, ***contribution***, or subrogation), . . .
> caused or allegedly caused, in whole or in part, directly or indirectly, . . . by asbestos
> or asbestos-containing products [for which a Debtor is legally responsible].

Plan § 1.01(18) (emphasis added).  By North River's own admission, its claims are for

reimbursement or contribution.  Its claims arise *indirectly* from bodily or personal injury resulting

from exposure to asbestos or asbestos-containing products.  And, even as claims based on

"contract," its claims are swept into the definition.  Accordingly, North River's argument that the

Plan has not placed its defense-cost claims in Class 7 fails.

61.    In addition, the Plan properly places the Asbestos Insurers' claims in Class 7, with

the tort claims of asbestos victims.  Section 1122(a) provides that "a plan may place a claim or an

interest in a particular class only if such claim or interest is substantially similar to the other claims

or interests of such class."  11 U.S.C. § 1122(a).  "Claims are similar if they have substantially

similar rights to the debtor's assets."  *In re Quigley Co.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007)

(citation and internal quotation marks omitted).  "The fact that some members of the class may

also look to third parties for payment, while others in the class do not have the same right, does

not mandate separate classification."  *Id*. (citing *In re AOV Indus., Inc.*, 792 F.2d 1140, 1151 (D.C.

Cir. 1986)).  Bankruptcy courts have broad discretion in determining whether a plan classification

scheme satisfies § 1122(a) and will uphold such a scheme so long as it is "reasonable" and does

not "arbitrarily designate classes."  *In re W.R. Grace & Co.*, 729 F.3d 311, 326 (3d Cir. 2013).

Here, North River's indirect claims and the direct claims of asbestos tort victims share substantially

similar rights to the Debtors' assets insofar as both kinds of claims are unsecured.  It makes no

difference whether North River's claims are contract-based or represent "ordinary commercial

debt" because, like the tort claims, they arise (albeit indirectly) from one root cause:  exposure to

asbestos or asbestos-containing products.

62.    For this very reason, the Third Circuit in *W.R. Grace* determined that the Grace

plan had "reasonably classified" the indemnification and contribution claims of Montana and

Canada "with direct personal injury claims."  *Id*.  The Court of Appeals explained that "[b]oth

direct and indirect claims under the Plan exhibit a similar effect on Grace's bankruptcy estate—

they seek recovery from the trust for actions related to Grace's asbestos liability."  *Id*. (quoting

*W.R. Grace*, 475 B.R. at 110).  Similarly, in *Armstrong World Industries*, the district court in

Delaware upheld the classification of contract-based indirect claims with direct personal-injury

claims in one asbestos class under the plan.  *See In re Armstrong World Indus., Inc.*, 348 B.R. 136,

159-60 (D. Del. 2006).  The court explained:

- 27 -

> Because all Asbestos Personal Injury Claims in Class 7 (including Indirect PI Trust
> Claims) relate, directly or indirectly, to AWI's liability for asbestos-related
> personal injury and wrongful death claims, whether arising under tort law (as is the
> case with direct Asbestos Personal Injury Claims . . .) or under contract (as may be
> the case with certain direct Asbestos Personal Injury Claims [such as unpaid settled
> claims] and certain Indirect PI Trust Claims), a reasonable basis exists for the
> classification of the Asbestos Personal Injury Claims together in a single class.

*Id*. As with the indirect claims in *W.R. Grace* and *Armstrong*, a reasonable basis exists for

classifying North River's claims for indemnity and defense costs with the asbestos tort claims in

Class 7, as all of these claims relate, directly or indirectly, to asbestos or asbestos-containing

products for which the Debtors are legally responsible.

63.     North River tries to distinguish *W.R. Grace* by arguing that the claims of Montana

and Canada "did not include claims for reimbursement of defense costs owed by the debtor, like

the Insurers' claims do." (Jt. Obj. at 6).  This asserted distinction is unavailing.  North River would

not be incurring defense costs in the first place but for the asbestos exposures that are giving rise

to the tort claims of asbestos victims.  North River has incurred, and will incur (if it chooses not to

settle), defense costs because it wrote insurance policies providing coverage responsive to asbestos

personal injury claims.  The root element common to all Class 7 claims is asbestos, and North

River's claims are properly classified in Class 7, regardless of whether they are for damages or

defense costs.  The Third Circuit's *W.R. Grace* decision is applicable and controlling here.

64.     North River also argues that, per the decision in *Congoleum*, their claims should be

classified with the general unsecured claims in Class 5.  (Jt. Obj. at 6-7).  But *Congoleum* does not

compel such a result.  The court in *Congoleum* held that the insurers' claims could not be separately

classified in an insurer-sponsored plan to obtain an impaired consenting class.  *See In re*

*Congoleum Corp.*, 362 B.R. 198, 203 (Bankr. D.N.J. 2007).  In other words, *Congoleum* is about

separate classification.  It does not prevent the Plan Proponents from *including* the asbestos-related

contribution claims of the Asbestos Insurers with other asbestos claims in Class 7.  Indeed,

§ 524(g) requires that there be "a *separate* class or classes of the claimants whose claims are to be addressed" by the § 524(g) trust. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) (emphasis added). Under the Plan, North River's claims will be "addressed" by the Trust because they will be channeled to the Trust, and North River will receive the Trust-Payment Credit and Judgment-Reduction Credit on account of its channeled claims. Accordingly, the claims of North River have been properly placed in Class 7, and its classification objection is overruled.

## 2. The Plan Provides for Equal Treatment of Class 7 Claims Under § 1123(a)(4)

65.     Compliance with § 1123 of the Bankruptcy Code is also necessary for the Court to conclude that the Plan complies with § 1129(a)(1) of the Bankruptcy Code. Among other things, § 1123 requires a chapter 11 plan to "provide the same treatment for each claim or interest of a particular class . . . ." 11 U.S.C. § 1123(a)(4). Nevertheless, as the Third Circuit explained in *W.R. Grace*:

> Courts are . . . in agreement that § 1123(a)(4) does not require precise equality, only approximate equality. Certain procedural differences, such as a delay in receipt of distributions for some claims, do[] not alone constitute unequal treatment. In fact, § 524(g) clearly envisions that asbestos claims will be paid periodically as they accrue and as they are allowed, since it requires courts to ensure that there will be sufficient funds available for both future demands and present claims to receive similar treatment. Therefore, differences in the timing of distributions and other procedural variations that have a legitimate basis do not generally violate § 1123(a)(4) unless they produce a substantive difference in a claimant's opportunity to recover.

*W.R. Grace*, 729 F.3d at 327–28 (alteration in original) (citations and internal quotation marks omitted).

66.     North River asserts that the Plan cannot be confirmed because it does not treat its claims the same as the other asbestos claims in Class 7. Specifically, it contends that the Plan will give it "*no opportunity*" to recover on its claims. (Jt. Obj. at 8). This is incorrect. The Plan will

treat North River's asserted claims in a manner that is at least the same, if not superior to, the treatment of indirect asbestos claims held by entities that are not Asbestos Insurers.

67.    To understand why this is the case, it is necessary to consider first how the indirect claims—chiefly, claims for reimbursement, contribution, or indemnity—of non-insurers (such as asbestos co-defendants) will be treated under the Plan.  Under the TDP, indirect claims will be treated as presumptively valid if four separate conditions are met.  First, the indirect claimant's liability for the underlying direct claim must be fixed and liquidated by either settlement or Final Order, and the indirect claimant must fully pay its share of the liability to the underlying direct claimant.  (TDP § 5.5, at 24-25).[6]  Second, the indirect claimant must fully pay the Trust's share of the liability to the underlying direct claimant.  (*Id.*).  Third, in any case in which the indirect claimant satisfies the underlying direct claim by way of settlement, the indirect claimant must obtain for the benefit of the Trust a release of liability.  (*Id.*).  Fourth, the indirect claim must not be barred by a statute of limitations or repose or by other applicable law.  (*Id.*).  If each of these four conditions is satisfied, the validity of the indirect claim will be established.  And, once validity is established, the indirect claim will be subject to the same categorization, evaluation, and payment provisions of the TDP as all other asbestos claims.  (*Id.* § 2.6).  Thus, the indirect claim will be paid in first-in-first-out (FIFO) order based on the date the indirect claim is liquidated in the claims review process (*id.* § 5.1(b)), and the indirect claimant will receive an amount equal to the lesser of the liquidated value of the indirect claim multiplied by the payment percentage or the scheduled TDP value of the underlying claim multiplied by the payment percentage.  (*Id.* §§ 4.1–4.3, 5.5).

---

[6]    The TDP is annexed to the Plan as **Exhibit F** (Bankr. ECF No. 279-6).

68.    North River will receive the same benefit that the non-insurer indirect claimants will receive, in the form of Trust-Payment Credit.  And North River will receive the Trust-Payment Credit without having to satisfy the four conditions to presumptive claim validity that indirect claimants will have to meet to receive a payment from the Trust.  Moreover, indirect claimants who are not Non-Settling Asbestos Insurers will not receive the benefit of the Judgment-Reduction Credit.  In this respect, North River will receive treatment more favorable than that afforded to indirect claimants who are not Non-Settling Asbestos Insurers.

### 3.    North River Is Not Entitled to Adequate Protection

69.    North River argues that it deserves to receive cash distributions from the Trust on account of its claims because it is entitled to "adequate protection."  (Jt. Obj. at 16-18).  In bankruptcy, "adequate protection" is a specific term of art (*see, e.g.*, 11 U.S.C. § 361), which North River misapprehends.  As the bankruptcy court explained in the *SunEdison* case,

> Adequate protection must be provided to protect against the decline in value to a non-debtor's interest in property of the estate resulting from the imposition of the automatic stay, . . . the use, sale or lease of that property, . . . or the granting of a priming lien on that property to secure post-petition financing.

*In re SunEdison, Inc.*, 562 B.R. 243, 252 (Bankr. S.D.N.Y. 2017) (citations omitted).[7]  In other words, adequate protection—in the form of, for example, cash payments or replacement liens—is intended to offset any erosion in the value of property in which a creditor holds an interest (normally a lien) while a bankruptcy case is pending.  Thus, "[u]nsecured creditors . . . do not have an interest in property of the estate that merits adequate protection, and *there is no express statutory requirement that unsecured creditors receive adequate protection*."  *SunEdison, Inc.*, 562 B.R. at

---

[7]    *See also In re 354 E. 66th St. Realty Corp.*, 177 B.R. 776, 782 (Bankr. E.D.N.Y. 1995) ("The purpose or intent of granting adequate protection payments are to maintain the status quo for that creditor and to protect the creditor from diminution or loss of the value of its collateral during the ongoing Chapter 11 case.  If that creditor is oversecured or if there is no reason to believe that the collateral will diminish, then adequate protection payments may not be granted.").

252 (emphasis added and citation omitted); *accord*, *In re Babcock and Wilcox Co.*, 250 F.3d 955, 960 n.12 (5th Cir. 2001) (explaining that party "is an unsecured creditor, not a senior lienholder, and thus *would* not be entitled to adequate protection . . . " (citations omitted)); *In re Patriot Contracting Corp.*, 2006 WL 4452840, at *4 (Bankr. D.N.J. Mar. 28, 2006) ("As an unsecured creditor of the Debtor, the IRS is not entitled to adequate protection." (citations omitted)); *In re 3036 Richmond Inc.*, 2001 WL 36275467, at *8 (Bankr. E.D. Pa. Mar. 13, 2001) (stating that "creditors who hold only an unsecured claim against the debtor do not, by virtue of such a claim, hold an interest in property entitled to adequate protection" (citations omitted)).  North River is not a lien creditor and holds no other interest in the Debtors' property.  As the holder of unsecured claims, North River is not entitled to adequate protection.

70.    North River's reliance on the *Johns-Manville* and *W.R. Grace* decisions to support its alleged entitlement to "adequate protection" is misplaced.  Neither decision stands for the proposition that the Asbestos Insurers are entitled to adequate protection.  Indeed, the Second Circuit in *Manville* was merely analogizing the effect of an asbestos channeling injunction to a sale free and clear of interests, where liens on the assets sold attach to the sale proceeds.  *See In re Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988); *see also* 11 U.S.C. § 363(e).  Moreover, the Trust-Payment Credit and Judgment-Reduction Credit were not before the courts of appeals in *Johns-Manville* and *W.R. Grace*.  As a result, those decisions fail to support North River's "adequate protection" argument.

71.    North River argues that the Judgment-Reduction Credit falls short because, even though it provides "adequate protection" with respect to its contribution claims against Settling Asbestos Insurers for indemnity costs, it fails to provide such protection with respect to contribution claims for defense costs. (Jt. Obj. at 17).  As noted above, this argument fails because

North River is not entitled to adequate protection.  Moreover, North River has no "interest" in the policies issued by the Settling Asbestos Insurers that is entitled to adequate protection under 11 U.S.C. § 363(e); North River's contribution claims against Settling Asbestos Insurers are based in equity, not the policies.  *Hartford Underwriters Ins. Co. v. Hanover Ins. Co.*, 653 F. App'x 66, 67 (2d Cir. 2016) ("Under New York law, "[t]here is . . . [a] well-settled equitable right to contribution, where there is concurrent insurance even in the absence of a policy provision for apportionment." (citing *Travelers Ins. Co. v. Gen. Accident, Fire & Life Assurance Corp.*, 271 N.E.2d 542 (N.Y. 1971))).  The argument also fails because it is incorrect.  If North River has equitable contribution claims for defense costs against Settling Asbestos Insurers, then the Judgment-Reduction Credit will take those claims into account, further reducing any judgment that an asbestos plaintiff obtains in a judgment-enforcement action against it.  (*See* Hr'g Tr. 120:13–24, Mar. 7, 2019).

### 4.    The Plan Complies with Other Elements of § 1123

72.    For the reasons set forth below, the Plan satisfies the other provisions of § 1123.

(a)    **Section 1123(a)(1).**  The Plan satisfies § 1123(a)(1) because it adequately and properly identifies and classifies all claims and interests.  (*See* Plan art. III).

(b)    **Section 1123(a)(2).**  Section 1123(a)(2) of the Bankruptcy Code requires that the Plan specify any class of claims or interests that are not impaired under the plan.  The Plan identifies Classes 1, 2, 3, 4, 5, and 8 as being unimpaired.  (*See* Plan art. III).  Accordingly, the Plan satisfies § 1123(a)(2).

(c)    **Section 1123(a)(3).**  The Plan complies with § 1123(a)(3) of the Bankruptcy Code, which requires that the Plan identify the treatment of each impaired class of claims and interests.  The Plan identifies Class 6 (Prepetition Defense-Cost Contribution Claims), Class 7 (Channeled Asbestos Claims), Class 9 (Intercompany Claims), Class 10 (Related-Party

Claims), Class 11 (Equity Interests in Duro Dyne National Corp.), and Class 12 (Equity Interests

in the other Debtors), and sets forth the treatment of each such impaired class of claims or interests.

(*See* Plan art. III).

(d)    **Section 1123(a)(5).**  Section 1123(a)(5) of the Bankruptcy Code requires

that the Plan include adequate means for implementation.  The Plan complies with § 1123(a)(5)

by, among other things, providing for (a) the substantive consolidation and merger of the Debtors

into the surviving Reorganized Debtor (Plan § 5.01); (b) appropriate amendment of the Debtors'

organizational documents (Plan § 5.02); (c) the creation of the Asbestos Trust (Plan § 4.01); (d)

the transfer and channeling of Channeled Asbestos Claims to the Asbestos Trust (Plan § 4.06); (e)

the Debtors' transfer of the Asbestos Insurance Rights to the Asbestos Trust (Plan § 4.07); and (f)

the funding of, and vesting of assets in, the Asbestos Trust (Plan §§ 4.08, 4.09, 4.10, 4.11).

(e)    **Section 1123(a)(6).**  Section 1123(a)(6) of the Bankruptcy Code requires a

plan to provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of

any corporation to which the debtor transfers all or any part of the debtor's estate or with which

the debtor has merged or consolidated, a provision prohibiting the issuance of non-voting equity

securities.  The Plan complies with § 1123(a)(6) in that it prohibits the issuance of nonvoting

securities of the Reorganized Debtor.   (Podgainy Cert. ¶ 59; Amended Plan Supplement sch.

5.02(a), at 3).

(f)    **Section 1123(a)(7).**  Sections of the Plan 4.02, 4.03, 4.04, and 4.05 of the

Plan contain provisions with respect to the manner of selection of the initial Asbestos Trustee and

his successors, the initial Delaware Trustee and its successors, the Trust Advisory Committee

(TAC), and the Legal Representative.  The Asbestos Trust Agreement (at the signature page) and

the Disclosure Statement (at page 37) identify Alan B. Rich as the Asbestos Trustee.  The

- 34 -

Disclosure Statement (at page 38) identifies the Delaware Trustee as Wilmington Trust, N.A.  The

initial members of the TAC are identified on the signature pages of the Asbestos Trust Agreement.

In addition, the Disclosure Statement (at pages 9 and 47) identifies the persons who will serve as

directors and officers of the Reorganized Debtor.  The Plan is consistent with public policy with

respect to the manner of selection of directors, officers, and managers of the Reorganized Debtor.

Thus, the requirements of § 1123(a)(7) are satisfied.

(g)    **Section 1123(a)(8).**    Section 1123(a)(8) of the Bankruptcy Code is

inapplicable because the Debtors are not individuals.

(h)    **Section 1123(b)(2).**    Article VIII of the Plan, which provides for

assumption or rejection of executory contracts and unexpired leases, complies with the

requirements of § 365 of the Bankruptcy Code and thus satisfies § 1123(b)(2).

(i)    **Section 1123(b)(3)(A).**    Section 1123(b)(3)(A) of the Bankruptcy Code

allows a plan to provide for the settlement of any claim or interest belonging to the Debtors or their

Estates.  The Plan contemplates partial or complete settlement of the Asbestos Insurance Litigation

and any related disputes.  (*See* Plan § 1.01(13)).  In addition, section 9.11 of the Plan provides for

the settlement and release of certain Avoidance Actions and Estate Causes of Action in accordance

with Bankruptcy Rule 9019(a).  The Court finds that the settlement and releases provided for in

section 9.11 of the Plan represent a good-faith compromise; are in the best interest of the Debtors,

their Estates, and the holders of Claims and Equity Interests; are within the reasonable range of

possible litigation outcomes; are fair and equitable; and are an essential element to the resolution

of these Chapter 11 Cases in accordance with this Plan.  (Podgainy Cert. ¶¶ 5-11, 54; Fitzpatrick

Decl. ¶¶ 12-14, 22).  Accordingly, the settlements and releases described in section 9.11 of the

Plan are approved pursuant to Bankruptcy Rule 9019(a) and § 105(a) of the Bankruptcy Code.

