Margaret F. Catalano
Christina R. Salem
570 Lexington Avenue – 8th Floor
New York, New York 10022
(212) 252-0004
meg.catalano@kennedyscmk.com
christina.salem@kennedyscmk.com

IFRAH PLLC
George R. Calhoun, V (*pro hac vice*)
1717 Pennsylvania Ave., NW
Washington, D.C. 20006
(202) 525-4147
george@ifrahlaw.com

*Attorneys for The North River Insurance Company*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re: | Chapter 11 |
| DURO DYNE NATIONAL CORP., *et al.*,[1] | Case No. 18-27963 MBK |
| Debtors. | (Jointly Administered) |

**THE NORTH RIVER INSURANCE COMPANY'S OBJECTION TO PLAN PROPONENTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND PROPOSED FORMS OF ORDERS IN SUPPORT OF CONFIRMATION OF THE MODIFIED SECOND AMENDED PRENEGOTIATED PLAN OF REORGANIZATION**

The North River Insurance Company ("North River") respectfully submits the following

objections to the Plan Proponents' Notice of Filing of Proposed Findings of Fact and

Conclusions of Law and Proposed Forms of Orders in Support of Confirmation of the Modified

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Duro Dyne National Corp. (4664); Duro Dyne Machinery Corp. (9699); Duro Dyne Corporation (3616); Duro Dyne West Corp. (5943); and Duro Dyne Midwest Corp. (4662).

Second Amended Prenegotiated Plan of Reorganization, Dkt. 615, ("Plan Proponents' Proposed

Findings").  The Plan Proponents' Proposed Findings are not supported by the evidence or the

law and, in many cases, are an effort to whitewash their failure to carry their burden of proof on

confirmation.  The Court should decline to confirm Debtors' Second Amended Plan of

Reorganization for Duro Dyne National Corp., *et al.*, Under Chapter 11 of the Bankruptcy Code,

Dkt. 278 (the "Plan").[2]

## NORTH RIVER'S RESPONSES

1.     **Plan Proponents' Proposed Findings ¶ 28:** The Plan Proponents ask that the

Court conclude that the Plan Proponents have met their burden of proof: "In support of

confirmation, the Plan Proponents submitted the Declarations (Bankr. ECF Nos. 479, 483, 484).

This Court finds the written testimony in the Declarations to be credible and supportive of

confirmation of the Plan."  Given Mr. Podgainy's testimony that he did not write, and has no

personal knowledge of substantial portions of his written testimony, the Court cannot make the

finding proposed by the Plan Proponents.

2.     **Plan Proponents' Proposed Findings ¶ 38**:  Plan Proponents' Proposed Finding

38 addresses an argument that North River has not advanced.  They propose that the Court find:

> In addition, insurers have argued that "closed system" TDPs violate the policies
> because they deprive the insurer of the ability to defend claims in the tort system.
> *See In re Combustion Engineering, Inc.*, 391 F.3d 190, 209 (3d Cir. 2004), *as
> amended* (Feb. 23, 2005). If this Plan were to provide for only payments by a trust,
> Non-Settling Asbestos Insurers would receive a windfall if they prevailed on any
> of these arguments, and the creditors would lose their ability to access a valuable

---

[2] Many of proposed findings and conclusions in The North River Insurance Company's Proposed
Findings of Fact and Conclusions of Law, Dkt. 613, already address the proposals raised by the
Plan Proponents and North River does not repeat those issues here.  To the extent necessary,
North River incorporates and adopts its own proposed findings and conclusions and its Joint
Objection of Certain Insurers To Debtors' Second Amended Plan Of Reorganization For Duro
Dyne National Corp., Et Al., Under Chapter 11 Of The Bankruptcy Code ("North River's
Objections"), Dkt. 445.

estate asset. But, under the Plan's "open system," claimants may conduct tort litigation against the Reorganized Debtor nominally to obtain a judgment. They will not be able to execute against the Reorganized Debtor or its assets to recover on any judgments obtained—recovery will be limited to available insurance coverage (whatever it turns out to be). The Plan thus tracks the standard bankruptcy practice of allowing tort claimants to proceed formally against the debtor, with recovery limited to available insurance. *See In re Edgeworth*, 993 F.2d 51, 54 (5th Cir. 1993) (citing cases); *In re Beeney*, 142 B.R. 360, 362 (B.A.P. 9th Cir. 1992). It is contemplated that tort suits will be tendered to North River, as the sole remaining Non- Settling Asbestos Insurer, who will then determine whether to defend or settle the lawsuit.

As an initial matter, an insurer does not receive a windfall when it prevails on a coverage defense. If the policyholder violates the terms of the policies, no coverage applies. Coverage defenses may apply whether claims are decided by a trust or otherwise. Contrary to Plan Proponents' assertions, however, North River has argued that the proposed Plan seeks to strip North River of its rights and abrogate Debtors' obligation to cooperate in the defense of claims, which it does expressly. *See* Response to Proposed Finding 88, *infra*. North River does not object to the pass-through of claims. It objects to Plan Proponents' efforts to strip North River of its rights and deprive it of the treatment of its claims mandated by the Bankruptcy Code.

3. **Plan Proponents' Proposed Findings ¶¶ 42–44**: Plan Proponents' proposed findings in Paragraphs 42-44 assert that the Plan's proposed treatment of North River's claims is "fair and equitable" or otherwise permitted. Their argument rests entirely on the Ninth Circuit's decision in *In re Plant Insulation Co.*, 734 F.3d 900 (9th Cir. 2013). Specifically, Plan Proponents assert that the Plan proposes to enjoin the contribution claims of Non-Settling Insurers in exchange for trust-payment credit and judgment-reduction credit. Plan Proponents' Proposed Findings ¶¶ 42–44 (citing *Plant*, 734 F.3d at 907). The *Plant* court's holding, however, is inapposite because that court considered a plan with a different structure than the

instant Plan and different insurance claims.  To the extent it is apposite, it is wrong.[3]  Perhaps

most significantly, the *Plant* court had made a factual finding that "the Non–Settling Insurers

would lose only a relatively small portion of the value of their contribution rights . . . ."  *Plant*,

734 F.3d at 911.  The Court cannot make a commensurate finding here because Plan Proponents

ask the Court to strip North River of contribution rights with a significant value.

Contrary to the facts testified to by Mr. Fitzpatrick, here Plan Proponents do not appear to

have limited the contribution claims to indemnity dollars, but defense costs theoretically were

included.  In addition, the *Plant* court made findings of fact that are not present here.

Specifically, the Plant Court determined that the only way to persuade an insurer to settle is to

obtain the finality from the post-settlement claims.  No evidence was introduced on this issue in

this case.  Indeed, the insurer settlements are not conditioned on § 524(g) protection and, as

originally filed, contemplated that North River's claims would attach to the proceeds.

The *Plant* court also was wrong because it did not adequately account for insurer defense

costs claims.  Insurers likely had very different state law rights in that case than they do here.  In

this case, there is a New York coverage ruling that pro rata allocation applies.  The New York

Court also recognized North River's rights to seek reimbursement of defense costs from the

Debtor.  This Court has approved a significant Class 7 Claim for defense costs.  None of those

facts existed in *Plant*.

