UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                      .    Case No. 18-27963 (MBK)
                            .
                            .
DURO DYNE NATIONAL          .    United States Courthouse
CORP, *et al.*              .    402 East State Street
                            .    Trenton, NJ 08608
          Debtors.          .
                            .    May 22, 2019
. . . . . . . . . . . . ..       10:04 a.m.


TRANSCRIPT OF MOTIONS AND CONFIRMATION HEARING
BEFORE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            Lowenstein Sandler
                            By:  JEFFREY D. PROL, ESQ.
                                 TERRI FREEDMAN, ESQ.
                            One Lowenstein Drive
                            Roseland, NJ 07068

For the U.S. Trustee:       Office of the United States Trustee
                            By:  JEFFREY M. SPONDER, ESQ.
                            One Newark Center
                            Newark, NJ 07102


Audio Operator:             Kathleen Feeley


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (cont'd):

| | |
|---|---|
| For Official Committee<br>of Asbestos Claimants: | Caplin & Drysdale, Chartered<br>By:  JAMES WEHNER, ESQ.<br>One Thomas Circle, N.W.<br>Washington, DC 20005 |
| For Lawrence Fitzpatrick,<br>Proposed Futures<br>Representative: | Young, Conaway, Stargett & Taylor<br>By:  SARA BETH A.R. KOHUT, ESQ.<br>     ED HARRON, ESQ.<br>Rodney Square,<br>1000 North King Street,<br>Wilmington, DE 19801 |
| For The North River<br>Insurance Company: | Ifrah PLLC<br>By:  GEORGE R. CALHOUN, ESQ.<br>1717 Pennsylvania Ave., NW<br>Washington, DC 20006 |
| For MidStates<br>Reinsurance Company: | Duane Morris, LLP<br>By:  SOMMER L. ROSS, ESQ.<br>222 Delaware Avenue, Suite 1600<br>Wilmington, DE 19801 |
| For Hartford Accident and<br>Indemnity Co.: | Shipman & Goodwin LLP<br>By:  ABIGAIL W. WILLIAMS, ESQ<br>400 Park Avenue, Fifth Floor<br>New York, NY 10022 |
| For Munich Reinsurance<br>America, Inc.: | Dilworth Paxson, LLP<br>By:  WILLIAM E. McGRATH, JR. ESQ.<br>2 Research Way<br>Princeton, NJ 08540 |
| Special Insurance Counsel<br>for the Debtors: | Anderson Kill, PC<br>By:  CORT T. MALONE, ESQ.<br>1251 Avenue of the Americas<br>New York, NY  10020 |

- - - - -

1          THE COURT:  All right.  Good morning.  We have the

2     Duro Dyne matters on for today which are the one, two, three,

3     four motions to approve compromises and sales, as well as the

4     confirmation hearings.  I have a number of parties and counsel

5     calling in on Court Solutions.  I'm not going to have

6     appearances made on the phone since this exercise for you --

7     it's mostly me speaking today and you all are on the listening

8     end.  But for the benefit of those who are on the phone, let me

9     have appearances from the counsel who are here in court so that

10    they know who's in court.

11         MR. PROL:  Well, Your Honor, Jeffrey Prol and Terri

12    Freedman from Lowenstein Sandler for the Debtors.  Also in

13    court with me are Cort Malone of the Anderson Kill firm,

14    special insurance counsel for the Debtor, and the Debtor's CEO,

15    Randy Hinden, and Abby Wein, who is in-house counsel.

16         Just so Your Honor knows, on the phone is my

17    colleague, Jeff Kramer, who initiated the Court Solutions call

18    for other members of the Hinden family and other officers of

19    the company.  As far as I know, on the phone with Jeff are Pat

20    Rossetto, president; David Krupnick, who is the executive VP,

21    and also a member of the Hinden family; Wendy Hinden; and Chris

22    O'Callaghan, who is with the Getzler Henrich firm, financial

23    advisors.

24         THE COURT:  All right.  Thank you.

25         MS. KOHUT:  Good morning, Your Honor.  Sara Beth

 1  Kohut from Young Conaway for Lawrence Fitzpatrick, the future

 2  claimants' representative.  And I understand that Mr.

 3  Fitzpatrick is on the phone.

 4            THE COURT:  All right.  I also have Mr. Harron listed

 5  as well.

 6            MR. CALHOUN:  Good morning, Your Honor.  George

 7  Calhoun of Ifrah, PLLC on behalf of the North River Insurance

 8  Company.

 9            THE COURT:  All right.  Thank you.

10            MS. ROSS:  Sommer Ross, Duane Morris, on behalf of

11  MidStates Reinsurance Company.

12            THE COURT:  All right.

13            MS. WILLIAMS:  Abigail Williams of Shipman & Goodwin

14  for Hartford Accident and Indemnity Company.

15            MR. McGRATH:  Perfect timing.  Good morning, Your

16  Honor.  William McGrath, Dilworth Paxson, on behalf of Munich

17  Reinsurance America, Inc.

18            THE COURT:  Okay.  Great.  Thank you very much.

19            It was my intent initially to --

20                        (Pause)

21            THE COURT:  Did they not hear any of that?

22            THE CLERK:  I wasn't sure.

23            THE COURT:  All right.

24            UNIDENTIFIED SPEAKER:  Your Honor, I did not hear any

25  of what he just said.

1           THE COURT:  Okay.

2           UNIDENTIFIED SPEAKER:  (indiscernible).

3           THE COURT:  Is -- on the -- all right.  Well, I had

4  counsel in court enter appearances.  We haven't progressed

5  beyond that.  I'm not going to have a repetition of it.  For

6  the most part, everybody you would think is here, is here than

7  on Court Solutions.

8           It is my intent -- it was my intent this morning to

9  read a very brief summary of my ruling.  However, I saw how

10 well that went over with -- for Attorney General Barr, and I

11 thought reading summaries can -- short summaries can be

12 problematic.  I'm going to read a little bit more extensive

13 summary of my ruling.  It is not the proposed findings of fact

14 and conclusions of law as you'll see, but it's a summary of my

15 intent on ruling on the confirmation issues.  So it is somewhat

16 lengthy, please get yourself comfortable, then we'll have a

17 discussion afterwards.

18          This matter comes before the Court upon the plan

19 proponents' application for confirmation of the second amended

20 plan.  The background of this case including the nature of the

21 Debtor's business and procedural history of this bankruptcy is

22 well known to the parties and will not be repeated here.  For

23 purposes of this hearing it is enough to note for the record

24 that the plan proponents have submitted the plan for

25 confirmation and that the non-settling insurer, North River,

1 and the US Trustee's office have objected to confirmation on
2 various grounds.

