

## VERIFICATION OF PUBLICATION

**COMMONWEALTH OF VIRGINIA**
**COUNTY OF FAIRFAX**

Being duly sworn, Vanessa Salvo says that she is the principal clerk of USA TODAY, and is duly authorized by USA TODAY to make this affidavit, and is fully acquainted with the facts stated herein: on **Thursday, January 28, 2021**, the following legal advertisement – **Duro Dyne National Corp.** – was published in the national edition of USA **TODAY**.

_____
Principal Clerk of USA TODAY
January 28, 2021

# USA AND MAIN

# Drive-in owner projected success



**A food truck serves refreshments to moviegoers at the Admiral Twin Drive-In.** PHOTOS BY JACOB HIGHTOWER FOR USA TODAY



**Blake Smith, owner of the Admiral Twin Drive-In and Starlite Drive-In movie theaters in Oklahoma and Kansas, turned to older movies to attract customers during the pandemic.**

### Old movies, events helped venues adapt

**Aimee Picchi and Andrea Kramar**
Special to USA TODAY

The pandemic created a pair of problems for the Admiral Twin Drive-In, a historic movie theater built in 1951 in Tulsa, Oklahoma.

For starters, the theater was shuttered for two months beginning in mid-March, only a few weeks after it had opened for its 2020 season, during the nationwide lockdown amid the pandemic's first wave. Next, Hollywood delayed many major film releases – usually a major driver of ticket sales for movie theaters, recalls owner Blake Smith, 54.

Once the lockdown lifted, Smith had to figure out how to provide entertainment when there weren't many new films. In a typical year, he says, "it would've been a real disaster for me."

Smith, who owns a second theater he bought in 2019, the Starlite Drive-In based in Wichita, Kansas, says he adapted to the challenges by finding creative strategies that allowed his theaters to thrive despite the pandemic. It's a common theme among small-business owners during a crisis that sent shockwaves through the economy. Many pivoted by investing in new technology, such as digital payment systems, or by stocking up on goods to avoid shortages, a survey in July from the U.S. Chamber of Commerce found.

"If you're a small-business owner, I think you've got to really open your eyes and listen to what's going on and make the best decision for your business," Smith says.

Smith listened to his customers and realized that people wanted to be entertained – especially after the nationwide lockdowns last spring. "You can only sit in your house for so long," he points out.

To attract moviegoers, Smith turned to older movies – airing retro films such as 1985's "The Goonies" and 1983's "The Outsiders" last summer and fall. The latter film has a special place in the Admiral Twin Drive-In's history, since one of the movie's scenes was shot at the drive-in.

"That's really our claim to fame. We still get a lot of people that come out here just to take pictures," Smith says.

Smith says he booked special events such as concerts and religious services, and clients sought out his venue because of concerns about indoor events and the risk of infection.

"I had three or four different churches that were doing something every Sunday," Smith recalls.

Though it wasn't the type of season that Smith had envisioned for his business, he says 2020 ended up being a stronger year for the Admiral Twin Drive-in, partly because of the economics of airing old movies and hosting events. Older films are less expensive to air than first-run movies, which require a larger payout to movie studios. Revenue from events "went to the bottom line pretty fast," he says.

Drive-in movie operators were able to pivot during the pandemic because of the nature of their industry: They operate outdoors, where there's plenty of space between cars. Indoor movie theaters struggled to adapt, given concerns about exposure to the coronavirus, as have other businesses reliant on indoor or in-person services, such as restaurants and bars.

It's a change of fortune for the drive-in movie theater industry, which has shrunk from 447 locations in 1999 to 305 today, according to the United Drive-In Theatre Owners Association.

"Who would have known the drive-in would become cool again in 2020 during such a hard time," Smith says.

# Secret ingredient can create 'clickable' content

### Emotion plays a key role in making a connection



**Steve Strauss**
Columnist
USA TODAY

How do you create content that gets clicks?

There was a time, not so long ago, when we pundits had the content business all to ourselves. Man, those were the days.

That's a quaint notion now.

Almost everyone creates content of one type or another – whether it's blogs, infographics, videos, newsletters, podcasts, articles or social media updates. Businesses have the same goals in mind – to get people to click and engage with their content.