### 5.    The Plan Complies with Bankruptcy Rule 3016

73.    The Plan also satisfies the requirements of Bankruptcy Rule 3016, as follows:

(a)    **Bankruptcy Rule 3016(a).**  As required by Bankruptcy Rule 3016(a), the Plan is dated and identifies the Plan Proponents.

(b)    **Bankruptcy Rule 3016(b).**  The filing of the Disclosure Statement with the Court satisfies Bankruptcy Rule 3016(b) in all the Chapter 11 Cases.  The Disclosure Statement was approved as containing adequate information within the meaning of § 1125 of the Bankruptcy Code.  (*See* Solicitation Procedures Order ¶ 4).  The Plan was transmitted in accordance with the Solicitation Procedures Order, a reasonable time was given to holders of Class 6 and Class 7 claims to accept or reject the Plan, and the solicitation complied with § 1126(b) of the Bankruptcy Code.

(c)    **Bankruptcy Rule 3016(c).**  The Plan and Disclosure Statement satisfy Bankruptcy Rule 3016(c) by identifying, in specific and conspicuous language, both the acts to be enjoined by the Asbestos Permanent Channeling Injunction and the other Injunctions contained in the Plan, and the entities that are subject to the Asbestos Permanent Channeling Injunction and the other Injunctions contained in the Plan.  (Plan §§ 9.03, 9.04, 9.05, 9.06, 9.07, 9.09, 9.10; Disclosure Statement at 56–60).

### F.    *The Plan Satisfies § 1129(a)(2) of the Bankruptcy Code*

74.    Section 1129(a)(2) of the Bankruptcy Code requires that the Plan Proponents comply with all applicable provisions of the Bankruptcy Code, including § 1125.  The Plan Proponents have satisfied this requirement.  The Disclosure Statement distributed to creditors contained adequate information about the Plan.  (*See* Solicitation Procedures Order).  The mailing and publication of notice of the Disclosure Statement and Plan provided adequate notice of the Disclosure and Plan to creditors entitled to vote as required by Bankruptcy Rules 2002 and 3017. The voting procedures utilized by the Plan Proponents and approved by the Bankruptcy Court in

the Solicitation Procedures Order satisfy all requirements of the Bankruptcy Code and Bankruptcy

Rules, including §§ 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 2002, 3017,

and 3018. The solicitation of votes was conducted in accordance with procedures approved by the

Bankruptcy Court. (Podgainy Cert. ¶¶ 46-50, 63, 83).

### G.     The Plan Satisfies § 1129(a)(3) of the Bankruptcy Code

75.     The Plan satisfies the requirement under § 1129(a)(3) that it be "proposed in good

faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).

### 1.     Good Faith

76.     The Plan is the result of extensive negotiations between the Debtors on the one

hand and representatives of existing and future asbestos claimants on the other hand, and is

supported by the Committee and the Legal Representative. (Podgainy Cert. ¶¶ 5-11; Fitzpatrick

Decl. ¶¶ 11-15). In addition, the Plan creates the Trust to pay the Debtors' present and future

asbestos creditors under § 524(g), taking advantage of funds that will become available to asbestos

victims only under a confirmed 524(g) plan. (*See* Plan §§ 4.01, 4.07, 4.08, 4.10, 4.11).

77.     The Plan also furthers the goals of § 524(g). Section 524(g) offers a means of

resolving asbestos liabilities that is uniquely valuable not only to debtors but also to the victims of

a debtor's use of asbestos, and to Asbestos Insurers who agree to contribute to the Trust under

§ 524(g). There is no effective mechanism other than § 524(g) to fairly address the claims of future

asbestos claimants or provide complete protection from litigation for parties that contribute to the

settlement. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 860 n.34 (1999) (denying class action

relief to resolve asbestos-related claims); *In re Federal-Mogul Glob., Inc.*, 684 F.3d 355, 358-59

(3d Cir. 2012). The Debtors invoked § 524(g) in good faith, as chapter 11, not some other chapter

of the Bankruptcy Code or a nonbankruptcy resolution, offers all participating parties the only

means to fully resolve the Debtors' asbestos liabilities. The Plan preserves going-concern value,

- 37 -

furthering another goal of § 524(g).  It is not bad faith to propose a plan that takes advantage of provisions of the Bankruptcy Code.  *See In re Sylmar Plaza, L.P.*, 314 F.3d 1070, 1075 (9th Cir. 2002).

78.     Moreover, caselaw teaches that "[t]he fact that the plan is proposed by the committee as well as the debtors is strong evidence that the plan is proposed in good faith."  *In re Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 2007).  Here, the Plan was proposed by the Debtors, the Legal Representative, and the Committee.  And 100% of the asbestos disease victims voting on the Plan approved it.  (*See* Tabulation Report).  The unanimous support for the Plan from the asbestos disease victims is a strong indication of good faith.

79.     North River argues that the Plan constitutes a ploy by the Plan Proponents to gain bargaining leverage over them in coverage disputes, which allegedly evidences "bad faith."  The Court is not persuaded by North River's arguments.  Liability insurance policies are property of the Debtors' bankruptcy estates, and the estates are "worth more with them than without them."  *In re Minoco Grp.*, 799 F.2d 517, 519 (9th Cir. 1986); *see also In re Vitek, Inc.*, 51 F.3d 530, 534 (5th Cir. 1995); *In re W. Asbestos Co.*, 313 B.R. 859, 864 (N.D. Cal. 2004).  As fiduciaries, the Debtors have a duty to maximize the value of estate assets, including insurance assets, for the benefit of creditors.  *See In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004); *Official Comm. of Unsecured Creditors of Cybergenics Corp., v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003); *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 474 (3d Cir. 1998).  On the other hand, as a Non-Settling Asbestos Insurer, North River is incentivized to oppose the maximization of value of the Debtors' insurance assets and is thus contesting the extent of its coverage obligations.  The Plan preserves the contested coverage available to the Debtors and their asbestos victims *and* makes the benefits of a § 524(g) reorganization available to all of the Debtors' constituencies,

including Asbestos Insurers.  The Asbestos Insurers have options:  They can choose to settle their differences with the Debtors and make a satisfactory contribution to the Trust, thereby gaining the protections of a Settling Asbestos Insurer and putting the coverage disputes and asbestos tort litigation behind them.  Or they can elect to continue litigating their coverage obligations and defending cases against the Debtors in the tort system—just as they were doing prebankruptcy.  As to the latter option, the Plan follows the standard bankruptcy practice under which liability insurers continue to owe policy obligations to provide tort defense and indemnity even after a policyholder bankruptcy.  *See, e.g.*, *Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992); *Owaski v. Jet Florida Sys., Inc.* 883 F.2d 970, 975 (11th Cir. 1989); *Lang v. Hanover Ins. Co.*, 820 N.E.2d 855, 858 (N.Y. 2004).

80.     North River's reliance on *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999), is misplaced.  In *SGL Carbon*, the debtor was facing seven antitrust lawsuits when it filed for bankruptcy.  *Id.* at 157.  The Third Circuit found that the lawsuits would have no impact whatsoever on the debtor's financial condition, so the debtor had no need to reorganize under chapter 11 protection.  *Id.* at 166.  The creditors committee moved to dismiss the debtor's case as a bad faith filing under § 1112 of the Bankruptcy Code, and the Third Circuit agreed that the filing was in bad faith.  By contrast, here the Debtors face not seven antitrust suits but potentially thousands of existing and future asbestos claims, and have filed chapter 11 to take advantage of a specific remedy granted by Congress for addressing such claims—§ 524(g).  Rather than being adverse to the creditors committee, as the debtor in *SGL Carbon* was, the Debtors have worked with representatives for present and future asbestos claimants in order to develop a consensual § 524(g) plan.  Unlike the debtor in *SGL Carbon*, which was trying to gain negotiating leverage in antitrust litigation, the Debtors are trying to maximize the value of estate assets—including, their

insurance assets—an effort to which North River's economic self-interest is diametrically opposed.  This is the context giving rise to the coverage disputes and North River's confirmation objections.  But it is not evidence of bad faith on the Debtors' part.

81.    North River also argues that the Plan is proposed in bad faith because the Debtors have a "profitable" business and thus can allegedly satisfy their asbestos-related obligations without relief under chapter 11 or § 524(g).  (Hr'g Tr. at 49, Mar. 7, 2019).  But it is "well established that a debtor need not be insolvent before filing for bankruptcy protection."  *SGL Carbon Corp.*, 200 F.3d at 163 (citations omitted).  Indeed, when enacted in 1978, the Bankruptcy Code eliminated the requirement in the former Bankruptcy Act that a debtor seeking bankruptcy relief "be insolvent or unable to pay his debts as they mature."  *In re Johns-Manville Corp.*, 36 B.R. 727, 732 (Bankr. S.D.N.Y. 1984) (citations omitted).  Moreover, when Johns-Manville Corporation, a leading asbestos manufacturer, filed for bankruptcy protection in the early 1980s, its business was "economically robust," but it sought chapter 11 relief because of "the *spectre* of proliferating, overburdening [asbestos] litigation to be commenced *in the next 20-30 years . . . .*"  *In re Johns-Manville Corp.*, 36 B.R. 743, 745 (Bankr. S.D.N.Y. 1984) (emphasis added and citation omitted).  With this "spectre" of anticipated *future* asbestos liability, Manville was able to confirm a plan of reorganization that provided for an asbestos trust and channeling injunction, which became a model on which Congress crafted § 524(g).  *See In re Johns-Manville Corp.*, 600 F.3d 135, 142 (2d Cir. 2010).  The fact that Manville was "economically robust" at the time of its bankruptcy did not disqualify it from relief under chapter 11.  Similarly, the current profitability of the Debtors' business should not disqualify the Debtors here.

82.    The record reflects that the Debtors' overhanging asbestos liability was, at the very least, starting to have a crippling effect on their business by preventing them from raising capital

or obtaining debt financing. (Hr'g Tr. 86:8–87:4, Mar. 6, 2019). The Debtors should not be forced to wait for a difficult situation to become worse before they can seek chapter 11 relief in good faith. As the Third Circuit observed in *SGL Carbon*, "the drafters of the Bankruptcy Code understood the need for early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation." *SGL Carbon Corp.*, 200 F.3d at 163 (footnote omitted). And, as the bankruptcy court in this district noted, "unmanageable asbestos mass tort litigation faced by small businesses provides a prototypical setting for implementing the Bankruptcy Code's vitally important early access policy." *In re Muralo Co.*, 301 B.R. 690, 701 (Bankr. D.N.J. 2003). North River is therefore incorrect when it asserts that the Debtors' "profitable" business precludes them from proposing a 524(g) plan in good faith. North River's "bad faith" objections are therefore overruled.

83.    In addition to North River, the UST argues that the Plan is not proposed in good faith because the proposed TDP allegedly contains objectionable provisions. This Court addresses the UST's TDP-related arguments below and finds them unavailing. *See infra* part X.Q. Accordingly, the UST's "bad faith" objections are also overruled.

### 2.    No Means Forbidden by Law

84.    The Plan provides that the Asbestos Insurance Rights of the Debtors will be transferred to the Asbestos Trust on the Plan's Effective Date. North River objects to this transfer, suggesting that it constitutes a "means forbidden by law" in violation of § 1129(a)(3). North River argues that, by attempting to transfer their policy rights without the Asbestos Insurers' consent, the "Debtors are attempting to change the entity that the Insurers are required to indemnify to one that has, as its beneficial owner, the very Asbestos Claimants that are adverse to the Debtors, and thus to the Insurers." (Jt. Obj. at 21). Thus, from North River's perspective, the Plan "improperly expands the rights of coverage under such insurance policies pursuant to the assignment." (*Id.*)

85.     Controlling Third Circuit precedent, however, authorizes the transfer of a debtor's insurance rights to § 524(g) trusts.  In the *Federal-Mogul* case, a number of insurers objected to confirmation, arguing that the plan's proposed assignment of the insurance rights violated their policies' anti-assignment provisions.  *See Federal-Mogul*, 684 F.3d at 363.  The bankruptcy court ruled against the objecting insurers, holding that the Bankruptcy Code preempted the anti-assignment clauses in their policies.  The bankruptcy court also relied on state insurance-law doctrine that assignments made after the occurrence giving rise to liability do not violate anti-assignment clauses because "there will be no additional risk to the insurance companies by virtue of the assignments."  *Id.* (internal quotation marks omitted) (quoting *In re Federal-Mogul Glob. Inc.*, 385 B.R. 560, 568 (Bankr. D. Del. 2008)).[8]  On appeal, the district court affirmed the bankruptcy court's decision in favor of assignment.  *See In re Federal-Mogul Glob., Inc.*, 402 B.R. 625 (D. Del. 2009).  On further appeal, the Third Circuit also affirmed, concluding that federal bankruptcy law preempted the policies' anti-assignment provisions.  In upholding preemption, the Third Circuit looked to § 1123(a)(5)(B), which provides in relevant part as follows:

> *Notwithstanding any otherwise applicable nonbankruptcy law*, a plan shall . . . provide adequate means for the plan's implementation, such as . . . transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan.

11 U.S.C. § 1123(a)(5)(B) (emphasis added).

86.     The Third Circuit determined that the language of § 1123(a)—most notably its "notwithstanding" or super-preemptory clause—evidenced Congress's "clear intent" to preempt

---

[8]     *See also, e.g.*, *Viola v. Fireman's Fund Ins. Co.*, 965 F. Supp. 654, 658 (E.D. Pa. 1997) ("Under Pennsylvania law, an insurer may not limit an insured's ability to assign his or her rights under a policy after the occurrence of the event which gives rise to the insurer's liability.").

state law.  *Federal-Mogul*, 684 F.3d at 369.[9]  As a result, the Third Circuit concluded that assignment of the debtor's coverage rights was permissible under the Bankruptcy Code.  And so it is permissible here.

87.    North River suggests that, by transferring the Asbestos Insurance Rights to the Trust, the Plan "improperly expands the rights to coverage," thereby putting the Asbestos Insurers at greater risk.  (Jt. Obj. at 21).  But courts have agreed that no such material increase in risk is present where the events giving rise to a covered loss already have occurred.[10]  As the Third Circuit noted in *Federal-Mogul*, "after events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity."  *Federal-Mogul*, 684 F.3d at 379 (quoting 3 Couch on Insurance § 35.8).  The transfer of coverage rights merely shifts liabilities "for which the insurers were already potentially responsible" to the 524(g) trust.  *Id*.

88.    North River also objects to section 4.13 of the Plan, which it claims attempts "to rewrite the Debtors' insurance contracts to eliminate the Debtors' cooperation obligations" thereunder.  (Jt. Obj. at 22).  Section 4.13 of the Plan provides that, in the event the Reorganized Debtor is sued nominally in the tort system in order to access available coverage, the "Reorganized Debtor shall have no obligation to defend or otherwise appear or incur any costs or expenses in

---

[9]    *See also Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) (observing that courts generally have interpreted similar "notwithstanding" language as superseding all other laws).

[10]    *See, e.g., OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. 06-167, 2006 WL 1473004 at *2–3 (D. Minn. 2006) (noting general consensus among courts that assignment of loss does not expand insurer's risk; simply allows change in identity to "reconnect the policy's coverage to the insured loss"); *In re ACandS, Inc.*, 311 B.R. 36, 41 (Bankr. D. Del. 2004) (holding that policies may be vested in personal injury trust because loss giving rise to liability already accrued); *CNH Am., LLC v. Am. Cas. Co.*, C.A. No. N12C-07-108 JTV, 2014 WL 626030, at *7–8 (Del. Super. Ct. Jan. 6, 2014) (refusing to enforce transferred policy's anti-assignment clause in the context of a corporate transaction based on finding that "[a]n anti-assignment provision intends only to limit the assignability of an interest in the policy before the insured-against loss has occurred"); *Viking Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 103 (Del. Ch. 2009) (stating that anti-assignment clauses in policies cannot be "erected as a barrier to the transfer of 'post-loss claims,' that is to say claims for losses that have already happened"); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Stauffer Chem. Co.*, No. C.A. 87C-SE-11, 1991 WL 138431, at *11 (Del. Super. Ct. July 15, 1991) ("'[A]nti-assignability' clauses are generally interpreted to limit the assignability of insurance contracts before the insured-against loss has occurred.").

connection with" such an action.   (Plan § 4.13).   The provision merely makes clear that the

Reorganized Debtor is not expected to become an active defendant if it is sued nominally in the

tort system on account of a Channeled Asbestos Claim.   Through § 524(g), the Debtors are buying

peace from asbestos lawsuits.   That does not mean that the Reorganized Debtor would refuse to

cooperate in the defense of such actions or that the Trust could not step into the Debtors' shoes to

do so.   The Plan does not cut off policy cooperation obligations.   Under the Plan, North River will

retain any rights to assert failure to cooperate.   If, in the future, the Reorganized Debtor (or the

Trust in its shoes) breaches the policies by failing to comply with any duty to cooperate, there may

be consequences under controlling state law.   Such a breach of cooperation obligations may give

rise to coverage defenses.   Nothing in the Plan takes away or modifies North River's right to

cooperation.   If there *is* a breach of any duty to cooperate, North River has meaningful remedies,

most importantly the right to refuse coverage for a prejudicial failure to cooperate.   *See, e.g.,*

*Admiral Ins. Co. v. Grace Indus., Inc.*, 409 B.R. 275, 283 (E.D.N.Y. 2009) (setting forth standard

under with insurer may disclaim coverage based on failure to cooperate).

89.      North River complains that the Plan in its totality seeks "a declaration concerning

the rights and obligations of the parties with respect to insurance policies in the context of a

confirmation hearing," which North River contends is improper.   (Jt. Obj. at 22).   The Court is

unpersuaded.   The Plan Proponents are not asking the Court to make coverage rulings.   They are

merely proposing treatment of North River's asserted rights and claims under the Plan.   By

necessity, treatment may involve alteration or interference with an insurer's state-law rights, and

indeed, § 524(g) contemplates interference with insurers' contractual rights, including rights

against other insurers. *See Thorpe Insulation*, 677 F.3d at 887.