That distinction is important because North River's post-petition claims (in Class 7) are

likely to consist entirely of defense costs, which are ineligible for any deduction, offset, or

---

[3] *Plant* is a double-edged sword.  If the Court follows it, the Court should consider the Ninth
Circuit's holding *Plant* in its entirety, including with respect to trust funding requirements.  The
Ninth Circuit rejected a proposed funding mechanism that essentially is identical to that
proposed by the Plan Proponents.

payment.  Similarly, the judgment-reduction provisions apply only to judgments, despite the fact that Debtors have not previously litigated a case to judgment.  The so-called benefits of the judgment-reduction provisions are entirely illusory and do not protect North River.

The Debtors have not pointed to any authority that would allow the Court to classify North River's claims with asbestos claims, deny those claims equal treatment, and also strip North River of its claims against third parties with no protection for those interests.  In the absence of any such authority, the Plan Proponents contend that the Court need determine "only *with respect to the benefits afforded to future asbestos plaintiffs*."  Plan Proponents' Proposed Findings ¶ 44 (emphasis in original).  This contention is a tacit admission that the Plan is not fair and equitable as to North River.

4.    **Plan Proponents' Proposed Findings ¶ 47–48**: Plan Proponents assert that the fact that the judgment reduction provision applies only to judgments does not render it inadequate because North River can "take advantage" of these provisions when it negotiates settlements in the future.  Plan Proponents' Proposed Findings ¶ 47.  This is pure speculation with no support.  In the only testimony on this issue, Mr. Fitzpatrick contradicted the Plan Proponents' argument, admitting that the plan and trust provisions might incentivize claimants to demand settlements regardless of the offset/coverage rights.  *See* March 6, 2019 Confirmation Hrn'g Tr. ("Mar. 6 Tr.") at 134.   The Plan Proponents again cite to *Plant* to support this argument, but *Plant* is inapplicable.  As established by the record, and as argued in North River's Objections, North River's allowed defense cost claims are in no way protected by the proposed judgment-reduction credit provisions.

Plan Proponents similarly assert that the Plan's judgment-reduction credits will give North River leverage over tort plaintiffs: "post-confirmation settlement negotiations will take

into account the fact that the Plan significantly strengthens the negotiating position of North River vis-à-vis tort plaintiffs because of the setoffs and credits against any tort judgment and the costs of pursuing litigation." Plan Proponents' Proposed Findings ¶ 48. This argument is irrelevant because any such advantage is speculative and does not amount to a showing under the Bankruptcy Code that North River's compensation under the Plan is adequate. Further, this argument does nothing to counter North River's assertion that the Plan's judgment-reduction mechanism is inadequate because it would only apply in cases resulting in judgments, not settlements.

5.    **Plan Proponents' Proposed Findings ¶ 49**: In their Proposed Finding 49, Plan Proponents argue that the fact that the judgment-reduction provision will not account for defense costs is irrelevant. In doing so, they rely on the Bankruptcy Court decision in *In re Plant Insulation Co.*, 469 B.R. 843 (Bankr. N.D. Cal. 2012). They argue that the *Plant* court made certain findings "on substantial evidence." Plan Proponents' Proposed Findings ¶ 49. No such substantial evidence was introduced here. Plan Proponents introduced no evidence on the impact of these provisions. Plan Proponents rely on the *Plant* Bankruptcy Court's findings that judgment-reduction and trust-payment credit provisions would be taken into account in settlement negotiations between the insurers and tort claimants, *id.* at 878, and that the plan in that case could effectively compensate insurers for lost contribution claims in connection with dismissed cases. *Id.* For the reasons stated above, however, the *Plant* opinion is inapposite and even if it were correct, there is no factual record here upon which the Court could make the requested findings. The Plan Proponents simply ask that this Court adopt factual findings from another case (in which North River was not a party) regardless of whether those findings would be appropriate here. They are not.

6

6.    **Plan Proponents' Proposed Findings ¶ 50**:  Plan Proponents similarly assert

that "[c]ases that settle produce no orphan defense costs."  There is no evidentiary support for

this statement, and it is directly contradicted by history and common sense.  Debtors have never

taken a judgment.  Each of its asbestos cases has been settled or dismissed.  Those cases have

resulted in significant defense costs.  The fact that North River might settle a case in the future in

no way means that it will not have a claim for defense costs.  This assertion is counter-factual.

7.    **Plan Proponents' Proposed Findings ¶ 51**: Plan Proponents claim that

> [i]n the future, the higher percentage of asbestos-related claims prosecuted in the
> tort system against the Reorganized Debtor will be high-value claims.   The
> unrebutted testimony of Mr. Fitzpatrick, who has decades of experience resolving
> asbestos-related claims, is that claimants with the "stronger" or "higher value"
> claims will most likely pursue the unsettled insurance coverage in the tort system.
> (Hr'g Tr. 114:13–24; 116:9–17, Mar. 6, 2019).  Incentives created by the Plan will
> reduce the assertion of tort claims of lower or marginal value.  (Hr'g Tr. 116:15–
> 17, Mar. 6, 2019 (Fitzpatrick Testimony))."

Mr. Fitzpatrick lacked any foundation for these statements and later rebutted them himself.  Mr.

Fitzpatrick confirmed that he had no foundation for these assertions when he admitted that he

was unfamiliar with provisions allowing the pursuit of insurance outside of a trust.[4]  Mar. 6 Tr at

131 ("I'm not aware – unaware, I just haven't looked at this.  This never come up before.").  Mr.

Fitzpatrick further admitted that *anyone* could bring a claim in the tort system.  Mar. 6 Tr. at

126–28.  He also admitted that the Plan and Trust Distribution Procedures ("TDPs") might

incentivize claimants to demand settlements regardless of the coverage rights and that the Trust

would not ordinarily pay unimpaired claims.  Mar. 6 Tr. at 134.  Logically, and because it costs

plaintiffs next to nothing to add a defendant to a claim, there is every reason to believe that such

claimants will continue to bring claims in the hope to obtain some value for their claims.

---

[4] The more likely reality is that these statements are simply assertions of counsel that they
attempted to relay through Mr. Fitzpatrick for a veneer of evidentiary support.

8.    **Plan Proponents' Proposed Findings ¶ 53**:  Plan Proponents argue that "North River will . . . have a significant benefit in the reduction of lawsuits after the Effective Date." Based on the evidence, or lack thereof, discussed above, the Court cannot conclude that North River will have any significant benefit in the reduction of lawsuits after the Effective Date or that the judgment-reduction credits adequately compensate North River for its defense costs claims, which receive no credit or reduction under the proposed Plan.