3      The Court has considered the submissions for the
4 party, the proposed findings of fact and conclusions of law, as
5 well as the arguments and evidence submitted at the
6 confirmation hearing held on March 6 and 7 of 2019.  We are
7 also addressing of course the motions for -- seeking approval
8 of the compromise with the settling insurers.

9      For the most part the Court is willing to recommend
10 confirmation of the proposed plan.  The Court finds that the
11 plan is confirmed well over the objections of North River.
12 However, the Court agrees with the United States Trustee that
13 certain aspects of the plan including the TDP and certain trust
14 documents are deficient, and as a result the Court is unwilling
15 to recommend confirmation of the plan in its present form.

16      The Court will suggest remedial changes which, if
17 accepted, would render the plan confirmable in this Court's
18 opinion.  Consistent with Federal Rule of Bankruptcy Procedure
19 3019(a), the proposed modifications would not adversely change
20 the treatment of any claim or interest.  The plan proponents
21 will be given time to contemplate the suggested changes, and
22 assuming these changes are accepted, and let me emphasize this
23 is not a negotiation, this Court will recommend confirmation to
24 the District Court.  In the event the plan proponents do not
25 accept the suggested changes, the Court will not recommend

1   confirmation.

2        Additionally,  this hearing is not intended to be an

3   exhaustive discussion of the issues related to confirmation.

4   Following the plan proponents' acceptance or rejection of the

5   suggested changes, the Court will issue formal and

6   comprehensive findings of fact and conclusions of law along

7   with his recommendation to the District Court.

8        For purposes of this hearing the Court will only

9   touch on the most significant contested provisions of the

10  proposed plan.  Before moving on to specific statutory

11  requirements of confirmation, the Court initially finds that

12  the plan was filed in good faith and not merely as North River

13  alleges as a means to gain leverage over insurers.

14       North River's correct in asserting that generally

15  Chapter 11 is intended to reorganize financially troubled

16  businesses, and that at the time they filed the instance

17  bankruptcy the Debtors were solvent operating companies.

18  However, 524(g) is somewhat of an exception to the general

19  rule.  And although the Debtors in this case are solvent

20  companies, they face the uncertainty of future asbestos

21  liability which includes not just the liabilities to asbestos

22  personal injury victims, but potential contribution obligations

23  to co-defendants and insurers for both indemnity and defense

24  costs.

25       By its own admission North River asserts that the

1  Debtors face potential liability for its share of defense

2  costs, which aggregate well north of $30 million, which means

3  that the Debtors' potential total liability to all insurers is

4  a contingent on a certain sum far in excess of that figure.

5  Ironically and tragically this Debtors -- or these Debtors'

6  very survival is threatened by the cost of its own defense

7  attorney retained under its own insurance policies.

8        A bankruptcy filed pursuant to Section 524(g) removes

9  that uncertainty and facilitates the company's ongoing

10  liability, which in turn provides the trust with an evergreen

11  source of funding to pay future claims.  It defies logic to

12  conclude that a bankruptcy under Section 524(g) should only be

13  available to financially troubled businesses because Section

14  524(g) specifically contemplates a substantial ongoing business

15  that can make the continuous payments to the trust.

16        This interpretation is discussed in various court

17  opinions and scholarly articles and find support in the

18  statutes and legislative history.  In light of the structure

19  and purpose of Section 534(g), such an injunction would be

20  nonsensical to limit its use to companies on the brink of

21  financial collapse when, in fact, the ideal candidate for a

22  524(g) injunction is a healthy business that is and remains a

23  viable operation that can maximize the trust's assets to pay

24  claims.

25        In this case the plan proponents set forth this plan

1  with the legitimate purpose of restructuring so they can emerge

2  from bankruptcy able to operate as a going concern and

3  continuously fund the trust.  This benefits the Debtors as well

4  as future claimant/creditors and comports with the objectives

5  and goals of Section 524(g) of the Bankruptcy Code.

6  Accordingly, the Court finds that the plan was filed in good

7  faith.

8          North River also asserts that the plan violates the

9  statutory requirements of good faith as a result of the

10  Debtors' efforts to manipulate votes and classes.  This

11  argument is inextricably intertwined with North River's other

12  objections which North River alleges -- in which North River

13  alleges that the plan violates various Bankruptcy Code

14  provisions.  The mainstay of North River's arguments is that

15  the plan misclassifies North River's future contribution claims

16  for indemnity and defense costs in a class with all other

17  asbestos personal injury claims.  And also improperly

18  discriminates against North River in its treatment of such

19  claims in violation of 1122(a) and 1123(a)(3).

20          This Court finds that the classification and

21  treatment of North River's claims under the plan is

22  appropriate.  As to classification, under 1122(a) of the Code a

23  plan may place a claim or interest in a particular class only

24  if such class -- only if such claim or interest is

25  substantially similar to the other claims or interests in the

1    class.  The Bankruptcy Code has broad discretion to decide if

2    the plan satisfies that requirement and we will uphold a plan's

3    classification scheme so long as it is reasonable and does not

4    arbitrarily designate classes.  And I'm citing of course the In

5    Re W.R. Grace, a 3rd Circuit decision, 729 F.3d at 326.

6            In this case the Class 7 of the plan is entitled,

7    Chattel, Asbestos Claims and includes in pertinent part any

8    asbestos personal injury claim or indirect trust claim.  The

9    plan proponents contend that both the asbestos personal injury

10   claims and North River's claims for reimbursement of post-

11   petition defense expenses and pre- and post-petition indemnity

12   expenses belong in Class 7.  North River argued -- North River

13   argues that its reimbursement claims arise from their

14   contractual relationship with the Debtors and are not

15   substantially similar to the asbestos personal injury claims,

16   which are tort claims.

17           This Court is guided by the holding of W.R. Grace and

18   determines that North River's claims are properly classified in

19   Class 7 along with the personal injury tort claims.  North

20   River's arguments to the contrary are unavailing and overlook

21   the purpose of Section 524(g) which evinces an intent to

22   include all potential, and I stress all potential asbestos

23   related liabilities of a Debtor regardless of when such

24   liabilities arose.