As marketing specialist Guy Kawasaki said, retweets (sharing on Twitter) are social media gold.

Having been in the business of creating content for quite a while, I thought I had a pretty good grasp of the answer to the question that I posed at the top – how to create clickable content.

Though true, I learned a new trick that you need to hear about.

Clickable, sharable content informs or entertains, yes, but it also should be unexpected. Whether it's a clever headline or an emotional hook or an incredible visual or a tidbit out of left field, the trick is to get noticed among the noise, then say something people feel compelled to share.

On my site TheSelfEmployed, the most popular article I ever wrote was "The 5 Guys Trick that Will Blow Your Mind (and Sales!)" It hit all the right marks. Unexpected, intriguing, valuable, relatable.

But, as indicated, there has to be one more ingredient to make that piece of content really stand out: It should be emotional.

I attended a marketing conference, and this last point was really driven home by an executive from National Geographic.

Like you, I am sure, I love NatGeo. For some of us, it is because we grew up on its iconic magazine. For others, it's the great television programing – the National Geographic channel or its sister station, NatGeo Wild.

Certainly, National Geographic is doing something right online. In 2019, it became the first brand to top 100 million followers on Instagram.

What the representative from NatGeo shared with me was that the thing that really works is creating content that:

● Is of high quality and authentic.
● Resonates emotionally with people.
● Bingo.

Quality, authentic content that strikes an emotional chord is the secret formula.

This is a key insight for small business. You need to create valuable content that speaks to your tribe, and it needs to be unique and intriguing. The secret sauce is when you mix all of that with a heaping teaspoon of real emotion.

Do that, let the cake bake, and you will create a tasty morsel that will be enjoyed, clicked and shared for years.

*Steve Strauss is an attorney, speaker and the author of 17 books, including "The Small Business Bible." You can learn more about Steve at MrAllBiz.com, get more tips at his site TheSelfEmployed and connect with him on Twitter @SteveStrauss and on Facebook at TheSelfEmployed.*

*The views and opinions expressed in this column are the author's and do not necessarily reflect those of USA TODAY.*



**Unexpected content gets clicks.** GETTY IMAGES

## MARKETPLACE TODAY

For advertising information: 1.800.397.0070   www.russelljohns.com/usat

### NOTICES
### LEGAL NOTICE

**UNITED STATES BANKRUPTCY COURT, DISTRICT OF NEW JERSEY**
In re: Duro Dyne National Corp., et al.[1] Debtors.
Chapter 11
Case No. 18-27963 (MBK)
(Jointly Administered)

**NOTICE OF (A) ENTRY OF ORDER (I) APPROVING AND ADOPTING THE BANKRUPTCY COURT'S AMENDED REPORT AND RECOMMENDATION AND (II) CONFIRMING THE THIRD AMENDED PRENEGOTIATED PLAN OF REORGANIZATION FOR DURO DYNE NATIONAL CORP., ET AL. PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE, AS MODIFIED AND (B) OCCURRENCE OF EFFECTIVE DATE**

PLEASE TAKE NOTICE OF THE FOLLOWING:

1. **Confirmation of the Plan and Effective Date.** On October 23, 2020, the United States District Court for the District of New Jersey entered the Order (I) Approving and Adopting the Bankruptcy Court's Amended Report and Recommendation and (II) Confirming the Third Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al. Pursuant to Chapter 11 of the Bankruptcy Code, as Modified (the "**Confirmation Order**") [Docket No. 1322] confirming the Third Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al., Under Chapter 11 of the Bankruptcy Code, as Modified (the "**Plan**") [Docket No. 729].[2] On December 31, 2020, the Effective Date of the Plan occurred. The Confirmation Order, the Plan, the Plan Supplement and the other documents filed in these cases, are available free of charge at https://bmcgroup.com/durodyne or for a nominal fee (with use of a PACER account) at https://ecf.njb.uscourts.gov/.