90.     It is incontrovertible that the impact of the Bankruptcy Code is to modify parties' contractual and equitable rights with respect to a debtor, and there is no absolute bar from doing so.  Sections 1129(a)(1) and 1129(a)(3) of the Bankruptcy Code do not contain any requirement that a chapter 11 plan leave the Asbestos Insurers' rights unaffected.  Section 1129(a)(1) simply requires that a plan comply with the *applicable provisions* of the Bankruptcy Code—a plan cannot violate § 1129(a)(1) unless it violates some other Code provision.  Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law."  Thus, the plain language of that provision is narrowly focused and prevents confirmation of plan *proposed by* means forbidden by law.

91.     North River's alleged rights can be impacted by a plan even if there is no affirmative provision of the Bankruptcy Code that explicitly *permits* a debtor to do so.  A plan proponent's ability to include items in a plan is extensive.  Section 1123(b)(6) makes clear that a plan can contain "any other appropriate provision."  11 U.S.C. § 1123(b)(6).  Applicable state law requires insurance companies to perform their obligations, even in the event of the policyholder's insolvency.  *See, e.g.*, *Grace Indus., Inc.*, 409 B.R. at 282 ("New York Insurance Law § 3420 makes clear that bankruptcy does not relieve the insurance company of its obligation to pay damages for injuries or losses covered under an existing policy." (quoting *Lang v. Hanover Ins. Co.*, 820 N.E.2d 855, 858–59 (2004))).[11]  Thus, state law requires insurers to perform their obligations, while the Bankruptcy Code excuses the debtor from performance.  This is not a violation of the law—it is precisely what the law provides.  North River's objections based on § 1129(a)(3) are overruled.

---

[11]    Indeed, New York Insurance Law § 3420 requires that every liability policy "*must* contain a provision asserting that bankruptcy or insolvency does not release the insurer from its obligations under the policy."  *See id*. (emphasis added).  All policies issued by North River contain such bankruptcy clauses.

### H.    The Plan Satisfies § 1129(a)(4) of the Bankruptcy Code

92.    Section 1129(a)(4) of the Bankruptcy Code provides that payments to be made to professionals for costs and expenses must be approved by the Bankruptcy Court.   The Plan complies with this requirement in section 2.01, which sets a bar date for Administrative Claims and Professional Claims.   The Plan further provides for payment of Allowed Administrative Claims in accordance with the terms and subject to any conditions of any agreements governing, instruments evidencing, or other documents relating to transactions in the ordinary course of business.   (Plan § 2.01(a)).   All payments made or to be made by the Debtors or Reorganized Debtor, for services or for costs and expenses in connection with the Chapter 11 Cases or the Plan, thus have been approved by or are subject to approval by the Bankruptcy Court.

### I.    The Plan Satisfies § 1129(a)(5) and (a)(6)

93.    The Plan complies with § 1129(a)(5) because the Debtors have disclosed in the Disclosure Statement the identities and affiliations of the individuals who will act as a director or officer of the Debtors and the Reorganized Debtor after Confirmation.   (*See* Disclosure Statement at 9, 47).   The identities of the individuals proposed to serve, after Confirmation, as directors, officers, or managers of the Reorganized Debtor are disclosed in the Disclosure Statement, and the appointment to, or continuance in, such offices of such individuals, is consistent with the interests of creditors, equity security holders, and public policy.   In addition, the name of the initial Asbestos Trustee, Alan B. Rich, is disclosed in the signature pages of the Asbestos Trust Agreement, as are the names of each member of the TAC and the Legal Representative.   (*See also* Disclosure Statement at 37–38; Podgainy Cert. ¶ 66).

94.    Section 1129(a)(6) of the Bankruptcy Code is satisfied because the Plan does not provide for any change in rates over which a governmental regulatory commission has jurisdiction. (Podgainy Cert. ¶ 67).

**J.      The Plan Satisfies the "Best Interests of Creditors" Test Under § 1129(a)(7)**

95.      Section 1129(a)(7) of the Bankruptcy Code provides that each creditor or interest holder in an impaired class must either accept the plan or receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.  11 U.S.C. § 1129(a)(7).  Holders of claims that have not voted to accept the Plan would receive less in a liquidation under chapter 7 than they would receive under the Plan.  (Podgainy Cert. ¶¶ 68-70).

96.      North River argues that the Plan fails the best interests test because the Plan proposes to pay it "nothing on [its] claims," while in a chapter 7 liquidation "the Insurers' claims would be entitled to some pro rata payment based on the liquidated assets of the Debtors."  (Jt. Obj. at 25).  This argument fails for a number of reasons.  First, when asserting that the Plan would pay "nothing on [North River's] claims," North River fails to take into account the *value* it would receive on account of its claims in the form of the Trust-Payment Credit and the Judgment-Reduction Credit.  Under the plain wording of § 1129(a)(7), the Court must assess whether a dissenting creditor is receiving "*property of a value*, as of the effective date of the plan, that is not less than the amount that [the creditor] would so receive . . . if the debtor were liquidated under chapter 7 . . . ."  11 U.S.C. § 1129(a)(7) (emphasis added).  In other words, the best interests test does *not* require the Plan to pay out *cash* to North River on account of its Class 7 claims.

97.      Second, North River's naked prediction that it would receive "some pro rata payment" in a chapter 7 case fails to grasp the practical realities of what an asbestos-related chapter 7 liquidation would entail.  It almost goes without saying that, in a chapter 7 liquidation, the Debtors would lose going-concern value, and their assets would be sold at fire-sale prices.  (*See* Liquidation Analysis, Podgainy Cert., Ex. E).  In addition, the Debtors' estates would lose the

benefit of the Hinden Contribution ($3,000,000) and of any insurance settlement that is contingent

on a confirmed chapter 11 plan or the granting of a § 524(g) channeling injunction.  A chapter 7

trustee could not expect to negotiate insurance settlements anywhere near the favorable terms that

can be achieved with a 524(g) plan.  Furthermore, in a chapter 7 case, the trustee would have to go

through a very lengthy and expensive asbestos claims allowance process, which for any contested

claim would have to be adjudicated by the District Court and before a jury under 28 U.S.C.

§§ 157(b)(5) and 1411(a), thereby exponentially increasing the administrative expenses incurred

in determining the allowance of present asbestos claims compared to the Trust's efficient

mechanism for liquidating claims.  Any bar date notice for asbestos claims sent out in a chapter 7

case would precipitate an avalanche of protective claim filings by claimants who have been

exposed to asbestos but who are currently unimpaired.[12]  During the ensuing years, while the

chapter 7 trustee would be litigating over whether these claims should be allowed, many of the

previously unimpaired claimants would begin manifesting physical injuries from their asbestos

exposures, thereby increasing the pool of allowable "present" claims.  While the chapter 7 claims

allowance process is ongoing, future asbestos personal-injury claims would ripen and become

eligible for payment.  In accordance with § 726(a)(2)(C) of the Bankruptcy Code, holders of future

asbestos personal-injury claims would be allowed to "tardily file" claims and would be entitled to

distributions in parity with existing asbestos personal-injury claims and other general unsecured

claims.  In what might be a never-ending process—described by one court as "a seemingly

---

[12]    Bar dates spur protective claims filings.  One principal explanation for this phenomenon is that bar dates create strong incentives for risk-averse lawyers to submit claims rather than incurring potential responsibility to clients for allowing those claims to be barred.  A well-documented example is the *A.H. Robins* case.  *Robins* was a bankruptcy precipitated by tort claims involving intrauterine contraceptive devices.  At the bankruptcy filing date, only 5,000 suits were pending against the debtor, and it was then thought that there were "perhaps an equal number not filed."  *A.H. Robins v. Piccinin*, 788 F.2d 994, 1013 (4th Cir. 1986).  As it turned out, more than 327,000 claims were filed in response to the bar date.  *See* Richard B. Sobol, BENDING THE LAW: THE STORY OF THE DALKON SHIELD BANKRUPTCY 98 (Univ. Chicago Press 1991).

indefinite period of time"[13]—scores, if not hundreds, of such "tardily filed" claims would be filed each year that the case was open, a process that could delay distributions to creditors for decades, which, in turn, would substantially reduce the present value of any distribution in a chapter 7 case. Creditor recoveries in a chapter 7 liquidation—*if any*—would not only be diluted by distributions to maturing future claims; the delays would diminish their present value, and the assets available for distribution would be substantially diluted, if not exhausted, by the costs of administering the chapter 7 claims allowance process.

98.    While this lengthy claims allowance process ran its course, North River as a Non-Settling Asbestos Insurer would continue to owe policy obligations to provide tort defense and indemnity, notwithstanding the chapter 7 proceeding, and asbestos plaintiffs could pursue available insurance coverage from North River.  Under the Plan, North River will receive payment in cash and in full of its Class 6 Prepetition Defense-Cost Contribution Claim (if Allowed) and will receive value on account of its Class 7 claims in the form of Trust-Payment Credits and the Judgment-Reduction Credits.  On the other hand, North River's assumption that it would obtain "some pro rata payment" in a chapter 7 liquidation, in excess of the value it would receive on account of its Allowed Class 6 claim and through Trust-Payment Credits and Judgment-Reduction Credits under the Plan, is speculative and without foundation, and fails to account for the practical realities of how the Debtors' chapter 7 proceedings would unfold and how asbestos personal-injury claims would be allowed.

---

[13]    "A Chapter 7 liquidation would need to be held open for a seemingly indefinite amount of time while all personal injury claimants pursued jury trials and settlements in the tort system.  Such a process would result in inevitable delay and disparate—or, even worse, unavailable—recovery amongst personal injury claimants.  Such uncertainty is certainly not within the creditors' best interests.  In comparison, the procedural safeguards and guaranteed recovery mechanisms that are in place under the Joint Plan will allow personal injury claimants to receive at least as much—if not more—than they would in liquidation.  Thus, it is evident to the Court that the guaranteed certainty of the Chapter 11 Joint Plan, as opposed to the high degree of uncertainty in a hypothetical Chapter 7 proceeding, is in the creditors' best interest."  *W.R. Grace*, 475 B.R. at 144–45.

99.     North River also argues that it would fare better in a chapter 7 case because, without any § 524(g) injunction, it "would be free to pursue contribution claims against Settling Asbestos Insurers to the full extent allowed by law." (Jt. Obj. at 25).  Yet, North River's contribution claims against Settling Asbestos Insurers are not relevant to the best interests test.  Under the best interests test, the Court must consider only the value of the property that each dissenting creditor will receive or retain on account of his or her claim *against the debtor* in a chapter 7 liquidation.  *See* 11 U.S.C. § 1129(a)(7).  Nothing in the statute suggests that a court look at how a plan impacts a creditor's other interests.  *See In re Dow Corning Corp.*, 237 B.R. 380, 411-12 (Bankr. E.D. Mich. 1999) ("When employing the best-interest-of-creditors test, courts look at the dividend the creditor would receive from the chapter 7 trustee—and only that amount—for comparison with the dividend available under the plan."); *In re Catholic Bishop of N. Alaska*, 2009 WL 8412175, at *6 (Bankr. D. Alaska Sept. 11, 2009) (stating that the court could not locate any case in which the "best interests" test of § 1129(a)(7) had been applied to account for the value of any cause of action that a creditor would *retain* in a liquidation and applying the "best interests" test to examine "the dividend the creditor would receive from the chapter 7 trustee—and only that amount—for comparison with the dividend available under the plan").

100.     In an analogous case involving contribution claims, a federal district court in New York affirmed the bankruptcy court's determination that the best interests test was satisfied.  *See In re Gaston & Snow*, 1996 WL 694421, at *8 (S.D.N.Y. Dec. 4, 1996).  In that case, a debtor-partnership's plan proposed to enjoin the contribution claims of nondebtor partners against other nondebtor partners.  One partner argued that the plan violated the best interests test because, as a result of this facet of the plan and resulting inability to sue his partners, he was "worse off under the Plan than he would have been under a chapter 7."  *Id*.  But the district court rejected the best

interests objection as not applying to plan treatment regarding the objector's status as a creditor of the debtor. *Id*.

101.    Based on the Declarations submitted in support of confirmation, the liquidation analyses provided by the Debtors, and the evidence admitted at the Confirmation Hearing, this Court finds and concludes that the Plan satisfies § 1129(a)(7) of the Bankruptcy Code.  In addition, North River's best interests objections are overruled.

### K.    The Plan Satisfies § 1129(a)(8), (9), and (10)

102.    Class 7 voted to accept the Plan, but Class 6 voted to reject the Plan.  (Podgainy Cert. ¶¶ 48-49; Tabulation Report).  Nevertheless, this Court may still confirm the Plan because at least one class of impaired noninsider claims (Class 7) has voted to accept the Plan, and the Plan satisfies the cramdown requirements with respect to Class 6 under § 1129(b). *See infra* part X.N.

103.    The Plan's treatment of Claims of the type specified in §§ 507(a)(2) through (a)(8) of the Bankruptcy Code, if any, complies with § 1129(a)(9) of the Bankruptcy Code.  (Plan §§ 2.01, 2.02, 3.03(a)).  The Plan is sufficiently funded to pay all administrative and priority claims, and all priority claims will be treated as required under § 1129(a)(9) of the Bankruptcy Code.  (Podgainy Cert. ¶¶ 15-21).

104.    The Plan satisfies § 1129(a)(10) because at least one impaired class of claims (Class 7) has voted to accept the Plan.  (Podgainy Cert. ¶¶ 49, 73; Tabulation Report).

### L.    The Plan Is Feasible and Satisfies § 1129(a)(11)

105.    Section 1129(a)(11) of the Bankruptcy Code requires the Court to determine that confirmation of the Plan "is not likely to be followed by the liquidation, or the need for further reorganization" of the Debtors.  11 U.S.C. § 1129(a)(11).  Courts have interpreted § 1129(a)(11) to mean that a debtor need only demonstrate a reasonable assurance of commercial viability. *See,*

*e.g.*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d. Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed.").

106.    Courts consider a series of factors in determining whether a debtor's plan is feasible under § 1129(a)(11).  These factors, while varying from case to case, traditionally include: "(1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan." *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 151 (Bankr. S.D.N.Y. 1984).  In these Chapter 11 Cases, the Debtors have satisfied these factors.

107.    First, the Debtors' board and current management have demonstrated their effectiveness through the successful operation of the Debtors for many years.  These key members of the board and the management team intend to stay on post-Confirmation.  (Disclosure Statement at 9, 47).

108.    The Debtors' financial advisor, Getzler Henrich, prepared revised long-term and short-term cash flow projections of the Debtors' expected  financial performance for fiscal years 2019 through 2024 (together, "**Projections**").  (Podgainy Cert., Exs. A & D).  The Projections indicate that the Reorganized Debtor will generate sufficient cash flow to service and pay its debt obligations and fund its operations.  The Debtors estimate that as of the Plan's Effective Date, the approximate amount of cash on hand will be $2.48 million.  (Podgainy Cert., Ex. A).  In addition, on or before the Plan's Effective Date, the Debtors will close on the Senior Lending Facility with Bank of America whereby Bank of America will extend a line of credit to the Reorganized Debtor in the aggregate sum of $9,950,000 to fund distributions under the Plan and the post-Effective Date

working capital needs.  (Podgainy Cert. ¶ 44).  By the end of 2020, it is projected that the

Reorganized Debtor will have fully repaid the Senior Lending Facility.  (Podgainy Cert., Ex. D).

109.    The Projections show that the Debtors will not only have sufficient cash to meet all

of their obligations under the Plan, but they are also projected to have a positive cash flow and net

income for each of the projected years.  (Podgainy Cert., Exs. A & D).  Moreover, other evidence

adduced at the Confirmation Hearing, including Mr. Podgainy's testimony, support the Court's

conclusion that the Reorganized Debtors will be able to effectuate the Plan.  (Podgainy Cert., Ex.

E).  Mr. Podgainy also concluded the Plan is not likely to be followed by the liquidation or the

need for further financial reorganization of the Debtors not contemplated in the Plan.  (Podgainy

Cert. ¶¶ 45, 74; Hr'g Tr. 57–64, Mar. 6, 2019 (Podgainy Testimony)).

110.    In addition to the foregoing, the Hinden Family Members and the Hinden Family

Entities have already paid in their $3 million contribution, and the contribution is currently held in

a segregated bank account by the Debtors, pending Confirmation and Consummation of the Plan.

(Exs. P-5 & P-6).

111.    As reflected in the Projections and based on the available cash on hand, the

proceeds from the Senior Lending Facility, and cash flow from operations, the Reorganized Debtor

will have sufficient funds available to pay all obligations due under the Plan and to operate its

business after the Effective Date.  (Podgainy Cert. ¶¶ 43-45, Exs. A & D).

112.    Section 1129(a)(11) does not require a guarantee of a plan's success; rather the

proper standard is whether the plan offers a "reasonable assurance" of success.  *See Johns-Manville*

*Corp.*, 843 F.2d at 649; *In re Rivers End Apartments, Ltd.*, 167 B.R. 470, 476 (Bankr. S.D. Ohio

1994) (noting that, to establish feasibility, "a [plan] proponent must demonstrate that its plan offers

a 'reasonable prospect of success' and is workable").  Based on Mr. Podgainy's certification and

testimony, and the evidence adduced at the Confirmation Hearing, the Court finds and concludes

that Confirmation of the Plan is not likely to be followed by liquidation or the need for further

financial reorganization of the Debtors or any successors thereof.  The Debtors will be in a position

to consummate the Plan and to meet all of their obligations under the Plan.  Accordingly, the Plan

satisfies § 1129(a)(11).

### M.      The Plan Satisfies the Remaining Requirements of § 1129(a)

113.    Section 1129(a)(12) of the Bankruptcy Code is satisfied because the fees payable

under 28 U.S.C. § 1930 have been paid or will be paid under the Plan (Plan § 2.03; Podgainy Cert.

¶ 75).

114.    Section 3.03(c) of the Plan provides for the Reorganized Debtor to continue making

payments to retiree benefit plans, funds, or programs, including Allowed Withdrawal Liability

Claims, as defined in § 1114 of the Bankruptcy Code.   Accordingly, the Plan complies with

§ 1129(a)(13) of the Bankruptcy Code.  (Podgainy Cert. ¶ 76).

115.    Section 1129(a)(14) of the Bankruptcy Code is inapplicable because the Debtors

are not required by a judicial or administrative order, or by statute, to pay a domestic support

obligation.

116.    Section 1129(a)(15) is inapplicable because the Debtors are not individuals.

117.    Section 1129(a)(16) of the Bankruptcy Code is inapplicable because the Plan

provides for no transfers of property by a corporation or trust that is not a moneyed, business, or

commercial corporation or trust.  (Podgainy Cert. ¶ 79).