9.    **Plan Proponents' Proposed Findings ¶ 54**: Plan Proponents argue that North River seeks a "trust backstop" from this Court and that this Court, like the *Plant* court, should reject that request:

> North River complains that judgment reduction is inadequate because it would not fully offset its contribution claims for defense and indemnity costs in every instance and suggests that the Plan should give it the right "to bring suit against the Trust to obtain whatever contribution they are entitled to but cannot obtain via the judgment reduction mechanism." (Jt. Obj. at 25).  This is similar to the "trust backstop" that the non-settling insurers demanded, and the courts rejected, in *Plant*.  Section 524(g) does not require that the Trust act as a "backstop" for indemnity and defense costs paid by non-contributing Insurers in excess of their allocated or "fair" share. Among other problems, a trust backstop would take funds that would otherwise go to future asbestos claimants and use them to pay the Non-Settling Asbestos Insurers' claims.  As noted above, Congress specified the standard by which the availability of injunctions under § 524(g) should be determined—§ 524(g)(4)(B)(ii) requires the court to find that a § 524(g) injunction is "fair and equitable" only *with respect to the benefits afforded to future asbestos claimants*.  The statutory language demonstrates that fairness to future asbestos plaintiffs, not enjoined insurers, is required.  In this respect, a trust backstop would not meet the standard of being fair and equitable to future claimants.

The Plan Proponents are seeking to recast North River's arguments.  North River argued that (1) the Plan must treat its Class 7 Claims in substantially the same manner as other Class 7 Claims, and (2) that its claims against third party insurers would only be protected by attaching to settlement proceeds at 100% dollars.  The first argument is axiomatic under §§ 1122 and 1123 of the Bankruptcy Code.  As to the second, the Plan Proponents are seeking approval of § 363 sales

of the Settling Insurers' policies.  To do so, they must provide adequate protection of North

River's claims against those entities.  Because North River would be paid in full by the solvent,

settling insurers, it follows that – at a minimum – its claims against those Settling Insurers attach

to the settlement proceeds in the same manner.  Thus, the Bankruptcy Courts in *Thorpe*

*Insulation* and *ASARCO* provided for 100% payment of insurer contribution claims.  *See Motor*

*Vehicle Cas. Co. v. Thorpe Insulation Co.,* 671 F.3d 980 (9th Cir. 2012); *In re ASARCO LLC*,

420 B.R. 314 (S.D. Tex. 2009); *see also In Re Quigley Co., Inc.*, 437 B.R. 102, 146 (Bankr.

S.D.N.Y. 2010) (plan failed best interests test when it attempted to strip claims against third

parties).

10.    **Plan Proponents' Proposed Findings ¶ 56**: The Plan Proponents attempt to

distinguish *Thorpe* and *ASARCO*, arguing that both were full-payment plans.  But that argument

is unavailing because the issue is the adequate protection of claims against third parties, not

whether claims against the debtor must be paid in full.  As in *ASARCO* and *Thorpe*, North

River's contribution claims against Settling Insurers are entitled to protection.  Consequently,

this Court should recognize North River's right to 100% payout on contribution claims.  Such

treatment was in these cases, as it should be here, a recognition of the requirements imposed by §

1129(a)(7): the plan could not enjoin the non-settling insurers' contribution claims without

providing compensation, and channeling those claims to the § 524(g) trust for payment in less

than 100-cent dollars provided the insurers with worse treatment than they would be entitled to

in a Chapter 7 case, in violation of the best interests test.

11.    **Plan Proponents' Proposed Findings ¶ 62–63**: Plan Proponents argue that *In Re*

*W.R. Grace & Co.*, 729 F.3d 311, 326 (3d Cir. 2013) and *Armstrong World Indus., Inc.*, 348 B.R.

136, 159–60 (D. Del. 2006), support their argument that "a reasonable basis exists for classifying

North River's claims for indemnity and defense costs with the asbestos tort claims in Class 7, as all of these claims relate, directly or indirectly, to asbestos or asbestos-containing products for which the Debtors are legally responsible." Unlike the asbestos claims, North River's claims do not depend on the existence of asbestos. They would exist upon responding to any potentially-covered claim, regardless of the nature of the underlying claim. As asserted by North River, and recognized in *Congoleum*, North River's claims are ordinary commercial claims and should be treated as such.

Even if North River's claims may be channeled to the proposed Trust, they cannot be classified with the underlying asbestos claims. As Plan Proponents admit, § 524(g) calls for the classification of "a separate class or classes . . . ." Plan Proponents Proposed Findings ¶ 64 (quoting § 524(g)(2)(B)(ii)(IV)(aa)). The reason that the statute recognizes that there may be more than one class is because the Bankruptcy Code does not allow claims to be classed together when they will be treated differently.

The impropriety of the classification is demonstrated by the absurdity of attempting to process North River's claims through the TDPs. North River's contractual and equitable claims for defense costs are not amenable to resolution through procedures addressing the exposure to asbestos or the proof of a disease. The TDPs simply have no mechanism for dealing with defense costs claims. Rather than attempt to do so, Plan Proponents ask the Court to instead rule by fiat that North River's claims are ineligible for compensation.

12.    **Plan Proponents' Proposed Findings ¶¶ 65–68**: Plan Proponents argue that they have satisfied § 1123 of the Bankruptcy Code because the Plan allegedly treats North River's asserted claims in a manner that is at least the same, if not superior to, the treatment of indirect asbestos claims held by entities that are not Asbestos Insurers. Plan Proponents have also argued

that North River is not a holder of an indirect asbestos claim, so that analogy is unhelpful to the

Court.  In any event, the analogy fails because it does not address the nature of North River's

claims, which consist primarily of defense costs (in addition to a claim for pre-petition indemnity

reimbursement).  Plan Proponents' argument that they have satisfied § 1123's requirement for

equality of treatment has no evidentiary support and is, charitably, disingenuous.[5]

Plan Proponents contend that the requirement that all creditors in a class be treated in the

same manner is satisfied because both tort claimants' and North River's claims will be channeled

to the Trust.  That argument fails as a matter of law because, as admitted by Mr. Podgainy, the

TDPs mandate disparate treatment.  Mar. 6 Tr. at 74:2–5.  Mr. Fitzpatrick similarly admitted that

insurer claims normally are not channeled to a trust.  *Id*. at 151.  He also confirmed that the trust

"does not pay insurers."  *Id.* at 150.  That evidence is undisputed.  The judgment-reduction credit

proposed by the Plan Proponents does not alter these facts.  It simply means that to the extent

some portion of a claimant's claim already has been satisfied, North River will not be asked to

pay twice on that claim.  The judgment-reduction credit provides nothing that existing law does

not already mandate.  In the face of the Plan Proponents' repeated admissions that North River's

claims will not be paid and that their treatment is different than other Class 7 creditors, the Court

cannot accept the Plan Proponents proffered findings and conclusions that North River's claims

are receiving equal treatment.

13.    **Plan Proponents' Proposed Findings ¶¶ 69–71**: Contrary to Plan Proponents'

arguments, North River is entitled to "adequate protection" under the Plan and, as a result,

deserves to receive cash distributions from the Trust on account of its claims.  Ironically, the

---

[5] As Plan Proponents admitted, the Plan is designed to "leverage" insurers by asking them to
defend claims in the tort system while simultaneously stripping insurers of their rights to
contribution and reimbursement.

Plan Proponents argue that the Second Circuit's decision in *Johns-Manville* is inapposite because that court was "analogizing the effect of an asbestos channeling injunction to a sale free and clear of interests," which is exactly what Plan Proponents are actually doing here.  Plan Proponents' Proposed Findings at ¶ 70.