25           As a practical matter, any claim that North River may

1    have against the Debtor arises from and is rooted in the same

2    events as do all other claims and demands covered by the

3    channeling injunction, namely the Debtors' production of

4    asbestos containing materials.  North River's claims arise

5    indirectly from bodily or personal injury resulting from

6    exposure to asbestos or asbestos containing products.  This

7    Court observes, as did the Bankruptcy Court in W.R. Grace, that

8    both indirect and direct claims under the plan exhibit a

9    similar effect on the bankruptcy estate.  They seek recovery

10   from the trust for actions related to the Debtors' asbestos

11   liability.

12         It is unimportant whether North River's claims are

13   for damages or defense costs or whether their claims are rooted

14   in tort or contract law because the Debtors' liability for such

15   claims depends solely on the asbestos related activities.  The

16   root element common to all Class 7 claims is asbestos.

17   Therefore the plan reasonably classifies North River's claims

18   in Class 7 together with the direct personal injury claims.

19         As to discrimination on Section -- under Section

20   1123(a)(4), that section requires that a plan of reorganization

21   provide the same treatment for each claim or interest of a

22   particular class.  Indeed the Supreme Court has said that the

23   quality of distribution among creditors is central policy of

24   the Bankruptcy Code.  That was Begier v IRS, 496 US 53.

25         Here North River objects to the confirmation alleging

1  non-compliance with this provision and discriminatory treatment

2  of its claim.  For the reasons which follow the Court overrules

3  North River's objection and finds that the plan satisfies

4  1123(a)(4).  North River asserts that its Class 7 claims fare

5  far worse under the plan than other similarly situated

6  creditors because its Class 7 claims are ineligible for any

7  payment whatsoever.

8          However, North River's objection overlooks that the

9  Bankruptcy Code's -- think I'm trying to go faster enough

10 here -- that the Bankruptcy Code's equal treatment requirement

11 does not mandate that the class members receive the same type

12 of benefit.  In this case a benefit in the form of monetary

13 distributions, or even that all creditors in the class receive

14 the same distribution percentage or payment at the same time

15 intervals.  Rather equal treatment has been interpreted to mean

16 that all claimants in a class must have the same opportunity

17 for recovery.  And that, again, cites the In Re W.R. Grace.

18         Thus, the fact that North River is ineligible for a

19 cash distribution while other Class 7 creditors are eligible is

20 not dispositive of this issue.  The focus for purposes of equal

21 treatment under Section 1123 remains on whether North River has

22 an equal opportunity to recover value on their claims and value

23 comes in many different forms.

24         Here it is undisputed that the plan afford North

25 River the opportunity to receive benefits in the form of trust

1  payment credits and judgment reduction credits.  Although these

2  benefits are a different type of benefit and have different

3  value than other members of Class 7 which they might receive in

4  that they are not cash payments, the trust payment credits and

5  judgment reduction credits are an undeniable benefit and serve

6  as legitimate compensatory value for North River's claims.

7          Thus, the plan does not unfairly limit North River's

8  opportunity for recovery.  It merely distinguishes the type of

9  recovery available to North River.  In fact, the depending on

10  the factual circumstances, many other Chapter 7 claimants under

11  the TDP will receive different types of compensation for their

12  claims including varying payments amounts depending on the

13  particular disease at issue, payment at different times or, in

14  fact, no distributions at all.  All in the discretion provided

15  to the Trustees under the TDP adopted as part of the plan.

16          Indeed, as an example, claimants receive recovery for

17  punitive damages, personal property injury, or less serious

18  injuries will not be -- will be channeled to the trust as part

19  of their plan treatment in Class 7, but may not see any

20  monetary distributions.  These procedural variations, and

21  specifically the differences in the form of the value provided

22  to creditors for their claims have a legitimate basis and do

23  not produce a substantive difference in North River's

24  opportunity to recover.  Accordingly, the Court rejects North

25  River's arguments regarding disparate treatment and finds that

1  the plan satisfies Section 1123(a)(4).

2          Further, this Court knows that in considering the

3  quality of treatment among creditors, the 3rd Circuit instructs

4  courts to consider the bankruptcy scheme as an integrated hole

5  in order to evaluate whether the plan confirmation is

6  warranted.  That's In Re Combustion Engineering, 391 F.3d at

7  241.  Courts are also in agreement that 1123(a)(4) does not

8  require precise equality, only approximately equality.  Again,

9  W.R. Grace, 729 F.3d at 327.

10         As set forth above, North River is eligible to

11 receive value for its claims in the form of trust payment

12 credits and judgment reduction credits under the plan, and

13 although they are not cash distributions, these credits have an

14 undeniable value, and nothing of about the TDP unfairly

15 restricts North River's ability to recover.

16         Apart from classification and improper discrimination

17 objections under 1129(a), North River takes issue with its

18 treatment of its Class 6 claim, specifically the application of

19 the federal judgment rate post-confirmation.  This Court agrees

20 with North River's concerns.  In determining the appropriate

21 interest rate, this Court is guided by the Supreme Court's

22 decision in Till v SCS Credit Corp, 541 US 465.  In that case

23 the Supreme Court observed that a debtor's promise of future

24 payments is worth less than an immediate lump sum payment

25 because the creditor cannot use the money right away.

1  Inflation may cause the dollar's value to decline before the

2  debtor pays and there is a non-payment risk.  <u>Till</u> at 466.

3       This Court is cognizant that <u>Till</u> dealt with cram

4  down of the plan under Section -- cram down of a plan in a

5  Chapter -- of a secured creditor's claim in a Chapter 13

6  bankruptcy.  However, the underlying concepts are applicable in

7  the present Chapter 11 case.  Further, pursuant to Section

8  726(a)(5) the legal rate, which is the federal judgment rate,

9  is for use only in liquidations under Chapter 7, and it is

10  applied in Chapter 11 only for purposes of determining whether

11  a plan satisfies the best interest of creditors test.  It is

12  used to determine what's fair to all creditors when they are

13  sharing a limited pot of money.

14       That is not what we're talking about here.  In this

15  matter the Court is tasked with determining an interest rate

16  that is sufficient to compensate North River for the present

17  value of its claims.  For the week ending on May 10, 2019, the

18  federal judgment rate was 2.37 percent.  This Court is not

19  convinced that the federal judgment rate adequately compensates

20  North River for the time value of its money and the risk of

21  default.  Rather, the Court calculates the appropriate rate

22  using the <u>Till</u> formula by using the prime rate as provided for

23  under the <u>Till</u> case which is presently 5.5 percent, and adding

24  a 1 percent point to account for North River's risk of non-

25  payment for a total rate of 6.5 percent.