2. **Administrative Claims Bar Date.** Except as otherwise provided in the Plan, all parties seeking payment of an Administrative Claim (other than a Professional Claim) must file and serve a request for payment of such Administrative Claim so as to be received on or before 4:00 p.m. ET on **March 1, 2021**. *Failure to comply with the Administrative Claims Bar Date shall forever bar the holder of an Administrative Claim (other than a Professional Claim) from seeking payment thereof.*

3. **Rejection Damages Bar Date.** If the rejection of a contract or lease pursuant to the Plan results in damages to the non-Debtor counterparty, any claim for damages will forever be barred unless a proof of claim is filed and served on or before 30 calendar days after the Bankruptcy Court's entry of an order authorizing the rejection.

4. **Injunctions.** The Plan provides for the issuance of Injunctions under Bankruptcy Code §§ 105(a) or 524(g) that will, among other things, result in the channeling of certain asbestos-related liabilities of the Debtors (excluding liabilities for worker compensation claims) to a newly created Asbestos Trust, as more fully described in the Plan. Except as expressly permitted under the terms thereof, the Injunctions prohibit any acts to collect, recover, or offset any asbestos-related liabilities of the Debtors against any Debtor, the Reorganized Debtor, certain third parties, and various persons or entities related to such parties. On the Effective Date, all Channeled Asbestos Claims are channeled to the Asbestos Trust pursuant to the Asbestos Permanent Channeling Injunction, and will be resolved, liquidated, and (if entitled to payment) paid in accordance with the Asbestos Trust Agreement and the Trust Distribution Procedures ("**TDP**").

(a) **Asbestos Permanent Channeling Injunction.** As more fully described in the Plan and the Confirmation Order and except as otherwise provided therein, on and after the Effective Date, all Entities that have held or asserted, or hold or assert, or may in the future hold or assert any Channeled Asbestos Claim against one or more of the Protected Parties as defined in the Plan are permanently stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery on account of any Channeled Asbestos Claim.

(b) **Settling Asbestos Insurer Injunction.** As more fully described in the Plan and the Confirmation Order and except as otherwise provided therein, on and after the Effective Date, all Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any Asbestos Insurance Policy Claim are permanently stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery on account of any such Asbestos Insurance Policy Claim or against any Settling Asbestos Insurer, only to the extent that such Settling Asbestos Insurer has been released from any claim under one or more Asbestos Insurance Policies in accordance with one or more Asbestos Insurance Settlements.

(c) **Asbestos Insurer Injunction.** As more fully described in the Plan and the Confirmation Order and except as otherwise provided therein, on and after the Effective Date, all Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any Asbestos Insurance Policy Claim or Channeled Asbestos Claim are permanently stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery on account of any such Asbestos Insurance Policy Claim or Channeled Asbestos Claim from or against any Asbestos Insurer.

(d) **Discharge Injunction.** As more fully described in the Plan, the Plan Documents and the Confirmation Order and except as otherwise provided therein, the discharge set forth in the Plan operates as an injunction pursuant to Bankruptcy Code §§ 105(a), 524(a), and 1141(d) prohibiting and enjoining the commencement or continuation of any action, the employment of process, or any act to collect, recover from, or offset (a) any Claim against or interest in any of the Debtors or the Reorganized Debtor by any Entity, and (b) any cause of action, whether known or unknown, against the Debtors or the Reorganized Debtor arising out of, attributable to, or based on any Claim or interest described Plan § 9.04(a).

Dated: January 15, 2021, **LOWENSTEIN SANDLER LLP**, */s/ Jeffrey D. Prol*, Kenneth A. Rosen, Esq., Jeffrey D. Prol, Esq., One Lowenstein Drive, Roseland, New Jersey 07068, (973) 597-2500 (Telephone), (973) 597-2400 (Facsimile), *Counsel to the Debtors and Debtors-in-Possession*

[1] The Debtors in these chapter 11 cases (the "**Chapter 11 Cases**"), along with the last four digits of each Debtor's tax identification number, are: Duro Dyne National Corp. (4664); Duro Dyne Machinery Corp. (9699); Duro Dyne Corporation (3616); Duro Dyne West Corp. (5943); and Duro Dyne Midwest Corp. (4662).

[2] Capitalized terms used but not defined herein have the meanings assigned to them in the Confirmation Order or, if not used therein, in the Plan.

## GET NOTICED!
Advertise in USA TODAY's Marketplace!
Call: 1-800-397-0070