### N.      The Plan Satisfies the Requirements for Cramdown of Class 6 Under § 1129(b)

118.    As noted above, Class 7 voted to accept the Plan, but Class 6 voted to reject the

Plan.  (Podgainy Cert. ¶¶ 48-49; Tabulation Report).   Nevertheless, the Court may still confirm

the Plan because at least one class of impaired noninsider claims (Class 7) has voted to accept the

Plan, and the Plan satisfies the cramdown requirements with respect to Class 6 under § 1129(b).

### 1.   The Plan Complies with the Absolute Priority Rule

119.   North River argues that the Plan is not fair and equitable as required by § 1129(b)

because it fails to satisfy the absolute priority rule with respect to its Class 6 claims due to the fact

that the shareholders of Duro Dyne National (the Reorganized Debtor on and after the Effective

Date) will be retaining their equity interests in that entity.   (Jt. Obj. at 11).   This argument fails

because, under the Plan, Allowed Class 6 claims will be paid in full, albeit over time with interest

at the federal judgment rate in effect as of the Petition Date.   (Plan § 3.03(f)(ii)).   In order for

shareholders to retain their shares or equity interests, a plan must provide that each creditor in the

class of unsecured claims "receive or retain on account of such claim property of a value, as of the

effective date of the plan, equal to the allowed amount of such claim."   11 U.S.C.

§ 1129(b)(2)(B)(i).   As noted above, under the Plan, holders of allowed Class 6 claims (Prepetition

Defense-Cost Contribution Claims) will receive "*payment in full*" of the allowed amount of their

claims, albeit over time with interest.   (Plan § 3.03(f)(ii) (emphasis added)).   Thus, holders of

allowed Class 6 claims will be receiving "value, *as of the effective date of the plan*, equal to the

allowed amount" of their claims.  11 U.S.C. § 1129(b)(2)(B)(i) (emphasis added).   This treatment

satisfies the requirements of § 1129(b).[14]

---

[14]   *See In re Renegade Holdings, Inc.*, 429 B.R. 502, 523-25 (Bankr. M.D.N.C. 2010) (debtors satisfied § 1129(b)(2)(B)(i) and demonstrated a good faith effort to repay creditors 100% of the principal amount of the claims plus interest); *In re STC, Inc.*, No. 14-41014, 2016 Bankr. LEXIS 1110 (Bankr. S.D. Ill. Apr. 7, 2016) (payment of impaired unsecured class 4 paid in full over nine years with interest satisfied § 1129(b)(2)(B)(i); *In re LMR, LLC*, 496 B.R. 410 (Bankr. W.D. Tex. 2013) (concluding that payment of claim in full with interest provides such claims with the "present value" and therefore, the plan satisfies the requirement for a cramdown of an unsecured creditor class set forth in § 1129(b)(2)(B)(i), and the plan may be confirmed over the rejecting class).

120.    The fact that the Reorganized Debtor's shareholders will be retaining their shares before North River receives full payment of any allowed Class 6 claims does not change the analysis.  "[T]he absolute priority rule does not require sequential distributions (i.e., cash payment in full to senior creditors before any distribution is made to junior creditors), but merely that the values represented by the higher-ranking claims are fully satisfied by the values distributed under the Plan."  *In re Penn Cent. Transp. Co.*, 458 F. Supp. 1234, 1283 (E.D. Pa. 1978).  Thus, courts have held that the absolute priority rule "merely means that senior classes must be fully provided for in order for junior classes to receive anything."  *In re Arden Props., Inc.*, 248 B.R. 164, 174 (Bankr. D. Ariz. 2000).[15]  The Plan provides for full payment of any allowed Class 6 claim. Accordingly, the Reorganized Debtor's shareholders are permitted to retain their shares under the absolute priority rule.  Because the Plan as written satisfies the absolute priority rule, it is not necessary to address North River's arguments regarding the "new value exception."  (*See* Jt. Obj. at 12-16).  Accordingly, North River's objections here are overruled.

### 2.    North River Is Not Entitled to "Cramdown" Protection Under § 1129(b) with Respect to Its Class 7 Claims

121.    North River contends that it is a secured creditor by virtue of allegedly holding "setoff rights" under § 553 of the Bankruptcy Code.  (Jt. Obj. at 16).  Because the Plan would allegedly "strip" North River of its setoff rights, North River argues that the Plan cannot be confirmed because it is not receiving the "indubitable equivalent" of its setoff claims, as required by § 1129(b).  (*Id.*)  These arguments are unavailing.  As noted above, the Plan provides that any

---

[15]    *See also In re Johnston*, 21 F.3d 323, 330-31 (9th Cir. 1994) ("Must the money be in hand at the date of confirmation to satisfy the absolute priority rule?  We think not, so long as its provision is established by uncontested findings of the bankruptcy court which are not clearly erroneous, and which 'provide for' such payments in accordance with the feasible confirmed plan."); *Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 5 (D. Conn. 2006) ("In this case, the debtor's plan provides that Mercury will be paid in full at the end of the thirty-month period. Such a plan does not violate the absolute priority rule 'simply because the payment term to secured creditors is longer than the payment term to unsecured creditors.'" (quoting *Arden Props., Inc.*, 248 B.R. at 174)).

allowed Class 6 claims (Prepetition Defense-Cost Contribution Claims) will be paid in full, so
these claims will not be "stripped" or extinguished.  As for its claims in Class 7, North River cannot
invoke the cramdown protections under § 1129(b), such as the "indubitable equivalent"
requirement, because Class 7 voted to accept the Plan.  The cramdown protections under § 1129(b)
apply only to a "class of claims or interests that is impaired under, *and has not accepted*, the plan
. . . ."  11 U.S.C. § 1129(b)(1) (emphasis added).  Thus, even if its Class 7 claims were "secured"
by virtue of "setoff rights," which they are not, North River still could not invoke the "indubitable
equivalent" requirement under § 1129(b)(2)(A)(iii).

122.    In addition, North River has no setoff rights under New York law, so its claims are
not "secured" under 11 U.S.C. §§ 506 and 553.  Section 553 does not create a right of setoff; it
merely preserves "whatever right of setoff otherwise exists" under applicable nonbankruptcy law.
*Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995).  "In order to establish a right to
setoff under § 553, a creditor must first demonstrate a preexisting right of setoff under
nonbankruptcy or state law."  *In re Corp. Res. Servs., Inc.*, 564 B.R. 196, 203 (Bankr. S.D.N.Y.
2017) (footnote and citations omitted).  "New York law does not recognize a right to setoff for
contingent claims."  *Id.* at 204.  "A claim is contingent and ineligible to be set off under New York
law when it is dependent on some future event that may never happen or has not yet accrued."  *Id.*
at 201.  North River's claims for future indemnity and defense costs are contingent claims and are
therefore ineligible for setoff under New York law.  Moreover, even "when a lawsuit has been
filed, claims that are not finally adjudicated are contingent."  *Id.* (citations omitted).[16]  North

---

[16]    *See also Cytec Indus., Inc. v. Allnex (Luxembourg) & Cy S.C.A.*, 2015 WL 3762592, at *13 (S.D.N.Y. May 15,
2015) ("Courts have declined to permit offsets directed toward damages in a pending litigation."); *Correspondent
Servs. Corp. v. J.V.W. Inv. Ltd.*, 524 F. Supp. 2d 412, 424 (S.D.N.Y. 2007) (stating that defendant "has no right to
setoff its pending disputed and unliquidated claim against [plaintiff's] present entitlement to damages owed"); *Willett
v. Lincolnshire Mgmt.*, 756 N.Y.S.2d 9 (App. Div. 2003) (affirming dismissal of setoff affirmative defense where
obligation was currently being disputed).

River's claims for prepetition indemnity and defense costs are disputed and have not been finally

adjudicated in the New York coverage action.  As a result, they are ineligible for setoff, and the

North River has no setoff right.  Accordingly, North River's claims are not "secured" under §§ 506

and 553, and its related arguments are rejected.

### O.    The Remaining Requirements of § 1129 Are Inapplicable or Satisfied

123.    Section 1129(c) of the Bankruptcy Code is inapplicable because no other chapter

11 plan has been proposed for confirmation.  (Podgainy Cert. ¶ 80).

124.    The principal purpose of the Plan is not avoidance of taxes or the requirements of

section 5 of the Securities Act of 1933, and there has been no request by any governmental unit

alleging such avoidance.  (Podgainy Cert. ¶ 81).  Accordingly, the Plan satisfies § 1129(d).

125.    As set forth in paragraphs 57-124 above, the Plan complies in all respects with the

applicable requirements of § 1129 of the Bankruptcy Code.

### P.    The Plan Satisfies the Requirements of § 524(g) of the Bankruptcy Code

126.    For the reasons set forth below, the Plan complies with the requirements of § 524(g)

of the Bankruptcy Code for the issuance of the Asbestos Permanent Channeling Injunction and the

establishment of the Asbestos Trust.

### 1.    The Trust Satisfies the Requirements of § 524(g)(2)(B)(i)

127.    Section 524(g)(1)(A) authorizes a court to enter, in connection with confirmation

of a plan of reorganization, an injunction to enjoin entities from taking legal action to recover,

directly or indirectly, payment on account of asbestos-related claims or demands if the plan of

reorganization establishes a trust to resolve and pay such claims.  11 U.S.C. § 524(g)(1)(A).  To

be entitled to such an injunction, the trust must meet the structure and funding requirements of

§ 524(g)(2)(B)(i).  For the reasons explained below, the proposed Trust satisfies those

requirements.

- 58 -

128.    Section 524(g)(2)(B)(i)(I) requires that an asbestos settlement trust assume the liabilities of a debtor that, as of the petition date, has been named as a defendant in actions to recover damages for asbestos-related claims.  *Id.* § 524(g)(2)(B)(i)(I).   The Trust meets this requirement because, on the Effective Date, the Trust will assume liability and responsibility for Channeled Asbestos Claims.  (Plan § 4.01, -.06).

129.    Section 524(g)(2)(B)(i)(II) requires that an asbestos settlement trust "be funded in whole or in part by the securities of one or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends.   11 U.S.C. § 524(g)(2)(B)(i)(II).  The Bankruptcy Code defines the term "security" to include a "note."  *Id.* § 101(49)(A)(i).  The Plan satisfies this requirement by providing that, on the Effective Date, the Reorganized Debtor will issue and deliver the Trust Note to the Trust.  (Plan § 4.08(d)).  The Trust Note will be a promissory note in the original principal amount of $13.5 million, payable in installments over roughly 20 years at an interest rate of 7.15% per annum.  (*Id.* § 1.01(123)).

130.    Section 524(g)(B)(i)(III) requires that an asbestos settlement trust have the ability to own, if specified contingencies occur, "a majority of the voting shares of—(aa) each such debtor; (bb) the parent corporation of each such debtor; or (cc) a subsidiary of each such debtor that is also a debtor." 11 U.S.C. § 524(g)(B)(i)(III).  In accordance with this requirement, the Trust will receive a pledge of, and possessory security interest in, 50.1% of the Reorganized Debtor's voting stock and 50.1% of the voting stock of Duro Dyne Canada.  (Plan §§ 1.01(50), (103), 4.09; Pledge and Security Agreement § 3 (Bankr. ECF No. 279-5)).   Under the Pledge and Security Agreement, which the Reorganized Debtor will execute and deliver on the Effective Date, the Trust will be entitled to own the pledged shares if an "Event of Default" occurs.  As defined, an "Event of Default" includes not only a payment default under the Trust Note but also an uncured

violation of an affirmative or negative covenant in the Plan Documents and a representation that is found to be false. (Pledge and Security Agreement § 11(a)). If an Event of Default were to occur, the Trust would not only have the right to enforce its possessory lien against 50.1% of the Reorganized Debtor's voting stock but would also have "drag-along" rights that would enable it to sell 100% of the voting stock in order to realize a "control premium" in the sale value. (*Id.* § 13).

131.    Relying on decisions rendered in *Congoleum* and *Plant Insulation*, North River objects to the pledge of voting stock as inadequate and "inconsequential" because, if a payment default were to occur, the Reorganized Debtor most likely would be insolvent and therefore the voting stock would be worthless. (Jt. Obj. at 19). In making this argument, North River essentially echoes *Congoleum*, in which the bankruptcy court read into the statute a requirement that the trust's stock ownership occur before a debtor is beyond the "financial point of no return." *In re Congoleum Corp.*, 362 B.R. 167, 176 (Bankr. D.N.J. 2007) (internal quotation marks omitted). As indicated, the plain terms of § 524(g) do not require that the trust actually own the stock before the stock drops below a certain value or before the reorganized debtor becomes insolvent. The language of § 524(g) does not specify the timing of the trust's stock ownership, much less that it cannot occur upon a note default. "[W]hen the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (citation and internal quotation marks omitted). "Congress expresses its purpose by words. It is for [the courts] to ascertain—neither to add nor to subtract, neither to delete nor to distort." *62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951). This Court rejects North River's invitation to use

*Congoleum* as a basis to write new requirements into § 524(g) when those requirements do not appear in the statute's plain text.

132.    Moreover, the *Congoleum* court's reasoning was based on the fact that the only default that would allow the trust to exercise its right to the stock was a payment default under the note.  *See Congoleum Corp.*, 362 B.R. at 175, 179.  In this respect, *Congoleum* is distinguishable because the Plan Documents here provide for a number of circumstances, other than a payment default, in which the Trust could exercise its rights to the voting stock, such as an uncured covenant violation.  (Pledge and Security Agreement § 11(a)(2); Note Issuance and Security Agreement § 13(c) (Bankr. ECF No. 279-4)).  Additionally, the Plan Documents will require the Reorganized Debtor to provide periodic financial reporting to the Trust, in the same form and at the same time required under the Senior Lending Facility, so that the Trust will be placed on notice if the Reorganized Debtor is approaching the "financial point of no return."  (Note Issuance Agreement § 10(g)).  *Plant Insulation* is also distinguishable because there is no indication in the Ninth Circuit's opinion that the Plant Insulation trust would be receiving the same type of "drag-along rights" that the Trust would be receiving here.  In any case, this Court follows the *Burns and Roe* decision rendered in this district, which held—more than a year after *Congoleum*—that a pledge of 50.1% of the voting shares to secure the reorganized debtors' deferred obligations under the plan satisfied § 524(g).  *See Burns & Roe Enters., Inc.*, No. 08-4191, 2009 WL 438694, at *35 (D.N.J. Feb. 23, 2009).  Thus, the pledge arrangement provided under the Plan here complies with § 524(g)(2)(B)(i)(III)(aa).

133.    North River also makes a technical argument under the Uniform Commercial Code to posit that the pledge is inadequate because the "Trust would be able to obtain only so much stock as was necessary to satisfy the outstanding obligations under the Note."  (Jt. Obj. at 19-20

n.9).  Section 524(g) does not require that the Trust actually own 50.1% of the voting stock; it

merely requires that the Trust be "*entitled to own*" the stock "*if specified contingencies occur*."  11

U.S.C. § 524(g)(2)(B)(i)(III)(aa) (emphasis added).  North River overlooks the fact that the Trust

could own the pledged stock, following an Event of Default, by making a successful credit bid for

the stock.  *See* N.Y. U.C.C. Law § 9-610(c); *In re Finova Capital Corp.*, 356 B.R. 609, 624-25

(Bankr. D. Del. 2006).

134.    North River contends that the Trust must own the stock in order to receive

dividends because § 524(g) requires that the Debtors be obligated "to make future payments,

*including dividends*."    11  U.S.C.  § 524(g)(2)(B)(i)(II) (emphasis added).    The Court is not

persuaded.  Under the Plan, the Reorganized Debtor will be obligated "to make future payments"

in the form of payments on the Trust Note and the Earn Out Payments.  These payments do not

have  to  be  "dividends"  because,  under  the  Bankruptcy  Code,  the  word  "including"  is  "not

limiting."  *Id.* § 102(3).  North River's objections to the pledge arrangement are overruled.

135.    Section 524(g)(B)(i)(IV) requires an asbestos settlement trust "to use its assets or

income  to  pay  claims  and  demands."  11  U.S.C.  § 524(g)(B)(i)(IV).    The  Plan  satisfies  this

requirement because, on the Effective Date, the Trust will assume liability and responsibility for

Channeled Asbestos Claims and will use its assets to resolve and, if eligible, pay those Channeled

Asbestos  Claims  in  accordance  with  the  Plan,  the  Confirmation  Order,  the  Asbestos  Trust

Agreement, and the TDP.  (Plan § 4.01).

136.    Accordingly, based on the foregoing provisions of the Plan and other applicable

documents, the Trust satisfies the structure and funding requirements for an asbestos settlement

trust under § 524(g)(2)(B)(i).

2.   **The Debtors' History, the Nature of Asbestos-Related Litigation, and the Facts of These Chapter 11 Cases Support the Issuance of the Asbestos Permanent Channeling Injunction**

137.   Section 524(g)(2)(B)(ii) requires a court to make certain factual findings to support the issuance of a § 524(g) injunction.   11 U.S.C. § 524(g)(2)(B)(ii).   As set forth below, the Debtors' history as defendants in the tort system, the nature of asbestos litigation, and the facts of these Chapter 11 Cases support the findings required for the issuance of the Asbestos Permanent Channeling Injunction under § 524(g).

138.   To support entry of a § 524(g) injunction, a court must find that "the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction." *Id.* § 524(g)(2)(B)(ii)(I). The Debtors' history and the nature of asbestos litigation support this finding in connection with confirmation of the Plan.   *See supra* paras. 7, 8, 13.   Based on this history, the Debtors have every reason to believe that, without the protection of § 524(g), they will be subject to substantial asbestos-related demands in the future.   (*See also* Fitzpatrick Decl. ¶ 28).

139.   Section 524(g)(2)(B)(ii)(II) requires a court to find that "the actual amounts, numbers, and timing of such future demands cannot be determined."   11 U.S.C. § 524(g)(2)(B)(ii)(II).   Due to the long latency period for asbestos-induced diseases and the substantial number of asbestos personal-injury lawsuits that had been asserted in the past and remained unresolved on the Petition Date, the actual number and amounts of future Demands, and the timing of assertion of such Demands, cannot be determined by the Debtors or their advisors with precise specificity.   Accordingly, § 524(g)(2)(B)(ii)(II) of the Bankruptcy Code is satisfied.