As discussed above, the Plan's contemplated judgment-reduction credit does not suffice as adequate protection because it fails to provide protection with respect to contribution claims for defense costs.  Plan Proponents ask the Court to conclude otherwise, but the plain language of the TDPs provides only for an indemnity judgment reduction credit.  Mr. Fitzpatrick confirmed that the provision did not account for defense costs.  Mar. 6 Tr. at 137:

> Q. All right.  And is it your interpretation of this provision that . . . North River would be entitled to reduce any amount that it would pay by such defense cost contribution rights?
> A. No, that's not my understanding of it.
> ***
> Q. How does this provision taken into account North River's claims for defense costs against other settled insurers?
> A I don't believe that it does.

The Court cannot disregard this undisputed evidence in favor of counsel's self-serving argument.[6]  And even if the judgment-reduction provisions did include defense costs, because defense costs indisputably exceed indemnity liability, and few if any claims ever reduce to judgment, any protection offered by such a provision would be illusory.

The Court also should reject the Plan Proponents' proposed findings and conclusions that North River does not have any interest in the policies subject to the proposed § 363 sales.

---

[6] Plan Proponents' citation to counsel's argument does not alter these facts.  *See* Plan Proponents' Proposed Findings ¶ 71 (citing March 7, 2019 Confirmation Hrn'g Tr. ("Mar. 7 Tr.) 120:13–24).

Plan Proponents' Proposed Findings ¶ 71.   Contrary to the Plan Proponents' assertions, North

River has an "interest" in the policies issued by the Settling Asbestos Insurers as contemplated

by § 363.   Whether North River's claim arises through equity or contract is of no relevance to the

§ 363 "interest" issue.   The Third Circuit has interpreted the term "interest" broadly to include

*claims* against the debtor or settling party arising out of the property to be sold.   *See, e.g.*, *In re*

*Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003).   If the Court were to accept the Plan

Proponents' argument that North River's claims against Settling Insurers were not an interest in

the Debtors' property, however, the Court would lack any power or jurisdiction to sell such

property free and clear of such claim.

Contrary to their proposed findings, the Debtors themselves seem to acknowledge that

claims are entitled to adequate protection.   In their proposed insurance settlement orders, they

ask that the Court find that:

> The Interests of Channeled Asbestos Claimants and other parties in interest are
> adequately protected because the Agreement provides that the Settlement Amount
> will be paid to the Asbestos Trust established pursuant to the Filed Plan to pay
> Channeled Asbestos Claims against the Debtors.

*See, e.g.,* Dkt. 607, Ex. 2 at 7.   The Plan Proponents contend that North River's claims are

channeled Asbestos Claims, but they are not eligible for payment.   As such, North River's

interests cannot be protected merely by an assignment to the Trust.

14.    **Plan Proponents' Proposed Findings ¶ 74**: Despite Plan Proponents' assertions

to the contrary, the Plan does not satisfy § 1129(a)(2) of the Bankruptcy Code.   As established by

the record and North River's Objections, the Plan Proponents have not complied with all

provisions of the Bankruptcy Code.   In particular, the Plan cannot be confirmed because it does

not protect North River's claims against third-party insurers and the proposed settlements violate

§ 363.   The proposed sale violates § 363 because the Debtors have not provided adequate

protection for North River's interests.  Under New York law, the Settling Insurers have no ability

to extinguish reimbursement obligations or duties (outside of a global settlement).  *See, e.g.*,

*Maryland Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 2010 (2d Cir. 2000) (rejecting as

"untenable" under New York law the "notion that any settlement by which an insurer obtains a

release from its insured, regardless of its terms, insulates that insurer from all contribution

claims."); *DaimlerChrysler Ins. Co. v. Universal Underwriters Ins. Co.*, 2010 N.Y. Misc. Lexis

1686 (N.Y. Sup. Ct. N.Y. Cnty. Mar. 31, 2010) ("The contract of settlement an insurer enters

into with the insured cannot affect the rights of another insurer who is not a party to it. Instead,

whatever obligations or rights to contribution may exist between two or more insurers of the

same event flow from equitable principles."); *Scotts Co., LLC v. Ace Indem. Ins. Co.*, 18 Misc.

3d 1139(A) (N.Y. Sup. Ct. N.Y. Cnty. Feb. 26, 2008) (permitting contribution suit against settled

co-insurer).  Under state law, those claims would be entitled to full payment.  The Plan

Proponents and Settling Insurers' proposed settlements offer North River no protection for these

state law rights.  Allowing the stripping of North River's claims would be a nullification of the

parties' state law rights and turns the Bankruptcy Code on its head by allowing the Settling

Insurers' to buy releases from liability to third parties by making a payment to the Debtor or

asbestos Trust.  Because the Plan violates § 363 by not providing adequate protection for North

River's interests in settlements that are proposed in conjunction with the plan, the Plan fails

§1129(a)(2), which requires that the plan proponent be in compliance with the Bankruptcy Code.

     15.    **Plan Proponents' Proposed Findings ¶ 75–78.**  The Court cannot find that the

Plan satisfies § 1129(a)(3) requirement that it be "proposed in good faith and not by any means

forbidden by law." 11 U.S.C. § 1129(a)(3).  North River does not dispute that the Plan is the

result of extensive negotiations between the Debtors and asbestos creditors' representatives.

North River does dispute that the resulting Plan was the product of good faith. In Proposed

Finding 76, the Plan Proponents argue that "[t]he Debtors invoked § 524(g) in good faith, as

chapter 11, not some other chapter of the Bankruptcy Code or a nonbankruptcy resolution, offers

all participating parties the only means to fully resolve the Debtors' asbestos liabilities." There

is no evidence to support this argument and Plan Proponents offered none. In contrast, Mr.

Podgainy and Mr. Scarcella provided extensive evidence that the Debtors have sufficient assets

to pay all of their creditors in full outside of the bankruptcy process. *See* North River's Proposed

Findings of Fact and Conclusions of Law ("North River's Proposed Findings"), Dkt. 613, at 20–

21.

     16.    **Plan Proponents' Proposed Findings ¶ 79**: Plan Proponents assert as follows:

> North River argues that the Plan constitutes a ploy by the Plan Proponents to gain
> bargaining leverage over them in coverage disputes, which allegedly evidences
> "bad faith." The Court is not persuaded by North River's arguments. Liability
> insurance policies are property of the Debtors' bankruptcy estates, and the estates
> are "worth more with them than without them." *In re Minoco Grp.*, 799 F.2d 517,
> 519 (9th Cir. 1986); *see also In re Vitek, Inc.*, 51 F.3d 530, 534 (5th Cir. 1995); *In
> re W. Asbestos Co.*, 313 B.R. 859, 864 (N.D. Cal. 2004). As fiduciaries, the Debtors
> have a duty to maximize the value of estate assets, including insurance assets, for
> the benefit of creditors. *See In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339
> (3d Cir. 2004); *Official Comm. of Unsecured Creditors of Cybergenics Corp., v.
> Chinery*, 330 F.3d 548, 573 (3d Cir. 2003); *In re Marvel Entm't Grp., Inc.*, 140
> F.3d 463, 474 (3d Cir. 1998). On the other hand, as a Non-Settling Asbestos
> Insurer, North River is incentivized to oppose the maximization of value of the
> Debtors' insurance assets and is thus contesting the extent of its coverage
> obligations. The Plan preserves the contested coverage available to the Debtors
> and their asbestos victims *and* makes the benefits of a § 524(g) reorganization
> available to all of the Debtors' constituencies, including Asbestos Insurers. The
> Asbestos Insurers have options: They can choose to settle their differences with the
> Debtors and make a satisfactory contribution to the Trust, thereby gaining the
> protections of a Settling Asbestos Insurer and putting the coverage disputes and
> asbestos tort litigation behind them. Or they can elect to continue litigating their
> coverage obligations and defending cases against the Debtors in the tort system—
> just as they were doing prebankruptcy. As to the latter option, the Plan follows the
> standard bankruptcy practice under which liability insurers continue to owe policy
> obligations to provide tort defense and indemnity even after a policyholder
> bankruptcy. *See, e.g., Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992); *Owaski v.*

*Jet Florida Sys., Inc.* 883 F.2d 970, 975 (11th Cir. 1989); *Lang v. Hanover Ins. Co.*, 820 N.E.2d 855, 858 (N.Y. 2004).