1          Turning to the best interest of creditors test.  The
2    Court also overrules North River's objections based on
3    1129(a)(7).  Section 1129(a)(7) requires that those in
4    possession of a claim or interest in an impaired class receive
5    or retain under the plan on account of such claim or interest
6    property of the value as of the effective date of the plan but
7    is not less than the amount such holder would receive or retain
8    if the Debtor were liquidated under Chapter 7 of this title.
9    This is commonly known as the best interest of creditors test,
10   and in this case North River argues that the proposed plan
11   fails this test because the plan does not propose to pay North
12   River anything whereas North River could possibly receive a
13   distribution in Chapter 7.

14         North River cites Mr. Podgainy's testimony in support
15   of its argument.  On direct examination Mr. Podgainy admitted
16   that he could not testify as to whether the proposed plan
17   satisfied 1129(a)(7).  On cross-examination Mr. Podgainy
18   further testified that North River might indeed receive a
19   distribution in a Chapter 7 liquidation.  Therefore North River
20   posits that the possibility of a distribution in a Chapter 7 is
21   more valuable than nothing and the plan cannot be confirmed.

22         As an additional matter North River's argument
23   ignores the fact that it will receive full payment of its
24   allowed Class 6 claims and that it will receive value for its
25   Class 7 claims in the form of trust payments -- trust payment

1  credits and the judgment reduction credits.  Again, North River

2  improperly conflates payment with value.  The Code does not

3  entitle creditors to cash distributions, it merely requires

4  that the creditors receive value for their claims.

5          Moreover, a firm liquidation analysis is an illusory

6  proposition at this juncture.  North River's asserted claims

7  could not have been calculated by Mr. Podgainy because they are

8  disputed and unliquidated and the coverage loss that remains

9  pending in New York state.  Even assuming that North River is

10  successful in the coverage action, the extent and the amount of

11  North River's Chapter 7 claims would depend in large part on

12  North River's defense and indemnity costs and thus, again, are

13  too variable to calculate.

14          North River also asked this Court to consider

15  creditors' rights against third parties, specifically North

16  River contends that the plan enjoins it from receiving the full

17  value of third party claims against non-debtors, whereas it

18  would retain those rights in a Chapter 7 proceeding.  North

19  River cites to In Re Quigley Company, which is a New York

20  Bankruptcy Court decision out of the Southern District of New

21  York in 2010 in which the Court found that a plan failed to the

22  best interest of creditors test because dissenting claimants

23  would not receive the full value of their third party claims

24  against the debtor's parent company.

25          However, the Quigley case is factually

1  distinguishable from the case at hand.  There, the objecting

2  parties were asbestos claimants and not settling -- non-

3  settling insurers that is in this case.  In addition to the

4  difference between the type of claim holder the values of the

5  derivative claims at issue in Quigley were more easily

6  estimated and predictable based on the historical payments made

7  by the parent company.  And as just discussed, the insurers'

8  claims here are highly contingent and speculative.  Even

9  setting the factual differences aside, this Court knows that

10 Quigley is an out-of-circuit decision and is not binding.  This

11 Court finds that the more persuasive case law limits the best

12 interest analysis to the dividend that the creditor would

13 receive from a Chapter 7 Trustee only and not from third party

14 debtors.

15      The Court adopts the rationale employed by the plan

16 proponents in setting forth the risks and costs associated with

17 the Chapter 7 Trustee administering the various asbestos claims

18 and settlements and the mounting administrative costs the

19 Chapter 7 would face as undercutting any argument that there

20 would be a meaningful dividend to North River in a Chapter 7.

21 For the foregoing reasons, the Court determines the plan

22 satisfies the best interest of creditors test articulated in

23 1129(a)(7).

24      The Court additionally finds over North River's

25 objection that the plan complies with the requirements of

1 Section 524(g).  And again, the Court will discuss only North

2 River's most weighty arguments with respect to this provision.

3 To be entitled to an injunction under 524(g) the trust must

4 meet the structure and funding requirements of Section

5 524(g)(2)(B)(i).  Section 524(g) requires that an asbestos

6 settlement trust be funded in whole or in part by the

7 securities of one or more debtors involved in such a plan and

8 by the obligations of such debtor or debtors to make future

9 payments including dividends.  This is the portion of the

10 statute that contemplates the evergreen source of funding for

11 future asbestos claimants.

12        With respect to this section, North River argues that

13 the plan proponents have failed to demonstrate that the trust

14 is funded by securities of any sort.  North River specifically

15 emphasizes the trust will not be funded by future dividends as

16 envisioned by the statute.  However, Section 4.08(d) of the

17 plan dictates that on the effective date the reorganized Debtor

18 will issue and deliver the trust note to the trust.  The trust

19 note will be a promissory note in the original principal amount

20 of 13.5 million payable in installments over roughly 20 years

21 at an interest rate of 7.15 percent per annum.

22        Moreover, as the plan proponents point out, there's

23 no mandatory requirement that dividends be used to fund the

24 trust.  Therefore the trust note constitutes an obligation to

25 make future payments and satisfies Section 524(g)(2)(B)(i),

1  (ii).

2          Section 524(g) further requires that an asbestos

3  settlement trust have the ability to own if specified

4  contingencies occur in a major of the voting shares of said --

5  each such debtor.  The parent corporation of each such debtor

6  or subsidiary of each such debtor that is also a debtor.  North

7  River asserts that the plan violates this provision because no

8  realistic possibility exists of the trust owning a majority of

9  the voting shares.

10         Pursuant to the plan, the trust will receive a pledge

11  of and possessory security interest in 50.1 percent of the

12  reorganized Debtors' voting stock and 50.1 percent of the

13  voting stock of Duro Dyne Canada.  Under the pledge and

14  security agreement which the reorganized Debtor will execute

15  and deliver on the effective date, the trust will be entitled

16  to own the pledged shares if an event of default occurs.  North

17  River asserts that the note default provision is insufficient

18  and cites the Congoleum and the Plant Insulation case out of

19  the 9th Circuit in support of this position.

20         However, this Court notes that since the decision in

21  Congoleum at least one other case in the circuit, Burns and

22  Roe, approved a plan which pledged to the trust 51 percent of

23  the stock in the event of default.  Moreover, North River's

24  arguments require an assumption that the shares become

25  worthless in the event of a default, or at least that the

1   shares value will drop to a negligible amount.  This Court is

2   not willing to make that leap and declines to conclude that a

3   default on a trust payment means that the Debtor companies are

4   insolvent or that their shares are worthless.