140.   Section 524(g)(2)(B)(ii)(III) requires a finding that "pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands."   *Id.* § 524(g)(2)(B)(ii)(III).   Here, if holders of

asbestos-related Demands were to pursue their Demands outside of the TDP, those Demands would need to be litigated in the tort system on an individual basis.  That would devolve into a race to the courthouse, with the inevitable result that the Debtors' very limited resources would be consumed by those claimants who are first to file suit, leaving little or nothing for other future Demand holders.  (Fitzpatrick Decl. ¶ 29).  Given the uncertainty and delay attendant with litigation, the value that Demand holders would receive would be less than the amounts they would receive under the Plan, and the relief available would be inconsistent.  Furthermore, the majority of asbestos-related Demands, and any estimate of the predicted liability for such Demands, would encompass a wide range of values.  There is a risk that, absent implementation of the TDP, Demands would not be treated equitably.  (Fitzpatrick Decl. ¶ 29; TDP §§ 2.1, 4.1).  Equitable treatment of both holders of Asbestos Claims and future Demands depends on all claimants being subject to the same rules and procedures provided under the terms of the Asbestos Trust Agreement and the TDP.  (Fitzpatrick Decl. ¶ 29).  Accordingly, the pursuit of asbestos-related Demands outside of the TDP would likely threaten the equitable treatment of Channeled Asbestos Claims by resulting in protracted litigation and consumption of the Debtors' assets by those claimants who first file suit, potentially leaving less for future Demand holders.

141.    Section 524(g)(2)(B)(ii)(IV) requires a court to find that, as part of the confirmation process, the terms of the channeling injunction proposed, including "any provisions barring actions against third parties," are set forth in the plan of reorganization and the related disclosure statement.  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa).  In addition, a court must find that "a separate class or classes of the claimants whose claims are to be addressed by a trust described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan."  *Id*. § 524(g)(2)(B)(ii)(IV)(bb).  As part of the confirmation process here, the Plan Proponents included

the terms of the Asbestos Permanent Channeling Injunction, including provisions barring actions against third parties (including Protected Parties) in conspicuous language in both the Plan and the Disclosure Statement.  (Plan §§ 9.05–9.07; Disclosure Statement at 57–60).  The Plan Proponents designated in Class 7 a separate class of Channeled Asbestos Claims that are to be addressed by the Trust and subject to the Asbestos Permanent Channeling Injunction.  (Plan § 3.03(g)).  More than 75% of the Class 7 creditors who voted on the Plan voted in favor of the Plan.  (*See* Tabulation Report).

142.    Finally, § 524(g)(2)(B)(ii)(V) requires a court to find that

> the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

11 U.S.C.  § 524(g)(2)(B)(ii)(V).  Here, as set forth in Article IV of the Plan, the Asbestos Trust Agreement, and the TDP, all Channeled Asbestos Claims will be determined and, if eligible, paid under the Asbestos Trust Agreement and TDP.  (Plan § 4.01).  Moreover, the Plan Documents contain mechanisms—such as structured, periodic, and supplemental payments, pro rata distributions, matrices, periodic review and estimates, numbers, and values of Channeled Asbestos Claims, and periodic adjustment of the payment percentage—that provide reasonable assurance that the Asbestos Trust will value and be in a financial position to pay existing Asbestos Claims and future Demands in substantially the same manner.  (Plan § 4.01; TDP § 2.1; Fitzpatrick Decl. ¶ 43; Hr'g Tr. 96:19–97:2, Mar. 6, 2019 (Fitzpatrick Testimony)).  Accordingly, the Plan satisfies § 524(g)(2)(B)(ii)(V).

143.    While conceding that the TDP contains procedures in most respects identical to those adopted in decades of previous § 524(g) cases (UST Obj. at 11), the UST argues nevertheless

that the TDP fails to provide the required "reasonable assurance" that present and future claims will be valued and paid in substantially the same manner. As noted above, the TDP, like the other court-approved procedures on which it is modeled, employs mechanisms that provide such reasonable assurance, including an adjustable payment percentage and periodic estimates of future claims. *See supra* para. 142. Decades of bankruptcy court, district court, and court of appeals decisions have approved these mechanisms as satisfying § 524(g)'s standards. As one of many examples, the bankruptcy court in *W.R. Grace* concluded at confirmation that the treatment of future claimants "will be substantially similar to that afforded to current claimants in their class."[17] This was seconded by the district court, which found "that § 524(g) is satisfied under these circumstances because the trust utilizes mechanisms that will value and pay present and future claims in substantially the same manner."[18] Confirmation was then affirmed by the Third Circuit.[19] The UST provides no basis for repudiating the Third Circuit's decision or the many other similar ones.

144.    The UST is not specific about what, substantively, it finds objectionable with respect to the mechanisms the Trust will use to protect future claims beyond briefly suggesting that some kind of "clawback" of claims payments might be considered. (UST Obj. at 23). The UST offers no example where a "clawback" scheme was ever deployed by an existing asbestos settlement trust, nor does it explain how a "clawback" scheme could or would work for a trust making payments to actual sick and dying people (or their survivors) over many decades.

---

[17]    *In re W.R. Grace*, 446 B.R. 96, 130 n.58 (Bankr. D. Del. 2011), *amended on reconsideration in part*, No. BK 01-1139 JKF, 2011 WL 832940 (Bankr. D. Del. Mar. 4, 2011), *and aff'd*, 468 B.R. 81 (D. Del. 2012), *withdrawn from bound volume, opinion amended and superseded*, 475 B.R. 34 (D. Del. 2012), *aff'd sub nom. In re W.R. Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), *and aff'd*, 532 F. App'x 264 (3d Cir. 2013).

[18]    *In re W.R. Grace*, 475 B.R. 34, 141 (D. Del. 2012), *aff'd*, 729 F.3d 311 (3d Cir. 2013), *and aff'd*, 729 F.3d 332 (3d Cir. 2013), *and aff'd*, 532 F. App'x 264 (3d Cir. 2013).

[19]    *In re W.R. Grace*, 729 F.3d 311 (3d Cir. 2013).

Moreover, the UST's "clawback" scheme is highly impractical for the simple reason that, once money is paid to sick or elderly claimants, it is essentially gone and cannot be recovered. (Hr'g Tr. 104:11–18, Mar. 6, 2019 (Fitzpatrick Testimony)). For the reasons set forth above, the Plan and TDP support the findings required in § 524(g)(2)(B)(ii)(V), and the UST's objections here are overruled.

### 3.    The Asbestos Permanent Channeling Injunction Protects Identifiable Third Parties

145.    Section 524(g)(4)(A)(ii) provides that a channeling injunction entered in accordance with § 524(g)

> may bar any action directed against *a third party who is identifiable from the terms of such injunction* (by name or as *part of an identifiable group*) and is alleged to be *directly or indirectly liable* for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of—
>
> (I)    the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
>
> (II)    the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;
>
> (III)    the third party's provision of insurance to the debtor or a related party; or
>
> (IV)    the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party . . . .

11 U.S.C. § 524(g)(4)(A)(ii)(I)—(IV) (emphasis added). Consistent with that section, the Plan contemplates that, in addition to protecting the Debtors and the Reorganized Debtor, the Asbestos Permanent Channeling Injunction will be extended to protect each Protected Party, as defined in the Plan. Each Protected Party is identifiable from the terms of the Plan by name or as part of an identifiable group. (Plan § 1.01(102) (defining "Protected Parties")). Accordingly, the Court authorizes and approves the application of the Asbestos Permanent Channeling Injunction to

protect all Protected Parties from liability for any Channeled Asbestos Claims, including future

Demands, in accordance with the terms and conditions of the Plan.

      **4.      The Legal Representative Has Been Appointed and Entry of the Asbestos Permanent Channeling Injunction Is Fair and Equitable With Respect to Future Asbestos Claimants**

146.    The Legal Representative has been appointed by the Bankruptcy Court as party of

the proceedings leading to the issuance of the Asbestos Permanent Channeling Injunction for the

purpose of, among other things, protecting the rights of persons who might subsequently assert

future Demands of the kind that are addressed in the Asbestos Permanent Channeling Injunction

and transferred to the Asbestos Trust. *See* 11 U.S.C. § 524(g)(4)(B)(i); *Order Appointing a Legal*

*Representative for Future Asbestos Personal Injury Claimants Effective as of the Petition Date*,

Oct. 17, 2018 (ECF No. 191).

147.    Pursuant to the Plan and Trust Agreement, Mr. Fitzpatrick will continue to serve as

the Legal Representative for the Asbestos Trust.  (Plan § 4.05; Trust Agreement §6.1).  Having

been involved in the prepetition due diligence and plan negotiations, as well as these Chapter 11

Cases as the Legal Representative, Mr. Fitzpatrick is knowledgeable about the asbestos liabilities

of the Debtors, the procedures that will govern the Trust, and matters that remain to be done on

behalf of the future claimants with respect to establishment of the Trust.  Mr. Fitzpatrick's

continued service as the Legal Representative will benefit the future claimants in the form of

providing them an experienced and knowledgeable fiduciary to represent their interests and to

counter the experienced professionals of the Trust Advisory Committee representing the current

claimants.  (*See* Hr'g Tr. 19:10-21, Oct. 16, 2018).

148.    Section 524(g)(4)(B)(ii) requires a court to determine that entry of the channeling

injunction, and the protection from liability of the third parties named therein, "is fair and equitable

with respect to the persons that might subsequently assert such demands, in light of the benefits

provided, or to be provided, to [the] trust on behalf of such debtor or debtors or such third party." *Id*. § 524(g)(4)(B)(ii).   In accordance with that section, the Asbestos Permanent Channeling Injunction will extend to and protect the Protected Parties in exchange for the following items being contributed to the Trust on the Effective Date:  (1) the Debtors' Contribution (cash sum of $7.5 million); (2) the Hinden Contribution (cash sum of $3 million); (3) the Trust Note (in the original principal amount of $13.5 million); (4) the right to receive Earn Out Payments in the aggregate amount of $2 million; and (5) the Asbestos Insurance Rights, including the proceeds of any Asbestos Insurance Settlement.  (Plan § 4.07, 4.08, 4.10; Fitzpatrick Decl. ¶ 17).  Each Settling Asbestos Insurer is designated as a Protected Party in exchange for cash derived from and payments made in accordance with an Asbestos Insurance Settlement.  (Fitzpatrick Decl. ¶¶ 39, 41).  In light of the substantial contributions to be made to the Trust on behalf of all Protected Parties, entry of the Asbestos Permanent Channeling Injunction, and the naming of the Protected Parties therein, is fair and equitable with respect to persons that might subsequently assert future asbestos-related Demands.   (Fitzpatrick Decl. ¶¶ 40, 41; Hr'g Tr. 97:24–98:5, Mar. 6, 2019 (Fitzpatrick Testimony)).

### 5.   Section 524(g) Mandates the Injunction and Channeling of North River's Class 7 Claims

149.   North River argues that, because the Plan allegedly deprives it of any recovery on account of its Class 7 claims, those claims cannot be enjoined under § 524(g).   North River contends that asbestos-related claims may be enjoined only if the claims are to be "paid in whole or in part by [the] trust."  (Jt. Obj. at 10 (quoting 11 U.S.C. § 524(g)(1)(B))).  The entire premise of this argument is flawed because, under the Plan, North River is receiving value on account of its claims, in the form of the Trust-Payment and Judgment-Reduction Credits.  Furthermore, this argument relies on a cramped reading of § 524(g)(1)(B), under which a channeling injunction may

enjoin any entity from "indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust . . . ." 11 U.S.C. § 524(g)(1)(B) (emphasis added). North River's argument essentially ignores the "with respect to" language in the statute. As the Court of Appeals in *Plant* explained in rejecting a similar argument by the non-settling insurers, the "phrase 'with respect to' is generally understood to be synonymous with the phrases 'relating to,' 'in connection with,' and 'associated with.'" *Plant Insulation Co.*, 734 F.3d at 910 (citing *Huffington v. T.C. Group, LLC*, 637 F.3d 18, 22 (1st Cir. 2011)). Thus, the "with respect to" language only requires that the claim be *related to* a claim to be paid by the Trust, not that the claim enjoined be converted into a claim against the Trust and otherwise paid in cash. *See id.* North River's contribution claims for indemnity and defense costs are related to claims for asbestos personal injury or wrongful death. Indeed, North River's claims never would arise in the first place but for the latter set of claims.

150. By arguing that its claims cannot be enjoined because tort indemnity and defense costs are not to be paid by the Trust, North River necessarily urges that a § 524(g) injunction is available only if all *amounts* associated with an underlying claim are actually paid by the Trust. This argument fails because the phrase "to be paid by a trust" in § 524(g)(1)(B) logically can refer only to claims *of the kind* that the plan provides are to be paid by a trust, rather than only those particular claims or demands that are actually paid by that trust. For example, § 524(g)(4)(B) looks prospectively to the "kind of demand" described in the plan and permits the injunction to be "enforceable with respect to a *demand of such kind* made, after such plan is confirmed," thus describing a category of claims rather than specific claims actually paid. 11 U.S.C. § 524(g)(4)(B) (emphasis added).

151.    To hold otherwise would render § 524(g) injunctions full of holes and set up a situation in which the scope of injunctive relief could not be ascertained for years or decades. Whether a claim is actually paid by the Trust will depend on whether it is (a) submitted for payment and (b) determined to be valid.  By the nature of a § 524(g) trust and given the long latency period of asbestos diseases, claims will be presented over many years as people die or manifest disease. Unless the statute is read to authorize the injunction to apply to all efforts to recover indirectly with respect to any and all claims of a "kind" to be paid by the Trust, parties could never know with any precision which "indirect actions" were covered by the injunction; the injunction would be of little value to Settling Asbestos Insurers or other parties for whose benefit it is intended; and those parties would have little or no incentive to make contributions to fund the trust because they would not be able to buy peace in any meaningful sense.  The statute should not be construed to set up such an unworkable result, and one so demonstrably at odds with the core purpose of § 524(g).

152.    As set forth in paragraphs 126-151 above, the Plan complies in all respects with the applicable requirements of § 524(g) of the Bankruptcy Code.    Accordingly, the Asbestos Permanent Channeling Injunction is authorized by § 524(g) of the Bankruptcy Code.  11 U.S.C. § 524(g)(3)(A).

### Q.    *The Trust Distribution Procedures Are Appropriate and Achieve the Objectives of § 524(g)*

153.    Under the Plan, Channeled Asbestos Claims are to be resolved and, if eligible, paid in accordance with the terms of the TDP.  As the UST concedes (UST Obj. at 11; Hr'g Tr. 33, Mar. 7, 2019), the TDP is based on models that have been approved by many courts in asbestos-related bankruptcy cases.  Yet, the TDP does not simply copy these models.  Instead, the proposed terms of the TDP reflect improvements tailored to the circumstances of these Chapter 11 Cases.

The Asbestos Trust to be established under the Plan will be of modest size, making efficiency and economy important considerations in the resolution and payment of claims. Accordingly, the TDP provides for only the relatively simple "expedited review" of claims, rather than offering other levels of processing and compensation available in other asbestos trusts, such as "individual review" of claims, which is more expensive than expedited review. (Hr'g Tr. 105:14–18, Mar. 6, 2019 (Fitzpatrick Testimony)). The TDP sets forth a streamlined schedule of five asbestos-related disease levels that each have prescribed medical and exposure criteria and specified liquidated values. (Hr'g Tr. 106:3–7, Mar. 6, 2019 (Fitzpatrick Testimony)). The TDP's criteria and values were selected and derived in light of the best available information and considering the settlement history of the Debtors and the rights claimants would have in the tort system absent these Chapter 11 Cases. (TDP § 2.1). Four of the five compensable disease levels of the TDP are malignant, cancerous diseases. (*Id*. § 5.3(a)(3)). The TDP's "claims payment ratio" directs that 90% of the trust's claims payments each year must be paid to claims based on mesothelioma, a disease that has no known cause other than asbestos exposure. (*Id*. § 2.5; Hr'g Tr. 100:21–101:7, Mar. 6, 2019 (Fitzpatrick Testimony)).

154.    The UST has raised several objections to the TDP, which in large part are premised on the UST's unproven assertion that there is widespread fraud or misconduct with respect to § 524(g) trusts that were approved in other asbestos-related bankruptcies. To support its assertion of alleged fraudulent claiming in the "asbestos trust system," the UST relies heavily on an opinion rendered by a bankruptcy court in North Carolina in the *Garlock Sealing Technologies* case. (UST Obj. at 1–3 (citing *In re Garlock Sealing Techs., LLC*, 504 B.R. 71 (Bankr. W.D.N.C. 2014))). That decision estimated the Garlock debtors' liability for mesothelioma claims. It was not tested on appeal and, further, the case resulted in the confirmation of a plan that provided for the

establishment of a settlement trust with funding in an amount nearly four times greater than the court's estimate.

155.    Although the *Garlock* opinion criticizes litigation in the tort system, it is not about fraud in the asbestos trust system and does not even mention the word "fraud."  The UST cites to other cases in support of its argument that the TDP "is intended to facilitate improper conduct." (UST Obj. at 14).  But those cases establish only that deviations from the traditional § 524(g) trust structure should be scrutinized closely.  For example, in *In re Combustion Engineering, Inc.*, 391 F.3d at 242, the Third Circuit found that a plan that proposed an unusual two-trust structure composed of a prepetition trust and a postpetition 524(g) trust was not confirmable on the record before it.  There is no "two-trust" structure here.  In *In re American Capital Equipment LLC*, 688 F.3d 145, 159-60 (3d Cir. 2012), the Third Circuit disapproved a non-524(g) asbestos trust that deviated from the structure required by § 524(g).  These authorities do not undercut the TDP and Plan, which creates an ordinary § 524(g) trust, but support it.

156.    Moreover, since § 524(g) was enacted, asbestos settlement trusts have been the subject of study, but there is no evidence of widespread fraud or mismanagement.  The United States Governmental Accountability Office ("**GAO**") observed in its comprehensive review of asbestos trusts in 2011 that the trusts were "committed to ensuring that no fraudulent claims are paid by the trust[s], which aligns with their goals of preserving assets for future claimants."[20] Similarly, the U.S. Office of Management and Budget ("**OMB**") gave no credence to "the false assertion that there is endemic fraud in the asbestos trust system."[21]  While this Court is cognizant

---

[20]    U.S. Gov't Accountability Off., GAO 11-819, Asbestos Injury Compensation, The Role and Administration of Asbestos Trusts, at 23 (2011) ("**GAO Report**").