The Plan Proponents are arguing against a straw man. North River has never argued that the Plan Proponents must resolve all claims in the Trust and that continued pursuit of claims in the tort system is barred by the Bankruptcy Code. As structured, the process envisioned by the TDPs very well may result in coverage defenses, but that does not mean that the structure is barred by the Bankruptcy Code; it means only that there may be no coverage for claims if the terms of the policies are violated. North River objects to the Plan Proponents' efforts to treat its claims unfairly and strip it of its rights against third parties. Duty to "maximize the value" of the estate does not give Plan Proponents carte blanche to disregard a party's rights under state law or the Bankruptcy Code. It is the Plan Proponents' efforts to eliminate North River's substantive rights without any compensation whatsoever that is the unfair tactic employed by the Debtors to "leverage" insurers.

17.    **Plan Proponents' Proposed Findings ¶ 80**: Contrary to Plan Proponents' assertion, this case is strikingly similar to *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999). In this case, it is even worse because Mr. Fitzpatrick expressly admitted that the purpose of the Plan was litigation "leverage." Mar. 6 Tr. at 135. He further admitted that this effort did not necessarily make economic sense for the trust because tort system claims could "bleed theoretically at least – bleed funds away that could be available for – for other claimants." *Id.* at 113.

In *SGL Carbon Corp.*, the Third Circuit ordered the dismissal of a bankruptcy case that had been filed to gain an unfair advantage over the debtor's litigation adversaries. As in *SGL Carbon*, the Debtors' efforts to manipulate the votes and classes to gain a litigation advantage show that the Plan was not proposed in good faith. By comparison, the Plan relies upon multiple

violations of the Bankruptcy Code and its underlying principles of equitable treatment. Because the Plan thus violates § 1129(a)(3), it cannot be confirmed.

18.     **Plan Proponents' Proposed Findings ¶¶ 81–82**: Plan Proponents assert that the Plan was offered in good faith because a debtor need not be insolvent before filing for bankruptcy protection. North River does not argue that the Debtors' status as profitable companies alone demonstrates a lack of good faith. While a profitable company may seek bankruptcy protection in certain cases, the fact that the companies are solvent is certainly relevant to the debtors' good faith. Here, the Debtors sought bankruptcy protection to cap their liability at the expense of insurers even though they could afford to pay their share of defense and indemnity costs. Further, in doing so, they preserved the value of their owner's equity interest, even though many creditors are not being paid in full. To accomplish this feat, they carefully crafted classes to manipulate the vote in an effort to facially comply with classification and voting requirements. Taken in its entirety, the Court must conclude that the Plan was not submitted in good faith.

19.     **Plan Proponents' Proposed Findings ¶¶ 88–91**: Plan Proponents contend that:

> The Plan Proponents are not asking the Court to make coverage rulings. They are merely proposing treatment of North River's asserted rights and claims under the Plan. By necessity, treatment may involve alteration or interference with an insurer's state-law rights, and indeed, § 524(g) contemplates interference with insurers' contractual rights, including rights against other insurers. *See Thorpe Insulation*, 677 F.3d at 887.

Plan Proponents' Proposed Findings ¶ 89. The language of the Plan contradicts this proposed finding/conclusion.

The Plan expressly provides that the "Reorganized Debtor shall have no obligation to defend or otherwise appear or incur any costs or expenses in connection with" such an action. Plan § 4.13. In their proposed findings, the Plan Proponents say this does not impact Debtors'

duty to cooperate, but means only that it does not have to be an "active defendant if it is sued nominally in the tort system on account of a Channeled Asbestos Claim." The Plan does not contain any insurance neutrality language preserving North River's coverage defenses and Debtors' duties under the policies. In the absence of such peremptory language of the sort approved by the Third Circuit in *Combustion Eng'g*, the Court should read the language as it is written. The Plan purports to relieve Debtors of their obligation to defend and appear or incur costs – all of which are necessarily attendant to a defense of a tort claim. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239 (3d Cir. 2004); s*ee also See In re Global Indus. Techs., Inc*., 645 F.3d 201, 212–15 (3d Cir. 2011) (*en banc*)*.*

The Plan proposes to eliminate Debtors' policy obligations and to cut off North River's contribution rights. Moreover, Mr. Fitzpatrick testified that North River would be unable to settle claims without the permission of the proposed Trust. Mar. 6 Tr. at 130 ("Well, I think there's – everything is relevant. I mean I assume there's some choke point somewhere.") and at 136 ("The Trustee, the TAC and the FCR would have to agree to [a North River-claimant settlement], yes."). The Court cannot make Proposed Findings 88–91.

20.   **Plan Proponents' Proposed Findings ¶ 95–96**: Plan Proponents ask that the Court find that the Plan satisfies the best interests of creditors test of § 1129(a)(7). The Court cannot do so.

Plan Proponents argue that the value of trust-payment credits and judgment-reduction credits satisfy the "best interests" test. Contrary to their assertions, however, the Plan Proponents have not satisfied the best interest of creditors test. The evidence is undisputed that the Plan Proponents conducted no analysis of what North River might receive in a hypothetical liquidation. The Plan Proponents' witness conceded that: (i) he did not consider the impact of

18

insurance on creditor recoveries, (ii) North River would be eligible for a pro rata payment in a hypothetical Chapter 7 proceeding, and (iii) that such payment likely would be greater than the zero payment that is proposed under the Plan.  Debtors' counsel attempted to rehabilitate this testimony in argument, but has presented the Court with no analysis or facts to support the hypothetical arguments made to attack their witnesses' testimony.  Mar. 7 Tr. at 150:11–151:7. *See also id.* at 138:10–139:19.  As such, the Plan Proponents wholly fail to carry their burden on satisfaction of § 1129(a)(7).  Further, North River would fare better in a Chapter 7 liquidation because, without any § 524(g) injunction, it would be free to pursue contribution claims against Settling Insurers to the full extent allowed by law.