5        The Court must point out that North River previously

6   argued that the Debtor companies were too healthy for a Chapter

7   11 bankruptcy at all, but now in the context of 524(g)(2) asks

8   the Court to predetermine that the companies are so unstable

9   that their stock can become worthless in the event of a

10  default.  These positions are untenable.

11       Further, this Court questions what benefit ownership

12  of the stock in advance of a default would confer.  As noted by

13  the Courts in <u>Congoleum</u> and <u>Plant Insulation</u>, the purpose of

14  this action is to ensure that the reorganized Debtors continue

15  to operate for the benefit of asbestos claimants.  If a Debtor

16  is making payments on the note, then the trust is funded and

17  everyone is happy.  So even if the trust had ownership of the

18  shares, it would not take any action with respect to those

19  shares while payments are being made because the goal of

20  Section 524(g) is being accomplished.

21       It is only until payments stop, when the reorganized

22  Debtor is no longer operating for the benefit of the asbestos

23  claimants.  Thus a transfer of control upon default does not

24  appear to impair the rights of the trust and future asbestos

25  claimants or otherwise put them at a disadvantage.

1    I want to take this opportunity also to point out the

2  distinction between the Congoleum case and the matter before

3  the Court.   In Congoleum the payment obligations consisted of a

4  $121,000 semi-annual payment and the Congoleum case was not 100

5  percent dividend case.   The Court viewed the payment

6  obligations to be so insubstantial and nominal that if there

7  were default and such, clearly there would be little value in

8  the stock.   Indeed the testimony during Congoleum that was

9  alluded to in the decision referenced I believe the CEO who

10 acknowledged that if Congoleum could not make a $121,000

11 payment semi-annually when due, then indeed the likelihood was

12 that the stock was valueless and that the company was in dire

13 straits.

14    That is not what we have here.   We have substantially

15 greater obligations than in Congoleum.   We have a $13.5 million

16 note over 20 years with interest at 7.15 percent which demands

17 much greater than $121,000 in semi-annual payments.   We have

18 100 percent distributions.   Indeed, if a Debtor could not make

19 a meaningless payment, yes, the stock could be considered

20 worthless.   But a default in payment obligations where there's

21 such demanding obligations, does not necessarily mean that Duro

22 Dyne is insolvent or that the stock is worthless.   It's a

23 completely different fact scenario which the Court in Congoleum

24 recognized in distinguishing its own case from other cases.

25    Finally, the Court notes that the plan in this case

1 provides for a number of circumstances other than a payment

2 default in which the trust could have the opportunity to

3 exercise its rights to the voting stock. And for all these

4 reasons the Court determines that the plan satisfies 524(g)(2).

5        Moving to -- moving on, 524(g)(2)(B)(ii) requires

6 Courts to make certain factual findings to support the issuance

7 of a 524(g) injunction. In this case the Debtors' history as

8 defendants in the tort system, the nature of the asbestos

9 litigation and the facts of these Chapter 11 cases support the

10 findings required for the issuance of the asbestos permanent

11 channeling injunction under Section 524(g).

12        Turning to adequate protection. North River also

13 argues that the plan does not provide adequate protection of

14 North River's alleged interest in the insurance policies that

15 the settling asbestos insurers are buying back under Section

16 363 as part of the settlements with the Debtors. However, as

17 the plan proponents point out, North River is not a lien

18 creditor, instead it is an unsecured creditor to the extent of

19 any allowed claim.

20        And courts uniformly hold that unsecured creditors

21 are not eligible for adequate protection. North River simply

22 does not hold any interest that is entitled to adequate

23 protection under the Bankruptcy Code. Importantly, North River

24 does not hold an interest in the insurance policies that the

25 settling asbestos insurers will buy back under the settlements.

1 North River's contribution claims against the settling asbestos

2 insurers, whether they are for indemnity or for defense costs,

3 arises as a matter of equity.  They do not involve property of

4 the estate and does not erode the limits of those policies.

5 Moreover, the statutory basis for enjoining North

6 River's contribution claims against the settling asbestos

7 insurers in Section 524(g), not Section 363(f).  North River's

8 contribution claims against the settling asbestos insurers,

9 which fall within the plans definition of asbestos insurance

10 policy claims will be enjoined by the settling asbestos insurer

11 injunction to be issued in accordance with Section 524(g) and

12 supplemented by Section 105(a).

13 Under Section 524(g) a court may enjoin any action

14 directed against an identifiable third party such as a settling

15 insurer who is alleged to be indirectly liable for the conduct

16 of claims against or demands on the Debtor to the extent of

17 such alleged liability, and rises by reason of the third

18 party's provision of insurance to the Debtor.  In sum, North

19 River's contribution claims against the settling asbestos

20 insurers will be enjoined under 524(g) by the settling asbestos

21 insurer injunction.  The settling asbestos insurer injunction

22 properly enjoins North River's contribution claims against the

23 settling asbestos insurers because those claims fall within

24 the -- within one of the by reason of categories set forth in

25 524(g)(4)(A)(ii) and are thus derivative of the Debtor's

1  asbestos liabilities.

2        North River's reliance on the <u>Combustion Engineering</u>

3  and <u>John Manville</u> cases to support its discharge argument is

4  misplaced.  Those cases involve Section 105 injunctions that

5  shielded non-debtors from their own independent asbestos

6  liabilities, not the liabilities that were derivative of the

7  Debtor's asbestos torts and enjoined under 524(g).

8        North River asks this Court to find in the

9  alternative that if North River does not have an interest

10  warranting adequate protection, then this Court lacks

11  jurisdiction to enjoin North River's claims and contribution

12  claims against the settling asbestos insurers.  As previously

13  discussed, North River's arguments presume that the plan

14  proponents are seeking leave solely under 363 or 105 and

15  therefore overlook that the settling asbestos insurer

16  injunction is to be issued under Section 524(g).

17        Finally, the Court notes that without the Section

18  524(g) injunction, there would be no settling asbestos

19  insurers, or their contribution towards the funding of the

20  trust which serves the interest of the asbestos personal injury

21  victims and is contrary to the underlying purposes of 524(g).

22        Bear with me one second.

23                          (Pause)

24        THE COURT:  Substantive consolidation.  The plain

25  proponents asked this Court to substantively consolidate and

1  merge all the Debtors into Duro Dyne National Corp, which will

2  emerge as the reorganized Debtor if the request is granted.