[21]    U.S. Office of Mgmt. and Budget, Statement of Administration Policy on H.R. 982 - Furthering Asbestos Claim Transparency (FACT) Act of 2013 (Nov. 12, 2013),

of the UST's claims of widespread or systemic fraud in the asbestos trust system, the UST did not

provide any support for these assertions beyond citations to commentary by individuals aligned

with defendants in the tort system whose agendas are not aligned with the interests of the claimants

that § 524(g) seeks to protect.  Indeed, the UST neither presented any witnesses nor asked any

questions of the witnesses who testified for the Plan Proponents.  Further, similar objections to

TDPs have been raised and overruled in other cases.[22]  This Court is unpersuaded that it should

disapprove of the TDP based on such unsubstantiated assertions.

### 1.    The Confidentiality Provision in Section 6.5 of the TDP Is Necessary and Appropriate

157.    As part of the claims processing under the TDP, asbestos claimants will be required

to submit to the Trust non-public personal information, such as medical information, that is

protected from disclosure under federal and state law, including the Bankruptcy Code.  Section 6.5

of the TDP provides for, and preserves, the confidentiality of all submissions, including proof of

claim forms and related materials, made by asbestos claimants to the Trust.  Protecting vulnerable

asbestos claimants is the primary purpose of section 6.5.  Claimants to asbestos trusts are typically

sick and dying individuals, or their survivors.  They are often elderly.  Confidentiality provisions

like section 6.5 are designed to protect those individuals' privacy interests, and address the

problem that publishing a list of sick, elderly, and vulnerable individuals who just received

payments from an asbestos trust is an invitation to identity thieves and other malefactors.  The

---

https://obamawhitehouse.archives.gov/sites/default/files/omb/legislative/sap/113/saphr982h_20131112.pdf      (last
visited Feb. 26, 2019) ("**FACT Act Statement**").

[22]    *See In re Pittsburgh Corning Corp.*, No. 00-22876 (JKF), 2013 WL 2299620 (Bankr. W.D. Pa. May 24, 2013)
(overruling objections to TDP raised by Garlock and an insurer), *clarified on denial of reconsideration*, No. 00-22876-
TPA, 2013 WL 5994979 (Bankr. W.D. Pa. Nov. 12, 2013), *aff'd and adopted sub nom. Mt. McKinley Ins. Co. v.
Pittsburgh Corning Corp.*, 518 B.R. 307 (W.D. Pa. 2014).   Hr'g Tr. 59:24–61:6 (Oct. 15, 2018) (Fitzpatrick
Testimony).

OMB acknowledged these hazards when it criticized proposed legislation that would have effectuated the type of disclosure that the UST seeks here.[23]

158.    In addition, the Trust to be created under the Plan will operate as a *settlement* trust rather than an adversarial litigant in the tort system.  The TDP essentially provides for a uniform settlement process for resolving and paying asbestos claims.  Settlements in the tort system ordinarily are not public.  *See Pittsburgh Corning Corp.*, 2013 WL 2299620, at *36 ("We credit the testimony that in the tort system, defendants generally try to keep the terms of their settlements confidential, and settlement agreements generally contain confidentiality provisions.").  (*See also* Hr'g Tr. 94:14–24; 120:9–10, Mar. 6, 2019 (testimony of Mr. Fitzpatrick that, in his experience working on behalf of claims settlement facilities for asbestos defendants, those defendants kept their tort settlements confidential)).  As the GAO observed in its 2011 review of asbestos trusts, "[a]sbestos trusts typically protect the confidentiality of claimants' submissions to the trust in accordance with the trust's TDP, unless specifically given permission by the clamant or subpoenaed by a court of jurisdiction."  GAO Report at 28.  Such trust confidentiality provisions appeared, for example, in the G-I Holdings TDP confirmed in this district a decade ago.  *See* Asbestos Personal Injury Settlement Trust Distribution Procedures § 6.5, at 47, *In re G-I Holdings, Inc.*, No. 01-30135 (Bankr. D.N.J. Oct. 6, 2009), ECF No. 9648.  Section 6.5 of the TDP is consistent with that approach and affords the Trust and claimants the same type of rights to confidentiality in settlement discussions that are enjoyed by plaintiffs and defendants in the tort

---

[23]    *See* FACT Act Statement ("The bill's mandatory reporting and disclosure requirements would threaten asbestos victims' privacy when they seek payment for injuries from an asbestos bankruptcy trust.  Claimants' sensitive personal information – including their names and exposure histories – would be irretrievably released into the public domain and thus available to parties unrelated to the claims (including insurance companies, prospective employers, lenders, and data collectors).  These parties could then use this personal information for purposes entirely unrelated to compensation for asbestos exposure, potentially to the detriment of asbestos victims.  The information on this public registry could be used to deny employment, credit, and insurance.  Victims would be more vulnerable to identity thieves and other types of predators.").

system.  Moreover, given its limited means and its purpose of compensating asbestos claimants, it is not appropriate to burden the Trust with operating as an information clearinghouse for the benefit of asbestos defendants.  Congress has evinced no intent to have claims filed with an asbestos settlement trust treated as public information, and to do so would threaten the efficiencies that § 524(g) was meant to foster.

159.    Despite the UST's concession that there is a legitimate privacy interest in the medical and personal information of claimants, the UST asserts there is no "legitimate basis" for the confidentiality provision found in section 6.5 of the TDP.  (UST Obj. at 17).  The object of the UST's concern is unclear, but references to *Garlock* (*e.g.*, *id*. at 18) suggest that the UST is focused on the interests of corporate asbestos defendants that remain outside the bankruptcy process and in the tort system.[24]  But asbestos trust claims information is already routinely available to asbestos defendants in tort litigation in state and federal courts, through ordinary discovery from claimants themselves and trusts, and pursuant to state-court case management orders.  For example, in New York asbestos litigation, the applicable case management order specifically addresses the timing of asbestos bankruptcy trust claims and the standard, court-mandated discovery package includes a document request for filed trust claims.[25]  The order was upheld on appeal, with the appellate court observing that the order "will enable the [court] to monitor any behavior that could indicate that plaintiffs are seeking to hide such trust claims."[26]  Many other state courts similarly require

---

[24]   The UST stated in its objection that the "only possible purpose of such far reaching secrecy provisions would appear to be to allow litigants to conceal the existence of claims against other defendants," characterizing this as "misconduct."  Objection of the United States Trustee to the Disclosure Statement for the Prenegotiated Plan of Reorganization for Duro Dyne National Corp., *et al*., at 9, Oct. 4, 2018, ECF No. 140.  This is simply not the case.

[25]   *See, e.g.*, Case Management Order, *In re New York City Asbestos Litigation (NYCAL)*, No. 782000/2017 (New York City July 20, 2017) (controlling timing of trust claims); Defendants' Fourth Amended Standard Set of Interrogatories and Request for Production of Documents, *In re New York City Asbestos Litigation (NYCAL)*, No. 40000/88 (New York City) (requiring production of bankruptcy trust claims).

[26]   *In re New York City Asbestos Litig.*, 74 N.Y.S.3d 180, 182 (App. Div. 2018) (alteration in original).

the production of asbestos bankruptcy claims.[27]  Asbestos settlement trust claims have long been known of and accounted for under state law, as each state legislature and court system sees fit.

160.    Section 6.5 of the proposed TDP complies with this structure.  It expressly subjects the Trust to ordinary discovery rules and obligates the Trust to respond to properly issued subpoenas.  Section 6.5 poses no obstacles to asbestos defendants obtaining trust claims in asbestos personal-injury litigation in the tort system pursuant to valid discovery rules or standing court orders.  Even the Garlock trust's distribution procedures, which the UST holds up as his preferred model, require the trust to protect claim submissions as confidential.[28]  Again, the UST provided no witness testimony or other evidence that anything about section 6.5 is improper.

161.    The Court notes that asbestos defendants have for a number of years lobbied for federal legislation that would create publicly accessible databases of asbestos settlement trust claims, and bills have been introduced that would accomplish that purpose.[29]  Congress has so far decided not to enact such measures.  This Court declines the UST's request to anticipate Congress's decisions on these legislative and policy issues.

---

[27]    *E.g.*, Third Amended General Order No. 29, *In re Los Angeles Asbestos Litig. – General Order*, No. C700000 (Cal. Super. Ct. Los Angeles Cty. May 27, 2009).  State legislatures are likewise fully aware of asbestos bankruptcy claims, and some have passed statutes which specifically address them in the context of asbestos personal injury lawsuits.  For example, the Wisconsin Code of Civil Procedure requires a plaintiff to assign to a defendant all future rights or claims he or she has or may have for a personal injury claim against an asbestos trust before the plaintiff can collect on a judgment.  *See* Wis. Stat. Ann. § 802.025(6) (2018).

[28]    *See* Garlock Settlement Facility, Amended and Restated Claims Resolution Procedures § 12.3, June 19, 2018. The current version of those procedures is available on the trust's website at http://garlocksettlementfacility.com/wp-content/uploads/2018/07/Settlement-Facility-Amended-and-Restated-Claims-Resolution-Procedures-as.._.pdf.

[29]    *E.g.*, Furthering Asbestos Claim Transparency (FACT) Act of 2015, S. Rep. No. 357; Furthering Asbestos Claim Transparency (FACT) Act of 2017, H.R. Rep. No. 906; Fairness in Class Action Litigation and Furthering Asbestos Claim Transparency (FACT) Act of 2017, H.R. Rep. No. 985.

### 2.    Section 5.6(b)(3) of the TDP Does Not Prevent the Trust from Asserting an "Affirmative Defense"

162.    Section 5.6(b)(3) of the TDP provides in relevant part that the "failure to identify a Debtor's products in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the Asbestos Trust, provided the claimant otherwise satisfies the medical and exposure requirements of this TDP."  The UST objects to this provision because it "appears to prevent the Trust from asserting an affirmative defense based on estoppel against a claimant who has engaged in dishonest or deceptive conduct in other proceedings." (UST Obj. at 20–21).

163.    The UST's objection lacks merit as it is based on several misunderstandings. Asbestos settlement trusts are established as an alternative to litigating claims in the tort system. They do not assert affirmative defenses any more than they conduct discovery, depose witnesses, or try cases.  Asbestos settlement trusts are set up to avoid litigating claims, because otherwise they would spend all their limited funds on lawyers rather than paying victims.  *See Federal-Mogul*, 684 F.3d at 362 ("Empirical research suggests the trusts considerably reduce transaction costs and attorneys' fees over comparable rates in the tort system.").  Rather, asbestos settlement trusts pay claims that meet the criteria set out in their respective trust distribution procedures.  The only exception is the post-ADR litigation option, which is set out in section 5.9 of the TDP. Historically, few, if any, claimants have ever litigated against asbestos settlement trusts under similar provisions in other trust distribution procedures.  However, if claimants should do so here, section 7.6 of the TDP preserves any defenses that the Debtors had in the tort system for use by the Trust, including any "estoppel" defense of the type the UST posits.

164.    In addition, a claimant's failure to identify Duro Dyne exposure in a parallel lawsuit in the tort system does not involve "dishonest or deceptive conduct."  When a person sick with

asbestos disease consults a lawyer, he or she does not necessarily have all the evidence of exposure to asbestos products immediately available. Instead, the lawyer must use various investigative techniques find out to which asbestos products that sick person might have been exposed decades earlier. The sick person may know of some products but be unaware of other exposures.[30] If the exposed person has died, his or her survivors may know even less. Developing a case against any particular manufacturer of asbestos products, therefore, takes considerable time and effort. At the same time, plaintiffs are not required to seek out evidence of all possible exposures. An attorney may reasonably (and ethically) focus development of the lawsuit against those manufacturers of asbestos products the attorney believes will provide the best chance of a meaningful, cost-effective recovery. If an asbestos defendant wants to make the case that someone else is responsible for a person's injury or death, it is that defendant's burden to do so.[31]

165.    Section 5.6(b)(3) of the TDP says only that if the information about a claimants' exposure to a Duro Dyne product has not already been developed in a tort case, that does not automatically foreclose recovery from the Trust. This is appropriate. The provision is not a nefarious one and appears in the distribution procedures for numerous operating asbestos settlement trusts. For example, the asbestos personal injury trust created in the *W.R. Grace*

---

[30]   It is not unusual for certain types of workers to have been exposed to the asbestos-containing products of multiple companies. The worker may not have known certain products contained asbestos, or the name and manufacturer of that product. *See In re Congoleum Corp.*, 426 F.3d 675, 679 (3d Cir. 2005) ("[B]ecause over time they may have been exposed to asbestos in various environments, some of the injured persons may have claims against a number of defendants.")

[31]   *See, e.g.*, *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 73–74 (Ky. 2010) (holding that when a defendant seeks to prove the fault of another entity, "[t]he burden of proof in such a case is effectively shifted, since it is the participating defendant, not the plaintiff, who seeks to show that the empty-chair defendant is responsible," and "a participating defendant must . . . prove liability on the part of the tortfeasor onto whom it seeks to shift some of the blame"); *Sparks v. Owens-Illinois, Inc.*, 38 Cal. Rptr. 2d 739, 749–50 (Ct. App. 1995) (the named defendant bears the burden of persuading the finder of fact that another entity is responsible, in whole or part, for the alleged injury).

bankruptcy, confirmed in 2012 and upheld on appeal by the Third Circuit in 2013, contains almost

identical language.[32]

### 3.    The Withdrawal and Deferral Provisions of Section 6.3 Are Appropriate

166.    Section 6.3 of the TDP permits the withdrawal or deferral of a claim without

affecting the status of the claim for statute of limitations purposes.    The UST objects to this

provision, arguing that it has no "valid purpose" and speculating that it may be exploited to harm

corporate asbestos defendants outside of bankruptcy in the tort system.    (UST Obj. at 21).    These

arguments lack merit.    First, the provision does not alter the exposure or medical requirements

necessary for payment by the Trust.    The provision does not mean that unqualified claimants will

be paid.    Second, section 6.3 provides practical claims-processing benefits for the Trust.    Trust

claimants facing a statute of limitations deadline may file incomplete claims to preserve potential

recoveries.    Without withdrawal and deferral provisions like section 6.3, however, the incomplete

claims would remain as a "filed claim" with the Trust, even if the necessary exposure evidence is

not obtained.    The withdrawal and deferral provisions lighten the Trust's administrative burden of

carrying such claims as filed claims with the Trust.    The Trust does not, for example, have to

process the claim and issue a deficiency notice; instead, the Trust has the equivalent of an "inactive

docket" or tolling provision for claims that are not ripe.    *See Pittsburgh Corning*, 2013 WL

2299620, at *38 (describing similar withdrawal provision as a tolling mechanism).    Additionally,

postponing the payment of those claims that do refile is financially beneficial to the Trust, as

paying claims with dollars later rather than dollars now permits the Trust to earn a return on

---

[32]    *See* WRG Asbestos PI Trust Distribution Procedures § 5.7(b)(3), http://wrgraceasbestostrust.com/wp-content/uploads/2014/02/WRG-TDP.pdf ("Similarly, failure to identify Grace products in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the PI Trust, provided the claimant otherwise satisfies the medical and exposure requirements of this TDP.").

retained funds.  Filing a claim with the Trust will require the payment of a $50 filing fee, which

will help defray the administrative costs of handling the claims that are submitted to the Trust.

(TDP § 6.4).

### 4.    The TDP Contains Appropriate Audit Procedures

167.    The UST objected that the TDP does not require a mandatory, independent audit of

the Trust and Trust fiduciaries, but provides instead for a discretionary one.  (UST Obj. at 22).

Prior to the Confirmation Hearing, the Plan Proponents made the audit provision mandatory,

mooting this objection.  To the extent the UST's objection remains, the Court finds that the Trust

Agreement and TDP provide for an appropriate level of auditing, particularly given the limited

resources of the Trust.  First, audited financial information and claim processing information is

required to be filed annually with the Bankruptcy Court under section 2.2(c) of the Trust

Agreement.  Second, the Trustee is required to develop a claims audit program under section 5.7

of the TDP.  It is appropriate to leave the implementation of the audit procedures to the Trustee's

discretion, given the limited resources of the Trust.  The Trustee must balance the need for auditing

with the costs of such a project, a reality called out expressly in section 7.2 of the TDP.  Third, the

Trust will be administered by the Trustee, who is bound by fiduciary duties as set forth in the Trust

Agreement, the TDP, and the state law governing the Trust.

### 5.    The Trust Need Not Require Evidence of Non-Duro Dyne Asbestos Exposures

168.    The UST protests that the TDP does not contain a provision equivalent to section

6.8(c) of the distribution procedures adopted in the *Garlock Sealing Technologies* case.  (UST Obj.

at 22).  Section 6.8(c) of the *Garlock* procedures requires claimants seeking extraordinary claim

review to execute a release authorizing the trust to receive copies of any submissions that the

claimant made to other asbestos trusts.  The Court agrees with the Plan Proponents that such a

provision is not necessary here because, unlike the *Garlock* procedures, the TDP does not have an

"extraordinary claims" category.   "Extraordinary claims" provisions are found in some trust

distribution procedures to provide the possibility of an enhanced recovery to claims where the

injured party was exposed exclusively, or almost exclusively, to a single asbestos product.   For an

ordinary claim, an asbestos trust does not have any need to consider other asbestos exposures

beyond exposure to the product for which the trust is responsible.   This is because, among other

things, the asbestos trust assumes that there was such other exposures.   Indeed, that assumption is

built into the ordinary settlement values paid by the trust.   To obtain the enhanced settlement value

for an "extraordinary claim," however, a claimant must represent to the trust that his or her

exposure was restricted to a limited number of sources.   Hence, it makes sense for the trust to

require information substantiating that representation.   Because the Garlock trust has such an

extraordinary claims category, information about other trust claims sought in section 6.8(c) is

relevant to the processing of those claims.   The Court notes that section 6.8(c) of the *Garlock*

procedures only applies to claimants seeking extraordinary claim review; other claimants are not

required to provide information regarding submissions to other trusts.   Given the extremely limited

resources of the Trust, the TDP has been simplified to reduce processing complexity and costs.

One of those simplifications was the decision not to have an "extraordinary claims" provision.

With no extraordinary claims provision, there is simply no need for the Trust to obtain information

of the type sought in section 6.8 of the *Garlock* procedures for extraordinary claims.