21.     **Plan Proponents' Proposed Findings ¶¶ 97–98**: Plan Proponents' argues that North River fails to grasp the realities of Chapter 7 when North River argues that it would receive some pro rata payment in a Chapter 7 liquidation.  In actuality, Plan Proponents' proposed findings in this section are nothing but speculation and unsupported by the evidence. The Plan Proponents put on a witness, Mark Podgainy, to testify concerning satisfaction of the best interest of creditors test.  He unequivocally stated that he had not performed such an analysis with respect to North River's claims.  Mar. 6 Tr. at 67.  He further conceded that it was possible that North River would receive a distribution.  *Id.* at 89.  When Mr. Prol examined Mr. Podgainy on redirect, the Court sustained objections pertaining to questions going to the Plan Proponents' speculation of how a Chapter 7 liquidation might treat North River's claims.  *See* Mar. 6 Tr. at 88.  Plan Proponents nonetheless ask the Court to make findings based on their arguments – not the evidence heard by the Court.  The Court should disregard the unsupported argument by Plan Proponents' counsel.  The Plan Proponents knew that North River was objecting to the Plan but could not be bothered to put on a case to address the best interest test.

The Plan Proponents have failed to carry their burden of proof and no amount of speculation by counsel can alter that fact.

22.    **Plan Proponents' Proposed Findings ¶ 99–100**: Plan Proponents assert that North River's potential contribution claims against Settling Asbestos Insurers are irrelevant to the best interest test.  North River submitted proposed findings and conclusions on this issue. *See* Dkt. 613 at 13–18.  Although there is conflicting law on this issue, the better position is that the best interest test requires the Court to consider a party's rights against non-debtors in cases where the debtor is proposing to alter or eliminate those rights.  Otherwise, the best interest test is rendered illusory and plan proponents could confirm biased plans that seriously prejudiced third-party claims that the bankruptcy court has little or no jurisdiction to consider.

23.    **Plan Proponents' Proposed Findings ¶ 119**: Plan Proponents argue that the Plan complies with the absolute priority rule because "Allowed Class 6 claims will be paid in full, albeit over time with interest at the federal judgment rate in effect as of the Petition Date."  Here, Debtors admit that Class 6 is impaired and voted to reject the Plan.  The Plan Proponents contend, however, that Class 6 is being paid in full based on the promise to pay Class 6 in full over time plus interest at the federal judgment rate.  The judgment rate does not fully compensate North River for the value of the forced loan reflected in the Plan.  Mr. Scarcella concluded that the "WACC based Discount Rate over the duration of the asbestos loss projections should be applied at 8.2% (5.7% Real-WACC)" for the insurance industry.  Scarcella Rpt. at 48.  As the judgment rate proposed by the Debtors does not fully compensate North River, the absolute priority rule prevents the equity holders from retaining their interest.

24.    **Plan Proponents' Proposed Findings ¶ 120**: Plan Proponents claim that the Plan complies with the absolute priority rule despite the fact that Reorganized Debtor's shareholders

will retain their shares before North River receives full payment of its Class 6 claims. The Plan

provides that the equity holders in Duro Dyne National Corp. will retain their interests "to the

same extent" as their interests on the petition date. *See* Plan §§ 3.03(k) and 3.03(l). Because

Class 6 is not paid in full, the Court cannot make this finding.

25.    **Plan Proponents' Proposed Findings ¶ 121**: Plan Proponents assert that North

River is not entitled to cramdown protections because Class 7 voted to accept the Plan. North

River contends that Class 7 also should have rejected the Plan or that North River's claims

should have been classified separately or in Class 5. In either case, that class would have

rejected the Plan and the absolute priority rule would prevent confirmation of the Plan. Plan

Proponents also contend that Class 6 is being paid in full based on the promise to pay Class 6 in

full over time plus interest at the federal judgment rate. The judgment rate does not fully

compensate North River for the value of the forced loan reflected in the Plan. Mr. Scarcella

provided testimony concerning the discount rate utilized in the insurance industry to reflect the

time-value/opportunity cost value of funds in that industry:

> Therefore, a more appropriate Discount Rate to mimic the expected growth rates
> for a riskbearing entity, such as a building material manufacturing company or
> insurance company, is typically measured by the company's weighted-average cost
> of capital ("WACC").
>
> WACC reflects the minimum rate of return acceptable to investors for use of the
> company's funds that could otherwise be used to retire debt, thus avoiding future
> interest expenditure, or invest in activity generating equity returns for shareholders.

Scarcella Rpt. at 41. Mr. Scarcella concluded that the "WACC based Discount Rate over the

duration of the asbestos loss projections should be applied at 8.2% (5.7% Real-WACC)" for the

insurance industry. *Id.* at 48. As the judgment rate proposed by the Debtors does not fully

compensate North River, the absolute priority rule prevents the equity holders from retaining

their interest.

26.     **Plan Proponents' Proposed Findings ¶ 122**: Plan Proponents argue that North

River has no setoff rights under New York law.  This assertion is untrue, as New York law does

allow insurer setoff claims.  *See, e.g.*, N.Y. Ins. Law § 7427; *Harnett v. Nat'l Motorcyle Plan,*

*Inc.*, 59 A.D.2d 870 (App Div. 1st Dep't 1977).  Plan Proponents' argument rests on the premise

that North River's claims are contingent.  But North River's claims are more properly considered

unliquidated, not contingent.  While the *amount* of North River's claims against Debtors for

defense contribution is contingent, the *existence* of these claims is not.  As such, North River's

claims for defense contribution amount to a "preexisting right of setoff under nonbankruptcy or

state law."  *In re Corp Res. Servs., Inc.*, 564 B.R. 196, 203 (Bankr. S.D.N.Y. 2017).  Plan

Proponents also argue that because North River's claims have not been finally adjudicated, they

are ineligible for setoff.  Plan Proponents' Proposed Findings ¶ 122.  The New York State Court,

however, has previously held that pro rata allocation applies to the Debtors' asbestos claims and

that Debtors are obligated to contribute to defense costs for claims/occurrences during uninsured

periods.  The only remaining dispute that exists is as to the percentages of that liability for which

each insurer and the Debtors will be responsible.  Disclosure Statement at 15–16.  Thus, again,

while the amount of North River's claims against have not be finally adjudicated, the existence

of those claims—and the preexisting setoff rights they engender—has been established.

Moreover, but for the Debtors' separation of North River's claims into pre- and post-petition

classes (Classes 6 and 7, respectively), North River's claims could not be considered contingent

in any case.  Ultimately, this issue is irrelevant, however, because the Plan Proponents otherwise

fail to treat fairly North River's claims against the Debtors and attempt to strip it of its third-

party claims.

27.    **Plan Proponents' Proposed Findings ¶ 129–132**: A plan providing for a §

524(g) trust and channeling injunction must provide for the trust to "own, or by the exercise of

rights granted under such plan would be entitled to own if specified contingencies occur, a

majority of the voting shares" of "each such debtor," "the parent corporation of each such

debtor," or "a subsidiary of each such debtor that is also a debtor." 11 U.S.C. §

524(g)(2)(B)(i)(III).  "This provision is to ensure that, if there are not sufficient funds in the trust

otherwise, the trust may obtain control of the debtor company."  4 *Collier on Bankruptcy* ¶

524.07 (16th ed. 2013).  Plan Proponents contend that the Trust Note and accompanying pledge

satisfy the requirements of § § 524(g)(2)(B)(i)(III).  They do not.