3  For the reasons discussed hereafter, the Court recommends

4  substantive consolidation.

5      The US Trustee objects to this request and asserts

6  that the plan proponents have failed to establish their case

7  for substantive consolidation because Mr. Podgainy's testimony

8  demonstrates his lack of personal knowledge regarding whether

9  any creditor actually viewed the Debtors as a single entity.

10 Furthermore, the US Trustee contends that the plan proponents

11 were unable to cite a single example of a creditor negotiating

12 an agreement with the Debtors as a whole.

13     In support of their request the plan proponents argue

14 that the evidentiary record, specifically the certification

15 provided by the Debtors' financial advisor, Mr. Podgainy, and

16 the testimony given by Mr. Hinden, the Debtors' CEO, support a

17 finding that the Debtors have satisfied the standard for

18 substantive consolidation established by the 3rd Circuit in

19 Owens Corning.

20     Although the Court agrees with the US Trustee that

21 the proof presented by the plan proponents are lacking, as the

22 plan proponents point out, the creditors in this case voted to

23 accept the plan that provides for substantive consolidation of

24 the Debtors' estates.  Case law indicate that the test for

25 consolidation articulated by the 3rd Circuit in Owens Corning

1  applies only absent consent.

2         The Court, especially in light of the fact that it's

3  100 percent plan, there is no prejudice to any creditor body of

4  any of the independent Debtors, sees no reason to impede the

5  plan proponents' efforts absent a more applied objection being

6  raised.  A Bankruptcy Court may order substantive consolidation

7  of the Debtor's estates upon an evaluation of whether the

8  economic prejudice of continued debtor separateness outweighs

9  the economic prejudice of consolidation.  In other words, a

10 court must conduct an inquiry to ensure that the consolidation

11 yields benefits offsetting the harm it inflicts on objecting

12 parties.

13        No other creditors have joined the US Trustee in its

14 objection, or asserted any prejudice or reliance on the credit

15 worthiness of a single Debtor.  Indeed, the US Trustee cites no

16 harm that will befall any party in interest as a result of

17 substantive consolidation.  Additionally, the cost and time

18 savings to be realized by the Debtors through substantive

19 consolidation, however modest they may be, weigh in favor of

20 consolidation.  For the reasons discussed on this record, the

21 parties are deemed to have consented to substantive

22 consolidation and this Court determines that it is warranted.

23        Now the United States Trustee -- now we turn to the

24 objections to the TDP procedures raised by the Office of the

25 United States Trustee.  First, the US Trustee objects to the

1  plan under Section 524(g)(2)(B)(ii) and argues that the plan

2  proponents have not established reasonable assurance that the

3  trust will be in a financial position to pay present claims and

4  future demands that involve similar claims in substantially the

5  same manner, specifically the US Trustee takes issue with the

6  fact that the TDP does not provide any mechanisms for claw back

7  of payments if initial payments are too high.  And without the

8  ability to take back payments, the US Trustee asserts that

9  future claimants are left unprotected against fraudulent or

10 invalid claims, and as a result may to be paid in substantially

11 the same manner as earlier submitted claims.

12        This objection is being overruled.  It's simply too

13 costly, impractical and ineffective, and for the reasons set

14 forth by the plan proponents.  However, in its submissions and

15 throughout the course of these proceedings, it has become

16 evident to the Court that the US Trustee's primary objections

17 to the plan is rooted in it concern that the TDP and the trust

18 lack the safeguards to prevent fraud and abuse, and in some

19 provisions it is argued that the TDP indeed facilitates such

20 fraud and abuse.

21        The US Trustee's concerns are bottomed on alarms

22 raised in industry studies and academic works.  The US Trustee

23 has not, however, been able to point to any concrete

24 illustrations or identify actual harms which have manifested in

25 the extended history of asbestos cases in our Bankruptcy

1  Courts.  Apart of course from the <u>Garlock</u> case which this Court

2  deems to be premised on a different factual scenario involving

3  different concerns.

4           This does not mean that the concerns of the Office of

5  the US Trustee are misplaced or that the Court and the US

6  Trustee's oversight is not needed to ensure that the potential

7  issues discussed do not materialize.  That is why, in an effort

8  to address the bulk of the US Trustee concerns relative to

9  transparency, I am requiring certain changes to the TDP and the

10  trust agreement.  And now I'll turn to those specific concerns.

11           Initially the Court believes that the bulk of the

12  concerns raised by the Office of the US Trustee can be

13  addressed through the addition of language in the TDP which

14  adds a notice requirement to the Office of the US Trustee,

15  specifically I start with Section 2.3 of the TDP in which the

16  Court requires that -- and throughout the whole document

17  including the trust agreement, that whenever the TDP or the

18  trust agreement requires notice to the futures representative

19  or the TAC, or requires consent or actions, or provides

20  information to the futures rep or attack, that the US Trustee

21  for Region 3 be given notice.

22           So specifically I would add and I will identify the

23  various sections that I think need to be modified, language

24  that says, And on notice to the United States Trustee for

25  Region 3 or his/her designee.  I am not requiring the US

1  Trustee to give consent and I'm not requiring that the trust

2  obtain the consent or that there be any actions by the US

3  Trustee.  I am simply requiring that whenever under the TDP or

4  the trust agreement the futures rep or the TAC receive notices

5  or information or are asked to consent to certain actions that

6  the United States Trustee for Region 3 or his or her designee

7  be given notice.  The US Trustee could then decide how to

8  respond, and I'll discuss that.

9        In my review of the TDP and the trust agreement, this

10  requires changes, and you could all get a copy of the recording

11  or a transcript of this ruling, and I'll read it out here,

12  Section 2.3, 2.5, 3.1, 3.2, 4.2, 4.3, 5.3, specifically 5.3(a),

13  5.6, again, 5.6(a)(3), 5.7, 5.8, 5.11, 6.1, 6.5, 7.3, 7.8, 8.1

14  and 8.2.  For the trust agreement -- that was all with the

15  TDP -- for the trust agreement 2.1(c)(16), 2.1(f),

16  2.2(c)(i)(ii), 2.2(d), 2.2(e), (f) and (h), 3.3(c), 7.3, and

17  7.6.