### 6.      Attorneys' Fees Should Be Left to State Regulation

169.      The UST objects that the TDP does not limit contingent fees for claimants'

attorneys.   But § 524(g) does not require regulation of attorneys' fees, and the UST does not

explain why, on what basis, or under what authority the Trust or this Court could attempt to

regulate attorneys' fees.   Nor does the UST suggest how such a provision would be enforced and

who should bear the cost of enforcement.  Regulation of the relationship between a client and an attorney is carried out at the state level.  *See* Geoffrey C. Hazard, Jr., W. William Hodes & Peter R. Jarvis, LAW OF LAWYERING § 1.17 (4th Edition, 2018-1 Supp. 2014).  The states use different mechanisms to regulate attorney-client fee arrangements, including state statutes, court rules, and, of course, the rules of professional conduct.[33]  There is no reason for this Court to impose arbitrary fee limitations when states already legislate on these matters.  Moreover, nothing in the TDP requires a claimant to retain an attorney to submit a claim.  That a claimant may find it necessary to retain an attorney suggests that the attorney should be compensated for the diligence and effort required to prepare and prosecute the claim.  The UST's objections to the TDP are overruled.

### R.    Further Findings and Conclusions in Support of Plan Confirmation and § 524(g) Relief

170.    The Asbestos Permanent Channeling Injunction, the other Injunctions, and the releases granted under section 9.11 of the Plan are to be implemented and granted in connection with the Plan, the other Plan Documents, and the Asbestos Trust.  (Plan arts. IV and IX).

171.    The Asbestos Permanent Channeling Injunction, the other Injunctions, and the releases granted under section 9.11 of the Plan (a) are essential to the Debtors' reorganization efforts and the feasibility of the Plan; (b) enable necessary funding under the Plan that otherwise would be unavailable absent the injunctions and releases; (c) are necessary to induce the Protected Parties to enter into the settlements and agreements described or embodied in the Plan and to

---

[33]    *See, e.g.*, Cal. Bus. & Prof. Code § 6146 (West 2019) (limiting contingency fees in medical malpractice actions based on the amount recovered (i.e., forty percent of the first fifty thousand dollars recovered)); *see also* N.Y. Jud. Law § 474-a (McKinney 2019) (setting statewide limits on contingent fees for medical, dental and podiatric malpractice cases); N.Y. Rules App. Div. 1st Dept. § 603.25 (limiting fees for personal injury and wrongful death actions in the counties in the First Appellate Department (Manhattan and the Bronx) either to a maximum based on the level of recovery, or a total not exceeding 33% of the amount recovered); Rules Regulating the Florida Bar § 4-15(f) (regulating contingency fees in personal injury suits by setting maximum percentages based on the amount of recovery and/or the stage when the litigation terminates).

otherwise settle their disputes; (d) are necessary to resolve finally all claims of the Debtors, their

Affiliates, and their creditors against the other Protected Parties; and (e) have been

overwhelmingly approved by holders of Asbestos Claims in Class 7.  (Podgainy Cert. ¶¶ 5-11, 33-

37, 49; Fitzpatrick Decl. ¶¶ 11-15, 21-22, 38-44).

172.    The settlements, compromises, releases, and Injunctions described or embodied in

the Plan are approved in all respects.

### S.    *Substantive Consolidation*

173.    Substantive consolidation is appropriate in these Chapter 11 Cases because there is

a substantial interrelationship between and among the Debtors.  (Podgainy Cert. ¶ 51).  Because

the Debtors historically operated on a consolidated basis, the Debtors' finances are completely

intertwined.  (Podgainy Cert. ¶ 52).

174.    The Debtors have the same officers, directors and shareholders.  They conduct

"virtually identical" business operations under similar names, and use the same general methods

of operation.  The Debtors' management works out of, and most administrative and accounting

functions are all performed from, one centralized location.  (Podgainy Cert. ¶ 52).

175.    Customers and vendors identified the Debtors generally as "Duro Dyne" as opposed

to any individual corporate identity.  The Debtors' trade creditors and customers view the Debtors

as a single entity when extending credit.  The Debtors as a whole capitalized upon the scale and

operations of the entirety of the Debtors' business operations to negotiate agreements and

maximize value.  (Podgainy Cert. ¶ 53; Hr'g Tr. 85:2–18, Mar. 6, 2019).

176.    No class of creditors will be negatively impacted by substantive consolidation.

(Podgainy Cert. ¶ 53).  Accordingly, this Court approves the proposed substantive consolidation

and merger of the Debtors into a single corporate entity, the Reorganized Debtor, as defined in the

Plan.  The UST's objection to the proposed substantive consolidation and merger of the Debtors is overruled.

## XI.    MODIFICATIONS TO THE PLAN

177.    The modifications made to the Second Amended Plan, as reflected in the Plan Supplements and the modified Plan filed on March 5, 2019 (collectively, "**Modifications**") (a) do not adversely change, in any material respect, the treatment under the Plan of any Claims or Equity Interests and (2) comply in all respects with Bankruptcy Rule 3019.

178.    Pursuant to § 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Modifications do not require additional disclosure under § 1125 of the Bankruptcy Code or the resolicitation of acceptances or rejections of the Plan under § 1126 of the Bankruptcy Code, nor do they require that holders of Claims against or Equity Interests in the Debtors be afforded an opportunity to change previously cast acceptances or rejections of the Plan as filed with the Bankruptcy Court.

179.    The filing of the Modifications on the docket of these Chapter 11 Cases constitutes due and sufficient notice thereof under the circumstances of these cases.

180.    Accordingly, the Plan (as modified) is properly before the Court and all votes cast with respect to the Plan prior to the Modifications are binding and deemed to be cast with respect to the Plan as modified.

**ORDER CONFIRMING PLAN AND GRANTING
RELIEF UNDER 11 U.S.C. §§ 105(a) AND 524(g)**

NOW, THEREFORE, BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, WHICH ARE INCORPORATED HEREIN AND ADOPTED, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:

## I.     GENERAL PROVISIONS

### A.     *Confirmation of the Plan*

181.    All objections to the Plan that have not been withdrawn or waived, and all reservation of rights pertaining to confirmation of the Plan included therein, are overruled on the merits.

182.    The Plan and each of its provisions (whether or not specifically approved herein) and all exhibits and schedules thereto, as amended or modified to the date hereof, are hereby **CONFIRMED** in each and every respect, in accordance with § 1129 of the Bankruptcy Code.

### B.     *Conditions to the Effective Date of the Plan*

183.    Nothing in this Confirmation Order or in the Findings of Fact and Conclusions of Law herein shall in any way affect the provisions of sections 10.02, 10.03, and 10.04 of the Plan, which include provisions regarding (a) the conditions precedent to the Effective Date of the Plan and (2) the waiver of any such conditions.  If a condition to the occurrence of the Effective Date set forth in section 10.02 or 10.03 of the Plan cannot be satisfied, and the occurrence of such condition is not waived in writing in accordance with section 10.04 of the Plan, then the Plan and this Confirmation Order shall be deemed null and void.  In such event, nothing contained herein or in any of the Plan Documents shall be deemed to constitute a waiver or release of any claims or defenses of, or an admission or statement against interest by, any of the Plan Proponents or any other Entity in any further proceedings involving the Debtors.  Upon satisfaction or waiver of the conditions contained in sections 10.02 and 10.03 of the Plan and the occurrence of the Effective Date, substantial consummation of the Plan, within the meaning of § 1127 of the Bankruptcy Code, shall be deemed to occur without further notice or order.

### C. Effects of Confirmation

184.    Upon the occurrence of the Effective Date and in accordance with § 1141(a) of the Bankruptcy Code, the terms of the Plan and this Confirmation Order shall be binding upon all Entities, including the Debtors, the Reorganized Debtor, any and all holders of Claims, Demands, or Equity Interests (irrespective of whether such Claims or Equity Interests are impaired under the Plan or whether the holders of such Claims or Equity Interests accepted, rejected, or are deemed to have accepted or rejected the Plan), any and all non-Debtor parties to executory contracts and unexpired leases with any of the Debtors, and any and all Entities who are parties to or are subject to the settlements, compromises, releases, waivers, discharges, and Injunctions described herein and in the Findings of Fact and Conclusions of Law or in the Plan, and the respective heirs, executors, administrators, trustees, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, guardians, successors, or assigns, if any, of any of the foregoing.

185.    On the Effective Date, in accordance with § 1141(b) of the Bankruptcy Code, except as otherwise provided in the Plan, the Plan Documents, or this Confirmation Order, the assets and property of the Debtors shall vest or revest in the Reorganized Debtor for use, sale, and distribution in accordance with operation of the Reorganized Debtor's business and the Plan.

### D. Approval, Modification, and Execution of Plan Documents

186.    The Plan, each of the other Plan Documents, and all exhibits and schedules to any of the foregoing, substantially in the form as they exist at the time of entry of this Confirmation Order, are ratified and approved in all respects.  Each of the officers of the Debtors and the Reorganized Debtor is authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and to take such actions as may be necessary or appropriate, for and on behalf of the Debtors and the Reorganized Debtor, to effectuate and further evidence the terms and conditions of the Plan, the transactions contemplated

by the Plan, and any securities issued pursuant to the Plan, notwithstanding that the efficacy of

such documents may be subject to the occurrence of the Effective Date as contemplated by and

under the Plan or any of the other Plan Documents.

187.    The Plan Proponents, acting unanimously, are hereby authorized to alter, amend,

or modify the Plan or any other Plan Document at any time prior to the substantial consummation

of the Plan, but only in accordance with § 1127 of the Bankruptcy Code and section 12.01 of the

Plan.

188.    The failure to reference or discuss any particular provision of the Plan in this

Confirmation Order shall have no effect on the validity, binding effect, and enforceability of such

provision, and such provision shall have the same validity, binding effect, and enforceability as

every other provision of the Plan.  If there is any conflict between the terms of the Plan, any exhibit

thereto, or any of the other Plan Documents on the one hand and the terms of this Confirmation

Order on the other hand, the terms of the Plan, such exhibits, or such Plan Document, as the case

may be, shall control.

## II.    CLAIMS BAR DATES AND OTHER CLAIMS MATTERS

### A.    *Bar Date for Administrative Claims (Other Than Professional Claims)*

189.    All parties seeking payment of an Administrative Claim (other than a Professional

Claim) must file with the Bankruptcy Court and serve upon the Reorganized Debtor a request for

payment of such Administrative Claim prior to the applicable deadline set forth below; *provided,*

*however*, that parties seeking payment of postpetition ordinary course trade obligations,

postpetition payroll obligations incurred in the ordinary course of a Debtor's postpetition business,

and amounts arising under agreements approved by the Bankruptcy Court or the Plan need not file

such a request.

190.    All holders of Administrative Claims (other than Professional Claims) must file

with the Bankruptcy Court and serve on the Debtors or the Reorganized Debtor, as applicable, a

request for payment of such Claims so as to be received on or before 4:00 p.m. (Eastern Time) on

the first Business Day after the date that is sixty (60) days after the Effective Date, unless otherwise

agreed to by the appropriate Debtor or Reorganized Debtor, without further approval by the

Bankruptcy Court.  *Failure to comply with these deadlines shall forever bar the holder of an*

*Administrative Claim (other than a Professional Claim) from seeking payment thereof.*

191.    Any holder of an Administrative Claim (other than a Professional Claim) that does

not assert such Claim in accordance with this Confirmation Order and section 2.01 of the Plan

shall have its Claim deemed disallowed under this Plan and be forever barred from asserting such

Claim against any of the Reorganized Debtor, the Debtors, their Estates, or their assets. Any such

Claim and the holder thereof are enjoined from commencing or continuing any action, employment

of process or act to collect, offset, recoup, or recover such Claim.

### B.    *Bar Date for Professional Claims*

192.    Holders of Professional Claims shall (i) file their respective final applications for

allowance of compensation for services rendered and reimbursement of expenses incurred through

the Effective Date by the first Business Day after the date that is thirty (30) calendar days after the

Effective Date or by such other date as may be fixed by the Bankruptcy Court, and (ii) be paid in

full in such amounts as are Allowed by the Bankruptcy Court (A) within seven (7) calendar days

after such Professional Claim becomes an Allowed Administrative Claim, or (B) upon such other

terms as may be mutually agreed upon between the holder of such Allowed Professional Claim

and the Reorganized Debtor.

### C.     *Bar Date for Rejection Damages Claims*

193.     If the rejection of a contract or lease pursuant to section 8.01 or section 8.03 of the

Plan results in damages to the non-Debtor party to such contract or lease, any claim for such

damages, if not heretofore evidenced by a filed proof of claim, shall forever be barred and shall

not be enforceable against the Debtors, or their respective properties, agents, successors, or

assigns, unless a proof of claim is filed with the Bankruptcy Court or with a duly appointed claims

agent, as applicable, and served upon the Debtors or the Reorganized Debtor on or before thirty

(30) calendar days after the later to occur of (a) the Confirmation Date, or (b) the date of entry of

an order by the Bankruptcy Court authorizing rejection of such contract or lease.

## III.     ACTIONS IN FURTHERANCE OF THE PLAN

194.     Pursuant to §§ 1123 and 1142 of the Bankruptcy Code, as well as the laws of any

relevant state governing corporations or other legal entities, without further action by the

Bankruptcy Court or the stockholders, members, managers, or board of directors of any Debtor or

the Reorganized Debtor, the Debtors, the Reorganized Debtor, and the officers of the appropriate

Debtor or Reorganized Debtor are authorized to (a) take any and all actions necessary or

appropriate to implement, effectuate, and consummate the Plan, the other Plan Documents, this

Confirmation Order, or the transactions contemplated thereby or hereby (including any and all

such actions as any of the Debtors, the Reorganized Debtor, and the officers of the appropriate

Debtor or Reorganized Debtor may determine are necessary or appropriate), and (b) execute and

deliver, adopt, or amend, as the case may be, any contracts, instruments, releases, and agreements

necessary to implement, effectuate, and consummate the Plan.

195.     To the extent that, under applicable nonbankruptcy law, any of the foregoing

actions would otherwise require the consent or approval of the stockholders, members, managers,

or directors of any of the Debtors or the Reorganized Debtor, this Confirmation Order shall,

pursuant to §§ 1123(a)(5) and 1142 of the Bankruptcy Code and applicable nonbankruptcy law, constitute such consent or approval, and such actions are deemed to have been taken by unanimous action of the stockholders, members, managers, or directors, as the case may be, of the appropriate Debtor or the Reorganized Debtor.

196.    The approvals and authorizations specifically set forth in this Confirmation Order are non-exclusive and are not intended to limit the authority of any Debtor or the Reorganized Debtor or any officer thereof to take any and all actions necessary or appropriate to implement, effectuate, and consummate the Plan, the other Plan Documents, this Confirmation order, or the transactions contemplated thereby or hereby.

197.    The Debtors, the Reorganized Debtor, the nondebtor Affiliates, the Protected Parties, the Asbestos Trust, and holders of Claims receiving Distributions under this Plan, and all other parties in interest are hereby authorized, from time to time, to prepare, execute, and deliver any agreements or documents and take any other action consistent with the terms of the Plan as may be necessary to effectuate the provisions and intent of the Plan or any of the other Plan Documents, with each such Entity to bear its own costs incurred after the Effective Date in connection therewith.

198.    On and after the Effective Date, the Reorganized Debtor and the Asbestos Trust may seek such orders, judgments, injunctions, and rulings that any of them deem necessary to carry out further the intentions and purposes of, and to give full effect of the provisions of, the Plan or any of the other Plan Documents, with each such Entity to bear its own costs in connection therewith.

## IV.     THE ASBESTOS TRUST

### A.     Creation of the Asbestos Trust

199.     Effective upon Consummation, the Asbestos Trust shall be created and established without further notice, action, or deed, except as provided in the Plan Documents.  The Asbestos Trust shall be a "qualified settlement fund" for federal income tax purposes within the meaning of the Treasury regulations issued pursuant to 26 U.S.C. § 468B and shall be subject to the continuing jurisdiction of the Bankruptcy Court as set forth in section 11.01 of the Plan .  The Asbestos Trust and the Asbestos Trustee are authorized and empowered to receive the property to be transferred to the Asbestos Trust pursuant to sections 4.07, 4.08, 4.09, and 4.11 of the Plan.  The Asbestos Trust Agreement and the TDP shall be substantially in the forms attached as Exhibits A and F to the Plan, respectively.

### B.     Funding of the Asbestos Trust and Vesting of Asbestos Trust Assets

200.     The Asbestos Trust shall be funded in accordance with sections 4.07, 4.08, and 4.11 of the Plan.  Upon the transfer of the Asbestos Trust Assets to the Asbestos Trust, the Asbestos Trust Assets shall be indefeasibly and irrevocably vested in the Asbestos Trust free and clear of all claims, Equity Interests, Liens, encumbrances, and other interests of any Entity, subject to the Asbestos Permanent Channeling Injunctions and other provisions of the Plan.

### C.     Assumption of Certain Liabilities by the Asbestos Trust

201.     On the Effective Date, except as provided in sections 4.13 and 4.14 of the Plan, subject to the terms of the Plan Documents, and in accordance with §§ 524(g) and 1141 of the Bankruptcy Code, the Asbestos Trust shall assume and succeed to all liability and responsibility for all Channeled Asbestos Claims.  Notwithstanding the Asbestos Trust's assumption of liability and responsibility for all Channeled Asbestos Claims, such assumption shall not itself operate or be construed as a release, accord, or novation of each Debtor's obligations on account of such

Claims for purposes of any Asbestos Insurance Rights solely to the extent of suits against the Reorganized Debtor directly in accordance with section 4.13 of the Plan (subject, however, to the discharge of any "personal liability" of the Debtors as that term is used in § 524(a) of the Bankruptcy Code and as provided in section 9.03 of the Plan).

### D.        *Transfer of the Asbestos Insurance Rights*

202.        On the Effective Date, by virtue of Confirmation, without further notice, action, or deed, the Asbestos Insurance Rights shall be automatically transferred to, and indefeasibly vested in, the Asbestos Trust, and the Asbestos Trust shall thereby become the estate representative pursuant to § 1123(b)(3)(B) of the Bankruptcy Code, with the exclusive right to enforce any and all of the Asbestos Insurance Rights against any Entity, and the Proceeds of the recoveries of any such Asbestos Insurance Rights shall be the property of, and shall be deposited in, the Asbestos Trust.  The Asbestos Insurance Rights shall be vested in the Asbestos Trust free and clear of all Liens, encumbrances, interests, claims, and causes of action of any Entity.

### E.        *Appointment of the Asbestos Trustee*

203.        The appointment of Alan B. Rich to be the initial Asbestos Trustee is approved.

### F.        *Creation of the Trust Advisory Committee*

204.        The Trust Advisory Committee shall be established pursuant to the Asbestos Trust Agreement and shall have the functions, duties, and rights provided in the Asbestos Trust Agreement.