Plan Proponents ask the Court to conclude that § 524(g) does not specify the timing of

the Trust's stock ownership, much less that it cannot occur upon a note default.  In doing so, the

Plan Proponents ask the Court disregard Judge Ferguson's rulings in *In re Congoleum Corp.*, 362

B.R. 167, 176 (Bankr. D.N.J. 2007), and – ironically – the Ninth Circuit's rulings in *Plant*.  In

those cases, the courts concluded that the pledge of voting stock to secure a promissory note

from the debtor does is inadequate and "inconsequential" because, if a payment default were to

occur, the reorganized debtor most likely would be insolvent and therefore the voting stock

would be worthless.  Plan Proponents make a half-hearted effort to distinguish these cases but

fail to do so in a meaningful way.  For example, they distinguish *Plant* only on the basis that

"there is no indication . . . that the Plant Insulation trust would be receiving the same type of

'drag-along rights' that the Trust would be receiving here."  Plan Proponents' Proposed Findings

¶ 132.  The analysis, however, in no way depends on the presence or absence of drag-along

rights (which is a method to increase the value of shares being sold, not to ensure voting control).

Both *Congoleum* and *Plant* focus on the illusory nature of the trust note/default structure.

Plan Proponents ask that this Court instead follow *Burns & Roe*, which confirmed a plan with a trust note/default structure.  But in that case, the Court did not consider or analyze any objections to the structure because it had concluded that the objecting insurer in that case did not have standing to object.  *Burns & Roe Enters., Inc.*, No. 08-4191, 2009 WL 438694, at *32 (D.N.J. Feb. 23, 2009).

Plan Proponents also claim that the *Congoleum* court's reasoning is inapplicable to the facts here "because the Plan Documents here provide for a number of circumstances, other than a payment default, in which the Trust could exercise its rights to the voting stock, such as an uncured covenant violation."  That reasoning is flawed.  Plan Proponents ignore the fact that upon a default, of whatever kind, the Trust is not entitled to own any stock whatsoever.  It is entitled only to foreclose on its security interest.  And that foreclosure is subject to state law limitations that render it effectively illusory when it comes to ownership of a majority of voting shares.  *See* UCC § 9-608(a); North River Proposed Findings, Dkt 613 at 23-26.

28.    **Plan Proponents' Proposed Findings ¶ 133**: Plan Proponents argue that the Trust is only required to be "*entitled to own*," not actually own, 50.1% of voting stock.  In other words, the Plan Proponents ask that the Court read "specified contingencies" to mean "any chain of events, no matter how unlikely."  It is precisely the illusory nature of such provisions that caused the Ninth Circuit to reject the note/default structure:

> We conclude that "specified contingencies," read in this context, refers to contingencies regulated by the bankruptcy court to ensure that control is either a realistic possibility or a backstop to trust insufficiency.  The plan can still "specify" what contingencies suffice, but those contingencies cannot be "shams" that allow control facially, but not in practice.

*Plant*, 734 F.3d at 916.  The Plan Proponents have not shown that ownership of voting control of

the Debtors is a realistic possibility or a backstop to trust insufficiency.

29.  **Plan Proponents' Proposed Findings ¶ 134**: Section 524(g)(2)(B)(i)(II)

provides that the asbestos personal injury trust must be "funded in whole or in part by the

securities of 1 or more debtors involved in such plan and by the obligation of such debtor or

debtors to make future payments, including dividends."  11 U.S.C. § 524(g)(2)(B)(i)(II).  Plan

Proponents assert that future payments on the Trust Note and the Earn Out Payments "do not

have to be 'dividends' because, under the Bankruptcy Code, the word 'including' is 'not

limiting.'"  Plan Proponents' Proposed Findings ¶ 134.  Regardless of whether Congress

intended for securities to mean share ownership in § 524(g),[7] it clearly contemplated an

evergreen funding source.  *See Plant*, 734 F.3d 914 ("Courts have recognized that § 524(g)

embodies the requirement that the reorganized debtor becomes a 'going concern, such that it is

able to make future payments into the trust to provide an 'evergreen' funding source for future

asbestos claimants.'") (citing *In re Combustion Eng'g, Inc.*, 391 F.3d at 248).  The Court cannot

make the Plan Proponents' requested finding because they have failed to show that the Trust

satisfies the evergreen funding requirement.  Mr. Fitzpatrick conceded that the Plan does not

propose an evergreen funding source for the Trust:

> Q: Do you understand – do you have an opinion as to whether or not the
> contributions to this Trust constitute an evergreen source of funding?
>
> A: I don't believe that they do, no.

---

[7] Review of the Congressional Record shows that Congress likely did mean "equity shares."  *See* 140 Cong. Rec. S4521–01, S4523 (Apr. 20, 1994) (statement of Senator Heflin) ("[W]hen an asbestos-producing company goes into bankruptcy and is faced with present and future asbestos-related claims, the bankruptcy court can set up a trust to pay the victims. The underlying company funds the Trust with securities and the company remains viable. Thus, the company continues to generate assets to pay claims today and into the future. In essence, the reorganized company becomes the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims.")).  Here, Debtors' future profitability has no impact on the trust.

Mar. 6 Tr. at 162.  The only provision that gives the Trust an interest in the performance of the
company is the proposed earn-out payment. But that obligation will be satisfied in two years.
*Id.* at 57–58.  Because the Trust is not funded by future payments including dividends, the Plan
violates §524(g)(2)(B)(i)(II) and cannot be confirmed as structured.

30.    **Plan Proponents' Proposed Findings ¶ 140**: Plan Proponents cite in their
proposed findings Mr. Fitzpatrick's declaration and the TDPs in support of their arguments that
the Asbestos Permanent Channeling Injunction is justified. *Id.* (citing Fitzpatrick Decl. ¶ 29 and
TDPs §§ 2.1, 4.1)).  This evidence is insufficient because, as was made apparent at the hearing,
the Plan Proponents conducted no analysis of the future claims against the Debtors.  Nor did they
consider the insurance available to the Debtors or the Debtors' projected net income in
considering how asbestos creditors would be treated outside of the Plan. Further, §
524(g)(2)(B)(ii)(V) requires that present claims and future demands will be paid "in substantially
the same manner."  Here, although the Plan Proponents have channeled North River's claims to
the Trust, they have not proposed to treat those claims in a way that is "substantially" the same
as other channeled claims.

31.    **Plan Proponents' Proposed Findings ¶¶ 146–48**: Contrary to Plan Proponent's
assertion, the Asbestos Permanent Channeling Injunction is unfair and inequitable to future
asbestos claimants. The evidence was undisputed that Debtors can pay all legitimate future
claimants in full.  Here, however, future demands will be subjected to a payment percentage and
uncertain recovery as more limited assets are used to pay present claimants.  This is the opposite
of fair and equitable.