18        Now notice is only as good as that which allows a

19  party to act.  So I'm requiring that under Section 7.13 of the

20  trust agreement that the following language be added, this is

21  with respect to the alternative dispute resolution process,

22  That notwithstanding the foregoing, any issue or dispute raised

23  by the Office of the US Trustee for Region 3 or his or her

24  designee, which may arise under the trust agreement or the TDP

25  may be brought directly before the Bankruptcy Court without

1  compliance with the dispute resolution procedure set forth in

2  this section.  So it's my dictate that the US Trustee be able

3  to bring issues that it has as a result of the additional

4  notice directly to the Court rather than pursuing dispute

5  resolution.

6          While we're on the trust agreement I have one request

7  if possible.  There is a reference in Section 7.2 to Joseph P.

8  Kennedy, Sr. for the rule against perpetuities.  If we could

9  find one of the more detestable people in our history in my

10  view, so if we could just base the rule of perpetuities on

11  somebody else's life, it would just make me happier, but it's

12  not critical.

13          Turning to Section 6. -- I think I made the same

14  request in State Insulation.  Returning to the TDP, Section

15  6.3, which deals with the withdrawal and deferral of claims,

16  the Court is directing that the first sentence be removed and

17  that the paragraph be changed to simply address deferral of

18  claims to eliminate the ability to withdraw claims without

19  statute of limitation consequences.  The Court views the

20  administrative burden to be negligble to keep any claim on

21  deferred status.  The Court does not take issue with keeping

22  claims on deferred status, but sees no reason why a claimant

23  should be entitled to withdraw a claim and not have an impact

24  on statute of limitations.

25          Turning to Section 6.5 of the TDP.  The Court has had

1  an opportunity to read proposed Senate Bill S-766 which is

2  called the Protect Asbestos Victims Act.  I think it was

3  introduced on March 13 of 2019.  And it addresses the critical

4  claims that the asbestos trust system lacks any independent

5  oversight by a neutral third party to ensure that the trusts

6  aren't deceived into paying erroneous or false claims and it

7  also addresses the public interest in having the information on

8  the claims and claims disposition available for review in

9  limited situations.

10         Now the Court is cognizant that proposed legislation

11 is not binding law, that there are reasons legislation do not

12 pass.  Congress sets it own agenda.  I won't comment further.

13 But notwithstanding -- well, let me first premise that the

14 Court is cognizant that it does not have the authority or the

15 legislative role in implementing a good portion of what's

16 included in this bill as far as enforcement mechanisms.

17 However, just because legislation is not passed doesn't -- or

18 become law, isn't -- doesn't mean it's necessarily misguided

19 and cannot offer some ideas and guidance.

20         And in this vein I look at Section 2.89 of this bill,

21 S-766, and it reads, With respect to assessing trust

22 information in general subject to Section 107 and any

23 appropriate protective order, a trust described in Paragraph

24 2(b)(1) shall on written request provide in a timely manner any

25 information relating to any payment from and any demand for

1  payment from the trust to a party to an action at law or equity

2  if the action relates to liability for asbestos exposure.  And

3  then it goes on to say that the trust described in that

4  paragraph may require from the person making the request

5  payment of any reasonable cost incurred to comply with the

6  requirements.

7          The Court believes that the intent underlying this

8  provision can be accomplished with the following change to

9  16.5 -- I'm sorry, 6.5.  And indeed I believe in the most

10 recent marked versions the plan proponents did address the

11 primary concern which would be to replace the phrase,

12 Bankruptcy Court, a Delaware State Court, or the United States

13 District Court for the District of Delaware with or ordered by

14 a court with the phrase that says, Or ordered by a court of

15 competent jurisdiction.

16         I believe the change may -- does go far to satisfy

17 the concerns raised in the bill.  So I wouldn't add to it

18 except to provide a backstop, that in addition to a court of

19 competent jurisdiction, we include the option to seek an

20 application before the Bankruptcy Court.  It is the intent of

21 this Court that for the trust to respond to a court order or a

22 subpoena issued by any court handling a suit in law or equity

23 which relates to liability for asbestos exposure, or as a

24 backstop after application to the Bankruptcy Court so that as

25 a -- in addition to any subpoenas from a competent court or

1   court orders, anyone seeking information pertaining to the

2   claims being made or paid can seek authorization from this

3   Court to direct the trust to release that information.

4           That's it, folks.  Those are the only changes that I

5   am requiring.  In effect, as a summary, if we go through it,

6   it's changing the interest rate on the Class 6 claim, it is

7   requiring the additional notice to the Office of the US Trustee

8   whenever notice or consent is asked for or given to the futures

9   rep or the TAC as I've outlined.  It is removing the ability to

10  withdraw claims and be shielded from the statute of limitations

11  issues.  It is allowing the US Trustee to seek the intervention

12  of the Bankruptcy Court on any issue as opposed -- raised under

13  the trust or the TDP as opposed to the dispute resolution

14  process.  It is ensuring that the Bankruptcy Court can be a

15  forum in addition to any competent forum where parties seeking

16  access to claims information can seek an order directing the

17  trust to disclose that information.  And I think that covers

18  the issues, the primary issues.

19          There was one issue raised on -- as to the

20  substantial consummation, when that will be effective.  I think

21  there should be clarity that substantial consummation of this

22  plan will not occur prior to the effective date nor prior to

23  any certification by or on behalf of the plan proponents

24  confirming the all requirements under Section 1101.2 have been

25  met that will inform all that the plan is ready to be deemed

1  substantially consummated.

2        So now the decision rests with the plan proponents

3  whether or not they wish to proceed under these parameters.  I

4  am happy to give time to consider it.  I'm thinking through

5  June 3.  I know it's a holiday weekend, but I'm certainly here.

6  I'll also -- I'll entertain are there any questions.  Well, let

7  me first -- needless to say, I'm prepared also to approve the

8  compromises which incorporate the sale of the policies.  I find

9  that they are integral to advancement of the plan and

10  benefitting the estate and the funding of the trust, which will

11  benefit the targeted asbestos personal injury victims who are

12  to be protected under Section 524.  I've addressed the adequate

13  protection issues that were raised and objections that were

14  raised.

15        So I'm ready -- I will, if the plan proponents agree

16  to move forward under the parameters I set forth, issue

17  proposed findings and conclusions of law to the District Court.

18  I don't know the timing of the District Court, they're strapped

19  these days.  There will be ample time to file notices of appeal

20  or motions for reconsideration, whatever objectors wish to

21  pursue.