### G.        *Continuation of the Legal Representative*

205.        Lawrence Fitzpatrick shall serve as the Legal Representative for the Asbestos Trust and shall have the functions, duties, and rights provided in the Asbestos Trust Agreement.

### H.      Cooperation Agreement

206.     On the Effective Date, the Reorganized Debtor and the Asbestos Trust shall enter

into a cooperation agreement substantially in the form included as Exhibit B to the Plan.

### I.      Institution of Legal and Other Proceedings

207.     On and after the Effective Date, without any further action of the Court or any

Entity, the Asbestos Trust shall be empowered to initiate, prosecute, defend, and resolve all legal

actions or other proceedings related to any asset, liability, or responsibility of the Asbestos Trust.

## V.      DISCHARGE OF CLAIMS AND RELATED INJUNCTION

208.     In accordance with and not in limitation of §§ 524(a) and 1141(d) of the Bankruptcy

Code, and except as provided in the Plan, upon the occurrence of the Effective Date, all Claims,

including, to the fullest extent permitted by law, Channeled Asbestos Claims, shall be, and shall

be deemed to be, discharged in full, and all holders of Claims shall be, to the fullest extent

permitted by law, precluded and enjoined from asserting against the Debtors and the Reorganized

Debtor, or any of their assets or properties, any other or further Claim based upon any act or

omission, transaction, or other activity of any kind or nature that occurred prior to the Effective

Date, whether or not such holder has filed a proof of claim.

209.     Except as specifically provided in the Plan or any of the Plan Documents, the

discharge set forth in immediately preceding paragraph shall also operate, upon the occurrence of

the Effective Date, as an injunction pursuant to §§ 105(a), 524(a), and 1141(d) of the Bankruptcy

Code, prohibiting and enjoining the commencement or continuation of any action, the employment

of process, or any act to collect, recover from, or offset (a) any Claim, including, to the fullest

extent permitted by law, any Channeled Asbestos Claim, against or interest in any of the Debtors

or the Reorganized Debtor by any Entity, and (b) any cause of action, whether known or unknown,

against the Debtors or the Reorganized Debtor arising out of, attributable to, or based on any

Claim, including, to the fullest extent permitted by law, any Channeled Asbestos Claim, or interest

described in clause (a) of this paragraph.

## VI.    THE ASBESTOS PERMANENT CHANNELING INJUNCTION

210.    In order to supplement, where necessary, the injunctive effect of the discharge

provided by §§ 1141(d), 524(a), and 105(a) of the Bankruptcy Code and as described in section

9.05 of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of this Court

under § 524(g) of the Bankruptcy Code, as supplemented by § 105(a) of the Bankruptcy Code, the

Plan provides for the following injunction, which is hereby approved and authorized in all respects

and which shall take effect on and after the Effective Date.

211.    Effective on and after the Effective Date, all Entities that have held or asserted, or

hold or assert, or may in the future hold or assert any Channeled Asbestos Claim against one or

more of the Protected Parties shall be permanently stayed, restrained, and enjoined from taking

any action for the purpose of directly or indirectly collecting, recovering, or receiving payments,

satisfaction, or recovery on account of any Channeled Asbestos Claim, including:

(a)    commencing or continuing in any manner any action or other proceeding of

any kind on account of any Channeled Asbestos Claim against any of the Protected Parties, or

against the property of any Protected Party on account of any such Channeled Asbestos Claim;

(b)    enforcing, attaching, collecting, or recovering, by any manner or means, any

judgment, award, decree, or order against any of the Protected Parties or against the property of

any Protected Party on account of any Channeled Asbestos Claim;

(c)    creating, perfecting, or enforcing any Lien of any kind against any Protected

Party or the property of any Protected Party on account of any Channeled Asbestos Claim;

(d)    except as otherwise specifically provided in the Plan, asserting or

accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind

against any obligation due any Protected Party or against the property of any Protected Party on account of any Channeled Asbestos Claim; and

(e)    taking any act, in any manner, in any place whatsoever, against any of the Protected Parties or their property, that does not conform to, or comply with, the provisions of the Plan Documents applicable to a Channeled Asbestos Claim.

212.    Notwithstanding anything to the contrary in the immediately preceding paragraph, this Asbestos Permanent Channeling Injunction shall not enjoin:

(a)    the rights of Entities to the treatment accorded them under Articles II and III of the Plan, as applicable, including the rights of holders of Channeled Asbestos Claims to have such Channeled Asbestos Claims resolved in accordance with the TDP;

(b)    the rights of Entities to assert any Channeled Asbestos Claim against the Asbestos Trust in accordance with the TDP, or any debt, obligation, or liability for payment of Asbestos Trust Expenses against the Asbestos Trust;

(c)    the rights of the Asbestos Trust or, if applicable, the Reorganized Debtor to prosecute any claim or cause of action based on or arising from any of the Asbestos Trust Assets against any Entity that is not a Protected Party;

(d)    any action under section 4.13 of the Plan against the Reorganized Debtor that strictly conforms to the pleading requirements of section 4.13; or

(e)    any action against any Asbestos Insurer that is neither a Settling Asbestos Insurer nor an Asbestos Insurer protected, at the time such action is brought, by the Asbestos Insurer Injunction.

## VII.    THE SETTLING ASBESTOS INSURER INJUNCTION

213.    In accordance with §§ 105(a) and 524(g) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Entities that have held or asserted, that hold or assert, or that

may in the future hold or assert any Asbestos Insurance Policy Claim shall be, and hereby are, permanently stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery on account of any such Asbestos Insurance Policy Claim from or against any Settling Asbestos Insurer, only to the extent that such Settling Asbestos Insurer has been released from any claim under one or more Asbestos Insurance Policies in accordance with one or more Asbestos Insurance Settlements, including:

(a)      commencing, conducting, or continuing in any manner any action or other proceeding of any kind (including an arbitration or other form of alternative dispute resolution) against any Settling Asbestos Insurer, or against the property of any Settling Asbestos Insurer, on account of any Asbestos Insurance Policy Claim;

(b)      enforcing, attaching, levying, collecting, or recovering, by any manner or means, any judgment, award, decree, or other order against any Settling Asbestos Insurer, or against the property of any Settling Asbestos Insurer, on account of any Asbestos Insurance Policy Claim;

(c)      creating, perfecting, or enforcing in any manner any Lien of any kind against any Settling Asbestos Insurer, or against the property of any Settling Asbestos Insurer, on account of any Asbestos Insurance Policy Claim;

(d)      asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation due any Settling Asbestos Insurer, or against the property of any Settling Asbestos Insurer, on account of any Asbestos Insurance Policy Claim; and

(e)     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Asbestos Insurance Policy Claim.

## VIII.   THE ASBESTOS INSURER INJUNCTION

214.    In accordance with § 105(a) of the Bankruptcy Code, in order to carry out the provisions of § 524(g) of the Bankruptcy Code, upon the occurrence of the Effective Date, except as expressly allowed in paragraph 215 below, all Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any Asbestos Insurance Policy Claim or Channeled Asbestos Claim shall be, and hereby are, permanently stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery on account of any such Asbestos Insurance Policy Claim or Channeled Asbestos Claim from or against any Asbestos Insurer, including:

(a)     commencing, conducting, or continuing in any manner any action or proceeding of any kind (including an arbitration or other form of alternative dispute resolution) against any Asbestos Insurer, or against the property of any Asbestos Insurer, on account of any Asbestos Insurance Policy Claim or Channeled Asbestos Claim;

(b)     enforcing, attaching, levying, collecting, or recovering, by any manner or means, any judgment, award, decree, or other order against any Asbestos Insurer, or against the property of any Asbestos Insurer, on account of any Asbestos Insurance Policy Claim or Channeled Asbestos Claim;

(c)     creating, perfecting, or enforcing in any manner any Lien of any kind against any Asbestos Insurer, or against the property of any Asbestos Insurer, on account of any Asbestos Insurance Policy Claim or Channeled Asbestos Claim;

(d)      asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly against any obligation due any Asbestos Insurer, or against the property of any Asbestos Insurer, on account of any Asbestos Insurance Policy Claim or Channeled Asbestos Claim; and

(e)      taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Asbestos Insurance Policy Claim or Channeled Asbestos Claim.

215.    The provisions of this Asbestos Insurer Injunction shall not preclude the Reorganized Debtor or the Asbestos Trust, to the extent either has the right to do so, from pursuing any claim for Asbestos Insurance Coverage or any claim that may exist under any Asbestos Insurance Policy against any Asbestos Insurer.  The provisions of this Asbestos Insurer Injunction shall not bar, impair, or affect (a) any Asbestos Insurance Litigation brought by the Asbestos Trust or any Debtor against any Asbestos Insurer, by the Asbestos Trust on behalf of the Reorganized Debtor, or by the Reorganized Debtor on behalf of the Asbestos Trust; (b) any Asbestos Insurance Rights held or acquired by the Asbestos Trust or the Reorganized Debtor; or (c) the rights of the Asbestos Trust to tender any Channeled Asbestos Claim or any action commenced under section 4.13 of the Plan to a Non-Settling Asbestos Insurer for coverage, indemnity, or defense, or otherwise to invoke Asbestos Insurance Coverage with respect to a Non-Settling Asbestos Insurer. Except for the penultimate sentence of this paragraph, the provisions of this Asbestos Insurer Injunction are not issued for the benefit of any Asbestos Insurer and no such insurer is a third-party beneficiary of this Asbestos Insurer Injunction.  The Asbestos Trust shall have the sole and exclusive authority at any time, upon written notice to any affected Asbestos Insurer, to terminate, or reduce or limit the scope of this Asbestos Insurer Injunction with respect to any Asbestos

Insurer, including for the purpose of allowing any Channeled Asbestos Claimant to bring any Asbestos Insurance Policy Claim or Channeled Asbestos Claim against such Asbestos Insurer; *provided*, *however*, that the Asbestos Trust may not permit the assertion of any Asbestos Insurance Policy Claim or Channeled Asbestos Claim by a Channeled Asbestos Claimant against a Non-Settling Asbestos Insurer unless and until such Channeled Asbestos Claimant agrees in writing to stipulate to and be bound by the provisions of section 4.14 of the Plan pertaining to the right of Non-Settling Asbestos Insurers to obtain a dollar-for-dollar reduction of any liability to such Channeled Asbestos Claimant based on the Non-Settling Asbestos Insurer's Asbestos Insurance Policy Claims against any and all Settling Asbestos Insurers that could have been asserted against such Settling Asbestos Insurers but for the Injunctions.  For the avoidance of doubt, the provisions of this Asbestos Insurer Injunction shall not impair or affect any claims between or among Non-Settling Asbestos Insurers.  Notwithstanding any provision of the Plan to the contrary, including this Asbestos Insurer Injunction, no new equitable contribution rights are created in favor of the Non-Settling Asbestos Insurers.

## IX.   OTHER INJUNCTIVE PROVISIONS

216.   Unless otherwise provided in the Plan, all injunctions or stays issued or rendered in the Chapter 11 Cases, or in any adversary proceeding relating thereto, pursuant to § 105 or § 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

217.   Pursuant to §§ 105(a) and 1142 of the Bankruptcy Code, on and after the Confirmation Date, all holders of Claims and Equity Interests, Affiliates, and other parties in interest, along with their respective present or former Agents, shall be enjoined from taking any action to interfere with the implementation and Consummation of the Plan, except for actions necessary to attain judicial review.

218.   Except as otherwise specifically provided in the Plan or this Confirmation Order,

nothing herein shall constitute or be deemed a waiver of any claim, right, or cause of action that

the Debtors, the Reorganized Debtor, or the Asbestos Trust may have against any Entity other than

a Protected Party in connection with or arising out of a Channeled Asbestos Claim, and the

Injunctions shall not apply to the assertion of any such claim, right, or cause of action by the

Debtors, the Reorganized Debtor, or the Asbestos Trust.

## X.    EXCULPATION

219.   None of the Plan Proponents, the members of the Asbestos Claimants Committee,

or any of their respective employees, advisors, attorneys, financial advisors, accountants, agents,

or other professionals retained with Bankruptcy Court approval, in their capacities as such, shall

have or incur any liability to any Entity for any act or omission in connection with or arising out

of the Chapter 11 Cases, including the negotiation of the Plan, pursuit of confirmation of the Plan,

the Consummation of the Plan, the administration of the Plan, or the property to be distributed

under the Plan, except for gross negligence or willful misconduct, and in all respects shall be

entitled to rely upon the advice of counsel with respect to their duties and responsibilities under,

or in connection with, the Plan.

## XI.   NO EFFECT ON INDEPENDENT LIABILITIES OF NON-DEBTORS

220.   Notwithstanding any provision to the contrary, nothing contained in the Plan, any

Plan Document, this Confirmation Order, the Bankruptcy Code (including § 1141 of the

Bankruptcy Code), or any other document filed in the Chapter 11 Cases shall be construed to

discharge, enjoin, release, or channel to the Asbestos Trust any liability or obligation of a non-

Debtor Entity not derived from that of a Debtor, including any independent liability of a non-

Debtor Entity that is not an Affiliate of, successor of, successor-in-interest to, merger partner of,

or transferor of assets to a Debtor as of the Petition Date.

- 101 -

## XII.    COMMITTEE AND LEGAL REPRESENTATIVE

221.    Except as provided herein, the Asbestos Claimants Committee and the Legal Representative shall continue in existence until the Effective Date.  On and after the Effective Date, the rights, duties, and responsibilities of the Legal Representative shall be as set forth in the Asbestos Trust Agreement.

222.    On and after the Effective Date, the Asbestos Claimants Committee and the Legal Representative shall continue in existence and shall have post-Effective Date standing and capacity (a) to complete matters, if any, including litigation, appeals, or negotiations pending as of the Effective Date that are not released pursuant to the Plan; (b) to grant or withhold, in their sole discretion, any consent contemplated or required under the Plan; (c) to object to or defend any Professional Claims; (d) to oppose any appeals of the Confirmation Order; and (e) to prepare and prosecute applications for the payment of fees and reimbursement of expenses of their respective professionals.

223.    In all events, the Asbestos Claimants Committee's professionals, and the Legal Representative and his professionals, shall have the right to seek, and shall be entitled to, reasonable fees and reimbursement of expenses pursuant to §§ 330 and 331 of the Bankruptcy Code for services rendered, including those services arising from or connected with any matter authorized or described in section 13.03(c) of the Plan.  The Debtors shall pay such reasonable fees and expenses incurred through the Effective Date, in accordance with the fee and expense procedures set forth in the Bankruptcy Code and Bankruptcy Rules or otherwise promulgated during the Chapter 11 Cases.  The Reorganized Debtor shall pay such reasonable fees and expenses relating to any post-Effective Date activities authorized or described in section 13.03(c) of the Plan without the necessity of approval by the Bankruptcy Court.

224.    Upon (a) the completion of all matters authorized and described in section 13.03(c) of the Plan and (b) the irrevocable and indefeasible payment in full by the Reorganized Debtor of all Allowed Professional Claims, the Asbestos Claimants Committee shall be dissolved, and the members thereof shall be discharged of and from all further authority, duties, and responsibilities related to, or arising from, the Chapter 11 Cases.  Upon dissolution of the Asbestos Claimants Committee, the Trust Advisory Committee shall succeed to, and exclusively hold, the attorney-client privilege and any other privilege held by the Asbestos Claimants Committee and shall enjoy the work product protections that were applicable or available to the Asbestos Claimants Committee before its dissolution.

## XIII.    EXEMPTIONS FROM TAXATION

225.    Pursuant to section 1146(a) of the Bankruptcy Code, the following shall not be subject to any stamp tax, transfer tax, mortgage recording tax, intangibles tax, conveyance fee, filing fee, sales or use tax, or other similar tax:  (a) the creation or recordation of any Lien, including the Bay Shore Mortgage and the Fairfield Mortgage; (b) the making or assignment of any lease or sublease; (c) the execution and implementation of the Asbestos Trust Agreement, including the creation or formation of the Asbestos Trust and any transfers to or by the Asbestos Trust; (d) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments, applications, certificates, or statements executed or filed in connection with any of the foregoing or pursuant to the Plan.

## XIV. RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT AND DISTRICT COURT

226.     Pursuant to §§ 105(a), 524(a), 1141(d), and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction, except as provided in section 11.03 of the Plan, over any proceeding (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or this Plan, or (c) involving the matters listed in section 11.01 of the Plan; *provided*, *however*, that nothing in this Confirmation Order or in any of the Plan Documents shall contravene any jurisdictional and other provisions herein and therein, including sections 4.13 and 4.14 of the Plan, that permit or require legal actions or proceedings to be brought in another court; and *provided further* that the District Court shall retain jurisdiction to hear and determine such matters in the first instance (i) as to which the automatic reference to the Bankruptcy Court has been withdrawn, (ii) to the extent the Bankruptcy Court lacks adjudicatory authority under the United States Constitution to hear and determine such matters in the absence of consent of the parties involved, (iii) to the extent required by law, or (iv) to the extent set forth in section 11.02 of the Plan.  In accordance with § 524(g)(2)(A) of the Bankruptcy Code, any proceeding that involves the validity, application, construction, or modification of the Asbestos Permanent Channeling Injunction may be commenced only in the District Court, and the District Court shall have exclusive jurisdiction over any such proceeding without regard to the amount in controversy; *provided*, *however*, that such proceeding, if so authorized by law or rule of court, may be referred to the Bankruptcy Court.

## XV. NOTICE OF ENTRY OF CONFIRMATION ORDER

227.     Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c), the Reorganized Debtor is directed to serve, within ten (10) Business Days after the occurrence of the Effective Date, a notice of the entry of this Confirmation Order, which shall include notice of the bar dates established by

the Plan and this Confirmation Order, the issuance of the Injunctions, and notice of the Effective

Date ("**Confirmation Notice**"), on all parties that received notice of the Confirmation Hearing.

228.    As soon as practicable after the entry of this Confirmation Order, the Debtors shall

make copies of this Confirmation Order and the Confirmation Notice available on the website of

the Debtors or their noticing agent for these Chapter 11 Cases.

229.    No later than twenty (20) Business Days after the Effective Date, the Reorganized

Debtor is directed to publish the Confirmation Notice once in the national edition of *USA Today*.

The Reorganized Debtor is authorized to pay all fees associated with such publication.

## XVI.  RECORDABLE ORDER

230.    This Confirmation Order is hereby deemed to be in recordable form and shall be

accepted by any recording officer for filing and recording purposes without further or additional

orders, certifications, or other supporting documents.

**SO ORDERED.**

_____
United States District Judge