The Hindens and the Debtors are contributing a total of $26 million to the Trust over a
twenty-year period.  Plan § 4.08.  Over that same period, the Debtors are projected to have

income in excess of $100 million.  Podgainy Cert. at 20.  This disparity far exceeds that found by

the Third Circuit to violate the requirements of equity.  As made clear by Mr. Scarcella's report,

the Debtors are potentially responsible for a large percentage of defense and indemnity costs

moving forward.  Scarcella Rpt. at 32, fig. 36.  Equally clear, however, is that the Debtors are

projected to have the ability to pay 100% of their share of such costs.  *Compare* Ex. C-2 *with*

Podgainy Cert. at Ex. B.  What the proposed Plan accomplishes is to eliminate the Debtors' share

of future defense costs and to provide favorable treatment to asbestos claimants.  To accomplish

this, Debtors seek to shift liability on to North River and then to eliminate its rights to recover

from other responsible parties.  A side impact of this tactic is that the Trust will impose a

payment percentage on present and future claimants that otherwise are likely to be paid in full in

the tort system.  *See* Mar. 6 Tr. at 97, 121.

In contrast, the Hindens are contributing only $3 million to the Trust and are retaining

their equity interests.  Disclosure Statement at 77; Podgainy Cert., Ex. B.  While the Trust likely

already has adequate funds to pay all claims in full, the Hindens' equity is worth far more than

$3 million.  As shown by Mr. Podgainy's certification, the Debtors' projected future income is

significantly greater than $3 million after its contributions to the trust.  Podgainy Cert., Ex. D.

Indeed, the Debtors' projected net income is projected to exceed that on a yearly basis.  As such,

the value of the proposed Plan to the Hindens is enormous in comparison to their contribution. In

addition, although the dollar contribution of the Settling Insurers to the Trust was maintained by

the Court under seal, Mr. Fitzpatrick admitted that those settlements discounted the insurers'

limits by more than $3 million amount being contributed to the Trust by the Hindens.  Mar. 6 Tr.

at 163.  In order to receive that $3 million, the Plan has foregone any opportunity to reap the

benefit of future income from the Debtors.  At the same time, Plan Proponents have extracted

settlements from certain insurers that discounts the available insurance by more than the amount

secured from the Hindens.  There is no rational reason that securing the Hinden contribution has

any importance in this context. There is no discernable benefit to future demand holders.  As to

whether the injunction is fair to all parties, there is no question that it is not fair and equitable to

North River.  The FCR admitted that the Plan was designed to "put leverage" on insurers.  Mar.

6 Tr. at 135; *see also id.* at 111–112.  It does so by shifting defense costs onto non-settling

insurers and then stripping those insurers of all right to recovery from the Debtor or other third

parties. Because over 90% of claims against Debtors have been resolved without any payment,

those defense costs are normally a multiple of indemnity expense.  *See generally* Scarcella Rpt.

As it stands, North River is the only creditor whose Class 7 claim has no opportunity for

payment.  The proposed injunction is not fair and equitable as required by § 524(g).

32.    **Plan Proponents' Proposed Findings ¶ 149**:  Plan Proponents ask that the Court

enjoin North River's claims against third parties, even though those claims will not be paid by

the Trust.  Section 524(g) does not extend that far.  According to its plain language, asbestos-

related claims may be enjoined only if the claims are to be "paid in whole or in part by [the]

trust." 11 U.S.C. § 524(g)(1)(B).[8]  Because the Plan deprives North River of recovery on

account of its Class 7 claims, those claims may not be enjoined.  Plan Proponents further contend

that North River's argument ignores the "with respect to" language in § 524(g)(1)(B).  On the

contrary, North River has addressed directly this point.  North River's Proposed Findings at 27–

28.  Section 524(g) provides that an "injunction may be issued under subparagraph (A) to enjoin

entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or

---

[8] The Plan Proponents ask that the Court refuse to construe § 524(g) when it comes to the timing and mechanisms required for the trusts entitlement to voting control over the Debtor, but here ignore the statute's plain language.

receiving payment or recovery *with respect to any claim or demand that*, under a plan of

reorganization, *is to be paid in whole or in part by a trust* described in paragraph (2)(B)(i),

except such legal actions as are expressly allowed by the injunction, the confirmation order, or

the plan of reorganization." 11 U.S.C. § 524(g)(1)(B) (emphasis added).  The statute clearly

specifies that the injunction reaches only claims that are to be paid in whole or in part by a trust.

With respect to North River's post-petition defense cost claims, however, the proposed Plan and

TDPs specify clearly that such claims are not eligible for payment whatsoever.  The proposed

judgment-reduction provisions do not alter this fact and would not apply to North River's

defense cost claims at all.  As a matter of basic statutory interpretation, the Plan Proponents

cannot propose to channel a claimant to a trust, strip the claimant of any entitlement to recovery

whatsoever, and then enjoin the claimant from pursuing its legal rights.

    33.    **Plan Proponents' Proposed Findings ¶¶ 150–51**: Plan Proponents assert that

North River's argument that it cannot be enjoined fails because "the phrase 'to be paid by a trust'

in § 524(g)(1)(B) logically can refer only to claims *of the kind* that the plan provides are to be

paid by a trust, rather than only those particular claims or demands that are actually paid by that

trust."  Plan Proponents' Proposed Findings ¶¶ 150–51 (emphasis in original).  In arguing that

this Section means only that the Trust must pay the claims "of the kind" channeled to the Trust,

the Plan Proponents are attempting to have their cake and eat it, too.  Although North River's

claims may be loosely related to underlying asbestos claims in that the defense costs are incurred

in connection with defending claims, the nature of the liability is different.  This conclusion is

evident from the fact that the Plan and TDPs contain express provisions preventing the payment

of North River's defense cost claims.  Since such claims are *never* paid and are not even eligible

for payment, they cannot be "of the kind" of claims paid by the Trust.  As such, the statute

prevents the channeling of North River's claims to the Trust and the injunction of its rights as to the Debtors and third parties.

Plan Proponents contend that a contrary ruling would render § 524(g) illusory.  This is not so.  Section 524(g) does, however, have limits.

The problem that Plan Proponents suggest is illusory.  Some claims are not paid by a trust because they do not satisfy the criteria to be allowed claims.  In effect, the trust substitutes for the courts in determining where a claim is "allowed."  There is nothing infirm in this interpretation of the statute.  In contrast, allowing claims to be enjoined even though they have no right to payment from a trust is fundamentally unfair and violates the Bankruptcy Code.  The Plan Proponents cannot enjoin a claim, channel it to a trust, and then preclude it from payment.

## CONCLUSION

The Plan Proponents' Proposed Findings are rife with speculative and unsupported argument.  The Court should not, and cannot, make the requested findings without a record.  So too, the Plan Proponents' proposed conclusions of law ask that this Court ignore authority that, in other contexts, the Plan Proponents contend is controlling.  There are too many evidentiary and legal failures for the Court to ignore.  The Court should deny confirmation and order the Debtors to negotiate a legally-compliant plan.


Dated:  May 3, 2019                          Respectfully submitted,

                                             KENNEDYS CMK LLP

                                              /s/ Christina R. Salem
                                             Margaret F. Catalano
                                             Christina R. Salem
                                             570 Lexington Avenue, 8th Floor
                                             New York, N.Y. 10022
                                             (212) 252-0004

Emails:  meg.catalano@ kennedyscmk.com
            christina.salem@kennedyscmk.com

-and-

IFRAH PLLC
George R. Calhoun, V (*pro hac vice*)
Ifrah PLLC
1717 Pennsylvania Ave., NW
Washington, D.C. 20006
202.525.4147
Email:  george@ifrahlaw.com

*Attorneys for The North River Insurance Company*