22        Is that -- is June 3 a reasonable amount of time?  Do

23  you --

24        MR. PROL:  Your Honor, Jeff Prol for the record.  I

25  just wanted to thank Your Honor for obvious hard work in doing

1  this and the time you put in.  I would like the opportunity to

2  consult with my client as well as with the other plan

3  proponents with regard to this, and I hope that

4  (indiscernible) on the phone --

5          UNIDENTIFIED SPEAKER:  Can he get closer to a mic?

6  it's hard to hear him on the phone.

7          MR. PROL:  The -- what may take the most amount of

8  time here is for the ACC to go back to committee members and

9  start to ask for them to weigh in on whether or not they think

10  that (indiscernible) is appropriate timing.

11          I do have one question for Your Honor about the

12  ruling.  There are a number of provisions in here where the US

13  Trustee is required to give notice to the trust and opportunity

14  to come back to this Court.  Given the length of time with

15  which the trust has to operate just to retain the note, I would

16  hope the order's not contemplating keeping this case open as

17  we'd like to, once we get through confirmation and then we're

18  in a position to close and would effectively like to close the

19  case.

20          And I certainly don't think that closing the case

21  would be restrictive if the Trustee had an issue or anybody

22  wanted to come back here and get a subpoena to go

23  (indiscernible).  The could certainly seek to reopen the case

24  as part of that process.

25          THE COURT:  I have -- first of all, as the Office of

1  the US Trustee well understands, I do whatever I can to close

2  my cases.  I am happy to have them closed.  I will always

3  facilitate reopening the case and waiving fees, especially in

4  light if it's Chapter 11 fees.  To reopen a case the filing fee

5  would be substantial.  So I have no problem reopening a case at

6  any time to address issues that arise.  I don't think I need to

7  keep this case open for the life of the trust.

8          MR. PROL:  Thank you, Your Honor.

9          THE COURT:  Once again, I want to --

10         MR. CALHOUN:  Your Honor, you'll be shocked to know

11 that we may disagree with some of your proposed conclusions.  I

12 really have more of an administrative request, or comment which

13 is, to the extent that Your Honor -- assuming that the plan

14 proponents agree to the changes Your Honor has mandated, when

15 you issue your proposed findings I would request that you issue

16 the settlement orders as proposed findings also so that they

17 all go up together, because they're -- because the way you've

18 ruled on the settlements, the 524(g) injunction is integral to

19 the settlements, that would prevent us from having to file

20 separate appeals as to the settlement orders, you know, put

21 everything on the same track.

22         So I think for administrative reasons that's the

23 easiest way to move forward with that, and I'd request that

24 rather than issue separate settlement orders, that you tie them

25 expressly to the proposed findings that go up to the District

1  Court.

2           THE COURT:  It would seem to make sense.  I would

3  think that for -- if my -- let's say the District Court accepts

4  my proposed findings, or doesn't, let's say they don't accept

5  it.  Then I assume there's not going to be settlements, that

6  they're tied.  In other words, if confirmation is not approved

7  by the District Court, then the settlements will also go by the

8  boards.  So they need to be considered together, but I

9  certainly will hear Mr. Prol or anyone else who will need to

10  address it.

11          All right.  Mr. Calhoun, you're suggesting I keep

12  orders approving the settlement or include it in one order as

13  part of the proposed findings and conclusions?

14          MR. CALHOUN:  I don't know that that makes that big

15  of a difference, Your Honor.  If you do it as one, that's

16  simple.  They're certainly intertwined.  I don't know if that's

17  makes a difference but I just want them on the same schedule if

18  that fits everyone's --

19          THE COURT:  Okay.  Mr. Prol?

20          MR. PROL:  I'd like the opportunity to consult

21  with --

22          THE COURT:  Sure.

23          MR. PROL:   -- the insurance counsel as well as with

24  the plan proponents' insurance counsel before we weigh in on

25  that.  What I suggest is if we can come back, Your Honor, with

1    a yay or nay on the plan amendments perhaps you could address

2    that procedure at that time.

3          THE COURT:  To make it easier do you want to have

4    just a conference call where you don't have to actually give me

5    a yay or nay next week after the holiday, on the 29th or 30th,

6    just to tell me if you need more time or you're -- or what your

7    timing would be, and if there's any objection to Mr. Calhoun's

8    administrative proposal.

9          MR. PROL:  I think that that sounds like it makes a

10   lot of sense, Your Honor.  The holiday is this Monday, the

11   27th --

12         THE COURT:  Right.

13         MR. PROL:   -- were you thinking later that week

14   or --

15         THE COURT:  Yeah, I -- now on the 28th nobody needs

16   to come back to this.  We can go and do it on the 30th which is

17   a Thursday.

18         MR. CALHOUN:  No, that day doesn't work for me.  The

19   31st would work.

20         THE COURT:  Friday morning for a quick call, the

21   31st?

22         MR. PROL:  (indiscernible).

23         THE COURT:  Then why don't we plan that.  We'll do a

24   call at eleven o'clock Friday morning.  And --

25         MR. WEHNER:  Your Honor, this is Jim Wehner --

1          THE COURT:  Yes.

2          MR. WEHNER:   -- from Caplin & Drysdale for the

3  Committee.

4          THE COURT:  Yes.

5          MR. WEHNER:  That Friday conference makes sense to

6  me.  I'm just sort of echoing Mr. Prol's sentiment that it may

7  take us longer than being served to digest the changes that you

8  have made and get to a decision on that.  Not -- hopefully not

9  much longer, but we can talk about that on the 31st.

10          THE COURT:  It's understandable.  It was lot for me

11  to go through, it's a lot for you to digest.  However, let's --

12  I just want to keep it on track so I know the timing and so

13  that Mr. Calhoun and others, the US Trustee, have an idea of

14  timing of when they have to act.  So let's -- we'll discuss

15  this then on the 31st.

16          All right.  I guess why don't we do it through Court

17  Solutions, make it easy so everybody can call in.

18          MR. PROL:  Thank you, Your Honor.

19          THE COURT:  All right.  Thank you all.  Have a good

20  holiday.

21          MR. CALHOUN:  You too, Your Honor.

22          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

23          THE COURT:  You're welcome.

24                    *  *  *  *  *

25

CERTIFICATION

I, TERRI STARKEY, a certified electronic transcriber, certify that the foregoing is a correct transcript, to the best of the transcriber's ability, from the official electronic sound recording of the partial proceedings in the above-entitled matter.


/s/ Terri Starkey

TERRI STARKEY

J&J COURT TRANSCRIBERS, INC.      Date:  May 23, 2019